

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed June 15, 2005

United States Bankruptcy Judge

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| MIRANT CORPORATION, *et al.*, | § | Case No. 03-46590-DML |
| | § | (Jointly Administered) |
| Debtors. | § | |

### MEMORANDUM OPINION

Before the court is the issue of whether certain discovery sought by Debtors with respect to Troutman Sanders LLP ("Troutman") is barred by attorney-client privilege.[1] This matter was initiated by a motion (the "Motion") filed by Debtors seeking (1) examination of Troutman pursuant to FED. R. BANKR. P. 2004; (2) production of documents by Troutman; and (3) turnover of records to Debtors by Troutman pursuant to section 542(e) of the Bankruptcy Code[2] (the "Code"). The Motion was joined by the

___

[1] To the extent the Motion presents other issues (other than the requirement of a subpoena), the court has already addressed those issues in its Memorandum Opinion dated June 1, 2005, In re Mirant, identified as docket number 9977 on the docket report for case number 03-46590-DML-11 (the "Goldman Sachs Opinion"), the reasoning of which is adopted herein.

[2] 11 U.S.C. §§ 101-1330 (2005), *amended by* 11 U.S.C. §§ 101-1532 (as enacted Apr. 20, 2005).

Official Committee of Unsecured Creditors of Mirant Corp. (The "Corp. Committee"). It was opposed by Troutman and The Southern Company ("TSC").[3] The court heard argument on the Motion on May 26, 2005, and granted Debtors some relief.[4] The court also invited briefs from the parties on the issue of whether TSC's attorney-client privilege with Troutman prevents disclosure to Debtors by Troutman of certain confidences. Troutman, TSC, Debtors and the Corp. Committee have submitted post-hearing briefs.

This matter is a contested matter subject to the court's core jurisdiction. 28 U.S.C. §§ 1334(a) and 157(b)(2)(B). This memorandum opinion represents the court's findings and conclusions. FED. R. BANKR. P. 7052 and 9014.

## I. Background

Prior to 2001, Debtors (with inconsequential exceptions) were part of the TSC corporate family. On April 17, 2000, TSC announced publicly its intention to divest itself of Mirant Corp. ("Mirant," at that time known as Southern Energy, Inc.),[5] parent of the other Debtors. In November of 2000, in furtherance of that purpose, TSC offered 20% of the stock of Mirant to the public. In April of 2001, TSC completed the divestiture by issuing the balance of Mirant's stock as a tax-free dividend to the shareholders of TSC.

---

[3] The Official Committee of Equity Security Holders filed a limited objection to the Motion which is not germane to the issue now before the court.

[4] The court entered two orders on the Motion on June 6 and June 7. The June 6 Order appears to have been entered in error, and does not reflect the court's oral rulings. *See* Transcript of Proceedings relating to the Motion, dated May 26, 2005 (hereafter "TR. [page]:[lines]"), pp. 37 *et seq.* Accordingly, the June 6 order will be VACATED.

[5] The court will hereafter refer to this Debtor as Mirant even when discussing a time before the name change.

Throughout this process, Troutman represented both Mirant and TSC (and continued to represent both corporate families generally following completion of the divestiture in April 2001). During the period beginning with TSC's formation of its intent and ending with its spin-off of Mirant stock, TSC and Mirant had a number of common officers and directors. Although the overlap of boards of directors apparently ceased after April 2001, management of Mirant (and some board seats) continued to be controlled by persons who had served in management positions at TSC.[6]

In anticipation of divestiture, Steve Wakefield ("Wakefield"), general (in-house) counsel for TSC, issued a memorandum on March 24, 2000, directing that both TSC and Mirant would use Troutman as their law firm advising on the divestiture. In November 2000, Troutman, TSC and Mirant entered into a Protocol for Legal Representation (the "Protocol").[7] The Protocol provides in part (at p. 2), "[a]s to all matters and at all times, [Troutman] will protect the confidences of each Client and take whatever measures are necessary to assure that confidential information is not shared with the other Client." Troutman is also authorized in the next paragraph of the Protocol to give advice to each of TSC and Mirant regarding the divestiture "even if the advice is adverse or perceived to be adverse to the interest of one of them." TSC and Mirant also entered into separation agreements, but these have not been presented to the court, and it is not clear when they were executed or became effective. See Troutman's post-hearing brief, p.7, n. 5

---

[6] Former Troutman attorneys also served – and continue to serve – in in-house positions at both Mirant and TSC.

[7] The Protocol was executed by Troutman on November 3, by TSC (through Wakefield) on November 3 or 6 and by Mirant Corp. by Douglas Hill, its general counsel, on November 15.

(contrary to Debtors' position, the separation agreements "were signed and became effective before the" public offering of Mirant stock; emphasis omitted).[8]

In July of 2002, Mirant entered into an engagement letter with Troutman. The engagement letter (in Attachment C) recognizes Troutman's conflicts with Mirant Corp. in the divestiture (item 5) and "[a]ll other matters covered by" the Protocol (item 8). Pursuant to the engagement letter, Troutman continued to serve as principal outside counsel for Mirant.[9] It also continued (and continues) to act as TSC's principal outside counsel.

Following divestiture, Mirant encountered financial difficulties. By late 2002, it was clear that Mirant would have to restructure its debt to survive as a going concern. When an out-of-court restructuring failed, on July 14 and 15, 2003, Mirant and 74 of its subsidiaries filed Chapter 11 petitions in this court. Eight additional subsidiaries have since filed Chapter 11 petitions.

From early in these Chapter 11 cases there has been controversy over transactions entered into between TSC and Mirant prior to and during the divestiture. Because limitations stand to run for some causes of action in Debtors' cases on the second anniversary of the Chapter 11 filings (*see* Code §§ 108(b) and 546(a)(1)), the court, concerned that Debtors' investigation of potential claims against TSC not run up against limitations, referred to Hon. Steven A. Felsenthal, Chief Judge, determinations respecting standing to investigate and prosecute claims against TSC. The court's action was

---

[8] If the agreements effected the separation of Mirant and TSC, then it clearly would be true that, thereafter, disclosures to TSC's board of directors (including some of Mirant's directors) would not be subject to any special rule governing the relationship of parent and subsidiary.

[9] Though Troutman stated otherwise on May 26, its representation of Debtors (for transitional purposes) continued post-petition, and this court entered its order on November 13, 2003, authorizing payment to Troutman in the amount of $205,681.23.

apparently timely, as a flurry of discovery on the eve of limitations has led to the court hearing two motions to compel in addition to the Motion.[10]

## II. Issue

It is in this context that the court must determine what documents and what testimony are not discoverable from Troutman by Debtors by reason of any assertion of attorney-client privilege by TSC.[11] To the extent TSC or Troutman has raised other objections to production or testimony by Troutman, except for Troutman's assertion that it must be subpoenaed,[12] the objections are overruled for the reasons stated on the record on May 26 or given in the Goldman Sachs Opinion.

## III. Discussion

It is well established that, in a case of a joint representation of two clients by an attorney, one client may not invoke the privilege against the other client in litigation between them arising from the matter in which they were jointly represented. *See Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co. of Del.*), 285 B.R. 601, 612 (D. Del. 2002) ("Generally, where the same lawyer jointly represents two clients with respect to the same matter, the clients have no expectation that their confidences . . . will remain secret from each other, and those confidential communication [sic] are not within the privilege in subsequent adverse

---

[10] *See* Goldman Sachs Opinion, which addressed Debtors' request for discovery from Morgan Stanley & Co. Incorporated, as well as Goldman Sachs Group, Inc. An additional motion to compel directed to Arthur Andersen & Co. was not actively contested.

[11] In reviewing the May 26 transcript, it appears the court may have left the impression that there would be a further hearing on the privilege issue (TR. 40:7-13). Having reviewed the briefs of TSC, Troutman, Debtors and the Corp. Committee; having studied the documents; and having read the authorities, the court does not believe a further hearing is necessary or would be productive.

[12] The court does not express an opinion regarding the need for issuance of a subpoena prior to Troutman's compliance with the court's orders.

proceedings between the co-clients.") (*quoting Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663, 670 (N.Y. 1996)); *Bass Pub. Ltd. Co. v. Promus Cos. Inc.*, 868 F.Supp. 615, 620 (S.D.N.Y. 1994) ("Where there is a joint attorney-client privilege, there is no expectation that confidential information will be withheld from joint clients as there is no privilege between them."); *E. F. Hutton & Co., Inc. v. Brown*, 305 F.Supp. 371, 393 (S.D. Tex. 1969) ("[I]nformation imparted to the common attorney relating to the subject of the joint representation is imparted for the mutual benefit of all the joint clients and is therefore not privileged against any of them."); *SIPA Prot. Corp. v. R.D. Kushnir & Co.*, 246 B.R. 582, 588 (Bankr. N.D. Ill. 2000) ("[A]ccording to some decisions, because co-clients cannot reasonably expect that their common lawyer will withhold information from other co-clients . . . those confidential client communications are not privileged in subsequent litigation in which the interests of the former co-parties become adverse . . . ."); *Yorke v. Santa Fe Indus., Inc.* (*In re Santa Fe Trail Transp. Co.*), 121 B.R. 794 (Bankr. N.D. Ill. 1990) (former parent corporation could not use claim of privilege to prevent discovery by former subsidiary corporation where former parent corporation's in-house legal department represented both parties in sale of stock of former subsidiary corporation).

The Court of Appeals for the Fifth Circuit has spoken clearly to the issue before the court, if not on identical facts. *See Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979) ("Assuming the prior representation was joint, defendants are quite correct that neither of the parties to this suit can assert the attorney-client privilege against the other as to matters comprehended by that joint representation."); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970), *cert. denied* 401 U.S. 974 (1971),

("In many situations in which the same attorney acts for two or more parties having a common interest, neither party may exercise the privilege in a subsequent controversy with the other.").

In the case at bar, the law of Georgia would apply to define the relationship between Debtors and Troutman and between Troutman and TSC.[13] The lawyers – so far as this court can tell – were licensed in and rendered their services and advice largely in Georgia. Thus, if TSC is entitled to invoke with Troutman the attorney-client privilege as to Debtors' discovery, it must do so under Georgia law.[14]

The Georgia courts have consistently taken the same view as the other authorities cited: that counsel who represents two clients in the same matter cannot keep confidences of one respecting the matter from the other. *Scoggins v. Powell, Goldstein, Frazer & Murphy* (*In re Kaleidoscope, Inc.*), 15 B.R. 232, 244 (Bankr. N.D. Ga. 1981) ("[T]he court believes that with regard to legal files created . . . during the course of joint representation . . . the entire contents of those legal files belong jointly to the clients in question, with each having an undivided ownership interest in, and equal right of access to, all of those files.") *rev'd on other grounds* 25 B.R. 729 (N.D. Ga. 1982); *Gearhart v. Etheridge*, 208 S.E.2d 460, 462 (Ga. 1974) ("If two or more persons jointly consult an attorney for the purpose of having him prepare a deed or contract for them, the communications which either makes to the attorney are not privileged in the event of any subsequent litigation between the parties.") (*quoting* Green, Georgia Law of Evidence, §

---

[13] TSC argues that federal common law governs privilege. TSC post-hearing brief, p. 5. The court disagrees but would reach the same conclusion if federal common law controls.

[14] *See* Resolution Trust Corp. v. H____, P.C., 128 F.R.D. 647 (N.D. Tex. 1989), in which the court so applied Texas Law. *But see* Glidden Co. v. Jandernoa, 173 F.R.D. 459 (W.D. Mich. 1997), in which the Magistrate Judge applied Delaware law in determining whether to grant a motion to compel directed against the Grand Rapids, Michigan attorneys.

185 (1957)); *Peterson v. Baumwell*, 414 S.E.2d 278, 280 (Ga. Ct. App. 1991) (same); *see also Atwood v. Sipple*, 357 S.E.2d 273, 276 (Ga. Ct. App. 1987).

Troutman responds to this wealth of authority, first, by arguing a subsidiary (Mirant) and its officers and directors must act for the sole benefit of the parent (TSC). Since this rule, according to Troutman, means any and all duties were owed to TSC alone by Mirant and its officers and directors until the sale of 20% of Mirant Corp. stock, Troutman reasons "there can be no lawful or permissible adverse interest between a wholly-owned subsidiary and its parent." (Troutman's post-hearing brief, p. 3).

For this proposition, Troutman cites *Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 545 A.2d 1171 (Del. 1988). Leaving aside Troutman's overly-broad reading of *Anadarko* (the court held that directors of a parent owed no fiduciary duty to prospective shareholders of the subsidiary prior to a spinoff, not that the subsidiary's directors owed no duty to the subsidiary), and even assuming that Troutman's reading is correct (*See*, however *Valente v. Pepsico, Inc.*, 68 F.R.D. 361 (D. Del. 1975)),[15] the decision is wholly inapposite to the case at bar. First, the very types of action against TSC that are contemplated are in the nature of fraudulent transfers, fraud and *alter ego*. The first and, for some purposes, the others, presuppose or implicate the insolvency of Debtors at the time of (and before) the spin-off. If Debtors were insolvent, the duty of directors to the shareholder was superceded by a duty to creditors. *See Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co. of Del.*), 280 B.R. 90, 92 (D. Del. 2002) ("[I]t is well-established that creditors are owed fiduciary duties in the zone of insolvency . . . .") (citations omitted); *Official Comm. of Unsecured Creditors v.*

---

[15] Troutman's argument also appears inconsistent with the existence of separation agreements. Once Mirant and TSC agreed to be "separate," it is questionable whether the normal rules of parent-subsidiary relations should apply.

Page 8 of 15

*Lozinski* (*In re High Strength Steel, Inc.*), 269 B.R. 560, 569 (Bankr. D. Del. 2001) ("Under Delaware law, once a corporation becomes insolvent, its officers and directors owe unsecured creditors a fiduciary duty. That fiduciary duty requires that the controlling shareholder(s) and director(s) of the debtor maximize the value of the assets for payment of unsecured creditors.") (citations omitted); *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 790-91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors.").

Second, *Anadarko* is easily distinguishable from the case at bar. The issue before the court in *Anadarko* was whether the contracts by which the subsidiary was separated from its parents were to be tested on the basis that the parent's directors owed a fiduciary duty to the subsidiary's prospective shareholders. Had such a duty existed, the contracts would have to have been "entirely fair" to the subsidiary for the parent to escape liability – a virtually impossible standard according to the court. *Anadarko*, 545 A.2d at 1174.

Troutman next argues that, under *Glidden*, TSC's privilege may be asserted to block Debtors' discovery. *Glidden*, however, does not support Troutman. *Glidden* involved a management buyout of a subsidiary which the parent thereafter attacked. The parent sought discovery from counsel who had represented management in the buyout and was general counsel to the subsidiary. *Glidden* does not stand for the proposition that a subsidiary jointly represented with a parent may be denied access to confidences between the parent and counsel. Indeed, the Magistrate Judge (applying Delaware law to construe the attorney-client relationship) noted (173 F.R.D. at 473), "[n]umerous courts have recognized that, for purposes of the attorney-client privilege, the subsidiary and the

parent are joint clients, each of whom has an interest in the privileged communications." Even if the court were bound by *Glidden*, there is nothing in *Glidden* that would require that the court deny the Motion on the basis of attorney-client privilege.

Next, Troutman points to the Protocol. This document, Troutman claims, is an agreement to limit the right of each of Mirant and TSC to see confidential documents of the other. However, even assuming such an agreement would be effective in the present situation, there is nothing in the Protocol that speaks to attorney-client privilege. Even in the case of joint defense agreements, attorney-client privilege may not be used to limit discovery in a subsequent dispute between the agreeing parties. *See Beneficial Franchise Co., Inc. v. Bank One, N.A.*, 205 F.R.D. 212, 216 (N.D. Ill. 2001) ("[T]he joint defense privilege cannot be waived without the consent of all parties to the defense, except in the situation where one of the joint defendants becomes an adverse party in a litigation.") (*quoting Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980)); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 213 B.R. 433, 440 (Bankr. S.D.N.Y. 1997) (granting trustee's request for discovery under Rule 2004 against party asserting privilege pursuant to alleged prior joint defense agreement with debtor because "[t]he trustee should not be stymied in uncovering the facts by the existence of a joint defense privilege which would evaporate were he or she only to file a complaint."); *In re Mich. Boiler & Eng'g Co.*, 87 B.R. 465, 471 (Bankr. E.D. Mich. 1988) ("The joint defense privilege protects the statements from disclosure to third parties. The statements, however, are not protected from disclosure in a subsequent dispute between the clients.") (citations omitted).

The court previously had also expressed concern that the Protocol, whatever its facial value, was entered into when Mirant was still under the control of TSC. Troutman argues, however, that Mirant ratified the Protocol in the engagement letter of July 1, 2002. The court does not find any specific ratification of the Protocol in the engagement letter. Moreover, Mirant's in-house general counsel had ties to TSC and Troutman and, at least arguably, an interest in maintaining the validity of the transactions involved in the divestiture. The court will not speculate on these (and other[16]) motives that may have led to the engagement letter. Rather, the court holds that, in any case, the Protocol does not provide either Mirant or TSC with any privilege beyond that which exists in an ordinary joint representation; to extend special protection to TSC by reason of either the Protocol or the engagement letter would be contrary to the public policy considerations discussed below.

Finally, Troutman includes (Troutman's post-hearing brief, pp. 10-11) a list of matters as to which it might provide testimony or documents. It suggests that this list demonstrates how innocuous was the firm's relationship with Mirant. The court cannot accept this list as conclusive of anything. Even if accurate, the list does not present an independent reason for denying the Motion.

For its part, TSC argues that Troutman's representation relating to the public offering and spin-off in no way constituted a joint representation of TSC and Mirant. TSC points to the Protocol as providing implicit evidence that no joint representation occurred. However, as the court has already noted, the Protocol specifically provided for the rendering of advice by Troutman to both TSC and Mirant, even when such advice

---

[16] For example, the engagement letter may have been a necessary precondition to Mirant's continued retention of Troutman or the special rates reflected in the engagement letter. The court does not suggest that any of these motives would be necessarily actionable or wrongful.

might be adverse to one or the other. Furthermore, TSC's argument is undermined by the March 24, 2000 Wakefield memorandum in which Wakefield directed Troutman be used as counsel by both Mirant and TSC. In that memorandum, Wakefield also states that Troutman attorneys "are representing the enterprise and understand that their role is not to be an advocate for either side, but rather to provide objective legal advice and to document agreements reached between executives." The words of TSC's own in-house counsel indicate that Troutman did not act on behalf of TSC and Mirant separately, but rather acted as counsel to both in the transactions between them. The court thus finds that Troutman's participation in the transactions constituted joint representation of TSC and Mirant, and nothing contained in the Protocol dictates a contrary finding.[17]

TSC also argues that Debtors are incorrect in their assertion that no attorney client privilege exists because knowledge gained by certain TSC directors in dealing with Troutman was imputed to Mirant where such directors also acted as directors for Mirant. TSC cites the court to *United States v. Bestfoods*, 524 U.S. 51 (1998) for the proposition that corporate law recognizes that directors sitting on the boards of a parent and a subsidiary represent the corporations separately. Although *Bestfoods* has nothing to do with issues of privilege, TSC argues that the reasoning of *Bestfoods* requires the court to draw the conclusion that a corporation does not lose its ability to assert a privilege simply because one or more directors acts as such for another entity in the corporate family. TSC cites the court to three other decisions in support of its conclusion: *Seltzer v. I.C.*

---

[17] The court also notes that much of the discovery sought by Debtors relates to matters and transactions (some concerning the divestiture of Mirant) which occurred prior to execution of the Protocol in November 2000. Even assuming the Protocol were effective to prevent certain discovery by Debtors, it would not be proper to deny Debtors comprehensive discovery concerning the many transactions which occurred prior to the time at which the relationship between Troutman, TSC and Mirant became governed by the Protocol.

*Optics, Ltd.*, 339 F.Supp.2d 601 (D.N.J. 2004); *Weintraub v. Texasgulf Inc.*, 564 F.Supp. 1466 (S.D.N.Y. 1983); *In re Fin. Corp. of Am.*, 119 B.R. 728 (Bankr. C.D. Cal. 1990). None of these cases effectively rebuts Debtors' arguments.

*Seltzer* dealt with the issue of whether the mere existence of overlapping directors is sufficient to establish domination of a subsidiary by a parent for purposes of an *alter ego* analysis, not whether the presence of overlapping directors has any impact on a privilege analysis. *Weintraub v. Texasgulf Inc.* addressed whether, in a Rule 10b-5 action, knowledge of plans for a takeover of a corporation could be imputed to that corporation (for purposes of establishing liability to a plaintiff shareholder) because some of its directors sat on the boards of the entities which purchased it. Again, this case does not address the issue of imputation of knowledge and its effect on privilege in the context of overlapping directors within the same corporate family. *In re Fin. Corp. of Am.* is off point as well. This case holds that at a parent corporation's meeting of officers or directors, at which officers or directors are present who also serve as officers or directors for subsidiaries, such overlapping directors are not "relegated to the status of third parties" (119 B.R. at 737) such that a waiver of privileged communications results. *In re Fin. Corp. of Am.* does not address Debtors' argument that any privilege that may exist is rendered unenforceable by the presence of overlapping directors working on inter-corporate family transactions for which there is joint representation by one law firm.

Even were there merit in the arguments of Troutman and TSC, the court would be most reluctant to deny Debtors the requested discovery for reasons of public policy. It is black-letter law that the attorney-client privilege is meant to foster open communications between attorney and client. *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)

("The privilege is intended to encourage 'full and frank communication between attorneys and their clients . . . .'") (*quoting Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)); *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997) (same). Neither Troutman nor TSC can show any reasonable basis for supposing enforcement of TSC's privilege in the case at bar would advance that goal. In a bankruptcy case, the need for investigation is far more acute than is any concern for attorney-client communications. *Compare Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)[18]. Whatever the facts involving TSC's ownership and divestiture of Mirant are, and the court has certainly reached no conclusions, it would be a bad precedent to carve in the case at bar a limitation on the usual rule respecting assertion of privilege in investigation of claims arising from transactions where common counsel was used.

Debtors, acting as fiduciaries for the benefit of their creditors, are pursuing an investigation which is important not only to those who may have lost money as a result of Debtors' demise. It is critical that both those who purchased Mirant's (and its

---

[18] In *Weintraub*, the Supreme Court found that an important goal of the bankruptcy laws – the uncovering of insider fraud through investigation by a trustee – would be frustrated if former officers and directors of a bankrupt corporation were allowed to retain control of the corporation's attorney-client privilege and use the same to prevent a trustee from gaining access to the corporation's legal files. *Id.* at 353. And, it has long been recognized that situations exist in which compelling reasons, such as the promotion of important public policy, require that a privilege give way in favor of disclosure. For example, in Clark v. United States, 289 U.S. 1 (1933), the Supreme Court stated:

> But the recognition of a privilege does not mean that it is without conditions or exceptions. The social policy that will prevail in many situations may run foul in others of a different social policy, competing for supremacy. It is then the function of a court to mediate between them, assigning, so far as possible, a proper value to each, and summoning to its aid all the distinctions and analogies that are the tools of the judicial process.

*Id.* at 13. *See also* United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 504 (2d Cir. 1991) ("The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose."); United States v. Skeddle, 989 F.Supp. 890, 900 (N.D. Ohio 1997) (same).

subsidiaries') securities and the public have confidence that potential liability of TSC (and Troutman) has been thoroughly explored. That Debtors sought chapter 11 relief less than two and one half years after TSC completed their divestiture is reason enough to raise concern that all might not have been right in the transactions between TSC and Mirant. Debtors' disputes with, *inter alia*, various California parties,[19] Potomac Electric Power Company ("Pepco")[20] and New York taxing authorities[21] all antedated divestiture or had their genesis in the period prior to divestiture. Given the short time between divestiture and commencement of these chapter 11 cases and given the pre-divestiture history of Debtors' problems, it is essential to the integrity of the chapter 11 process that no stone be left unturned in ensuring satisfactory completion of Debtors' investigation.

### IV. Conclusion

For the foregoing reasons, (1) this court's order of June 6, 2005 is VACATED; and (2) subject to the argument that a subpoena must be issued to Troutman , Debtors' Motion is hereby GRANTED as to (a) production of all documents and (b) oral examination of Troutman pursuant to FED. R. BANKR. P. 2004.

It is so ORDERED.

### ### END OF ORDER ###

---

[19] Debtors have been involved in litigation with a number of public, private and regulatory entities regarding Debtors' conduct in California during the periods in 2000 and 2001 when exceptionally high prices for wholesale electricity and natural gas prevailed in western power markets. *See* Mirant Form 10-K filed March 15, 2005, available online at www.mirant.com.

[20] Debtors have been involved in litigation with Pepco regarding Debtors' efforts to reject certain agreements entered into with Pepco in connection with Mirant's purchase of certain assets from Pepco in 2000. *See* Mirant Form 10-K filed March 15, 2005, available online at www.mirant.com.

[21] Debtors have been involved in litigation in various courts in New York regarding the proper assessment value and tax liability for certain power generation facilities located in New York. These proceedings involve disputes as to the proper assessment value and tax liability for years dating as far back as 1995. *See* Mirant Form 10-K filed March 15, 2005, available online at www.mirant.com.