

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed July 12, 2005                                      United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| Mirant Corporation, et al., | § § | Case No. 03-46590-DML-11 |
| | § | Jointly Administered |
| Debtors. | § | Chapter 11 |

**MEMORANDUM OPINION**

Before the court is Debtors Mirant Corporation's, Mirant Services, LLC's and Mirant Americas Energy Marketing, LP's Motion for Summary Judgment (the "Motion") by which Debtors seek disposition of Joseph T. Pokalsky's ("Pokalsky") claims. Pokalsky has filed his Response in Opposition to Debtors' Motion for Summary Judgment. The parties have briefed the issues to the court, and the court conducted a hearing on the Motion on March 9, 2005. The court has before it summary judgment evidence consisting of affidavits, depositions and documents, described as required below. This matter is subject to the court's jurisdiction pursuant to 28 U.S.C. §§ 1334(b)

Page 1 of 16

and 157(b)(2)(B) and (O). This memorandum opinion and order constitutes the court's findings and conclusions. FED. R. BANKR. P. 7052 and 9014.

## I. Background

On May 3, 1996, Pokalsky entered into an Employment Agreement with Southern Electric International, Inc. ("SEI").[1] Pursuant to the Employment Agreement, Pokalsky agreed to a term of employment of three years and was to receive (i) a base salary of $200,000.00 per year, (ii) guaranteed bonus payments of $200,000.00 per year on May 1 of 1997, 1998 and 1999, and (iii) other bonus payments governed by the Southern Energy Marketing Executive Incentive Pay Plan (the "Incentive Plan"). Among the bonuses provided to Pokalsky by the Incentive Plan was a Phantom Equity Grant (the "PE Grant"). This PE Grant was tied to certain percentage increases in the Fair Market Value ("FMV")[2] of SETM and vested as to Pokalsky (i) 25% at the end of 1997, (ii) 25% at the end of 1998, (iii) 25% at the end of 1999 and (iv) 25% at the end of 2000.

On February 13, 1998, Pokalsky attended a meeting with S. Marce Fuller ("Fuller") and Vance Booker ("Booker"), CEO and Vice President of Mirant,

---

[1] SEI subsequently changed its name to Southern Energy, Inc. and then, in 2001, became Mirant Corporation ("Mirant") through a spin-off of Mirant and its subsidiaries by The Southern Company. Pokalsky began his employment with SEI in the position of SEI's Vice President, Energy Trading and Marketing, and subsequently assumed the role of Vice President of Trading and Marketing of Southern Energy Trading and Marketing ("SETM"), a wholly-owned subsidiary of SEI operating in the electric power marketing business. In late 1997, SEI and Vastar Energy Resources ("Vastar") entered into a joint venture whereby SEI transferred electricity marketing interests held by SETM into a new entity known as Southern Company Energy Marketing ("SCEM") and Vastar transferred its gas marketing interests into SCEM. Following the formation of SCEM, employees of SEI assigned to work at SETM, including Pokalsky, resigned from SETM to accept positions with SCEM. On January 1, 1998, Pokalsky became Co-Managing Director of SCEM. The court does not believe the particular entity by which Pokalsky was technically employed is relevant to determination of the matters before the court. Therefore, the court will hereafter refer to Pokalsky's employer at all relevant times as Mirant for purposes of convenience.

[2] Pursuant to the Incentive Plan, the FMV was calculated by multiplying the company's EBIT, as defined in section 1.13 of the Incentive Plan, by a factor of ten.

respectively. At this meeting Pokalsky was informed that he was being removed from his current position and a discussion concerning the possibility of Pokalsky assuming a new position within Mirant to develop an international energy trading business ensued. The parties dispute whether the result of this meeting was a resignation by Pokalsky or a termination (without cause) by Mirant. Pokalsky alleges that he was terminated because, although discussion occurred regarding a new position, no formal offer was ever made. Mirant alleges that Pokalsky simply refused to consider a reassignment and thus made a unilateral decision to resign. On April 20, 1998, Mirant forwarded a letter to Pokalsky indicating that it accepted his resignation and would provide Pokalsky with severance pay in the total amount of $545,000.00. The lump sum paid to Pokalsky following his departure, according to Mirant's pleadings, was greater than $545,000.00 and consisted of (i) the $200,000.00 payments guaranteed for both May 1, 1998 and May 1, 1999, (ii) a $160,000.00 bonus for 1997, (iii) $66,000.00 in prorated salary and (iv) $10,000.00 in unused vacation pay.

Pokalsky claims that after the meeting on February 13, 1998, he was escorted off Mirant's premises by security personnel without being given an opportunity to retrieve certain personal belongings[3] from his office. Following his departure, Pokalsky made one or more requests that these belongings be returned to him. On September 14, 1998, Booker sent a letter to Pokalsky informing him that Mirant was unable to locate certain of the materials Pokalsky requested and that Mirant would send him a check if Pokalsky

---

[3] Pokalsky alleges his belongings include (i) some monthly issues of Energy Risk magazine, (ii) books published by Risk Publications, (iii) a Southern Company lapel pin, (iv) materials from a risk management conference in 1997 and (v) legal files.

Page 3 of 16

would place a reasonable dollar value on the materials. Pokalsky did not respond to Booker's request and the materials were not subsequently located or returned.

While Pokalsky was employed by Mirant, Mirant retained Energy Imperium ("EI") to produce a customized energy trading software system for use in Mirant's business. Pokalsky executed the agreement on behalf of Mirant. Donald Jefferis ("Jefferis") served as a consultant to Mirant and was then hired, *inter alia*, to implement the software system constructed by EI. Shortly after Pokalsky's employment with Mirant concluded, he was employed by EI. Pokalsky alleges that he was promised ownership of a percentage of the equity in EI upon becoming an employee.[4]

On July 17, 1998, representatives of Mirant and EI held a meeting to discuss the working relationship between the companies. Among the representatives present were Jefferis, Pokalsky and Ricardo Medina ("Medina"), President of EI. At the meeting, Mirant informed EI that it would require a representative of EI to work full-time on site at Mirant for EI to fulfill its obligations under their agreement. EI disagreed that this was necessary, and, shortly after the meeting began, the EI representatives terminated discussions and left the premises.

Immediately following the July 17, 1998 meeting, Jefferis forwarded a letter dated July 17, 1998 to Medina in which Jefferis stated Mirant's position that EI had materially breached the agreement between the parties and further directed Medina to vacate Mirant's premises and return all keys and electronic access cards to the same. In the letter, Jefferis stated that "Joe Pokalsky stated [at the meeting] that you would not

---

[4] In a deposition taken on January 10, 2001, Pokalsky stated that the agreement giving him ownership in the equity of EI was never consummated and that he could not remember the percentage promised him, but that it was greater than 10%. Pokalsky amended his deposition testimony on March 15, 2001 to indicate that he was to be given a 32% interest in EI. Pokalsky later stated in an affidavit dated January 7, 2005 that he had a 30% interest in EI.

provide the services during the hours and at the location set forth in the Memorandum" and that Pokalsky's assertions at the meeting concerning the intent of the parties at the time of execution of the agreement, being at that time employed by Mirant, "raises some issues regarding his interest in and duties to you and us at the time that he executed the referenced agreement."

At the time Pokalsky became employed by EI, EI was in negotiations with Altra Energy Technologies, Inc. ("Altra") for Altra's acquisition of EI. Following termination of the contractual relationship between Mirant and EI, Altra did in fact acquire EI, but at a purchase price of approximately half of what it had proposed prior to the dispute between Mirant and EI. The number of Altra shares distributed to the owners of EI was also significantly reduced from the number originally proposed.

Pokalsky filed a complaint (the "Complaint") in Georgia state court on April 14, 2000 (the "State Court Litigation") seeking recovery for, *inter alia*, (i) breach of contract based on Mirant's failure to make payments to Pokalsky on account of his PE Grant, (ii) injuries suffered as a result of defamatory statements made by Jefferis and (iii) conversion of the personal belongings not returned by Mirant to Pokalsky following his departure from the company. Mirant answered the Complaint and subsequently moved for summary judgment, which was granted in part and denied in part by order of the state court dated March 21, 2003.[5]

---

[5] The Georgia state court granted summary judgment in favor of Mirant on certain claims not before this court which were included in the Complaint. As to Pokalsky's claims for breach of contract for Mirant's alleged failure to compensate him for his PE Grant, defamation based on Jefferis's statements and conversion, the state court denied summary judgment in each instance. However, because no final judgment was entered in the State Court Litigation, the Georgia state court's order on Mirant's motion for summary judgment has no *res judicata* effect and is not binding on this court. *See* Nowell v. Fain, 330 S.E.2d 741, 743 (Ga. Ct. App. 1985) ("The grant of summary judgment constitutes final judgment only if it disposes of the entire case and the case is no longer pending in the court below."); *see also* O.C.G.A. § 9-11-54(b) (2004).

Beginning the evening of July 14, 2003 and continuing into the following morning, Mirant and 74 of its affiliates filed chapter 11 petitions in this court. The cases of all 75 Debtors were consolidated for administrative purposes by order entered on July 17, 2003. *See* FED. R. BANKR. P. 1015(b). Since then eight additional affiliates not affected by these proceedings have filed chapter 11 petitions. On November 24, 2003, Pokalsky filed three separate proofs of claim[6] seeking $10,000,000.00 - $15,000,000.00 in damages based on the causes of action asserted in the Complaint. Debtors filed their Consolidated Omnibus Objection to Proofs of Claim Filed by Freeman Mathis & Gary LLP on Behalf of Joseph T. Pokalsky (the "Objection") on October 17, 2004 and filed the Motion on December 30, 2004.

## II. Issues

The court must determine whether summary judgment may be granted to dispose of Pokalsky's claims for (i) breach of contract based on Mirant's failure to make payments to Pokalsky on account of his PE Grant, (ii) defamation based on oral and written statements made by Jefferis and (iii) conversion of the personal belongings not returned by Mirant to Pokalsky following his departure from the company.

## III. Standard for Summary Judgment

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). *Jenkins v. Chase Home Mortg. Corp.*, 81 F.3d 592, 595 (5th Cir. 1996). It is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[6] Pokalsky filed (1) proof of claim number 5356 against Mirant Americas Energy Marketing, LP, (2) proof of claim number 5357 against Mirant Services, LLC and (3) proof of claim number 5358 against Mirant.

with the affidavits, if any," when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Summary judgment is inappropriate when conflicting inferences and interpretations may be drawn from the evidence. *Askanase v. Fatjo*, 130 F.3d 657, 665 (5th Cir. 1997); *James v. Sadler*, 909 F.2d 834, 836-37 (5th Cir.1990). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247.

In making its determination, the court must draw all justifiable inferences in favor of the non-moving party. Id at 255. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," the non-movant must come forward, after adequate time for discovery, with significant probative evidence showing a triable issue of fact. FED. R. CIV. P. 56(e); *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue for trial. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). To defeat a properly supported motion for summary judgment, the non-movant must present more than a mere scintilla of evidence. *See Anderson*, 477 U.S. at 251. Rather, the non-movant must present sufficient evidence upon which a jury could reasonably find in the non-movant's favor. *Id.* at 1097.

## IV. Discussion

**A. Breach of Contract**

Pokalsky alleges that Mirant has breached the Employment Agreement by failing to compensate Pokalsky for his PE Grant. The Employment Agreement governs what distributions Mirant was required to make to Pokalsky upon termination of his employment. Section 8.c applies if Mirant terminated Pokalsky's employment without cause and provides that Mirant "shall pay Employee, in lump sum, any accrued but unpaid awards under the PE Grant . . . through the date of termination." Section 9 controls if Pokalsky resigned and states that "Employee shall be entitled to . . . any vested but unpaid amounts under the PE Grant . . . through the date of such termination in satisfaction of any and all amounts owing to Employee . . . under . . . the Incentive Plan."

As discussed above, Mirant and Pokalsky differ as to the nature of Pokalsky's termination. Mirant asserts that Pokalsky resigned and Pokalsky maintains that he was terminated without cause. The record contains sufficient evidence to support either view and a genuine issue of material fact thus exists,[7] the resolution of which is necessary before the court can reach the initial conclusion as to which section of the Employment Agreement Mirant may or may not have breached.

---

[7] Pokalsky's deposition testimony indicates that, while there was discussion of him filling another position within Mirant, no formal offer was ever made by Mirant. Furthermore, the position Mirant allegedly wanted Pokalsky to consider taking, according to the deposition testimony of Booker, did not exist at the time of Pokalsky's separation from Mirant. The court believes this evidence, *inter alia*, provides reasonable support for Pokalsky's interpretation of the events of February 13, 1998 and thereafter as a termination without cause. However, the court also finds evidence in the record supporting Mirant's contention that there was no intention to terminate Pokalsky. Such evidence includes other deposition testimony of Booker and a letter dated February 23, 1998 from Pokalsky to Booker in which Pokalsky, at the request of Booker, identifies and discusses certain issues relating to the new position Mirant alleges it intended to create for Pokalsky. Fuller also testified at her deposition that she expressly told Pokalsky at the February 13, 1998 meeting that he was not being terminated, but that Mirant simply wished to reassign him to a new position.

Even if the court were able to determine conclusively which section of the Employment Agreement applies to this dispute, summary judgment would still not be appropriate. The value of Pokalsky's PE Grant, if any, was tied to the FMV of SETM. Debtors have provided the court with evidence[8] indicating that, for the relevant time periods, Pokalsky's PE Grant had no value because the FMV was equal to zero. Pokalsky, on the other hand, has provided evidence[9] indicating that the FMV was greater than zero, thus entitling him to a distribution for his PE Grant. In viewing the record in a light most favorable to Pokalsky, the court concludes that Pokalsky has succeeded in putting forth evidence demonstrating that a genuine issue of material fact exists as to whether his PE Grant had a positive value at the time of his separation from Mirant. Accordingly, the Motion, as to Pokalsky's breach of contract claim, must be denied.

**B. Defamation**

Because Pokalsky was domiciled in Georgia at the time of the alleged defamation and because the alleged defamation occurred in Georgia, the court applies Georgia law to this claim. *See Levine v. CMP Publ'ns, Inc.*, 738 F.2d 660, 667 (5th Cir. 1984) (federal court must follow the choice of law principles of the forum state and "Texas has adopted the most-significant-relationship test for determining which state's law applies to a tort action"). Pokalsky's defamation claim is based on two categories of communication from Jefferis. The first concerns statements made by Jefferis in his July 17, 1998 letter to

---

[8] Such evidence includes the deposition testimony of Booker and Robert B. Cameron ("Cameron"), Compensation Director, and an affidavit of Cameron detailing Mirant's calculations of the value of Pokalsky's PE Grant.

[9] Such evidence includes the affidavit of Gary Morsches ("Morsches"), former COO of SCEM, in which Morsches states that he received value for his own PE Grant, including for the year 1998, in the form of Mirant stock options.

Medina. The other concerns oral statements allegedly made by Jefferis to individuals in the business community.[10]

Pokalsky's claim that Jefferis's July 17, 1998 letter to Medina was defamatory is based on the following two passages in that letter:

> At our meeting this morning, Friday, July 17, 1998, we perceived that each party fully understood the parameters, requirements and timing of the activities under the work plan for the last six (6) months of calendar 1998. However, Joe Pokalsky stated that you would not provide the services during the hours and at the location set forth in the Memorandum accompanying Scott Hobby's June 29, 1998 letter to John Fry.
>
> In response to our assertion that such refusal was a breach of the referenced agreement . . . Joe Pokalsky responded that regardless of the wording of the referenced agreement, the intent of that agreement was that we did not have the right to direct you as to where and when your services would be performed under that agreement. He bolstered his argument by asserting that he was the officer of Southern Energy Trading and Marketing, Inc. that executed the referenced agreement on behalf of that company. . . . Some minutes earlier to that assertion [sic], Joe Pokalsky also indicated that he is principal [sic] in Energy Imperium and accordingly, his later assertion raises some issues regarding his interest in and duties to you and us at the time that he executed the referenced agreement.

Under Georgia law, the above passages might arguably give rise to a defamation claim as either libel per se or libel per quod. *Zarach v. Atlanta Claims Ass'n*, 500 S.E.2d 1, 4-5 (Ga. Ct. App. 1998).

---

[10] Pokalsky alleges that Jefferis referred to him as a "straw man for a slave driver or a hard ass" in conversation with individuals in the business community. Pokalsky testified to this in his deposition, but could not identify any actual person to whom these comments were made. The court concludes that this is not sufficient evidence to warrant denial of the Motion as to this category of alleged defamatory remarks. Furthermore, these comments constitute subjective opinions expressed by Jefferis which are incapable of being proven as true or false, and cannot support a claim of defamation under Georgia law. *See* Webster v. Wilkins, 456 S.E.2d 699, 701 (Ga. Ct. App. 1995) ("A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be.") (*quoting* Kendrick v. Jaeger, 436 S.E.2d 92, 93 (Ga. Ct. App. 1993)).

Libel per se includes statements charging one with criminal guilt, dishonesty or immorality, or statements which tend to injure one in their trade or business. *Id.* at 5. In determining whether the statements contained in Jefferis's letter fall within any of these categories, the court cannot "hunt for strained constructions." *Id.* In the case at bar, none of the statements constitute libel per se and the court's conclusion would be no different even if it were permitted to hunt for strained constructions.

The first passage, alleging that Pokalsky stated, in essence, that EI would not honor its obligations, is no more than a statement reflecting Jefferis's interpretation of Pokalsky's comments at the July 17, 1998 meeting. The second passage also cannot constitute libel per se because "[t]he distinction between . . . libel per se and . . . libel by use of words of covert meaning is that in the former no innuendo need be alleged, the words themselves, if in fact untrue, being a sufficient basis for the action . . . ." *Mathews v. Atlanta Newspapers Inc.*, 157 S.E.2d 300, 303 (Ga. Ct. App. 1967). The second passage contains no direct attack on Pokalsky's honesty or morality and does not assert that he is guilty of any crime. The court concludes that the use of innuendo would be necessary to find such a meaning in Jefferis's words. The court also concludes that Jefferis's statement that "some issues" regarding Pokalsky's interests and duties were raised by Pokalsky advocating an interpretation of an agreement (which he executed on behalf of Mirant) inconsistent with Mirant's reading of the agreement at the time of the meeting is not, on its face, a statement which would tend to damage Pokalsky in his business. Therefore, because Pokalsky has failed to present any evidence which would allow the court to conclude, without resort to strained construction or the use of

innuendo, that Jefferis's statements fit the definition of libel per se under Georgia law, summary judgment in favor of Mirant is warranted on this theory of defamation.

Pokalsky's defamation claims also cannot survive the Motion premised on a theory of libel per quod. In order to prevail in an action for libel per quod, Pokalsky must show special damages, i.e., loss of money or of "some other material temporal advantage capable of being assessed in monetary value."[11] *Zarach*, 500 S.E.2d at 5. Pokalsky claims that he suffered monetary injury from Jefferis's statements in connection with Altra's purchase of EI.

Pokalsky alleges that he was granted a percentage of the equity interest in EI when he began employment with EI and that he was to be compensated for this at the time Altra purchased EI.[12] Pokalsky also alleges that he was entitled to receive a cash payment, in addition to compensation for his equity interest in EI, upon Altra's purchase of EI. Pokalsky contends that Jefferis's statements (i) delayed the closing of Altra's purchase of EI, (ii) resulted in Altra purchasing EI at a significantly reduced price than it had previously offered, (iii) strained Pokalsky's business relationship with EI and (iv) ultimately caused Pokalsky to receive a number of shares in Altra that was one third less than what he was entitled to receive based on his equity interest in EI and caused the cancellation of the cash payment due to him at the Altra closing. The court need not

---

[11] Although Pokalsky claims that, due in part to Jefferis's statements, his confidence in his professional abilities has been shattered and he has suffered a diminished sense of self worth, "loss of peace of mind and similar 'wounded feeling' damages [are] not the types of damages giving rise to libel per quod." Jamison v. First Ga. Bank, 387 S.E.2d 375, 379 (Ga. Ct. App. 1989).

[12] As previously noted, Pokalsky has provided sworn testimony at different points in time that this equity interest was (i) greater than 10%, (ii) 32% or (iii) 30%. However, assuming that such an agreement existed, for whatever percentage it may have been, such agreement was apparently never reduced to writing and the court has no such agreement before it.

question the truth of any of the aforementioned occurrences; none can be said to be the result of Jefferis's words in the July 17, 1998 letter.

Pokalsky has failed to provide any evidence that the Altra closing was delayed, and the ultimate purchase price reduced, because of any statement made by Jefferis. Rather, the record demonstrates that the delay and reduction in purchase price were due to Mirant's termination of the agreement with EI. Jefferis's statements were simply an explanation of Mirant's position that EI had materially breached the agreement and why Mirant believed it was entitled to pursue the course of action it chose. The court finds it implausible to assume that if Mirant and EI had been able to resolve their differences and continue their working relationship following Jefferis's letter, that the purchase price paid by Altra for EI would have dropped in the manner it did. Rather, any delay in the Altra closing and the reduced purchase price were a direct result of EI losing, in Pokalsky's words in his deposition, Mirant as a "primary customer".

The court likewise concludes that Pokalsky has shown no evidence indicating that any strain between Pokalsky and EI following Jefferis's letter and any decision by EI to reduce Pokalsky's compensation at the Altra closing could be attributed to Jefferis's statements. Again, Jefferis's statements reflect his interpretation of Pokalsky's statements at the meeting, as a representative of EI, and why those statements justified Mirant's termination of its relationship with EI. If, as Pokalsky stated in his deposition, Medina informed Pokalsky that Pokalsky should bear responsibility for the collapse of the relationship between Mirant and EI and thus reduced the compensation Pokalsky should have received at the Altra closing, and Pokalsky believes this was unjust and

violated some agreement between Pokalsky and EI, then any fault that exists lies with EI, not Mirant.[13]

The record is clear; the economic impact felt by EI in the Altra closing was a product of Mirant terminating its agreement with EI, not the result of Jefferis's statements explaining why Mirant believed it was entitled to do so, and the decision to reduce Pokalsky's compensation at the Altra closing was a decision made by EI, not caused by Jefferis's words. Because Pokalsky has failed to provide the court with any evidence that any of the four occurrences discussed above could be traced to statements made by Jefferis, Pokalsky cannot demonstrate that he suffered any special damages as a result of those statements. In the absence of evidence of special damages, no genuine issue of material fact exists on Pokalsky's defamation claim on a theory of libel per quod, and summary judgment in favor of Mirant is appropriate.

The court further concludes that summary judgment in favor of Mirant on Pokalsky's defamation claim is appropriate because Jefferis's written statements are exempt from prosecution under Georgia law. The Georgia Code provides that communications privileged and immune from attack as libel include "[s]tatements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned." O.C.G.A. § 51-5-7 (3) (2004). Pokalsky has failed to present evidence demonstrating that Jefferis's statements in the July 17, 1998 letter do not fall squarely within this privilege. Even viewing the record in a light most favorable to

---

[13] The court notes that Medina was present at the July 17, 1998 meeting. Medina, as President of EI, had the opportunity to correct anything stated by Pokalsky on behalf of EI at the meeting if he believed it to be inaccurate, but the evidence does not indicate that he did so. In reading Jefferis's statements, Medina could not reasonably have placed blame on Pokalsky for the termination of the agreement with Mirant because Medina heard whatever Jefferis heard at the meeting, and if Jefferis misinterpreted EI's intentions, Medina was in as good a position as anyone to recognize this.

Pokalsky, the court can only conclude that the statements were made to protect Mirant's interests in its dealings with EI by explaining Mirant's reasons for declaring EI in default and terminating the agreement. *See also Layfield v. Turner Adver. Co.*, 354 S.E. 2d 14, 15 (Ga. Ct. App. 1987) ("The record reveals that the letter, allegedly constituting a libel, was written . . . in an effort to resolve a bone fide dispute between two parties concerning their respective rights. As such, the communication clearly falls within the purview of O.C.G.A. § 51-5-7 (3) . . . ."). For the foregoing reasons, the Motion, with respect to Pokalsky's defamation claim, must be granted.

**C. Conversion**

Because Pokalsky was domiciled in Georgia at the time of the alleged conversion and the alleged conversion also took place in Georgia, the court again looks to Georgia law. In order to make out a prima facie case for conversion under Georgia law, Pokalsky must show that (i) he has title or a right of possession to the property at issue, (ii) Mirant has actual possession of the property, (iii) he demanded that Mirant return the property to him and (iv) Mirant has refused to return the property. *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F.Supp.2d 1276, 1295 (S.D. Ga. 2003); *Johnson v. First Union Nat'l Bank*, 567 S.E.2d 44, 48 (Ga. Ct. App. 2002).

Pokalsky has failed to present the court with any evidence to support the second and fourth elements of his conversion claim. While the court does not doubt that Mirant had actual possession of the materials on the day of Pokalsky's departure from Mirant, Booker's letter to Pokalsky dated September 14, 1998 indicates that the items were searched for but not located following Pokalsky's request for their return. Pokalsky has presented no evidence to contradict Booker's statements in the letter and the court finds

nothing in the record that would lead it to question Booker's accuracy. Pokalsky has therefore failed to produce any evidence demonstrating that Mirant is in actual possession of the materials at issue.

Booker's September 14, 1998 letter also precludes a finding that a material factual dispute exists as to whether Mirant refused to return the materials. Booker's letter demonstrates that, rather than refuse to return the materials, Mirant made a good faith attempt to locate them, but was unsuccessful.[14] Furthermore, Booker offered to replace the value of the lost materials if Pokalsky would provide him with a fair estimate of their value, which Pokalsky did not.[15] The evidence demonstrates that Mirant did not refuse to return any materials to Pokalsky, but rather returned what it could locate and made a reasonable effort to compensate Pokalsky for that which it could not. Thus, no genuine issue of material fact exists as to Pokalsky's claim for conversion and the Motion must be granted.

## V. Conclusion

For the foregoing reasons Debtors' Motion must be, and is hereby, GRANTED IN PART and DENIED IN PART.

Debtors shall prepare and submit to Pokalsky and the court a proposed form of judgment consistent with this opinion.

---

[14] Booker's letter also indicates that some items sought by Pokalsky, which are not at issue here, were in fact located by Mirant and returned to Pokalsky.

[15] The court notes that Booker's letter, in effect, constituted an offer to provide Pokalsky with that to which he would be entitled to in a successful conversion action because, under Georgia law, "[s]ince an action for conversion is a suit for money damages for the personal property converted, then such suit constitutes the election of money damages rather than recovery of the personal property in a trover action." Taylor v. Powertel, Inc., 551 S.E.2d 765, 769 (Ga. Ct. App. 2001). And while the court, for purposes of the Motion, accepts that the value of some of the items to Pokalsky may have been more sentimental than monetary, the court finds that Booker's letter represented a good faith effort on the part of Mirant to make Pokalsky whole for the loss of the materials Mirant could not locate.