U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed July 21, 2005					United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| MIRANT CORPORATION, *et al.*, § | |
| § | CASE NO. 03-46590-DML-11 |
| Debtors. § | Jointly Administered |

**MEMORANDUM OPINION AND ORDER**

Before the court are (1) Debtors' Third Motion for Partial Summary Judgment ("MPSJ")[1] Relating to Administrative Claims[2] Asserted by Wachovia Bank, N.A. (individually, "Wachovia"), and Credit Suisse First Boston (individually, "Credit Suisse"), as Agent for Certain Lenders

---

[1] Debtors' multiple motions are hereinafter referred to in the plural as "MPSJs."

[2] On February 17, 2005, the court received written notice that W&CS (as defined *infra*) were "withdrawing their request for administrative claims treatment in connection with their Proofs of Claims in the above-referenced bankruptcy cases."

Pursuant to the Four[-]Year Credit Agreement (collectively, "W&CS"[3]) [CM-ECF Docket No. 7901]; (2) Debtors' Fourth MPSJ Relating to Alleged Subrogation Claims Asserted by W&CS [CM-ECF Docket No. 7902]; (3) Debtors' Fifth MPSJ Relating to Alleged Reimbursement Claims and Interests in Certain Drawn Letter of Credit ("LOC")[4] Proceeds Asserted by W&CS [CM-ECF Docket No. 7903]; (4) W&CS's Omnibus Memorandum of Law in Opposition to Debtors' MPSJs ("Response") [CM-ECF Docket No. 8167]; (5) Debtors' Reply to W&CS's Response [CM-ECF Docket No. 8303]; (6) Debtors' Supplemental Brief Regarding Section 509 Preemption ("Supplemental Brief") [CM-ECF Docket No. 8959]; and (7) W&CS's Response to Debtors' Supplemental Brief [CM-ECF Docket No. 9434], together with all applicable pleadings, supporting documents, and affidavits, if any.

A hearing on Debtors' multiple MPSJs was held on February 18, 2005, and the court took the issues of res judicata, subrogation, and equitable reversion under advisement. At the parties' request, however, the court postponed consideration of the issues while negotiations toward settlement were in progress. On June 22, 2005, the parties informed the court that no settlement could be reached. Although the arguments of the parties regarding the three separate but related issues often overlap, the court will address each MPSJ in turn.

## BACKGROUND

The issues herein arise pursuant to the terms of a Four-Year Credit Agreement ("Credit Agreement") dated July 17, 2001; a Letter of Credit Agreement ("LOC Agreement") dated

---

[3] The court is cognizant of the parties' distinct roles *vis-à-vis* the issues considered herein and refers to W&CS in the collective for purposes of convenience only.

[4] Letters of credit are hereinafter referred to in the plural as "LOCs."

September 4, 2001; and this court's (1) Final Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (i) Authorizing the Amendment of a Certain Prepetition Credit Facility to Permit the Extension or Replacement of Outstanding LOCs, (ii) Authorizing the Execution of an Agreement Related to the Foregoing[,] and (iii) Confirming Certain Matters Related to the Foregoing dated October 8, 2003, and (2) Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code (i) Authorizing the Amendment of a Certain Prepetition Credit Facility to Permit the Further Extension or Replacement from Time to Time of Outstanding LOCs, (ii) Authorizing the Execution of an Amendment Agreement, (iii) Confirming Certain Matters Related to the Foregoing, and (iv) Granting Related Relief dated April 29, 2004 (collectively, "Extension Orders").

The Credit Agreement and the LOC Agreement provided Mirant Corporation ("Mirant") with a revolving credit facility ("Facility") comprised of various lenders, including W&CS. Wachovia served the Facility as "issuing bank" and Credit Suisse served the Facility as "administrative agent." Wachovia also claims to be an "Agent" and/or "Senior Managing Agent" of the Facility pursuant to the terms of the Credit Agreement and LOC Agreement, respectively. The Extension Orders authorized amendment of the Facility and extended the expiration dates of undrawn LOCs related to the Facility. The parties dispute whether W&CS are entitled – under the terms of the Credit Agreement, the LOC Agreement, the Extension Orders, and all the circumstances of the case – to assert subrogation claims against Debtors other than Mirant for payment defaults which the LOC beneficiaries would otherwise have been able to assert had the beneficiaries not been paid as a result of the LOC draws.

## STANDARD OF PROOF

"Summary judgment is appropriate where there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." *Baker Hughes Oilfield Operations, Inc. v Cage (In re Ramba, Inc.)*, No. 04-20807, 2005 U.S. App. LEXIS 13469, at *20 (5th Cir. July 7, 2005). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056. A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248. In making its determination, the court must draw all justifiable inferences in favor of the nonmoving party. *Id.* at 255.

## DISCUSSION

### Third MPSJ, Count One – Res Judicata

Debtors argue that because the Extension Orders are final, appealable orders which resolve all issues pertaining to extension of the LOCs and the parties' extension agreements, the doctrine of res judicata precludes W&CS from asserting any claims, including the Credit Suisse Amended Claims, against Debtors other than Mirant. Debtors contend the subrogation claims made by W&CS are inconsistent with Mirant's reimbursement obligations under the provisions of the Extension Orders and had W&CS wished to pursue their subrogation claims based on draws against the extended LOCs, W&CS should have raised the issue of subrogation at any one of the several hearings held prior to the court's entry of the Extension Orders. Because W&CS are bound by the terms of the Extension Orders, Debtors argue that W&CS are now barred from pursuing their subrogation claims based on the doctrine of res judicata.

W&CS do not dispute that they are bound by the terms of the Extension Orders. Rather, W&CS dispute "what the Extension Orders say and what they mean." W&CS do not agree that their rights of subrogation are subsumed within the Extension Orders' provisions for Mirant's reimbursement obligations and point out that the Extension Orders say nothing about W&CS waiving any right to assert subrogation claims and, in fact, the Extension Orders say nothing *at all* about subrogation. Because the issues of subrogation were not addressed by the Extension Orders, W&CS argue that the doctrine of res judicata does not apply. The court agrees.

The doctrine of res judicata, or claim preclusion, forecloses relitigation of claims that were or could have been raised in a prior action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The following elements must be met for a claim to be barred by the doctrine of res judicata:

1. the parties in both the prior suit and current suit must be identical;
2. a court of competent jurisdiction must have rendered the prior judgment;
3. the prior judgment must have been final and on the merits; and
4. the plaintiff must raise the same cause of action in both suits.

*See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.)*, 200 F.3d 382, 386 (5th Cir. 2000); *Howe v. Vaughn*, 913 F.2d 1138, 1143–44 (5th Cir. 1990).

Assuming *arguendo* that the first two elements of the res judicata test have been met, the court disagrees that (1) the Extension Orders rendered final judgment on the merits of W&CS's subrogation claims; or (2) any subrogation claims must have been raised by W&CS in connection with the Extension Orders. The court is not convinced, as urged by Debtors, that Mirant's reimbursement obligations pursuant to the Extension Orders encompass "all forms of reimbursement claims, including subrogation claims."

First, the court concludes the Extension Orders must be interpreted in light of the provisions of the Bankruptcy Code then in effect.[5] There is no quarrel that the Extension Orders specifically refer to Mirant's reimbursement obligations but make no reference to W&CS's subrogation claims, if any. Debtors argue that specific reference in the Extension Orders to W&CS's subrogation rights, if any, was not necessary because Mirant's reimbursement obligations included subrogation. The court notes, however, that the plain language of the Code makes specific distinctions among reimbursement, contribution, and subrogation.[6] It logically follows that a reasonable interpretation of the Extension Orders in light of the plain language of the Code supports W&CS's position that the Extension Orders addressed Mirant's reimbursement obligations *only* and not W&CS's separate subrogation claims, if any. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (concluding that the sole function of the court is to enforce the statute according to its terms); *Toibb v. Radloff*, 501 U.S. 157, 162 (1991) (concluding that courts must look first to the statutory language).

Second, although the parties do not dispute that the Extension Orders entered by the court in connection with the parties' extension agreements[7] were intended to preserve the *status quo*

---

[5] 11 U.S.C. §§ 101-1330 (2005), *amended by* 11 U.S.C. §§ 101-1532 (as enacted Apr. 20, 2005) (hereinafter the "Code").

[6] *Cf.* Code § 502(e)(1)(C) *with* Code § 502(e)(2) *and* Code § 509(a) *with* Code § 509(b)(1).

[7] "An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation." *Thomasville Furniture Indus., Inc. v. Elder-Beerman Stores*, 250 B.R. 609, 635 (S.D. Ohio 1998). *See also In re 360 Inns, Ltd.*, 76 B.R. 573, 578 (Bankr. N.D. Tex. 1987) ("[A]n agreed order is in the nature of a contract and is subject to the rules of construction of contracts."); *In re Delaney's II, Inc.*, No. 90 C 7264, 1991 U.S. Dist. LEXIS 8235, at *5 (N.D. Ill. June 17, 1991) (same).

*ante* and to not improve any party's position or to strip rights from any party absent that party's consent, the court is not confident the Extension Orders made the court's intent unambiguous.[8]

Third, the claims dealt with in the Extension Orders were the claims arising under the Credit Agreement and the LOC Agreement. Any subrogation claims W&CS might assert arise by reason of the rights to payment of the beneficiaries of the LOCs. As W&CS, through subrogation, seek to make claims which are independent of the LOCs and the agreements governing them, the Extension Orders do not affect those claims.

The court finds that a reasonable interpretation of the Extension Orders consistent with the plain language of the Code could have resulted in (1) W&CS's conclusion that any subrogation claims were separate issues not subsumed within the provisions of the Extension Orders related to Mirant's reimbursement obligations; and (2) W&CS's determination that they had no obligation to raise the subrogation issues at any of the hearings in connection with the Extension Orders. Because the Extension Orders may have been subject to differing interpretations, the court does not believe that W&CS should be penalized if they reasonably relied on the court's Extension Orders as entered. *See Mirant Americas Energy Mktg., L.P. v. Kern Oil & Refining Co. (In re Mirant Corp.)*, 310 B.R. 548, 562 (Bankr. N.D. Tex. 2004) (determining that "a party who reasonably relied on the [order] ought not to be penalized for that reliance"); FED. R. BANKR. P. 9024 *incorporating* FED. R. CIV. P. 60 (authorizing the courts to correct orders to conform to court's intent); *In re Tyler*, 285 B.R. 635, 641 (Bankr. W.D. Tex.

---

[8] "A contract is ambiguous if it is susceptible to more than one reasonable interpretation." *Thomasville Furniture Indus., Inc.,* 250 B.R. at 635.

2002) (concluding that the court may not alter the substantive rights of a party if the party has relied on the court's order to its detriment).[9]

The court concludes that because W&CS were not required to raise – and in fact did not raise – the subrogation issues at the hearings, *a fortiori*, no final judgment on the merits of W&CS's subrogation claims could possibly have been thus rendered by this court. Accordingly, the court finds that Debtors have failed to show that the doctrine of res judicata bars W&CS from pursuing any subrogation claims. Therefore, Debtors' Third MPSJ, Count One, should be, and hereby is, **DENIED**.[10]

**Fourth MPSJ, Counts Two, Three, and Four – Subrogation**

Debtors argue that W&CS are precluded from asserting subrogation claims because (1) the LOCs incorporate the Uniform Customs and Practices for Documentary Credits of the International Chamber of Commerce (the "UCP") which preempt application of nearly all of the New York Uniform Commercial Code (the "NYUCC")[11]; (2) subrogation is inconsistent with the

---

[9] The court specifically does *not* find that W&CS did not intend to waive their subrogation claims. This is a question of disputed fact.

[10] Consistent with the above reasoning Debtors' additional arguments regarding res judicata *vis-à-vis* agreed orders and equitable, judicial, and quasi-estoppel must also fail.

[11] The Credit Agreement and LOC Agreement provide that they shall be governed by, and construed in accordance with, the laws of the State of New York; some, but not all, of the LOCs are subject to New York law.

independence principle[12]; and (3) Code section 509 preempts state law doctrines of subrogation and is the sole means by which a creditor may assert subrogation rights in bankruptcy.

W&CS respond by arguing that (1) section 5-117 of the Uniform Commercial Code ("UCC") rejects the previous majority view that subrogation should be unavailable in the LOC context; (2) although the independence principle ensures payment of an LOC draw, the independence principle ceases to apply once payment has been made; (3) the UCP does not preclude the assertion of subrogation rights; (4) ambiguity exists with regard to whether W&CS are "liable with the debtor on" or "codebtors" as required under Code section 509(a) and that such ambiguity must be resolved by reference to the NYUCC; and (5) even if subrogation is unavailable under Code section 509(a), claims for equitable subrogation may still be asserted.

The parties agree that amendments to the NYUCC cannot change the Code and that the plain meaning of the Code should prevail. *See Lamie*, 540 U.S. at 534 (concluding that when the language of a statute is plain and does not lead to an absurd result, the sole function of the court is to enforce the statute according to its terms). However, Debtors and W&CS dispute what constitutes the "plain meaning" of Code section 509(a).

The court agrees that Code section 509's meaning is at best opaque. Neither "codebtors" or "liable with the debtor on" is defined anywhere in the Code nor is the answer to whether W&CS are entitled under the facts of this case to assert subrogation rights under section 509

---

[12] *See Faulkner v. EOP-Colonnade of Dallas, LP (In re Stonebridge Techs., Inc.)*, 291 B.R. 63, 70 (Bankr. N.D. Tex. 2003) ("Under the independence principle, an issuer's obligation to the letter of credit's beneficiary is independent from any obligation between the beneficiary and the issuer's customer.") (quoting *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 590 (5th Cir. 1988). *See also Berliner Handels-Und Frankfurter Bank v. E. Tex. Steel Facilities, Inc. (In re E. Tex. Steel Facilities, Inc.)*, 117 B.R. 235, 239 (Bankr. N.D. Tex. 1990) (explaining that the "independence principle describes the basic letter of credit transaction as the formation of three separate and independent obligations between three different parties").

evident from the plain language of that section. Moreover, whether W&CS must make an election of remedies between (1) asserting a claim pursuant to the Credit Agreement and the LOC Agreement; or (2) assuming, through subrogation, the position of the parties drawing on the LOCs is not readily apparent. Finally, determining W&CS's rights of subrogation, if any, under Code section 509 implicates fact questions as yet unanswered as to what those rights are, what the parties intended them to be,[13] whether W&CS intended in connection with the entry of the Extension Orders to waive (and so did waive) any rights to subrogation, whether and to what extent W&CS may be able to assert subrogation rights *vis-à-vis* the UCP, the UCC, the NYUCC, and the remaining LOC choices of law, and whether equitable subrogation, if available, would work an injustice to others.

Because genuine issues of material fact exist with regard to the existence and/or extent of W&CS's rights of subrogation, and because the court must make all justifiable inferences in favor of the nonmoving party,[14] here W&CS, the court concludes summary judgment is inappropriate. Accordingly, Debtors' Fourth MPSJ, Counts Two, Three, and Four, should be, and hereby are, **DENIED**.

**Fifth MPSJ, Count Two – Equitable Reversion**

Debtors' Fifth MPSJ, Count Two, argues that W&CS cannot claim a reversionary interest in any of the drawn LOC proceeds based on the independence principle because (1) all draw

---

[13] "[I]f a contract is ambiguous, the parties' intent is a question of fact." *In re Delaney's II, Inc.*, 1991 U.S. Dist. LEXIS 8235, at *6 (citation omitted).

[14] *See Liberty Lobby*, 477 U.S. at 255.

conditions were met for each LOC; and (2) how the beneficiaries of the LOCs thereafter applied the drawn proceeds was irrelevant.

W&CS claim, however, that various LOC beneficiaries drew down on the LOCs – not because of payment default but because of impending expiration – and then either gave all of the proceeds to Debtors or agreed with Debtors to split the proceeds. W&CS assert that they should recover the proceeds drawn against the LOCs based on the doctrine of equitable reversion because the proceeds were not applied against amounts owed by the Debtors to the beneficiaries. The court disagrees.

The court need not engage in lengthy discussion regarding these arguments, because W&CS acknowledged at the hearing held February 18, 2005, that W&CS drafted the LOCs and related documents; acknowledged that the "beneficiary of the [LOC] has an unfettered right to make a draw"; acknowledged that W&CS "can't point to a provision [Debtors and beneficiaries] are breaching"; and also acknowledged "this is not necessarily wrong as a matter of law."

Therefore, because the credit documents in no way restricted draws made against the LOCs based on impending expiration and because the credit documents in no way restricted the beneficiaries' application of the proceeds once drawn, the court concludes that W&CS may not assert a reversionary interest in said proceeds. *See Barclay's Bank PLC v. Dresdner Bank Lateinamerika A.G. (In re Lancaster Steel Co., Inc.)*, 284 B.R. 152, 159 (S.D. Fla. 2002) (determining that when a letter of credit did not restrict what the beneficiary could do with the funds, the beneficiary was free to do as it wished). Accordingly, Debtors' Fifth MPSJ, Count Two, should be, and hereby is, **GRANTED.**

## CONCLUSION

Consistent with the court's reasoning set forth above, Debtors' Third MPSJ, Count One, should be, and hereby is, **DENIED**; Debtors' Fourth MPSJ, Counts Two, Three, and Four, should be, and hereby are **DENIED**; and Debtors' Fifth MPSJ, Count Two, should be, and hereby is **GRANTED**.

**SO ORDERED**.

# # #  END OF ORDER # # #