U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the order of the Court.**

**Signed September 21, 2005**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES OF BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| MIRANT CORPORATION, et al., | § | Case No. 03-46590 |
| | § | Jointly Administered |
| Debtors. | § | Chapter 11 |

**MEMORANDUM OPINION**

Before the court is the Tier IV Objection to Proof of Claim Filed by Kern River Gas

Transmission Company (the "Objection"). Kern River Gas Transmission Company ("Kern

River") timely filed proof of claim number 7573, later amended by proof of claim number 8121

(the "Claim"). Debtors filed the Objection to the Claim asserting that the Claim was filed for an

excessive amount. The court conducted a hearing (the "Hearing") on the Objection over eight

days: May 16-18, May 31, June 1-2, and July 6-7. The court then took the matter under

advisement. At the Hearing the parties presented evidence, including the testimony of Mr. Kirk

Morgan ("Morgan"), Vice President of Marketing and Regulatory Affairs for Kern River, Mr.

Thomas Beach ("Beach"), Principal Consultant with the consulting firm Crossborder Energy,

Mr. J. Peter Williamson ("Williamson"), a consultant for pipelines and utilities, Dr. Cindy Ma

("Ma"), Vice President of Securities, Energy, and Risk Management Practices at National

Economic Research Associates, Inc., Mr. John Smith ("Smith"), Director of Regulatory and

Government Affairs for Kern River, Mr. John Hogan ("Hogan"), Director of Gas and Fuel

Procurement for Mirant Corporation, Mr. Robert Kilmer ("Kilmer"), Vice President of Rates and

Certificates for Florida Gas Transmission Company and Transwestern Pipeline Company from

1992 to 2004, and Dr. Jeff MaKholm ("MaKholm"), Senior Vice President for National

Economic Research Associates, Inc.; designations from depositions of Lynn Dahlberg, Manager

of Marketing for Kern River, Robert L. Pettinato ("Pettinato"), Natural Gas Manager at the Los

Angeles Department of Water and Power, Harold Orndorff ("Orndorff"), Business Manager for

Aera Energy, LLC, and Kilmer; and 315 exhibits, identified as necessary below.[1]  Beach,

Williamson, Ma, Kilmer and MaKholm were offered as expert witnesses,[2] while Morgan, Smith

and Dahlberg's testimony concerned Kern River's operations, efforts at mitigation by Kern River

and Kern River's presently pending rate case before the Federal Energy Regulatory Commission

("FERC").  Hogan testified about Debtors' operations and relations with Kern River, while

---

[1]    On September 15, 2005, on the eve of issuance of this opinion, Debtors filed a request that the court take judicial notice of certain filings and proceedings before FERC (as defined below).  The court has reviewed the request. Because the materials appended to the request are consistent with and would not change the court's ruling, the court need not determine whether the request should be granted.

[2]    Beach provided expert testimony regarding sales expectations (quantity and price) for the Kern River pipeline over the term of the Contract (as defined below).  Williamson testified about appropriate discount rates to reduce Kern River's damages to present value.  Ma also offered testimony about discount rates. Kilmer was called by Debtors to testify about the economic consequences of Kern River's pending rate case.  MaKholm's testimony related to the value to Kern River of the capacity that was the subject of the Contract.

Pettinato and Orndorff's testimony was illustrative of the posture of Kern River's vintage shippers.

This memorandum opinion comprises the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014. The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

## I. Background

Kern River is the owner and operator of a pipeline system that provides for the transmission of natural gas from Southwestern Wyoming through Utah and Nevada to delivery points in California. Mirant Americas Energy Marketing, LP, ("MAEM"), is one of the Debtors in the captioned chapter 11 cases.[3] Debtors are in the merchant energy business, providing electricity to markets throughout the United States. MAEM serves as Debtors' purchasing and marketing arm, buying (and transporting) fuels for Debtors' generation facilities and selling the power generated. Debtors own generation facilities in California and, of particular significance for the matter before the court, a gas-fired facility, the Apex Facility, in Southern Nevada, which are served by Kern River's pipeline.

Kern River and MAEM entered into a contract (the "Contract") on May 29, 2001,[4] which obligated MAEM, an "expansion" Kern River shipper,[5] to pay for transmission capacity of

---

[3]   Debtors' chapter 11 cases have been consolidated for administrative purposes. In the Objection, as in most other matters that come before the court, Debtors act as a unit.

[4]   The parties entered into a Precedent Agreement for Firm Transportation Service on January 31, 2001.

[5]   Kern River constructed its original pipeline in the mid 1990's. Shippers purchasing firm capacity upon construction of this portion of the pipeline were considered "vintage" shippers. Kern River then expanded its pipeline and took subscriptions for the newly-created transportation capacity. MAEM subscribed to this expansion capacity and was considered an "expansion" shipper.

90,000 decatherms of natural gas per day on the Kern River pipeline from May of 2003 through April 30, 2018. This transportation capacity[6] was considered "firm" capacity[7] (as opposed to interruptible transportation capacity[8]) and was to be used by MAEM to supply the Apex Facility and to transport gas to points throughout the state of California. MAEM's payment was required whether or not the capacity was actually used.

MAEM (along with 74 other Debtors) filed for chapter 11 bankruptcy protection on July 14, 2003. Pursuant to an order of this court dated August 14, 2003, Debtors rejected the Contract effective December 18, 2003.[9] 11 U.S.C. § 365(a). Kern River filed the Claim for the damages it sustained as a result of the rejection of the Contract, calculating its damages to be $153,641,087, representing total remaining payments under the Contract discounted to present value using a 4.25% discount rate, less mitigation, also discounted to present value.

Debtors dispute the amount of the Claim and urge that the court reduce it by an amount representing additional mitigation, as required under Utah law, and apply a different, higher discount rate to arrive at a lower present value. Kern River argues that it has no duty to mitigate the damages caused by Debtors. Alternatively, Kern River alleges that its ability to mitigate the

---

[6]    Kern River's pipeline was designed to transport, at minimum, 1.75 billion cubic feet of natural gas per day. This equates to 1.75 million decatherms of gas (the decatherm being the unit of measurement commonly used in the industry). Various shippers on the system subscribed to the capacity in decatherm blocks that were reserved for their use for the terms of their contracts. The shippers' contracts were usually for ten or fifteen years. An individual shipper's "capacity" equals the total amount it is entitled to ship on the Kern River Pipeline per day under its contract.

[7]    "Firm" transportation capacity is capacity that is usually subscribed to by long-term contract, is always available, and must always be paid for regardless of use. Firm capacity assures its holder a supply of gas.

[8]    "Interruptible transportation" capacity is different from firm capacity in that it is not always available, is only paid for when used, and can be purchased for much shorter time periods than firm capacity. It is sold on the secondary market. Its availability fluctuates with the temperature on the pipeline, as temperature affects gas volume and the efficiency of the pipeline's compression stations.

[9]    The capacity rejected by Debtors is sometimes referred to below as the "rejected capacity."

damages caused by rejection is limited due to most-favored-nation clauses ("MFN clauses")[10] in contracts with certain of its vintage shippers as well as by the general economic environment which has caused the rates paid for interruptible transportation to drop.  Kern River also stands by its discount rate as consistent with applicable law.

## II.  Discussion

Several questions are presented by this matter.  First, does Kern River have an active duty to mitigate the damage caused by Debtors upon rejection of the contract?  Second, if Kern River does have a duty to mitigate the damage caused by Debtors' rejection, what form must this mitigation take?  Third, what value will be assigned to the Claim after appropriate mitigation has been deducted, including what is the correct discount rate to properly quantify the claim?  The answers to these questions will be governed by the law applicable pursuant to the Contract – that of Utah.

### A.  Does Kern River have a Duty to Mitigate the Damage Caused by Rejection?

In Utah, "[d]amages awarded for breach of contract 'should place the non-breaching party in as good a position as if the contract had been performed.'"  *Mahmood v. Ross*, 990 P.2d 933, 940 (Utah 1999).  Despite this, the party harmed has an "active duty" to mitigate the damage caused by "making reasonable exertions to render the injury as light as possible." *Madsen v. Murrey & Sons Co.*, 743 P.2d 1212, 1214 (Utah 1987).  "[N]o recovery may be had for losses which the person injured might have prevented by reasonable efforts and expenditures."  *Id.*; *see also Angelos v. First Interstate Bank*, 671 P.2d 772, 777-78 (Utah 1983).

---

[10]     MFN clauses in gas transportation contracts protect firm capacity shippers from price competition from other shippers by providing that if the transmission company, here Kern River, sells firm transportation capacity to a shipper for a certain amount of time and below a threshold price, then it must lower the transportation price for firm shippers with such MFN clauses to that same price.  MFN clauses act as insurance for existing shippers against price undercutting by competitors in times of falling rates.

Kern River has argued that any duty to mitigate the damage caused by Debtors must have first been triggered by Debtors' attempt at mitigation. Kern River relies on cases such as *Alexander v. Brown* to support this argument. In *Alexander*, the Utah Supreme Court stated "[w]here the party having the primary duty for performance [under the breached contract] has the same opportunity to perform and the same knowledge of the consequences of non-performance as the party to whom the duty is owed, he cannot complain about the failure of the latter to perform his duty for him." *Alexander v. Brown*, 646 P.2d 692, 695 (Utah 1982). While appealing on its face, the present circumstances do not fit neatly within this rule.

In *Alexander*, the damage arose out of a contractor's failure to install a curb, gutter, and sidewalk in a residential housing development in 1973. *See id*. at 694. In 1976 the purchaser of the property had the items put in himself and then sued to recover the cost of the improvements. *See id*. The contractor claimed that the purchaser did not properly mitigate his damages because he did not have the curb, gutter, and sidewalk installed in 1973, when prices for labor and concrete were lower. *See id*. The court concluded that, as the contractor had the "same opportunity to perform" the installation at the lower price but did not do so, he could not complain that the purchaser failed to install the items at the lower price. *See id*. at 695.

Unlike in *Alexander*, Debtors do not have the "same opportunity to perform" as Kern River. When Debtors rejected the Contract they forfeited control over the rejected capacity. Without retaining control over the rejected capacity, Debtors could not mitigate the damage caused, and, therefore, would not be subject to the rule in *Alexander*. As Kern River has control

over the rejected capacity the court concludes that Kern River is in the best position to mitigate the damage caused by Debtors' rejection and, therefore, bears responsibility to do so.[11]

The holding of the Utah Supreme Court in *Angelos* supports this holding. There the Court held that Angelos had no duty to mitigate the damage caused by a third party's embezzlement where the Bank, which controlled access to account information, was in a better position to effect such mitigation by discovering the embezzlement and stopping it. *See Angelos*, 671 P.2d at 777. Similarly, once Debtors relinquished control over the transportation capacity to Kern River, Kern River was in a better position to mitigate the damage caused by the rejection of the Contract.

Therefore, the court holds that Kern River has an active duty to mitigate the damage caused by Debtors' rejection and that the value of mitigation should be deducted from its allowed claim.

B. **What Form Must Kern River's Mitigation Take?**

Kern River asserts that it faces severe limitations on its ability to mitigate the damage caused by Debtors' rejection. It argues that the MFN clauses in its contracts with some vintage shippers prevent it from selling the rejected capacity as long-term firm capacity. To do so, Kern River reasons, would force it to make large rate refunds[12] to vintage shippers with MFN clauses,

---

[11]   On at least one occasion, Kern River offered to work with Debtors to mitigate damages; however, a precondition was that Debtors provide cash equal to the present value of the difference between the rate a new purchaser of capacity would be willing to pay and the rate provided in the Contract. *See* testimony of Morgan and Hogan.

[12]   If Kern River were to breach the MFN clauses in its contracts with vintage shippers by selling firm transportation below the MFN rate, it would incur a refund liability to those shippers for the difference between the rate in the new contract and the rates at which the existing shippers were locked in. For instance, if the MFN minimum rate were $.35 / decatherm and the protected vintage shipper was paying $.40 / decatherm for transportation, but Kern River sold firm transportation capacity to a new shipper for $.20 / decatherm, Kern River would then owe a refund of $.20 / decatherm to the vintage shipper.

the cost of which would far exceed what the sale of the rejected capacity would bring.  Its

inability to sell the rejected capacity as firm capacity, other than with the collateral triggering of

MFN clauses, is due to the general economic environment, which has lowered the primary and

secondary market price of transportation capacity.  The current price of firm capacity is below

the triggering level for MFN refund liability, thus making sales of the rejected capacity as firm

capacity uneconomic.  Kern River asserts that this lowered value of transportation capacity has

also caused interruptible transportation sales of the Debtors' rejected capacity to bring less in

mitigation value than such sales might have previously.

Kern River maintains that it qualifies for lost volume seller status, allowing it to credit to

Debtors, as mitigation, only those sales of interruptible transportation capacity which reach the

last 90,000 decatherms of its operating capacity[13] on any given day.  For example, Kern River's

position is that no mitigation should be credited to Debtors where there was sold, on the

interruptible transportation market, 90,000 decatherms of capacity out of 180,000 decatherms of

operating capacity available on that particular day.  This effectively limits mitigation to the

hottest months of the year.

Debtors counter that Kern River has not made a reasonable effort to mitigate its damages.

First, Debtors claim Kern River should be required to ask its vintage shippers to waive their

---

[13]     Operating capacity is the actual amount of natural gas that Kern River can ship on its pipeline on any given day.  This number is always higher than or equal to the pipeline's design capacity.  Design capacity is the maximum amount of natural gas that can be shipped on a pipeline on the hypothetical hottest day of the year (in the case of Kern River, 1.75 million decatherms). On other days there is less gas expansion on the pipeline.  The lack of gas expansion creates "extra" capacity that the transportation provider can sell as interruptible transportation on the secondary market.  The amount of capacity created over the pipeline's design capacity is largely dependent on the weather.  As this capacity depends on weather, it cannot be guaranteed as can firm capacity.  As Debtors rejected the Contract and so forfeited their former firm capacity, and Kern River cannot sell such capacity on the "firm" market at present rates due to MFN restrictions, such capacity now is treated as interruptible capacity, which, however, unlike other interruptible capacity, is available every day of the year, no matter the temperature.

MFN clauses or else should simply breach the MFN clauses by selling the capacity at current market prices. If these shippers were to waive their rights under the MFN clauses, Debtors reason, then Kern River could feasibly market the rejected capacity as long-term firm transportation, significantly mitigating the damage caused by rejection. Alternatively, if Kern River were to breach the MFN clauses and sell the capacity at market prices, Debtors argue that it would effect long-term mitigation for the rejected capacity and that Kern River could recoup some of its refund liabilities through its pending rate case before FERC.

Second, Debtors also challenge the premise that Kern River qualifies as a lost volume seller. Debtors argue that Kern River rather must give credit as mitigation for sales of the first 90,000 decatherms of operating capacity in excess of contracted capacity.[14]

Third, Debtors assert that Kern River improperly hindered its own ability to mitigate by raising interruptible transportation rates to above-market levels for Southern Nevada delivery points on the pipeline. This rise in cost caused Debtors to purchase capacity from firm shippers in the form of capacity releases,[15] which do not count as mitigation, rather than directly from Kern River.

**1. Is Kern River Obligated to Breach its MFN Clauses to Mitigate its Rejection Damages?**

Kern River is not obligated by Utah law to breach MFN clauses with its vintage shippers to mitigate damages resulting from Debtors' rejection. While "a party has [an] active duty" to make "reasonable exertions" to mitigate its damages and "render [its] injury as light as possible,"

---

[14]     Besides the rejected capacity, Kern River has available only about 4000 decatherms per day of design capacity that may be sold as firm capacity or will be marketed as interruptible capacity.

[15]     A capacity release purchase occurs when a party sells a portion or all of its unused firm transportation capacity on the secondary market. Such a release still qualifies as firm transportation to the purchaser, making it certain for the secondary-market buyer.

*Madsen*, 743 P.2d at 1214, it is not required to take extraordinary efforts to avoid losses from a breach of contract and is not required to spend substantial sums of money to protect the party in default under the contract. *See Bank One, Tex., N.A. v. Taylor*, 970 F.2d 16, 29 (5th Cir. 1992); *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 755-56 (10th Cir. 1975).

The court holds that requiring Kern River to breach its MFN clauses would be unreasonable. Breach of the MFN clauses to effect mitigation would qualify as an extraordinary effort to protect the interests of the Debtors. Such a requirement could be very expensive for Kern River as some of its MFN clauses are triggered upon any below-threshold-price sale of firm transportation, however brief the period.[16] The evidence suggests that, without accounting for any other consequences of breach of the MFN clauses, just balancing cost of breach against the mitigation value of the sale of the rejected capacity, the former would equal or exceed the latter.

Debtors also argue that Kern River should be required at least to inquire of its shippers whether they would waive the MFN clauses in their contracts. Debtors point to various instances where Kern River obtained waivers of MFN clauses from vintage shippers as evidence that those shippers are willing to grant waivers under proper circumstances. While it is true that certain shippers did grant waivers of MFN clauses when Kern River expanded its pipeline, these waivers were not free and are unlikely to be repeated except where consideration such as a discount in transportation costs is offered.[17] Because an inquiry by Kern River regarding the waiver of the

---

[16] *See, e.g.*, Kern River's contract with Union Pacific in which the MFN clause is triggered by any sale of firm transportation, for as short a time as one day, that is below the threshold price set by the contract. In Kern River's contracts with other vintage shippers, the MFN clauses are triggered upon a sale of firm transportation for a longer period of time than the one-day time period provided by the Union Pacific contract.

[17] Pettinato and Orndorff testified at their depositions that their employers, the Los Angeles Department of Water and Power and Aera Energy, LLC, each the beneficiary of an MFN clause, would not consider waiver of their MFN clauses without receiving payment or some other substantial benefit.

MFN clauses will likely be fruitless, the court holds that effective mitigation need not include either the breaching of the MFN clauses by Kern River or an effort to obtain a waiver of those clauses by its vintage shippers.

### 2.  Does Kern River Qualify as a Lost Volume Seller?

Kern River contends that it qualifies as a lost volume seller and therefore has the right to sell all other interruptible capacity available on its pipeline before it must sell the rejected capacity.  Debtors vehemently disagree and urge that the first interruptible transportation capacity sold by Kern River should count as mitigation for the damages caused by rejection.  The question is of great import as mitigation would effectively be halted during several months of the year if Kern River is a lost volume seller.[18]

"A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity."  *Bill's Coal Co. v. Bd. of Pub. Utils.*, 887 F.2d 242, 245 (10th Cir. 1989).  The doctrine focuses on two factors:  capacity and wholly independent sales events.  *In re El Paso Refinery, L.P.*, 196 B.R. 58, 66 (Bankr. W.D. Tex. 1996).  The Tenth Circuit has laid out a helpful example:

> [W]hen a buyer breaches a contract to purchase an automobile from a dealer, the dealer is entitled to the benefit of its bargain whether or not it ultimately resells the car intended for the breaching customer. This is so because in theory the dealer can supply as many new cars as there are buyers. The fact of resale demonstrates that two or more buyers exist and that the seller could expect to earn two profits once the original buyer agreed to make his purchase.

---

[18]  During the late fall, winter, and early spring months more capacity is created on the pipeline in the form of interruptible capacity, and individuals use less air conditioning and, as a result, less electricity.  This decrease in demand causes power plants to produce less electricity and, consequently, to transport less natural gas during the cooler months.  As the need for natural gas transportation wanes, demand for interruptible transportation on the Kern River pipeline falls below the pipeline's operational capacity.  During this period of the year some firm shippers offer firm capacity for sale by capacity release agreements.  If Debtors' rejected capacity is to be the last offered for sale during these months, it is likely that sufficient demand would not exist for it to be sold.

*Bloomfield Fin. Corp. v. Nat'l Home Life Assurance Co.*, 734 F.2d 1408, 1412-13 (10th Cir. 1984).

Kern River's situation is distinguishable from that in *Bloomfield Fin. Corp.* Here, Kern River seeks to sell capacity to others, thus collecting a profit, but claims that it is not the same capacity as that originally sold to MAEM, thereby making the sale ineligible for mitigation. However, Kern River cannot meet the requirements laid out in *In re El Paso Refinery* for eligibility to be seen as a lost volume seller as it does not always have the operational capacity needed to sell interruptible transportation other than that which was rejected by Debtor. Whereas the seller in the *Bloomfield Fin. Corp.* example could "supply as many new cars as there [were] buyers," Kern River cannot supply as much interruptible capacity as could be demanded because it is limited by the operational capacity of its pipeline. *Id.*

As Kern River does not fit the requirements laid out in *In re El Paso Refinery*, the court holds Kern River is not a lost volume seller. Below the court determines the additional mitigation that must accordingly be credited to Debtors.

### 3. Did Kern River's Point-to-Point Interruptible Capacity Price Increase Hinder Mitigation?

From rejection of the Contract until December 2004, Debtors purchased interruptible capacity from Kern River to supply its Apex Facility.[19] Debtors typically require about 30,000 decatherms of gas per day for the Apex Facility. In December 2004, Kern River instituted a point-to-point pricing policy change that raised the interruptible capacity rate to Southern

---

[19] In accordance with its "lost volume seller" theory, Kern River did not give credit for these purchases even though Debtors only purchased interruptible transportation capacity because they had rejected Contract. Obviously, revenues to Kern River that would not have occurred but for the rejection must count as mitigation to offset damages, since Debtors would not have been purchasers of interruptible transportation if the Contract had not been rejected. The court holds such sums are deductible from the Claim as mitigation.

Nevada destinations, including the Apex Facility, to more than double what it was previously.

After this price increase, which was limited to the Nevada destinations, Debtors found alternative

methods of gas transportation to the Apex Facility, effectively halting the mitigation credit

Debtors could have been receiving as a result of purchasing interruptible capacity from Kern

River.

Debtors allege that this rate increase, from $.20 per decatherm to $.52 per decatherm,[20] a

price well above the market rate, was instituted maliciously[21] and was designed to force them out

of the interruptible capacity market, thus exacerbating the damage occasioned by the rejection of

the Contract. Kern River denies that the rate increase was done maliciously[22] but instead insists

that it was instituted to create value for the other firm shippers on the pipeline by reducing the

price competition in that area on the secondary interruptible transportation market.[23] Kern River

also points out that it gave Debtors notice of the rate increase in November of 2004, thus giving

Debtors time to find alternate means of transportation, which Debtors in fact did.

The Utah Supreme Court has not only held that a non-breaching party has an active duty

to mitigate damage caused by the breaching party but has also ruled that the non-breaching party

"may not, either by action or inaction, aggravate the injury occasioned by the breach." *Utah*

*Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 64 (Utah 1981); *Mahmood*, 990 P.2d at 940;

*Madsen*, 743 P.2d at 1214. This standard does not require that Kern River have a malicious

---

[20]   *See* Debtors' Exhibit 120, pp. 19-20, 32-33 and 85-86.

[21]   *See* Debtors' Exhibit 9, p. 11 and Debtors' Exhibits 120-124.

[22]   *See* testimony of Morgan.

[23]   Kern River was able to accomplish this price increase because its pipeline has a monopoly on natural gas transportation in that area. Its stated reasoning for not instituting a point-to-point pricing increase system-wide was that it was engaged in an active competition for shippers in other parts of the pipeline, thus making higher prices in those areas disadvantageous to it financially.

intent to harm, as Debtors charge. Regardless of motivation,[24] Kern River is disallowed from taking any action or failing to take any action that could have the effect of aggravating the injury caused by Debtors' rejection.

Kern River's point-to-point price increase for Southern Nevada shipping points did aggravate the injury caused by Debtors' rejection, as the new price made Debtors' purchase of interruptible capacity uneconomic. When MAEM found other avenues of supply for the Apex Facility,[25] the revenue Kern River had been receiving from Debtors' purchase of interruptible transportation ceased.

But for the price increase, as Hogan testified, Debtors would have preferred to purchase interruptible capacity from Kern River. Because the price increase by Kern River was not in response to competitive forces but was instead in recognition of its monopolistic presence in the

---

[24] Kern River serves two other plants in Southern Nevada, Big Horn and Silver Hawk, but the owners of each of these plants had firm capacity agreements with Kern River. It is uncontroverted that the Big Horn firm capacity agreement was sufficient to meet all of its demand, and, as a result, Big Horn was unaffected by Kern River's point-to-point price increase. The Silver Hawk firm capacity agreement may have been sufficient to meet its natural gas needs as well, and, if so, Debtors' Apex Facility, as the principal purchaser of interruptible capacity destined for Southern Nevada, would have been the one to feel the impact of the price increase. Certainly, Debtors, with the only plant in Southern Nevada not serviced by a firm capacity agreement, were most affected by the increase in the price of interruptible capacity.

[25] Because holders of firm capacity on the pipeline frequently do not use their allotment of capacity, MAEM was able to replace Kern River as a supplier of capacity. In spite of Morgan's testimony, the court has some difficulty in seeing how "competition" caused Kern River to raise the rates for interruptible transportation when its competition was its own shippers, whose offer of capacity on the secondary market was characterized by its "firm" versus "interruptible" nature. Even if Kern River was motivated by a desire to do its firm capacity shippers a favor by sending MAEM's business their way (as opposed to retaliating against MAEM in a bite-your-nose-to-spite-your-face fashion), the decision to raise the rates cost Kern River revenues that would otherwise have offset its damages. The court recognizes that Debtors believe Kern River's strategy is related to its FERC case; if so, that is not relevant in the present context (as opposed to, say, subordination under 11 U.S.C. § 510(c)), indicating, at most, a prioritization by Kern River of various means for making itself whole.

region, the court will include, for the term of the Contract following the price change, the

mitigation value of Debtors' previous interruptible capacity purchasing activity.[26]

Therefore, the court holds that, for mitigation purposes, Kern River's damages must be

calculated as if Debtor continued to purchase interruptible transportation capacity from Kern

River at the system-wide market rate during the months of November to March until the contract

expiration date.[27]

### 4. Are Debtors Entitled to Credit for the First Interruptible Capacity Sold by Kern River?

Debtors take the position that the first 90,000 decatherms of capacity sold as interruptible

transportation by Kern River should be credited as mitigation. Debtors' argument is that the

rejected capacity is part of the pipeline's design capacity and that design capacity should be

deemed the first capacity sold by Kern River. While the court concurs that 12,897

decatherms of capacity to the Wheeler Ridge destination point (discussed below) should be

considered the first interruptible capacity sold to that destination, since it is available only

because of Debtors' rejection of the Contract, the balance of the rejected capacity is no

different from any other of Kern River's operational capacity. The court holds that Kern

River is under no obligation to sell the rejected capacity first as interruptible transportation.

The court therefore finds that, except for Debtors' allocation of Wheeler Ridge capacity and

---

[26]     In calculating the value of the potential mitigation, the court has adopted MAEM's decatherm purchases
monthly from the 12 months preceding the rate increase and then assumed identical purchases going
forward in future years at rates largely as opined to by Beach.

[27]     For a discussion as to why mitigation is only credited to Debtors for its interruptible capacity purchases
during the months of November through March, see below.

capacity Debtors bought or would have bought for themselves, Beach's forward estimate of mitigating sales constitutes reasonable mitigation.[28]

### 5. Should Kern River's Rate Case Recovery Offset the Claim?

Debtors argue that, in its rate case before FERC, Kern River seeks an increase in rates in part to compensate it for losses from rejection of the Contract. Debtors reason that, if successful there, Kern River will wind up with two recoveries: one on the Claim; the other through increased rates.

Debtors mistake the significance of the potential overlap between an increase in regulated rates and rejection damages. That a debtor's contract party is able to cover losses resulting from the debtor's rejection of the contract by raising prices is not comparable to those situations where the Bankruptcy Code recognizes the need to adjust the amount of a claim to account for the obligation of another party to pay it.[29] To equate recovery through a price increase to recovery on a claim would invite endless inquiry and litigation regarding all actions of the contract party to compensate for the debtor's default. Nor is Kern River's case different because it involves regulated rates. With certain specific exceptions,[30] the Bankruptcy Code does not distinguish between contracts that are subject to regulatory control and those that are not. The court does not

---

[28]  The court adopts most of Beach's estimate of future sales. Beach's report and testimony provide the only projection of sales of interruptible capacity before the court. MaKholm's report and testimony were based on sales of firm capacity. If Kern River had made sales of firm capacity as projected by MaKholm, it would have breached its MFN clauses. As the court concludes calculation of the Claim should not be based on the assumption that Kern River should ignore the MFN clauses, MaKholm's testimony and report cannot be used.

[29]  *See, e.g.*, 11 U.S.C. §§ 502(e) and 508.

[30]  *See, e.g.*, 11 U.S.C. §§ 362(d)(4), 365(o) and 1129(a)(6). *See also Official Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp., et al.)*, 373 F.3d 511 (5ᵗʰ Cir. 2004).

propose to do so, and thus holds that Kern River is not required to offset against the Claim any increase in rates obtained from FERC.[31]

**C. What is the Value of Kern River's Claim after Allowance for Proper Mitigation?**

The mitigation Kern River is required by Utah law to perform will reduce the Claim. In the Claim, Kern River has accounted for a certain amount of mitigation but has not factored in all legally required mitigation.[32] Kern River has also discounted its total damages back to get a net present value but has chosen a discount rate that does not properly quantify its Claim.[33] Therefore, the court must establish the further mitigation for which Debtors should receive credit and will select a discount rate for the Claim that is consistent with the court's understanding of the law.

**1. What Factors Should Affect Kern River's Mitigation?**

**i. Sale of Rejected Capacity to Third Parties on the Interruptible Transportation Market**

Beach opined in his expert report that Kern River would mitigate its damage by selling the rejected capacity on the interruptible transportation market during the months of April

---

[31]    Debtors point out that in the rate case, contrary to the way it calculated the Claim, Kern River assumes the rejected capacity will be the first interruptible capacity sold. In the different contexts presented it is not *per se* unreasonable that Kern River would adopt a different position for rate-fixing purposes than for determining damages from rejection of the Contract. In any case, since there is no way Kern River's customers can recover from Debtors' estates, if any offset to account for overlap is appropriate it would logically occur in the rate case.

[32]    *E.g.*, Kern River sold as firm capacity a certain portion of the rejected capacity. It credited this sale, $1,391,968, as mitigation against the damages resulting from rejection.

[33]    Kern River offers three alternative rates for discounting its claim to net present value. *See* testimony of Williamson. It suggests the FERC refund rate, which it states is 4.25%. Alternatively it proposes its cost of debt associated with the 2003 pipeline expansion project, which is 5.14%, or the federal judgment rate of interest, 1.07%. Debtor offers a risk-adjusted rate of 15.92% based on Ma's method for calculating the true worth of the Claim for discounting it to a net present value.

through October[34] through the term of the Contract (those being the months in which demand for interruptible transportation on the Kern River system is highest). In his report, Beach differentiated between sales of capacity to the Daggett delivery point and the Wheeler Ridge delivery point.[35] He concluded[36] that while Kern River could sell the part of the rejected capacity that was deliverable to Daggett as interruptible transportation during these months, it would be unable to sell the capacity deliverable to Wheeler Ridge because that was considered a "bottleneck" on the system.[37] Beach based his opinion that sales are impossible at Wheeler Ridge on Kern River's assumption that it qualifies as a lost volume seller.[38] In other words, because the rejected capacity was to be considered the last 90,000 decatherms of interruptible capacity and since users of firm capacity or interruptible capacity sold before the rejected capacity would disproportionately elect Wheeler Ridge for delivery, all available capacity to Wheeler Ridge would be claimed before the last 90,000 decatherms of capacity were reached. As the court holds that Kern River does not qualify as a lost volume seller, Beach's opinion is flawed. Indeed, had Debtors not rejected the Contract, the Wheeler Ridge capacity available under the Contract would have been reserved for MAEM's use and would not have been

---

[34]     See Kern River Exhibit 87, p. 10.

[35]     In the contract it was specified that, out of 90,000 decatherms of capacity purchased per day, 77,103 decatherms would be designated as deliverable to the Daggett, California delivery point and 12,897 decatherms would be designated as deliverable to the Wheeler Ridge, California delivery point. While the MAEM capacity was purchased principally to supply the Apex Facility, and therefore might typically be delivered short of either the Daggett or Wheeler Ridge delivery point, MAEM also wanted access to other gas markets through Daggett and Wheeler Ridge. Between Daggett and Wheeler Ridge, the Wheeler Ridge delivery point was more valuable as it was the "gateway" into a larger market (Southern California) than that accessed by the Daggett delivery point (Northern California).

[36]     See Kern River Exhibit 87, p. 7

[37]     Because of the value associated with the Wheeler Ridge delivery point and the resulting excess of demand over supply, at the time of subscription shippers received only a prorated share of their capacity at that point, thereby causing what Kern River calls a capacity "bottleneck."

[38]     See Kern River Exhibit 87, p. 10.

available for sale on the interruptible transport market. Thus, the assumption that the Wheeler Ridge capacity would be exhausted before the rejected capacity is reached is wrong.

Adopting Beach's view that Kern River is able to mitigate its damage by selling the rejected capacity on the interruptible transportation market during the months of April through October, mitigation shall include every such period until the expiration date of the Contract. The court also holds that due to Kern River's replacement seller status, it will mitigate its losses further by selling the rejected Wheeler Ridge capacity during the remaining five months of the year. Kern River's Claim will be reduced accordingly.[39]

### ii. Sale of Rejected Capacity to Debtors as Interruptible Transportation

Prior to Kern River's point-to-point price increase at the Apex delivery point in December of 2004, Debtors purchased capacity from Kern River on the interruptible transportation market.[40] These purchases should have been credited as mitigation. The Claim will be reduced accordingly.

After the price increase Debtors looked elsewhere for capacity needs and eventually acquired capacity from third parties. By raising the rate, Kern River made mitigation through purchase of capacity to the Nevada destinations impossible, including interruptible transportation purchased by Debtors. This action served to exacerbate the damage caused by Debtor's rejection and to that extent is not allowable as damages per Utah law. *See Utah Farm Prod. Credit Ass'n*, 627 P.2d at 64; *Mahmood*, 990 P.2d at 940; *Madsen*, 743 P.2d at 1214. Without this action, according to Hogan, Debtors would have preferred purchasing interruptible transportation from

---

[39] Up to the 12,897 decatherms per day of capacity shall be counted as additional mitigation for any period following rejection of the Contract during which less than 90,000 decatherms per day of mitigation has been credited to Debtors.

[40] These capacity purchases were of approximately 30,000 decatherms per day.

Kern River at the market price for the foreseeable future and would have continued to accumulate mitigation credit against the damage caused by rejection of the Contract.

Consequently, the court holds that Debtors should receive credit for mitigation during the months of November through March of each year until the Contract expiration date for the amount of capacity Debtors purchased during those same months in 2003-2004.[41] Such mitigation may be computed by multiplying the historical transportation capacity purchased by Debtors during the months specified by the projected market price in Beach's report (adjusted as described below) for the year being evaluated.

### iii. How Liquefied Natural Gas Should Affect Mitigation

In his report, Beach stated that a Liquefied Natural Gas ("LNG") terminal was expected to be completed in California in 2008[42] that would drastically impact the interruptible transportation market price for the Kern River and other pipeline systems.[43] He reasoned that such an infusion of supply into the California market, combined with falling demand for natural gas, would harm pipeline capacity value.[44] On this basis, Beach calculated interruptible

---

[41]   Mitigation need only be added for the months of November through March of each year because Beach already credited sale of all of the rejected capacity on the interruptible transportation market during the other seven months of the year.

[42]   *See* Kern River Exhibit 87, p. 10.

[43]   Liquefied natural gas is an alternative delivery option to natural gas shipped via traditional pipeline. With LNG, the gas is chilled until it condenses and is compressed for transportation on large tanker vessels. It is then delivered to receiving terminals where it is expanded back into a gaseous form and is shipped via short-range pipeline to its ultimate destination. Such transportation is neither inexpensive nor completely reliable. Traditionally, LNG has been a more expensive market alternative than pipeline-delivered natural gas. *See* The Center for Liquefied Natural Gas, http://www.lngfacts.org/faq/, (last visited 8/17/2005).

[44]   Beach explains that as California moves toward a significant presence in renewable energy sources and away from electricity generated by traditional sources such as coal and natural gas, a large infusion of natural gas supply will destroy the value of transportation on the Kern River pipeline system. *See* Kern River Exhibit 87, pp. 10-11.

transportation in 2008 at a negligible rate.[45] As he viewed transportation sales in 2008 to be virtually without value, he also viewed the mitigation available to Kern River in such year as without meaningful value.

The court does not find Beach's reasons for a very low 2008 interruptible transportation rate to be convincing. Due to the added costs associated with creating and transporting LNG and the delays in the construction of the California LNG terminal,[46] it is doubtful that the eventual completion of a working LNG terminal would so severely affect the secondary interruptible transportation market for Kern River. This seems to be acknowledged by Beach, as he has placed the 2009 capacity price higher than his assumed scenario of shrinking demand and oversupply would seem to allow. Moreover, the court has insufficient evidence before it to find that liquefied natural gas would affect Kern River's transport of gas to places served directly by pipelines, especially in Southern Nevada, where Kern River has an effective monopoly. Finally, as Hogan testified, added use of gas-fired facilities to replace a Mohave coal-fired plant that will soon be shut down will require use of Kern River's pipeline.

The court finds that Beach's projections for 2009 are likely accurate as to the effects of the LNG terminal on the marketplace. As such, and in light of the fact that delays in

---

[45]   Beach's original estimate of 2008 interruptible transportation value was $.00 per decatherm but was later revised upward to $.01 per decatherm. *See* Kern River Exhibit 87, pp. 10-11, and Kern River Exhibit 153.

[46]   On cross examination, both Morgan and Beach admitted to the uncertainty surrounding the introduction of LNG into the California market. Morgan testified that the high costs, environmental and public safety concerns, and licensing requirements associated with the introduction of LNG into the California market created uncertainty as to whether such an introduction would actually occur. Beach testified that he had relied upon a California Energy Commission report on the status of the proposed LNG projects in formulating his own report projecting a very low interruptible transportation rate for 2008. Beach admitted that subsequent updates to the California Energy Commission's report reflecting delays in the construction of the Energia Costa Azul LNG project indicated that it is less likely that LNG will be introduced into the California market by 2008.

construction could cause the terminal to be completed later than 2008, the court will adopt

Beach's 2009 price projections as the 2008 capacity price as well in its mitigation calculations.

### 2. Discount Rate to be Used to get a Net Present Value of Kern River's Claim After Proper Mitigation has been Subtracted

Kern River must discount its Claim, minus mitigation, back to its net present value. 11

U.S.C. § 502(b); *In re Stembridge*, 394 F.3d 383, 387-88 (5th Cir. 2004); *In re Loewen Group*

*Int'l, Inc.*, 274 BR 427, 434-35 (Bankr. D. Del. 2002). "[T]he discount rate performs two

functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash

flow stream to account for risk." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333

(Fed. Cir. 2002). There is, however, no mandated method in federal law for the determination of

discount rates so as to reduce a claim to its present value. *St. Louis Sw. Ry. Co. v. Dickerson*,

470 U.S. 409, 412 (1985).

Kern River has suggested several rates that it contends are equally appropriate for use as

a discount rate in the case at bar. These rates range from 1.07% to 5.14%. Debtors have

suggested, alternatively, a rate Debtors contend gives proper recognition to the risk of an

obligation from a bankrupt entity. This rate is at 15.92%.[47]

The Kern River proposed rates are not suitable for the purpose of quantifying the Claim

at an amount commensurate with the claims of other creditors. Being a rate to ensure that

payment of a judgment in the future provides compensation for the passage of time the federal

judgment rate (1.07%) is inapplicable.[48] FERC's refund rate (4.25%) serves a like function,

---

[47] Neither party has offered any Utah case or any controlling decision in federal court that would require use of any particular discount rate.

[48] The applicability of the federal judgment rate to quantification or satisfaction of claims is questionable after *Till v. S.C.S. Credit Corp.*, 541 U.S. 465 (2004). Were the court to consider use of a rate in bankruptcy meant to compensate for a delay in future payment as a discount rate, it would look to *Till* for guidance.

compensating for loss of the use of funds. Kern River's interest rate on its debt is closer to the mark, but is more apt for assessing the correct discount rate on an obligation *from* Kern River than one *to* Kern River.

Kern River rejects the idea that risk should play any role in fixing the discount rate. Relying on *Kucin v. Devan*, 251 B.R. 269 (D. Md. 2000), *In re Highland Superstores, Inc.*, 154 F.3d 573 (6th Cir. 1998),[49] and the Sixth Circuit's analogy in the latter case to a creditworthy contract party (e.g., Bill Gates) who enters into a contract identical to that rejected by a bankrupt debtor, Kern River argues that adding a risk premium to a discount rate for determining damages would result in the damages assessable against the creditworthy contract party (whose discount rate would be lower since it would include a smaller risk premium) being more than those assessable against the bankrupt debtor. Thus, relying on *Highland*, Kern River urges that in setting damages, risk should not be a factor.

With all respect to the Court of Appeals for the Sixth Circuit, the Bill Gates analogy is flawed. The creditworthy contract party would typically not enter into the same contract as the

---

[49]        In *Kucin v. Devan*, the court applied a risk-free discount rate based on rates for government securities in calculating the present value of plaintiffs' claims against the debtor for retirement benefits. The Court in *In re Highland Superstores, Inc.* similarly found the use of a risk-free discount rate (here the judgment rate applicable under state law) to be appropriate in determining the present value of a creditor's claim that arose out of the debtor's breach of a lease. The Courts in both cases applied fundamental contract principles in reaching the conclusion that, in discounting a creditor's claim for a fixed, legally certain amount of damages to present value, it is inappropriate to apply a discount rate that includes a risk factor based upon the debtor's financial condition at the time of breach. The *Kucin* and *Highland* Courts' analyses are equally flawed in that each presents a dichotomy between a risk-free discount rate and a discount rate that takes into account the debtor's creditworthiness *at the time of breach*. Neither Court considered the appropriateness of including in the discount rate a risk factor based upon an *ex ante* view of the debtor's creditworthiness, that is its creditworthiness at the time the parties entered into the contract. It is for this reason that the court declines to follow the *Kucin* and *Highland* Courts' reasoning. Moreover, in *Highland*, the Sixth Circuit had the benefit of guidance in state law on quantification of damages. Finally, the *Highland* case posed the issue of whether mitigation of a lease rejection through reletting the premises to a lessee that, though paying less rent, was highly creditworthy could wipe out the landlord's claim (since the stream of payments due from debtor were subject to greater risk than those due from the new tenant, the discounted value of the mitigation exceeded the landlord's claim). In the case at bar, mitigation is deducted from the payments due to Kern River under the Contract prior to discounting. Thus the absurd result rejected by the *Highland* Court could not occur under the methodology adopted to quantify the Claim.

prospective debtor; their different creditworthiness would be accounted for in dickered terms of their respective bargains. There being small risk of Bill Gates being unable to perform, he could contract for better terms.

This flaw in Kern River and the Sixth Circuit's analogy also points out the error in Debtors' selection of a discount rate. The discount rate chosen to reduce a claim to present value should be determined not on the basis of risks associated with dealing with Debtors postpetition or after confirmation of a plan of reorganization. Rather, the risk to be taken into account is the risk of non-performance at the time Debtors contracted with Kern River.[50] The purpose of application of the discount rate is to reduce the Claim to an amount consistent with the allowed amounts of other claims. Just as 11 U.S.C. § 502(b)(2) provides for disallowance of a claim to the extent of unmatured interest, including an original issue discount (*See In re Pengo Indus., Inc.*, 962 F.2d 543, 546 (5th Cir. 1992); S.Rep. No. 989, 95th Cong., 2d Sess. 62, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5848; H.R.Rep. No. 595, 95th Cong., 2d Sess. 352, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308) to ensure that a creditor is not compensated for time passage (and the concomitant risk) that will never be faced, so, too, a discount rate must be applied to a claim for rejection damages to compensate for the absence of future risk of non-performance.[51]

By taking into account in the discount rate the risk of non-performance faced by Kern River *before* bankruptcy, the court will ensure that the discounted Claim is quantified similarly

---

[50] The Contract dates from 2001. It is that point in time that the court must look to. If the court were determining a discount rate for a contractual relationship originating on the eve of bankruptcy, a higher discount rate would be in order.

[51] Although Kern River is subject to regulatory agencies that limit the variables in contracts between Kern River and its shippers, as demonstrated by its pending rate case before FERC, the risk of non-performance is accounted for in the rate-approval process. In its FERC case, Kern River has raised as one of its reasons for increased rates its losses due to rejection of the Contract. The relevance of these losses to the rate-fixing process demonstrates that risk of non-performance by a shipper is considered in establishing the terms controlling contracts with Kern River.

to, and will thus be treated on a parity with, other claims.[52] This will prevent Kern River from being overcompensated in comparison with other claimants. On the other hand, it will ensure that Kern River is not penalized by application of a discount rate that reflects a bankrupt's lack of creditworthiness rather than the credit of the party with which Kern River initially contracted.[53]

Although the court does not have extensive evidence before it showing what discount rate should be applied to reduce the Claim to an amount commensurate with other debts incurred prepetition, there is some guidance available: the interest rates Debtors paid for borrowed money prepetition. The interest rate required of Debtors prepetition, at a time when Debtors were more creditworthy, is a fair measure of the market's[54] assessment of the risk associated with dealing with Debtors. Prior to filing, Debtors' borrowings included Mirant Corp. debt securities, which were largely comprised of $200 million of senior notes bearing a 7.4% interest rate and $500

---

[52]     Equivalent treatment of creditors is a key goal in bankruptcy. *See Pension Benefit Guaranty Corp. v. CF&I Fabricators of Utah, Inc*., 150 F.3d 1293, 1301 (10th Cir. 1998) (Court relying on the "cardinal rule of bankruptcy" that all claims within the same class must be treated alike in support of its conclusion that it was not bound by an ERISA valuation regulation in determining the appropriate discount rate to be applied in calculating the present value of a claim); *Hunt v. Bankers Trust Co*., 799 F.2d 1060, 1069 (5th Cir. 1986) (Court stating that the purpose of the automatic stay is to promote the bankruptcy goal of equal treatment of creditors); *Chao v. Hosp. Staffing Servs., Inc*., 270 F.3d 374, 382 (6th Cir. 2001) (same); *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Company, Inc.*), No. 98-1080, 1998 U.S. App. LEXIS 21387, at *16 (4th Cir. Aug. 31, 1998) (Court agreeing with the proposition that the central goal of bankruptcy law is the equality of treatment among creditors).

[53]     Although the Supreme Court's decision in *Till* was in a case that is no more "than a distant cousin" to that before this court (*Highland*, 154 F.3d at 580), *Till* does clearly counsel the use of reality-based interest rates for quantification purposes in bankruptcy cases (there the prime rate). The selection of a discount rate for the Claim that recognizes realities of the various transactions entered into by Debtors is consistent with such an approach.

[54]     In valuing Debtors, looking to the post-confirmation period, the market's assessment of risk is not determinative. *See, e.g., In re Exide Techs*., 303 B.R. 48, 66 (Bankr. Del. 2003); *In re Penn Cent. Transp. Co*., 596 F.3d 1102, 1115 (3rd Cir. 1979). However, in choosing a discount rate to reduce a prepetition claim to present value, applying the market's assessment of risk prepetition is suited to quantifying a claim so that it is placed on the same footing as other claims.

million of senior notes bearing a 7.9% interest rate.[55] Debtors' prepetition borrowings also included the following debt securities at the Mirant Americas Generating, LLC., level: $500 million of senior notes at 7.625% interest, $300 million of senior notes at 7.20% interest, $850 million of senior notes at 8.30% interest, $450 million of senior notes at 8.50% interest, and $400 million of senior notes at 9.125% interest.[56] This analysis suggests the use of a discount rate of between 7.4% and 9.125%, and, thus, the court fixes the discount rate for purposes of calculating Kern River's claim at 8.00%, which it finds will fairly compensate Kern River but will not overcompensate it at the expense of all other similarly situated creditors.

## III. Valuation

After adding the additional mitigation required by this opinion, the court finds that the total value to be mitigated against Kern River's original unadjusted, undiscounted claim of $210,210,543 is $73,938,459.05. Such mitigation will reduce Kern River's undiscounted claim to $136,272,083.95. After applying a discount rate of 8.00% and offsetting all sums Kern River has already received, the court holds that Kern River shall have allowed a general, unsecured Claim against MAEM in the amount of $74,403,116.17. The Objection is SUSTAINED as hereinbefore described and otherwise OVERRULED.

It is so ORDERED.

### # # # END OF ORDER # # #

---

[55] *See* First Amended Disclosure Statement Relating to the Debtors' First Amended Joint Chapter 11 Plan of Reorganization, p.36.

[56] *See id.*