**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| In re | Chapter 11 Case |
| MIRANT CORPORATION, et al., | Case No. 03-46590 (DML) |
|  | Jointly Administered |
| Debtors. |  |

---

**SECOND AMENDED DISCLOSURE STATEMENT RELATING TO THE**
**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

---

Dated: September 30, 2005

WHITE & CASE LLP
Thomas E Lauria
Craig H. Averch
Gerard Uzzi
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
(305) 371-2700

HAYNES AND BOONE, LLP
Robin Phelan
Ian T. Peck
901 Main Street, Suite 3100
Dallas, TX 75202
(214) 651-5000

ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION

### TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................... 1
II.    NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS................. 1
III.   EXPLANATION OF CHAPTER 11 ............................................ 3
       A.  Overview of Chapter 11 ..................................................... 3
       B.  Plan of Reorganization ...................................................... 4
       C.  Confirmation of a Plan of Reorganization ...................................... 4
IV.    OVERVIEW OF THE PLAN ................................................... 5
       A.  Summary of the Terms of the Plan ........................................... 5
       B.  Summary of Distributions Under the Plan ...................................... 8
V.     GENERAL INFORMATION .................................................... 19
       A.  The Businesses of Mirant ................................................... 19
           1.   The North American Business ........................................... 20
           2.   The International Business .............................................. 35
       B.  Employees ................................................................ 39
       C.  Existing Financing Transactions of the Debtors ................................. 39
           1.   Mirant ................................................................ 39
           2.   MAEM ................................................................ 40
           3.   Mirant Americas Development Capital, LLC............................... 40
           4.   West Georgia ......................................................... 40
           5.   MAG ................................................................. 41
           6.   MIRMA ............................................................... 41
       D.  History of Mirant Corporation and Events Precipitating the Chapter 11 Cases ........ 41
           1.   Formation, Initial Public Offering and Spin-Off............................ 41
           2.   Financial Crisis in the U.S. Power Industry ............................... 43
           3.   Credit Rating Downgrades, Financing Issues and Accounting Issues ............ 43
           4.   Unsuccessful Out-of-Court Restructuring and Exchange Offers................. 45
VI.    CERTAIN AFFILIATE TRANSACTIONS ...................................... 46
       A.  Overview.................................................................. 46
       B.  Material Intercompany Transactions and Relationships Among the Debtors........... 46
           1.   Intercompany Relationships Involving Mirant Services ....................... 47
           2.   Intercompany Relationships Involving MAEM ............................. 47
           3.   Consolidated Cash Management System.................................... 48
           4.   Credit and Capital Support .............................................. 48
           5.   Dividends and Capital Transactions ....................................... 49
           6.   Intercompany Loans and Advances ....................................... 49
           7.   Intercompany Loans by MAG ............................................ 50
           8.   Purchase of Mid-Atlantic Generation Assets ............................... 50
           9.   Recapitalization of Intercompany Debt .................................... 51
           10.  MAI/New England Note ................................................. 51
           11.  The Equipment Warehouse Facility........................................ 52
           12.  Common Asset Management .............................................. 52
           13.  Tax Sharing Arrangements ............................................... 52

i

Page

C. Potential Claims and Remedies .............................................. 53
    1. Substantive Consolidation ................................................ 53
    2. Fraudulent Conveyances and Preferences ................................... 53
    3. Equitable Subordination and Recharacterization ............................ 54

VII. SELECTED FINANCIAL INFORMATION ..................................... 55
  A. Annual Financial Information for Mirant ...................................... 55
  B. Financial Statements for Mirant .............................................. 55

VIII. FINANCIAL PROJECTIONS AND ASSUMPTIONS............................. 59
  A. Purpose and Objectives....................................................... 59
  B. Projected Consolidated Financial Statements .................................. 59
  C. Summary of Significant Assumptions .......................................... 61
    1. Effective Date and Plan Terms........................................... 61
    2. North America ......................................................... 62
    3. Philippines ............................................................ 65
    4. Caribbean ............................................................. 65
    5. Corporate Overhead .................................................... 66
    6. Operating Expenses .................................................... 67
    7. Operating Performance Initiative ........................................ 67
    8. Collateral and Liquidity Needs........................................... 68
    9. Income Taxes ......................................................... 69
    10. Capital Expenditures and Depreciation .................................... 69
    11. Reorganization Costs ................................................... 70
    12. Interest Expense ....................................................... 70
    13. Financing Activities .................................................... 71
    14. Reinstated MAG Debt .................................................. 71
    15. No Dividend Assumption ................................................ 71
    16. Credit Support ........................................................ 71
    17. MAG Long-Term Notes Refinancing ..................................... 71
  D. Subsequently Identified Variances to Projected Gross Margins .................... 71
  E. Temporary Shut Down of Potomac River Station; Outage at Morgantown Station ..... 72

IX. VALUATION ................................................................ 73

X. THE CHAPTER 11 CASES ................................................... 75
  A. Commencement of the Chapter 11 Cases ...................................... 75
  B. Continuation of Business after the Petition Date ................................ 75
    1. Counterparty Assurance Program......................................... 75
    2. DIP Credit Facility .................................................... 76
    3. Employee-Related Matters .............................................. 76
    4. Cash Management ...................................................... 77
    5. Payment of Prepetition Trust Fund Taxes and Governmental Fees .............. 77
    6. Critical Vendors ....................................................... 77
    7. Retention of Ordinary Course Professionals ................................ 77
    8. Limited Notice Procedures and Complex Chapter 11 Bankruptcy Case Treatment 77
    9. Continued Trading Order ................................................ 78
    10. Trading Contract Settlement Protocol ..................................... 78

                                                                                      **Page**

    C.   Representation of the Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
    D.   Formation and Representation of the Creditors' Committee . . . . . . . . . . . . . . . . . . . . . . . . 79
        1.   Committee of Unsecured Creditors for Mirant Corporation . . . . . . . . . . . . . . . . . . . 79
        2.   Committee of Unsecured Creditors for Mirant Americas Generation . . . . . . . . . . . 79
        3.   Committee of Equity Security Holders of Mirant Corporation . . . . . . . . . . . . . . . . . 79
    E.   Matters Relating to Unexpired Leases and Executory Contracts . . . . . . . . . . . . . . . . . . . . 80
    F.   Exclusivity Periods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    G.   Protected Persons Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    H.   Risk Management Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    I.   Appointment of Examiner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    J.   Professional Fee Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    K.   Intercompany Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    L.   Material Asset Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
        1.   Coyote Springs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
        2.   Turbine Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
        3.   Wrightsville . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
        4.   Birchwood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
        5.   Mint Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
        6.   Mirant Service Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
        7.   Wichita Falls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
    M.   Letter of Credit Extensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
    N.   Canadian Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
    O.   Claims Objection Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
    P.   Equity Committee Motion and Complaint to Compel a Shareholders' Meeting . . . . . . . . 85
    Q.   California Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
        1.   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
        2.   Mirant Debtors Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
        3.   MAG Debtors Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
        4.   Chapter 5 Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
    R.   Term Sheet Concerning Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
XI.    MATERIAL CLAIMS, LITIGATION AND INVESTIGATIONS . . . . . . . . . . . . . . . . . . . . 91
    A.   Overview of Estate Claims and Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
    B.   Procedures for Resolving Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
        1.   Claims Objection Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
        2.   Claims Estimation Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
    C.   Description of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
        1.   Estimated Claim Amounts by Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
        2.   Disputed Material Litigation Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
    D.   Detailed Description of Material Claims and Obligations . . . . . . . . . . . . . . . . . . . . . . . . . 97
        1.   Resolved Disputed Material Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
        2.   Unresolved Disputed Material Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
        3.   Environmental Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
        4.   Western Ratepayer Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
        5.   Shareholder-Bondholder Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

                                                                                                    Page

        E.    Disputed Claims With Associated Estate Causes of Action ........................ 116
              1.    NY Tax — New York Real Property Tax Litigation .......................... 116
              2.    Southern Company Investigation/Litigation ................................ 117
              3.    MIRMA Leases/Litigation ............................................... 118
              4.    Pepco Litigation ...................................................... 119
              5.    SMECO — Southern Maryland Electric Cooperative ....................... 123
        F.    Other Estate Claims — Avoidance Actions ................................... 124
              1.    The Tolling Motion ................................................... 124
              2.    Preference Actions ................................................... 125
              3.    Fraudulent Transfer Actions ............................................ 125
              4.    Southern Transactions: Morgan Stanley & Co., Incorporated and Goldman
                    Sachs & Co. ......................................................... 130
              5.    Southern Transactions: Troutman Sanders, LLP ........................... 130
              6.    Southern Transactions: Lehman and Bank of America ...................... 131
              7.    Southern Transactions: Arthur Andersen ................................. 131
              8.    Causes of Action Subject to Stay........................................ 131
              9.    Reservation of Rights with Respect to Tolled, Stayed and Potential Actions ...... 132
XII.    THE CHAPTER 11 PLAN ........................................................ 132
        A.    Introduction ............................................................... 132
        B.    Settlement of Certain Inter-Debtor Issues — Creation of Debtor Groups ............. 133
        C.    General Description of the Treatment of Claims and Equity Interests................ 136
              1.    Administrative Claims and Priority Tax Claims ........................... 136
              2.    Treatment of Administrative Claims ..................................... 136
              3.    Allowed Tax Claims.................................................. 138
              4.    Classified Claims and Equity Interests .................................. 139
              5.    Separate Classification of Certain Claims ................................ 139
              6.    Separate Classification of Certain MAG Claims ........................... 139
        D.    Provisions for Treatment of Mirant Debtor Claims and Equity Interests ............. 140
              1.    Mirant Debtor Class 1 — Priority Claims ................................ 140
              2.    Mirant Debtor Class 2 — Secured Claims ................................ 140
              3.    Mirant Debtor Class 3 — Unsecured Claims ............................. 142
              4.    Mirant Debtor Class 4 — Convenience Claims ........................... 144
              5.    Mirant Debtor Class 5 — Equity Interests .............................. 145
        E.    Provisions for Treatment of MAG Debtor Claims and Equity Interests .............. 146
              1.    MAG Debtor Class 1 — Priority Claims................................. 146
              2.    MAG Debtor Class 2 — Secured Claims ................................. 146
              3.    MAG Debtor Class 3 — New York Taxing Authorities Secured Claims ........ 147
              4.    MAG Debtor Class 4 — PG&E/RMR Claims ............................. 147
              5.    MAG Debtor Class 5 — Unsecured Claims ............................... 148
              6.    MAG Debtor Class 6 — MAG Long-term Note Claims ..................... 149
              7.    MAG Debtor Class 7 — Convenience Claims ............................. 151
              8.    MAG Debtor Class 8 — Equity Interests ................................ 152
        F.    Designated Net Litigation Distributions ....................................... 152

Page

G.  Transfers and Restructuring to Implement the Plan ............................... 153
    1.  General ................................................................. 153
    2.  Organization of Parent Company .......................................... 154
    3.  Transfer of Assets to New Mirant ........................................ 155
    4.  New Corporate Vehicles ................................................. 155
    5.  Transfer of the Energy Trading Business.................................. 156
    6.  Credit Support for MAG Debtors ......................................... 156
    7.  Transfer of Generation Assets to MAG ................................... 157
    8.  Transfer of MIRMA Lease Obligations and Assets.......................... 157
    9.  Mirant and Plan Trust .................................................. 157
    10. Effect of Transfers and Restructuring to Implement the Plan ................. 158
H.  Description of Certain Securities to be Issued Pursuant to the Plan ................. 159
    1.  New Mirant Common Stock .............................................. 159
    2.  New Mirant Warrants .................................................. 161
    3.  Plan Secured Notes ..................................................... 162
    4.  West Georgia Secured Note .............................................. 162
    5.  New MAG Holdco Notes ................................................. 162
    6.  MAI Series A Preferred Shares ........................................... 163
    7.  MAI Series B Preferred Shares ........................................... 164
I.  Exit Financing .............................................................. 165
    1.  Bidding Process for Exit Financing ....................................... 165
    2.  Terms of Exit Financing ................................................ 166
    3.  Conditions to Exit Financing ............................................ 167
J.  Claims Against Insiders ...................................................... 168
K.  Settlements and Compromises ................................................ 169
    1.  California Settlement .................................................... 169
    2.  Proposed New York Tax Settlement ....................................... 169
    3.  Settlement of Certain Prepetition Employee Obligations ..................... 172
    4.  Settlement of Certain Subordination Rights ................................ 173
L.  Means of Implementation of the Plan ......................................... 174
    1.  Operations between the Confirmation Date and the Effective Date.............. 174
    2.  Corporate Action ...................................................... 174
    3.  Termination of Certain Debt Obligations .................................. 175
    4.  Continued Corporate Existence of the Debtors ............................. 175
    5.  Re-vesting of Assets .................................................... 175
    6.  Sale Provisions Relating to Mint Farm ................................... 175
    7.  Management .......................................................... 176
    8.  Initial Boards of Directors ............................................... 176
    9.  Officers .............................................................. 177
    10. Causes of Action ...................................................... 177
    11. Appointment of the Disbursing Agent ..................................... 178
    12. Sources of Cash for Plan Distributions .................................... 178
    13. New Mirant Employee Stock Programs .................................... 178

Page

14. Investment of Funds Held by the Disbursing Agent; Tax Reporting by the
Disbursing Agent ........................................................ 178

15. Releases by the Debtors ................................................ 178

16. Appointment of New Mirant and MET as Attorneys-In-Fact .................. 178

M. The Plan Trust ............................................................ 179

1. Creation of Plan Trust and Appointment of Plan Trustees ..................... 179

2. Property of the Plan Trust .............................................. 179

3. Powers and Duties of the Plan Trustees ................................... 179

4. No Successor Liability ................................................. 180

N. Distribution Provisions ..................................................... 180

1. Plan Distributions .................................................... 180

2. Timing of Plan Distributions ........................................... 180

3. Address for Delivery of Plan Distributions ................................ 180

4. De Minimis Distributions .............................................. 181

5. Time Bar to Cash Payments ............................................ 181

6. Manner of Payment under the Plan ...................................... 181

7. Expenses Incurred on or after the Effective Date and Claims of the Disbursing
Agent ............................................................... 181

8. Fractional Plan Distributions ........................................... 181

9. Special Distribution Provisions for MAG Short-term Debt Claims, MAG Long-
term Note Claims and Mirant Debt Claims ............................... 182

10. Special Distribution Provisions for Equity Securities ........................ 184

11. Special Distribution for California Parties ................................. 184

12. Surrender and Cancellation of Instruments ................................ 185

13. Accrual of Interest for Purposes of Calculating Plan Distributions .............. 185

O. Supplemental Distributions to Holders of Allowed Mirant Debtor Class 3 — Unsecured
Claims ................................................................... 186

P. Procedures for Resolving and Treating Contested Claims ......................... 186

1. Objection Deadline .................................................... 186

2. Prosecution of Contested Claims ........................................ 186

3. Claims Settlement .................................................... 186

4. Entitlement to Plan Distributions Upon Allowance .......................... 187

5. Estimation of Claims .................................................. 187

Q. Conditions Precedent to Confirmation of the Plan .............................. 187

R. Conditions Precedent to Consummation of the Plan ............................. 189

1. Effective Date ....................................................... 189

2. Waiver of Conditions Precedent ......................................... 189

3. Effect of Non-Occurrence of the Effective Date ............................ 189

S. The Disbursing Agent ...................................................... 189

1. Powers and Duties .................................................... 189

2. Plan Distributions .................................................... 190

3. Exculpation ......................................................... 190

T. Executory Contracts and Unexpired Leases ..................................... 190

1. Executory Contracts and Unexpired Leases ................................ 190

2. Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 190

Page

3. Cure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
4. Assumption and Assignment of Executory Contracts and Unexpired Leases . . . . . . 192
5. Claims Arising from Rejection, Expiration or Termination . . . . . . . . . . . . . . . . . . . . 192
6. Special Provisions Relating to the BEWAG Contract . . . . . . . . . . . . . . . . . . . . . . . . . 192
7. Special Provisions Relating to the MIRMA Leases . . . . . . . . . . . . . . . . . . . . . . . . . . 193
8. Special Provisions Relating to Agreements with Pepco and its Subsidiaries . . . . . . . 196
9. Special Provisions Relating to Mint Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197
10. Special Provisions Relating to the New York Debtors . . . . . . . . . . . . . . . . . . . . . . . . 198
11. Special Provisions Relating to the FCC Agreement and Site Lease . . . . . . . . . . . . . 198
12. Special Provisions Relating to Mirant NY-Gen, LLC . . . . . . . . . . . . . . . . . . . . . . . . 199
U. Retention of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 200
V. Other Material Provisions of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
1. Payment of Statutory Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
2. Satisfaction of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
3. Third Party Agreements; Subordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201
4. Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
5. Discharge of Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
6. Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
7. Expedited Determination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
8. Exemption from Transfer Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
9. Retiree Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
10. Notice of Confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
11. Modification of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
12. Revocation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
13. Setoff Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
14. Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
15. Injunctions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
16. Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
17. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
18. Plan Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
19. Charter and Bylaws of New Mirant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
20. Discharge of Debtors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
XIII. ACCEPTANCE OR REJECTION OF THE PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
A. Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205
B. Confirmation of the Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207
1. Elements of Section 1129 of the Bankruptcy Code . . . . . . . . . . . . . . . . . . . . . . . . . . 207
2. Acceptance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208
3. Best Interests Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208
4. Feasibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
C. Cramdown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
1. No Unfair Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209
2. Fair and Equitable Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

Page

XIV.    RISK FACTORS ................................................................ 210
XV.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ..................... 219
    A.    U.S. Federal Income Tax Consequences to the Debtors ........................... 220
        1.    COD Income ...................................................... 220
        2.    Limitation on Net Operating Loss Carryforwards and Other Tax Attributes ...... 221
        3.    Intercompany Restructuring Transactions .................................. 224
        4.    Transfer of Assets to New Mirant ....................................... 225
        5.    Section 269 of the Tax Code ........................................... 225
        6.    Alternative Minimum Tax............................................. 226
    B.    U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of
        Allowed Claims and Equity Interests ........................................ 226
        1.    General Tax Considerations for Holders of Allowed Claims and Equity Interests .. 226
        2.    Certain Other Tax Considerations for Holders of Allowed Claims .............. 228
        3.    Tax Consequences to Certain Holders of Allowed Mirant Debtor Claims and
            Equity Interests in Mirant .............................................. 229
        4.    Tax Consequences to Certain Holders of Allowed Claims Against the
            MAG Debtors.......................................................... 233
    C.    U.S. Federal Income Tax Consequences to Holders of Contested Claims............. 237
    D.    U.S. Federal Income Tax Consequences of Ownership of New Mirant Common Stock
        and Notes ............................................................... 237
        1.    U.S. Holders ....................................................... 237
        2.    U.S. Federal Income Tax Consequences of Ownership of New Mirant
            Common Stock....................................................... 237
        3.    U.S. Federal Income Tax Consequences of Ownership of Notes ............... 238
        4.    U.S. Federal Income Tax Consequences of Ownership of New Mirant Warrants .. 241
    E.    Backup Withholding Tax and Information Reporting Requirements ................. 241
XVI.    CERTAIN SECURITIES LAW MATTERS ..................................... 242
    A.    Issuance of New Debtor Securities ........................................... 242
    B.    FERC Approval ........................................................... 242
    C.    Subsequent Transfers of New Debtor Securities ................................ 243
    D.    Antitrust Requirements..................................................... 244
XVII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN     244
    A.    Liquidation Under Chapter 7 of the Bankruptcy Code........................... 244
    B.    Alternative Plans of Reorganization ......................................... 244
XVIII.    CONCLUSION .............................................................. 246

## SCHEDULES AND EXHIBITS

| | |
|---|---|
| List of Defined Terms | Schedule 1 |
| List of the Debtors | Schedule 2 |
| Group Structure Chart | Schedule 3 |
| Third Parties That Have Obtained Relief From the Automatic Stay | Schedule 4 |
| Petition Date Net Intercompany Payables | Schedule 5 |
| Tier IV Claim Objections | Schedule 6 |
| Potential Causes of Action (No Complaint Filed) | Schedule 7 |
| Designated Avoidance Actions | Schedule 8 |
| Tolling Agreements With Non-Debtor, Wholly Owned Entities | Schedule 9 |
| Terms of New MAG Holdco Indenture | Schedule 10 |
| Schedule of Rejected Executory Contracts and Unexpired Leases | Schedule 11 |
| Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases | Schedule 12 |
| Provisions of Certificate of Incorporation of New Mirant Restricting Transfer of Securities | Schedule 13 |
| Market Prices for the Debtors' Publicly-Traded Securities | Schedule 14 |
| Second Amended Joint Chapter 11 Plan of Reorganization | Exhibit A |
| Disclosure Statement Order and Notice of the Confirmation Hearing | Exhibit B |
| Liquidation Analysis | Exhibit C |
| Projections | Exhibit D |
| View of Pepco and SMECO of How Certain Parts of the Disclosure Statement Should Read | Exhibit E |

(This page intentionally left blank)

# I.

## INTRODUCTION

THIS SECOND AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") INCLUDES AND DESCRIBES THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, DATED SEPTEMBER 30, 2005 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS EXHIBIT "A," FILED BY AND WITH RESPECT TO THE CHAPTER 11 DEBTORS LISTED IN SCHEDULE 2 (THE "DEBTORS"). OTHER THAN MIRANT DEBTOR CLASS 1 — PRIORITY CLAIMS, MAG DEBTOR CLASS 1 — PRIORITY CLAIMS, MAG DEBTOR CLASS 6 — MAG LONG-TERM NOTE CLAIMS AND MAG DEBTOR CLASS 8 — EQUITY IN-TERESTS, WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, EXCEPT FOR THE FOREGOING UNIMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND EQUITY INTERESTS.

THE PLAN IS THE PRODUCT OF EXTENSIVE NEGOTIATIONS BETWEEN AND AMONG, AND IS SUPPORTED BY, THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MIRANT CORPORATION (THE "CORP COMMITTEE"), THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MIRANT AMERICAS GENERATION, LLC (THE "MAG COMMITTEE"), THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS OF MIRANT CORPORATION (THE "EQUITY COMMITTEE" AND, TOGETHER WITH THE CORP COMMITTEE AND THE MAG COMMITTEE, THE "COMMITTEES") AND CERTAIN AFFILIATES OF MORGANS WATERFALL, INCLUDING PHOENIX PARTNERS LP, TO-GETHER WITH ITS AFFILIATES ("PHOENIX"), ACTING AS AN AD HOC REPRESENTATIVE OF THE HOLDERS OF SUBORDINATED DEBT OF MIRANT CORPORATION ("MIRANT").

THE DEBTORS, THE COMMITTEES AND PHOENIX BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLAIMS AND EQUITY INTERESTS. THE DEBTORS, THE COMMITTEES AND PHOENIX URGE ALL HOLDERS OF CLAIMS AND EQUITY INTER-ESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO VOTE IN FAVOR OF THE PLAN.

VOTING INSTRUCTIONS ARE CONTAINED IN THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO AS EXHIBIT "B." **TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 4:00 P.M., PREVAILING CENTRAL TIME, ON NOVEMBER 10, 2005 (THE "VOTING DEADLINE").**

FOR INFORMATION REGARDING YOUR ESTIMATED RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN — SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

**All capitalized terms used in this Disclosure Statement and not defined in the immediately preceding paragraphs shall have the meanings ascribed thereto in the Plan (see Exhibit "A" of the Plan entitled "Definitions and Interpretation") or Schedule 1 of this Disclosure Statement. Unless otherwise stated, all references to "Schedules" and "Exhibits" are references to schedules and exhibits to this Disclosure Statement, respectively.**

# II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, or as a stockholder whose Equity Interest is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

1

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLO- SURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF TITLE 11, UNITED STATES CODE (11 U.S.C. §§ 101, ET SEQ.) (THE "BANKRUPTCY CODE") AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PER- SONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFER- RING SECURITIES OR CLAIMS OF MIRANT OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, MIRANT OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.

On September 30, 2005, after notice and a hearing, the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), issued an order pursuant to section 1125 of the Bankruptcy Code approving this Disclosure Statement (the "Disclosure Statement Order") as containing information of a kind, and in sufficient detail that would enable a hypothetical, reasonable investor typical of the solicited classes of Claims and Equity Interests of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (the Disclosure Statement Order is attached hereto as Exhibit "B," and should be referred to for details regarding the procedures for the solicitation of votes on the Plan). APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

Each holder of a Claim or Equity Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the professionals they have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made by any such person, such information

may not be relied upon as having been authorized by the Debtors. **You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the Schedules and Exhibits hereto.**

After carefully reviewing this Disclosure Statement, including the attached Schedules and Exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and return the executed ballot in the enclosed, postage prepaid, return envelope so that it will be received by Bankruptcy Services, LLC ("BSI") or Financial Balloting Group LLC (as applicable), the Debtors' solicitation agent, no later than the Voting Deadline. All votes to accept or reject the Plan must be cast by using the appropriate ballot. Votes which are cast in any other manner will not be counted. All ballots must be actually received by the solicitation agent no later than November 10, 2005 at 4:00 p.m., Prevailing Central Time. **For detailed voting instructions and the name, address and phone number of the person you may contact if you have questions regarding the voting procedures, see the Disclosure Statement Order attached hereto as Exhibit "B."**

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT.**

You may be bound by the Plan if it is accepted by the requisite holders of Claims and Equity Interests, even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim. See "Acceptance or Rejection of the Plan — Cramdown."

**Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on December 1, 2005, at 9:30 a.m., Prevailing Central Time. Parties who intend to participate in the Confirmation Hearing must appear at a pre-Confirmation Hearing status conference on November 30, 2005 at 9:00 a.m., Prevailing Central Time. Both hearings are at the Bankruptcy Court before the Honorable D. Michael Lynn, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before November 10, 2005, by 4:00 p.m., Prevailing Central Time in the manner described in the Disclosure Statement Order attached hereto as "Exhibit B."**

**THE DEBTORS, THE COMMITTEES AND PHOENIX SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLAN.**

III.

EXPLANATION OF CHAPTER 11

A.  **Overview of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, stockholders, and other parties in interest. The Debtors commenced the chapter 11 cases (the "Chapter 11 Cases") with the filing by the Debtors for voluntary protection under chapter 11 of the Bankruptcy Code on July 14, 2003 and various dates thereafter. The Chapter 11 Cases have been consolidated for administrative purposes and are jointly administered under Case No. 03-46590 (DML) by order of the Bankruptcy Court. See "Chapter 11 Cases — Commencement of the Chapter 11 Cases."

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor-in-possession as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Cases, each Debtor remains in possession of its property and continues to operate its businesses as a debtor-in-possession. See "The Chapter 11 Cases — Continuation of Business after the Petition Date."

3

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization. In the Chapter 11 Cases, no creditor or party in interest has obtained relief from the automatic stay, except for the third parties and entities listed in Schedule 4.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor's estate. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"). However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Filing Period upon a showing of "cause." Following the filing of a plan, a debtor must solicit acceptances of the plan within a certain time period (the "Solicitation Period"). The Solicitation Period may also be extended or reduced by the bankruptcy court upon a showing of "cause." In the Chapter 11 Cases, the Debtors' Filing Period and the Debtors' Solicitation Period have been extended to the conclusion of the Confirmation Hearing, subject to certain conditions. As the Debtors filed their original plan during the Filing Period as extended by the Bankruptcy Court, no other creditor or party in interest may file a plan until the expiration of the Solicitation Period unless the Bankruptcy Court shortens or extends the Solicitation Period for cause. See "The Chapter 11 Cases — Exclusivity Periods."

## B. Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, the plan becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "Overview of the Plan."

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, that would enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

## C. Confirmation of a Plan of Reorganization

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "The Chapter 11 Plan — Conditions Precedent to Confirmation of the Plan." **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. See "Acceptance or Rejection of the Plan."

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan generally will be solicited only from those persons who hold claims or equity interests in an impaired class that is receiving or retaining property under the Plan. See "Acceptance or Rejection of the Plan Interests — Classes Entitled to Vote." **Except for Mirant Debtor Class 1 – Priority Claims, MAG**

4

**Debtor Class 1 – Priority Claims, MAG Debtor Class 6 – MAG Long-term Note Claims and MAG Debtor Class 8 – Equity Interests, which are unimpaired, all classes of Claims and Equity Interests are impaired under the Plan and entitled to vote on the Plan.**

In settlement and compromise of certain existing and potential disputes regarding Intercompany Claims and related matters, the Plan contemplates the grouping of the Debtors into two separate Debtor Groups, the Mirant Debtors and the MAG Debtors. Each Debtor Group is treated as a single Estate solely for purposes of voting on the Plan (except as set forth in Section 7.3 of the Plan), confirmation of the Plan and determining treatment of and making distributions in respect of Claims against and Equity Interests in such Debtor Group. For each Debtor that is able to satisfy the requirements of sections 1129(a)(8) and/or (10) of the Bankruptcy Code on a stand alone basis, provided that all other requirements to confirmation of the Plan are met, the inclusion of such Debtor into the applicable Debtor Group will be deemed to occur by operation of the Plan. If a Debtor is unable to satisfy the requirements of sections 1129(a)(8) and/or (10) of the Bankruptcy Code on a stand alone basis, the inclusion of such Debtor into the applicable Debtor Group will be subject to a determination of the Bankruptcy Court that such inclusion is appropriate under applicable standards, which determination may be made at the Confirmation Hearing. Accordingly, for purposes of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor, the Debtors will tabulate votes on an individual Debtor basis and to the extent relevant and appropriate as determined by the Bankruptcy Court, on a Debtor Group basis. See "The Chapter 11 Plan — Settlement of Certain Inter-Debtor Issues — Creation of Debtor Groups."

The bankruptcy court also may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the votes of Insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "Acceptance or Rejection of the Plan — Cramdown." **In the view of the Debtors, the Committees and Phoenix, the Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.**

IV.

## OVERVIEW OF THE PLAN

The Plan implements and reflects the agreement between and among the Debtors, the Committees and Phoenix as reflected in the Mirant Plan Term Sheet, dated September 7, 2005, setting forth the terms on which the Debtors will exit chapter 11 protection, and provides for the treatment of all Claims against and Equity Interests in all of the Debtors, whose Chapter 11 Cases are jointly administered under Case No. 03-46590 (DML).

### A.  Summary of the Terms of the Plan

The Plan is built around the following key elements:

- the Debtors' business will continue to be operated in substantially its current form, subject to certain internal structural changes that the Debtors believe will improve operational efficiency, facilitate and optimize their ability to meet financing requirements and accommodate the enterprise's debt structure as contemplated at emergence (see "The Chapter 11 Plan — Transfers and Restructuring to Implement the Plan");

- the consolidated business will have approximately $4,283,000,000 of debt (as compared to approximately $8,630,000,000 of debt at the commencement of the Chapter 11 Cases), comprised of (1) $1,063,000,000 of debt obligations associated with non-debtor international subsidiaries of Mirant; (2) $169,000,000 of miscellaneous domestic indebtedness including, in particular, the $109,700,000 West Georgia Secured Note (or, in the event of a settlement, approximately $94,700,000 under the

5

West Georgia Amended Loan Documents); (3) $1,700,000,000 of reinstated debt at MAG; and (4) $1,350,800,000 of new debt issued by a newly formed intermediate holding company under MAG ("New MAG Holdco") in partial satisfaction of certain existing MAG debt. The foregoing amounts exclude (a) MIRMA's obligations under the lease-financing transactions covering the Morgantown Power Station and Dickerson Power Station, and (b) any amounts drawn on a new $1,000,000,000 senior secured revolving credit facility that is part of the Exit Facility being provided to New MAG Holdco under the Plan (see "The Chapter 11 Plan — Introduction");

- in settlement of the intercompany claims and potential causes of action arising from the complex historical relationships between and among the Debtors, (1) the Estates of Mirant, Mirant Americas Energy Marketing, LP ("MAEM"), Mirant Americas, Inc. ("MAI") and the other Debtor-subsidiaries of Mirant (excluding Mirant Americas Generation, LLC ("MAG") and its Debtor-subsidiaries) (collectively, the "Mirant Debtors") will be treated as comprising a single Estate, (a) eliminating any distributions under the Plan in respect of intercompany claims between and among the Mirant Debtors, and (b) limiting a creditor holding a base claim against a Mirant Debtor and a guarantee of such base claim from another Mirant Debtor to a single recovery thereon; (2) the Estates of MAG and its Debtor-subsidiaries (collectively, the "MAG Debtors") will be treated as a single Estate, eliminating intercompany claim distributions and multiple recoveries on guarantee claims, as described in (a) and (b) above with respect to the Mirant Debtors; and (3) all claims and actions between the Mirant Debtors and the MAG Debtors will be released (see "The Chapter 11 Plan — Settlement of Certain Inter-Debtor Issues — Creation of Debtor Groups");

- the holders of all approximately $6,368,000,000 of Unsecured Claims against the Mirant Debtors (which amount includes (a) Claims arising under Mirant's 6.25% Junior Convertible Subordinated Debentures in the principal amount of $356,000,000 (the "Subordinated Notes"), and (b) interest as calculated pursuant to Section 10.14(a) of the Plan on all Unsecured Claims against the Mirant Debtors, but excludes a de minimis amount of Convenience Claims that will be paid in Cash in full) will receive a Pro Rata Share of (1) 96.25% of the shares of New Mirant Common Stock to be issued under the Plan, excluding: (a) the shares to be issued to the holders of certain Claims against the MAG Debtors as described herein, and (b) the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs, and (2) the right to receive Cash payments equal to 50% of the Cash recoveries realized by New Mirant, if any, in connection with certain designated avoidance actions set forth in Schedule 8, subject to certain adjustments for expenses, offsets and certain tax consequences to New Mirant; provided, however, that Claims in respect of Subordinated Notes shall receive the treatment provided under Section 15.4 of the Plan, as described in the paragraph below (see "The Chapter 11 Plan — Provisions for Treatment of Mirant Debtor Claims and Equity Interests");

- a settlement of the contractual subordination provisions among the holders of certain senior unsecured obligations of Mirant and the beneficial holders of the Subordinated Notes pursuant to which, in lieu of the shares of New Mirant Common Stock they would otherwise receive absent subordination, (1) the holders of Subordinated Notes will receive (a) 3.5% of the New Mirant Common Stock issued under the Plan (which shares are included in the 96.25% referred to in the immediately preceding paragraph and subject to the exclusions noted above for Mirant's general unsecured creditors, as applicable) and (b) New Mirant Warrants to purchase an additional 5% of New Mirant Common Stock, and (2) the holders of Subordinated Notes will share pari passu with Mirant's general unsecured creditors in the recoveries under the designated avoidance actions, if any (see "The Chapter 11 Plan — Settlements and Compromises");

- the outstanding Equity Interests in Mirant will be cancelled and the holders thereof will receive (1) 3.75% of the shares of New Mirant Common Stock (subject to the exclusions noted above for Mirant's general unsecured creditors, as applicable), (2) New Mirant Warrants to purchase up to an additional 10% of the New Mirant Common Stock, and (3) the right to receive Cash payments equal to 50% of the Cash recoveries realized by New Mirant, if any, in connection with the designated avoidance actions set forth in Schedule 8 subject to certain adjustments for offsets, expenses and

certain tax consequences to New Mirant (see "The Chapter 11 Plan — Provisions for Treatment of
Mirant Debtor Claims and Equity Interests");

• the holders of Unsecured Claims against the MAG Debtors will be paid in full (including postpetition
interest as calculated pursuant to Section 10.14(b) of the Plan) through (1) the issuance to general
unsecured creditors, holders of MAG Revolver Claims and MAG Short-term Note Claims, of:
(a) $1,350,810,000 Cash proceeds from third-party financing transactions or, at the Debtors' election,
new debt securities of New MAG Holdco, to be shared on a ratable basis with holders of MAG Debtor
Class 4 — PG&E/RMR Claims, and (b) 2.3% of shares of New Mirant Common Stock issued under
the Plan, excluding the shares to be reserved for issuance pursuant to the New Mirant Employee Stock
Programs, to be shared on a ratable basis with holders of MAG Debtor Class 4 — PG&E/RMR
Claims, and (2) the reinstatement of the MAG Long-term Notes; and in consideration for the
agreement of the MAG Committee to support the Plan, and to help ensure the feasibility of the Plan,
the establishment of the provision of certain additional covenant protections for the benefit of the
holders of certain Unsecured Claims against MAG (see "The Chapter 11 Plan — Provisions of
Treatment of MAG Debtor Claims and Equity Interests");

• to further support the feasibility of the Plan with respect to the MAG Debtors, Mirant shall contribute
(or cause to be contributed) value to MAG, including (1) the transfer of the trading and marketing
business (subject to the transfer to New Mirant or MAI of $250,000,000 of Cash and certain
receivables) to New MAG Holdco, (2) the transfer of Mirant Peaker and Mirant Potomac to
MIRMA, (3) the transfer of Mirant Zeeland to New MAG Holdco, and (4) commitments to make
prospective capital contributions of $150,000,000 for the refinancing of certain MAG debt that matures
in 2011 and, under certain circumstances, up to $265,000,000 for environmental capital expenditures
(see "The Chapter 11 Plan — Transfers and Restructuring to Implement the Plan");

• substantially all of the contingent liabilities of the Debtors associated with the California energy crisis
and certain related matters are resolved pursuant to the California Settlement Agreement (see "The
Chapter 11 Cases — California Settlement");

• the disputes regarding the Debtors' ad valorem real property taxes for the Bowline and Lovett facilities
will be settled and resolved on terms that permit the feasible operation of these Assets, or the New
York Debtors will remain in chapter 11 until such matters are resolved by settlement or through
litigation (see "The Chapter 11 Plan — Settlements and Compromises");

• substantially all of the Assets of Mirant will be transferred to New Mirant, which will serve as the
corporate parent of the Debtors' business enterprise on and after the Effective Date and which shall
have NO SUCCESSOR LIABILITY FOR ANY UNASSUMED OBLIGATIONS OF MIRANT;
similarly, the trading and marketing business of the Trading Debtors shall be transferred to MET,
which shall have NO SUCCESSOR LIABILITY FOR ANY UNASSUMED OBLIGATIONS OF
THE TRADING DEBTORS (see "The Chapter 11 Plan — Transfers and Restructuring to Imple-
ment the Plan");

• After the transfers of Assets described above, Mirant and the Trading Debtors will be transferred to a
trust created under the Plan and ANY AND ALL NON-DISCHARGEABLE OBLIGATIONS OR
CLAIMS NEITHER TREATED NOR PROVIDED FOR UNDER THE PLAN, AND THE
BEWAG CONTRACT, WILL RIDE THROUGH THE PLAN AND THE CHAPTER 11
CASES. SUCH CLAIMS AND OBLIGATIONS WILL REMAIN CONTINGENT LIABILI-
TIES OF MIRANT AND/OR THE TRADING DEBTORS WHICH WILL EACH BE OWNED
BY THE TRUST (see "The Chapter 11 Plan — The Plan Trust"); and

• The Debtors' obligations under all agreements with Pepco will be performed on an interim basis
pending a final determination of the Debtors' right to reject, recharacterize, avoid or recover payments
under the Back-to-Back Agreement, the APSA and the Assumption/Assignment Agreement. If the
Debtors are unable to reject, recharacterize, avoid or recover payments under the Back-to-Back
Agreement, the APSA or the Assumption/Assignment Agreement, and such agreements constitute
executory contracts under the Bankruptcy Code, the Debtors shall assume such agreements (and the

Back-to-Back Agreement, the APSA and the Assumption/Assignment Agreement shall be assigned to Mirant Oregon and guaranteed by New Mirant) and any cure obligations shall be performed pursuant to Section 14.2 of the Plan.

The Plan, as originally filed on January 19, 2005, and subsequently amended on March 25, 2005, was the product of extensive but, at that time incomplete, negotiations between the Debtors and representatives of certain of their constituencies, including the Corp Committee, which indicated its willingness to support a plan that was consistent with the Debtors' view of an appropriate reorganization. The Equity Committee vigorously disputed the value of and entitlement to recoveries under such Plan and as initially projected by the Debtors.

As a result, between April 18, 2005 and June 27, 2005, the Bankruptcy Court conducted a hearing to determine the value of the Debtors' businesses. At the conclusion of the hearing, the Bankruptcy Court directed certain modifications, requiring months to implement, to be made to the Debtors' business plan projections and valuation methodology. While these modifications were being implemented, the Debtors, with the support of William Snyder, the court-appointed examiner in the Chapter 11 Cases, and each of the Debtors' key constituencies engaged in active settlement discussions. In light of, among other things, the delay, uncertainty, and risk of additional litigation associated with or arising from the valuation proceeding, the parties agreed to the allocation of value that is embodied in the Mirant Plan Term Sheet.

The Debtors' ability to achieve a largely consensual plan has been facilitated by the currently favorable status of the capital markets and certain of the key power markets in which the Debtors participate. Most notably, the exit financing obtained by the Debtors is not only in an amount sufficient to fund the Plan (and to permit the Debtors to exchange the $1,358,000,000 of New MAG Holdco Notes for a cash payment), but is also on terms that provided substantial flexibility to the Debtors and their constituencies in their negotiations. It is important to note, however, that the Debtors' exit financing remains subject to contingencies until the Plan is consummated. As such, because material changes in the capital and power markets can occur at any time, any delay in the confirmation process as currently fixed by the Bankruptcy Court exposes the Debtors to an increased risk of adverse changes in such markets. If this were to occur, renegotiation or, in the worst case, reformulation, of the Plan may be required.

## B.   Summary of Distributions Under the Plan

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached as Exhibit "A." In addition, for a more detailed description of the terms and provisions of the Plan, including a hypothetical distribution of New Mirant Common Stock under the Plan on the Effective Date. See "The Chapter 11 Plan."

The Claim amounts set forth below reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding disputed Claims. The amounts utilized differ materially from the outstanding filed Claim amounts. The filed Claim amount for the Mirant Debtors is currently in excess of $23,300,000,000 and the filed Claim amount for the MAG Debtors is currently in excess of $13,700,000,000 (in each case taking into account the results of the claim objection/estimation process).

8

The following chart summarizes the estimated Plan Distributions to each class on the Distribution Date (unless otherwise provided):

## UNCLASSIFIED CLAIMS

**Classes of Claims**

**Treatment of Classes of Claims[1]**

Administrative Claims (includes costs of the Chapter 11 Cases and expenses of operation as specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, including DIP Claims, cure obligations with respect to assumed executory contracts and leases, any outstanding statutory fees, certain amounts owed under the California Settlement, estimates for earned but unpaid professional fees and expenses as of December 31, 2005 for certain professionals providing restructuring services to the Debtors, the Corp Committee, the MAG Committee, the Equity Committee, the MAG Ad Hoc Committee, the Mirant Ad Hoc Committee, Phoenix, the Old Indenture Trustees and the Examiner, and a $19,000,000 provision for success fees as originally requested by certain professionals in their applications for retention).[2]

Estimated Allowed Claims: $56,600,000[3]

On the Distribution Date, each holder of an Allowed Administrative Claim shall receive: (a) the amount of such holder's Allowed Claim in one Cash payment, or (b) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Claim; provided, further, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

**Estimated Recovery: 100% of Allowed Claim.**

Tax Claims (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code).

Estimated Allowed Claims: $15,000,000

At the election of the Debtors, each holder of an Allowed Tax Claim shall receive in full satisfaction of such holder's Allowed Tax Claim: (a) the amount of such holder's Allowed Tax Claim, with Post-Confirmation Interest thereon, in equal annual Cash payments on each anniversary of the Effective Date, until the sixth anniversary of the date of assessment of such Tax Claim (provided that the Disbursing Agent may prepay the balance of any such Allowed Tax Claim at any time without penalty), (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder, or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed-upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim.

**Estimated Recovery: 100% of Allowed Claim.**

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

[2] The $19,000,000 figure does not include additional compensation that may be sought by certain professionals retained by the Equity Committee in accordance with retention orders previously entered by the Bankruptcy Court.

[3] This amount does not include estimated fees of the Old Indenture Trustees.

## CLASSIFIED CLAIMS AND INTERESTS

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests |
|---|---|

### MIRANT DEBTORS

Class 1 — Priority Claims

Estimated Allowed Claims: $44,000

Unimpaired.

Pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which a holder of an Allowed Priority Claim is entitled shall be fully reinstated and retained, and such Allowed Priority Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Distribution Date.

**Estimated Recovery: 100% of Allowed Claim.**

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|
| Class 2 — Secured Claims | Impaired. |
| Estimated Allowed Claims: $152,100,000 of Allowed Claims plus $300,000 of interest accrued from the Petition Date through the Effective Date | *General:* Except as otherwise agreed, each holder of an Allowed Secured Claim against any of the Mirant Debtors shall, at the sole option of the Debtors, receive on the Distribution Date on account of its Allowed Secured Claim: (a) a Plan Secured Note (secured by existing collateral or, at the Debtors' election, alternative collateral having comparable value), (b) the collateral that secures payment of such Secured Claim, (c) a single Cash payment in an amount equal to the amount of such Allowed Secured Claim, or (d) if applicable, the implementation of any valid right of setoff permitted under section 553 of the Bankruptcy Code. If the holder of an Allowed Secured Claim receives treatment as provided in (a) above, such holder shall retain the liens securing the Allowed Secured Claim (or, at the Debtors' election, receive alternative collateral having a value at least equivalent to the existing collateral) until paid in full. Any deficiency amount related to a Secured Claim against any of the Mirant Debtors shall be treated as a Mirant Debtor Class 3 — Unsecured Claim. |
| | *Alternative Consensual Treatment:* Alternatively, the Mirant Debtors and any holder of an Allowed Secured Claim may agree to any alternate treatment of such Secured Claim; provided that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Secured Claim. |
| | *West Georgia Facility Claims:* If the holders of the West Georgia Facility Claims do not enter into and comply with their obligations under the West Georgia Settlement Agreement and do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, on the Distribution Date, the holders of the Allowed West Georgia Facility Claims shall receive, to the extent that the West Georgia Facility Claims are determined by the Bankruptcy Court to be Secured Claims: (a) a Cash payment of up to $30,000,000 and (b) to the extent that the secured portion of the West Georgia Facility Claims exceeds $30,000,000, the West Georgia Secured Note. |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|
| | If the holders of the West Georgia Facility Claims enter into and comply with their obligations under the West Georgia Settlement Agreement and vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, the West Georgia Facility Claims will be Allowed as Secured Claims in the amount of $139,700,000 plus accrued and unpaid interest through the Effective Date and, on the Distribution Date, the holders of the Allowed West Georgia Facility Claims shall receive (a) a Cash payment in the amount of $45,000,000 and (b) rights under the West Georgia Amended Loan Documents. **Estimated Recovery: 100% of Allowed Claim.** |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|
| Class 3 — Unsecured Claims<br><br>Estimated Claims: $5,690,600,000 of Allowed Claims, plus $677,400,000 of interest accrued from the Petition Date through the Effective Date | Impaired.<br><br>Except as provided in Sections 15.4 and 17.3 of the Plan, each holder of an Allowed Unsecured Claim (including accrued interest as calculated pursuant to Section 10.14(a) of the Plan) against any of the Mirant Debtors shall receive on the Distribution Date a Pro Rata Share of (a) 96.25% of the shares of New Mirant Common Stock to be issued pursuant to the Plan (excluding (i) the shares to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims pursuant to Sections 5.2(d) and (e) of the Plan, respectively, and (ii) the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs), and (b) the right to receive Cash payments in an amount equal to such holder's Pro Rata Share of 50% of the Designated Net Litigation Distributions as set forth in Section 10.13 of the Plan.*<br><br>The enforcement of subordination rights by the holders of certain Mirant Debt Claims is also resolved pursuant to Section 15.4 of the Plan, pursuant to which, in lieu of the distributions to this class referred to above, (1) each holder of Allowed Claims in respect of Subordinated Notes will receive on the Distribution Date a Pro Rata Share of (a) 3.5% of the shares of New Mirant Common Stock to be issued under the Plan (which shares are included in the 96.25% referred to in the immediately preceding paragraph excluding (i) shares to be issued to holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims, provided that if such shares are issued to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, the holders of the Claims in respect of the Subordinated Notes shall receive 3.5% of such shares, and (ii) the shares reserved for issuance pursuant to New Mirant Employee Stock Programs); and (b) the New Mirant Series B Warrants; and (2) holders of claims (including accrued interest calculated pursuant to Section 10.14(a) of the Plan) in respect of Subordinated Notes shall participate on a pari passu basis with holders of Allowed Mirant Class 3 — Unsecured Claims in Cash payments equal to 50% of the Designated Net Litigation Distributions.* |

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

* A table setting forth the ownership of New Mirant on the Effective Date after distribution of New Mirant Common Stock under the Plan to holders of Allowed Mirant Debtors Class 3 — Unsecured Claims, Allowed MAG Debtors Class 4 — PG&E/RMR Claims and Allowed MAG Debtors Class 5 — Unsecured Claims is set forth in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Mirant Common Stock — Hypothetical Effective Date for Distribution of New Mirant Common Stock under the Plan."

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|
| Class 3 — Unsecured Claims (continued) | **Estimated Recovery: More than required by the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.** |
| Class 4 — Convenience Claims | Impaired. |
| Estimated Allowed Claims: Up to $6,200,000 | Each holder of an Allowed Mirant Debtor Class 4 — Convenience Claim, which is an Unsecured Claim against any of the Mirant Debtors (excluding Mirant Debt Claims, Subordinated Note Claims and Claims of current and former directors, managers, officers and employees) up to $25,000 in amount, or up to $140,000 in amount in respect of certain Mirant Debtors, at the Debtors' election in consultation with the Corp Committee, shall receive on the Distribution Date a single Cash payment in an amount equal to the amount of such holder's Allowed Convenience Claim. |
| | **Estimated Recovery: 100% of Allowed Claim.** |
| Class 5 — Equity Interests | Impaired. |
| Estimated Allowed Equity Interests: N/A | On the Effective Date, all Equity Interests in Mirant shall be cancelled, and each holder of an Allowed Mirant Debtor Class 5 — Equity Interest shall receive on the Distribution Date a Pro Rata Share of: (a) 3.75% of the shares of New Mirant Common Stock to be issued under the Plan, excluding the shares (i) to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims; provided, that, if such shares are distributed to holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, the holders of Allowed Mirant Debtor Class 5 — Equity Interests shall receive 3.75% of such shares, and (ii) to be reserved for issuance pursuant to the New Mirant Employee Stock Programs; (b) the New Mirant Series A Warrants; and (c) the right to receive cash payments in an amount equal to such holder's Pro Rata Share of 50% of the Designated Net Litigation Distributions.* |
| | **Estimated Recovery: Undetermined.** |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

* A table setting forth the ownership of New Mirant on the Effective Date after distribution of New Mirant Common Stock under the Plan to holders of Allowed Mirant Debtors Class 3 — Unsecured Claims, Allowed MAG Debtors Class 4 — PG&E/RMR Claims and Allowed MAG Debtors Class 5 — Unsecured Claims is set forth in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Mirant Common Stock — Hypothetical Effective Date for Distribution of New Mirant Common Stock under the Plan."

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|

## MAG DEBTORS

| | |
|---|---|
| Class 1 — Priority Claims | Unimpaired. |
| Estimated Allowed Claims: $11,000 | Pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which a holder of an Allowed Priority Claim is entitled shall be fully reinstated and retained, and such Allowed Priority Claims (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Distribution Date. |
| | **Estimated Recovery: 100% of Allowed Claims.** |
| Class 2 — Secured Claims | Impaired. |
| Estimated Allowed Claims: $39,200,000 of Allowed Claims, plus $1,000,000 of interest accrued from the Petition Date through the Effective Date | *General Treatment:* Except as otherwise agreed, each holder of an Allowed Secured Claim against any of the MAG Debtors (other than any Allowed MAG Debtor Class 3 — New York Taxing Authorities Secured Claim) shall, at the sole option of the Debtors, receive on the Distribution Date on account of its Allowed Secured Claim: (a) a Plan Secured Note (secured by existing collateral or, at the Debtors' election, alternative collateral having comparable value), (b) the collateral that secures payment of such Allowed Secured Claim, (c) a single Cash payment in an amount equal to the amount of such Allowed Secured Claim, or (d) if applicable, the implementation of any valid right of setoff permitted under section 553 of the Bankruptcy Code. If the holder of an Allowed MAG Debtor Class 2 — Secured Claim receives treatment as provided in (a) above, such holder shall retain the liens securing the Allowed Secured Claim (or at the Debtors' election, receive alternative collateral having a value at least equivalent to the existing collateral) until paid in full. Any deficiency amount shall be treated as a MAG Debtor Class 5 — Unsecured Claim. |
| | *Alternative Consensual Treatment:* Alternatively, the MAG Debtors and any holder of Allowed Secured Claim may agree to any alternate treatment of such Secured Claim; provided that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim. |
| | **Estimated Recovery: 100% of Allowed Claim.** |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests[1] |
|---|---|
| Class 3 — New York Taxing Authorities Secured Claims | Undetermined |
| Estimated Allowed Claims: Undetermined | If the holders of Allowed New York Taxing Authorities Secured Claims vote in favor of the Plan, each holder shall receive on the Distribution Date the treatment specified in the Proposed New York Tax Settlement set forth in Section 15.3 of the Plan. |
| | If the holders of the Allowed New York Taxing Authorities Secured Claims do not vote to accept the Plan, the New York Debtors shall be excluded from the Plan and remain in chapter 11. |
| | **Estimated Recovery: 100% of Allowed Claim.** |
| Class 4 — PG&E/RMR Claims | Impaired. |
| Estimated Allowed Claims: $133,000,000 | In respect of the Allowed PG&E/RMR Claim, PG&E shall receive on the Distribution Date the treatment specified in the California Settlement as set forth in Section 15.1 of the Plan (which is substantively identical to the treatment of MAG Debtor Class 5 — Unsecured Claims, including (a) at the option of the Debtors as exercised with respect to MAG Debtor Class 5, $119,700,000 either in Cash or New MAG Holdco Notes and (b) 0.2% of the shares of New Mirant Common Stock issued under the Plan (less the shares reserved for issuance to the New Mirant Employee Stock Programs)) except that the amount of such Allowed PG&E/RMR Claims shall not include any accrued interest).* |
| | **Estimated Recovery: 100% of Allowed Claim.** |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

* A table setting forth the ownership of New Mirant on the Effective Date after distribution of New Mirant Common Stock under the Plan to holders of Allowed Mirant Debtors Class 3 — Unsecured Claims, Allowed MAG Debtors Class 4 — PG&E/RMR Claims and Allowed MAG Debtors Class 5 — Unsecured Claims is set forth in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Mirant Common Stock — Hypothetical Effective Date for Distribution of New Mirant Common Stock under the Plan."

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests1 |
|---|---|
| Class 5 — Unsecured Claims<br><br>Estimated Claims: $1,157,400,000 Allowed Claims, plus $210,500,000 of interest accrued from the Petition Date through the Effective Date | Impaired.<br><br>Each holder of an Allowed MAG Debtor Class 5 — Allowed Unsecured Claim against any of the MAG Debtors (including accrued interest as calculated pursuant to Section 10.14(b) of the Plan) shall receive on the Distribution Date a Pro Rata Share of: (a) at the option of the Debtors, $1,231,110,000 either in Cash or New MAG Holdco Notes and (b) 2.1% of shares of New Mirant Common Stock issued under the Plan (excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs). The treatment of Allowed MAG Debtor Class 5 — Unsecured Claims is based upon an assumed Effective Date of December 31, 2005. To the extent the Effective Date occurs on a date other than December 31, 2005, the Plan Distribution will be adjusted to reflect the amount of accrued interest payable, calculated in accordance with Section 10.14(b) of the Plan.*<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

---

[1] In each instance, where postpetition interest is calculated, the calculation assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

[*] A table setting forth the ownership of New Mirant on the Effective Date after distribution of New Mirant Common Stock under the Plan to holders of Allowed Mirant Debtors Class 3 — Unsecured Claims, Allowed MAG Debtors Class 4 — PG&E/RMR Claims and Allowed MAG Debtors Class 5 — Unsecured Claims is set forth in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Mirant Common Stock — Hypothetical Effective Date for Distribution of New Mirant Common Stock under the Plan."

17

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests1 |
|---|---|
| Class 6 — MAG Long-term Note Claims | Unimpaired. |
| Estimated Allowed Claims: $1,732,700,000, plus approximately $416,400,000 of interest accrued from the Petition Date through the Effective Date | Each holder of an Allowed MAG Long-term Note Claim shall be unimpaired under the Plan, and pursuant to section 1124 of the Bankruptcy Code: (a) all of the legal, equitable and contractual rights to which such Claim entitles such holder against the MAG Debtors in respect of such Claim shall be fully reinstated and retained; (b) all defaults, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, shall be cured; (c) the maturity of such MAG Long-term Notes shall be reinstated; and (d) all amounts owed to such holders (including (i) accrued interest as calculated pursuant to Section 10.14(c) of the Plan, and (ii) the Indenture Trustee Fees incurred by the Indenture Trustee for the MAG Long-term Notes), shall be paid in full in Cash on the later of the Effective Date and the date such amount otherwise becomes due and payable under the MAG Indenture and the MAG Long-term Notes, as reinstated. In addition, the Confirmation Order shall implement the New MAG Debt Covenants. |
|  | **Estimated Recovery: 100% of Allowed Claim.** |
| Class 7 — Convenience Claims | Impaired. |
| Estimated Allowed Claims: $4,800,000 | Each holder of an Allowed MAG Debtor Class 7-Convenience Claim, which is an Unsecured Claim against the MAG Debtors (excluding MAG Debt Claims and Claims of current or former directors, managers, officers and employees) up to $25,000 in amount, shall receive on the Distribution Date a single Cash payment in an amount equal to the amount of such holder's Allowed Convenience Claim. |
|  | **Estimated Recovery: 100% of Allowed Claim.** |
| Class 8 — Equity Interests | Unimpaired |
| Estimated Allowed Equity Interests: N/A | MAI, as the holder of the Allowed Equity Interests in MAG, shall be unimpaired under the Plan, and pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interests entitle MAI in respect of such Equity Interests shall be fully reinstated and retained on and after the Effective Date. |
|  | **Estimated Recovery: Undetermined.** |