As of June 30, 2003, Mirant had provided letters of credit issued under its credit facilities for the benefit of its subsidiaries in the following amounts (in millions):

| Subsidiary | Amount |
| --- | ---: |
| Mirant Birchwood | $ 19.1 |
| MAEM | 584.6 |
| MD Ash Mgmt | 0.2 |
| Mirant | 2.3 |
| Mirant Curacao | 15.2 |
| Mirant Trinidad | 3.7 |
| Mirant Delta | 0.0 |
| Mirant Las Vegas | 46.3 |
| Mirant Lovett | 4.3 |
| Mirant Oregon | 1.5 |
| Mirant Services | 0.4 |
| Shady Hills Power | 15.0 |
| Mirant DCOM | 0.1 |
| MIRMA | 102.7 |
| Perryville | 35.0 |
| Mirant Sual | 85.9 |
| Mirant Pagbilao | 83.5 |
| West Georgia | 32.2 |
| **TOTAL** | $1,032.0 |

As of September 15, 2005, approximately $581,600,000 in principal amount of the foregoing letters of credit had been drawn, and approximately $183,445,000 in principal amount remained outstanding.

### 5. Dividends and Capital Transactions

As discussed above, the Debtors treated some intercompany transfers as dividends and capital contributions. The aggregate dividends paid by MAG, a Debtor in the MAG Debtor Group, to MAI, a Debtor in the Mirant Debtor Group, for the years ended December 31, 2001 and December 31, 2002 and the 6-month period ended June 30, 2003 were $221,000,000, $797,000,000 and $150,000,000, respectively. In addition, during these same time periods, the capital contributions by MAI to MAG were $38,000,000, $884,000,000 and $2,000,000, respectively. The dividend and capital contribution activity between MAI and MAG during each quarter of the above periods is set forth on Schedule 5-A.

MAI's ownership of MAG represents the only direct equity interest between the Mirant Debtors and the MAG Debtors. Thus, the above amounts represent the only dividend and capital contribution activity between the two groups during the periods described above. There were also substantial dividends and capital contributions between the Debtors within each of the two Debtor Groups during these periods; however, the Debtors have not prepared an analysis of the dividend and capital contribution activity for each separate Debtor.

### 6. Intercompany Loans and Advances

As discussed above, the Debtors' intercompany funding transactions were generally treated as unsecured loans. In some instances these transactions were evidenced by promissory notes and in other instances these transactions were reflected only on the Debtors' books and records as a receivable and corresponding payable. Schedule 5-B shows the Petition Date amount of intercompany funding which is evidenced by a promissory note. Schedule 5-C shows the Debtors' Petition Date intercompany loans, including those also listed on Schedule 5-B, on a net basis.

## 7. Intercompany Loans by MAG

In October 1999, MAG obtained approximately $1,450,000,000 of financing from a consortium of banks under three credit facilities. Of this amount, MAG lent approximately $1,320,000,000 to certain of its operating subsidiaries. These amounts were used by the operating subsidiaries to repay intercompany notes owed to Mirant by such subsidiaries which, in certain instances, arose out of the acquisition of certain of the generating facilities by the Debtors. In particular, MAG loaned approximately: (a) $645,000,000 to Mirant California; (b) $138,200,000 to Mirant Bowline; (c) $158,500,000 to Mirant Lovett; (d) $13,300,000 to Mirant NY-Gen; (e) $290,000,000 to Mirant Canal, and (f) $80,000,000 to State Line Energy, which was sold in June 2002.

In the fourth quarter of 1999, Mirant used a portion of the amounts received from the subsidiaries on account of the intercompany loans to repay $734,000,000 of intercompany loans that Mirant owed to Southern and to pay down short-term borrowings under its commercial paper program. The Debtors are seeking to avoid this repayment as a fraudulent transfer. See "Material Claims, Investigations and Litigation — Disputed Claims with Associated Estate Courses of Action — Southern Company Investigation/Litigation."

## 8. Purchase of Mid-Atlantic Generation Assets[1]

Certain aspects of the transaction described below, and the resulting commercial relationships, are or have been the subject of litigation between the Debtors and Pepco. This is described in "Material Claims, Litigation and Investigations — Disputed Claims with Associated Estate Causes of Action — Pepco Litigation."

In June 2000, Mirant agreed to purchase Pepco's generation business in Maryland and Virginia for approximately $2,650,000,000 in Cash and the assumption of approximately $2,400,000,000 in net liabilities. As part of this transaction, MIRMA, Mirant Peaker, Mirant Chalk Point and Mirant Potomac were formed and subsequently entered into a series of assumption and assignment agreements with Mirant relating to Mirant's rights and obligations under the APSA. In particular, prior to the acquisition from Pepco, Mirant entered into an assignment and assumption agreement with, among others, MIRMA, Mirant Chalk Point, Mirant Peaker and Mirant Potomac pursuant to which Mirant assigned to these entities certain of its rights and obligations under the purchase agreement with Pepco. In addition, Mirant and MAEM entered into an assignment and assumption agreement pursuant to which Mirant assigned to MAEM, and MAEM assumed, Mirant's rights and obligations under the purchase agreement with respect to the PPAs to be assumed from Pepco and the TPAs to be entered into with Pepco, and Mirant agreed to make certain payments to MAEM.

A portion of the funds for the acquisition from Pepco was obtained through a lease-financing transaction. See "General Information — Existing Financing Transactions of the Debtors — MIRMA." The remainder of the funds needed to consummate the acquisition from Pepco was supplied through intercompany funding. For example, the facilities purchased by Mirant Peaker and Mirant Potomac were funded by a cash capital contribution of $101,000,000 from Mirant and two unsecured loans totaling $223,000,000 from MIRMA. The first loan was to Mirant Peaker and was evidenced by a promissory note in the amount of $71,110,000 payable to MIRMA (the "Peaker Note"). The second loan was to Mirant Potomac and was evidenced by a promissory note in the amount of $152,165,000 payable to MIRMA (the "Potomac Note"). The terms of the Peaker Note and the Potomac Note limit the pre-payment thereof and the notes may not be amended except as permitted under the so-called MIRMA Agreements. By their terms, both the Peaker Note and the Potomac Note are due and payable in 2028.

Under the Capital Contribution Agreement, referred to above in "General Information — Existing Financing Transactions — MIRMA," that Mirant and MIRMA entered into as part of the Pepco acquisition, Mirant Potomac and Mirant Peaker, as directed by Mirant, are to make distributions to Mirant at least once per quarter, if funds are available. Distributions are equal to cash available after taking into account projected cash requirements, including mandatory debt service, prepayments under (and as limited by) the Peaker Note

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectional. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

and the Potomac Note and maintenance reserves, as reasonably determined by Mirant. Mirant contributed or caused these amounts to be contributed to MIRMA. For the years ended December 31, 2002 and 2001, total capital contributions received by MIRMA under this agreement totaled $39,000,000 and $25,000,000, respectively.

Finally, MIRMA issued a note in favor of MAG for $150,000,000 and, in 2002, MAG transferred, as a capital contribution, $130,000,000 of that debt to MIRMA, as noted below in paragraph (h) under "Recapitalization of Intercompany Debt."

## 9. Recapitalization of Intercompany Debt

In the first quarter of 2002, MAI, MAG and certain Debtors entered into a series of agreements pursuant to which intercompany indebtedness was transferred to the respective obligors as contributions of capital.

In January 2002, MAG converted to equity approximately $1,700,000,000 of debt owed to MAG by various of its subsidiaries, thereby extinguishing such indebtedness. The promissory notes executed by such subsidiaries were contributed to capital through the ownership chain pursuant to contribution agreements among the holder, the maker and the other intermediate entities in the following approximate amounts:

    (a) $668,100,000 owed from Mirant California;

    (b) $2,400,000 owed from Mirant Delta;

    (c) $2,000,000 owed from Mirant Potrero;

    (d) $310,900,000 owed from Mirant Canal;

    (e) $158,500,000 owed from Mirant Lovett;

    (f) $13,300,000 owed from Mirant NY-Gen;

    (g) $138,200,000 owed from Mirant Bowline;

    (h) $130,000,000 owed from MIRMA;

    (i) $63,000,000 owed from Mirant Neenah, LLC;

    (j) $132,000,000 owed from Mirant Texas, LP; and

    (k) $80,000,000 owed from State Line Energy, LLC.

Similarly, in February 2002, approximately $217,000,000 in intercompany indebtedness owed to Mirant or MAI by subsidiaries of MAG was extinguished as part of the $1,100,000,000 of debt that was contributed to capital pursuant to various contribution agreements in the following approximate amounts:

    (a) $107,400,000 owed from Mirant Bowline;

    (b) $68,400,000 owed from Mirant Delta;

    (c) $4,800,000 owed from Mirant Potrero; and

    (d) $35,900,000 owed from Mirant Bay Area Procurement, LLC.

## 10. MAI/New England Note

Mirant New England sold to MAI its membership interests in Mirant Canal and Mirant Kendall. Immediately following this acquisition, MAI contributed its interests in Mirant Canal and Mirant Kendall to Mirant New England, Inc. In consideration for the purchase, MAI executed a promissory note to Mirant New England for approximately $255,000,000. As of the Petition Date, this amount remained due in full. The note receivable is Mirant New England's largest asset. In January 2002, MAI contributed its interest in Mirant New England to MAG. Mirant New England was then merged into Mirant New England, Inc. in February 2003 with the amount due from MAI owed to Mirant New England, Inc. and still outstanding.

### 11. The Equipment Warehouse Facility

Mirant formed MADCI for the sole purpose of acquiring and financing the purchase of certain gas turbines and other equipment. In October of 2001, MADCI entered into a warehouse operating lease facility (the "Equipment Warehouse Facility"). The Equipment Warehouse Facility provided MADCI with funding to acquire gas turbines and other related equipment from General Electric Company, Siemens Westinghouse Power Corporation, Mitsubishi Heavy Industries America, Inc. and others. See "General Information — Existing Financing Transactions of the Debtor — Mirant Americas Development Capital, LLC."

Prior to the Petition Date, a series of intercompany claims against MAI and MAPI relating to the Equipment Warehouse Facility were created when MADCI purchased terminated equipment contracts from proceeds of the Equipment Warehouse Facility, which was intended to be an off-balance sheet financing mechanism, bringing the resulting liabilities and assets on balance sheet pursuant to GAAP. As a result, MAI's books and records list $146,694,728 of the outstanding $214,000,000 as an intercompany payable from MAI to MADCI. The balance of the Equipment Warehouse Facility obligation is listed on the Debtors' books and records as an intercompany payable between MADCI and MAPI relating to the remaining equipment financed under the Equipment Warehouse Facility. Accordingly, MAI and MAPI were burdened with substantial intercompany payables for the turbines. The Debtors lack supporting details for the creation of those intercompany claims.

### 12. Common Asset Management

MAEM enters into certain hedging arrangements involving the forward sale of power and purchase of fuel on behalf of substantially all of the other Debtors in order to protect against fluctuations in market commodity prices. This activity serves to reduce the volatility and risk around the expected gross margins and cash flows from the Debtors' generation assets and is part of the integrated operations of Mirant. This information should be read in conjunction with the above discussion "General Information — The Businesses of Mirant — The North American Business." The Debtors that own generation facilities bear the risk and reward of the respective asset hedging transactions conducted on their behalf by MAEM.

Prior to the Petition Date, MAEM was paid a service fee under intercompany agreements for providing a variety of services to the Debtors that own generation facilities, including asset hedging services, but did not apportion the costs associated with providing trade credit and collateral to counterparties in support of asset hedge positions. Subsequent to the Petition Date, MAEM allocates, through various overhead allocations and intercompany charges, all the costs associated with providing services to asset-holding Debtors, including the cost of trade credit and collateral required to support asset-hedging activities. MAEM no longer receives defined service fees under the intercompany agreements with the asset-holding Debtors.

### 13. Tax Sharing Arrangements

Prior to the Petition Date, a method was established for allocating the consolidated or state and local tax liability of Mirant and certain subsidiaries, as members (each a "Member") of an affiliated group (as defined in section 1504(a) of the Internal Revenue Code) among Mirant and these subsidiaries, reimbursing Mirant for payment of tax liabilities made by Mirant on behalf of these subsidiaries, compensating any Member for use of its losses or tax credits and providing for the allocation and payment of any refund arising from a carryback of losses or tax credits from subsequent years.

These prepetition tax allocation agreements allow certain subsidiaries "potential" benefits, including, but not limited to, payment of any net operating losses, net capital losses, excess charitable contributions, foreign tax credits, or other similar items (collectively, the "Tax Attributes"). Based on the terms of the tax allocation agreements, Mirant is not obligated to make payments to the respective subsidiaries that generated such benefits. On the other hand, subsidiaries of Mirant are required to remit to Mirant taxes that may be attributable to the operations of any particular subsidiary whether or not Mirant is ultimately required to pay any tax based on a consolidated return. Any postpetition benefits arising from the Tax Attributes are uncertain, difficult to access, and inherently difficult to quantify. The attendant litigation regarding claims based on these tax allocation agreements, therefore, will be expensive, protracted, and highly uncertain. Although the Debtors believe that these tax allocation agreements have not, on a postpetition basis, benefited

any of the Debtors' bankruptcy estates in any demonstrable way, litigation to liquidate the claims under the tax allocation agreements would involve enormous amounts of the Debtors' time and expense. Moreover, it is highly speculative what, if any, payments would be due from the individual subsidiaries pursuant to the prepetition tax allocation agreements.

## C. Potential Claims and Remedies

As a consequence of the Debtors' filing for chapter 11 relief, certain claims and remedies may be assertable as a result of the various intercompany relationships and transactions described above, which claims and remedies include substantive consolidation, avoidance actions to recover fraudulent conveyances and preferences, equitable subordination and recharacterization. A brief overview of each of these potential causes of action is set forth below. Furthermore, as is discussed in more detail in "The Chapter 11 Plan — Settlement of Certain Inter-Debtor Issues — Creation of Debtor Groups," the Plan contemplates a settlement and compromise of these various disputes by grouping the Debtors into two separate Debtor Groups whereby each group is treated as a single Estate for the purposes of making distributions under the Plan and, under certain circumstances, voting and confirmation.

### 1. Substantive Consolidation

Substantive consolidation is a judicially-created equitable remedy whereby the assets and liabilities of two or more entities in bankruptcy are aggregated for the purpose of determining creditor recoveries. Typically, substantive consolidation eliminates intercompany claims and any issues concerning ownership of assets among the consolidated entities, as well as guaranty claims against any consolidated entity that guaranteed the obligations of another consolidated entity.

### 2. Fraudulent Conveyances and Preferences

Parties-in-interest may attempt to assert claims to invalidate certain of the intercompany transactions described above. In particular, they may attempt to assert that these transactions should be avoidable either as fraudulent conveyances or preferences.

In a chapter 11 proceeding, actions to avoid fraudulent transfers may be brought pursuant to either section 548 of the Bankruptcy Code or applicable state law, as made applicable pursuant to section 544 of the Bankruptcy Code. Under section 548 of the Bankruptcy Code, a transfer of a debtor's property or the incurrence of an obligation by the debtor that occurs within one year of the commencement of a bankruptcy case may be avoided either: (a) if it was made or incurred with actual intent to hinder, delay or defraud any creditor of the debtor, or (b) if the debtor received less than reasonably equivalent value in exchange for the transfer or obligation and: (i) was insolvent at the time of the transfer or obligation or became insolvent as a result of the transfer or obligation; (ii) was engaged in business or a transaction, or about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital, or (iii) intended to incur, or believed it would incur, debts beyond the debtor's ability to pay as they matured. While state fraudulent conveyance laws may vary, they are generally similar to the Bankruptcy Code in that both actual and constructive fraud are considered, although the statutory language may vary from that in the Bankruptcy Code. Unlike section 548 of the Bankruptcy Code, however, fraudulent conveyance actions brought under state law are not limited to transfers that took place or obligations that were incurred within one year of the commencement of a bankruptcy case. Instead, transfers that occurred or obligations that were incurred during the periods set forth in the applicable state statute of limitations prior to the commencement of the bankruptcy case (and that otherwise meet the requirements of the statute) may be subject to avoidance.

In general, as provided in section 546(a) of the Bankruptcy Code, fraudulent transfer actions commenced under either section 548 of the Bankruptcy Code or applicable state law must be commenced no later than the earlier of (i) two years after the commencement of a bankruptcy case and (ii) the closing or dismissal of the case, provided that, in the case of an action brought under state law, the applicable state statute of limitations has not expired prior to the commencement of the bankruptcy case.

Another form of avoidance action is a preference action pursuant to section 547 of the Bankruptcy Code. In general, a transfer is preferential if: (a) the transfer was to or for the benefit of a creditor; (b) the transfer

was for or on account of an antecedent debt (i.e., a debt owed before the time of the transfer); (c) the debtor was balance sheet insolvent at the time of the transfer (there is a rebuttable presumption that a debtor was insolvent during the ninety days prior to the filing date); (d) the transfer was made to an insider within one year prior to the date of the commencement of the bankruptcy case or to a third party within ninety days prior to the filing date; and (e) the transfer had the effect of giving the creditor more than it would have received in a distribution under a chapter 7 liquidation of the debtor. There are, however, certain defenses to preference actions under the Bankruptcy Code. To the extent a transfer is covered by one of these defenses, it cannot be invalidated, even if all of the elements of a preference action can be proven. As with fraudulent conveyance actions under the Bankruptcy Code, preference actions generally must be commenced by the earlier of (i) two years after the commencement of a bankruptcy case and (ii) the closing or dismissal of the case.

### 3. Equitable Subordination and Recharacterization

Two other causes of action that may potentially arise in connection with the intercompany relationships and transactions described above are equitable subordination and recharacterization.

Bankruptcy courts have equitable power to subordinate claims. Such a remedy is considered when a claimant may have engaged in inequitable conduct which has resulted in an injury to creditors of a debtor or conferred an unfair advantage on the claimant. Subordination sometimes may be warranted by inequitable conduct not specifically related to the claim in question. Further, a claim only may be subordinated to the extent necessary to offset the harm to other creditors due to the claimant-defendant's inequitable conduct. There is no presumption against insider or affiliate transactions, however such transactions tend to come under scrutiny.

It also has generally been recognized that bankruptcy courts, pursuant to their equitable powers under the Bankruptcy Code, have the right to recharacterize claims as equity. Unlike equitable subordination, recharacterization involves an examination by the court of the substance of a transaction to determine its true nature and character, rather than whether there was any inequitable conduct justifying subordination of a claim. Courts normally consider numerous factors in determining whether to recharacterize a claim and generally will not recharacterize claims unless the claims have more indicia of equity than of debt or they do not appear to be the result of an arm's length transaction. If a court decides to recharacterize a claim, such claim will be treated as an equity interest for all purposes in a bankruptcy proceeding.

# VII.

## SELECTED FINANCIAL INFORMATION

**A. Annual Financial Information for Mirant**

For the year ended December 31, 2004, Mirant reported a $476,000,000 net loss on a consolidated basis. The results for the year ended December 31, 2004, include a $582,000,000 impairment of goodwill related to Mirant's Asia business. The total cash and cash equivalents of Mirant and its subsidiaries, on a consolidated basis, as of December 31, 2004 was approximately $1,500,000,000, approximately $274,000,000 of which was cash required for operating, working capital or other purposes or restricted by subsidiary debt agreements.

For the year ended December 31, 2003, Mirant reported a $3,800,000,000 net loss on a consolidated basis. The results for the year ended December 31, 2003, include a $2,100,000,000 impairment of goodwill and a $1,300,000,000 impairment related to long-lived assets. The total Cash and cash equivalents of Mirant and its subsidiaries, on a consolidated basis, as of December 31, 2003 was approximately $1,600,000,000, approximately $351,000,000 of which was Cash required for operating, working capital or other purposes or restricted by subsidiary debt agreements.

For the year ended December 31, 2002, Mirant reported a $2,400,000,000 net loss on a consolidated basis.

**B. Financial Statements for Mirant**

The annual financial statements should be read in conjunction with the financial statements and notes thereto included in Mirant's Annual Report on Form 10-K for the year ended December 31, 2004 that was filed on March 15, 2005. The June 30, 2005 financial statements should be read in conjunction with the financial statements and notes thereto included in Mirant's Quarterly Report on Form 10-Q for the period ended June 30, 2005 that was filed on August 8, 2005. These filing are available at the SEC's website at www.sec.gov and on Mirant's website at www.mirant.com.

## CONSOLIDATED STATEMENTS OF OPERATIONS

| | For the Six Months Ended June 30, 2005 | For the Years Ended December 31, | |
| --- | --- | --- | --- |
| | | 2004 | 2003 |
| | (In millions, unaudited) | (In millions) | |
| **Operating Revenues:** | | | |
| Generation | $1,474 | $3,999 | $ 4,639 |
| Integrated utilities and distribution | 341 | 573 | 523 |
| Total operating revenues | 1,815 | 4,572 | 5,162 |
| **Cost of fuel, electricity and other products** | 963 | 2,620 | 3,184 |
| **Gross Margin** | 852 | 1,952 | 1,978 |
| **Operating Expenses:** | | | |
| Operations and maintenance | 484 | 1,004 | 1,085 |
| Depreciation and amortization | 154 | 308 | 340 |
| Goodwill impairment losses | — | 582 | 2,067 |
| Long-lived asset impairment losses | — | — | 1,339 |
| Other impairment losses and restructuring charges | 10 | 23 | 57 |
| Loss (gain) on sales of assets, net | 25 | 53 | (46) |
| Total operating expenses | 673 | 1,970 | 4,842 |
| **Operating Income (Loss)** | 179 | (18) | (2,864) |
| **Other (Expense) Income, net:** | | | |
| Interest expense | (63) | (130) | (379) |
| Interest rate hedging losses | — | — | (110) |
| Gain on sales of investments, net | 1 | — | 67 |
| Equity in income of affiliates | 14 | 26 | 33 |
| Impairment losses on minority owned affiliates | — | — | — |
| Interest income | 12 | 11 | 24 |
| Other, net | (7) | 68 | 48 |
| Total other expense, net | (43) | (25) | (317) |
| **Income (Loss) From Continuing Operations Before Reorganization Items, Income Taxes and Minority Interest** | 136 | (43) | (3,181) |
| Reorganization items, net | 94 | 259 | 290 |
| Provision for income taxes | 32 | 87 | 126 |
| Minority interest | 13 | 21 | 35 |
| **Loss From Continuing Operations** | (3) | (410) | (3,632) |
| **Income (Loss) from Discontinued Operations, net of tax benefit of $1 and $55 in 2003 and 2002, respectively** | 4 | (66) | (174) |
| **Income (Loss) Before Cumulative Effect of Changes in Accounting Principles** | 1 | (476) | (3,806) |
| **Cumulative Effect of Changes in Accounting Principles, net of taxes of $1 in 2003** | — | — | (29) |
| **Net Income (Loss)** | $ 1 | $ (476) | $(3,835) |

## CONSOLIDATED BALANCE SHEETS

| | June 30, 2005 | December 31, 2004 |
|---|---|---|
| | (In millions, unaudited) | (In millions) |
| **ASSETS** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 1,495 | $ 1,485 |
| Funds on deposit | 494 | 493 |
| Receivables, net | 677 | 771 |
| Price risk management assets | 348 | 209 |
| Inventories | 358 | 353 |
| Prepaid expenses | 232 | 253 |
| Assets held for sale | 124 | 222 |
| Other | 136 | 133 |
| Total current assets | 3,864 | 3,919 |
| **Property, Plant and Equipment, net** | 6,112 | 6,170 |
| **Noncurrent Assets:** | | |
| Intangible assets, net | 271 | 276 |
| Investments | 256 | 248 |
| Price risk management assets | 146 | 112 |
| Funds on deposit | 205 | 210 |
| Deferred income taxes | 185 | 185 |
| Other | 341 | 304 |
| Total noncurrent assets | 1,404 | 1,335 |
| **Total assets** | 11,380 | $11,424 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| **Current Liabilities:** | | |
| Short-term debt | $ 10 | $ 15 |
| Current portion of long-term liabilities | 271 | 206 |
| Accounts payable and accrued liabilities | 559 | 725 |
| Price risk management liabilities | 395 | 286 |
| Accrued taxes and other | 198 | 174 |
| Total current liabilities | 1,433 | 1,406 |
| **Noncurrent Liabilities:** | | |
| Long-term debt | 1,023 | 1,169 |
| Price risk management liabilities | 94 | 62 |
| Deferred income taxes | 360 | 346 |
| Other | 396 | 378 |
| Total noncurrent liabilities | 1,873 | 1,955 |
| **Liabilities Subject to Compromise** | 9,206 | 9,217 |
| **Minority Interest in Subsidiary Companies** | 170 | 164 |
| **Commitments and Contingencies** | | |
| **Stockholders' Equity (Deficit):** | | |
| Common stock, $.01 par value, per share | 4 | 4 |
| Authorized — 2,000,000,000 shares | | |
| Issued — June 30, 2005: 405,568,084 shares | | |
| — December 31, 2004: 405,568,084 shares | | |
| Treasury — June 30, 2005: 100,000 shares | | |
| — December 31, 2004: 100,000 shares | | |
| Additional paid-in capital | 4,918 | 4,918 |
| Accumulated deficit | (6,154) | (6,155) |
| Accumulated other comprehensive loss | (68) | (83) |
| Treasury stock, at cost | (2) | (2) |
| Total stockholders' deficit | (1,302) | (1,318) |
| **Total liabilities and stockholders' deficit** | $11,380 | $11,424 |

# MIRANT CORPORATION AND SUBSIDIARIES
## (Debtor-in-Possession)

## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Six Months Ended June 30, 2005 | For the Years Ended December 31, | |
|---|---|---|---|
|  |  | 2004 | 2003 |
|  | (In millions, unaudited) | (In millions) | |
| **Cash Flows from Operating Activities:** |  |  |  |
| Net income (loss) | $ 1 | $ (476) | $(3,835) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: |  |  |  |
| Amortization of transition power agreements and other obligations (non-cash revenue) | (12) | (349) | (449) |
| Depreciation and amortization | 158 | 320 | 359 |
| Impairment losses and restructuring charges | 7 | 639 | 3,640 |
| Loss (Gain) on sales of assets and investments | 25 | 53 | (92) |
| Interest rate hedging losses | — | — | 110 |
| Equity in income of affiliates, net of dividends | (5) | (7) | (12) |
| Non-cash charges for reorganization items | 22 | 168 | 260 |
| Minority interest | 13 | 21 | (70) |
| Cumulative effect of changes in accounting principles | — | — | 29 |
| Price risk management activities, net | (70) | (148) | 126 |
| Deferred income taxes | 16 | 50 | 46 |
| Other, net | 26 | 6 | (23) |
| Changes in operating assets and liabilities: |  |  |  |
| Receivables, net | 9 | 149 | 949 |
| Other current assets | 28 | (153) | (91) |
| Other assets | (24) | 23 | (84) |
| Accounts payable and accrued liabilities | (116) | (194) | (787) |
| Taxes accrued | 26 | (22) | (10) |
| Other liabilities | 6 | (9) | (85) |
| Total adjustments | 109 | 547 | 3,816 |
| Net cash provided by (used in) operating activities | 110 | 71 | (19) |
| **Cash Flows from Investing Activities:** |  |  |  |
| Capital expenditures | (95) | (159) | (493) |
| Cash paid for acquisitions | — | (21) | (61) |
| Issuance of notes receivable | — | — | (29) |
| Repayments on notes receivable | — | 1 | 98 |
| Proceeds from the sale of assets and minority owned investments | 72 | 45 | 398 |
| Cash paid related to disposition | — | (12) | — |
| Other | (5) | — | (1) |
| Net cash (used in) provided by investing activities | (28) | (146) | (88) |
| **Cash Flows from Financing Activities:** |  |  |  |
| (Payments on) proceeds from short-term debt, net | (3) | (14) | (36) |
| Proceeds from issuance of long-term debt | 33 | 376 | 355 |
| Repayment of long-term debt | (103) | (218) | (300) |
| Repayment of commodity prepay transaction | — | — | — |
| Purchase of TIERS Certificates | — | — | (51) |
| Payment of debt related derivatives | — | — | — |
| Proceeds from issuance of common stock | — | — | 2 |
| Payment of dividends to minority interests | (7) | (17) | (11) |
| Change in debt service reserve fund | 7 | (154) | 9 |
| Other | 1 | — | 14 |
| Net cash used in financing activities | (72) | (27) | (18) |
| **Effect of Exchange Rate Changes on Cash and Cash Equivalents** | — | — | 6 |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | 10 | (102) | (119) |
| **Cash and Cash Equivalents, beginning of year/period** | 1,485 | 1,587 | 1,706 |
| **Cash and Cash Equivalents, end of year/period** | $1,495 | $1,485 | $ 1,587 |
| **Supplemental Cash Flow Disclosures:** |  |  |  |
| Cash paid for interest, net of amounts capitalized | $ 60 | $ 117 | $ 372 |
| Cash paid (refunds received) for income taxes | $ 27 | $ 42 | $ (7) |
| Cash paid for reorganization items | $ 78 | $ 107 | $ 56 |
| **Business Acquisitions:** |  |  |  |
| Fair value of assets acquired | $ — | $ 21 | $ 61 |
| Less cash paid | $ — | 21 | 61 |
| Liabilities assumed | $ — | $ — | $ — |

58

# VIII.

# FINANCIAL PROJECTIONS AND ASSUMPTIONS

## A.  Purpose and Objectives

The value of the securities to be issued pursuant to the Plan and the recoveries by holders of Allowed Claims who receive such securities, depend in part upon the ability of the Debtors to achieve financial results projected on the basis of certain assumptions.

To maximize creditor recoveries, the Debtors must seek to maximize the value of their businesses. Additionally, for the Plan to meet the feasibility test of section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must conclude that confirmation of the Plan is not reasonably likely to lead to the liquidation or further reorganization of the Debtors.

With these considerations in mind, the Debtors prepared their projections, which as more fully set forth below, are based upon the Debtors' long term business plan and in turn serve as the basis for the Plan. The Debtors believe that the assumptions that serve as the basis for the projections, subject to the updates described herein, are reasonable under the circumstances and that pursuit of the business plan will maximize the value of the businesses of the Debtors.

## B.  Projected Consolidated Financial Statements

The Debtors have prepared the projected operating and financial results (the "Projections") for New Mirant, MAG, New MAG Holdco, MIRMA and West Georgia for the period ending December 31, 2011 (the "Projections Period"). The Projections are presented solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the holders of Claims and Equity Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Equity Interests in, the Debtors or any of their affiliates. The Projections are attached as Exhibit "D."

The Projections were prepared in connection with the Debtors' First Amended Disclosure Statement and are based on the business plan prepared by the Debtors in October 2004 and reflect commodity and power market forecasts and assumptions and other relevant conditions and assumptions considered reasonable by the Debtors at such time and reflect the terms and structure of the March 2005 Plan. The Projections as initially set forth in the First Amended Disclosure Statement, including "fresh start" accounting adjustments, are attached as Exhibit "D." Since the Projections were prepared, however, the terms of the Plan have been revised, actual financial results have been realized that differ from the results forecasted in the Projections and the forward-looking view of the Debtors has changed with respect to certain assumptions and expectations, including forecasted gross margin, operating expenses, cash taxes, reorganization costs and capital expenditures. In some cases, the variances to the Projections are material. While the Debtors have not undertaken to update the Projections or the underlying assumptions, the Debtors have identified certain changes and qualitative factors that are meaningful to the consideration of such assumptions and the development of an updated long term view of the expected performance of the Debtors' business, including changes resulting from the amendment of the Plan, expected variances to North America gross margin performance, certain changes to projected cash operations and maintenance ("O&M") expenses, cash taxes and capital expenditures. These factors are discussed where appropriate under "Financial Projections and Assumptions — Summary of Significant Assumptions." Subject to the updates and variances discussed herein, the Debtors believe that the Projections taken as a whole and considered over the span of the Projections Period and in light of the limited purpose for which they are presented represent a reasonable forecast of the future financial performance of the respective Debtors. Nevertheless, you should consider all of these assumptions together with the factors discussed under "Risk Factors" when reviewing the Projections in order to achieve a reasonable representation of the expected future performance of the Debtors' businesses.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO

ENABLE THE HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OF THEIR AFFILIATES.

THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THE PROJECTIONS HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT AND PROFESSIONALS. THESE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO ASSURANCES CAN BE MADE AS TO THE ACCURACY OF THE ASSUMPTIONS AND RESULTANT PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES OR THE ABILITY OF THE DEBTORS AND NEW MIRANT TO ACHIEVE THE PROJECTED RESULTS, INCLUDING SUBSEQUENTLY IDENTIFIED VARIANCES, FOLLOWING THE EFFECTIVE DATE. THE PROJECTIONS SHOULD BE CONSIDERED IN LIGHT OF THE UPDATED INFORMATION DEVELOPED SINCE THEIR PREPARATION DISCUSSED IN "SUMMARY OF SIGNIFICANT ASSUMPTIONS." SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE PROJECTIONS UTILIZE THE PRELIMINARY VALUATION PREPARED BY THE BLACKSTONE GROUP SOLELY IN CONNECTION WITH THE FILING OF THE FIRST AMENDED DISCLOSURE STATEMENT. HOWEVER, NO FRESH START ADJUSTMENTS ARE REFLECTED IN THE INCOME STATEMENT INCLUDED IN THE PROJECTIONS. AS A RESULT, THE OPERATING RESULTS MAY NOT BE INDICATIVE OF TRUE PERFORMANCE, AND FINANCIAL RATIOS CALCULATED USING THE PROJECTIONS MAY NOT BE ACCURATE OR REPRESENTATIVE OF NEW MIRANT AFTER EMERGENCE. ABSENT A STIPULATED OR BANKRUPTCY COURT DETERMINED ENTERPRISE VALUE OF THE DEBTORS, THE DEBTORS INTEND TO IDENTIFY AN ENTERPRISE VALUE FOR PURPOSES OF "FRESH START" ACCOUNTING UTILIZING MARKET DATA, INCLUDING THE TRADING PRICES OF THE SECURITIES OF THE DEBTORS THAT MAY DIFFER MATERIALLY FROM THE VALUATION ASSUMED IN THE PROJECTIONS.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE DEBTORS' INDEPENDENT ACCOUNTANTS, KPMG LLP ("KPMG"), HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS AND STRATEGIES OR PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO: (1) FURNISH UPDATED BUSINESS PLANS OR PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE, OR TO HOLDERS OF SECURITIES OF ANY DEBTOR, OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (2) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC; OR (3) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE. HOWEVER, FROM TIME TO TIME, THE DEBTORS WILL PREPARE UPDATED PROJECTIONS IN CONNECTION WITH PURSUING FINANCING (INCLUDING THE EXIT FINANCING), CREDIT RATINGS AND OTHER PURPOSES. SUCH PROJECTIONS MAY DIFFER MATERIALLY FROM THE PROJECTIONS PRESENTED HEREIN.

THE ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS AND SUBSEQUENTLY IDENTIFIED VARIANCES IN CONNECTION WITH EFFECTING FRESH START ACCOUNTING. THE DEBTORS AND NEW MIRANT WILL BE REQUIRED TO DETERMINE THE ENTERPRISE VALUE, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUES AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LOWER THAN THE VALUES ASSUMED IN THE FOREGOING COMPUTATIONS. IN ALL EVENTS, THE REORGANIZATION VALUE, AS WELL AS THE DETERMINATION OF THE FAIR VALUE OF THE DEBTORS' ASSETS, INCLUDING PROPERTY, EQUIPMENT, AND INVENTORIES AND THE DETERMINATION OF THEIR ACTUAL LIABILITIES, WILL BE MADE AS OF THE EFFECTIVE DATE. ALTHOUGH THE DEBTORS EXPECT TO UTILIZE A CONSISTENT METHODOLOGY, THE CHANGES BETWEEN THE AMOUNTS OF ANY OR ALL OF THE FOREGOING ITEMS AS ASSUMED IN THE PROJECTIONS AND THE ACTUAL AMOUNTS THEREOF AS OF THE EFFECTIVE DATE MAY BE MATERIAL.

**C. Summary of Significant Assumptions**

**1. Effective Date and Plan Terms**

The Projections assumed that the Plan would be consummated in accordance with its terms and that all transactions contemplated by the Plan would be consummated by June 30, 2005. The Effective Date of the Plan has been delayed beyond such time, which has caused the Debtors to incur significantly higher reorganization costs than projected as discussed below under "Summary of Significant Assumptions — Reorganization Costs."

The Projections assume the consummation of the First Amended Plan as filed on March 25, 2005. The primary changes included in the Second Amended Plan being filed with this Disclosure Statement that impact the Projections are as follows: (i) the Projections assume New MAG Holdco will issue $1,322,500,000 of New MAG Holdco Notes to the holders of MAG Class 5 — Unsecured Claims and MAG Class 4 — PG&E/RMR Claims, should the Debtors elect to issue New MAG Holdco Notes to the holders of such Unsecured Claims in lieu of cash, the principal amount to be issued would be $1,350,810,000, which additional debt would result in approximately $2,100,000 of additional interest expense per year; (ii) while the Projections contemplate the issuance of certain preferred securities by MET to MAI, the Plan provides for New MAG Holdco to transfer $250,000,000 to New Mirant or MAI; and (iii) change of projected emergence date from June 30, 2005 to December 31, 2005.

## 2. <u>North America</u>

### a. Methodology and Market Assumptions.

The U.S. generating facilities owned or controlled by the Debtors produce gross margin, through transactions in spot energy markets and/or pursuant to contractual arrangements. Gross margin projections are based on the modeled cash flows of consummated contractual arrangements or forecasts of spot energy prices, as appropriate.

The Debtors forecast near-term gross margins for uncontracted generation using proprietary tools that utilize fuel, emissions and power forward market prices. The Debtors forecast longer-term merchant gross margins using proprietary tools that make certain fundamental assumptions about fuel and emission prices and simulate the fundamentals of the power markets in which the Debtors' facilities are located.

The Projections are based on the assumption that in the short to medium term, power markets across the United States are over-built but that in the long term, an equilibrium reserve margin will be reached and prices should provide a return sufficient to attract market entry of new units. Due to current market and regulatory conditions, the Projections assume that equilibrium does not occur in major U.S. markets until at least 2008. The following table lists the assumed equilibrium years in the Projections for each major U.S. market.

| Region | Equilibrium Year |
| --- | --- |
| PJM | 2008 |
| NYPP | 2008 |
| NEPOOL | 2010 |
| ECAR | 2008 |
| ERCOT | 2009 |
| WECC | 2009 |

Since the Projections were prepared, the Debtors have identified certain changes to projected load growth and generation facility retirement and mothball expectations compared to the assumptions in the Projections. However, the Debtors do not believe that any such changes would lead to a variation of more than a year — either sooner or later — to the equilibrium year assumed in the Projections.

The gross margin forecast of the Debtors is based on energy and capacity only and does not explicitly forecast ancillary services revenues, assuming that generators would make the best economic decision when choosing between dispatching a generating facility to the energy market or providing ancillary services.

The Projections assume that certain regions that currently do not have a traded capacity market (ECAR, ERCOT and the West) will develop some form of a mechanism to compensate for capacity by 2006. The development of pool-based capacity markets in the regions that do not have such capacity markets, and the implementation of such capacity markets in the regions that do have such capacity markets, has occurred more slowly than assumed in the Projections. As a result, for the period through December 31, 2007, the gross margin variances to the Projections shown under "Subsequently Identified Variances to Projected Gross Margins" assume forward market prices for capacity in those regions with pool-based capacity markets and no compensation for capacity in markets without capacity markets. The eventual timing and the final structure of capacity markets could have a significant impact on the ability of the Debtors to achieve their projected gross margins.

The fuel cost assumptions used in the Projections are developed on a regional basis, starting from commodity forecasts for gas, oil and coal. The gas and oil commodity forecasts in the Projections are based on the June 30, 2004 forward prices and a consensus estimate of external forecasts, as well as the expectations of the Debtors (generally bounded by external forecasts) for the longer term. The coal prices used in the Projections are a combination of forecasted prices for the various production basins and transportation costs from these basins to various regions in the United States. Delivered spot coal prices are used to dispatch the generating facilities of the Debtors. A blended coal price based on spot and contracted coal prices is used to

dispatch market units through 2008, with spot prices used for the balance of the Projection Period. Where applicable, the Debtors' fuel costs reflect contracts in place as of June 30, 2004.

The emissions credit prices used in the Projections are based on the forward prices as of June 30, 2004 for 2005 and 2006 for NOx and 2005 for SO$_2$. Longer-term emission prices used in the Projections reflect the expectations of the Debtors of prices and the uncertainty surrounding various proposed environmental regulations.

Since the Projections were prepared, market prices of power, fuel and emissions have been volatile and generally have been trending upward. The Debtors have determined that it is reasonable to utilize forward market prices for power, fuel and emissions as of June 30, 2005 for the period through December 31, 2007. While subsequent forward commodity prices are higher in some cases than June 30, 2005 prices, the Debtors believe that the more recent price data is heavily influenced by abnormally hot weather in the Eastern half of the United States during the summer of 2005 as well as the effects of hurricane activity. As a result, the June 30, 2005 price data more closely approximates the Debtors' fundamental view of commodity prices going forward. Furthermore, the Debtors believe that these forward prices are a better representation of the price levels at which they will actually be able to enter into transactions because the Debtors have already hedged anticipated volumes consistent with the Debtors' hedging strategy for 2006 and the amount of collateral currently deployed against existing hedge positions significantly limits the Debtors' ability to enter into additional hedging transactions in the near term. The RMP restricts the Debtors' ability to enter into hedge transactions beyond the first quarter of 2007 at this time. The impact of these revised commodity prices and hedge positions as of June 30, 2005 on the Debtors' near-term gross margins is shown below under "Subsequently Identified Variances to Projected Gross Margins."

In addition to the cash gross margin for energy and capacity discussed above, the Projections also include $50,000,000 of gross margin per year in opportunistic hedging or incremental hedging value for the year ended December 31, 2006 and each year thereafter. However, in connection with the preparation of the gross margin variances to the Projections shown under "Subsequently Identified Variances to Projected Gross Margins," such amount was not included in the calculation of the gross margin for the year ended December 31, 2007 due to the utilization of forward market prices in the calculation of such gross margin variances.

The Debtors' optimization portfolio reflects projected market opportunities and risk tolerance given the Debtors' current credit situation, and conforms to the RMP adopted by the Debtors. The Projections assume $32,000,000 in gross margin for optimization activities in 2005 (excluding existing positions that the Debtors intend to exit or allow to roll off), escalating at approximately 3% per year.

### b. Certain Plant-Specific Assumptions

Certain outstanding issues in the United States may impact the decision of the Debtors to continue operating certain facilities. Given that some of these issues are not yet resolved, the Debtors have developed planning assumptions to address these issues in the Projections.

### i. New York Property Taxes

The Projections assume that the property tax disputes in New York were settled in December 2004 and that, starting in 2005, Mirant Bowline and Mirant Lovett tax-related payments accrue at a rate more consistent with the actual value of the facilities as opposed to the current assessed value. As they relate to the financial statements, the differences between the settlement assumptions in the Projections and the Proposed New York Tax Settlement are not material. See "The Chapter 11 Plan — Settlements and Compromises — Proposed New York Tax Settlement."

### ii. Kendall Mothball

The Projections assume that a portion of the Mirant Kendall facility is operated through October 2005 under an RMR agreement and that the Debtors will mothball the Mirant Kendall facility from January 2006 through December 2007 and restart operations in January 2008. It is likely that the RMR agreement will be extended through January 2006 and at the expiration of such an extension, the Debtors intend to mothball the Mirant Kendall facility if it is not economically feasible to continue to operate the facility. Neither the

potential extension of the RMR agreement nor the delay in mothballing the facility are reflected in the Projections. See "General Information — The Businesses of Mirant — The North American Business."

### iii. Lovett Shutdown

The Projections assume that the Lovett Unit 5 is shut down in April 2007 and that the Lovett Units 3 & 4 are shut down in 2008. While this is the assumption in the Projections, the Debtors are currently pursuing alternatives to allow the Lovett facility to continue to operate. There can be no assurance that such efforts to allow the Lovett facility to continue to operate will be successful. See "General Information — The Businesses of Mirant — The North American Business."

### iv. Pittsburg 7 Retirement, California Tolling Arrangements

The Projections assume that Pittsburg Unit 7 is retired in the first six months of 2005. Subsequent to the preparation of the Projections, the Debtors entered into tolling agreements through the end of 2005 for Pittsburg Unit 7 and through August 2005 for Contra Costa Unit 6. As a result of the tolling arrangement, the retirement of Pittsburg Unit 7 will be delayed until January 2006. The positive impact of this delay on cash gross margin is reflected below under "Substantially Identified Variances to Projected Gross Margins" and the impact on operating expenses is discussed below under "Summary of Significant Assumptions — Operating Expenses." See "General Information — The Businesses of Mirant — The North American Business." While the assumption regarding retirement of Pittsburg Unit 7 is contained in the Projections and the subsequently identified variances, the Debtors are currently pursuing alternatives to allow the unit to continue to operate. There can be no assurance that such efforts will be successful.

### v. California Portfolio

Consistent with the California Settlement, the Projections do not include any cash receipts with respect to receivables nor cash payments with respect to potential refunds, including RMR refunds. The Projections assume that the Debtors continue to operate in California for the entirety of the Projections Period. See "The Chapter 11 Plan — Settlement and Compromises — California Settlement."

### c. Asset Sales

The Projections include approximately $35,000,000 in December 2005 for the sale of various excess equipment.

The Projections do not include any proceeds from the sale of the Wrightsville facility to AECC. The Debtors completed the sale on September 28, 2005 for approximately $85,000,000. See "The Chapter 11 Class Cases — Material Asset Sales — Wrightsville."

### d. The Back-to-Back Agreement[1]

The Projections assume that the Back-to-Back Agreement is either rejected or recharacterized as of the Petition Date. Therefore, the Projections do not include any future payments under the Back-to-Back Agreement. Furthermore, the Projections assume that postpetition payments made under the Back-to-Back Agreement form the basis of a claim against Pepco and consequently are included as a receivable on the balance sheet of New Mirant. As a result of recent decisions in the district court, it is possible that neither New Mirant nor any of its subsidiaries will be able to reject or otherwise recharacterize the obligations under the Back-to-Back Agreement and therefore will remain liable under the Back-to-Back Agreement. As a result, the "Subsequently Identified Variances to Projected Gross Margins" set forth below reflect the resulting negative impact on cash from operations.

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

### 3. Philippines

#### a. Capacity Charges

Over 90% of the revenues of the Pagbilao and Sual plants come from fixed capacity charges that are paid by the NPC. The Projections assume that capacity factors range from 35% to 50% for Pagbilao and 40% to 55% for Sual over the Projection Period. The Projections assume that Sual and Pagbilao meet their respective contractual obligations and therefore incur no operational penalties. In addition, the Projections assume that the NPC continues to meet its obligations related to fuel management and payment for services.

#### b. Energy Supply Business

The Sual, Pagbilao, and Ilijan plants have excess capacity of 218 MW, 35 MW, and 51 MW, respectively. The Projections assume that Mirant Philippines sells this excess capacity, ranging from 90MW in 2005 to 281 MW in 2011, with an average load factor of approximately 60% to large industrial customers, economic zone authorities, electric cooperatives and private distribution utilities.

#### c. Put Options

International Finance Corporation ("IFC"), a minority shareholder in the Pagbilao project, holds a put option that expires in August 2008. The Projections assume that IFC will exercise its put option at the end of November 2005 for an estimated amount of approximately $33,000,000. Similar to Pagbilao, IFC holds a put option in the Sual project that expires in December 2005. The Projections assume that IFC will exercise this put option at the end of November 2005 for an estimated amount of approximately $39,000,000. The actual timing of the put options could vary from the assumption in the Projections.

#### d. Navotas II Transfer

The Projections assumed that the Navotas II facility would be transferred to NPC in July 2005 under the existing build-operate-transfer arrangement, which transfer did occur on August 1, 2005.

#### e. Tax Holidays

The Sual project benefits from a tax holiday that is projected to expire in October 2005. The Ilijan project benefits from a tax holiday that is expected to expire in January 2008.

### 4. Caribbean

#### a. Jamaica Public Service Company Limited

The Projections assume that JPS will experience annual MWh sales growth of 4.0% from 2005 to 2009 and 3.8% in 2010 and 2011. JPS will require new generation to serve growing demand in Jamaica. The Projections assume that JPS will bring online additional capacity of approximately 120 MW in each of January 2008 and January 2011, and will self fund the expansion through a combination of project or corporate financing and internally generated funds. The start of construction for the 2008 project has been delayed from 2005 to 2006 and as a result the additional capacity will not be operational until 2009. The gross margin impact of this delay is reflected in the revised gross margin projections shown below under "Subsequently Identified Variances to Projected Gross Margins" and the impact on capital expenditures is discussed under "Summary of Significant Assumptions—Capital Expenditures and Depreciation." In addition, the incurrence of additional indebtedness to finance construction has been delayed. Additionally, JPS is looking to enter into a PPA for an additional IPP project of 50 MW that is expected to come on-line for an additional capacity of 50 MW in January 2006.

In 2005, sales growth has been below expectations and line losses above Projections primarily driven by significantly higher power prices resulting from increased oil prices (with the exception of 3% hydros, oil is the sole fuel source for all generating facilities in Jamaica). Additionally, JPS suffered significant fuel revenue impairment due to higher than projected heat rates resulting from operational challenges in the post-Hurricane Ivan period through the third quarter 2005. JPS anticipates that it will need access to working capital either from lenders or from an affiliate of Mirant to fund working capital needs attributable in part to higher fuel costs and lower than expected sales. All of these negatively impact EBITDA and cash flow in 2005

versus the Projections. If oil prices continue at current high price levels, the JPS could continue to experience lower sales growth and higher line losses and the related adverse impact on EBITDA and cash flow beyond 2005. The major operational issues are now resolved and this should lead to improved heat rate performance from the fourth quarter 2005 onward.

### b. Grand Bahama Power Company Limited

Grand Bahama Power is assumed in the Projections to experience 7.2% MWh sales growth over the weather and hurricane impacted 2004 projected sales estimate. MWh sales growth is assumed to gradually improve from 2.0% in 2006 to 3.5% in 2008. Growth is assumed to remain at 3.5% annually through 2011. Grand Bahama Power has begun construction of a new 18 MW generation facility to replace a 15 MW 1936 vintage unit with commercial operation expected in October 2005. An additional 18 MW of capacity is expected to come online in August 2009 to meet demand requirements. The Projections assume that the new capacity is financed with debt by Grand Bahama Power.

### c. Power Generation Company

PowerGen's current power purchase agreement escalates payments for capacity by 95% and energy by 100% of U.S. CPI annually. The Projections assume that PowerGen will extend its PPA with the T&TEC, which expires in December 2009, under terms and conditions similar to the existing contract. However, PowerGen and T&TEC are expected to begin these discussions shortly, with amended terms projected to be effective in 2006. The heat rate is forecasted to average 13,269 btu/kwh over the planning period. The foreign exchange rate is forecasted to remain steady at TTD 6.30/USD.

The Projections assume no new generation for the Projection Period. However, PowerGen is negotiating to build new generation and provide electric generation capacity under a long-term power purchase agreement to NGC and T&TEC. Furthermore, PowerGen is expected to begin discussions with NEC for additional power supply. The capital expenditures, revenues and costs associated with this potential new generation project are not included in the Projections.

### d. Curacao Utilities Company and Aqualectra

The Projections assume that CUC will continue to meet its contractual obligations under its Utility Services Agreement with the Isla Refinery. The foreign exchange rate is forecasted to remain steady at ANG1.78/USD and local inflation is forecasted to be 2.0% per year. The CUC tax holiday is not scheduled to expire during the Projection Period. The Projections assume no exercise of the put/call rights with respect to Mirant's interest in Aqualectra.

### 5. Corporate Overhead

The Debtors project corporate overhead expenses based on the historical costs of the current organization adjusted for known differences and changes to the organization, including projected savings. The Projections assume that a consumer price index of 2.5% per year creates escalation in corporate overhead costs, but that escalation will be managed through efficiency improvements.

The Projections assume that the Corporate Overhead Initiative ("COI"), an initiative undertaken by the Company to find efficiencies and cut costs where reasonable to do so, results in a reduction to company-wide costs of $35,400,000 in 2005 and $51,800,000 in 2006, with similar annual savings in 2007 and beyond. These savings are projected to be achieved in both the corporate and North America segments. At this time, approximately $9,000,000 of the overhead cost savings for 2006 have not been identified. In addition, certain corporate costs are now expected to continue to increase as a result of the implementation of elements of the Plan such as pursuit of the Avoidance Actions or as a result of infrastructure and processes necessary to prepare financial statements and to comply with the requirements of section 404 of the Sarbanes-Oxley Act for multiple SEC registrants, thereby making the Debtors' cost savings targets difficult to achieve for 2006 and possibly beyond.

### 6. Operating Expenses

The Debtors' operating expenses include costs related to labor, operations and maintenance, selling, general and administrative expenses ("SG&A"), corporate overhead, property tax and other smaller expenses.

Union labor costs are based on current labor contracts and the Projections assume that the U.S. and Philippine contracts remain in place through the Projection Period. Caribbean union contracts are renegotiated every 3 to 5 years. Therefore, the Projections assume similar terms to the existing union contracts for the Caribbean units. The Debtors forecast non-union labor costs based on headcount and fully-loaded labor costs for each employee. Labor projections include amounts for short-term incentives, which are consistent with the current incentive program and past practices.

The Debtors project annual O&M expenses based on historical levels, anticipated run profiles, specific projects necessary to maintain plants and/or enhance efficiency, and a forward view of inflation and prices. In addition, maintenance expenditures include long-term services agreement payments associated with the new gas fired combined cycle and simple cycle plants of the Debtors. Also included in North America O&M is the "Periodic Lease Rent" expense obligation associated with the MIRMA Leases, shown as a separate line item in the Projections. Since the Projections were completed, the following changes have occurred:

- Keeping Pittsburg Unit 7 operational through the end of 2005 increases cash O&M expenses by $6,000,000 and defers cash O&M expenses of $2,200,000 due to severance costs from 2005 to 2006[1];

- Delays in installing the Potrero Unit 3 selected catalytic reduction ("SCR") caused 2005 O&M expenses to increase by $7,000,000; and

- Repairs at Swinging Bridge dam related to a sinkhole will cause O&M expenses to increase by more than $5,600,000 in 2005, of which approximately 50% should be covered by insurance proceeds to be received in 2006. However, the cost of the repairs could be substantially in excess of this amount. Furthermore, Mirant NY-Gen is required to perform a flood study relating to the Swinging Bridge, Rio and Mongaup reservoirs to determine the maximum capacity of the reservoirs and the down stream consequences of a rain event resulting in a greater than the maximum capacity event. The results of the flood study will not be known until the fourth quarter of 2005 and the costs of any remedial work are unknown but could be significantly greater than the repair costs referred to above.

SG&A expenses include computer-related telecommunications, and other miscellaneous expenses at the business units.

Property taxes in the United States are calculated based on a facility's current assessment multiplied by its millage rate. With the exception of Mid-Atlantic and New York, property taxes are assumed to escalate based on schedules defined by the tax authorities. The Projections assume no escalation of property taxes at MIRMA.

The property and casualty insurance costs reflected in the Projections represent current premiums escalating at approximately 3.5% per year.

### 7. Operating Performance Initiative

In an effort to reduce costs and enhance gross margins, the Debtors conducted an Operations Performance Initiative ("OPI"), which involved a review of its power plant related processes and projects in the United States and Jamaica.

For North America, the Projections incorporate $199,000,000 in EBITDA and capital cost improvements in 2005 and an average of approximately $176,000,000 per year in expected operational improvements through 2011.

---

[1] The projected non-cash impairment charge of $7,000,000 related to the Pittsburg Unit 7 shutdown will likewise be deferred from 2005 to 2006.

For Jamaica, the Projections assume approximately $1,500,000 in EBITDA improvements in 2005 and $3,500,000 per year from 2006 to 2009.

## 8. Collateral and Liquidity Needs

The Projections assume that the Debtors have outstanding collateral throughout the Projection Period ranging from approximately $600,000,000 to $975,000,000. Approximately $200,000,000 to $225,000,000 of this amount is associated with the Debtors' assumption in the Projections that they will continue to economically hedge the output and fuel requirements of a portion of the North America generation asset portfolio. The remainder of the outstanding collateral (approximately $400,000,000 to $750,000,000) is associated with postings on behalf of international businesses as well as infrastructure, gas transport, prepayments, asset direct postings, optimization activities, and legacy positions in North America. While not explicitly included in the Projections, the Debtors believe they will need to maintain additional liquidity of approximately $645,000,000 to $780,000,000 in order to have sufficient funds for price shock events, such as the one discussed below, seasonal/intra-month working capital, and other contingencies.

As of September 20, 2005, the Debtors have posted approximately $860,600,000 of cash collateral related to their trading and marketing activities, compared to $322,000,000 assumed in the Projections for June 2005. The higher cash collateral levels are a result of the high commodity prices and actual hedges entered into by the Debtors consistent with their risk management policy. Notwithstanding the currently high level of cash collateral, in light of the fact that collateral will be returned to the Debtors as hedge positions roll off, the Debtors believe that the assumed cash collateral levels in the Projections are an appropriate reflection of expectations through the Projection Period.

The Projections assume that New MAG Holdco is able to raise $750,000,000 to fund operations and working capital. New MAG Holdco has a commitment for a revolving credit facility in the amount of $1,000,000,000.

The Debtors expect to satisfy their liquidity and capital requirements in North America with cash generated by operations and letters of credit and borrowings under the New MAG Holdco credit facility. Further, Mirant expects to satisfy the liquidity and capital requirements of its international subsidiaries with cash generated by operations and additional financing arrangements. The table below sets forth the total forecasted cash and cash equivalents and availability under credit facilities of New Mirant, MAG, New MAG Holdco and MIRMA as of December 30, 2005, after giving effect to the Plan and, based on the most recent liquidity forecast of the Debtors as of September 20, 2005.

|  | December 31, 2005 |
|---|---|
|  | (In millions) |
| Cash and Cash Equivalents: |  |
| Debtors: |  |
| Mirant | $ 547 |
| MAG | — |
| New MAG Holdco | 20 |
| MIRMA | 5 |
| Other subsidiaries (including international subsidiaries) | 280 |
| Total unrestricted cash and cash equivalents | 852 |
| Cash required for operating, working capital or other purposes or restricted by the subsidiaries' debt agreements | 254 |
| Total cash and cash equivalents | 1,107 |
| Availability under New MAG Holdco credit facility | 626 |
| Total cash, cash equivalents and credit facilities availability | $1,733 |

In connection with emergence from chapter 11, the Mirant Debtors will distribute approximately $80,000,000 in Cash to holders of Claims and the MAG Debtors will distribute approximately $505,000,000 in Cash to holders of Claims.

### 9. Income Taxes

The Projections assume that federal and state taxes for the Debtors' U.S. entities are paid to the extent that the applicable taxable entity has generated future taxable income in excess of its accumulated tax loss carry forwards or to the extent that the taxable entity's income exceeds the tax loss carryforward available based on the applicable annual limitation determined under section 382(1)(6) of the Internal Revenue Code. The Projections also assume the formation of New Mirant as a non-U.S. entity and that Mirant's transfer of substantially all of its assets to New Mirant in exchange for New Mirant stock and other consideration, which is distributed to Mirant's current stockholders and creditors, qualifies as a tax-free reorganization under section 368(a)(1)(G) of the Internal Revenue Code, and that certain other mergers or transfers of assets by the Debtors pursuant to the Plan will be tax-free. Since the Projections were prepared, the Debtors, in consultation with the Corp Committee and Equity Committee as well as the Board of Directors of Mirant, have elected to form New Mirant as a Delaware corporation. The earnings of non-U.S. entities are assumed to be taxed at the applicable local tax rates. The Projections also assume that West Georgia, MIRMA, MAG, and New MAG Holdco do not pay cash taxes for federal income tax purposes. However, these entities may be required to record federal income tax accruals for financial statement purposes even though no cash tax payments are made. The Projections also assume that section 382(1)(6) of the Internal Revenue Code applies with respect to the utilization by the Debtors of their net operating losses and other tax attributes. The long-term tax exempt rate utilized for purposes of determining the annual section 382 limitation was 4.24%, the rate in effect for September 2005. The projected reduction/(increase) in cash taxes of the consolidated Debtors as a result of remaining a domestic company, compared to cash taxes forecasted in the Projections that assumed a non-U.S. parent company, is: $26,000,000 in 2006, $15,000,000 in 2007, $8,000,000 in 2008, $6,000,000 in 2009, ($1,000,000) in 2010 and $20,000,000 in 2011. However, the Debtors do not anticipate applying section 382(1)(6) of the Internal Revenue Code if the Debtors determine that section 382(1)(5) will provide better utilization of their tax attributes. The Debtors will need to determine whether to apply section 382(1)(5) or (1)(6) prior to the filing of New Mirant's consolidated tax return for the tax year in which Mirant emerges from bankruptcy. Assuming that Mirant emerges from bankruptcy in December 2005, the determination of whether to apply section 382(1)(5) or (1)(6) of the Internal Revenue Code must be made on New Mirant's consolidated tax return for its tax year ended December 31, 2005, which must be filed by September 2006. The New Mirant common stock will be subject to transfer restrictions upon emergence to prevent a subsequent ownership change from occurring in the event that the Debtors choose to apply section 382(1)(5) of the Internal Revenue Code. To effect such restriction the shares of New Mirant common stock will include the legend set forth in Schedule 13. If section 382(1)(5) applies, the cash taxes in the Projections would be reduced(increased) by the following amounts: ($1,000,000) in 2006; $0 in 2007; $8,000,000 in 2008; $102,000,000 in 2009; $81,000,000 in 2010; and $41,000,000 in 2011. It should be noted the cash taxes described above for 382(1)(6) with a domestic parent company is based on the valuation prepared by Blackstone in connection with the filing of the First Amended Disclosure Statement. Should the value at emergence exceed this valuation, the cash taxes above may change. Cash taxes and NOL utilization will be affected by the subsequently identified variances discussed herein. Such effects are not included in the above analysis.

### 10. Capital Expenditures and Depreciation

The Projections include capital expenditures associated with anticipated environmental compliance, long-term service agreements, maintenance, construction completion, and other miscellaneous expenditures. The Projections do not include construction of any new generating assets in the United States during the Projection Period, but do include construction of substations, transmission lines, and/or new generating facilities in Asia and the Caribbean.

The Projections include adequate capital expenditures to achieve compliance with the CAIR and the CAMR throughout the Projection Period.

Depreciation expense was based on capital expenditure projections, historical book values, and estimated remaining life projections.

Since the development of the Projections, the Debtors have identified certain changes to cash capital expenditures:

- The Projections assumed the installation of two SCRs at the Morgantown plant but the Debtors have signed an engineering procurement and construction contract for the installation of the SCRs with different levels and timings than those assumed. As a result, capital spending needs to be decreased in 2005 by $7,000,000, increased in 2006 by $33,000,000 and decreased in 2007 and 2008 by $28,000,000 and $18,500,000, respectively;

- The Projections assumed the installation of an ammonia-based reagent system for the Chalk Point Selective Auto-Catalytic Reduction and the Debtors have subsequently determined that a urea-based reagent system will be required. As a result, capital spending should be increased by $1,500,000 in 2005, $4,000,000 in 2006 and $1,000,000 in 2007; and

- As a result of the delay in construction of the additional capacity at Jamaica, capital spending needs to be decreased by $56,000,000 in 2005, $16,300,000 in 2006 and $8,000,000 in 2007 and increased by $83,800,000 in 2009.

The impact of these adjustments is reflected in the table below (in millions):

| | Favorable/(Unfavorable) Change in Business Plan | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| **Cash Capital Expenditures** | | | | | | | |
| North America | | | | | | | |
| New MAG Holdco | | | | | | | |
| MIRMA ............................... | 5.5 | (37.0) | 27.0 | 18.5 | 0.0 | 0.0 | 0.0 |
| Other new MAG Holdco................. | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | 5.5 | (37.0) | 27.0 | 18.5 | 0.0 | 0.0 | 0.0 |
| Non-New MAG Holdco .................... | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Subtotal North America ...................... | 5.5 | (37.0) | 27.0 | 18.5 | 0.0 | 0.0 | 0.0 |
| International | | | | | | | |
| Jamaica .................................. | 56.0 | 16.3 | 8.0 | (83.8) | 0.0 | 0.0 | 0.0 |
| Subtotal International......................... | 56.0 | 16.3 | 8.0 | (83.8) | 0.0 | 0.0 | 0.0 |
| Mirant Corporation Total...................... | 61.5 | (20.7) | 35.0 | (65.3) | 0.0 | 0.0 | 0.0 |

### 11. Reorganization Costs

Reorganization costs consist of restructuring related, non-ordinary course expenses such as professional fees, costs specific to emergence and other bankruptcy related items.

The level of professional advisor activity, and delay of the Effective Date of the Plan beyond the June 30, 2005 date, has caused and will cause the Debtors to incur significantly higher reorganization costs than assumed in the Projections, resulting in an unfavorable cash flow variance in the year ended December 31, 2005 of approximately $95,000,000 to $105,000,000.

### 12. Interest Expense

The Projections assume the debt of non-Debtor entities bears interest as described in the applicable financing documents. Debt that has been reinstated as part of the Plan also bears interest at the applicable rates. The West Georgia Secured Notes bear interest at 7% per annum and all other notes issued under the Plan bear interest at 8%-8.25% per year over the Projection Period.

### 13. Financing Activities

All existing international financings were modeled using the contractual interest rate, amortization schedule and other principal debt terms. The Projections include certain refinancings (sometimes at terms different than the debt being refinanced) in the Bahamas, Trinidad and Tobago and Curacao, and the issuance of new debt of $269,000,000 to support generation construction projects in Jamaica.

### 14. Reinstated MAG Debt

For the purpose of the Projections, the MAG Long-term Notes have been included on the balance sheet of MAG at face value. If applicable, "fresh start" accounting will require that the MAG Long-term Notes are recorded at fair market value.

### 15. No Dividend Assumption

The Projections for MAG, New MAG Holdco and MIRMA, respectively, assume that such entity does not pay dividends and that such entity holds its cash, although subsidiary cash is assumed to be available to such entity.

### 16. Credit Support

For purposes of the Projections for New MAG Holdco, credit support for certain environmental capital expenditures (including the installation of control technology relating to $SO_2$ emissions) has been included in the cash flow statement beginning in 2007 through 2011, in the amounts of $5,000,000, $31,000,000, $84,000,000, $95,000,000 and $50,000,000, respectively. In addition, the cash flows of MAG include credit support for potential refinancing needs of the MAG Long-term Notes due in 2011. This credit support comes due in 2010 in the amount of $150,000,000.

### 17. MAG Long-Term Notes Refinancing

For the purposes of the Projections, the $850,000,000 in MAG Long-term Notes due in 2011 is assumed to be refinanced.

## D. Subsequently Identified Variances to Projected Gross Margins[1]

As discussed above under "Summary of Significant Assumptions", the Debtors have identified a number of items that have caused them to revise their short-term cash gross margin projections, including updating their commodity forward market prices to utilize June 30, 2005 forward market prices, taking into account the tolling agreement for Contra Costa Unit 6 and Pittsburg Unit 7, reflecting the continuation of payments associated with the Back-to-Back Agreement and reflecting the construction delay related to the new capacity in Jamaica.

Therefore, using proprietary tools, the forward market prices described above, hedge positions as of June 30, 2005 and actual cash gross margin through June 30, 2005, the Debtors generated a new forecast of

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

cash gross margins and have set forth below the resulting favorable (unfavorable) change to the Projections (in millions):

| | Favorable/(Unfavorable) Change in Projections | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| **Cash Gross Margin**[a] | | | | | | | |
| North America | | | | | | | |
| New MAG Holdco | | | | | | | |
| MIRMA . . . . . . . . . . . . . . . . . . . . . . . . | (48.4) | 112.5 | 171.5 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other New MAG Holdco . . . . . . . . . . | 0.0 | 22.4 | 18.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| | (48.4) | 134.9 | 189.6 | 0.0 | 0.0 | 0.0 | 0.0 |
| Non-New MAG Holdco . . . . . . . . . . . . . | 17.5 | (4.6) | (8.5) | | | | |
| Back-to-Back Agreement[b] . . . . . . . . . . . | (87.8) | (42.1) | (38.4) | (46.3) | (41.5) | (42.9) | (46.2) |
| Subtotal North American . . . . . . . . . . . . . . | (118.6) | 88.2 | 142.8 | (46.3) | (41.5) | (42.9) | (46.2) |
| International | | | | | | | |
| Jamaica . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.0 | 0.0 | 0.0 | (34.2) | 0.0 | 0.0 | 0.0 |
| Subtotal International . . . . . . . . . . . . . . . . . . | 0.0 | 0.0 | 0.0 | (34.2) | 0.0 | 0.0 | 0.0 |
| Mirant Corporation Total . . . . . . . . . . . . . . | (118.6) | 88.2 | 142.8 | (80.5) | (41.5) | (42.9) | (46.2) |

[a] Gross margins are used to capture the cash impacts of hedges. Because hedges are marked-to-market, income statement gross margins are expected to be different.

[b] Back-to-Back Agreement amounts represent the expected cash payments to Pepco.

## E. Temporary Shut Down of Potomac River Station; Outage at Morgantown Station[1]

Pursuant to an agreement between Mirant Potomac River and the Virginia Department of Environmental Quality ("Virginia DEQ"), the parties commissioned an environmental computer modeling study of air quality in the vicinity of the Potomac River generating facility. The modeling study completed on August 19, 2005 showed that emissions from the Potomac River facility have the potential to contribute to localized, modeled instances of exceedances of some of the EPA Clean Air Act mandated national ambient air quality standards ("NAAQS") under certain conditions. As an immediate response, the Debtors submitted the study to the Virginia DEQ and, on August 21, 2005, voluntarily reduced output of all five units at the Potomac River facility to their lowest feasible levels. In response to a directive received from the Virginia DEQ, Mirant Potomac River completely shut down operations of the facility on a temporary basis on August 24, 2005. On August 25, 2005, the Washington, D.C. Public Service Commission filed a petition and complaint under sections 202(c) and 207 of the Federal Power Act, respectively, requesting that either FERC or DOE order the plant to remain in service. Such proceeding is pending. The Debtors plan to bring the facility back on line as soon as Mirant Potomac River can satisfy the requirements of the Virginia DEQ with respect to NAAQS, unless the facility is ordered to return to operation sooner to support electric system reliability by the appropriate federal authority with the ability to order its operation notwithstanding the Virginia DEQ directive.

Following the shut down of the Potomac River facility, Mirant Potomac River notified Pepco of the occurrence of a "Force Majeure" event under its Local Area Support Agreement dated December 29, 2000 with Pepco (the "LASA"). By letter dated September 13, 2005, Pepco notified Mirant Potomac River of an alleged default under the LASA as a result of the temporary shut down of the Potomac River facility.

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

Beginning on September 21, 2005, Mirant Potomac River commenced partial operation of one unit of the Potomac River facility. Mirant Potomac River will operate the unit approximately 16 hours a day, including approximately eight hours at maximum load (88 MW) and approximately eight hours at minimum load (35 MW), as the Debtors reported to Virginia DEQ on September 20, 2005. Dispersion modeling conducted by the Debtors demonstrates no modeled exceedances of NAAQs under these operating conditions. The Debtors' engineers and plant technicians have been working to develop a longer-term solution that would allow the plant to return to normal operation as soon as possible.

The Projections and "Subsequently Identified Variances to Projected Gross Margins" do not reflect the impact of the shut down of the Potomac River generating facility. The Debtors project that a temporary shut down could have an unfavorable impact on gross margins of approximately $20,000,000 in 2005 and $85,000,000 in 2006, measured against projected gross margins as shown under "Subsequently Identified Variances to Projected Gross Margins." If the shutdown continues after such time, the Debtors believe that its impact on EBITDA less capital expenditures is the more relevant measure and project that these amounts would be negatively impacted by a range of $41,800,000 to $57,800,000 per year over the remainder of the Projection Period. The Projections do not reflect any payments that Mirant Potomac River could be required to make under the LASA for the cost of transmission upgrades as a result of the shut down of the Potomac River generating facility, which Pepco alleged range from $60,000,000 to $70,000,000.

On September 18, 2005, Unit No. 1 at the Morgantown power station experienced a forced outage that required the unit to be shut down. As of the date hereof, the Debtors have not determined when the unit will be operational, the cost of any repairs or the amounts recoverable from insurance proceeds. As a result, the Debtors are unable to determine the financial impact of the forced outage on MIRMA or the other Debtors.

The Debtors do not anticipate that the shut down of the Potomac River facility — including the contingency event of a permanent shut down of the facility — and the forced outage at Morgantown Unit No. 1 would result in MIRMA being prohibited from making distributions under its leveraged lease facility.

## IX.

## VALUATION

As a result of a dispute among the stakeholders as to the enterprise value of the Debtors, on February 11, 2005, the Bankruptcy Court entered an order scheduling a hearing on the issue between April 11-13, 2005 (the "Valuation Hearing") and setting forth the deadlines and procedures for the concomitant discovery. Pursuant to this order, parties-in-interest were required to file notice of intent to participate in the Valuation Hearing by February 18, 2005. The close of discovery was scheduled for April 1, 2005.

On February 22, 2005, the Bankruptcy Court entered an amended scheduling order that further clarified certain pre-trial deadlines and procedures for fact and expert discovery, including but not limited to the production of documents and expert reports. Although eighteen parties filed notices of intent to participate in the Valuation Hearing, only five parties actively participated in discovery: (1) the Debtors; (2) the Corp Committee; (3) the MAG Committee; (4) the Equity Committee; and (5) Phoenix (collectively, the "Valuation Parties"). The Valuation Parties produced over one million pages of documents and deposed 18 witnesses, including 7 fact witnesses and/or corporate representatives (Curt Morgan, Robert Hayes, William Holden, William Dahlberg, Kumar Krishnan, Richard Boswell and Todd Filsinger, as Corp Committee representative) and 11 expert witnesses (Richard Tabors and Tim Coleman for the Debtors; David Ying and Todd Filsinger for the Corp Committee; William "Tuck" Hardie for the MAG Committee; Seth Parker, Benjamin Schlesinger, Kenneth Slater and Anders Maxwell for the Equity Committee; W. Paul Ruwe and Israel Shaked for Phoenix). The Bankruptcy Court held a number of hearings and conferences regarding discovery disputes and other issues related to the Valuation Hearing.

The Valuation Parties, except for Phoenix, submitted initial expert reports on February 25, 2005. On March 2, 2005, the Bankruptcy Court granted Phoenix's petition to submit its initial expert report on March 7, 2005. Rebuttal expert reports were submitted on March 16, 2005. On March 29, 2005, L. Matthew Wilson

sought leave to participate in and call witnesses at the Valuation Hearing on behalf of a group of shareholders (the "Wilson Shareholders").

In light of the burdens imposed by the voluminous discovery, the Bankruptcy Court entered an order extending the discovery deadline through April 8, 2005 and the Valuation Hearing was adjourned until April 18, 2005. On April 12, 2005, the Bankruptcy Court ruled that the Wilson Shareholders could participate in the Valuation Hearing, but precluded them from calling witnesses. At the commencement of the Valuation Hearing on April 18, 2005, the Bankruptcy Court denied the Wilson Shareholders' motion to extend discovery or continue the Valuation Hearing, and ruled that the Wilson Shareholders could conduct non-cumulative cross examinations of the Valuation Parties' witnesses.

Between April 18, 2005 and June 27, 2005, the Bankruptcy Court conducted a hearing over the course of twenty-seven court days in which over one thousand exhibits were exchanged among the six different parties who participated in the hearing. Three fact witnesses, Curt Morgan, William Holden and Kumar Krishnan, testified for the Debtors. In addition, eight expert witnesses testified: Richard Tabors, Tim Coleman, David Ying, Todd Filsinger, Benjamin Schlesinger, Kenneth Slater, Anders Maxwell and Israel Shaked. The testifying experts submitted ten reports and hundreds of demonstrative exhibits to support their testimony. The Valuation Parties also agreed that the MAG Committee would be permitted to admit into evidence the expert reports and deposition transcript of Tuck Hardie in lieu of calling witnesses to testify at the hearing. The Bankruptcy Court heard twenty-five days of live witness testimony, which included three-day cross examinations of Messrs. Coleman, Slater and Maxwell.

The Valuation Parties introduced evidence of comparable companies' enterprise values to estimate the Debtors' value. As set forth in Exhibit 1 to the Fifth Interim Report of William K. Snyder, Court-Appointed Examiner, which was initially submitted confidentially to the Bankruptcy Court on April 15, 2005 (the "Examiner Report"), the Examiner's review of the Valuation Parties' expert reports indicated that they took the following positions with respect to the Debtors' enterprise value (in millions):

| Party | Low | Middle | High |
|---|---|---|---|
| Debtors | $ 8,266 | $ 8,861 | $ 9,557 |
| Corp Committee | 7,843 | | 8,970 |
| MAG Committee | 8,550 | | 9,245 |
| Equity Committee | 11,699 | | 14,549 |
| Phoenix | 9,059 | 10,928 | 13,381 |

During the Valuation Hearing, the Bankruptcy Court asked the parties to submit memoranda of law addressing whether recent precedent established by the United States Supreme Court indicated that: (1) standards independent from market value could be used when assessing the amount a party is entitled to receive in the context of a cramdown under the Bankruptcy Code's absolute priority rule, and (2) cramdown principles under section 1129(b) of the Bankruptcy Code are relevant to the Debtors' valuation, including an appropriate weighted average cost of capital. Oral argument on these issues was heard at the conclusion of the Valuation Hearing on June 27, 2005.

On June 30, 2005, the Bankruptcy Court issued a letter directing the Debtors and Blackstone, the Debtors' financial advisors, to make certain modifications to the Debtors' business plan projections and valuation methodology. The Bankruptcy Court subsequently amended that letter by letter dated July 26, 2005 (these letters are hereinafter referred to collectively as the "Valuation Ruling"). As directed by the Bankruptcy Court, the Debtors and Blackstone worked together to implement the Valuation Ruling under the supervision of a committee comprised of Curt Morgan, Tim Coleman and William Snyder (the "Valuation Implementation Committee").

In light of the amount of time the Valuation Implementation Committee anticipated that it would take to perform the work directed by the Bankruptcy Court, the uncertainty regarding the ultimate result, the potential for additional protracted litigation related to the Plan, the Valuation Ruling and the implementation thereof, the prospect of additional, material costs to the Debtors' Estates and their stakeholders from

additional litigation and delay, and the potential harm to the Debtors' business from all of the above, the Debtors engaged in negotiations with the Committees and Phoenix, with the support of the Examiner, to see if a consensual resolution of the valuation issues could be achieved. Pursuant to these discussions, a global agreement regarding the terms of the Plan and allocating value on a consensual basis was reached on September 7, 2005. As a result, at the parties' request, the Bankruptcy Court (1) ordered that the Valuation Implementation Committee not complete the work as previously directed by the Bankruptcy Court in the Valuation Ruling, and (2) stated that it would not issue a formal opinion regarding valuation unless required to do so in connection with confirmation of the Plan. See "The Chapter 11 Cases — Term Sheet Concerning Plan," and "The Chapter 11 Plan — Introduction."

## X.

## THE CHAPTER 11 CASES

### A. Commencement of the Chapter 11 Cases

On July 14, 2003 and July 15, 2003, Mirant and 74 of its wholly owned subsidiaries in the United States (collectively, the "Original Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On August 18, 2003, Mirant EcoElectrica Investments I, Ltd. and Puerto Rico Power Investments Ltd, two wholly owned subsidiaries of Mirant, commenced chapter 11 cases under the Bankruptcy Code (the "EcoElectrica Debtors"). On October 3, 2003, four of Mirant's Affiliates, Mirant Wrightsville Investments, Inc., Mirant Wrightsville Management, Inc., Wrightsville Development Funding, L.L.C., and Wrightsville Power Facility, L.L.C. (the "Wrightsville Debtors"), who jointly own directly and indirectly the Wrightsville power plant, also commenced chapter 11 cases ("Mirant Wrightsville"). On November 18, 2003, Mirant Americas Energy Capital, LP and Mirant Americas Energy Capital Assets, LLC, two wholly owned subsidiaries of Mirant (collectively, the "MAEC Debtors"), commenced chapter 11 cases under the Bankruptcy Code. On September 26, 2005, Newco 2005 Corporation, a newly-formed, wholly owned subsidiary of Mirant, commenced a chapter 11 case under the Bankruptcy Code. The Chapter 11 Cases have been jointly administered under a single case heading and number, In re Mirant Corporation et al., Case No. 03-46590, before the Honorable D. Michael Lynn.

### B. Continuation of Business after the Petition Date

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses. As discussed in "The Chapter 11 Cases," during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 administration and the stabilization of their operations.

#### 1. Counterparty Assurance Program

The Bankruptcy Court granted the Debtors permission to implement a counterparty assurance program (the "Counterparty Assurance Program"). MAEM conducts a substantial portion of its business through the use of forward contracts and swap agreements (i.e. trading contracts) that fall within the "safe-harbor" provisions set forth in sections 556 and 560 of the Bankruptcy Code which permit non-debtor parties to, among other things, exercise certain contractual termination rights and remedies notwithstanding the commencement of a chapter 11 case. If a contract qualifies for this safe harbor protection, a non-debtor party can terminate or liquidate the contract upon a commencement of a bankruptcy proceeding and, in certain circumstances may cause automatic termination or liquidation of the contract in accordance with the contractual terms. The Counterparty Assurance Program authorized MAEM to honor all obligations under existing and future trading contracts, to perform all obligations arising from prepetition trading contracts, affirmed its ability to enter into postpetition trading activities, including new trading agreements with counterparties and granted counterparties an administrative expense priority with respect to MAEM's

obligations arising from postpetition market movements under its prepetition and postpetition trading contracts, as well as the right to terminate for certain contractual defaults other than MAEM's petition for chapter 11 relief.

### 2. DIP Credit Facility

On November 5, 2003, certain of the Debtors (the "DIP Borrowers") entered into a two-year debtor-in-possession credit facility (the "DIP Facility") providing for borrowings or the issuance of letters of credit in an amount not to exceed the lesser of $500,000,000 or the then existing "borrowing base." The borrowing base is the aggregate value assigned to specified power generation assets of the DIP Borrowers that serve as collateral for the DIP Facility. However, upon the occurrence of certain triggering events, including the sale of borrowing base assets or an event that has a material adverse effect on the business, operations or value of a power generation facility, the borrowing base may be revalued or reserves against the borrowing base may be imposed, thus lowering the borrowing base. Up to $300,000,000 of borrowings, which amount may be increased to $500,000,000 upon written approval of each of the Committees or further order of the Bankruptcy Court, are permitted. The DIP Facility also contains an option, exercisable by Mirant or MAG, to remove MAG and its subsidiaries as borrowers and obligors under the DIP Facility and reduce the DIP Facility commitment to a maximum of $200,000,000 of borrowings. Borrowings under the DIP Facility are secured by substantially all of the assets of the DIP Borrowers, including the borrowing base facilities.

### 3. Employee-Related Matters

Of particular importance to the Debtors' efforts to stabilize their businesses and continue their operations uninterrupted was their ability to maintain the continued support and cooperation of their employees. Accordingly, on the Petition Date, the Debtors sought and obtained Bankruptcy Court authority to pay a significant portion of their prepetition employee obligations and continue to honor employee programs during the Chapter 11 Cases.

During the Chapter 11 Cases, the Debtors also received authority to implement various severance programs. To minimize the risk of potential departures of the Debtors' key executives and managers (the "Key Employees") during the Chapter 11 Cases, the Debtors proposed a comprehensive key employee retention plan (the "KERP"), seeking to retain approximately 90 of the Key Employees, that consisted of two phases: Phase I and Phase II. The Bankruptcy Court authorized the Debtors to make the first stay bonus payment of approximately $1,200,000 on or after June 30, 2004 to certain eligible Key Employees (i.e., non-management council employees), reserved judgment on the remaining payments under Phase I of the KERP, and instructed the Debtors to deposit $8,000,000 into a segregated, interest-bearing account from which the anticipated stay and performance-based payments under both phases of the KERP are to be paid. Thereafter, at the request of the Examiner, the Debtors developed a global resolution of a number of outstanding employee compensation and benefit issues, including the KERP. As a result, the Bankruptcy Court authorized the Debtors to make the remaining stay bonus payments under Phase I of the KERP. The Bankruptcy Court also authorized the Debtors to make performance-based bonuses based upon progress toward completion of certain reorganization milestones under Phase II of the KERP to each eligible Key Employee other than the Chief Executive Officer. The Bankruptcy Court also authorized the implementation of a KERP severance plan for four key employees, pursuant to which, until one year after the Debtors' emergence from chapter 11, certain Key Employees are entitled, upon termination without cause (including a constructive termination), to a severance payment equal to 24 months base salary plus target short-term incentive and 24 months of medical benefits. Pursuant to separate settlement agreements with each of the Committees, the Debtors were authorized to provide severance to the Chief Executive Officer and agreed to seek selection of a new Chief Executive Officer, subject to certain conditions. The Corp Committee sought to vacate the order approving severance to the Chief Executive Officer on the grounds that the Debtors breached the agreement. The Corp Committee has agreed to withdraw its motion to vacate in connection with its execution of the Mirant Plan Term Sheet.

The Debtors were also authorized to, among other things, provide for the continuation of the general severance plan for all employees, excluding the four covered by the KERP severance plan discussed above, until one year after the Debtors' emergence from chapter 11 and continue certain prepetition non-qualified

benefit plans and honor any prepetition claims arising under the non-qualified benefit plans to current employees as they become due in the ordinary course. In connection with the resolution of those employee issues, the Debtors were required to terminate certain change in control severance plans and policies and otherwise eliminate any change in control provisions contained in any of the Debtors' employee benefit plans.

### 4. Cash Management

Prior to the Petition Date, the Debtors primarily utilized a consolidated cash management system for receipts and disbursements (the "Cash Management System"). Mirant also maintained excess funds in various money market accounts. The Bankruptcy Court issued an order granting the Debtors the authority: (a) to continue the use of their existing: (i) Cash Management System; (ii) certain bank accounts, and (iii) business forms and stationery, and (b) to continue to invest excess funds consistent with prior practice and certain investment guidelines. In connection with the approval of the DIP Facility, the Cash Management System was modified to provide for, among other things, (a) the grant of junior liens and junior superpriority administrative claims on account of intercompany transfers between various Debtor Groups, and (b) certain limitations on the incurrence of intercompany indebtedness.

### 5. Payment of Prepetition Trust Fund Taxes and Governmental Fees

In the ordinary course of their operations, the Debtors collected sales, use, and other trust fund type taxes ("Trust Fund Taxes") from various persons and remitted such taxes to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Bankruptcy Court authorized the Debtors to: (a) pay related tax obligations and other governmental assessments due and owing to the Taxing Authorities, and (b) replace any checks or fund transfer requests regarding prepetition Trust Fund Taxes dishonored or rejected as of the commencement of the Chapter 11 Cases.

### 6. Critical Vendors

As of the Petition Date, the Debtors utilized approximately 120 vendors (other than utility companies) that provided services that were essential to the Debtors' operations and could not be replaced except at exorbitant costs. The Bankruptcy Court issued an order granting the Debtors the authority to pay: (a) prepetition debt to the extent an entity claimed a lien against property of any of Debtors' Estates to secure debt incurred by a Debtor prepetition and to the extent payment of such prepetition debt was, in the exercise of the Debtors' business judgment, in the best interests of the respective Estate, and (b) prepetition Claims: (i) to the extent an entity asserted a prepetition Claim that Debtors, upon advice of their counsel, reasonably believed would be authorized, and (ii) of an entity that refused to deal with the Debtors on any basis absent payment of such Claim if the Debtors reasonably believed, in the exercise of their business judgment, that such Claim was required to be paid in order for the Debtors to continue their respective businesses, with certain exceptions.

### 7. Retention of Ordinary Course Professionals

Prior to the Petition Date, the Debtors employed certain professionals, in the ordinary course of business, to render services to their Estates (collectively, the "Ordinary Course Professionals"), which were necessary to the day-to-day continuation of the Debtors' operations. On August 1, 2003, the Bankruptcy Court granted the Debtors the authority to: (a) employ the Ordinary Course Professionals utilized by the Debtors in the ordinary course of business as of the Petition Date and thereafter; (b) supplement the list of Ordinary Course Professionals, and (c) pay compensation and reimburse expenses to each of the Ordinary Course Professionals up to $50,000 per month per each such Ordinary Course Professional, subject to the filing of a statement of disinterestedness under Bankruptcy Rule 2014 by each such Ordinary Course Professional.

### 8. Limited Notice Procedures and Complex Chapter 11 Bankruptcy Case Treatment

The Bankruptcy Court determined that the Chapter 11 Cases appeared to be a complex chapter 11 case and established certain guidelines regarding notices of and hearings on motions and other matters and settlements.

## 9. Continued Trading Order

On August 18, 2003, the Bankruptcy Court issued the *Order Approving Specified Information Blocking Procedures and Permitting Trading in the Debtors' Securities, Bank Debt, Purchase or Sale of Trade Debt and Issuing of Analyst Reports Upon Establishment of a Screening Wall* effective July 25, 2003, amended on April 21, 2004 and September 15, 2004 (collectively, the "Screening Wall Order"). The Screening Wall Order regulates the dissemination of information about the Debtors to the members of the Committees and the continued trading of securities of the Debtors by members of the Committees.

## 10. Trading Contract Settlement Protocol

On December 31, 2003, Mirant sought to establish procedures permitting the settlement of certain terminated prepetition or postpetition forward contracts, futures contracts, swap agreements, options or similar instrument contracts as defined by the Bankruptcy Code (each a "Trading Contract"). Generally, each time a Trading Contract is terminated (without regard to whether it was entered into prepetition or postpetition), a termination payment must be calculated by netting all amounts owing to the Debtors and all amounts owing to the counterparty under the Trading Contract. Mirant sought to establish specific, confidential procedures for the settlement of Trading Contracts due to the highly confidential nature of the settlement parameters to be used to calculate the termination payment.

After extensive negotiations, Mirant, the Committees and their advisors reached an agreement regarding the procedures for settling Trading Contracts (the "Trading Contract Settlement Protocol"). Pursuant to the Trading Contract Settlement Protocol, instead of filing a motion with the Bankruptcy Court seeking approval of a settlement of a Trading Contract, Mirant submits certain information concerning the settlement to the Committees and the Committees' advisors (the "Notice Parties") for review. If no timely objections to a particular settlement have been made, the settlement of the Trading Contract is approved and Mirant and the counterparty may consummate such a settlement without further order of the Bankruptcy Court. If one of the Notice Parties objects to a settlement, Mirant may seek to resolve the issue directly with the objecting party and/or file a motion with the Bankruptcy Court seeking approval of the settlement.

Currently, Trading Contracts with approximately ten counterparties have been settled pursuant to the Trading Contract Settlement Protocol. These settlements have resulted in an aggregate payment of approximately $25,500,000 to the Debtors, as well as the withdrawal of several proofs of claim filed by various counterparties to the Trading Contracts. None of the counterparties to the Trading Contracts have been granted an Allowed Claim against any Debtor on account of any settlement under the Trading Contract Settlement Protocol.

## C. Representation of the Debtors

Since late 2000, White & Case LLP ("W&C") has been retained by the Debtors to provide legal services with respect to a variety of issues, including the California energy crisis and the bankruptcy filings of Enron and certain of its Affiliates. In addition, W&C has provided restructuring and bankruptcy advice, performed due diligence and prepared the requisite petitions, pleadings and other documents submitted in connection with the commencement of the Chapter 11 Cases. As lead counsel to the Debtors, W&C have been coordinating the responsibilities and activities of all of the firms retained in the Chapter 11 Cases.

In anticipation of the volume of matters that were likely to come before the Bankruptcy Court in the Chapter 11 Cases, and to maximize the efficiency with which all such matters were to be handled, the Debtors retained the Texas-based firm of Haynes and Boone, LLP ("H&B") to serve as Texas bankruptcy co-counsel in connection with the prosecution of the Chapter 11 Cases.

In addition, given the size and complexity of the Chapter 11 Cases and the diverse activities and relationships of the Debtors and their non-debtor subsidiaries nationally and internationally, and recognizing the possibility that one or more matters may arise that could present potential or actual conflicts of interest for W&C and H&B, the Debtors also retained the firm of Forshey & Prostok, LLP ("F&P") to serve as special conflicts counsel to represent the Debtors in connection with any such matters.