**D.    Formation and Representation of the Creditors' Committee**

**1.    Committee of Unsecured Creditors for Mirant Corporation**

On or about July 25, 2003, the United States Trustee appointed the Corp Committee. The Corp Committee initially retained the law firms of Simpson Thacher & Bartlett, LLP, 425 Lexington Avenue, New York, New York 10017 and Andrews Kurth, LLP, 450 Lexington Avenue, New York, New York 10017 as counsel. By order, dated June 25, 2004, Simpson Thacher & Bartlett, LLP was authorized to withdraw. The Corp Committee thereafter retained Shearman & Sterling, LLP, 599 Lexington Avenue, New York, New York 10022. Accordingly, Andrews Kurth, LLP and Shearman and Sterling, LLP are co-counsel for the Corp Committee, with Paul N. Silverstein of Andrews Kurth, LLP and Fredric Sosnick of Shearman & Sterling, LLP as lead co-counsel for the Corp Committee.

The Corp Committee is currently comprised of the following members:

Ronald Goldstein
Appaloosa Management LP
26 Main Street, 1st Floor
Chatham, NJ 07928

LoriAnn Curnyn
Hypovereins Bank
150 East 42nd Street
New York, NY 10017-4679

Mark B. Cohen
Deutsche Bank AG
60 Wall Street
New York, NY 10019

Sandi Horwitz
HSBC Bank USA
10 East 40th Street, 14th Floor
New York, NY 10016-0200
(as Indenture Trustee)

Daniel Fisher
Law Debenture Trust Company of New York
767 Third Avenue
New York, NY 10022
(as Indenture Trustee)

**2.    Committee of Unsecured Creditors for Mirant Americas Generation**

On or about July 25, 2003, the United States Trustee appointed the MAG Committee. The MAG Committee retained the law firms of Cadwalader, Wickersham and Taft, LLP, One World Financial Center, New York, NY 10281 and Cox, Smith, Matthews Inc., 112 E. Pecan St., Suite 1800, San Antonio, TX 78205 as counsel.

The MAG Committee is currently comprised of the following members:

Don Morgan
Mackay Shields Financial
9 West 57th Street
New York, NY 10019

Mike Claybar
California Public Employees Retirement System
Lincoln Plaza
400 P Street
Sacramento, CA 95814

Thomas M. Korsman
Wells Fargo Bank National Association
MAC N9303-120
Sixth and Marquette
Minneapolis, MN 55479
(as Indenture Trustee)

Ivan Krsticevic
Elliott Associates, L.P.
712 Fifth Avenue, 36th Floor
New York, NY 10019

**3.    Committee of Equity Security Holders of Mirant Corporation**

On or about September 18, 2003, the United States Trustee appointed the Equity Committee. The Equity Committee retained the law firms of Brown, Rudnick, Berlack & Israels, LLP, 120 W. 45th St., New York, NY 10036 and Hohmann, Taube & Summers, LLP, 100 Congress Ave, 18th Floor, Austin, TX 78701 as counsel.

The Equity Committee is currently comprised of the following members:

Morris D. Weiss, Chairman
Tejas Securities Group, Inc.
112 E. Pecan, Suite 1510
San Antonio, TX 78205

Roger B. Smith
301 Kemp Road
Suwanee, GA 30024-1607

Andres Forero
705 E. 43rd Street
Austin, TX 78751

Michael Willingham
9202 Meaux Drive
Houston, TX 77031

## E.    Matters Relating to Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is assumed, the rights of the Debtor party to such agreement continue as property of its estate. A subsequent breach of an assumed lease or executory contract creates an administrative claim in favor of the non-Debtor party, entitling it to an administrative claim for prepetition obligations as well as postpetition obligations arising as a result of the breach. If an executory contract or unexpired lease is rejected, the non-Debtor counterparty to the agreement may file a claim for damages incurred by reason of the rejection, which is treated as a prepetition claim. In the case of rejection of leases of real property, such damage claims are subject to certain claim amount limitations imposed by the Bankruptcy Code.

Prior to the Petition Date, the Debtors were party to several thousand executory contracts and unexpired leases (collectively, the "Contracts and Leases"). Shortly after the Petition Date, the Debtors formed an internal committee to analyze the Contracts and Leases (the "Contract Assessment Team"). The Contract Assessment Team reviewed and analyzed substantially all of the Debtors' contracts and leases and evaluated which should be rejected or assumed and the timing with respect thereto. The Debtors have also rejected and assumed various executory contracts and unexpired leases in accordance with regular notice procedures in the Chapter 11 Cases. Excluding the Back-to-Back Agreement, as a result of these contract rejections, the Debtors have been relieved of in excess of $500,000,000 in prospective obligations on a net present value basis.

The Bankruptcy Code also allows a non-Debtor party to an executory contract or unexpired lease to file a motion with the Bankruptcy Court requesting that the Bankruptcy Court set a deadline by which the Debtor must assume or reject the particular agreement. Several parties have filed such motions in the Chapter 11 Cases and, in connection therewith, the Debtors exercised their right to either assume or reject the agreement, or simply opposed the motion.

Generally, debtors have until the confirmation of a plan of reorganization to assume executory contracts and unexpired leases to which they are a party. An exception to the foregoing is set forth in section 365(d)(4) of the Bankruptcy Code which provides that if a debtor does not assume or reject an unexpired lease of nonresidential real property under which a debtor is the lessee within 60 days after the petition date, or within such additional time as the bankruptcy court, for cause, within such 60-day period, fixes, then such lease is deemed rejected. At the Debtors' request, the Bankruptcy Court has extended the time within which the Debtors must assume or reject such leases through the date of confirmation of the Plan.

## F.    Exclusivity Periods

As of the Petition Date, pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors had: (a) the Filing Period within which to file their plans of reorganization, and (b) the Solicitation Period to solicit acceptances of these timely filed plans after filing before other parties-in-interest were permitted to file plans. The initial Filing Period and the initial Solicitation Period were initially due to expire on November 11, 2003 and January 9, 2004, respectively.

Pursuant to rulings of the Bankruptcy Court: (a) the initial Filing Period and the Solicitation Period were extended through April 30, 2004 and June 30, 2004, respectively, and (b) the Debtors agreed to meet certain

key milestones (the "Milestones") for the completion and presentation of the Debtors' business plan and an initial analysis of Intercompany Claims to the Committees. Each of the Milestones was timely met.

On May 10, 2004, the Bankruptcy Court entered an order further extending the Filing Period and the Solicitation Period through December 31, 2004 and February 28, 2005, respectively (the "Second Exclusivity Order"). On or about May 13, 2004, the MAG Committee filed a Notice of Appeal of the Second Exclusivity Order (the "MAG Appeal"). The appeal was docketed before Judge McBryde of the United States District Court for the Northern District of Texas (the "District Court"). On or about May 20, 2004, M.H. Davidson & Co. LLC, a MAG bondholder, filed a Notice of Appeal (the "Davidson Appeal"). This separate appeal was docketed in the District Court. In an order addressing both the MAG Appeal and the Davidson Appeal issued on September 30, 2004, the District Court affirmed the Second Exclusivity Order.

On December 21, 2004, the Bankruptcy Court entered an order further extending the Filing Period and Solicitation Period through to January 31, 2005 and March 31, 2005, respectively. On March 30, 2005, an order was issued by the Bankruptcy Court granting an extension of the Solicitation Period through the conclusion of the Confirmation Hearing; provided that if the Disclosure Statement is abandoned or the Disclosure Statement is not approved, the Solicitation Period will terminate upon the expiration of five Business Days after the Debtors' notice of abandonment of the Disclosure Statement or the Bankruptcy Court's denial of the approval of the Disclosure Statement unless the Debtors file a motion to extend the Solicitation Period during such five Business Days, in which case the Bankruptcy Court will consider such motion upon notice to parties-in-interest.

### G. Protected Persons Order

On August 5, 2003, the Bankruptcy Court entered the *Order Restricting Pursuit of Certain Persons*, which was subsequently amended on September 29, 2003 by the *Order Extending Order Restricting Pursuit of Certain Persons* (collectively, the "Protected Persons Order"). The Protected Persons Order stays and enjoins all entities from commencing any claim or action against the following parties: (a) members of the Committees and the entities they represent; (b) officers, directors, and managers who were employed or terminated by the Debtors during the Chapter 11 Cases, and (c) Professional Persons who are not otherwise afforded indemnity in connection with such professionals' work in connection with the Chapter 11 Cases (the Protected Persons, as defined in the Plan). The purpose of the Protected Persons Order is to allow the Protected Persons to perform the duties and tasks assigned to them without fear of being sued. Any claim or action against a Protected Person expires 30 days after the Protected Persons Order is terminated, which will occur on the date an order confirming the Plan is entered or such earlier date as the Bankruptcy Court determines is appropriate.

### H. Risk Management Policy

On November 5, 2003, the Bankruptcy Court issued an order requiring Mirant to conduct trading and marketing activities and further comply with the terms and provisions of the November 5, 2003 amendment to the Debtors' Global Risk Management Policy. The amended policy establishes clear definitions and protocols for the types of commercial activities in which the Debtors may engage (including asset hedging, marketing and optimization activities), and formalizes the creation of a legacy portfolio containing certain existing transactions that have been deemed to be non-strategic to the Company.

### I. Appointment of Examiner

On April 7, 2004, the Bankruptcy Court issued an order directing the United States Trustee to appoint an examiner in the Chapter 11 Cases to perform certain monitoring and investigating duties. On April 13, 2004, the Bankruptcy Court approved the United States Trustee's appointment of William K. Snyder (the "Examiner") as the examiner. The Bankruptcy Court authorized the employment of Corporate Revitalization Partners, LLC as financial advisors for the Examiner and the employment of Gardere Wynne Sewell LLP as counsel for the Examiner, effective as of April 13, 2004 and April 27, 2004, respectively.

The Bankruptcy Court issued an *Order Defining Role of Examiner* on April 29, 2004, amended and restated on May 27, 2004 and July 7, 2004, that defined, amended and restated the duties and powers of the Examiner, which was expanded by the Bankruptcy Court under the *Memorandum Order Expanding Role of Examiner* issued on July 30, 2004.

**J.  Professional Fee Committee**

On August 27, 2003, the Bankruptcy Court issued an order appointing Dean Nancy B. Rapoport ("Dean Rapoport") of the University of Houston School of Law as the Bankruptcy Court's expert with respect to professional fees and expenses in the Chapter 11 Cases. Dean Rapoport was empowered to serve as chairperson of a fee review committee which is also comprised of representatives of the Debtors, the Committees, the Examiner and the United States Trustee.

**K.  Intercompany Issues**

On the Petition Date, substantial intercompany account balances existed between Mirant and various of its subsidiaries. These arose as a result of the manner in which Mirant conducted its activities and channeled cash through its subsidiaries for these activities and otherwise. These are described in more detail in "Certain Affiliate Transactions."

**L.  Material Asset Sales**

Section 363 of the Bankruptcy Code grants the Debtors the power, subject to approval of the Bankruptcy Court, to use, sell or lease property of the Debtors' Estates outside of the ordinary course of their business.

The Bankruptcy Court entered an order providing certain procedures governing the sale of certain miscellaneous assets. In addition to selling assets in accordance with these approved procedures, the Debtors have also sold certain assets outside of the ordinary course of business by filing a motion and obtaining authorization of the Bankruptcy Court. Certain material assets and sales are described below.

**1.  Coyote Springs**

The Coyote Springs facility is a gas fired facility located in Boardman, Oregon. The facility was owned by Mirant Oregon, a non-Debtor, wholly owned subsidiary of MAI, and Avista Corporation, as tenants-in-common, each with an undivided 50% interest. The Debtors initiated an active marketing process for the interest in Coyote Springs with the assistance of their financial advisors to ensure the highest price would be obtained at any auction. On October 13, 2004, Mirant Oregon entered into an agreement to sell its 50% interest in the Coyote Springs facility to Avista Corporation for $62,500,000. The agreement was approved by the Bankruptcy Court and the sale closed during January 2005.

**2.  Turbine Sales**

On October 13, 2004, the Debtors sought authorization from the Bankruptcy Court for the sale of three gas turbines and all appurtenances, modules, equipment and certain other services related thereto (collectively, the "Bowline Turbines") by Mirant Bowline to Invenergy Turbine Company LLC ("Invenergy"). The sale of the Bowline Turbines was subject to higher and otherwise better offers. Since no other party submitted a bid for the turbines, Invenergy was selected as the successful bidder and purchased the Bowline Turbines for $46,500,000. By order dated December 10, 2004, the Bankruptcy Court approved the sale to Invenergy.

On May 20, 2005, the Debtors sought authorization from the Bankruptcy Court for the sale of two gas turbines located in Wyandotte, Michigan and one steam turbine located in Nagasaki, Japan, including all appurtenances, modules, and equipment related thereto (collectively, the "Wyandotte Turbines"), by Mirant Wyandotte, LLC and MAI to Mitsubishi Power Generation, LLC ("Mitsubishi"). The sale of the Wyandotte Turbines was subject to higher and otherwise better offers. Since no other party submitted a bid for the turbines, Mitsubishi was selected as the successful bidder and purchased the Wyandotte Turbines for $23,000,000. By order dated June 29, 2005, the Bankruptcy Court approved the sale to Mitsubishi and the

Debtors completed the sale in July 2005. The Debtors are continuing the process of negotiating, and obtaining Bankruptcy Court approval of the sale of the remaining assets located in Wyandotte.

### 3. Wrightsville

The Wrightsville facility consists of gas fired intermediate/peaking units with a generating capacity of 438 MW. Wrightsville Power Facility, L.L.C. ("WPF") leases the facility from Pulaski County, Arkansas (the "County"). The County financed the costs of acquiring and constructing the facility by issuing $300,000,000 of industrial revenue bonds to Wrightsville Development Funding, L.L.C. ("WDF"). The bonds are secured by a mortgage encumbering the County's interests in the facility and the lease. In connection with the foregoing agreements, WPF and the County entered into a payment-in-lieu-of-taxes agreement ("PILOT Agreement") reducing real property taxes associated with the facility for an 11-year period. WDF raised the $300,000,000 necessary to purchase the bonds by obtaining approximately $120,000,000 in capital contributions from its members, and borrowing $180,000,000 (the "Loan") from MAG on an unsecured basis, which Loan was subsequently assigned to MAI. In 2004, the Debtors mothballed the Wrightsville facility pending recovery of regional power prices.

On March 17, 2005, the Debtors filed a motion to sell the Wrightsville facility and related assets to AECC for $85,000,000. On April 6, 2005, the Bankruptcy Court approved the Debtors' motion to approve the bid procedures with respect to the sale and set the sale hearing for May 25, 2005. Pursuant to the bid procedures, the sale of the Wrightsville facility and related assets was to be subject to higher and otherwise better offers at an auction to be held in connection with the sale, in the event the Debtors received qualified competing bids. In accordance with the bid procedures, one party executed a confidentiality agreement with the Debtors. However, that party did not submit a bid by the extended bid deadline of May 18, 2005. Accordingly, no auction was conducted, and AECC was determined to have submitted the highest and best bid pursuant to that certain Asset Purchase and Sale Agreement dated February 24, 2005 (including all related exhibits and schedules) among WPF, Mirant Wrightsville Management, Inc., Mirant Wrightsville Investment, Inc., WDF and AECC. On May 25, 2005, the Bankruptcy Court approved the sale of the Wrightsville facility and related assets to AECC. On September 28, 2005, the sale of the Wrightsville facility to AECC was consummated.

Upon the closing of the sale, the County transferred the facility to the purchaser; the respective parties cancelled the lease, the mortgage and the PILOT Agreement; and WDF surrendered the outstanding bonds in consideration of payment from the net proceeds of the proposed sale remaining after payment of closing costs and the costs of funding certain associated settlement agreements with the County, the Pulaski County Special School District and the City of Wrightsville, Arkansas. As the net proceeds of the proposed sale were insufficient to satisfy the bonds in full, WPF will realize no net cash proceeds from the sale. Notwithstanding anything herein to the contrary, MAI's Claims on account of the Loan (the "MAI/WDF Note Claim") does not constitute an Intercompany Claim that is deemed resolved under the Plan, but shall remain a valid and enforceable Claim against WDF after the Effective Date. Consequently, payments received by WDF on account of the bonds in connection with the sale of the Wrightsville facility and related assets were transferred to MAI upon the closing of the sale.

### 4. Birchwood

The Birchwood facility is a 242 MW coal fired electric cogeneration facility in Virginia. In May 2003, Mirant Birchwood, Inc. contracted to sell to General Electric Capital Corporation its joint venture partnership interests in the Birchwood facility and related joint venture assets for a purchase price of approximately $71,000,000. That sale was consummated pursuant to an order of the Bankruptcy Court entered on October 8, 2003.

### 5. Mint Farm

The Mint Farm facility in Longview, Washington is currently under construction, and upon completion would be a 290 MW gas-fired combined cycle generating facility. The construction of the Mint Farm facility is approximately 60% complete and construction has been suspended. On September 4, 2005, the Debtors filed a motion with the Bankruptcy Court to sell the Mint Farm facility to Longview Generation, LLC for a purchase

price of $17,200,000, subject to higher or otherwise better offers. On September 21, 2005, the Bankruptcy Court approved bidding procedures to be employed in connection with the sale of the Mint Farm facility. A hearing to consider the sale is scheduled for October 19, 2005. In the event a sale of the Mint Farm facility does not occur within one year after the Effective Date, the Debtors intend to liquidate the Mint Farm facility and related assets.

### 6. Mirant Service Center

On September 13, 2005, MIRMA executed an agreement of sale for the sale of its Mirant Service Center building and accompanying 68 acres located in Upper Marlboro, Maryland. This agreement is the result of a structured and competitive marketing effort commenced earlier this year. The execution of the agreement initiates a 30-day due diligence period. If no substantive issues arise by the close of the due diligence period, the Debtors intend to pursue Bankruptcy Court approval of the sale and anticipate a closing by year end.

### 7. Wichita Falls

The Wichita Falls facility is a 77 MW combined cycle facility in Texas. The Debtors are currently in the process of soliciting bids for a potential sale of this facility.

## M.  Letter of Credit Extensions

Mirant is the borrower under the Mirant 4-Year Revolver, pursuant to which the 4-Year Lenders agreed to make available to Mirant a working capital and letter of credit facility of up to $1,125,000,000 in aggregate principal amount. Pursuant to the terms of the Mirant 4-Year Revolver, Mirant also entered into a letter of credit agreement, dated September 4, 2001 (the "L/C Agreement"), between Mirant and Wachovia Bank N.A. (the "L/C Issuing Bank") pursuant to which, at the request of Mirant, the L/C Issuing Bank agreed to issue letters of credit ("L/Cs") to beneficiaries designated by Mirant, subject to and in accordance with the terms of the L/C Agreement. The beneficiaries of the L/Cs include trading counterparties under "safe harbor" contracts, counterparties under PPAs and transportation agreements, lenders under project financing debt, ISOs and other vendors and suppliers.

Following is a summary of L/Cs issued as of December 31, 2004 and December 31, 2003 (in millions):

|  | December 31, 2004 | December 31, 2003 |
|---|---|---|
| Energy trading and marketing L/Cs | 130 | 249 |
| Debt service reserves, operating and other L/Cs | 75 | 331 |
| **TOTAL** | $205 | $580 |

The Bankruptcy Court authorized the Debtors to amend the Mirant 4-Year Revolver to set out the terms and conditions upon which the L/Cs that were issued and outstanding as of the date of the first amendment agreement (the "Existing L/Cs") could be further extended after the Petition Date. Thereafter, the Bankruptcy Court entered additional orders allowing further extensions of the Existing L/Cs.

Pursuant to these L/C extension orders, the reimbursement obligations with respect to any draw under any Existing L/Cs extended pursuant to an amendment agreement (including any evergreen L/C renewed pursuant to its terms or otherwise) constitute prepetition Unsecured Claims against Mirant, without waiver or prejudice to any objection by a party in interest to the allowance of such claims. Notwithstanding the extension of many of the L/Cs, the Debtors do not anticipate further L/C extensions and expect that the remainder of the L/Cs will be drawn or will expire. Furthermore, despite the order allowing the extension of the Existing L/Cs, the 4-Year Agent and 4-Year Lenders filed amended proofs of claim asserting, among other things, the right of subrogation and the return of excess proceeds from L/C draws. The Debtors objected to these amended proofs of claim on various grounds. See "Material Claims, Litigation and Investigation — Unresolved Disputed Material Claims — Mirant 4-Year Revolver and L/C Agreement Litigation."

### N.    Canadian Filing

On July 15, 2003 in Calgary, Alberta, certain of the Debtors' Canadian subsidiaries, Mirant Canada Energy Marketing, Ltd. ("MCEM") and Mirant Canada Marketing Investments, Inc. (collectively the "Canadian Filers"), filed an application for creditor protection under the Companies Creditors' Arrangement Act, which, like chapter 11, allows for reorganization under the protection of the court system (the "CCAA Proceedings").

As part of the CCAA Proceedings, the Canadian Filers liquidated all of their assets. Pursuant to a Plan of Compromise and Arrangement approved by the Canadian court on April 22, 2004, the Canadian Filers paid their third-party creditors 80% of their allowed claims, which totaled CAD43,600,000. It is anticipated that the Canadian Filers will return approximately $45,000,000 to the Debtors. The CCAA Proceedings are no longer pending; the Canadian Filers emerged from creditor protection on May 21, 2004.

Some of the Debtors guaranteed certain obligations of the Canadian Filers. All of the Claims arising from said guarantees have been liquidated and Allowed in the Chapter 11 Cases with the exception of one Disputed Claim asserted by TransCanada in the amount of $48,376,900.

### O.    Claims Objection Procedures

Approximately 8,385 proofs of claim were filed by claimants asserting claims against the Debtors of approximately $269,000,000,000. See "Material Claims, Litigation and Investigations — Procedures for Resolving Claims — Claims Objection Procedures" for a discussion of procedures approved by the Bankruptcy Court to resolve objections to claims.

### P.    Equity Committee Motion and Complaint to Compel a Shareholders' Meeting

On November 22, 2004, the Equity Committee filed a motion in the Bankruptcy Court (the "Motion to Compel") seeking an injunction compelling the Debtors to convene a shareholders' meeting, purportedly for the purpose of replacing Mirant's board of directors. On the same day, the Equity Committee commenced an adversary proceeding in the Bankruptcy Court seeking identical relief. The complaint in the adversary proceeding names Mirant as the sole defendant. In each of the Motion to Compel and the adversary proceeding, the Equity Committee alleges entitlement to the relief it seeks under Delaware law, Mirant's bylaws, and Mirant's certificate of incorporation. On December 23, 2004, the Debtors filed a cross motion (the "Motion to Dismiss or Consolidate") to dismiss the Motion to Compel or, in the alternative, to consolidate the Motion to Compel into the adversary proceeding. The parties subsequently agreed to schedule a valuation hearing to determine whether the equity holders are entitled to any distribution from Mirant's Estate. This agreement resulted in the resolution of the Motion to Compel.

### Q.    California Settlement

In 1996, the California legislature passed a bill to restructure California's energy industry. As part of this restructuring, California created three markets for the sale of electricity at wholesale: the "day-ahead" market, the "day-of" market and the "real-time" market (the "California Energy Markets"). The "day-ahead" market and the "day-of" market were administered by the California Power Exchange Corporation (the "Cal PX"). The "real-time" market was and is administered by the CAISO.

Prior to the Petition Date, MAEM, along with many other independent energy producers or marketers, sold energy into the California Energy Markets. In 2000 and 2001, the price of energy in the western energy markets, including the California Energy Markets, increased to historically high levels. Buyers of power in such markets asserted that the high prices were due to market manipulation by energy wholesalers, including MAEM. As a result, a number of civil and criminal investigations were initiated by FERC, the California Public Utilities Commission, California's Electricity Oversight Board ("CEOB") and the States of Washington, Oregon and California. In addition, various civil actions in the state and federal courts and regulatory proceedings at FERC were pursued against energy producers or wholesalers by PG&E, Southern California Edison, San Diego Gas and Electric Company, the DWR, the Attorney General of the State of California (the "California Attorney

General") and the CEOB (collectively referred to as the "California Parties"). The vast bulk of the Claims described in this paragraph were settled by the California Settlement described in this section of the Disclosure Statement.

On April 15, 2005, the Bankruptcy Court approved the California Settlement Agreement, and that agreement became effective. The Confirmation Order shall authorize and direct the Debtors to take all actions that are necessary or appropriate to give effect to the California Settlement. Certain provisions of the California Settlement are summarized below. To the extent there is any conflict between the California Settlement Agreement and the Plan, the California Settlement Agreement shall prevail.

### 1. General

On January 14, 2005 Mirant and certain other Debtors entered into the California Settlement Agreement with the California Parties and the Office of Market Oversight and Investigations of the FERC. The Debtors which are parties to the California Settlement are Mirant, MAI, MAEM, MAG, Mirant California Investments, Inc., Mirant California, Mirant Delta, Mirant Potrero, Mirant Special Procurement, Inc., Mirant Services, MAEMII and MADI (collectively, the "Mirant Settling Parties"). The effectiveness of the California Settlement was conditioned upon its approval by the CPUC, the Bankruptcy Court, the bankruptcy court having jurisdiction over PG&E's bankruptcy proceedings initiated in 2001 and FERC. The CPUC approved the California Settlement prior to January 14, 2005, as signified by its execution of the California Settlement Agreement. The PG&E bankruptcy court approved the California Settlement on March 24, 2005. FERC approved it on April 13, 2005, and the Bankruptcy Court approved it on April 15, 2005, causing it to become effective.

The California Parties and the Mirant Settling Parties entered into the California Settlement to comprehensively settle various disputes by and among the California Parties and the Mirant Settling Parties, including the allegations of market manipulation generally described above. The California Settlement is complex, involving numerous disputes and exchanges of settlement consideration among the many disputing parties.

### 2. Mirant Debtors Settlement

Under the California Settlement: (i) the California Parties received an assignment of certain receivables owed to MAEM for energy sales made by MAEM during 2000 and 2001 into the California Energy Markets (the "MAEM Receivables"); (ii) the California Parties received an unsecured Allowed Claim against MAEM in the amount of $175,000,000, which for purposes of the Plan has been classified as an Allowed Mirant Debtor Class 3 — Unsecured Claim, and (iii) DWR received an unsecured Allowed Claim against MAEM in the amount of $2,250,000, which for purposes of the Plan has been classified as an Allowed Mirant Debtor Class 3 — Unsecured Claim. In return for the assignment of the MAEM Receivables and the Allowed Claims, the California Parties released all claims they may have had against the Mirant Settling Parties related to sales of electricity or natural gas at wholesale in western markets in the period from January 1, 1998 through July 14, 2003, including all such claims filed by the California Parties in the Chapter 11 Cases, in proceedings currently pending before the FERC, or in four pending suits filed by the California Attorney General. The Debtors estimate that, excluding duplicative claims, this will compromise more than 90% of California Energy Market Claims at issue in the proceedings before FERC concerning whether the prices charged by MAEM and other market participants in the California Energy Markets during certain periods in 2000 and 2001 were excessive. Also, the California Parties assumed MAEM's obligation to pay any refunds determined by FERC to be owed by MAEM to other parties for transactions in the CAISO and Cal PX markets from October 2, 2000 through June 21, 2001 (the "Refund Period"). Subject to applicable bankruptcy law, MAEM continues to be liable for any refunds that FERC determines it to owe to: (i) participants in the Cal PX or CAISO markets other than the California Parties (or other parties that chose to opt into the California Settlement as described below) for periods outside the Refund Period, or (ii) to parties with which MAEM engaged in bilateral electricity or natural gas transactions other than the California Parties (or other parties that chose to opt into the California Settlement).

Pursuant to the California Settlement Agreement, any California Party may request that their share of any New Mirant Common Stock received on account of an Allowed Mirant Debtor Class 3 — Unsecured Claim be paid into a trust for the benefit of such California Party. The terms of any such trust shall be negotiated by the Mirant Settling Parties and the applicable California Party on or before the Effective Date. The parties anticipate that the trust agreement will contain customary terms and conditions, including that the designated trustee hold any New Mirant Common Stock issued on account of an Allowed Mirant Debtor Class 3 — Unsecured Claim in lieu of any such California Party.

Pursuant to the California Settlement, the California Parties also agreed to withdraw their opposition at FERC to another settlement (the "Trading Practices Settlement") that had been reached between certain of the Mirant Parties and the Office of Market Oversight and Investigations of the FERC prior to the California Settlement. Pursuant to the Trading Practices Settlement, MAEM agreed to pay $332,411 in cash to a FERC designated trust account and to grant FERC an unsecured Allowed Claim against MAEM in the amount of $3,665,811, which has been classified as an Allowed Mirant Debtor Class 3 — Unsecured Claim, to resolve certain investigations by FERC into whether certain Mirant Parties engaged in improper trading strategies and double sold ancillary services between January 1, 2000 and June 20, 2001. At the time that the California Settlement became effective, the FERC staff and certain Mirant Parties had requested that FERC approve the Trading Practices Settlement, but FERC had not yet done so. As a result of the California Parties withdrawing their opposition to the Trading Practices Settlement pursuant to the California Settlement, FERC approved the Trading Practices Settlement on June 27, 2005. The Bankruptcy Court approved the Trading Practices Settlement on August 24, 2005.

Some of the consideration to be received by the California Parties under the California Settlement is available to other market participants that choose to opt into the California Settlement and several did so. Those market participants that elected to opt into the California Settlement have given releases of liability to the Mirant Settling Parties that are similar to those given by the California Parties, although opt-in participants are not required to release certain bilateral claims. Approximately 14 market participants (other than California Parties) opted into the California Settlement. Market participants that are neither California Parties nor market participants opting into the California Settlement are referred to as "Non-Settling Participants."

In addition to the claims filed by the California Parties in the Chapter 11 Cases seeking to recover refunds from MAEM and other Mirant entities for sales of electricity made by MAEM into the CAISO and Cal PX markets in 2000 and 2001, CAISO and the Cal PX have filed claims against MAEM and other Mirant Settling Parties seeking to recover refunds on behalf of participants in the markets for which they were responsible. FERC's approval of the California Settlement constitutes its direction to CAISO and Cal PX to conform their books and records to the terms of the settlement and to withdraw with prejudice all proofs of claim filed by them in the Chapter 11 Cases that seek to recover amounts or otherwise obtain relief on behalf of, or for the benefit of, any of the California Parties or any other market participants that opt into the California Settlement. In addition, the CAISO separately agreed with Mirant to release its claims for refunds and certain other claims upon the California Settlement becoming effective. The California Settlement also automatically assigned the portions of the proofs of claim filed by the Cal PX against MAEM and Mirant Corporation seeking to recover amounts or otherwise obtain relief on behalf of, or for the benefit of, a Non-Settling Participant to such Non-Settling Participant. In order to implement this aspect of the California Settlement, on July 22, 2005, the Debtors and Cal PX filed a joint motion with the Bankruptcy Court to approve certain agreed-to assignment procedures. On August 25, 2005, the Bankruptcy Court granted the joint motion and the Debtors expect to fully implement the procedures approved by the Bankruptcy Court by September 30, 2005.

The California Parties also released the Mirant Settling Parties from any liability or refund claims related to a 19-month agreement entered into by MAEM with DWR on May 22, 2001, including claims asserted in complaints filed by CPUC and EOB with FERC in February 2002. FERC's approval of the California Settlement, under its terms, also has the effect of terminating any pending investigations by the FERC of the conduct of the Mirant Settling Parties in the western energy markets in 2000 and 2001, including pending investigations of bids made by MAEM to Cal PX and CAISO in excess of $250 per MWh in the period

May 1, 2000 through October 1, 2000 and of allegations of physical withholding of generation assets by certain of the Mirant Settling Parties in 2000 and 2001.

### 3. MAG Debtors Settlement

The California Settlement also resolved all claims asserted by PG&E against Mirant Delta, Mirant Potrero, and the other Mirant Settling Parties in the Chapter 11 Cases or in proceedings before FERC that relate to refunds potentially owed with respect to sales previously made by Mirant Delta and Mirant Potrero under RMR agreements between Mirant Delta and CAISO applicable to the generating plants owned by Mirant Delta and a similar RMR agreement between Mirant Potrero and CAISO applicable to the generating plant owned by Mirant Potrero (the "RMR Agreements"). When Mirant Delta and Mirant Potrero acquired their generating facilities from PG&E in 1999, those facilities were subject to the RMR Agreements, which were assumed by Mirant Delta and Mirant Potrero. The rates that Mirant Delta and Mirant Potrero could charge the CAISO under those agreements, where they were also making sales into the market and were retaining the revenues from those sales, were the subject of an ongoing disputed rate proceeding before the FERC and were being collected subject to refund. This potential refund liability was unrelated to the high prices experienced in western energy markets in 2000 and 2001. While CAISO is the party to the RMR Agreements with Mirant Delta and Mirant Potrero, CAISO's obligations under those agreements are funded by PG&E, and PG&E is the real party in interest with respect to any refunds owed by Mirant Delta and Mirant Potrero for sales made previously under those agreements. A decision issued by a FERC administrative law judge in June 2000 addressing the rates that Mirant Delta and Mirant Potrero should be allowed to charge under the RMR Agreements for their generating units subject to the RMR Agreements and from which Mirant Delta or Mirant Potrero had exercised its rights to make market sales, if it had been adopted by FERC, would have resulted in Mirant Delta and Mirant Potrero owing refunds to CAISO, and in effect indirectly to PG&E, that, with interest, would have potentially exceeded $300,000,000. In its order approving the California Settlement, FERC dismissed as moot the pending rate proceeding related to the RMR Agreements, in which the ALJ decision was before FERC for its review. On June 3, 2005, the FERC denied requests for rehearing filed by various parties with respect to that dismissal.

Under the California Settlement, PG&E released Mirant Delta and Mirant Potrero from any potential refund liability under the RMR Agreements on or before September 30, 2004, and the claims filed by PG&E in the Chapter 11 Cases seeking to recover refunds from Mirant Delta and Mirant Potrero for sales made under the RMR Agreements have been withdrawn with prejudice. Under the terms of the California Settlement, FERC's approval of the California Settlement constituted its direction to CAISO to conform its books and records to the terms of the California Settlement and to withdraw, with prejudice, all proofs of claim filed by it in the Chapter 11 Cases that seek to recover amounts related to sales made under the RMR Agreements on or before September 30, 2004. In addition, the CAISO has separately agreed with Mirant to release any RMR-related claims settled pursuant to the California Settlement Agreement upon the California Settlement becoming effective.

In return for the releases it granted to the Mirant Settling Parties described in the previous paragraphs, PG&E received two Allowed Claims against Mirant Delta, which have been classified as MAG Debtor Class 4 — PG&E RMR Claims under the Plan. Under the California Settlement Agreement and the Plan, the first Allowed Claim will receive a distribution of $43,000,000 and the second Allowed Claim will receive a distribution of $20,000,000. PG&E will liquidate any securities received as part of such distributions and, to the extent that the net amount resulting from the liquidation of the securities received by PG&E plus any cash received by it is less than $43,000,000 or $20,000,000, as the case may be, the difference will be made up by PG&E by withholding amounts it owes to Mirant Delta over a three-month period under either of the power purchase agreements described below or by payment from Mirant Delta or MAG. In addition, either: (i) the CC8 Assets will be transferred to PG&E, or (ii) PG&E will receive the CC8 Alternative Consideration. The Bankruptcy Court's order of April 15, 2005 approving the California Settlement (the "California Settlement Order") also approved the transfer of the CC8 Assets pursuant to the terms of the California Settlement. A definitive transfer agreement for the CC8 Assets (the "CC8 Transfer Agreement") as well as certain ancillary agreements related thereto have been executed by certain Mirant Settling Parties and PG&E pursuant to the California Settlement Order. The CC8 Transfer Agreement will be filed with the Bankruptcy Court prior to

88

Confirmation and may be obtained from the official docket maintained in connection with these Chapter 11 Cases after it has been filed with the Bankruptcy Court.

To fund the CC8 Alternative Consideration, in the event it is paid, PG&E will receive an Allowed MAG Debtor Class 4 — PG&E/RMR Claim that will receive a distribution of $70,000,000. PG&E will liquidate any securities received as part of such distribution and place the net resulting amount plus any cash received into an escrow account. To the extent that the net amount resulting from the liquidation of the securities received by PG&E plus any cash received by it is less than the CC8 Alternative Consideration, the difference will be made up by PG&E withholding and paying into the escrow account amounts it owes to Mirant Delta over a three-month period under the power purchase agreement described below or by payments from Mirant Delta or MAG. If the transfer of the CC8 Assets to PG&E does not occur on or before June 30, 2008, or if certain specified events occur prior to that date, such as the failure of the CPUC to approve PG&E's acquisition of the CC8 Assets, then the CC8 Alternative Consideration is to be paid to PG&E and the Mirant Settling Parties will retain the CC8 Assets. If PG&E closes on its acquisition of the CC8 Assets, the funds in the escrow account will be paid to Mirant Delta.

PG&E has also entered into two power purchase agreements with Mirant Delta and Mirant Potrero that will allow PG&E to dispatch and purchase the power output of all units of the generating plants owned by Mirant Delta that have been designated by the CAISO as RMR units under the RMR Agreements and will allow PG&E to direct Mirant Potrero to change the operating condition under the Mirant Potrero RMR Agreement of all units of the Potrero power plant designated by the CAISO as RMR units. The first agreement took effect in January of 2005. The second agreement will take effect from 2006 through 2012. For the years 2005 through 2008, PG&E will pay Mirant Delta and Mirant Potrero under those agreements rates for the affected generating units equal to the rates currently in effect under the RMR Agreements during 2004 reduced by $5,000,000. After 2008, the payments to be made by PG&E will be determined on an annual basis by rate filings at FERC consistent with the terms of the existing RMR Agreements.

Under the California Settlement, PG&E and Mirant Delta also are to negotiate by September 30, 2005 an agreement (the "Option Agreement") under which PG&E would have separate options to purchase each of Mirant Delta's existing Contra Costa generating plant and its existing Pittsburg generating plant, in both cases once no unit at the plant has operated for a certain period of years. The price at which each plant could be purchased pursuant to the option would be equal to the amount of certain capital costs not recovered by Mirant Delta under the terms of the RMR Agreement applicable to that plant at the time of the exercise of the option. If Mirant Delta and PG&E do not reach agreement on the Option Agreement by September 30, 2005, or if PG&E cannot obtain CPUC approval of the Option Agreement or its exercise of its rights thereunder, Mirant Delta and the other Mirant Settling Parties will have no further obligations to PG&E with respect to the Option Agreement or the rights it was to provide to PG&E.

#### 4. Chapter 5 Releases

In exchange for the above-described consideration, the Debtors and the California Parties have provided releases to each other as specifically described in the California Settlement Agreement, including releases of the California Parties from any and all claims, obligations, causes of action and liabilities: (i) under sections 542, 544, 545, 547, 548, 549 or 553 of the Bankruptcy Code to avoid any alleged transfer to or seek turnover from a California Party; (ii) under section 550 of the Bankruptcy Code to recover any such alleged transfer; (iii) under section 510(c) to subordinate any claim of a California Party; or (iv) under section 502(d) to disallow any claim of a California Party based upon any alleged avoidable transfer so released. In addition, the California Parties, FERC and other settling participants have withdrawn their respective applicable proofs of claim filed in the Chapter 11 Cases with prejudice.

**R.    Term Sheet Concerning Plan**

On September 7, 2005, the Debtors and certain of their key stakeholders reached an agreement concerning the terms of the Plan.[1] The term sheet (the "Mirant Plan Term Sheet"), among the Debtors, the Committees and Phoenix (and supported by the MAG Ad Hoc Committee and the Examiner), is summarized in the chart below.[2]

The Mirant Plan Term Sheet and resultant Plan were the product of extensive arm's length, good faith negotiations between the Debtors, the Committees and Phoenix. Although the Mirant Plan Term Sheet and resultant Plan may not reflect the best possible recovery with respect to certain Claims, Equity Interests or certain classes of Claims or Equity Interests, the Debtors believe that approval of the Plan, as modified by the Mirant Plan Term Sheet, is in the best interests of the Debtors, their Estates, their creditors and their equity holders. Entering into the Mirant Plan Term Sheet, which is supported by the Committees, the MAG Ad Hoc Committee, the Examiner and Phoenix, is beneficial to all parties in interest to these Chapter 11 Cases by allowing confirmation of the Plan to proceed and reducing the costs and uncertainty of litigation concerning the Plan.

<b>Summary of Key Aspects of the Mirant Plan Term Sheet</b>

| | |
|---|---|
| Purpose of the Mirant Plan Term Sheet | The Mirant Plan Term Sheet sets forth the modifications that the Debtors would make to the Plan dated March 25, 2005, and the terms on which the constituencies will support and recommend that the stakeholders vote to accept and that the Bankruptcy Court confirm the amended Plan. |
| Key Provisions of the Mirant Plan Term Sheet | The Mirant Plan Term Sheet: |
| | (1) sets forth the financial terms on which the value of the Debtors' enterprise will be shared among stakeholders; |
| | (2) affirms that all MAG debt obligations will be satisfied in full (including the payment in Cash of the Indenture Trustee Fees) and that MAG's $1,700,000,000 of long-term debt will be reinstated; |
| | (3) clarifies the Debtors' intention to satisfy MAG's approximately $1,500,000,000 of short-term debt and other obligations with common stock in the reorganized parent company for 10% of the amount owed with the balance to be paid in Cash. (Although the company plans to raise the cash through a proposed $1,350,000,000 capital markets financing at its exit from Chapter 11, it still reserves the right to issue new notes directly to the creditors for this portion of their claims); |
| | (4) specifies the methodology for calculating the amount of interest that accrued on all MAG debt during the pendency of the Chapter 11 Cases and provides details regarding various credit support mechanisms to be provided under the Plan by the reorganized parent company for the benefit of MAG; |

---

[1] The Debtors filed a Current Report on Form 8-K attaching the Mirant Plan Term Sheet with the SEC on September 7, 2005.

[2] Parties-in-interest should refer directly to the Mirant Plan Term Sheet for information concerning the terms of the agreement.

(5) specifies that Cash recoveries on Designated Avoidance Actions (including the action against Mirant's former parent, Southern) will trigger payments to be shared by Mirant's former creditors and shareholders on a 50/50 basis; and

(6) provides that Mr. Edward Muller, the former CEO of Southern California Edison Company's merchant energy subsidiary, Edison Mission Energy, will be elected to the board of directors of Mirant and named chairman and that a new board of directors will be formed consisting of Mr. Muller, Mr. A.D. ("Pete") Correll (a current board member), six independent members selected jointly by Mirant and the Corp Committee, and one independent member to be chosen through a joint selection process with the Mirant Equity Committee.

Amended Plan:            Under the plan to be amended, approximately $6,368,000,000 of unsecured debt and obligations at the parent level will be exchanged for 96.25% of the remaining common stock (exclusive of the above-noted MAG shares and shares reserved for employee programs under the Plan). This includes an agreed-upon participation by Mirant's subordinated trust preferred securities, which will receive 3.5% of the common stock (excluding the MAG and employee shares) and warrants entitling the holders to purchase 5% of the new common stock issued under the Plan, exclusive of employee shares. The remaining common stock (3.75%, excluding the MAG and employee shares) will go to Mirant's current shareholders. The shareholders will also receive warrants to purchase an additional 10% of the common stock of New Mirant. In addition, the unsecured creditors of Mirant and the current shareholders of Mirant will share in certain payments to be triggered by recoveries on specified lawsuits.

## XI.

## Material Claims, Litigation And Investigations

### A.   Overview of Estate Claims and Liabilities

Commencing in September 2003, each of the Debtors filed its respective Schedules and Statements. The aggregate scheduled liabilities for the Debtors were approximately $9,300,000,000. In addition to the claims scheduled by the Debtors, numerous proofs of claim have been filed against the Debtors. On August 21, 2003, the Bankruptcy Court issued an order (the "Initial Bar Date Order") applying to the Original Debtors that established: (1) December 16, 2003 at 5:00 p.m. (EST) as the last day to file a timely proof of claim in the Chapter 11 Cases of the Original Debtors with the Claims Agent, and (2) January 12, 2004 at 5:00 p.m. (EST) as the last day for governmental units to file a timely proof of claim in the Chapter 11 Cases of the Original Debtors with the Claims Agent. Notice of the Initial Bar Date Order was provided in *The Wall Street Journal* (National Edition) and *USA Today* (National Edition), on or about October 17, 2003. The Initial Bar Date Order was made applicable to the EcoElectrica Debtors and the Wrightsville Debtors by orders entered September 8, 2003 and October 9, 2003, respectively.

On January 8, 2004, the Bankruptcy Court issued an order (the "MAEC Bar Date Order") applying to the MAEC Debtors that established: (1) March 12, 2004 at 5:00 p.m. (EST) as the last day to file a timely proof of claim in the Chapter 11 Cases of the MAEC Debtors with the Claims Agent, and (2) May 17, 2004 at 5:00 p.m. (EST) as the last day for governmental units to file a timely proof of claim in the Chapter 11 Cases of the MAEC Debtors with the Claims Agent.

91

On September 28, 2005, the Bankruptcy Court issued an order applying to Newco 2005 Corporation that established October 20, 2005, 5:00 p.m., (EST), as the last date and time to file a timely proof of claim in the chapter 11 case of Newco 2005 Corporation.

## B.   Procedures for Resolving Claims

### 1.   Claims Objection Procedures

On June 8, 2004, the Bankruptcy Court entered an order establishing procedures for objections to proofs of claims (the "Claims Objection Procedures"). The Claims Objection Procedures divide objections into four "Tiers," and provide specific procedures for each type of objection.

The Debtors have filed numerous "Tier I" claim objections to claims that were either: (a) identical to a proof of claim filed multiple times, asserting the same liability against the same Debtor, or (b) a proof of claim that was amended or superseded by a subsequently-filed proof of claim. On August 12, 2004 and January 11, 2005, the Bankruptcy Court sustained certain objections to claims exceeding $3,000,000,000. Additionally, on February 22, 2005 and April 6, 2005, the Bankruptcy Court expunged an additional $23,800,000 in claims from the Debtors' claims register. On June 1, 2005, the Bankruptcy Court sustained objections expunging $664,000 in claims from the Debtors' claims register.

The Debtors also filed a "Tier II" claims objection seeking the disallowance and expungement of claims that were filed based upon equity interests. On October 5, 2004, the Bankruptcy Court issued an order sustaining the Debtors' objection and expunging approximately 5,000 proofs of claim, in the aggregate amount of approximately $34,000,000, from the Debtors' claims register. On April 18, 2005, the Debtors served notice that an additional $674,520 in claims based on equity interests would be expunged from the Debtors' claims register.

The Debtors also filed numerous "Tier III" claims objections to certain proofs of claim. On September 29, 2004 and January 13, 2005, the Bankruptcy Court issued orders expunging over 200 proofs of claim from the Debtors' claims register, in amounts exceeding $100,000,000. Additionally, on February 1 and February 22, 2005, the Bankruptcy Court expunged an aggregate of over $8,000,000 in claims from the Debtors' claims register. On April 6, 2005, the Bankruptcy Court sustained objections reducing the claims register by an additional $4,000,000. On May 31, 2005, the Bankruptcy Court expunged approximately $1,600,000 in employment-related claims and approximately $25,500,000 in tax-related claims. On June 1, 2005, the Bankruptcy Court sustained objections expunging $114,000 in claims from the Debtors' claims register.

On August 4, 2005, the Debtors filed a *Tier III Objection To Certain Duplicative Proofs Of Claim Filed By Senior Noteholders (Group XVII)*. During the course of the Debtors' review and reconciliation of proofs of claim with their respective books and records, the Debtors identified approximately $50,000,000 in claims which were filed on account of the same liabilities scheduled by the Debtors for Deutsche Bank AG New York Branch, as fiscal agent in relation to the Mirant Corporation $200,000,000 7.4% Senior Notes due 2004 and Mirant Corporation $500,000,000 7.9% Senior Notes due 2009 (collectively, the "Mirant Corp. Senior Notes"). The Court sustained this objection on September 14, 2005.

With respect to "Tier IV" claim objections to material claims, as of September 12, 2005, the Debtors objected to the claims of the parties identified on Schedule 6. As discussed in more detail below, a substantial portion of those objections have been resolved.

The Bankruptcy Court has entered orders that have significantly reduced the unliquidated and disputed claims against the Estates. To date, there have been over 8,385 claims filed against the Mirant entities, totaling approximately $269,000,000,000. The majority of these claims, with a cumulative notional amount of $232,000,000,000, were expunged from the claims register as a result of settlements and Bankruptcy Court orders. In addition, there are $1,900,000,000 of estimated liabilities for claims that were filed on an unliquidated basis.

### 2. Claims Estimation Procedures

To assist the Debtors' ability to resolve material claims that could unduly delay the administration of the Debtors' cases, on October 21, 2004 and October 26, 2004, the Bankruptcy Court issued orders authorizing the Debtors to estimate certain contingent and unliquidated proofs of claim for purposes of feasibility of, voting on, and distribution under the Plan and providing procedures for the estimation of such contingent and unliquidated proofs of claim.

## C. Description of Claims

### 1. Estimated Claim Amounts By Class

The following chart provides the estimated claim amounts for both the Mirant Debtors and the MAG Debtors. The amounts presented in the chart below represent the Debtors' estimates of the claims and potential settlement value. **THESE ESTIMATED AMOUNTS DO NOT, AND ARE NOT INTENDED TO, REPRESENT THE FULL, FINAL, AND LIQUIDATED CLAIM VALUES.** As discussed below, a number of the claims are currently the subject of ongoing litigation.

|  | Estimated Claims | | |
|---|---|---|---|
|  | Principal and Prepetition Interest | Postpetition Interest | Total |
| **Mirant Debtors**[a] |  |  |  |
| Class 1 — Priority Claims .............. | $ 44,000 |  | $ 44,000 |
| Class 2 — Secured Claims ............. | $ 152,100,000 | $ 300,000 | $ 152,400,000 |
| Class 3 — Unsecured Claims ........... | $5,690,600,000 | $677,400,000 | $6,368,000,000 |
| Class 4 — Convenience Claims ......... | $ 6,200,000 |  | $ 6,200,000 |
| **MAG Debtors**[b] |  |  |  |
| Class 1 — Priority Claims .............. | $ 11,000 |  | $ 11,000 |
| Class 2 — Secured Claims ............. | $ 39,200,000 | $ 1,000,000 | $ 40,200,000 |
| Class 3 — New York Tax Secured Claims | undetermined |  |  |
| Class 4 — PG&E/RMR Claims......... | $ 133,000,000[c] |  | $ 133,000,000 |
| Class 5 — Unsecured Claims[d] ......... | $1,157,400,000 | $210,500,000 | $1,367,900,000 |
| Class 6 — MAG Long-term Note Claims[e] | $1,732,700,000 | $416,400,000 | $2,149,100,000 |
| Class 7 — Convenience Claims ......... | $ 4,800,000 |  | $ 4,800,000 |

[a] For the Mirant Debtors, the Unsecured Claims include the Mirant Credit Facilities, the Mirant Debt Securities, trade debt, and lease rejection claims as discussed in "General Information — Existing Financing Transactions of the Debtors." The character and content of the other classes of claims are also discussed in "The Chapter 11 Plan — General Description of the Treatment of Claims and Equity Interests — Classified Claims and Equity Interests."

[b] For the MAG Debtors, the Unsecured Claims include the MAG Credit Facilities, the MAG Debt Securities, trade debt, and lease rejection claims discussed in detail in "General Information — Existing Financing Transactions of the Debtors." The character and content of the other classes of claims is also discussed in detail in "The Chapter 11 Plan — General Description of the Treatment of Claims and Equity Interests — Classified Claims and Equity Interests."

[c] The Debtors estimate that the "CC8 Alternative Consideration" will be $70,000,000 and have used such number to determine the Allowed amount of the PG&E/RMR Claims. In addition, the Debtors believe that PG&E is not entitled to interest on account of its PG&E/RMR Claims. PG&E disputes this contention.

[d] For purposes of calculating accrued interest on Unsecured Claims, the Debtors used non-default contract rates compounding the bonds semi-annually and the revolver quarterly. Additional interest of 0.50% was added to the bonds for the period between August 28, 2003 and July 28, 2005. For purposes of calculating postpetition accrued interest on Unsecured Claims other than MAG Revolver Claims and MAG Short-term

Notes, the Debtors calculated interest at the federal judgment rate in effect on the Petition Date, which was 1.08%.

e  For purposes of calculating accrued interest on the MAG Long-term Note Claims, the Debtors used non-default contract rates, compounding interest semi-annually. More specifically, the Debtors used annual rates of 8.3% for the MAG Long-term Notes due 2011, 8.5% for the MAG Long-term Notes due 2021 and 9.125% for the MAG Long-term Notes due 2031. Additional interest of 0.50% was added to the bonds for the period between August 28, 2003 and July 28, 2005.

## 2. Disputed Material Litigation Claims

The Debtors contested the Tier IV claim objections identified on Schedule 6. Certain other Tier IV claim objections, however, and other material claims remain unresolved and/or unliquidated. The following chart summarizes the resolved and unresolved material litigation claims.

| Status | Mirant | MAG |
|---|---|---|
| Disputed and Resolved | $287,270,551[a] | |
| Disputed and Unresolved | $1,035,249,462 | $152,046,532 |

a  This is the consolidated amount for both MAG and Mirant Corp.

94

### a. Resolved Material Litigation Claims

### i. Summary of Settled Material Litigation Claims[a]

| Claimant | Total Filed Amount | Settled Amount |
|---|---|---|
| Californians for Renewable Energy | $ 469,854,000 | $ 0 |
| Egger, Jerry et al. | $ 800,000,000 | $ 5,000 |
| Oregon Department of Justice | Unliquidated | $ 250,000 |
| Brown, James and Waller, Greg | $ 100,000,000 | $ 0 |
| Wisniak, Gil | $ 700,000,000 | $ 2,000,000[b] |
| Alstom Power, Inc. | $ 6,827,849 | $ 3,755,849 |
| Burns and McDonnell | $ 12,718,525 | $ 3,750,000[c] |
| Cascade Natural Gas Corporation | $ 1,032,938 | $ 592,709[d] |
| Commodity Futures Trading Commission ("CFTC") | Unliquidated | $ 12,500,000[e] |
| Enbridge Midcoast Energy | $ 25,412,958 | $ 750,000 |
| Entergy Arkansas and Entergy Services | $ 26,432,106 | $ 0 |
| NSTAR Gas Company, Cambridge Electric Light Company, Commonwealth Electric Light ("NSTAR") | $ 7,865,149 | $ 365,247[f] |
| Predator Development Company | $ 95,000,000 | $ 1,200,000 |
| California Department of Toxic Substances | $ 400,034 | $ 51,197 |
| Dynegy Marketing and Trade | $ 5,484,741 | $ 0 |
| Massachusetts Department of Environmental Protection | Unliquidated | $ 41,400 |
| Metropolitan Water District of Southern California, Portland General Electric Company and Salt River Project Agricultural Imp. & Power District | Unliquidated | $ 0 |
| Pericen Limited Partnership | $ 30,226,424 | $ 2,003,000 |
| San Francisco Bay Regional Water Quality Control Board | $ 15,000,000 | $ 0 |
| Southern California Water Company | Unliquidated | $ 0 |
| Unitil Power Corp. and Unitil Energy Systems | $ 40,000,000 | $ 0 |
| Virginia Electric and Power Company | $ 8,682,606 | $ 0 |
| Brazos Electric Cooperative | $ 17,278,092 | $ 3,543,088 |
| Powerex Corp. | Unliquidated | $ 0 |

[a] The Summary includes settlements of some Claims for which Bankruptcy Court approval has not yet been obtained. The Debtors, however, expect to receive Bankruptcy Court approval of these settlements prior to confirmation of the Plan.

[b] The Wisniak Claim is subordinated to other general Unsecured Claims of Mirant.

[c] The Burns and McDonnell Claims are allowed, fully secured Claims against Mirant Sugar Creek and will be treated solely as set forth in the settlement agreement approved by the Bankruptcy Court on January 19, 2005.

[d] Cascade Natural Gas Corporation ("Cascade") has an allowed general, prepetition, Unsecured Claim for $592,709 solely for purposes of voting and determining feasibility of the Plan. Determination for purposes of distribution on account of Cascade's Claim will be resolved through the Claims Objection Procedures and will not exceed the amount of $592,709.

[e] The CFTC Claim is subordinated to the general Unsecured Claims of MAEM.

[f] The stipulation entered into between NSTAR and the Debtors provides that NSTAR, or its affiliates, may be entitled to additional rejection damages Claims if certain contracts are rejected, as well as potential other Claims depending on the outcome of certain refund proceedings before FERC.

| Claimant | Total Filed Amount | Settled Amount |
|---|---|---|
| Gas Transmission Northwest | $ 145,305,380 | $ 25,000,000 |
| Mirant Securities Plaintiffs | $ 100,000,000 | $ 0 |
| Gunderboom, Inc. and Gunderboom Shareholders | $ 457,644,361 | $ 206,676 |
| Modesto Irrigation District | $ 16,958,642 | $ 2,302,500 |
| Enron/EME | $1,375,931,028 | $ 19,250,000 |
| Dick Corp./St. Paul[a] | $ 49,700,108 | $ 11,500,000 |
| Perryville | $1,390,129,956 | $108,300,000 |
| ENA Upstream | $ 5,786,198 | $ 5,786,198 |
| Enron Power Marketing | Unliquidated | $ 10,111,687 |
| Cruz Bustamante (filed by Paul Kiesel) | $2,500,000,000 | $ 1,000 |
| Oscar's Photo Lab and Mary L. Davis | Unliquidated | $ 2,000 |
| | $8,403,671,095 | $213,270,551 |

## ii. Summary of Disallowed Material Litigation Claims

| Claimant | Total Filed Amount | Remaining Claim |
|---|---|---|
| Banc of America Securities | $ 25,633,135 | $ 0 |
| Bank of America | $215,749,201 | $ 0 |
| Kinder Morgan Power Company | $153,419,000 | Undetermined[b] |
| Kern River Gas Transmission | $363,851,630 | $ 74,000,000 |
| Total | $718,652,965 | $ 74,000,000 |

[a]  The Dick/St. Paul Claims are Secured Claims against MAG and Mirant Kendall and will be treated as set forth in the settlement agreement approved by the Bankruptcy Court, by order dated June 20, 2005.

[b]  The Kinder Morgan Power Company Claim, regarding transmission credits and sums related thereto that is disputed by the Debtors, has been settled for $1,500,000 subject to Bankruptcy Court approval.

**b. Unresolved Disputed, Material Litigation Claims**

The following chart identifies the unresolved and/or unliquidated Claims that are both disputed and material:

| Mirant Debtors | | Filed Amount |
|---|---|---|
| Bewag . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | None Filed |
| California Power Exchange Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Undetermined |
| Freeman Mathis & Gary LLP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Unliquidated |
| Gregory, Vernon J. & Sandra . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 21,000,000[a] |
| Richard Neimark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 5,000,000 |
| Potomac Electric Power Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 31,142,447[b] |
| Southern Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 48,983,612[c] |
| TransCanada Gas Services Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 50,826,900 |
| Wachovia/Credit Suisse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 773,296,503[d] |
| Pepco TPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 105,000,000 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | $1,035,249,462 |
| **MAG Debtors** | | |
| Algonquin Gas Transmission Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 10,023,619 |
| Dominion State Line, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 736,306 |
| Foster Wheeler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 1,694,160 |
| Kelly & Meenagh . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 2,450,000 |
| Potomac Electric Power Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 31,142,447 |
| Schoenberger, Michael & Patricia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 1,000,000 |
| Pepco TPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 105,000,000 |
| MIRMA Owner/Lessors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | Unliquidated |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ | 152,046,532 |

[a] Gregory, Vernon & Sandra filed 8 redundant claims totaling $168,000,000.

[b] Pepco has filed 24 claims totaling $2,500,000,000.

[c] Southern has filed over 300 redundant claims totaling greater than $4,800,000,000.

[d] Wachovia/Credit Suisse filed 50 redundant claims totaling $17,000,000,000. See generally "Certain Affiliate Transactions — Intercompany Relationships Involving MAEM — Credit and Capital Support."

The Debtors estimate that approximately $146,000,000 (excluding Wachovia and the Pepco TPA) of the unresolved and/or unliquidated Claims against the Mirant Debtors identified above could ultimately be Allowed. The Debtors estimate that approximately $10,000,000 (excluding the Pepco TPA and MIRMA Lease Claims) of the unresolved and/or unliquidated Claims against the MAG Debtors identified above could ultimately be Allowed.

**D.   Detailed Description of Material Claims and Obligations**

    **1.   Resolved Disputed Material Claims**

        **a. Claims Subordinated by Court Order or Settlement Agreement**

            **i. Commodity Futures Trading Commission**

On December 3, 2004, MAEM, Mirant and CFTC announced that they reached a settlement relating to CFTC's investigations of MAEM. The terms of the settlement are embodied in the *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and*

*Imposing Remedial Sanctions* issued by CFTC. This order makes findings, which are neither admitted nor denied by MAEM, that, during 2000 and 2001, MAEM traders knowingly reported inaccurate price, volume and/or counterparty information regarding natural gas transactions and/or trades observed in the market to the trade press, and that from January 2000 to October 2000, certain MAEM employees who traded natural gas for the western region of the United States knowingly delivered inaccurate information to index publishers in an attempt to manipulate the price of natural gas. To resolve the inquiry by CFTC, MAEM has agreed that CFTC will have an Allowed Claim against MAEM of $12,500,000. CFTC's Allowed Claim is subordinate to the Claims of MAEM's general unsecured creditors. CFTC's Allowed Claim will be characterized as a Subordinated Claim and subject to Section 17.3 of the Plan.

### ii. Wisniak

On or after June 11, 2003, Gil Wisniak, on behalf of himself and all persons who had purchased MAG bonds issued in a $750,000,000 offering pursuant to a Prospectus and Registration Statement dated May 7, 2002 (the "Wisniak Plaintiffs"), filed a class action against MAG, styled *Gil Wisniak v. Mirant Americas Generation, LLC, et al.*, Civil Action No. 2003-CV-71095, in the Superior Court of Fulton County, Georgia. The Wisniak Plaintiffs alleged claims for violation of sections 11 and 15 of the Securities Act of 1933 against MAG and certain current and former officers and managers of MAG.

On December 16, 2003, Wisniak filed proofs of claim on behalf of himself and the class. The Bankruptcy Court, on January 19, 2005, approved a settlement agreement between MAG and the Wisniak Plaintiffs that, among other things, entitles the Wisniak Plaintiffs to a single collective Allowed Claim of $2,000,000 against Mirant. The Wisniak Plaintiffs' Allowed Claim is subordinate to the Claims of Mirant's general unsecured creditors. The Wisniak Plaintiffs' Allowed Claim will be characterized as a Subordinated Claim and subject to Section 17.3 of the Plan. On September 6, 2005, the superior court approved the settlement and dismissed the class action with prejudice.

### b. Entergy Arkansas and Entergy Services

Entergy Arkansas, Inc. ("EAI") filed a proof of claim against WPF in the amount of $9,095,304.48 (as amended), which is comprised of the following material components: (i) $4,500,000 tax gross-up claim; (ii) $4,100,000 Generator Imbalance Agreement claim; and (iii) miscellaneous claim amounts for approximately $400,000. EAI's tax gross-up claim was based upon that certain Interconnection and Operating Agreement (the "Entergy IOA") between WPF and EAI. The Generator Imbalance Agreement claim also arose out of the Entergy IOA and was based upon penalties allegedly owing on account of discrepancies (or imbalances) between amounts of energy scheduled to be transmitted by the Wrightsville Facility, and the actual output provided by the Wrightsville Facility. Under the Entergy IOA, WPF is owed transmission credits in the amount of $30,912,405.82 as of December 31, 2004, plus any accrued interest allowed by FERC ("Transmission Credits").

On February 13, 2004, EAI filed a motion for relief from stay (as amended on November 23, 2004), pursuant to which EAI sought Bankruptcy Court approval to offset certain amounts EAI owed to WPF (on account of prepetition energy imbalance true-ups and refunds of amounts relating to the Entergy IOA) against amounts allegedly owed by WPF to EAI. The amount EAI owed to WPF which EAI sought to offset was $1,625,252. The Debtors objected to all of the EAI claims above. On January 7, 2005, EAI and WPF entered into a Settlement Agreement with the following material terms: (i) EAI is to immediately pay $1,000,000 to WPF (EAI is permitted to retain $364,391 of the sums owing to WPF); (ii) the Transmission Credits are reduced by $7,272,648, of which, $4,272,649 (as well as certain cash) is subject to refund to WPF, with interest, pending a favorable ruling from the IRS relating to whether certain payments made by WPF to EAI in connection with the Entergy IOA constitute taxable income, thus giving rise to a tax gross-up claim (the "IRS Determination"); (iii) EAI shall have an allowed claim against WPF in the amount of $4,533,509; however, EAI is not entitled to any distribution from the WPF estate on account of such claim as such claim will be satisfied from reduction of certain Transmission Credits and other consideration received under the Settlement Agreement, as appropriate under the Settlement Agreement; and (iv) although the Settlement Agreement contains mutual releases, certain litigation before FERC and the DC Court of Appeals relating to

the Entergy IOA is carved out from the release and will continue, and WPF's right to receive a refund of improperly collected tax gross-up amounts from EAI is also reserved.

### c. Enron/EME EcoElectrica Litigation

In 2001, Mirant, Mirant EcoElectrica Investments I, Ltd. and Puerto Rico Power Investments, Ltd. (collectively, the "Mirant EE Purchasers") sought to obtain the controlling interest in a special purpose limited partnership, EcoElectrica, LP, whose principal asset was a 540 MW electric generation facility in Puerto Rico (the "EcoElectrica Facility"). The acquisition was to take place pursuant to two separate, but cross-contingent, stock purchase agreements (the "SPAs") executed in July 2001. Pursuant to one SPA, subsidiaries of Edison Mission Energy (collectively, "Edison") were to sell a 50% indirect ownership interest in EcoElectrica, LP to the Mirant EE Purchasers, subject to numerous express conditions precedent and other terms. Pursuant to the other SPA, Enron Asset Holdings, LLC, a subsidiary of Enron (collectively, the "Enron Vendors"), was to sell a 47.5% indirect ownership interest in EcoElectrica, LP to the Mirant EE Purchasers, again subject to numerous express conditions precedent and other terms.

Following the Enron Bankruptcy and the failure of closing to occur by December 31, 2001, the Mirant EE Purchasers terminated the SPAs, asserting that the Enron Bankruptcy, and the absence of any approval for the proposed acquisition from the Enron Bankruptcy Court, caused the failure of several conditions precedent to closing the SPAs.

In March 2002, Edison filed suit alleging the Mirant EE Purchasers breached their SPA by failing to complete the acquisition. Enron Vendors and Edison also filed various proofs of claim against the Mirant EE Purchasers, alleging breach of contract and misrepresentations in connection with the Mirant EE Purchasers' decision not to close the acquisition. The Enron Vendors filed various proofs of claim against the Mirant EE Purchasers in the amount of $136,000,000 in liquidated damages (the "Enron Claims"). Edison filed various proofs of claim against the Mirant EE Purchasers requesting either $93,584,063 or $92,797,387 in damages (the "Edison Claims").

On May 11, 2005, the Bankruptcy Court approved an agreement with Edison to settle the Edison Claims, which provides for Edison to have an allowed, prepetition general unsecured claim against Mirant in the amount of $7,000,000 in full satisfaction of the Edison Claims. A settlement agreement with Enron to settle the Enron Claims, which provides for Enron to have an allowed, unsecured claim against Mirant of $12,250,000 in full satisfaction of the Enron claims was approved by the Bankruptcy Court on July 13, 2005 and by the United States Bankruptcy Court for the Southern District of New York, before which the Enron's bankruptcy proceedings are pending, on June 23, 2005.

In addition, Enron and certain of its affiliates (the "Enron Entities") entered into various commodity contracts with various Mirant Affiliates, including MAEM, MAI, Mirant California, MAEC, Mirant Canada and Mirant Europe B.V. The Debtors and their Affiliates filed approximately 20 proofs of claim in the Enron Bankruptcy based on these commodity contracts. Following the Petition Date, the Enron Entities also filed proofs of claim against certain Debtors based on these contracts. On September 7, 2005, the Bankruptcy Court entered an order approving a settlement with the Enron Entities that resolved all issues relating to the commodity contracts and granting the Debtors authority to sell their allowed claims against the Enron Entities. The settlement provides that: (i) MAEM will have an allowed guaranty claim of $50,000,000 against Enron and an allowed general unsecured claim of $53,401,574 against ENA North America Corp.; (ii) Mirant Europe, B.V. will have an allowed general unsecured claim of $7,709,762 against Enron Capital & Trade Resources International Corp.; and (iii) Mirant Europe, B.V. will have an allowed guaranty claim of $7,709,762 against Enron. The settlement also provides that: (i) ENA Upstream Company LLC will have an allowed general unsecured claim of $5,786,198 against MAEM; (ii) Enron Power Marketing, Inc. ("EPMI") will have an allowed general unsecured claim of $10,111,687 against MAEM; and (iii) EPMI may file a proof of claim against MAEM for refunds that FERC may determine to be owed to EPMI arising out of certain sales made by MAEM in the markets administered by the CAISO and the Cal PX.

#### d. Perryville Litigation

As of September 15, 2003, the Debtors rejected the tolling agreement (the "Tolling Agreement") with Perryville Energy Partners, LLC ("Perryville"). Perryville filed claims in excess of $1,000,000,000 against MAEM as a result of the rejection. In addition, Perryville filed claims against both Mirant and MAI in the respective amounts of $175,000,000 and $100,000,000 based on guaranty agreements. MAEM, Mirant and MAI (as well as the Corp Committee and Equity Committee) filed objections to the Perryville claims.

At the time of the rejection, MAI held a subordinated note receivable from Perryville in the face amount of $100,000,000. Under the terms of the subordinated loan, Perryville asserted that its obligations to make payments to MAI are suspended until it has recovered the damages resulting from the rejection of the tolling agreement. In addition, under the subordinated note, Perryville asserted a right to set off obligations under the subordinated note against amounts payable by MAI based on a guaranty of the Tolling Agreement executed in August 2002.

On January 28, 2004, Perryville and its parent company, Perryville Energy Holdings, LLC, filed voluntary petitions for protection under chapter 11 in Alexandria, Louisiana ("Perryville Cases"). The Debtors filed claims in the Perryville Cases based on the unpaid subordinated loan.

The Debtors and Perryville have settled all claims against each other.

In furtherance of the settlement, on or about July 20, 2005, the Debtors and Perryville executed a letter agreement, pursuant to which Perryville acknowledged its consent to immediately offset: (a) Perryville's Allowed Claim of $98,700,000 against MAI against (b) MAI's allowed claim of $98,700,000 against Perryville. As a result of such offset, (i) Perryville's Claim against MAEM has been reduced to $108,300,000, (ii) Perryville's Claim against MAI has been satisfied in full, (iii) Perryville does not have any right to vote on the Plan as an MAI creditor, (iv) Perryville's aggregate recovery on all of its remaining Allowed Claims is limited to the amount of Perryville's Allowed Claim against MAEM ($108,300,000), and (v) MAI's claim against Perryville has been satisfied in full.

On or before August 25, 2005, Perryville sold and assigned its Allowed Claims against MAEM and Mirant to a syndicate of parties led by Credit Suisse. Pursuant to the Settlement Agreement, all of Perryville's assignees are bound by the terms of the Settlement Agreement.

#### e. Kern River Gas Transmission

Kern River Gas Transmission Company ("Kern River") filed a proof of claim in the amount of $153,641,087 (as amended) against MAEM's estate based on damages that allegedly arose from MAEM's rejection of the Firm Transportation Service Agreement, as amended, Contract Number 1712, entered into on or about May 29, 2001, between Kern River and MAEM. The Debtors filed an objection to this proof of claim based upon, among other things, the fact that: (A) Kern River failed to mitigate and reduce the amount of the rejection damages to present value, and (B) Kern River did not hold a secured claim against the Debtors for the rejection damages.

The Bankruptcy Court commenced trial on the objection to the Amended Kern River Claim on May 16, 2005. The trial was concluded on July 8, 2005. On September 21, 2005, the Bankruptcy Court issued an order reducing the claim of Kern River to $74,000,000.

#### 2. Unresolved Disputed Material Claims

#### a. Litigation

##### i. TransCanada

On July 9, 1997, TransCanada Gas Services, Inc. ("TransCanada") entered into a Gas Transportation Contract for Transportation Service with Portland Natural Gas Transmission System Limited ("PNGTS") for capacity for TransCanada to ship natural gas over a pipeline owned and operated by PNGTS. The contracted capacity for the relevant period was 15,000 MMBtu/day. On June 4, 1998, TransCanada entered into a transportation contract assignment and capacity release with Androscoggin Energy LLC. Under this

assignment/release agreement, TransCanada released 11,000 MMBtu/day of the total capacity of 15,000 MMBtu available to Androscoggin (the "Androscoggin Capacity Release"). The term of the Androscoggin Capacity Release is from November 10, 1999 to October 31, 2018.

On October 10, 2001, MCEM and Mirant Americas Energy Marketing Investments, Inc. ("MAEMI") and TransCanada and two of its affiliates entered into a Purchase and Sale Agreement (Margin Business) (the "PSA") under which MAEMI acquired certain assets of TransCanada. In connection with the PSA, on October 10, 2001, Mirant signed a guaranty providing, in part, for the guaranty of the obligations of MCEM and MAEMI to TransCanada under the PSA. MCEM and MAEMII agreed to accept assignment of the Androscoggin Capacity Release as a minor component of the overall transaction involving the PSA and the related obligations.

On November 30, 2001, TransCanada, MAEMI and MAEM executed an Agreement Relating to Purchase and Sale Agreement (Margin) whereby the three signatories agreed, among other things, that MAEM would assume the obligations of MAEMI under the PSA. Further, on December 1, 2001, MAEM and MAEMII entered into a Contribution, Assignment and Assumption Agreement (Margin) and General Conveyance (Margin) whereby MAEMI transferred certain assets purchased from TransCanada to MAEM.

The Debtors rejected all liability arising from or under the assumption and guaranty of the Androscoggin Capacity Release. TransCanada filed Claim No. 8082, asserting, in relevant part, a claim in the amount of $48,376,900 under the Androscoggin Capacity Release. On the same day, TransCanada filed Claim No. 8083 against MAEM asserting an "early termination of contracts." The Debtors filed objections to the claims filed by TransCanada based on, among other things: (A) the lack of damages based on the current performance by Androscoggin; (B) TransCanada's failure to mitigate; (C) section 502(e) of the Bankruptcy Code, and (D) TransCanada's failure to discount any amounts due and owing to the present value. Androscoggin filed for relief under chapter 11 of the Bankruptcy Code at the end of November 2004. Accordingly, the nature, scope, and amount of TransCanada's claims are uncertain. For the purpose of voting under the Plan only, TransCanada's claim has been capped by the Bankruptcy Court at $36,000,000.

TransCanada filed an objection to the Disclosure Statement jointly with Gas Transmission Northwest Corp. The objection requests two primary proposals for inclusion: (i) the Disclosure Statement should provide complete disclosures related to the cash-equivalent value of the proposed payout to unsecured creditors so that unsecured creditors may understand exactly what the Debtors propose to pay them under the New Plan and (ii) the Disclosure Statement should provide complete disclosure of issues relating to the proposed substantive consolidation under the Plan. The Debtors believe that the Disclosure Statement as amended provides adequate information with respect to the matters raised by TransCanada and Gas Transmission Northwest Corp.

### ii. Lehman Commercial Paper Inc. and Wells Fargo Bank, N.A. Litigation

On December 16, 2003, Lehman Commercial Paper Inc. ("Lehman"), as agent for various lenders under certain prepetition credit agreements, filed a claim against MAG. On December 15, 2003, Wells Fargo Bank, N.A. ("Wells Fargo") also filed claims as successor indenture trustee for bond indebtedness under a certain indenture against MAG. In addition to their original claims, on or about that same date, Lehman and Wells Fargo filed contingent, unliquidated supplemental claims against MAG and a number of other Debtors (the "Supplemental Claims") seeking recovery of principal, interest, fees and costs under the MAG loan documents and bond documents, respectively. In their Supplemental Claims, Lehman and Wells Fargo essentially seek to preserve certain alleged causes of action which, if they exist, are derivative claims of the Debtors' respective bankruptcy estates or personal claims of MAG creditors.

On November 3, 2004, the Debtors objected to the Supplemental Claims against MAG and such other Debtors on the grounds that: (A) Lehman and Wells Fargo lack standing to pursue the Supplemental Claims which are derivative claims belonging to each respective Debtor's estate; (B) there is no factual basis for any of the "potential" causes of action against MAG and no basis whatsoever for the claims against any other Debtors, and (C) the Supplemental Claims are duplicative and contingent.

The Bankruptcy Court issued an order on April 12, 2005, ruling that: (A) the Supplemental Claims will be withdrawn without prejudice; (B) the Bar Date will be extended for the Supplemental Claims, to the extent that they are not property of the Estates of or derivative of a Debtor, through the date of confirmation of a plan of reorganization; (C) to the extent the Supplemental Claims are derivative, the rights of Lehman, Wells Fargo or any other party in interest to assert the Supplemental Claims or any issue relating thereto in connection with the confirmation of a plan of reorganization are preserved and (D) the rights of Lehman, Wells Fargo and the MAG Committee to seek leave to assert the Supplemental Claims would be preserved.

### iii. Mirant 4-Year Revolver and L/C Agreement Litigation

On December 16, 2003, the 4-Year Agent, on behalf of the lenders under the Mirant 4-Year Revolver, and Wachovia Bank, National Association, as issuing bank ("Wachovia"), each filed proofs of claim (the "L/C Claims") against Mirant in the aggregate amount of approximately $1,017,000,000.00 based upon, among other things, amounts owing on account of revolving credit advances and letters of credit issued under the Mirant 4-Year Revolver. Wachovia also filed proofs of claims (the "Wachovia L/C Claims") against certain other Debtors, including MAEM (the "Subsidiary Debtors"), for which Mirant had caused the issuance of certain prepetition letters of credit. The Debtors have not objected to the L/C Claims filed against Mirant, but do object to the claims asserted against the Subsidiary Debtors.

On October 27, 2004, after the expiration of the Initial Bar Date Order, the 4-Year Agent amended the Wachovia L/C Claims (the "Amended L/C Claims"), stating that Wachovia had nominated the 4-Year Agent as its attorney-in-fact for all purposes pursuant to a revocable power of attorney to deal with the Amended L/C Claims. The Amended L/C Claims assert, among other things, subrogation rights against the Subsidiary Debtors, entitlements to Administrative Claims, and entitlements to the return of excess L/C proceeds not utilized to satisfy the Debtors obligations to L/C beneficiaries. The 4-Year Agent and Wachovia also assert that certain letters of credit were improperly drawn and that the 4-Year Agent and Wachovia are entitled to the return of any proceeds derived from such improperly drawn letters of credit. The Debtors dispute such assertions.

In connection with the Debtors' objections to the Amended L/C Claims, the Debtors filed five summary judgment motions asserting, among other things, that, as a matter of law, no rights of subrogation, entitlement to Administrative Claims or to the return of excess letter of credit proceeds existed, and, even if these rights had existed, such rights were waived, both by order and by the conduct of the parties, in connection with the letter of credit extensions approved by the Bankruptcy Court. On February 17, 2005, the 4-Year Agent withdrew its request for Administrative Claim treatment. On July 21, 2005, the Bankruptcy Court issued an order in respect of the Debtors' summary judgment motions determining that the 4-Year Agent and Wachovia were not entitled to any of the proceeds from drawn L/Cs that had been returned to the Debtors. Additionally, the Bankruptcy Court determined that its order entered in connection with the letter of credit extensions did not bar the claimants' subrogation claims. With respect to subrogation, waiver by conduct and certain other matters, however, the Bankruptcy Court determined that a trial on the merits was necessary, and certain other issues raised in the summary judgment motions have not yet been addressed by the Bankruptcy Court. Although the parties continue to engage in settlement discussions, no agreement has been reached and the resolution of these claims remains subject to further litigation.

If the claimants' attempts to assert subrogation rights are ultimately successful, the claimants will be permitted to assert subrogation claims directly against the applicable Subsidiary Debtor and may be able to assert such subrogation claims against the applicable Subsidiary Debtors and reimbursement claims against Mirant concurrently, providing potentially two sources for recoveries. However, the aggregate face amount of claims will not increase as compared with those properly asserted against Mirant as contractual reimbursement claims under the Mirant 4-Year Revolver. For this reason, the claimants, if successful, may contest the settlement and compromise embodied in the Plan that provides for the treatment of Debtor Groups as single Estates for the purposes of, among other things, distributions.

As of September 15, 2005, Mirant owed approximately $581,600,000 on account of revolving credit advances and previous letter of credit draws and approximately $183,445,000 in letters of credit remained outstanding.

102

### iv. Bayerische Hypo Und Vereinsbank, Cayman Branch

On October 11, 2001, MAEM entered into a swap agreement (the "Swaps") with each of HVB Risk Management Products, Inc. ("HVB Risk Management") and Scarlett Resource Merchants LLC. MAEM's obligations under the Swaps were guaranteed by Mirant pursuant to the Guarantees dated October 11, 2001 (the "Guarantees"). All of the parties' rights, title and interest to the amounts payable under the Swaps and the Guarantees were subsequently assigned to Bayerische Hypo Und Vereinsbank, Cayman Branch ("HVB"). On December 15, 2003, HVB filed proofs of claim: (A) against MAEM for $222,913,568.10 based on the Swaps (the "HVB-MAEM Claim"); and (B) against Mirant for $222,913,568.10 based on the Guarantees (the "HVB-Mirant Guarantee Claim" and, collectively with the "HVB-MAEM Claim," the "HVB Claims"). The Debtors filed their Tier IV Objection to the HVB Claims on June 17, 2005.

The Debtors have negotiated a stipulation with HVB (the "HVB Stipulation") with respect to the HVB Claims. Under the HVB Stipulation, HVB will receive an Allowed Mirant Debtor Class 3 — Unsecured Claim in the principal amount of $222,913,568 as well as accrued interest on such principal amount at the non-default imputed contract rate of 5.0624% as of the Petition Date. In the event the Debtors are substantively consolidated, no holder of a claim similar to the HVB Claims will receive treatment more favorable than the treatment afforded to the HVB Claims. In exchange, HVB has agreed to withdraw its formal and informal objections to the Disclosure Statement, with prejudice, and to support the Plan, as amended. On September 19, 2005, the Debtors filed a motion for approval of that settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. The Bankruptcy Court approved the HVB Stipulation by order entered September 28, 2005.

### v. Deutsche Bank Securities Inc.

On July 30, 2001, MAI entered into (a) a purchase agreement (the "SHC Purchase Agreement") with Shady Hills Holding Company, L.L.C. ("SHC"); and (b) a purchase agreement (the "Mesquite Purchase Agreement," together with the SHC Purchase Agreement, the "Purchase Agreements") with Mesquite Investors, L.L.C. ("Mesquite"). MAI's obligations under the Purchase Agreements were guaranteed by Mirant (a) in favor of SHC in a guaranty dated October 12, 2001 (the "SHC Guaranty"); and (b) in favor of Mesquite in a guaranty dated October 4, 2001 (the "Mesquite Guaranty"). On December 16, 2003, SHC filed four proofs of claim, each in the amount of $15,750,000, against Mirant, MAI and MAG (the "SHC Claims") based on amounts allegedly owing under the SHC Purchase Agreement and SHC Guaranty. Mesquite filed four proofs of claim, each in the amount of $29,250,000, against Mirant, MAI and MAG (the "Mesquite Claims", and together with the SHC Claims, the "DBSI Claims") based on amounts allegedly owing under the Mesquite Purchase Agreement and the Mesquite Guaranty.

Both SHC and Mesquite assigned the DBSI Claims to Deutsche Bank Securities Inc. ("DBSI") on September 30, 2004. The Debtors filed an objection to these claims on June 17, 2005 (as amended on July 12, 2005). Additionally, Debtors commenced an adversary proceeding (Adv. Case No. 05-04143) against Mesquite, SHC and DBSI (the "Adversary Proceeding") seeking to avoid certain obligations of the Debtors and recover certain payments made by the Debtors in the above-described transactions (the "DBSI Adversary"). DBSI filed both an informal objection and formal objection to the Disclosure Statement (collectively, the "DBSI Disclosure Statement Objections").

The Debtors have negotiated a stipulation with DBSI with respect to the DBSI Claims (the "DBSI Stipulation"). Under the DBSI Stipulation, DBSI will receive an Allowed Mirant Debtor Class 3 — Unsecured Claim (the "DBSI Allowed Claim") in the principal amount of $53,000,000 which includes both principal and interest at a floating rate equal to the sum of the Prime Rate plus 200 basis points from the Petition Date through December 31, 2005. In the event the Effective Date has not occurred by December 31, 2005, the DBSI Allowed Claim will continue to accrue interest through and including the Effective Date. Additionally, no holder of a claim similar to the DBSI Claims will receive treatment more favorable than the treatment afforded to the DBSI Claims. In exchange, DBSI has agreed to withdraw its formal and informal objections to the Disclosure Statement and to support the Disclosure Statement and confirmation of the Plan. On September 20, 2005, the Debtors filed a motion for approval of the DBSI Stipulation pursuant to

Rule 9019 of the Bankruptcy Rules. The Bankruptcy Court approved the DBSI Stipulation by order entered September 28, 2005.

### vi. Montana Attorney General Suit

On June 30, 2003, the Montana Attorney General and Flathead Electric Cooperative, Inc. filed a suit in the First Judicial District of Montana, County of Lewis and Clark, against various owners of generating facilities and marketers of electricity and natural gas in western states, including Mirant, alleging that the defendants had engaged in unlawful and unfair business practices in 2000 and 2001 involving the sale of wholesale electricity and natural gas and had manipulated the markets for wholesale electricity and natural gas. The plaintiffs have neither served Mirant, nor filed a proof of claim. The plaintiffs will not receive an Allowed Claim or Plan Distribution on account of any facts or circumstances arising from or related to this suit and any such Claim will be discharged in accordance with the Plan, and such holder thereof enjoined from proceeding with any Claim related to or arising from this suit.

### vii. Other Disputed Material Claims

The Debtors expect to resolve the following additional disputed material claims through settlement or trial:

- Freeman Mathis/Joseph Pokalsky ("Pokalsky"): Prior to the Petition Date, Mr. Pokalsky filed a state lawsuit in Georgia state court based on the alleged wrongful termination of Pokalsky's employment. Pokalsky filed three separate claims against Mirant, MAEM and Mirant Services seeking $10,000,000 to $15,000,000 based on that lawsuit. The Debtors thereafter filed an objection to these claims and a motion for summary judgment seeking disposition of these claims. Pokalsky filed a response in opposition to the Debtors' motion for summary judgment. On July 12, 2005, the Bankruptcy Court issued a memorandum opinion: (i) denying summary judgment for Pokalsky's claim for breach of contract; and (ii) granting summary judgment for Pokalsky's claims for defamation and conversion of personal belongings.

- Algonquin Gas Transmission Company ("Algonquin"): Algonquin filed approximately $10,000,000 in claims alleging damages for MAEM's rejection of a gas transportation agreement.

- Pension Benefit Guaranty Corporation ("PBGC"): Mirant Services, and all members of its controlled group, within the meaning of 29 U.S.C. § 1301(a)(14), including any other Debtors that are members of the controlled group, are obliged to contribute to the Pension Plans at least the amounts necessary to satisfy ERISA's minimum funding standards, found in ERISA section 302 and Internal Revenue Code section 412. The PBGC, a U.S. Government corporation which guarantees the payment of certain pension benefits upon termination of a pension plan has taken the position that in the event of a termination of the Pension Plans, the Debtors may be jointly and severally liable for the unfunded benefit liabilities of the Pension Plans. The Pension Plans may be terminated only under certain circumstances and in compliance with applicable law.

  The Debtors intend to continue funding and maintaining the Pension Plans and such plans will not be terminated under the Plan. The Debtors project that the minimum funding amounts related to the Pension Plans will be approximately $15,000,000 per year, on average, through 2012. The Debtors are current in their payment obligations (including all administrative expenses and minimum funding payments) required with respect to the Pension Plans.

The Plan contemplates that the Debtors will assume the benefit plans related to the Claims filed by the PBGC. Accordingly, the Debtors expect that the PBGC will withdraw its proofs of claim filed against each of the Debtors' estates.[1]

• The disputed, material claims for which the Debtors could assert counterclaims as set forth in "Material Claims, Litigation and Investigations — Disputed Claims With Associated Estate Causes of Action."

### b. Government Proceedings for Which No Proof of Claim Was Filed

#### i. Department of Justice Inquiries

In 2002, Mirant was contacted by the DOJ regarding the Company's disclosure of accounting issues, energy trading matters and allegations, contained in an amended complaint filed in securities litigation pending against Mirant, that Mirant improperly destroyed certain electronic records related to its activities in California. The Company was asked to provide copies of the same documents requested by the SEC in its investigation described below in "Securities and Exchange Commission Investigation." The DOJ has advised Mirant that it has closed this investigation.

In November 2002, Mirant received a subpoena from the DOJ, acting through the United States Attorney's Office for the Northern District of California, requesting information about its activities and those of its subsidiaries for the period since January 1, 1998. The subpoena requested information related to the California energy markets and other topics, including the reporting of inaccurate information to the trade press that publish natural gas or electricity spot price data. The subpoena was issued as part of a grand jury investigation. Mirant has continued to receive additional requests for information from the United States Attorney's Office, and it intends to continue to cooperate fully with the United States Attorney's Office in this investigation.

#### ii. Securities and Exchange Commission Investigation

In August 2002, Mirant received a notice from the Division of Enforcement of the SEC that it was conducting an investigation of Mirant. The Division of Enforcement asked for information and documents relating to various topics such as accounting issues (including accounting issues announced by Mirant on July 30, 2002 and August 14, 2002), energy trading matters (including round trip trades), Mirant's accounting for transactions involving special purpose entities, and information related to shareholder litigation. In late June 2003, the Division of Enforcement advised Mirant that its investigation of Mirant had become a formal investigation in February 2003. On May 11, 2005, the SEC staff notified Mirant that its investigation had been terminated and that no enforcement action had been recommended.

#### iii. Department of Labor Inquiries

On August 21, 2003, Mirant received a notice from the Department of Labor (the "DOL") that it was commencing an investigation pursuant to which it was undertaking to review various documents and records relating to the Company's 401(k) plans. The DOL also has interviewed Mirant personnel regarding those plans. The Company intends to continue to cooperate fully with the DOL.

#### iv. Montana Public Service Commission

On February 12, 2004, the Montana Public Service Commission initiated an investigation of the Montana retail electricity market affected by transactions involving the western electricity grid. The purpose of the investigation is to determine whether there is evidence of unlawful manipulation of that market related to the high prices for electricity in the western wholesale markets that occurred in 2000 and 2001.

---

[1] Mirant Services has established and maintained two pension plans for certain of its employees: The Mirant Services Pension Plan (the "Non-Bargaining Unit Pension Plan"), and the Mirant Services Pension Plan for Bargaining Unit Employees (the "Bargaining Unit Pension Plan") (collectively, the "Pension Plans"). The Pension Plans are covered by Title IV of the ERISA (29 U.S.C. §§ 1301 et seq.).

### 3. Environmental Liabilities

#### a. Mirant Lovett 2003 Consent Decree

On June 11, 2003, Mirant New York, Inc. ("Mirant New York"), Mirant Lovett and the State of New York entered into, and filed for approval with the United States District Court for the Southern District of New York, a consent decree that released Mirant Lovett from all potential liability for matters addressed in a notice of violation previously issued by the State of New York to Orange and Rockland Utilities, Inc. and for any other potential violation of NSRR or related New York air laws prior to and through the date of entry of the consent decree by the court. Under the decree, Mirant Lovett committed to either shut down a unit or install on Lovett's two coal fired units, by 2007 through 2008: (i) emission control technology consisting of selective catalytic reduction technology to reduce NOx emissions; (ii) alkaline in-duct injection technology to reduce sulfur dioxide emissions; and (iii) a baghouse. The cost of the emission controls prescribed by the consent decree will likely exceed $100,000,000. The consent decree was approved by the Bankruptcy Court on October 15, 2003. Under the consent decree, Mirant New York was required to notify the State of New York by August 1, 2004 whether (i) it would convert Lovett Unit 5 to natural gas, install control technology on the unit or discontinue its operation; and (ii) whether it would install a baghouse on Lovett Unit 4 or Unit 5 to reduce particulate emissions. The State of New York subsequently agreed to a one year extension of this notice requirement. On June 10, 2005, Mirant New York requested a further extension of the notification deadline pursuant to the force majeure provisions of the consent decree.

#### b. EPA Information Request

In January 2001, the EPA issued a request for information to Mirant concerning the air permitting and air emissions control implications under the NSRR of past repair and maintenance activities at Mirant Potomac's plant in Virginia and MAG's Chalk Point, Dickerson and Morgantown plants in Maryland. The requested information concerns the period of operations that predates Mirant's ownership or lease of the plants. Mirant has responded fully to this request. Under the sales agreement with Pepco for those plants, Pepco is responsible for fines and penalties arising from any violation associated with historical operations prior to Mirant's acquisition or lease of the plants. If a violation is determined to have occurred at any of the plants, the Mirant entity owning or leasing the plant may be responsible for the cost of purchasing and installing emissions control equipment, the cost of which may be material. If such violation is determined to have occurred after Mirant acquired or leased the plants or, if occurring prior to the acquisition, is determined to constitute a continuing violation, the Mirant entity owning or leasing the plant at issue would also be subject to fines and penalties by the state or federal government for the period subsequent to its acquisition or lease of the plant, the cost of which may be material.

#### c. Potomac River Notice of Violation

On September 10, 2003, the Virginia Department of Environmental Quality (the "Virginia DEQ") issued a NOV to Mirant Potomac alleging that it violated its Virginia Stationary Source Permit to Operate by emitting NOx in excess of the "cap" established by the permit for the 2003 summer ozone season. Mirant Potomac responded to the NOV by asserting that: (i) the cap was unenforceable; (ii) it could comply through the purchase of emissions credits, and (iii) other equitable defenses apply. Virginia's civil enforcement statute provides for injunctive relief and penalties. On January 22, 2004, the EPA issued a NOV to Mirant Potomac alleging the same violation of its Virginia Stationary Source Permit to Operate as set out in the NOV issued by the Virginia Department of Environmental Quality.

On September 27, 2004, Mirant Potomac, MIRMA, the Virginia DEQ, the Maryland Department of the Environment, the DOJ and the EPA entered into, and filed for approval with the United States District Court for the Eastern District of Virginia, a consent decree that, if approved, will resolve Mirant Potomac's potential liability for matters addressed in the NOVs previously issued by the Virginia DEQ and the EPA. The consent decree requires Mirant Potomac and MIRMA to: (i) install pollution control equipment at Mirant Potomac's Potomac River plant and the Morgantown plant leased by MIRMA in Maryland; (ii) comply with declining system-wide ozone season NOx emissions caps from 2004 through 2010; (iii) comply with system-wide annual NOx emissions caps starting in 2004; (iv) meet seasonal system average emissions rate targets in 2008; and

(v) pay civil penalties and perform supplemental environmental projects in and around the Potomac River plant that are expected to achieve additional environmental benefits. Except for the installation of the controls planned and completed for the Potomac River units and the installation of selective catalytic reduction ("SCR") or equivalent technology at MIRMA's Morgantown Units 1 and 2 in 2007 and 2008, the consent decree does not obligate the Mirant entities to install specifically designated technology, but rather to reduce emissions sufficiently to meet the various NOx caps. Moreover, as to the required installations of SCRs at Morgantown, MIRMA may choose not to install the technology by the applicable deadlines and leave the units off either permanently or until such time as the SCRs are installed. The aggregate amount of the civil penalties to be paid and costs to be incurred by Mirant Potomac for the supplemental environmental projects is $1,500,000. The consent decree remains subject to the approval of the district court and the Bankruptcy Court.

The MIRMA Owner/Lessors have filed an objection to the Consent Decree in the Bankruptcy Court and filed a Motion for Leave to Intervene in the district court action. The Mirma Owner/Lessors' primary objection is that the Mirma Owner/Lessors, not the Debtors, own the Morgantown and Dickerson plants. Additionally, the Mirma Owner/Lessors argue that the consent decree unjustly imposes financial hardships on the Mirma Owner/Lessors and significantly affects the economic value of the Morgantown and Dickerson plants by requiring capital investments to install pollution control equipment and imposing significant operating limitations. In part, in response to the objections of the Mirma Owner/Lessors, the Debtors are currently working with the EPA, the Virginia DEQ, and the MDE to amend the consent decree to facilitate its approval and implementation.

The Plan contemplates various restructuring transactions, including, under certain circumstances, the creation of MD Leaseco as a wholly owned subsidiary of MIRMA and the assignment of the MIRMA Leases and the assets related to the Morgantown and Dickerson plants to MD Leaseco. See "The Chapter 11 Plan — Executory Contracts and Unexpired Leases — Special Provisions Relating to the MIRMA Leases." The Debtors anticipate that MD Leaseco will assume, and MIRMA will not remain liable with respect to, the obligations under the consent decree in the event of the assumption and assignment of the MIRMA Leases to MD Leaseco.

### d. Consent Order Regarding Downwash Modeling[1]

On September 23, 2004, the Virginia DEQ and Mirant Potomac entered into an order by consent with respect to the Potomac River plant under which Mirant Potomac agreed to perform a modeling analysis to assess the effect of "downwash" from the plant: (i) on ambient concentrations of $SO_2$, $NO_2$, carbon monoxide ("CO"), and particulate matter less than or equal to 10 micrometers ("PM10") for comparison to the applicable national ambient air quality standards ("NAAQS"), and (ii) on ambient concentrations of mercury for comparison to Virginia Standards of Performance for Toxic Pollutants. Downwash is the effect that occurs when aerodynamic turbulence induced by nearby structures causes pollutants from an elevated source, such as a smokestack, to be mixed rapidly toward the ground resulting in higher ground level concentrations of pollutants. If the modeling analysis indicates that emissions from the facility may cause exceedances of the NAAQS for $SO_2$, $NO_2$, CO or PM10, or exceedances of mercury compared to Virginia Standards of Performance for Toxic Pollutants, the consent order requires Mirant Potomac to submit to the Virginia DEQ a plan and schedule to eliminate and prevent such exceedances on a timely basis. Upon approval by the Virginia DEQ of the plan and schedule, the approved plan and schedule is to be incorporated by reference into the consent order. The results of the computer modeling analysis showed that emissions from the Potomac River plant have the potential to contribute to localized, modeled instances of exceedances of the NAAQS for $SO_2$, $NO_2$, and PM10 under certain conditions. In response to a directive from the Virginia DEQ, Mirant Potomac River temporarily shut down the Potomac River facility on August 24, 2005 pending identification and implementation of modifications to the facility or its operations, which modifications could be material. On September 21, 2005, Mirant Potomac River commenced partial operation of one unit of the facility. The financial and operational implications of the discontinued operation of the Potomac River plant or

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

any such modifications are not known at this time. See "Financial Projections and Assumptions — Temporary Shut Down of Potomac River Station".

### e. New York Opacity Issue

On October 20, 2004, the Region 3 Staff of the New York State Department of Environmental Conservation ("NYSDEC") filed a complaint against Mirant Bowline, Mirant Lovett and Mirant New York, Inc. The complaint alleges that the generating facilities owned by Mirant Bowline and Mirant Lovett violated Article 19 of New York's Environmental Conservation Law and regulations promulgated pursuant to that law by violating opacity standards set for smoke emissions on more than 100 occasions between the second quarter of 2002 and the first quarter of 2004. The complaint seeks a cease and desist order and fines of $1,960,000 against the Mirant defendants.

On June 8, 2005, Mirant Lovett, Mirant Bowline, Mirant New York and the NYSDEC entered into a order decree that resolved the complaint. The consent order provides that the Mirant defendants must report all excess opacity incidents and establishes penalties for such "exceedances" occurring after January 1, 2005. Additionally, the Mirant defendants paid a penalty of $44,100 for emissions violations occurring prior to January 1, 2005. The consent order was approved by the Bankruptcy Court on August 17, 2005.

### f. New York Lovett CAMF

On July 8, 2004, as supplemented on January 19, 2005, the NYSDEC issued a NOV to Mirant Lovett for alleged improper closure techniques used for the coal ash management facility located at the Lovett generating facility. On May 16, 2005, the NYSDEC staff filed a complaint with the NYSDEC against Mirant Lovett and Mirant New York based on the allegations of improper closure techniques. The complaint seeks a civil penalty of $100,000 and an order requiring Mirant Lovett to make certain equipment enhancements and to provide a letter of credit to cover estimated closure and post-closure costs and to make certain informational filings. The outcome of this proceeding cannot now be determined.

### g. New York Dissolved Oxygen

On September 29, 2003, the NYSDEC issued a complaint to Mirant New York for alleged failure to comply with state regulatory standards for minimum dissolved oxygen in the Mongaup River at the Swinging Bridge, Mongaup Falls and Rio hydroelectric projects owned by Mirant NY-Gen. The complaint sought a civil penalty of $120,000 and an order requiring Mirant New York to upgrade the three hydroelectric projects to prevent further discharges that do not meet the standards for minimum dissolved oxygen. In its complaint, the NYSDEC proposed that $100,000 of the $120,000 penalty it was seeking be suspended on the condition that Mirant New York complete corrective actions for each facility by a certain schedule it proposed. On June 1, 2004, Mirant New York filed an answer and motion to dismiss on grounds including that Mirant New York is not the owner of the hydroelectric projects. Mirant New York granted an extension of time to allow the NYSDEC to respond.

### h. City of Alexandria Zoning Action

On December 18, 2004, the City Council for the City of Alexandria, Virginia (the "City Council") adopted certain zoning ordinance amendments recommended by the City Planning Commission which result in the change of the zoning status of Mirant Potomac's generating plant from "noncomplying use" to "nonconforming use subject to abatement." Under the nonconforming use status, unless Mirant Potomac applies for and is granted a special use permit for the plant during the seven-year abatement period, the operation of the plant must be terminated within a seven-year period, and no alterations that directly prolong the life of the plant will be permitted during the seven-year period. Typically, the City Council grants special use permits with various conditions and stipulations as to the permitted use.

During its December 18, 2004 meeting, the City Council also approved revocation of two special use permits issued in 1989 (the "1989 SUPs"), one applicable to the administrative office space at Mirant Potomac's plant and the other for the plant's transportation management plan. Under the terms of the approved action, the revocation of the 1989 SUPs was to take effect 120 days after the City Council revocation, provided, however, that if Mirant Potomac, within such 120-day period, filed an application for the