necessary special use permits to bring the plant into compliance with zoning ordinance provisions then in effect, the effective date of the revocation of the 1989 SUPs would be stayed until final decision by the City Council on such applications. The approved action further provides that if such special use permit application is approved by the City Council, revocation of the 1989 SUPs will be dismissed as moot, and if the City Council does not approve the application, the revocation of the 1989 SUPs will become effective and the plant will be considered a nonconforming use subject to abatement. On July 7, 2005, the Circuit Court for the City of Alexandria entered a consent order agreed to by the City of Alexandria and Mirant Potomac in the suit described in the next paragraph that extends through October 17, 2005 the period within which Mirant Potomac may file an application for the necessary special use permit.

On January 18, 2005, Mirant Potomac and MIRMA filed a complaint against the City of Alexandria and the City Council in the Circuit Court for the City of Alexandria. The complaint seeks to overturn the actions taken by the City Council on December 18, 2004 changing the zoning status of Mirant Potomac's generating plant and approving revocation of the 1989 SUPs, on the grounds that those actions violated federal, state and city laws. The complaint asserts, among other things, that the actions taken by the City Council constituted unlawful spot zoning, were arbitrary and capricious, constituted an unlawful attempt by the City Council to regulate emissions from the plant, and violated Mirant Potomac's due process rights. Mirant Potomac and MIRMA request the court to enjoin the City of Alexandria and the City Council from taking any enforcement action against Mirant Potomac or from requiring it to obtain a special use permit for the continued operation of its generating plant.

Certain proceedings before the City Council in June 2004 also referred to the possible institution by the City of Alexandria of a suit against Mirant Potomac for violation of the Clean Air Act based on the allegations underlying the NOVs issued by the Virginia DEQ on September 10, 2003 and the EPA on January 22, 2004. Any such suit, however, would require further approval of the City Council before being instituted. The City Council also authorized the City of Alexandria to file an objection to any plan of reorganization that the Debtors file in the Chapter 11 Cases that includes the continued operation of the Mirant Potomac plant. These NOVs are the subject of a proposed consent order as described in "Material Litigation, Claims and Investigations — Detailed Description of Material Claims — Environmental Liabilities."

### i. Mirant NY-Gen Pipeline Leak

In the fall of 2003, Mirant NY-Gen, LLC discovered a leaking underground pipeline at the Hillburn generating facility in Ramapo, New York. The underground line was used for supplying kerosene fuel to the gas turbines located on site. After confirmatory testing revealed a potential leak, the line was removed from service and plans were undertaken to excavate and sample portions of the line to determine the extent of the line damage and the possible soil contamination. Upon initial discovery the leak was reported to the NYSDEC and the Rockland County Health Department. In the summer of 2004, soil contamination was discovered and a subsequent testing of portions of the line revealed a small hole. Currently, investigations are continuing to determine the extent of contamination. Additionally, Mirant NY-Gen is working under the direction of the NYSDEC to remove all free product contamination from the groundwater and undertake remediation actions for additional onsite and offsite contamination. The current estimate of the cost of cleanup is greater than $1,000,000; however, due to the ongoing evaluation to determine the extent of the contamination, the exact cost of remediation is unknown at this time.

On May 19, 2005, the NYSDEC filed a complaint seeking an order requiring Mirant NY-Gen, LLC to implement its approved remediation plan, to pay all costs relating to the cleanup (including all costs incurred by the NYSDEC), and to pay a civil penalty of $100,000. On August 1, 2005, Mirant NY-Gen and the NYSDEC entered into a consent order regarding the remediation of the pipeline leak. The remediation consent order provides that Mirant NY-Gen, LLC will: (i) determine to what extent, if any, the leak impacted the groundwater in the area of the Hillburn facility and (ii) design and install equipment to remediate impacted soil and groundwater.

Mirant NY-Gen, LLC has negotiated a second consent order with the NYSDEC that would govern penalties and cost reimbursement to the NYSDEC relating to the remediation of the Hillburn facility. Mirant NY-Gen, LLC and the NYSDEC have generally agreed that, pursuant to the second consent order, Mirant

NY-Gen, LLC will: (i) pay a penalty of $50,000; (ii) reimburse the NYSDEC for costs to date and future costs in an amount not to exceed $20,000; and (iii) pay costs associated with an independent, third-party environmental audit of the Hillburn facility (which is estimated to cost approximately $35,000).

The consent orders have been filed with the Bankruptcy Court. The Bankruptcy Court is scheduled to hold a hearing to approve the first consent order, and approve entering into the second consent order, on September 21, 2005.

### j. New York Oil Storage Assessment

Mirant Bowline and Mirant Lovett have undertaken a program to review compliance associated with oil storage at the Lovett and Bowline facilities. As part of the project, Mirant Bowline and Mirant Lovett are preparing complete tank inventories and condition assessments according to operating requirements outlined in the state and federal regulations, including: (i) an assessment and confirmation of key design parameters such as adequacy of secondary capacity, containment structure, size and permeability resistance; (ii) a review of the facility's SPCC plans for Lovett and Bowline; and (iii) an inspection program of the tank farms at Lovett and Bowline to insure compliance with necessary regulations. A number of outside contractors, consultants and engineers have been retained to facilitate this work.

Results of the Lovett assessment indicate the secondary containment capacity may not be adequate for the design capacity of the tanks although it is sufficient for the working volume. Additionally, it appears that up to 10% of the liner requires repair. At Bowline, the secondary containment is adequate; however, an evaluation of the liner permeability is currently being undertaken. As a result of the ongoing evaluations, the cost of repair for the facilities is unknown at this time.

### k. Riverkeeper Suit Against Mirant Lovett

On March 11, 2005, Riverkeeper, Inc. filed suit against Mirant Lovett, LLC in the United States District Court for the Southern District of New York (the "SDNY Court") under the Federal Water Pollution Control Act (the "Clean Water Act"). The suit alleges that Mirant Lovett's failure to implement a marine life exclusion system at its Lovett generating plant and to perform monitoring for the exclusion of certain aquatic organisms from the plant's cooling water intake structures violated Mirant Lovett's water discharge permit issued by the State of New York. On April 20, 2005, the SDNY Court approved a stipulation agreed to by the plaintiff and Mirant Lovett that stays the suit until 60 days after entry of a final and non-appealable order by the Bankruptcy Court confirming a plan of reorganization for Mirant Lovett.

### 4. Western Ratepayer Litigation

Various lawsuits were filed in 2000 through 2003 that asserted claims under California law based on allegations that certain owners of electric generation facilities in California and energy marketers, including Mirant, MAEM and several MAG subsidiaries, engaged in various unlawful and anti-competitive acts that served to manipulate the Western wholesale power markets.

### a. Prepetition Litigation For Which Claims Have Been Filed

### i. Wholesale Electricity Antitrust Cases I & II

Six suits were filed between November 27, 2000 and May 2, 2001 in various California Superior Courts. Three of these suits seek class action status, while two of the suits are brought on behalf of all citizens of California. Those suits were coordinated in *Wholesale Electricity Antitrust Cases I & II*, JCCP, Nos. 4204 and 4205, for purposes of pretrial proceedings before the Superior Court for San Diego County. Plaintiffs filed a master complaint on March 8, 2002 (the "Master Complaint") describing the claims in all of these suits, and alleging that defendants' anticompetitive conduct damaged class members in excess of $1,000,000,000.

Two plaintiffs in these suits, Oscar's Photo Lab and Mary L. Davis, filed proofs of claim (the "Oscar Claims") on behalf of themselves and a purported class of all persons or entities in California who purchased electricity or natural gas for purposes other than for resale or distribution at any time since January 1, 1999. These claimants alleged that various misconduct by Mirant and several of its subsidiaries caused inflated prices in the wholesale power markets. The Debtors filed an objection to the Oscar Claims and a motion pursuant to

Bankruptcy Rule 7012(f) requesting that the Bankruptcy Court strike the portions of the Oscar Claims that purported to have been filed on behalf of unnamed absent members of a purported class. On December 1, 2004, the Bankruptcy Court granted this motion, disallowing the Oscar Claims, with prejudice, to the extent they sought to recover on account of any claims other than the claims of Oscar's Photo Labs and Mary L. Davis in their individual capacities.

On March 9, 2005, the Bankruptcy Court issued an order approving a stipulation entered into by the Debtors with Oscar's Photo Lab and Mary L. Davis entitling each of the two named plaintiffs to receive an allowed, general, prepetition unsecured claim against MAEM in the amount of $1,000. No other putative plaintiffs will receive a Claim or Plan Distribution on the account of any of the facts or circumstances arising from or related to the Master Complaint and/or Oscar Claims and any such Claim will be discharged in accordance with the Plan and such holder thereof enjoined from proceeding with any Claim related to or arising from the Master Complaint and/or Oscar Claims.

### ii. Bustamante Litigation

On November 20, 2002, California Lieutenant Governor Cruz Bustamante ("Bustamante") filed a claim against several sellers and marketers of natural gas and gas price indices publishers in a lawsuit styled *Bustamante v. McGraw Hill Cos., Inc.*, BC285598, in the Superior Court of the State of California, County of Los Angeles. The suit alleged that defendants conspired to report false and fraudulent information regarding natural gas transactions to publishers of natural gas indices in order to manipulate those indices.

Paul R. Kiesel ("Kiesel") filed proofs of claim as attorney for Cruz Bustamante and putative class members (the "Bustamante Claims") in the total amount of $500,000,000 and attached to his claims the original and first amended complaints filed in the California Superior Court action.

The Debtors objected to the Bustamante Claims and filed a motion with the Bankruptcy Court pursuant to Bankruptcy Rule 7012(f) requesting that the Bankruptcy Court strike the portions of the Bustamante Claims that purported to have been filed on behalf of unnamed absent members of a purported class. The Bankruptcy Court granted this motion on the same grounds as it granted the Oscar Claims, disallowing the Bustamante Claims, with prejudice, to the extent they sought to recover on account of any claims other than the claims of Bustamante in his individual capacity.

On July 11, 2005, the Bankruptcy Court approved a stipulation entered into by the Debtors and Bustamante entitling Bustamante to receive an allowed, general, prepetition unsecured claim against MAEM in the amount of $1,000. No other putative plaintiffs will receive a Claim or Plan Distribution on the account of any of the facts or circumstances arising from or related to the Bustamante Claims and any such Claim will be discharged in accordance with the Plan and such holder thereof enjoined from proceeding with any Claim related to or arising from the Bustamante Claims.

### iii. Egger Litigation

On April 28, 2003, several plaintiffs filed suit against sellers and marketers of wholesale electricity in the Western markets, including Mirant, styled *Egger v. Dynegy, Inc.*, GIC 809822, Superior Court for the State of California, County of San Diego. The complaint asserts claims similar to those alleged in Wholesale Electricity Antitrust Cases I & II discussed above, but is filed on behalf of ratepayers residing in Oregon, Washington, Utah, Nevada, Idaho, New Mexico, Arizona and Montana.

Five plaintiffs in that litigation, Jerry Egger, Monica Sivulich, Karl H. Tschinderle, Sean Crotty and Lucy Crotty (the "Proposed Representatives"), filed proofs of claim (the "Egger Claims") purportedly on behalf of a class of "all persons and businesses residing in Oregon, Washington, Utah, Nevada, Idaho, New Mexico, Arizona and Montana who were purchasers of electrical energy during the period beginning January 1, 1999 to the present."

The Debtors objected to the Egger Claims. On November 10, 2004, the Bankruptcy Court entered a Scheduling Order and Discovery Plan, pursuant to which the parties agreed that the Egger Claims were sufficiently similar to the Oscar Claims so that the Bankruptcy Court's ruling on Mirant's motion to strike the Oscar Claims would bind the Debtors and the Proposed Representatives and would be dispositive as to the

Egger Claims. Thus, the Bankruptcy Court disallowed the Egger Claims, with prejudice, to the extent they sought to recover on account of any claims other than those of the Proposed Representatives in their individual capacities.

On January 19, 2005, the Bankruptcy Court issued an order approving a settlement agreement between the Debtors and the Proposed Representatives (the "Egger Settlement Agreement"), pursuant to which each of the five Proposed Representatives is entitled to receive an allowed, prepetition, general unsecured claim against MAEM in the amount of $1,000 in full and final satisfaction of the Egger Claims. No other putative plaintiffs will receive a Claim or Plan Distribution on the account of any of the facts or circumstances arising from or related to the Egger Claims and any such Claim will be discharged in accordance with the Plan and such holder thereof enjoined from proceeding with any Claim related to or arising from the Egger Claims.

### b. Prepetition Litigation For Which Claims Were Not Filed

#### i. T&E Pastorino Nursery Litigation

Eight additional rate-payer lawsuits were filed between April 23, 2002 and October 18, 2002 alleging that certain owners of electric generation facilities in California, as well as certain energy marketers, including Mirant, MAEM and several MAG subsidiaries, engaged in various unlawful and fraudulent business acts that served to manipulate wholesale markets and inflate wholesale electricity prices in California during 1999 through 2002. Each of the complaints alleged violation of California's Unfair Competition Act. The actions sought, among other things, restitution, compensatory and general damages, and to enjoin the defendants from engaging in illegal conduct.

These suits were initially filed in California state courts by the plaintiffs and removed to various United States district courts in California. These eight cases were consolidated for purposes of pretrial proceedings before the United States District Court in the Southern District of California, with the lead case styled *T&E Pastorino Nursery, et al. v. Duke Trading and Marketing, L.L.C., et al.*, CV 02-2176-RHW. These actions were stayed with respect to the Mirant defendants by the filing of the Chapter 11 Cases, but proceeded with respect to the other defendants. On August 28, 2003, the district court granted the motions to dismiss filed by the defendants for all but one of those cases, *Kurtz v. Duke Energy Trading et al.*, finding that the plaintiffs' claims were barred by the filed rate doctrine and federal preemption. On February 25, 2005, the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") affirmed the dismissal of the suits by the district court. The plaintiff in the Kurtz suit voluntarily dismissed his case without prejudice on February 18, 2004. No putative plaintiffs will receive a Claim or Plan Distribution on the account of any of the facts or circumstances arising from or related to the T&E Pastorino Nursery Litigation and/or related lawsuits and any such Claim will be discharged in accordance with the Plan and such holder thereof enjoined from proceeding with any Claim related to or arising from the T&E Pastorino Nursery Litigation and/or related lawsuits.

#### ii. Snohomish

On July 15, 2002, an additional rate-payer lawsuit, *Public Utility District No. 1 of Snohomish County v. Dynegy Power Marketing, et al.* ("Snohomish Lawsuit"), was filed in the United States District Court for the Central District of California against various owners of electric generation facilities in California, including Mirant. The plaintiff alleged violations of California's antitrust and unfair competition statutes. The Snohomish Lawsuit was consolidated for purposes of pretrial proceedings with the other ratepayer suits pending before the United States District Court for the Southern District of California. On January 6, 2003, the district court granted a motion to dismiss filed by the defendants, holding that the claims were barred by the filed rate doctrine and federal preemption. The plaintiff appealed the dismissal to the Ninth Circuit. On August 13, 2003, the Bankruptcy Court issued an order granting partial relief from the stay of the claims asserted against the Mirant defendants resulting from the filing of the Chapter 11 Cases to allow the appeal to proceed with respect to those claims as well as the claims asserted against the other defendants. On September 10, 2004, the Ninth Circuit affirmed the dismissal. On November 5, 2004, the plaintiff filed a petition for writ of <u>certiorari</u> with the United States Supreme Court seeking to appeal the Ninth Circuit's decision. On June 27, 2005, the United States Supreme Court denied that petition, causing the dismissal of the suit to become final. No putative plaintiffs will receive a Claim or Plan Distribution on the account of any

of the facts or circumstances arising from or related to the Snohomish Lawsuit and any such Claim will be discharged in accordance with the Plan and such holder thereof enjoined from proceeding with any Claim related to or arising from the Snohomish Lawsuit.

### 5. Shareholder-Bondholder Litigation[1]

#### a. Mirant Securities Consolidated Action

Twenty lawsuits have been filed since May 29, 2002 against Mirant and four of its officers alleging, among other things, that the defendants violated sections 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder by making material misrepresentations and omissions to the investing public regarding Mirant's business operations and future prospects during the period from January 19, 2001 through May 6, 2002. The suits have each been filed in the United States District Court for the Northern District of Georgia (the "Georgia District Court") with the exception of three suits filed in the United States District Court for the Northern District of California that have been transferred by the court to the Georgia District Court and consolidated with the 17 consolidated suits already pending before that court. The complaints seek unspecified damages, including compensatory damages and the recovery of reasonable attorneys' fees and costs.

In November 2002, the plaintiffs in the consolidated suits in the Georgia District Court filed an amended complaint that added additional defendants and claims. The plaintiffs added as defendants Southern, the directors of Mirant immediately prior to its initial public offering of stock, and various firms that were underwriters for the initial public offering by Mirant.

Under a master separation agreement between Mirant and Southern, Southern is entitled to be indemnified by Mirant for any losses arising out of any acts or omissions by Mirant and its subsidiaries in the conduct of the business of Mirant and its subsidiaries. Whether the indemnities are enforceable against Mirant is subject to dispute. See "Material Claims, Litigation and Investigations — Disputed Claims With Associated Estate Causes of Action, Southern Company Investigation/Litigation." The underwriting agreements between Mirant and the various firms added as defendants that were underwriters for the initial public offering by the Company also provide for Mirant to indemnify such firms against any losses arising out of any acts or omissions by Mirant and its subsidiaries.

On December 11, 2003, the plaintiffs filed a proof of claim against Mirant's estate, which was subsequently withdrawn on or about October 10, 2004. On August 29, 2005, the Georgia District Court granted a motion filed by the plaintiffs seeking to dismiss Mirant as a defendant in the consolidated suits. No putative plaintiffs will receive a Claim or Plan Distribution on account of any facts or circumstances arising from or related to the Mirant Securities and any such claim will be discharged in accordance with the Plan and such holders thereof enjoined from proceeding with any claim related to or arising from these suits.

#### b. Goldman Sachs

On or about December 15, 2003, Goldman, Sachs & Co. ("Goldman") and Morgan Stanley & Co. Incorporated ("Morgan Stanley" and collectively with Goldman, the "Underwriters") filed proofs of claim on behalf of various underwriters (the "Underwriters' Claims") for the initial public offering of Mirant. The Underwriters are defendants in an action entitled *In re Mirant Corporation Securities Litigation* now pending in the Georgia District Court (the "Securities Litigation"). This litigation is stayed in its entirety against all defendants pursuant to an order of the Bankruptcy Court dated November 19, 2003. Pursuant to an agreement between Mirant and the plaintiffs, dated December 8, 2003, document discovery is proceeding.

The Underwriters' Claims seek recovery from Mirant for indemnity and contribution with respect to the Securities Litigation in an unknown amount and in an amount of approximately $450,000 in defense costs relating to the Securities Litigation which the Underwriters contend have been paid out-of-pocket. In the

---

[1] Certain of the claims in this category are also asserted against certain of the directors, officers and affiliates of the Debtors. These claims are addressed in Section 17.20 of the Plan. The Debtors will take actions to discontinue all the actions in this category in connection with the Plan process.

Underwriters' Claims, Goldman and Morgan Stanley state that they are acting on behalf of all of the underwriters, including Bank of America Securities, LLC, Credit Suisse First Boston, LLC, J.P. Morgan Securities, Inc., Lehman Brothers, Inc., Citigroup Global Marketing, Inc., and ABN AMRO Incorporated, pursuant to an Underwriting Agreement.

On October 18, 2004, Mirant filed objections to the Underwriters' Claims based upon the following: (i) the Underwriters' Claims are contingent claims for contribution and reimbursement which have not yet been fixed by payment and should be disallowed; (ii) the Underwriters' Claims arise from the purchase or sale of a security and must be subordinated subject to section 510(b) of the Bankruptcy Code; (iii) the Underwriters assert a contractual right of indemnity against Mirant which is unenforceable as against public policy, and (iv) any claim for statutory or common law contribution must be disallowed as a contingent claim for contribution.

Both parties filed motions for summary judgment with respect to the Underwriters' Claims with Mirant seeking either disallowance or subordination of the Underwriters' Claims as described above. On March 7, 2005, the Bankruptcy Court entered an order agreed to by the Debtors and the Underwriters granting partial summary judgment and subordinating the Underwriters' Claims to the claims of Mirant's other creditors to the extent (if any) they may be allowed. During the April 26, 2005 hearing on the motions for summary judgment, the parties announced their agreement that, subject to approval by the Bankruptcy Court under Bankruptcy Rule 9019, the Underwriters will receive an allowed claim against Mirant Corporation in the amount of $250,000 that will be subordinated pursuant to section 510(b) of the Bankruptcy Code.

### c. MAG Bondholder Suit

On June 10, 2003, certain holders of senior notes of MAG maturing after 2006 filed a complaint in the Court of Chancery of the State of Delaware, styled *California Public Employees' Retirement System, et al. v. Mirant Corporation, et al.,* that named as defendants Mirant, MAI, MAG, certain past and present Mirant directors, and certain past and present MAG managers. Among other claims, the plaintiffs assert that a restructuring plan pursued by Mirant and MAG prior to their filing petitions for reorganization under chapter 11 of the Bankruptcy Code was in breach of fiduciary duties allegedly owed to them by Mirant, MAI and MAG managers. In addition, plaintiffs challenge certain dividends and distributions made by MAG. The plaintiffs seek damages in excess of $1,000,000,000. Mirant has removed this suit to the United States District Court for the District of Delaware. This action is stayed with respect to the Mirant entities that are defendants by the filing of the Chapter 11 Cases. On November 19, 2003, the Bankruptcy Court entered an order staying this action also with respect to the individual defendants to avoid the suit impeding the ability of the Debtors to reorganize or having a negative effect upon the assets of the Debtors. The MAG Committee filed a motion in Mirant's bankruptcy proceedings seeking to pursue claims against Mirant, MAEM, certain past and present Mirant directors, and certain past and present MAG managers similar to those asserted in this suit. The Bankruptcy Court ruled that, while the MAG Committee has standing to assert claims on behalf of the estate of MAG, no such claims could be filed without the Bankruptcy Court's approval and no motions seeking such approval could be filed at least through April 2004. On June 15, 2005, the MAG Committee again filed a motion in these proceedings seeking to pursue claims against Mirant, MAI, certain past and present Mirant directors and certain past and present managers of the Debtors similar to those asserted in this suit. On June 30, 2005, the Bankruptcy Court issued an oral ruling that if the Debtors had not, by July 8, 2005, entered into agreements with the individual defendants in this action tolling the running of any statutory limitation period, then the MAG Committee would be authorized to file claims against those defendants on behalf of the estate of MAG. The Debtors did obtain tolling agreements from each of the individual defendants. Any and all Intercompany Claims arising from this suit will be resolved in accordance with the Plan.

### d. Shareholder Derivative Litigation

Four purported shareholders' derivative suits have been filed against Mirant, its directors and certain officers of Mirant. These lawsuits allege that the directors breached their fiduciary duties by allowing the Company to engage in alleged unlawful or improper practices in the California energy market during 2000 and 2001. The Company practices complained of in the purported derivative lawsuits largely mirror those in the shareholder litigation and the rate payer litigation described above. One suit also alleges that the defendant

officers engaged in insider trading. The complaints seek unspecified damages on behalf of Mirant, including attorneys' fees, costs and expenses and punitive damages. No proofs of claims were filed with respect to the shareholder derivative suits. On November 19, 2003, the Bankruptcy Court entered an order staying these actions also with respect to the individual defendants to avoid the suits impeding Mirant's ability to reorganize or having a negative effect upon Mirant's assets. On December 8, 2003, the court in one of the suits took notice of the Bankruptcy Court's Order dated November 19, 2003 staying the litigation and administratively closed the action. Following confirmation of the Plan, the Debtors will seek a turnover and/or dismissal with prejudice of this litigation.

### e. ERISA Litigation

On April 17, 2003 and June 3, 2003, purported class action lawsuits alleging violations of ERISA were filed in the Georgia District Court (the "ERISA Litigation"). The ERISA Litigation names as defendants Mirant, certain of its current and former officers and directors, and Southern Company. The plaintiffs, who seek to represent a putative class of participants and beneficiaries of Mirant's 401(k) plans, allege that defendants breached their duties under ERISA by, among other things: (i) concealing information from the 401(k) plans' participants and beneficiaries; (ii) failing to ensure that the 401(k) plans' assets were invested prudently; (iii) failing to monitor the 401(k) plans' fiduciaries, and (iv) failing to engage independent fiduciaries to make judgments about the 401(k) plans' investments. The plaintiffs seek unspecified damages, injunctive relief, attorneys' fees and costs. On September 2, 2003, the Georgia District Court issued an order consolidating the two suits. On September 23, 2003, the plaintiffs filed an amended and consolidated complaint. The amended and consolidated complaint asserted similar factual allegations as the previously filed lawsuits and added as defendants T. Rowe Price Trust Company and certain additional current and former officers of Mirant. The consolidated action is stayed as to Mirant by the filing of the Chapter 11 Cases. On November 19, 2003, the Bankruptcy Court entered an order staying this action also with respect to the other defendants to avoid the suit impeding the ability of Mirant to reorganize or having a negative effect upon Mirant's assets. By agreement, however, the suit has been allowed to proceed through the filing of, and ruling by the Georgia District Court upon, motions to dismiss. On January 9, 2004, T. Rowe Price Trust Company answered the amended and consolidated complaint and all other defendants filed motions on that date seeking dismissal of the plaintiffs' claims for failure to state a claim upon which relief can be granted. On February 19, 2004, the plaintiffs dismissed their claims against Southern without prejudice. On June 14, 2004, the plaintiffs filed a motion seeking to amend their consolidated complaint to add as defendants Mirant Services and its board of managers.

On August 4, 2004, the Georgia District Court entered an order staying the ERISA Litigation until the Bankruptcy Court lifts the stay resulting from the filing of Mirant's bankruptcy proceedings and the order entered by the Bankruptcy Court on November, 19, 2003 staying the action with respect to the other defendants. In the order issued August 4, 2004, the Georgia District Court also denied the motions to dismiss filed by various defendants, including Mirant, and the motion filed by the plaintiffs seeking to amend their consolidated complaint to add as defendants Mirant Services and its board of managers. With respect to both motions, the district court granted the party filing the motion leave to refile the motion once the stays have been lifted by the Bankruptcy Court.

In December 2003, attorneys representing the plaintiffs in the ERISA Litigation filed proofs of claims against the Debtors' estates, totaling approximately $50,000,000 (the "Brown & Waller Claims"). On October 18, 2004, the Debtors objected to the Brown & Waller Claims. By order dated April 6, 2005, the Bankruptcy Court approved a settlement agreement under which the claimants agreed to limit their recovery against the Debtors and any related defendants in the ERISA Litigation to the proceeds paid or payable under certain insurance policies issued to Southern and Mirant. The Brown & Waller Claims have been amended to $0.00. No putative plaintiffs will receive a Claim or Plan Distribution on the account of any facts or circumstances arising from or related to the ERISA Litigation and any such claim will be discharged in accordance with the Plan and such holders thereof shall be limited in their recovery to the proceeds paid or payable by Associated Electric and Gas Insurance Services Ltd. and Energy Insurance Mutual as set forth in the settlement agreement described in this paragraph.

115

### E.   Disputed Claims With Associated Estate Causes of Action

#### 1.   NY Tax — New York Real Property Tax Litigation

##### a.   New York Tax Proceedings

MAG's subsidiaries that own generating plants in New York are or were (in the settled proceedings discussed below) the petitioners in 41 proceedings (the "Tax Certiorari Proceedings") initially brought in various New York state courts challenging the assessed value of those generating plants determined by their respective local taxing authorities. Mirant Bowline has challenged the assessed value of the Bowline generating facility and the resulting local tax assessments paid for tax years 1995 through 2003. Mirant Bowline succeeded to rights held by Orange & Rockland Utilities, Inc. for the tax years prior to its acquisition of the Bowline Plant in 1999 under its agreement with Orange & Rockland for the purchase of that plant. Mirant Lovett and Mirant New York challenged the assessed value of the Lovett facility for each of the years 2000 through 2003. Mirant NY-Gen, LLC ("Mirant NY-Gen" and, collectively with Mirant Bowline and Mirant Lovett, the "New York Debtors") has settled its Tax Certiorari Proceedings with respect to the combustion turbine and hydroelectric facilities it owns for each of the years 2000 through 2003. If the remaining Tax Certiorari Proceedings result in a reduction of the assessed value of the generating facility at issue in each proceeding, the New York Debtor owning the facility would be entitled to a refund with interest of any excess taxes paid for those tax years.

On September 30, 2003, the Debtors filed a motion (the "Tax Determination Motion") with the Bankruptcy Court requesting that a determination be made of what the property tax liability should have been for the Bowline generating facility in each of the years 1995 through 2003. The Tax Determination Motion similarly sought to have the Bankruptcy Court determine what the property tax liability should have been for: (a) the generating facility acquired by Mirant Lovett concurrently with Mirant Bowline's acquisition of the Bowline facility in each of the years 2000 through 2003, and (b) certain generating facilities concurrently acquired by Mirant NY-Gen at the time Mirant Bowline acquired the Bowline facility in each of the years 2000 through 2003. The bases for the relief requested in the Tax Determination Motion were that the assessed values of the generating facilities had no justifiable basis and were far in excess of their actual value. The local taxing authorities have opposed the Tax Determination Motion, arguing that the Bankruptcy Court either lacks jurisdiction over the matters addressed by the Tax Determination Motion or should abstain from addressing those issues so that they can be addressed by the state courts in which the Tax Certiorari Proceedings described in the preceding paragraph were originally filed. On December 10, 2003, the Bankruptcy Court ruled that it would retain joint jurisdiction with the New York state courts over the issues raised by the Tax Certiorari Proceedings and the Tax Determination Motion.

Collectively, Mirant Bowline and Mirant Lovett have not paid: (a) approximately $62,000,000 assessed by local taxing authorities on the generating facilities for 2003, that were due on September 30, 2003 and January 30, 2004, and (b) approximately $53,000,000 assessed by local taxing authorities on the generating facilities for 2004, that were due on September 30, 2004 and January 30, 2005, in order to preserve their respective rights to offset the overpayments of taxes made in earlier years against the sums payable on account of current taxes. The failure to pay the taxes due on September 30, 2003, January 30, 2004 and September 30, 2004 and January 30, 2005 could subject Mirant Bowline and Mirant Lovett to additional penalties and interest. Two of the local tax authorities, the County of Rockland and the Haverstraw-Stony Point Central School District, filed seven proofs of claim concerning these unpaid taxes. The Debtors have objected to these proofs of claim and, to the extent such claims are allowed, the Debtors have sought estimates of the allowed claims based on the trial records and exhibits in the Tax Certiorari Proceedings. Moreover, in the Tax Determination Motion and subsequent filings, the Debtors requested that the Bankruptcy Court permit each of the New York Debtors to apply any previous tax overpayments made on account of their generating facilities against any postpetition tax liabilities owing to the relevant local taxing authority for current tax liabilities and be entitled to a refund of any remaining overpayments. The Tax Determination Motion also requested that the Bankruptcy Court rule that any interest or penalties that may otherwise be imposed on the New York Debtors by the relevant taxing authorities for failure to timely pay taxes be disallowed or determined to be zero. On February 11, 2004, the County of Rockland, New York, filed a motion with the

116

Bankruptcy Court requesting that it order the New York Debtors to pay all unpaid ad valorem taxes for 2003 assessed by the taxing authorities located in Rockland County and all prospective ad valorem taxes. On March 10, 2004, the Bankruptcy Court denied this motion.

The County of Rockland has represented to the Debtors that on or about April 1, 2004, it advanced approximately $62,000,000 to the Haverstraw-Stony Point Central School District (the "School District") on account of the real property taxes that were assessed for 2003 with respect to the generating facility, and now asserts subrogation rights with respect to that payment. The County of Rockland has further informed the Debtors that it has advanced to the School District the approximately $53,000,000 in taxes that were assessed for 2004 with respect to the generating facility and will likewise assert a right of subrogation with respect to such payment.

### b. Proposed New York Tax Settlement

Prior to the Petition Date, Debtors Mirant Bowline and Mirant Lovett paid approximately $60,000,000, in the aggregate on an annual basis, to the New York Taxing Authorities with respect to real property taxes levied in connection with those power generating facilities in New York.

During the fall of 2004, the Debtors entered into settlement discussions with the New York Taxing Authorities regarding the property taxes associated with the Mirant Bowline and Mirant Lovett facilities. Representatives of the Debtors and the New York Taxing Authorities have developed a framework for settlement. The representatives are prepared to recommend such settlement to their respective management and/or board for approval. Notwithstanding the agreement among the representatives, any settlement framework remains subject to, among other things, final management approval on the part of the Debtors and final board approval on the part of the New York Taxing Authorities. If approved, the Proposed New York Tax Settlement will be enforceable under New York law and is consistent with the Debtors' financial projections. The Proposed New York Tax Settlement contains numerous terms and conditions, some of which are described in "The Chapter 11 Plan — Settlements and Compromises — Proposed New York Tax Settlement." Because of the time necessary to satisfy all conditions precedent and obtain all necessary approvals for the Proposed New York Tax Settlement, the Debtors expect that the New York Debtors will likely remain in chapter 11 pending satisfaction of all conditions precedent to the Proposed New York Tax Settlement, and the Effective Date of the Plan as to those Debtors will be extended to the date such conditions precedent are satisfied, such date defined in the Plan as the "New York Debtors Effective Date." The Plan contemplates and permits the continued operation of the New York Debtors in chapter 11 after all other Debtors have emerged from chapter 11 protection.

### 2. <u>Southern Company Investigation/Litigation</u>

In early 2004, Mirant's board of directors formed a special committee (the "Special Committee") to investigate potential claims and causes of action arising from transfers by Mirant to Southern in connection with the separation of the companies, including the IPO and Spin-Off. The members of the Special Committee are Stuart E. Eizenstat, Robert F. McCullough and Ray M. Robinson. None of these directors have any affiliation with Southern. Each of these directors was appointed to the board after the Spin-Off. The Special Committee directed W&C to conduct the investigation and, upon completion, report its findings to the Special Committee. W&C did not represent Mirant in connection with any of the transfers it investigated. AlixPartners, LLC and Charles River Associates, Inc. were retained by W&C to evaluate solvency, adequacy of Mirant's capitalization and other issues.

As part of the investigation, W&C identified and investigated, among other things, the following transfers from Mirant to Southern: (a) the dividend paid in the fourth quarter of 1999 by Mirant to Southern in the amount of $165,000,000 (the "1999 Dividend Payment"); (b) the dividends paid by Mirant to Southern in the aggregate amount of $503,000,000 in May and July 2000 (the "2000 Dividend Payment"); (c) the dividend distribution of one share of Series B Preferred stock by Mirant to Southern on August 30, 2000 and its redemption on March 5, 2001 in exchange for Mirant's 80% interest in a holding company which owned SE Finance and Capital Funding worth at least $242,000,000 (the "Series B Issuance and Redemption"), and (d) repayments by Mirant in 1999 of intercompany loans (the "Intercompany Advances") by Southern in the

amount of $927,000,000, plus payment of accrued interest expense in the amount of $108,000,000 (collectively, the "1999 Repayments").

W&C completed the investigation and reported its findings to the Special Committee. In turn, the Special Committee made recommendations to the Mirant board with respect to the actions to be taken in connection with the subject matter of the investigation. Based on the Special Committee's recommendation, the board authorized the commencement of litigation against Southern to recover the 1999 Dividend Payment, the 2000 Dividend Payment, the Series B Issuance and Redemption, and the 1999 Repayments. The results of the investigation were shared with the Examiner, the Corp Committee, the MAG Committee and the Equity Committee.

On June 16, 2005, Mirant and the Corp Committee jointly filed a complaint styled *Mirant Corporation and the Official Committee of Unsecured Creditors of Mirant Corporation, et al. v. The Southern Company*, (the "Southern Complaint") Adv. No. 05-04099 (the "Southern Adversary Proceeding"), with the Bankruptcy Court. Mirant and the Corp Committee allege that the Southern Complaint constitutes a counterclaim to Southern's previously filed proofs of claim. Southern disputes this allegation. In the Southern Complaint, Mirant seeks to avoid over $2,000,000,000 in fraudulent transfers from Mirant to Southern under sections 544 and 550 of the Bankruptcy Code relating to the 1999 Dividend Payment, the 2000 Dividend Payment, the Series B Issuance and Redemption, and the 1999 Repayments. The Southern Complaint also seeks to: (a) recharacterize the Intercompany Advances as equity, (b) declare Mirant, as a former subsidiary of Southern, to be the alter ego of Southern and Southern to be responsible for the debts of Mirant, (c) hold Southern, as the parent corporation, liable for inducing or aiding and abetting Mirant's breach of its fiduciary duties to creditors while in the zone of insolvency, and (d) adjudicate Mirant's objections to Southern's proofs of claim and/or to equitably subordinate Southern's proofs of claim to the claims of all other creditors. See "The Chapter 11 Plan — Designated Net Litigation Distributions."

On July 26, 2005, Southern filed with the District Court a motion seeking to withdraw the reference of the Southern Adversary Proceeding from the Bankruptcy Court (the "Withdrawal Motion"). On August 31, 2005, the Bankruptcy Court issued its Report and Recommendation to the District Court recommending that the Withdrawal Motion be denied.

On August 5, 2005, Southern filed with the District Court a motion to transfer the Southern Adversary Proceeding to the Georgia District Court (the "Transfer Motion"). To date, the District Court has not ruled on either the Withdrawal Motion or the Transfer Motion.

On August 17, 2005, Southern filed its answer to the Southern Complaint denying each of the counts asserted in the Southern Complaint.

The following paragraph has been inserted in the Disclosure Statement at Southern's request:

"Southern contends that the lawsuit is wholly without merit. Southern's position is that it acted properly and lawfully as the corporate parent of Mirant through the initial public offering of Mirant's common stock and then as majority shareholder of Mirant through the Spin-Off of Mirant shares to Southern shareholders. Southern asserts that the overall divestiture was formulated and executed with Mirant's active participation, was in all respects fair to Mirant and was subjected to intense public, regulatory and creditor scrutiny. According to Southern, Mirant's financial problems arose after its independence from Southern and after Mirant was frustrated in its attempt to pursue a rapid growth strategy in the wake of an industry crisis that devastated Mirant's credit ratings and business model."

Mirant disputes the foregoing. Southern has indicated it will vigorously defend the litigation.

### 3.  MIRMA Leases/Litigation

MIRMA, formed in 2000 as Southern Energy Mid-Atlantic, LLC, was organized as a Delaware limited liability company in connection with Mirant's planned acquisition of four power generating stations and related assets as set forth in the APSA. Following the closing on or about December 19, 2000, MIRMA or its

subsidiaries, along with two of Mirant's subsidiaries, Mirant Potomac River, LLC and Mirant Peaker, LLC, came to own or lease approximately 5,256 MW of electric generation capacity in the Washington, DC area.

To raise approximately $1,500,000,000 of the total $2,650,000,000 purchase price (excluding assumed liabilities) for the acquisition of the "Auctioned Assets" as defined in the APSA, Mirant made use of a complex leveraged lease financing transaction (the "Lease-Financing"). See "General Information — Existing Financing Transactions of the Debtors — MIRMA."

During the Chapter 11 Cases, significant disputes arose between the Debtors, on the one hand, and the lessors and the MIRMA Indenture Trustee under the Lease Financing, on the other hand, regarding whether, among other things, the Lease-Financing constitutes a "lease" (or "leases") within the meaning of section 365 of the Bankruptcy Code, or instead evidences a financing arrangement. If the Lease-Financing is one or more "true leases," then as to any such "true lease," MIRMA must: (a) either assume or reject such agreements as are found to comprise the "true lease" or "leases," (b) perform all obligations under the leases pending assumption or rejection (subject to certain exceptions), and (c) cure all defaults under any "true lease" (subject to certain exceptions) as a condition to assuming the "true lease" should MIRMA desire to assume such "lease." If the MIRMA Agreements evidence a financing arrangement, MIRMA would own the facilities subject to the mortgages that the lessors recorded with respect to the Lease-Financing and the obligation owing thereunder would be subject to compromise under a chapter 11 plan of reorganization.

To resolve these and other issues, on August 31, 2004, MIRMA and certain of its affiliates commenced an adversary proceeding (the "MIRMA Lease Litigation") before the Bankruptcy Court seeking, among other things, a determination that the Lease-Financing is a financing arrangement. In response to the complaint, on or about October 25, 2004 the lessors and the Indenture Trustee each filed: (a) a motion to dismiss all claims for relief included in the MIRMA Lease Litigation except for the request that the Bankruptcy Court characterize the MIRMA Agreements as financing arrangements rather than leases, and (b) a motion to dismiss the Chapter 11 Case of MIRMA in its entirety based on their contention that MIRMA, considered independently of all of the other Debtors, was not in financial distress on the Petition Date.

The hearings on all four motions took place on January 5, 2005 and January 6, 2005. The Bankruptcy Court denied the two motions to dismiss the Chapter 11 Case of MIRMA, and the lessors and MIRMA Indenture Trustee sought leave to appeal, which was denied. With regard to the two motions to dismiss the complaint, the Bankruptcy Court did not dismiss the complaint, but ruled that it was granting the motions "in part" such that certain issues could proceed at this time, but others would be deferred "without prejudice."

On February 25, 2005, the lessors filed a motion for partial summary judgment. The Debtors opposed that motion and cross-moved for summary judgment. On April 7, 2005, the Bankruptcy Court entered an order dismissing the MIRMA Lease Litigation on the grounds that, under the present circumstances, recharacterization was unnecessary because MIRMA is solvent and capable of performing its obligations under the Lease-Financing. The Bankruptcy Court, however, reserved the right to re-examine the recharacterization issue if a change in circumstances warranted, including in the event that MIRMA was determined to be insolvent or the lessors or MIRMA Indenture Trustee sought to enforce any provision of the Lease-Financing agreements, that, by reason of the Chapter 11 Cases, would trigger a forfeiture of the assets or loss of rights by any of the Debtors. See "The Chapter 11 Plan — Executory Contracts and Unexpired Leases — Special Provisions Relating to MIRMA Leases."

### 4. Pepco Litigation[1]

In December 2000, Mirant and its subsidiaries acquired certain power generating assets and other assets from Pepco (the "Pepco Assets") pursuant to the terms of the APSA. The consideration paid by Mirant for the Pepco Assets included $2,650,000,000 in cash and Mirant's and MAEM's agreement to purchase from Pepco at its cost power Pepco was obligated to purchase from third parties at above-market rates. By way of

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

separate contracts, Mirant and/or MAEM entered into other transactions with Pepco, including the Back-to-Back Agreement. Under the terms of the Back-to-Back Agreement, Mirant agreed to purchase from Pepco "all capacity, energy, ancillary services and other benefits" that Pepco received from certain PPAs, including the Panda and Ohio Edison PPAs that run until 2021 and 2005 respectively. Under the Back-to-Back Agreement, Mirant agreed to pay Pepco for the power it received the amount Pepco owed under the PPAs to the other parties to the PPAs. Under the Back-to-Back Agreement, Mirant is obligated to purchase power from Pepco at prices that are significantly higher than existing market prices for power. The amount of these out of market obligations assumed by Mirant was valued at that time to be worth $500,000,000.

### a. Motions to Reject

#### i. Back-to-Back Agreement

On August 28, 2003, the Debtors filed a motion with the Bankruptcy Court to reject the Back-to-Back Agreement (the "First Rejection Motion"), along with an adversary proceeding to enjoin Pepco and FERC from taking certain actions against the Debtors (the "Injunction Litigation"). The Debtors forecast that it would cost in excess of $300,000,000 during 2004 and 2005 if the Back-to-Back Agreement were to remain in effect. These anticipated losses, as compared to what could be obtained if market rates were applied, are even greater over the entire life of the Back-to-Back Agreement, which continues until 2021. On October 9, 2003, the District Court removed the First Rejection Motion from the Bankruptcy Court. The Corp Committee intervened and has been very active in all aspects of the litigation involving the Back-to-Back Agreement. In December 2003, the District Court denied the First Rejection Motion concluding that the Federal Power Act preempts the Bankruptcy Code and that a bankruptcy court cannot affect a matter within FERC's jurisdiction under the Federal Power Act and, thereafter, dismissed the Injunction Litigation.

The Debtors and the Corp Committee appealed the District Court's orders to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit"). The Fifth Circuit reversed the District Court's decision, holding that the Bankruptcy Code authorizes a district court (or bankruptcy court) to reject a contract for the sale of electricity that is subject to FERC's regulation under the Federal Power Act as part of a bankruptcy proceeding and that the Federal Power Act does not preempt that authority. The Fifth Circuit remanded the proceeding to the District Court for further action on that motion. The Fifth Circuit indicated that on remand the District Court could consider applying a more rigorous standard than the business judgment standard typically applicable to contract rejection decisions by debtors in bankruptcy, which more rigorous standard would take into account the public interest in the transmission and sale of electricity.

On December 9, 2004, the District Court held that the Back-to-Back Agreement was a part of and nonseverable from, and therefore nonrejectable apart from, the APSA. The District Court also noted that, if the Fifth Circuit overturned the District Court's ruling with respect to severability, the Back-to-Back Agreement should be rejected only if: (A) Mirant can prove that the Back-to-Back Agreement burdens the Debtors' Estates; (B) after scrutiny and giving significant weight to the comments of FERC relative to the effect of rejection on the public interest, the equities balance in favor of rejecting the Back-to-Back Agreement, and (C) rejection of the Back-to-Back Agreement would further the chapter 11 goal of permitting the successful rehabilitation of the Debtors.[1] The Debtors and the Corp Committee have appealed the District Court's December 9, 2004, decision to the Fifth Circuit. The Debtors' request for the Fifth Circuit to hear this appeal on an expedited basis has been denied, and the appeal has not yet been scheduled for argument. See "The Chapter 11 Plan — Executory Contracts and Unexpired Leases — Special Agreements with Pepco and Its Subsidiaries."

#### ii. APSA

On January 21, 2005, the Debtors filed a motion in the Chapter 11 Cases to reject the APSA, including the Back-to-Back Agreement (the "Second Rejection Motion"). The Second Rejection Motion does not seek

---

[1] The Debtors anticipate that the foregoing standard may be applicable in connection with a request by the Debtors to reject certain other energy contracts that are subject to FERC jurisdiction. The Debtors believe that they will be able to satisfy the foregoing standard for rejecting any contracts, to the extent it is applicable, and the rejection of such contracts will be approved.

to reject other agreements entered into between Debtors and Pepco in conjunction with Mirant's and/or its subsidiaries' purchase of the Pepco Assets. On February 10, 2005, Pepco filed a motion requesting that the District Court assert jurisdiction over and rule upon the Second Rejection Motion rather than having the Bankruptcy Court rule on that motion, arguing that the motion required the consideration of laws other than the Bankruptcy Code. On March 1, 2005, the District Court ruled that it would withdraw the reference to the Bankruptcy Court of the Second Rejection Motion. The District Court's March 1 order is discussed further in "Suspension of Pepco Back-to-Back Payments and Subsequent Litigation" below. The District Court ordered the parties to brief the issue whether the APSA (between Mirant and Pepco) incorporates other agreements (between other Debtors and Pepco) and ultimately ordered Pepco to file its objection to the Second Rejection Motion by March 28, 2005. The parties have filed briefs on the integration issue and Pepco (and other parties) have filed objections to the same Second Rejection Motion.

On April 22, 2005, Mirant filed a reply brief in response to the opposition briefs of Pepco and certain state and federal regulatory bodies. The District Court has, by order dated August 16, 2005, informally stayed the proceeding pending rulings by the Fifth Circuit on the Debtors' appeals of the District Court's denial of the First Rejection Motion and of the District Court's order of March 1, 2005, as amended, discussed further in "Suspension of Pepco Back-to-Back Payments and Subsequent Litigation" below.

### b. Suspension of Pepco Back-to-Back Payments and Subsequent Litigation

On December 9, 2004, in an effort to halt further out-of-market payments under the Back-to-Back Agreement while awaiting resolution of issues related to rejection of the Back-to-Back Agreement (but prior to notice of entry of the District Court's order of December 9, 2004), Mirant filed a notice in the Bankruptcy Court stating that Mirant was suspending further payments to Pepco under the Back-to-Back Agreement absent further order of court (the "Suspension Notice").

On December 14, 2004, in response to the Suspension Notice, Pepco filed a motion to compel the Debtors to pay, as administrative expenses, amounts that had been suspended under the Back-to-Back Agreement (the "Administrative Expense Motion"). Pepco also filed other motions and litigation seeking the same substantive result. On January 19, 2005, the Bankruptcy Court entered an order embodying its oral ruling made on January 14, 2005, which denied the Administrative Expense Motion, but required the Debtors to pay amounts due under the Back-to-Back Agreement in January 2005 and thereafter until either: (i) the Debtors filed a motion to reject the APSA; (ii) the Fifth Circuit issued an order reversing the District Court's order of December 9, 2004 denying the motion to reject the Back-to-Back Agreement, or (iii) the Debtors were successful in having the obligations under the Back-to-Back Agreement recharacterized as debt obligations. Pepco appealed the Bankruptcy Court's January 19, 2005 order. On March 1, 2005, the District Court withdrew the reference to the Bankruptcy Court of the Administrative Expense Motion and the Second Rejection Motion, ordered the Debtors to pay Pepco all past-due, unpaid obligations under the Back-to-Back Agreement by March 10, 2005, and dismissed Pepco's appeal of the January 19, 2005 order denying the Administrative Expense Motion as moot. On March 4, 2005, the Debtors filed a motion requesting that the District Court reconsider its order of March 1, 2004, or alternatively, to stay that order while the Mirant Debtors appealed it to the Fifth Circuit. On March 7, 2005, the District Court modified the March 1 order to require Pepco to file a response to the Mirant Debtors' motion for reconsideration by March 14 and to delay the date by which the Mirant Debtors were to pay past-due, unpaid obligations under the Back-to-Back Agreement to March 18, 2005.

On March 16, 2005, the Debtors filed: (i) a notice of appeal of the District Court's March 1 order and March 7 order; (ii) a petition for writ of mandamus and (iii) a motion for stay pending consideration of appeal and mandamus with respect to the same. Also on March 16, 2005, the District Court further modified its order of March 1, 2005 to clarify that the amounts to be paid by the Debtors by March 18, 2005 did not include amounts that became due prior to the Petition Date. On March 17, 2005, the Fifth Circuit issued a temporary stay of the March 1, 2005 order, as modified. On March 21, 2005, the Debtors filed a supplement to the appeal, petition for writ of mandamus and motion for stay pending appeal and mandamus review addressing only the March 16 amended order. On April 11, 2005, the Fifth Circuit vacated the temporary stay entered on March 17, 2005, denied the petition for writ of mandamus, and denied the Debtors' request for a stay pending

appeal in its order. The Fifth Circuit concluded that the Debtors' challenges to the District Court order of March 1, 2005, as modified, could be remedied in their pending appeals and that the Debtors had not shown they would suffer irreparable harm if the order was not stayed pending appeal.

On April 13, 2005, Mirant paid to Pepco all amounts due and owing with respect to the Back-to-Back Agreement, an amount totaling $57,479,324. The appeal of these District Court orders is pending. On April 20, 2005, the District Court entered an order directing the Debtors to pay Pepco by April 25, 2005 all unpaid amounts due under the Back-to-Back Agreement accruing since the Petition Date to the extent they had not already done so, and to continue performance of all obligations under the agreement until further order of the District Court.

### c. Pepco TPA Settlement

On October 29, 2003, the Debtors filed a motion with the Bankruptcy Court for approval of a settlement (the "Pepco TPA Settlement") between the Debtors and Pepco regarding two out-of-market TPAs (the "Pepco TPAs") under which MAEM sells power to Pepco pursuant to the APSA. The Pepco TPA settlement was approved and implemented as described in "General Information — The Businesses of Mirant — The North American Business."

### d. Asbestos Litigation

As a part of the purchase of Pepco's generating facilities in December 2000, Mirant agreed to indemnify Pepco for certain liabilities arising in lawsuits related to the acquired assets filed after December 19, 2000, even if they relate to incidents occurring prior to that date, with certain qualifications. Under intercompany agreements, the subsidiaries of MAG that acquired those facilities assumed Mirant's indemnity obligations to Pepco. Since the acquisition, Pepco has notified Mirant of more than 100 asbestos cases, distributed among three Maryland jurisdictions (Prince George's County, Baltimore City and Baltimore County), as to which it claims a right of indemnity. Based on information and relevant circumstances known at this time, the Debtors do not believe these suits will result in significant Allowed Claims.

### e. Claims Litigation

Pepco and its Affiliate, Pepco Energy Services, collectively filed 14 separate proofs of claim (the "Pepco Claims") against Mirant, MAEM and the following additional subsidiaries of Mirant that are referred to hereinafter as the "Other Mirant Parties:" Mirant Potomac, Mirant Piney Point, LLC, Mirant Peaker, Mirant Mid-Atlantic Services, LLC, MIRMA, Mirant MD Ash Management, LLC, Mirant D.C. O&M, LLC, and Mirant Chalk Point. On December 23, 2004, Pepco amended certain of its claims for goods and services to increase the amount claimed by an additional $5,000,000. The Pepco Claims, as amended, seek damages ranging from $37,769 to approximately $136,100,000 for alleged unpaid prepetition obligations. Certain of the Pepco Claims also seek to reserve claims that may arise in connection with the rejection of the Back-to-Back Agreement. Most of the Pepco Claims derive from the APSA and its ancillary agreements.

Mirant filed an omnibus objection to the Pepco Claims (the "Pepco Claims Objection"), objecting to each one of the Pepco Claims. The Pepco Claims Objection primarily focused on the following three objections. First, the Pepco Claims filed against the Other Mirant Parties are based upon an assertion that the Other Mirant Parties are jointly and severally liable for obligations of Mirant and MAEM of $131,200,000 (amended to $136,100,000) comprised of the following: (i) approximately $105,000,000 allegedly due under certain Transition Power Agreements; (ii) $25,500,000 (amended to approximately $31,500,000) in alleged unpaid goods and services obligations, and (iii) at least $698,000 in alleged fixed and contingent indemnity obligations. Specifically, Pepco has asserted that an Assignment and Assumption Agreement dated December 19, 2000 among Pepco and various subsidiaries of Mirant, including MIRMA, Mirant Potomac, Mirant Peaker, Mirant Chalk Point and MAEM (the "AAA"), causes the Mirant subsidiaries that are parties to the agreement to be jointly and severally liable to Pepco for various obligations, including the obligations under the Back-to-Back Agreement. Pepco also asserts that the AAA causes Mirant's subsidiaries to be jointly and severally liable for a claim of $105,000,000 filed by Pepco in the Chapter 11 Cases related to modifications agreed to between MAEM and Pepco related to the Transition Power Agreements in place between Pepco and MAEM through January 2005. The Debtors are disputing this interpretation of the AAA in proceedings

before the Bankruptcy Court. The parties filed cross-motions for summary judgment with respect to this issue with the Bankruptcy Court. On May 4, 2005, the Bankruptcy Court denied both summary judgment motions. The Bankruptcy Court has not scheduled a trial on this matter.

The Debtors have also filed a motion to estimate each of the Pepco Claims at an amount of $0.00. No hearing date on this motion to estimate is currently scheduled.

### f.  Potential Adjustment Related to Panda Power Purchase Agreement

At the time of the acquisition of the MIRMA assets from Pepco, Mirant entered into a separate agreement with Pepco that, as subsequently modified, provides that the price paid by Mirant for its December 2000 acquisition of Pepco assets would be adjusted if by April 8, 2005, a binding court order has been entered finding that the Back-to-Back Agreement violates Pepco's power purchase agreement with Panda (the "Panda PPA") as a prohibited assignment, transfer or delegation of the Panda PPA or because it effects a prohibited delegation or transfer of rights, duties or obligations under the Panda PPA that is not severable from the rest of the Back-to-Back Agreement. The agreement also provides that if a court order is entered that triggers the purchase price adjustment, the amount of the adjustment is to be negotiated in good faith by the parties or determined by binding arbitration so as to compensate Pepco for the termination of the benefit of the Back-to-Back Agreement while also holding Mirant economically indifferent from such court order. Panda initiated legal proceedings in 2000 asserting that the Back-to-Back Agreement violated provisions in the Panda PPA prohibiting Pepco from assigning the Panda PPA or delegating its duties under the Panda PPA to a third party without Panda's prior written consent. On June 10, 2003, the Maryland Court of Appeals, Maryland's highest court, ruled that the assignment of certain rights and delegation of certain duties by Pepco to Mirant in the Back-to-Back Agreement did violate the non-assignment provision of the Panda PPA and was unenforceable. The court, however, left open the issues of whether the provisions found to violate the Panda PPA could be severed and the rest of the Back-to-Back Agreement enforced and whether Panda's refusal to consent to the assignment of the Panda PPA by Pepco to Mirant was unreasonable and violated the Panda PPA.

### g.  Fraudulent Transfer Action

On July 13, 2005, the Debtors filed a complaint styled *Mirant Corporation, et al. v. Potomac Electric Power Company*, Adv. No. 05-04138, with the Bankruptcy Court (the "Pepco Complaint"). In the Pepco Complaint, the Debtors seek an order declaring that the amounts paid for the Pepco Assets exceeded the fair value of such assets and was a transfer in fraud of the rights of creditors under state law, as made applicable by section 544(b) of the Bankruptcy Code, and recoverable under section 550(a) of the Bankruptcy Code. The Pepco Complaint constitutes a counterclaim to Pepco's previously filed proofs of claim. In addition, in the Pepco Complaint the Debtors have objected to the Pepco Claims on the basis that: (i) the Pepco Claims should be disallowed under section 502(d) of the Bankruptcy Code; (ii) that no amounts are due and owing to Pepco, and (iii) the obligations on which the Pepco Claims are based arose under agreements which were voidable, fraudulent and illegal transfers.

### 5.  SMECO — Southern Maryland Electric Cooperative[1]

On March 15, 2004, Mirant Peaker, Mirant Chalk Point, and Mirant commenced an adversary proceeding in the Bankruptcy Court, Adv. No. 04-4073, seeking a declaratory judgment from the Bankruptcy Court that the Facility and Capacity Credit Agreement (the "FCC Agreement") with Southern Maryland Electric Cooperative, Inc. ("SMECO") constitutes an unexpired lease of nonresidential real property and that any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code. The complaint names both SMECO and Pepco as defendants, as certain of the Debtors are Pepco's assignee under the FCC Agreement. Under the FCC Agreement, certain of the Debtors use and occupy an electric power generation facility built by SMECO and are obligated to pay SMECO approximately $5,000,000 million per year until 2015. Pepco has guaranteed the performance of the Debtors' obligations under

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

the FCC Agreement to SMECO. The Debtors maintain that the FCC Agreement should be characterized as a real property lease. SMECO and Pepco dispute this characterization of the FCC Agreement.

The parties have completed discovery and filed motions for summary judgment. Subsequent to the filings, the parties agreed that the Bankruptcy Court could rule upon the motions for summary judgment without oral argument. The Bankruptcy Court has not yet ruled upon these motions, nor set a trial date. If the Bankruptcy Court grants the Debtors' summary judgment motion and characterizes the FCC Agreement as a lease, Mirant expects to reject the lease under the Plan. See "The Chapter 11 Plan — Executory Contracts and Unexpired Leases — Special Provisions Relating to the FCC Agreement and the Site Lease."

## F.   Other Estate Claims — Avoidance Actions

The Bankruptcy Code provides that certain transactions may be avoided as preferential or fraudulent transfers. For a general discussion of preferences and fraudulent conveyances, see "Certain Affiliate Transactions — Potential Claims and Remedies." Section 546(a) of the Bankruptcy Code requires that a chapter 11 debtor file avoidance actions within two years after filing of the bankruptcy proceeding, unless the Debtors and a potential avoidance action defendant enter into an agreement to toll that two-year period, or other equitable considerations apply.

The deadline for commencing avoidance actions for the Original Debtors was July 14, 2005. Before the avoidance action deadline, the Debtors conducted an investigation of their prepetition transactions to identify potential preferential or fraudulent transfer claims with respect to those transactions. While the Debtors determined that certain colorable avoidance action claims exist, the Debtors filed a motion with the Bankruptcy Court for an order authorizing the Debtors to enter into agreements with potential defendants to toll the avoidance action deadline. The Debtors filed the motion in the interest of preserving the resources of the estates while the enterprise valuation process continued to unfold and the Debtors and their stakeholders continued negotiating the terms of the Plan.

The Debtors have taken all necessary and appropriate steps to ensure that all viable and cost-efficient claims against third-parties are commenced prior to the expiration of any applicable limitations period. However, given the complexity and magnitude of the Debtors' estates, the Debtors sought to toll the applicable limitations period out of an abundance of caution. See "The Chapter 11 Plan — Designated Net Litigation Recoveries."

### 1.   The Tolling Motion

On June 7, 2005, the Debtors filed the *Debtors' Motion To: (I) Approve Stipulation Tolling Statute Of Limitations And Authorize The Debtors To Enter Into Other Tolling Agreements With Third Parties, (II) Extend Statute Of Limitations Relating To Third Parties, And (III) Preserve The Debtors' Right To Utilize Sections 502(b)(1) And (d) After Expiration Of Applicable Statute Of Limitations Periods* (the "Tolling Motion"). Pursuant to the Tolling Motion, the Debtors requested entry of an order: (a) authorizing the Debtors to enter into the Stipulation Tolling Statute of Limitations by and among the Debtors (the "Inter-Debtor Toll") and enter into other tolling agreements with third parties which are necessary, in the Debtors' reasonable business judgment (with the Inter-Debtor Toll, the "Tolling Agreement Request"); (b) tolling, extending, and suspending the statutes of limitations set forth in sections 108, 546 and 549 of the Bankruptcy Code and other applicable statutes of limitation relating to actions against non-Debtor third parties (the "Limitations Extension Request"); and (c) confirming and preserving the Debtors' right to assert defenses to claims pursuant to sections 502(b)(1) and (d) of the Bankruptcy Code after the expiration of any applicable periods (the "502 Request").

A hearing on the Tolling Motion was held on June 30, 2005 and the Bankruptcy Court entered an order (i) granting the Tolling Agreement Request; (ii) granting the 502 Request (with certain limitations), and (iii) denying the Limitations Extension Request, but preserving the Debtors right to argue, in certain cases, that any applicable limitations period has been extended under the principles of equitable tolling and/or waiver of applicable statutes of limitations (the "Tolling Motion Order").

Pursuant to the Tolling Motion Order, the Debtors have entered into tolling agreements with each of Couch White, LLP, Orange & Rockland Utilities, Inc., Consolidated Edison Company of New York, NYISO, Troutman Sanders LLP, Morgan Stanley & Company, Inc., Goldman, Sachs & Company, Lehman Brothers and Lehman Commercial Paper, Inc., Bank of America and Deutsche Bank Trust Company Americas. In addition to the Inter-Debtor Toll, the Debtors also entered into a tolling agreement with 79 affiliated, wholly owned entities as listed in Schedule 9. Each of the following current or former officers and or directors have also executed separate tolling agreements with the Debtors: William Dahlberg, Marce Fuller, A.D. Correll, Stuart E. Eizenstat, David J. Lesar, Robert F. McCullough, James F. McDonald, Ray M. Robinson, Edwin H. Adams, Carlos Ghosn, Steve Gillis, Randall Harrison, Raymond D. Hill, William Hjerpe, J. William Holden III, Gary Morsches, Sean Murphy, Richard J. Pershing, David Rozier, Michael L. Smith and Harvey Wagner. The Debtors filed the following avoidance actions which were not tolled by the Tolling Motion Order or separate agreement.

## 2. Preference Actions

The Debtors' financial advisors and counsel analyzed the Debtors' payments to third parties within 90 days preceding the Petition Dates of each of the relevant Debtors to determine the possibility of any preferential payments under section 547 of the Bankruptcy Code. Such analysis was conducted with respect to insiders concerning payments made to insiders within 1 year preceding each Petition Date. The analysis revealed that, while the Debtors may have made some preferential payments to third parties, the potential recovery of such payments in the aggregate were not large enough to justify the costs associated with seeking to recover those payments. After extensive discussions with the Corp Committee, and carefully weighing the costs and benefits associated with seeking to recover preferential payments, the Debtors determined that filing preference actions under these circumstances would not be in the economic interests of the Estate, its creditors, and equity holders. Therefore, no preference actions were filed except in conjunction with some of the fraudulent transfer actions identified below.

## 3. Fraudulent Transfer Actions

On July 13, 2005, in addition to other actions commenced as previously described herein the Debtors filed the following actions to recover amounts as fraudulent transfers:

**a. In re: MAEC, LP et al. v. Castex Energy, Inc., et al. (Adv. No. 05-04139 No. 1) (the "Castex Fraudulent Transfer Action")**

On June 14, 2001, Mirant Americas Energy Capital, LP ("MAEC") and Castex Energy, Inc. ("Castex"), Castex Energy 1995, L.P. ("Castex 1995"), Castex Energy 1996, L.P., and LaTerre Co., Ltd. ("LaTerre", and collectively referred to as the "Castex Defendants") entered into the Purchase and Sale Agreement (the "2001 Purchase Agreement"). On October 16, 2002, MAPCO, Mirant South Louisiana Production, LLC ("MSLP") and Mirant Southern Louisiana Fee, LLC ("MSLF")[1] and Castex 1995, LaTerre and Castex entered into a Purchase and Sale Agreement (the "2002 Purchase Agreement").

Under the 2001 Purchase Agreement, MAEC agreed to purchase 75% of the Castex Defendants' rights, titles and interests in certain oil and gas interests and lands located in Cameron, Terrebonne, Iberia, Lafourche, Jefferson Davis and Vermilion Parishes, Louisiana (the "Assets") and the Castex Defendants agreed to transfer to MAEC 75% of the capital stock in Castex LaTerre, Inc. (the "Stock" and together with the Assets, the "Property") for a purchase price of approximately $198,750,000. This transaction was completed on August 31, 2001. In the 2002 Purchase Agreement, MAPCO, MSLP and MSLF agreed to sell the Property back to Castex 1995, LaTerre and Castex for a purchase price of $134,633,939.[2] This transaction was completed on December 11, 2002. As a result of the 2002 Purchase Agreement, the Castex Defendants reacquired the 75% interest that they had sold pursuant to the 2001 Purchase Agreement. The Castex Defendants subsequently sold their 100% interest in that property in December 2002 to Apache Corp. for $260,000,000.

---

[1] MSLP and MSLF no longer exist.

[2] This figure is adjusted from the $150,000,000.00 purchase price stated in the 2002 Purchase Agreement.

In the Castex Fraudulent Transfer Action, Debtors seek to avoid certain obligations and transfers of property under the terms of the 2001 Purchase Agreement and the 2002 Purchase Agreement. The Castex Fraudulent Transfer Action is currently stayed. See "The Chapter 11 Plan — Designated Net Litigation Distributions."

**b. In re: Mirant v. Salomon Smith Barney, et al. (07/13/05; Adv. No. 05-04140 No. 1) (the "MADCI Fraudulent Transfer Action")**

As discussed in "General Information — Existing Financing Transactions of the Debtors — Mirant Americas Development Capital, LLC," on October 22, 2001, MADCI, the MC Trust Lessor, U.S. Bank National Association (the "Trustee"), various persons named as "Noteholders" and "Certificate Holders" and Citibank, N.A. ("Citibank") entered into the Equipment Warehouse Facility pursuant to which the purchase of the Turbine Facility Equipment was financed.

The MC Trust Lessor, formed for the purpose of owning the Turbine Facility Equipment, is subject to an Amended and Restated Declaration of Trust, dated as of October 22, 2001, among State Street[1] and various Certificate Holders. To facilitate the transactions contemplated by the Equipment Warehouse Facility, the MC Trust Lessor, as lessor, and MADCI, as lessee, entered into the Lease Agreement dated as of October 22, 2001 (the "Lease"), which provides that MADCI may either purchase or lease, on a triple-net basis, the Turbine Facility Equipment from the MC Trust Lessor. In order to facilitate the financing of the transactions pursuant to the Lease, the MC Trust Lessor entered into a Loan Agreement dated as of October 22, 2001 among the MC Trust Lessor, Citibank, as Agent, and various Noteholders, including Citibank (in its capacity as a Noteholder), Dresdner Bank, Bank of America, Scotiabanc, Kreditanstalt, Commerzbank, CSFB, Royal Bank, Toronto Dominion and Bayerische Landesbank.

In order to facilitate the financing of the transactions pursuant to the Lease, the MC Trust Lessor and MADCI entered into an Agency Agreement, dated as of October 22, 2001, (the "Agency Agreement") which provides that MADCI is to act as the MC Trust Lessor's agent, in its capacity as lessor under the Lease and perform certain acts. The MC Trust Lessor, MADCI and General Electric Company ("GE") entered into the Master Equipment Purchase and Sale Agreement (the "Master Purchase Agreement") dated December 20, 2000. Pursuant to an Assignment of Purchase Rights (the "Assignment"), dated as of January 30, 2002, the MC Trust Lessor assigned its rights in the Master Purchase Agreement to MAI, as assignee, with respect to certain Turbine Facility Equipment. The MC Trust Lessor and MAI also executed an Assignment and Assumption Agreement (the "Assumption Agreement"), dated as of January 30, 2002, pursuant to which MAI assumed certain obligations to GE under the Master Purchase Agreement with respect to the items of equipment subject to the Assignment agreement.

Pursuant to the Agreement to Offset Amounts Owed by MC Equipment Revolving Statutory Trust to General Electric Company for Termination Payments, for Certain Turbines Terminated, Against Certain Amounts Owed by GE to Mirant Americas, Inc. (the "Offset Agreement"), executed on or about July 11, 2003, among MAI, the MC Trust Lessor and GE, GE offset $3,562,320 owed by it to MAI against an obligation owed by the MC Trust Lessor to GE. On the date of this offset, the eve of the Petition Date, MAI was, or was thereby rendered, insolvent. Upon the avoidance of the Assumption Agreement, MAI's obligation to GE will have also been avoided, and MAI will have received no value in exchange for the offset.

A Consent, Wavier and Amendment to Operative Documents (the "Consent and Waiver") dated as of July 14, 2003 was executed among MADCI, the MC Trust Lessor, U.S. Bank (as Trustee of the MC Trust Lessor) and various Note Holders and Certificate Holders pursuant to the Equipment Warehouse Facility, consenting to the termination of the Master Purchase Agreement.

Mirant executed a Guaranty (the "Mirant Guaranty"), dated as of October 22, 2001, guaranteeing the obligations pursuant to certain "Operative Documents." Mirant received neither fair consideration nor reasonably equivalent value in exchange for the Mirant Guaranty. As of the date of the Mirant Guaranty, the claim alleges that both MADCI and Mirant were insolvent. Mirant Services had no obligations under the

---

[1] U.S. Bank acts as Successor Trustee of the Trust.

Master Purchase Agreement, Assumption Agreement, Equipment Warehouse Facility, Lease Offset Agreement and Consent and Waiver, all as amended or supplemented, and all related documents (sometimes hereinafter referred to as the "Equipment Lease Transactions"). Other than the Assumption Agreement, MAI did not execute any guaranty or other writing to evidence or support any obligations on its behalf relating to, or arising under, the Equipment Lease Transactions.

Various Debtors made payments pursuant to the Equipment Lease Transactions: (i) MAI made the following payments: (a) three (3) payments totaling $33,338,386 on January 30, 2002; (b) seven payments totaling $63,750,320 on October 11, 2002; (c) a payment of $49,517,039.19 on October 29, 2002; and (d) a payment of $43,750,600 on November 21, 2002 (collectively, the "MAI Payments"); (ii) Mirant Services made a payment of $8,982,103 on each of April 15, 2003, April 15, 2003 and June 16, 2003 (sometimes hereafter collectively referred to as the "Mirant Services Payments" and the MAI Payments and Mirant Services Payments are sometimes collectively referred to as the "Subsidiary Payments"); (iii) Mirant Corp. made: (a) two payments of $950,787 on February 27, 2003 (sometimes collectively referred to as the "Mirant Corp. Payments"); and (b) three payments of $809,848 on each of August 30, 2002, September 30, 2002 and October 30, 2002 (sometimes collectively referred to as the "Siemens Payments").

In the MADCI Fraudulent Transfer Action, Debtors Mirant, MAI, Mirant Services and MADCI seek (1) to avoid (a) the Mirant Guaranty, the Mirant Corp. Payments, the Siemens Payments, the transfer of funds through the Subsidiaries to make the Subsidiary Payments and any other alleged obligations of Mirant Corp. relating to the Equipment Lease Transactions; (b) the Assumption Agreement, MAI Payments and any other alleged obligations of MAI relating to the Equipment Lease Transactions; (c) any alleged obligations of Mirant Services relating to the Equipment Lease Transactions, including the Mirant Services Payments; and (d) any payment to GE by the Debtors in relation to the Equipment Lease Transactions, including those made pursuant to the Offset Agreement; and (2) recovery of payments from the immediate or mediate transferees pursuant to section 550(a) of the Bankruptcy Code. With respect to the payment to GE, the Debtors alternatively seek recovery of such payments as preferential transfers.

Citibank, the Noteholders and the Certificate Holders assert that to the extent that any prior transaction is avoided resulting in the return of cash by such parties to the Debtors, such parties' claim against MADCI and Mirant will increase by an amount equal to the amount of cash returned, but as to Mirant, only to the extent of the Mirant Guaranty and to the extent such guaranty is not avoided.

The MADCI Fraudulent Transfer Action is currently stayed. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### c. In re:  Mirant v. Salomon Smith Barney — f/k/a Smith Barney, et al. (Adv. No. 05-04144 No. 1) (the "CSFB Fraudulent Transfer Action")

In the CSFB Fraudulent Transfer Action, Mirant seeks to recover from Salomon Smith Barney f/k/a Smith Barney, a division of Citigroup Global Markets, Inc., Citibank, NA and Credit Suisse First Boston (collectively, the "Bank Defendants") fraudulent conveyances of corporate assets, to avoid certain obligations incurred to the Bank Defendants, and to equitably invalidate or subordinate the Bank Defendants' claims to those of all other creditors in Mirant's bankruptcy case. Mirant also seeks to hold the Bank Defendants liable for aiding and abetting Southern's breach of its fiduciary duties to Mirant and waste of Mirant's corporate assets. The investigation of potential claims and causes of action arising from transfers by Mirant to Southern in connection with the IPO and Spin-Off is discussed in "Material Claims, Litigation and Investigation — Disputed Claims With Associated Estate Causes of Action — Southern Company Investigation Litigation."

Mirant's causes of action against the Bank Defendants arise out of obligations incurred ("Obligations") to the Bank Defendants in certain third-party transactions ("Transactions") by Mirant, while a wholly owned subsidiary of Southern, and by various direct and indirect subsidiaries of Mirant to the detriment of Mirant's creditors. Certain of the proceeds from the Transactions ("Proceeds") went directly to Southern.  The Debtors argue that the Bank Defendants not only received repayment of the Obligations (the "Repayment Transfers"), but also earned millions of dollars in fees, interest and expenses for these Transactions (the

"Transaction Fees"), which provided no benefit to Mirant or Mirant Affiliates to the extent the Proceeds were distributed to Southern.

Mirant is seeking to avoid the Repayment Transfers, the payment of the Transaction Fees (collectively, the "Transaction Transfers") conveyed and the obligations Mirant incurred to the detriment of Mirant's creditors and to recover the Transaction Transfers from the Bank Defendants. Mirant's causes of action against the Bank Defendants arise out of Obligations incurred in that certain Purchase Agreement dated as of July 21, 1999 (the "Purchase Agreement"), by and between Bank Defendants and Mirant (while named SEI), in connection with the issuance of those certain $200,000,000 7.40% Senior Notes due 2004 and those certain $500,000,000 7.90% Senior Notes due 2009 ("144A Notes").

Bankers Trust Company and Mirant entered into that certain Fiscal Agency Agreement dated July 26, 1999 and related agreements in connection with the 144A Notes (the "Fiscal Agency Agreement"). According to the Fiscal Agency Agreement, the 144A Notes were unsecured obligations of Mirant and ranked <u>pari passu</u> with all other unsecured and unsubordinated obligations of Mirant. On July 26, 1999, Southern caused Mirant to borrow $700,000,000 through the issuance of the 144A Notes. In exchange for substantially assisting Southern in issuance of the 144A Notes, Bank Defendants earned substantial Transaction Fees. Even though Southern's public reports stated that its advances ("Advances") to Mirant of funds necessary to acquire investments in a number of energy facilities ("Investments") were corporate contributions, Southern caused itself to receive $289,500,000 of the proceeds from the 144A Notes, $192,500,000 of which "reduced" the Advances and $97,000,000 of which Southern deemed to be "interest" on the Advances. The Bank Defendants received Transaction Transfers from Mirant in connection with the Purchase Agreement.

The CSFB Fraudulent Transfer Action is currently stayed. Mirant Corp. has entered into a tolling agreement with Bankers Trust Company's successor, Deutsche Bank Trust Company Americas. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### d. In re:   Mirant v. Commerzbank, AG (07/13/05; Adv. No. 05-04142 No. 1) (the "Commerzbank Fraudulent Transfer Action")

During December of 2000, Mirant Asset Development and Procurement B.V. ("Mirant Europe") entered into a Master Equipment Purchase and Sale Agreement (as amended on May 22, 2002, the "Master Agreement") with GE and General Electric International, Inc. ("GEI," together with GE, the "Power Island Manufacturers") for the acquisition of nine 386-MW engineered equipment packages (each "Power Island" and collectively the "Power Islands"). In accordance with the Master Agreement, from time to time, Mirant Europe entered into an Agreement for the Purchase and Sale of Equipment with respect to each Power Island (each a "Project Specific Agreement").

Mirant executed and delivered a guaranty dated January 19, 2001, in favor of the Power Island Manufacturers (the "Equipment Guaranty"). In the Equipment Guaranty, Mirant guaranteed to the Power Island Manufacturers the obligations of Mirant Europe under the Master Agreement and each Project Specific Agreement.

The European Power Island Procurement B.V. ("European Power") was established to act as owner of the Power Islands. The ownership interest in European Power was held by Stichting European Power Island ("Stichting"). Prior to making any payments under the Master Agreement, Mirant Europe entered into a temporary off-balance sheet financing (the "Bridge Facility") with Westdeutsche LandesBank Girozentrale ("West LB"). The Bridge Facility was refinanced through another off-balance sheet financing, the 1,100,000,000 Euro Power Island Acquisition Facilities ("Facilities"). Mirant Europe and West LB entered into an Owner Assignment and Assumption Agreement dated February 15, 2001, assigning all of Mirant Europe's interest in the Master Agreement to West LB. Subsequently, European Power and West LB entered into a Purchase Option and Assignment and Assumption Agreement ("West LB Assignment"), dated May 25, 2001, assigning all of West LB's interest in the Master Agreement and certain other contracts to European Power.

In connection with the Power Island Facilities, Mirant Europe, European Power, Stichting, Commerzbank AG ("Commerzbank AG"), Commerzbank AG, New York Branch ("Commerzbank New

York"), Commerzbank AG, Grand Cayman Branches ("Commerzbank Grand Cayman," together with Commerzbank AG and Commerzbank New York, "Commerzbank"), ABN AMRO Bank NV. ("ABN AMRO"), IntesaBci, S.p.A ("IntesaBci"), ING Bank N.V. ("ING"), The Royal Bank of Scotland, plc ("Royal Bank"), Credit Lyonnais, ANZ Investment Bank and Australia and New Zealand Banking Group, Limited ("ANZ"), Danske Bank A/S ("Danske Bank"), Barclays Bank, plc ("Barclays Bank") and BNP Paribas ("BNP Paribas," together with European Power, Stichting, Commerzbank, ABN AMRO, IntesaBci, ING, Royal Bank, Credit Lyonnais, ANZ, Danske Bank, Barclays Bank, the "Facility Defendants") (or certain of them) as Lenders and Investors, and Commerzbank AG, New York Branch as Administrative Agent, entered into the participation agreement ("Initial Participation Agreement") dated May 25, 2001. Subsequently, on August 13, 2001, Mirant Europe, European Power, Stichting, Commerzbank AG, New York Branch and ABN AMRO and the Facility Defendants (or certain of them) entered into an Amended and Restated participation agreement (as amended from time to time, the "Amended Participation Agreement").

European Power and Mirant Europe entered into an amended and restated procurement agency agreement ("Procurement Agency Agreement") dated as of August 13, 2001. As procurement agent, Mirant Europe was required to administer the acquisition and construction of the Power Islands in accordance with the terms of the Master Agreement.

Mirant executed and delivered a guaranty dated May 25, 2001 (the "Participation Agreement Guaranty" and together with the Equipment Guaranty, the "Guarantees") in favor of Commerzbank AG, New York Branch, certain Lenders and Investors pursuant to the Initial Participation Agreement, European Power, Stichting and the Collateral Agent, and which are referred to in the Participation Agreement Guaranty as the "Beneficiary." In the Participation Agreement Guaranty, Mirant unconditionally guaranteed to the Beneficiary all amounts payable by Mirant Europe under the Initial Participation Agreement, Procurement Agency Agreement and West LB Assignment. When the Amended Participation Agreement was executed, Mirant executed a Consent and Acknowledgment by Mirant Corporation dated August 13, 2001, acknowledging that the Participation Agreement Guaranty was in full effect as to all amounts due under the Amended Participation Agreement and Procurement Agency Agreement.

Mirant Europe ultimately concluded that it would not utilize the Power Islands. Consequently, pursuant to the Amended Participation Agreement, Mirant Europe purchased the rights to the respective Power Islands for the purchase prices set forth in the Amended Participation Agreement. Simultaneously or shortly thereafter, Mirant Europe exercised the termination rights with respect to the Power Islands. To the extent that the progress payments previously paid equaled or exceeded the termination amount under the Master Agreement, no further amount was due. If the progress payments were less than the termination amount, Mirant Europe was required to pay the deficit.

In connection with the purchase options, certain payments were made to Commerzbank AG, New York Branch pursuant to the Amended Participation Agreement (collectively the "Transfers"). The funds to make the first two Transfers on February 22 and April 26, 2002, in the respective amounts of 6,900,000 and 7,400,000 Euros (the "Subsidiary Payments"), were provided to Mirant Investments Europe B.V. ("Mirant Investments") by Mirant. The last two Transfers on December 30, 2002 and February 28, 2003 were in the respective amounts of 4,500,000 and 118,073,950 Euros (sometimes hereinafter referred to as the "Mirant Payments").

As a result of the termination of the orders on the Power Islands, Mirant was required under the Equipment Guaranty to make a termination payment to GEI pursuant to the Master Agreement. On or around May 29, 2002, Mirant Europe or Mirant Investments paid directly to GEI or GE a termination payment in the amount of 7,092,060 Euros (the "Termination Payment"). The funds for the Termination Payment were provided to Mirant Investments by Mirant. Notwithstanding, on or around September 2002, Mirant Europe paid to GEI or GE a progress payment in the amount of 9,672,223 Euros ("GE Progress Payment" and, collectively with the Termination Payment, the "GE Payments"). The funds for the GE Progress Payment were provided by Mirant.

None of the Power Islands were ever delivered to Mirant Europe. In the Commerzbank Fraudulent Transfer Action, Mirant seeks entry of judgment against the Facility Defendants, European Power and/or Stichting to avoid all obligations incurred pursuant to the transactions described herein, including without limitation the Guarantees, the Transfers and the GE Payments. Mirant also seeks recovery of transfers pursuant to section 550(a) of the Bankruptcy Code.

The Commerzbank Fraudulent Transfer Action is currently stayed pursuant to the Stay Order. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### e. In re: Official Committee for Mirant Creditors v. Harris, et al. (07/13/05; Adv. No. 05-04146 No. 1) (the "Harris Complaint")

On July 13, 2005, the Corp Committee filed the Harris Complaint against Elmer B. Harris, W.L. Westbrook, H. Allen Franklin, Frederick D. Kuester, Barney S. Rush, Gale E. Klappa, James A. Ward, Douglas L. Miller and Stephen A. Wakefield (the "Harris Defendants"), all former or current officers and/or directors of Southern and/or Mirant. Through the Harris Complaint, the Corp Committee sought to recover, for the benefit of the Debtors' Estates, damages for alleged breaches of fiduciary duties and duties of care, with respect to certain transfers (and acquisitions), owed to Mirant and its creditors by the Harris Defendants, and to recover certain dividends authorized by the directors.

On August, 25, 2005, at the request of the Corp Committee, the Bankruptcy Court entered an order dismissing the Harris Complaint.

### f. In re: Official Committee for Mirant Creditors v. Allen, et al. (07/13/05; Adv. No. 05-04145 No. 1) (the "Allen Complaint")

On July 13, 2005, the Corp Committee filed the Allen Complaint, on behalf of the estate of Mirant Corporation, *et al.*, against Thomas J. Allen, III; Dianne Davenport; John Edward Dorsett, Jr.; David T. Gallaspy; George P. Henefeld; Richard J. Koch; Frederick D. Kuester; John J. Robinson; Richard F. Owen; and James Arthur Ward (collectively, the "Allen Defendants") seeking to avoid over $5,000,000 in preferences and fraudulent conveyances made in connection with the purchase of annuities for certain former directors, officers and employees of the Debtors.

Prior to the Petition Date, in December 2002 and early 2003, the Debtors purchased approximately $17,000,000 of individual annuity contracts for approximately 25 active and non-active directors, officers and employees. The Corp Committee seeks to recover all amounts paid by the Debtors to or for the benefit of Allen Defendants in connection with the annuities purchased for such individuals. The Allen Complaint was stayed by order of the Bankruptcy Court entered August 2, 2005 (the "Stay Order") until the earlier of 180 days after August 2, 2005 or the Effective Date of the Plan.

### 4. Southern Transactions: Morgan Stanley & Co., Incorporated and Goldman Sachs & Co.

With respect to the Spin-Off of Mirant from Southern, Morgan Stanley and Goldman served as financial advisors and consultants to Mirant and Southern. Morgan Stanley and Goldman also provided underwriting services related to the IPO. Morgan Stanley and Goldman advised Mirant with respect to the IPO, the Spin-Off, and all related transactions. The Debtors are currently investigating potential causes of action against Morgan Stanley and Goldman related to the financial advice and consulting services they rendered to Mirant, including claims for, without limitation, aiding and abetting, breach of fiduciary duty and unjust enrichment. The Debtors and Morgan Stanley and Goldman have entered into a tolling agreement that tolls the statute of limitations while the Debtors conclude their investigation of potential claims against Morgan Stanley and Goldman. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### 5. Southern Transactions: Troutman Sanders, LLP

With respect to the divestiture of Mirant from Southern, Troutman Sanders, LLP ("Troutman") acted as counsel for both Southern and Mirant. Troutman's representation of Mirant included providing legal advice to Mirant regarding all aspects of the separation of Mirant from Southern, including the Separation Agreements, IPO, Spin-Off, and all related transactions. Troutman provided concurrent legal representation with respect to the foregoing matters to Southern. The Debtors are presently investigating potential causes of

action against Troutman arising out of its concurrent legal representation of Mirant and Southern. In addition, the Debtors filed an objection to the proofs of claim filed by Troutman.

By letter dated July 7, 2005, Mirant, the Corp Committee and the MAG Committee entered into an agreement with Troutman tolling any statutes of limitations or other time-related defenses to any claims that could be asserted against Troutman by such parties (the "Troutman Tolling Agreement"). In early September 2005, counsel for Troutman advised counsel for Mirant that it was revoking "acceptance" of the Troutman Tolling Agreement notwithstanding Troutman's express representation to the Bankruptcy Court at a hearing held on July 20, 2005 that it had executed and returned the Troutman Tolling Agreement to counsel for Mirant. Mirant believes that the Troutman Tolling Agreement is binding and enforceable against Troutman.

### 6. Southern Transactions: Lehman and Bank of America

With respect to certain of the financing activities of the Debtors during 1999 and 2000, certain financial institutions entered into the following transactions with the Debtors: (a) senior credit facilities of $1,450 million completed by Lehman Commercial Paper Inc., Initial Lender and Administrative Agent, and Lehman Brothers Inc., Advisor, Lead Arranger, and Book Manager ("Lehman") on behalf of MAG in October 1999 and (b) credit agreement between Mirant and Bank of America, N.A., Agent, and Banc of America Securities LLC, Lead Arranger ("Bank of America"), in May 2000, with commitments totaling $550,000,000, and increased in June 2000 to $1,000,000,000. The Debtors are presently investigating potential causes of action against Lehman and Bank of America including, without limitation, claims, either through affirmative acts or omissions for avoidance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, breach of contract, breach of professional duties, breach of statutory duties, and equitable subordination. The Debtors and Lehman and Bank of America have entered into tolling agreements that toll the statute of limitations while the Debtors conclude their investigation of potential claims against Lehman and Bank of America. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### 7. Southern Transactions; Arthur Andersen

On July 12, 2005, the Corp Committee, on behalf of Mirant and certain of its affiliates, filed a lawsuit against Arthur Andersen LLP ("Andersen") in the State Court of Fulton County, Georgia, Civil Action 05-EV-000130-B. On August 11, 2005, Andersen removed the lawsuit to the United States District Court for the Northern District of Georgia. The Corp Committee has filed a motion to remand the lawsuit to the State Court and the motion is pending before the District Court. In the Complaint the Corp Committee alleges that Andersen committed professional malpractice in connection with the services Andersen provided to Mirant. Among other deficiencies, the Corp Committee alleges that Andersen overlooked material weaknesses in Mirant's internal controls and otherwise failed to perform its audits according to the applicable professional auditing and accounting standards. After Andersen was replaced as Mirant's auditor in May 2002 it became necessary for Mirant to hire KPMG to re-audit its financial statements for 2000 and 2001. The Corp Committee alleges that the re-audit uncovered significant, material misstatements in the financial statements that were caused by Andersen's errors and omissions. Mirant restated its financial statements for 2000 and 2001. The Corp Committee seeks to recover the fees paid to Andersen, the fees paid to Mirant's replacement auditor to re-audit the 2000 and 2001 financial statements, the fees and expenses associated with Mirant's internal investigations and the investigations by the Securities and Exchange Commission resulting from Mirant's misstated earnings, and other damages resulting from Andersen's professional malpractice. While the Corp Committee believes the claims have merit, it cannot be predicted with any degree of certainty the amount, if any, that ultimately will be recovered from Andersen. See "The Chapter 11 Plan — Net Designated Litigation Distributions."

### 8. Causes of Action Subject to Stay

Each of the Castex Fraudulent Transfer Action, MADCI Fraudulent Transfer Action, CSFB Fraudulent Transfer Action, Commerzbank Fraudulent Transfer Action, the Allen Complaint (as each is described above in "Material Claims, Litigation and Investigations — Other Estate Claims — Avoidance Actions — Fraudulent Transfer Actions") and the DBSI Objection and HVB Objection (as each is described above in "Material

131

Claims, Litigation and Investigations — Detailed Description of Material Claims") were stayed by the Stay Order.

**9. Reservation of Rights with Respect to Tolled, Stayed and Potential Actions**

To the extent the Debtors and the parties to the Tolling Agreements cannot reach resolution in respect of such Avoidance Actions, the Debtors reserve the right and ability to prosecute any action against a party to a tolling agreement. The Debtors also reserve the right to prosecute any stayed action or any potential Causes of Action which are presently being investigated, including, without limitation, those identified in Schedule 7.

## XII.

## THE CHAPTER 11 PLAN

### A.  Introduction

Commencing in early 2004, the Debtors' management began to focus its efforts on assessing the business and its short- and long-term prospects in order to develop a credible business plan that could serve as a platform for negotiations with the Debtors' primary constituencies regarding the terms of a chapter 11 plan of reorganization. As a consequence of this exercise, by mid-2004, a number of fundamental principles were developed upon which a chapter 11 plan could be formulated:

(1)  the value of the Debtors' assets would be maximized for the benefit of all stakeholders by continuing to operate the business in substantially its current form;

(2)  the Debtors' balance sheet would have to be materially delevered in order to reduce to acceptable levels the risk of future defaults in the payment of debt;

(3)  absent a global settlement of intercompany claims and related matters arising from the thousands of transactions and transfers of value between and among the Debtors, overall value was at risk of material degradation to the detriment of all stakeholders; and

(4)  in order for Mirant to retain its ownership interest in MAG, the creditors of MAG would have to be paid in full.

Preliminary plan discussions between and among the Debtors, the Corp Committee and the MAG Committee began in earnest in the fall of 2004 and quickly produced consensus regarding the basic structure of a plan. In particular, the Corp Committee and the MAG Committee were both prepared to support a plan pursuant to which substantially all unsecured debt and obligations against Mirant and its non-MAG subsidiaries would be converted into equity in the reorganized company. In addition, both Committees also agreed that all unsecured claims against MAG and its subsidiaries would be paid in full mainly in cash and/or debt. Discussions soon broke down, however, over how best to achieve the foregoing results. The Corp Committee was of the view that the debt obligations of MAG should be reinstated and localized within the MAG Debtor family. In contrast, the MAG Committee believed that new debt should be issued at the Mirant level where it would be supported by the net cash flow of the entire enterprise. In attempting to broker a resolution of this issue, the Debtors developed the view that it would be advantageous to the enterprise to keep the MAG debt at MAG, but that significant assets and credit support would have to be provided to MAG in order to (a) make the plan appropriately feasible at MAG, and (b) support compromising the potential intercompany claims between Mirant and MAG. Simultaneously, on the basis of advice provided by the Debtors' financial advisor, Blackstone, management also began to crystallize its view that the overall value of the Debtors' business enterprise would be $2-3 billion less than the amount needed to pay the claims of all creditors in full. As such, given the magnitude of the shortfall and the absolute priority rule, management believed that the holders of Equity Interests in Mirant would be entitled to no recovery under the Plan.

To move the process forward and to frame the parties' ongoing negotiations, the Debtors filed their first proposed Plan of Reorganization on January 19, 2005. The Plan embodied the Debtors' views on the foregoing issues and also reflected the Debtors' effort to strike fair and appropriate compromises on the key disputed

issues. Although the Plan, as initially filed, did not enjoy the support of any of the Committees, each of the Corp Committee and MAG Committee acknowledged that the Plan was a constructive step in moving the Debtors toward an exit from chapter 11.

The Equity Committee vigorously objected to the Plan to the extent it treated the Equity Interests in Mirant as being "out of the money," and sought relief from the Bankruptcy Court to hold a shareholders' meeting in order to remove and replace Mirant's Board of Directors. In resolution of this motion, the Debtors agreed to conduct a valuation hearing in April 2005.

After 27 days of trial conducted over a 2-month period, on June 30, 2005, the Bankruptcy Court issued a preliminary letter ruling that directed the Debtors and their financial advisor to make certain revisions to the business plan and to adjust certain aspects of Blackstone's valuation methodology. As the parties had an opportunity to assess and consider the Bankruptcy Court's ruling, it quickly became apparent that the revisions to the business plan would take over 2 months, that the resulting determination of value was unlikely to produce a clear answer to the critical question that was before the Court, and that significant additional litigation likely awaited the parties, regardless of the answer.

Confronted with the risk of further material delay in the Debtors' exit from chapter 11, uncertainty regarding the ultimate result and mounting costs from ongoing chapter 11 administration, the Debtors, the Committees and Phoenix found themselves effectively driven into settlement negotiations regarding the open issues raised by the Debtors' then-pending Plan. The discussions accelerated and became increasingly intense during the last week of August and the first week of September, culminating in the Mirant Plan Term Sheet on September 7, 2005, the terms of which are now reflected by the Plan.

On the whole, the Plan is only slightly changed from the version that was initially filed by the Debtors in January, as amended in March. Notably,

- substantially all unsecured claims against the Mirant Debtors are still being converted to equity in the reorganized company;

- substantially all unsecured claims against the MAG Debtors are still being satisfied in full through a combination of reinstatement and new funding to be raised through the issuance of debt at confirmation; and

- significant value and credit support are still being provided to the MAG Debtors by the Mirant Debtors, although the terms of such support have now been brought into focus.

The most notable differences are that Equity Interests in Mirant are now participating in the plan recoveries on an agreed-upon basis, the recovery disputes between senior and subordinated debt have been resolved amicably, the precise terms for determining the recovery of the MAG creditors have now been established, and the terms on which litigation recoveries will be shared have been established. Importantly, because all of this has been achieved by agreements in compromise of numerous disputed issues, none of the results (or potential implications thereof) should be viewed as an admission of the validity of any party's position or any conclusion or inference that could be drawn therefrom.

Mirant and MAG each have a number of series of publicly-traded securities outstanding. Since the Petition Date, the trading in the Debtors' securities has been volatile. Attached as Schedule 14 is a chart reflecting the trading prices for the Debtors' publicly traded securities at various points in time (with monthly price points provided for the last year and weekly price points for September 2005).

## B.  Settlement of Certain Inter-Debtor Issues — Creation of Debtor Groups

In settlement and compromise of certain existing and potential disputes regarding Intercompany Claims and related matters, see "Certain Affiliate Transactions," pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan: (a) treats the Mirant Debtors as comprising a single Estate solely for purposes of voting on the Plan (except as set forth in Section 7.3 of the Plan), confirmation of the Plan and making Plan Distributions in respect of Claims against and Equity Interests in the Mirant Debtors under the Plan; and (b) treats the MAG Debtors as comprising a single Estate solely for purposes of

voting on the Plan (except as set forth in Section 7.3 of the Plan), confirmation of the Plan and making Plan Distributions in respect of Claims against and Equity Interests in the MAG Debtors. Such settlement and compromise shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any Assets and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

As a result of such settlement and compromise, Intercompany Claims between and among a Debtor in a Debtor Group and another Debtor in the same Debtor Group shall, solely for purposes of receiving Plan Distributions, be deemed resolved under the Plan and therefore not entitled to vote on the Plan. Further, all Intercompany Claims between the Mirant Debtors and the MAG Debtors shall, solely for the purposes of receiving Plan Distributions, be deemed resolved under the Plan and not entitled to vote on the Plan nor to receive any Plan Distribution. Notwithstanding the treatment provided under the Plan, the Plan permits the Debtors to otherwise restructure, in their discretion, Intercompany Claims for all other purposes other than for the making of Plan Distributions. For example, MAI's Claim on account of the MAI/WDF Note Claim shall not constitute an Intercompany Claim. Consequently, the MAI/WDF Note Claim will not be deemed satisfied in full (or in part) under or pursuant to the Plan, but shall remain a valid and enforceable Claim against WDF after the Effective Date that will be satisfied from the sale proceeds of the Wrightsville facility as described in "The Chapter 11 Cases — Material Asset Sales — Wrightsville" above. MAI shall not be entitled to vote on the Plan on account of the MAI/WDF Note Claim.

Under the Plan, any holder of a Claim against a Debtor and a Claim based on a guaranty of a base Claim given by a Debtor within the same Debtor Group (either the Mirant Debtors or the MAG Debtors) will receive a single recovery. This will include, without limitation, a single Claim from: (a) Claims arising under the Commodity Prepay Facility and the Commodity Prepay Guaranty, and (b) Claims arising under the Equipment Warehouse Facility and the Equipment Warehouse Guaranty. The single Claim treatment also eliminates having to commence Avoidance Actions to avoid downstream, upstream, and cross-stream guarantees. Such Avoidance Actions would require the valuation of various Debtors at the time such Debtors issued the respective guarantees. The prosecution of those Avoidance Actions would unnecessarily delay the administration of the Chapter 11 Cases, increase the costs of administration, result in uncertainty, and (in the judgment of the Debtors) ultimately end with overall recoveries that would be less favorable to all of the constituencies than that proposed in the Plan.[1]

The Plan, as initially filed, contemplated the grouping of the Debtors into two Debtor Groups in a manner similar to that which is contemplated by the current settlement and compromise set forth herein; however, such prior versions of the Plan utilized the nomenclature "substantive consolidation" to implement and describe such structure. In response to objections and other concerns raised by certain creditors of MAG asserting that the "temporary substantive consolidation" of the Debtors was not permissible, the Bankruptcy Court questioned whether the Plan was, in substance, providing for "substantive consolidation" as such term is used in applicable case law, particularly in light of the Plan's provisions providing for the tabulation of votes on a Debtor by Debtor basis. In its Memorandum Opinion issued on May 24, 2005, the Bankruptcy Court, without expressing any opinion as to the propriety of the substantive consolidation proposed by the Plan (prior to its amendment), announced that "[t]he substantive consolidation envisioned in the Plan, if approved by the court, is not the equivalent of a merger, however. It is only a temporary consolidation of estates of MAG and its subsidiaries for the limited purposes of voting on and confirmation of the Plan and determination of claims against the MAG Estate under the Plan. MAG and its various subsidiaries are not to lose their separate corporate identities through the proposed consolidation."

Many courts have confirmed plans that "substantively consolidate" debtors for purposes of voting on, confirming, and making distributions under a chapter 11 plan of reorganization while providing for the continued separate existence of the debtors. See, e.g., In re Magnatrax Corp., Case No. 03-11402 (Bankr. D.

---

[1] If the treatment of holders of a base claim against a Mirant Debtor and a guarantee of such base from another Mirant Debtor described in the preceding two paragraphs is not approved as part of the Plan, holders of a base claim against a Mirant Debtor and a guarantee of such base from another Mirant Debtor may possess additional substantive rights, which may result in a modification of the Plan.

Del. Nov. 17, 2003); In re Standard Brands Paint Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993) (noting that there is a distinction between the legal merger of two corporations and the merger of their bankruptcy estates and stating that "[t]he cases and the [Bankruptcy] Code do not state that in substantive consolidation the debtor corporations cannot keep their charters and continue operating as separate corporations."); In re Genesis Health Ventures, Inc., 280 B.R. 95, 98 (Bankr. D. Del. 2002), aff'd, 2005 WL 729031 (3d Cir. 2005) (noting that the plan, by consolidating two debtor groups for purposes of voting and distribution under the plan, "did not change the legal and organizational structure of the individual debtors"); Packaging Indus. Group, Inc. v. Dennison Mfg. Co., Inc. (In re Sentinel Products Corp., PI), 192 B.R. 41, 46 (N.D.N.Y. 1996) (noting that plan confirmed by bankruptcy court provided for the substantive consolidation of the debtors for purposes of the treatment of claims under the plan while providing that the debtors would continue to maintain their separate corporate existences). The Third Circuit's recently announced ruling in In re Owens Corning, 2005 WL1939796 (3rd Cir. 2005), though non binding on the Bankruptcy Court, calls into question the power of the courts to implement substantive consolidation as previously envisioned by the Plan.

The Debtors believe that, even as initially proposed, the resolution of intercompany issues and the consequent grouping of the Debtors into two Debtor Groups does not constitute formal substantive consolidation similar to that which was addressed by the Owens Corning decision. Accordingly, to simplify matters and to avoid the potential confusion and complexity of prolonged substantive consolidation litigation in the face of potential and anticipated objections to confirmation, including in light of the Owens Corning decision, the Debtors have amended the Plan to clarify that formal substantive consolidation is not being pursued and instead have replaced such provisions with the settlement described herein. Nevertheless, the principles announced by courts in their assessment of substantive consolidation may be relevant to the Bankruptcy Court's consideration of the proposed settlement of inter-Debtor matters as contemplated by the Plan. To the extent the Bankruptcy Court, however, determines that the Plan does in fact constitute a formal substantive consolidation or that a showing of substantive consolidation is necessary to confirm the Plan, the Debtors reserve the right to make such showing and to seek to substantively consolidate the Debtors into two Debtor Groups in a manner consistent with the settlement and compromise set forth herein.

As the claims of creditors of the MAG Debtors are either being paid in full or reinstated under the Plan, the settlement and compromise of Intercompany Claims resulting in the grouping of the MAG Debtors for distribution purposes will not have a negative economic impact on the value of recoveries received by such creditors.

To the extent that the creditors of the Mirant Debtors are not being paid in full, the grouping of the Mirant Debtors may have a potential adverse impact on the value of recoveries received by a limited number of creditors who may have claims against more than one Debtor arising from the same transaction, such as guarantee claims, or claims against certain Debtors where the asset values exceed the amount of liquidated liabilities reflected on such Debtors' books as compared to the value of distributions that would be payable by such Debtors on a stand alone basis under a different reorganization construct. The existence of Intercompany Claims and other latent liabilities relating to intercompany transactions, however, has introduced a great deal of uncertainty regarding the ultimate amount of liabilities that would need to be satisfied and the value of the assets that would be available to satisfy such liabilities at any one Debtor. In light of such uncertainty and the potential value degradation that might ensue from a protracted delay of emergence from chapter 11, the Debtors determined that the settlement embodied in the Plan represents a fair compromise of the outstanding issues and is in the best interest of all creditors. The Plan also contains a convenience class that provides for the payment in Cash of the full principal amount of all claims (subject to certain exceptions) under $25,000 and permits such amount to be increased up to $140,000 at the discretion of the Debtors for certain creditors of Debtors where the asset value exceeds the amount of liabilities without regard to the effect of latent Intercompany Claims. The Debtors believe that such mechanism mitigates substantially any negative consequences the global settlement and compromise may have or the rights of any individual creditors.

## C.  General Description of the Treatment of Claims and Equity Interests

### 1.  Administrative Claims and Tax Claims

Administrative Claims and Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Under the Plan, such Claims are to be paid in Cash in full once Allowed (or as otherwise agreed), and in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

### 2.  Treatment of Administrative Claims

#### a.  Administrative Claims Defined

An Administrative Claim is a right to payment that constitutes a cost or expense of administration of any of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estate of a Debtor, any actual and necessary costs and expenses of operating the businesses of a Debtor, any indebtedness or obligations incurred or assumed by a Debtor in connection with the conduct of its business on or after the Petition Date (including, without limitation, the obligations under the DIP Credit Agreement), any allowance of compensation or reimbursement of expenses to the extent allowed by a Final Order under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against an Estate of a Debtor under 28 U.S.C. § 1930.

#### b.  Estimation of Administrative Claims

The Debtors currently estimate that the aggregate amount of Administrative Claims to be paid in connection with the consummation of the Plan will be approximately $56,600,000. The Administrative Claims are comprised of the following material components: (i) Fee Claims of professionals retained by the Debtors and the Committees that will have been incurred but not paid as of the Effective Date of approximately $35,200,000; (ii) Fee Claims of the Old Indenture Trustees, and (iii) miscellaneous Administrative Claims of approximately $12,400,000 that are substantially comprised of cure amounts under assumed executory contracts and unexpired leases.

##### i.  Chapter 11 Professional Fee Claims

Shortly after the commencement of the cases, the Court issued "interim fee" orders authorizing the Debtors to pay 80% of the professional fees and 100% of the out-of-pocket expenses of professionals employed pursuant to orders of the Bankruptcy Court who timely submitted a monthly professional fee and expense statement to the Fee Review Committee, provided the Fee Review Committee did not object to the payment of such fees and expenses. The interim fee orders also required each professional receiving interim professional fee and expense payments to submit to the Fee Review Committee "Quarterly Compensation Summaries," after which the Debtors would be authorized to pay each professional the remaining 20% of fees that were withheld during the preceding quarter. The Debtors satisfied most of the professional Fee Claims during the Chapter 11 Cases pursuant to the interim fee orders. Approximately $269,000,000 in professional fees were incurred through July, 2005. Of that amount, approximately $222,000,000 was paid to professionals pursuant to the interim fee orders described above. Accordingly, the Debtors estimate that approximately $47,000,000 will need to be paid to professionals in accordance with orders of the Bankruptcy Court approving final applications for approval of professional fees and expenses.[1]

##### ii.  Fees and Expenses of the Old Indenture Trustees

The Old Indenture Trustees include the indenture trustees and fiscal agents of the Mirant Indentures and the MAG Indenture: Deutsche Bank Trust Co. Americas, HSBC Bank USA, Law Debenture Trust Company of New York, Wells Fargo Bank, N.A. and Bankers Trust Company. The Old Indenture Trustees and their

---

[1]  The Equity Committee has advised that certain of its retained professionals may seek additional compensation in accordance with retention orders previously entered by the Bankruptcy Court.

professionals are expected to assert claims for Indenture Trustee Fees. The Indenture Trustee Fees are expected to include compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys', agents' (including paying and transfer agents') fees, expenses and disbursements, incurred by the Old Indenture Trustees or their respective predecessors, before and after the Petition Date and consummation of the Plan. The payment of the Indenture Trustee Fees must be approved by the Bankruptcy Court pursuant to section 1129(a)(4) of the Bankruptcy Code, to the extent that section is applicable. If Bankruptcy Court approval is necessary and granted, the Indenture Trustee Fees will be paid in accordance with Section 10.9(i) of the Plan. The Confirmation Order shall provide that unless contested by the Debtors, the Indenture Trustee Fees shall be deemed reasonable without any further action of the Bankruptcy Court. To the extent disputes arise, such disputes shall be resolved by the Bankruptcy Court.

### iii. Professional Fees of the Phoenix Professionals

Conditioned upon approval by the Bankruptcy Court as required under the Bankruptcy Code, Phoenix shall be reimbursed from the Estates for their professional fees and expenses incurred in connection with the Valuation Hearing and otherwise in the Chapter 11 Cases including expert fees and disbursements and the incentive fee of counsel to Phoenix. Subject to reasonable opportunity to review such fees, each of the Debtors and the Committees shall not object to such fees to the extent they do not exceed $5,500,000 in the aggregate. The approval by the Bankruptcy Court of such fees shall be neither a prerequisite, nor a condition to, confirmation of the Plan.

### iv. Professional Fees of the MAG Ad Hoc Committee Professionals

Conditioned upon any approval by the Bankruptcy Court as required under the Bankruptcy Code, the MAG Ad Hoc Committee shall be reimbursed from the Estates for their professional fees and expenses incurred in connection with the Chapter 11 Cases. Subject to a reasonable opportunity to review such fees, each of the Debtors and the Committees shall not object to such fees to the extent they do not exceed $3,500,000 in the aggregate. Notwithstanding anything set forth herein, the approval by the Bankruptcy Court of such fees shall be neither a prerequisite, nor a condition to, confirmation of the Plan.

### v. Professional Fees of the Mirant Ad Hoc Committee Professionals

Conditioned upon approval by the Bankruptcy Court as required under the Bankruptcy Code, the Mirant Ad Hoc Committee shall be reimbursed from the Estates for their professional fees and expenses incurred in connection with the Chapter 11 Cases. Subject to reasonable opportunity to review such fees, each of the Debtors and the Committees shall not object to such fees to the extent they do not exceed $300,000 in the aggregate. Notwithstanding anything set forth herein, the approval by the Bankruptcy Court of such fees shall be neither a prerequisite, nor condition to, confirmation of the Plan.

### vi. Miscellaneous Administrative Claims

The Debtors will assume the executory contracts and unexpired leases identified on Schedule 12 (and any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases)." See "Executory Contracts and Unexpired Leases — Assumption and Assignment of Executory Contracts and Unexpired Leases." To assume such executory contracts and unexpired leases, the Debtors must "cure" any prepetition monetary defaults under those executory contracts and unexpired leases. The Plan provides that the Debtors will cure monetary defaults under assumed executory contracts and unexpired leases: (a) by payment of the default amount in Cash on the Effective Date or (b) on such other terms as agreed to by the Debtors and the counterparties to the assumed contracts and leases. The Debtors estimate that the cure amounts with respect to the executory contracts and unexpired leases being assumed under the Plan total approximately $12,400,000.

### c. Time for Filing Administrative Claims

The holder of an Administrative Claim, other than: (i) the DIP Claims; (ii) a Fee Claim; (iii) a liability incurred and payable in the ordinary course of business by a Debtor (and not past due), or (iv) an Administrative Claim that has been Allowed on or before the Effective Date or as part of the California Settlement, must file with the Bankruptcy Court and serve on the Debtors, the Committees and the Office of

137

the United States Trustee, notice of such Administrative Claim within forty days after service of Notice of Confirmation. Such notice must include at a minimum: (a) the name of the Debtor(s) which are purported to be liable for the Administrative Claim; (b) the name of the holder of the Administrative Claim; (c) the amount of the Administrative Claim; and (d) the basis of the Administrative Claim. **FAILURE TO FILE A PROOF OF ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE SHALL RESULT IN SUCH ADMINISTRATIVE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

### d. Time for Filing Fee Claims

Each Professional Person who holds or asserts a Fee Claim is required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five days after the Effective Date. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

### e. Allowance of Administrative Claims/Fee Claims

An Administrative Claim with respect to which notice has been properly filed and served pursuant to Section 6.2(a) of the Plan shall become an Allowed Administrative Claim if no objection is filed within 30 days after the later of: (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Claim shall become an Allowed Administrative Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Claim only to the extent allowed by Final Order.

### f. Payment of Allowed Administrative Claims

Upon Allowance, each holder of an Allowed Administrative Claim shall receive: (i) the amount of such holder's Allowed Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

### g. Allowance and Payment of DIP Claims

The DIP Claims shall be allowed Administrative Claims on the Effective Date and shall be paid in Cash in full on the Effective Date. On the Effective Date, in accordance with the terms of the DIP Credit Agreement, any outstanding letters of credit issued under the DIP Credit Agreement shall be cash collateralized, replaced or secured with letters of credit issued under the Exit Facility.

### 3. Allowed Tax Claims

A Tax Claim is a Claim that is an Unsecured Claim for taxes of a kind and priority as specified in section 507(a) of the Bankruptcy Code. At the election of the Debtors, each holder of an Allowed Tax Claim shall receive in full satisfaction of such holder's Allowed Tax Claim: (a) the amount of such holder's Allowed Tax Claim, with Post-Confirmation Interest thereon, in equal annual Cash payments on each anniversary of the Effective Date, until the sixth anniversary of the date of assessment of such Tax Claim (provided that the Disbursing Agent may prepay the balance of any such Allowed Tax Claim at any time without penalty); (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder, or (c) such other treatment as may be agreed upon in writing by such holder; provided, that such agreed upon treatment may not provide such holder with a return having a present value as of the Effective Date that is greater than the amount of such holder's Allowed Tax Claim. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. The Debtors estimate the aggregate amount of Tax Claims to be paid in connection with the confirmation of the Plan to be about $15,000,000.