### 4. Classified Claims and Equity Interests

The classified Claims against, and Equity Interests in, the Debtors are classified in the Plan as follows:

   a. The classes of Claims against, and Equity Interests in, the Mirant Debtors under the Plan are as follows:

   i.   Mirant Debtor Class 1 — Priority Claims

   ii.  Mirant Debtor Class 2 — Secured Claims

   iii. Mirant Debtor Class 3 — Unsecured Claims

   iv.  Mirant Debtor Class 4 — Convenience Claims

   v.   Mirant Debtor Class 5 — Equity Interests

   b. The classes of Claims against, and Equity Interests in, the MAG Debtors under the Plan are as follows:

   i.    MAG Debtor Class 1 — Priority Claims

   ii.   MAG Debtor Class 2 — Secured Claims

   iii.  MAG Debtor Class 3 — New York Taxing Authorities Secured Claims

   iv.   MAG Debtor Class 4 — PG&E/RMR Claims

   v.    MAG Debtor Class 5 — Unsecured Claims

   vi.   MAG Debtor Class 6 — MAG Long-term Note Claims

   vii.  MAG Debtor Class 7 — Convenience Claims

   viii. MAG Debtor Class 8 — Equity Interests

### 5. Separate Classification of Certain Claims

Although Secured Claims against the Mirant Debtors and the MAG Debtors have been placed in one category with respect to each Debtor Group for purposes of nomenclature, each such Secured Claim shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions (to be designated as Mirant Debtor Class 2A, Mirant Debtor Class 2B, Mirant Debtor Class 2C, etc.; MAG Debtor Class 2A, MAG Debtor Class 2B, MAG Debtor Class 2C, etc.). In addition, each of the three PG&E/RMR Claims, which have been placed in one category for purposes of nomenclature, shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions (to be designated MAG Debtor Class 4A, MAG Debtor Class 4B and MAG Debtor Class 4C, etc.). Although the Claims of the New York Taxing Authorities have been placed in one category for purposes of nomenclature, each claim of the New York Taxing Authorities shall be treated as a separate claim for purposes of voting on the Plan (to be designated MAG Debtor Class 3A, MAG Debtor Class 3B, MAG Debtor Class 3C, etc.).

### 6. Separate Classification of Certain MAG Claims

Section 1122(a) of the Bankruptcy Code states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." Various courts have held that section 1122(a) only governs which claims can be grouped together in the same class but does not address whether all similar claims must be grouped together in the same class. Indeed, under Fifth Circuit precedent, similar claims need not be classified together so long as the debtor has a legitimate business reason for the separate classification. See In re Briscoe Ent., Ltd., II, 994 F.2d 1160, 1166-67 (5th Cir. 1993).

The Plan classifies and treats MAG Short-term Debt Claims differently than MAG Long-term Note Claims. As described in greater detail below, holders of MAG Short-term Debt Claims will receive a combination of: (a) Cash (or, if sufficient Cash cannot be obtained from the capital markets to make such Cash payment, the Debtors may elect to issue the New MAG Holdco Notes, the terms of which will be negotiated with the MAG Committee and the MAG Ad Hoc Committee), and (b) shares of New Mirant Common Stock, while the MAG Long-term Note Claims are unimpaired and the MAG Long-term Notes will be reinstated pursuant to section 1124 of the Bankruptcy Code. The Debtors believe that they have a

legitimate business reason for separately classifying and treating the MAG Short-term Debt Claims and the MAG Long-term Note Claims. For example, the Debtors note that while much of the obligations that form the basis of the MAG Short-term Debt Claims (specifically the MAG Short-term Notes) and all of the MAG Long-term Notes were issued pursuant to the MAG Indenture and are unsecured obligations of MAG, each series of notes has a different maturity date and a different interest rate and, consequently, has a materially different economic impact upon MAG. This requires that the MAG Short-term Notes and the MAG Long-term Notes be treated differently to maximize value for the stakeholders of MAG. The MAG Short-term Debt Claims include claims under the MAG Revolvers that matured shortly after the Chapter 11 Cases were commenced and MAG Short-term Notes that mature in 2006 and 2008. If such debt was to receive the same treatment as the MAG Long-term Notes (i.e., were reinstated pursuant to the Plan), MAG would be faced with having to repay or refinance the obligations that form the basis of the MAG Short-term Debt Claims upon, or shortly after, its emergence from chapter 11 and before MAG is able to execute its business plan. Conversely, if the MAG Long-term Notes were treated similarly to the MAG Short-term Notes (i.e., satisfied with Cash or New MAG Holdco Notes and shares of New Mirant Common Stock), New MAG Holdco would have to raise significantly more Cash at exit than currently required and, as of the Effective Date, be burdened with significantly more debt, which would impact the ability of New MAG Holdco to obtain an Exit Facility on favorable terms and conditions, thereby increasing risk to all MAG creditors.

## D. Provisions for Treatment of Mirant Debtor Claims and Equity Interests

The classes of Claims against the Mirant Debtors and Equity Interests in Mirant shall be treated under the Plan as follows:

### 1. Mirant Debtor Class 1 — Priority Claims

Under the Plan, a Priority Claim is any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims, and Tax Claims. Each holder of an Allowed Priority Claim against any of the Mirant Debtors shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles such holder in respect of such Claim shall be fully reinstated and retained. The Allowed Priority Claims against the Mirant Debtors aggregate approximately $44,000 and the total expected recovery thereon is 100%.

### 2. Mirant Debtor Class 2 — Secured Claims

#### a. Treatment of Secured Claims

There are approximately $152,100,000 of Claims that are secured by liens against the Assets of the Mirant Debtors. The West Georgia Facility Claims account for approximately $140,000,000 of the Secured Claims. The balance of the Secured Claims (approximately $12,000,000) are generally secured tax claims that are secured by real property and mechanics' liens claims. All holders of an Allowed Secured Claim (other than Deutsche Bank, as agent, described below) against any of the Mirant Debtors shall, at the sole option of the Debtors, receive on the Distribution Date:

(i) a Plan Secured Note (providing for simple interest at 5% per annum and shall be payable in twenty equal quarterly payments);

(ii) the collateral that secures payment of such Secured Claim;

(iii) a single Cash payment in an amount equal to the amount of such Allowed Secured Claim; or

(iv) if applicable, the implementation of any applicable valid right of setoff permitted under section 553 of the Bankruptcy Code.

If the holder of an Allowed Secured Claim receives treatment as provided in (i) above, such holder shall retain the liens securing the Allowed Secured Claim (or, at the Debtors' election, receive alternative collateral having a value at least equivalent to the existing collateral) until paid in full. Any deficiency amount related to

a Secured Claim against any of the Mirant Debtors shall be treated as a Mirant Debtor Class 3 — Unsecured Claim.

To provide flexibility for consensual resolutions, the Debtors and the holder of an Allowed Secured Claim against the Mirant Debtors may agree to any alternative treatment of such holder's Allowed Secured Claim; provided that such alternative treatment does not provide the holder with a recovery having a value in excess of the Allowed amount of such Secured Claim.

### b. Treatment of West Georgia Facility Claims

West Georgia, as borrower, is party to the West Georgia Credit Agreement, pursuant to which West Georgia owes the lenders approximately $139,700,000, the repayment of which is secured by a lien on substantially all of West Georgia's Assets, including its Cash.

If the holders of the West Georgia Facility Claims do not enter into and comply with their obligations under the West Georgia Settlement Agreement and do not vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code, the holders of the Allowed West Georgia Facility Claims, to the extent that the West Georgia Facility Claims are determined by the Bankruptcy Court to be Secured Claims, will receive on the Distribution Date: (i) a cash payment of up to $30,000,000, and (ii) to the extent that the secured portion of the West Georgia Facility Claims exceeds $30,000,000, the West Georgia Secured Note. The principal terms and conditions of the West Georgia Secured Note shall include the following: (A) simple interest accruing at the rate of 7% per annum, without compounding; (B) principal payments of $10,000,000 per annum on June 30 of each year through the earlier of (I) the date that less than $10,000,000 of principal remains outstanding in respect of the West Georgia Secured Note, and (II) June 30, 2014, with the balance, if any, payable on June 30, 2014. The West Georgia Secured Note provides for voluntary prepayments of the West Georgia Secured Note at any time without premium or penalty, and contains limitations on asset sales and dividends and distributions consistent with restrictions contained in investment grade debt documentation. The treatment of the Allowed West Georgia Facility Claims specified in this paragraph is hereafter referred to as the "Non-consensual West Georgia Treatment."

The holders of the West Georgia Facility Claims have indicated their objection to their proposed treatment under the Plan. West Georgia and Deutsche Bank have reached an agreement in principle regarding the terms of a consensual restructuring of the West Georgia Facility Claims. This agreement is subject to the negotiation of definitive documentation. If the parties are able to come to terms on such definitive documentation, the holders of the West Georgia Facility Claims will enter into a settlement agreement with West Georgia, pursuant to which West Georgia Facility Claims shall be treated as Allowed Secured Claims and restructured as provided in such definitive documentation in lieu of the treatment described above. The principal economic terms of the agreement in principle for the consensual restructuring of the West Georgia Facility Claims are as follows:

(i) on the Distribution Date, West Georgia will make a Cash payment to Deutsche Bank for the benefit of the West Georgia banks in the amount of $45,000,000 which shall be applied to reduce the outstanding principal amount of the West Georgia Facility Claims;

(ii) interest shall accrue on the balance of the amount outstanding under the West Georgia Credit Agreement at LIBOR plus 262.5 basis points through June 1, 2006, and at LIBOR plus 312.5 basis points through final maturity, in each case with a corresponding base rate option;

(iii) the final maturity date under the West Georgia Credit Agreement shall be extended to September 30, 2011;

(iv) after payment of $45,000,000 as set out in (a) above to the West Georgia banks and of certain Administrative Claims and other expenses, West Georgia will be permitted to make a Cash payment to MAI of $10,000,000;

(v) West Georgia shall be authorized to maintain a working capital reserve in the amount of $8,500,000;

141

(vi) so long as the foregoing payments have been made and the working capital reserve is fully funded, Deutsche Bank, an agent, shall be entitled to sweep on a quarterly basis any cash in excess of the working capital reserve, provided that the amount of such excess is at least $100,000; and

(vii) the terms of voluntary prepayments, and the limitations on asset sales and distributions and dividends, shall remain unchanged.

The foregoing are the principal economic terms of the modifications to the West Georgia Credit Agreement under the consensual treatment of the Allowed West Georgia Facility Claims. Final agreement on the consensual treatment terms is subject to definitive documentation satisfactory to the parties. Absent agreement to such definitive documentation, Deutsche Bank and the banks under the West Georgia Credit Agreement will be provided the Non-consensual West Georgia Plan Treatment on account of their Allowed Secured Claim.

### 3. Mirant Debtor Class 3 — Unsecured Claims

### a. Description of Mirant Debtor Unsecured Claims.

The Unsecured Claims are the largest single class of Claims against the Mirant Debtors. The holders of Mirant Debtor Class 3 — Unsecured Claims are summarized as follows:

| Mirant Corp Class 3 Claims | Principal and Prepetition Interest | Postpetition Interest | Total |
|---|---|---|---|
| Mirant Debt Claims | | | |
| Mirant C Facility | $ 447.1 | $ 57.0 | $ 504.1 |
| Mirant Term Loan | $1,127.2 | $162.9 | $1,290.2 |
| Mirant CSFB Facility | $ 708.0[a] | $ 65.2[b] | $ 773.3 |
| Corp Conv. Bonds (5.75%, 2007) | $ 380.6 | $ 56.9 | $ 437.5 |
| Trust Preferreds | $ 356.5 | $ 58.7 | $ 415.3 |
| Corp Bonds (7.4%, 2004) | $ 207.4 | 40.6 | $ 248.0 |
| Corp Bonds (7.9%, 2009) | $ 519.8 | $109.1 | $ 628.8 |
| Corp Conv. Bonds (2.5%, 2021) | $ 668.4 | $ 42.1 | $ 710.5 |
| Commodity Prepay Facility | $ 222.9 | $ 27.7 | $ 250.7 |
| Turbine Facility | $ 214.1 | $ 28.0 | $ 242.0 |
| Total Debt Claims | $4,852.3 | $648.4 | $5,500.7 |
| California Party Unsecured Claims | | | |
| California Parties | $ 177.3 | $ 4.7[c] | $ 182.0 |
| Other Unsecured Claims | | | |
| Pepco | $ 105.0 | $ 2.8 | $ 107.8 |
| Perryville | $ 108.3 | $ 2.9 | $ 111.2 |
| Mesquite Investors/Shady Hills Debt | $ 45.0 | $ 8.0 | $ 53.0 |
| Gas Transmission Northwest | $ 25.0 | $ 0.7 | $ 25.7 |
| Litigation | $ 220.0 | $ 5.8 | $ 225.8 |
| Other | $ 157.7 | $ 4.2 | $ 161.9 |
| Total Other Unsecured Claims | $ 661.0 | $ 24.4 | $ 685.4 |
| Total | $5,690.6 | $677.4 | $6,368.0 |

(a) As of September 15, 2005, $581,600,000 was owing on account of revolving credit advances and previous letter of credit draws and approximately $183,445,000 in letters of credit remained outstanding. $708.0 million represents the Debtors' estimate of the total claim after anticipated remaining letter of credit draws. The ultimate amount of allowed claims may be lesser or greater than the Debtors' estimate.

(b)  Does not include letter of credit fees of $19,200,000.

(c)  The Debtors have used the Federal Judgment Rate (without compounding) to calculate the interest due in respect of the California Party Unsecured Claim. The California Parties dispute the Debtors' use of the Federal Judgment Rate (without compounding) to calculate interest on the California Party Secured Claim asserting that higher contractual interest rates are applicable to the claims comprising the California Party Secured Claim. The Debtors and the California Parties will attempt to consensually resolve this dispute. If they cannot, the dispute shall be resolved by the Bankruptcy Court post-confirmation via a contested matter.

### b.  Treatment Under the Plan

The above chart identifying the "Other Unsecured Claims" includes both resolved and unresolved material litigation claims, executory contract and unexpired lease rejection claims and trade payable claims against the Mirant Debtors. The chart organizes those claims by category, specifically identifying some of the larger material litigation claims (Pepco, Perryville, Mesquite Investors/Shady Hills, Gas Transmission Northwest). The "Litigation" category includes the Unresolved, Disputed, Material Litigation Claims. See "Material Claims, Litigation and Investigations — Description of Claims — Unresolved, Disputed, Material Litigation Claims." The "Other" category includes (1) certain Resolved Material Litigation Claims, including Enron and EME, (2) executory contract and unexpired lease rejection claims and (3) trade payable claims.

The Plan delevers the Mirant Debtors and equitizes the Claims of the holders of the Allowed Mirant Debtor Class 3 — Unsecured Claims through the issuance of New Mirant Common Stock. Subject to Sections 15.4 and 17.3 of the Plan, each holder of an Allowed Mirant Debtor Class 3 — Unsecured Claim, including the Mirant Debt Claims (but excluding Convenience Claims) against any of the Mirant Debtors, shall receive on the Distribution Date a Pro Rata Share of (i) 96.25% of the shares of New Mirant Common Stock to be issued pursuant to the Plan, except for: (a) the shares to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims pursuant to Sections 5.2(d) and (e) of the Plan, respectively; and (b) the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs; and (ii) the right to receive the Designated Net Litigation Distributions allocated to holders of Allowed Mirant Debtor Class 3 — Unsecured Claims as provided in Section 10.13 of the Plan.

In addition, each holder of an Allowed Mirant Debtor Class 3 — Unsecured Claim (including holders of Allowed Claims in respect of Subordinated Notes) shall receive its Pro Rata Share of the Designated Net Litigation Distributions allocated to holders of Allowed Mirant Debtor Class 3 — Unsecured Claims as provided in Section 10.13 of the Plan. The mechanics of implementing this arrangement are to be agreed between the Debtors, the Corp Committee and the Equity Committee.

### c.  Inclusion of Postpetition Interest

Disputes existed with respect to the entitlement and/or accrual rate of postpetition interest. To facilitate a global settlement and thereby avoid the risk, expense, and uncertainty of litigation, the Debtors, the Corp Committee, and Phoenix provided parameters for allowance of postpetition interest to augment the Claims of the holders of Mirant Debtor Unsecured Claims.

The agreement on postpetition interest (embodied in the Plan and Term Sheet) provides that, for purposes of calculating Plan Distributions, the accrual of interest from the Petition Date through the Effective Date on Allowed Mirant Debtor Class 3 — Unsecured Claims (including Allowed Claims in respect of Subordinated Notes) that have a contractual interest rate shall be at the applicable non-default contractual rate with compounding to occur on the date of scheduled payments. With respect to holders of Allowed Unsecured Claims against the Mirant Debtors that do not have a contractual rate of interest, interest from Petition Date through the Effective Date shall be accrued at the Federal Judgment Rate without compounding.

The estimation of postpetition interest in the Disclosure Statement assumes an Effective Date of December 31, 2005. If the Effective Date occurs before or after December 31, 2005, appropriate adjustments in postpetition interest amounts will be made.

### d. Settlement of Certain Subordination Rights

As discussed above in "General Information — Existing Financing Transaction Transactions of the Debtors," Mirant issued $356,000,000 of 6¼% of the Subordinated Notes to Mirant Trust I. In turn, Mirant Trust I issued $345,000,0000 of 6¼% Trust Preferred Securities to purchase the Subordinated Notes.

The Subordinated Notes are contractually subordinated to certain senior unsecured creditors. A dispute existed over the scope and extent of the subordination, the enterprise value of the Debtors (see "Valuation" discussion above) and the accrual rate of postpetition interest of the senior creditors. To compromise and settle these disputes, the representatives of the major constituencies agreed to allocate value to the Subordinated Notes under the Plan (and Mirant Plan Term Sheet). Accordingly, the Plan allocates value between the holders of "Senior Debt" and the holders of Subordinated Notes and settles any disputes that could arise under contractual subordination provisions. Pursuant to the Plan, the Confirmation Order will provide:

(i) the right of the holders of "Senior Debt" (as defined in the applicable indenture) to enforce contractual subordination provisions against all holders of the Subordinated Notes shall be compromised and settled under the Plan on the following terms: each holder of Subordinated Notes shall receive a Pro Rata Share of (A) three and one half percent (3.5%) of the shares of New Mirant Common Stock to be issued under the Plan (which shares are included in the 96.25% referred to in "Chapter 11 Plan — General Description of the Treatment of Claims and Equity Interests — Mirant Debtor Class 3 — Unsecured Claims — Treatment under the Plan" and excluding the shares (I) to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims; provided, that, if any such shares are issued to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, then the holders of Subordinated Notes shall receive 3.5% of such issued shares; and (II) to be reserved for issuance pursuant to the New Mirant Employee Stock Programs), (B) the New Mirant Series B Warrants; and (C) the right to share on a pari passu basis in the Designated Net Litigation Distributions allocated to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims as provided in Section 10.13 of the Plan.

(ii) except for the Plan Distributions contemplated by Sections 15.4(a) and (b) and 10.13 of the Plan, any Plan Distribution that would otherwise be distributable under the Plan to the holders of the Subordinated Note Claims but for the enforcement of the subordination provision in the applicable indenture, shall be distributed to the holders of Allowed Mirant Debt Claims that constitute debt senior to the Subordinated Notes.

The Debtors estimate the aggregate amount of Allowed Claims in Mirant Debtor Class 3 — Unsecured Claims to be approximately $5,690,600,000 exclusive of approximately $677,400,000 of interest accrued on such amount during the Chapter 11 Cases. For purposes of calculating Plan Distributions, the accrual of interest from the Petition Date through the Effective Date on Allowed Mirant Debtor Class 3 — Unsecured Claims (including Allowed Claims in respect of Subordinated Notes) that have a contractual interest rate shall be at the applicable non-default contractual rate with compounding to occur on the date of scheduled payments. With respect to Allowed Mirant Debtor Class 3 — Unsecured Claims that do not have a contractual interest rate, the accrual or interest on such claims from the Petition Date through the Effective Date shall be at the Federal Judgment Rate without compounding.

### 4. Mirant Debtor Class 4 — Convenience Claims

The Plan creates a separate class of Unsecured Creditors designed to avoid the inefficiencies associated with distributions of securities to numerous creditors holding relatively small claims. The Mirant Debtor Class 4 — Convenience Claims promotes efficiency by providing immediate Cash payments to holders of relatively small Claims. The Plan also permits the Debtors to increase, following consultation with the Corp Committee, the amount of Convenience Claims in their discretion to pay in cash the full principal amount of

Claims of certain Creditors of Debtors which may be solvent without regard to the effect of latent Intercompany Claims. See "The Chapter 11 Plan — Settlement of Certain Inter Debtor Issues — Creation of Debtors Groups."

Under the Plan, a Convenience Claim with respect the Mirant Debtors is any Unsecured Claim in an amount equal to or less than $25,000, other than a Mirant Debt Claim (i.e., a Claim evidenced by a promissory note or similar instrument) or a Claim of a current or former director, manager, officer or employee of a Debtor. Each holder of an Allowed Mirant Debtor Class 4 — Convenience Claim shall receive a single Cash payment in an amount equal to the amount of such holder's Allowed Convenience Claim. The Debtors estimate that the aggregate amount of Allowed Claims in Mirant Debtor Class 4 — Convenience Claims to be up to approximately $6,200,000 and the total recovery is 100% of the principal amount of the Claim. The Debtors reserve the right to increase the $25,000 limitation amount, following consultation with the Corp Committee, up to an amount not to exceed $140,000 with respect to Mirant Peaker, Mirant Potomac, Mirant Zeeland, Mirant Las Vegas, Mirant Sugar Creek, LLC, Mirant Wichita Falls, LP, Mirant Wyandotte, and Shady Hills Power Company, L.L.C.

### 5.  **Mirant Debtor Class 5 — Equity Interests**

There are approximately 405,468,064 shares of existing Mirant common stock held by over 200,000 holders. As discussed above in "Valuation," there was hotly and vigorously contested trial regarding the enterprise value of the Debtors. The Equity Committee also challenged the entitlement and accrual right of postpetition interest for creditors of both the Mirant Debtors and the MAG Debtors. To avoid the continuing cost and expense of litigation, and the concomitant risk with respect to valuation, the Corp Committee agreed to allocate a portion of the New Mirant Common Stock to the holders of Equity Interests. The amount of New Mirant Common Stock allocated to the holders of Equity Interests is based solely on the agreement of the parties (considering the risks and expense of litigation, as well as facilitating the emergence of the Debtors from the Chapter 11 Cases) and is not based, in whole or in part, on any particular enterprise valuation of the businesses operated by the Debtors.

The settlement of the disputes, as provided in the Plan (and Mirant Plan Term Sheet), results in the cancellation of all existing Equity Interests of Mirant and the allocation, on the Effective Date to each holder of an Allowed Mirant Debtor Class 5 — Equity Interests of a Pro Rata Share of (i) three and three-quarters percent (3.75%) of the shares of New Mirant Common Stock to be issued under the Plan (excluding the shares (a) to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims, provided that, if such shares are distributed to holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, then holders of Allowed Mirant Debtor Class 5 — Equity Interests shall receive 3.75% of such shares and (b) to be reserved for issuance pursuant to the New Mirant Employee Stock Program), (ii) the New Mirant Series A Warrants (having terms as described in Exhibit E to the Plan), and (iii) the right to receive the Designated Net Litigation Distribution allocated to Allowed Mirant Debtor Class 5 — Equity Interests as provided in Section 10.13 of the Plan. The expected total recovery for the holders of Mirant Debtor Class 5 — Equity Interests is undetermined.

In addition, Cash payments in an amount equal to 50% of the Designated Net Litigation Distributions are to be paid to the holders of Allowed Mirant Debtor Class 5 — Equity Interests. The mechanics of implementing this sharing arrangement are to be agreed between the Debtors, the Corp Committee and the Equity Committee.

The Disclosure Statement Order provides that an informational "Town Hall" meeting (the "Meeting"), open to the public, may be held to respond to equity holder questions relating to the Plan and Disclosure Statement. The determination as to selection of specific questions for response at the Meeting will be made by the Equity Committee's professionals in consultation with the Examiner. In conducting the Meeting, the members of the Equity Committee, Committee professionals, the Examiner, and the Examiner's counsel (together, the "Participants") shall not be acting by or on behalf of the Debtors. None of the Participants shall have any liability for participation in the Meeting except for gross negligence or willful misconduct as determined by a Final Order of the Bankruptcy Court. Further, and without limitation of the foregoing, the Participants' responses and comments at the Meeting shall not be considered violative of any fiduciary,

confidentiality, or other obligations, including, without limitation, such obligations to the Debtors, equity holders, or other parties in interest, so long as the Participants do not provide material information beyond the information provided in, derived from, or complimentary to the Disclosure Statement, or otherwise made public. All mechanics of the Meeting shall be determined by the Equity Committee professionals in consultation with the Examiner. The Bankruptcy Court shall be the exclusive venue for resolving any disputes relating to the Meeting.

### e. Special Provisions relating to percentage of distribution of New Mirant Common Stock to Holders of Subordinated Notes and Equity Interests

The treatment of both the Subordinated Notes and Equity Interests includes a "proviso" that ensures that the Subordinated Notes and Equity Interests will receive 3.5% and 3.75%, respectively, of the New Mirant Common Stock issued under the Plan excluding shares reserved for employees and MAG classes 4 and 5 even if no distributions of New Mirant Common Stock are made to the holders of Claims against MAG Debtors. The "proviso" is a prophylactic provision requested by representatives of the Subordinated Notes and Equity Interests to ensure that if the New Mirant Common Stock that could be distributed to holders of Claims against MAG Debtors is instead distributed to holders of unsecured Claims against the Mirant Debtors, the holders of Subordinated Notes and Equity Interests will receive their agreed upon stock percentage calculated in reference to the larger pool of New Mirant Common Stock that is, in fact, distributed.

### E. Provisions for Treatment of MAG Debtor Claims and Equity Interests

The classes of Claims against the MAG Debtors and Equity Interests in MAG under the Plan are as follows:

### 1. MAG Debtor Class 1 — Priority Claims

Under the Plan, a Priority Claim is any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims and Tax Claims. Each holder of an Allowed Priority Claim against any of the MAG Debtors shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles such holder in respect of such Claim shall be fully reinstated and retained. The Allowed Priority Claims against the MAG Debtors aggregate approximately $11,000 and the total expected recovery is 100%.

### 2. MAG Debtor Class 2 — Secured Claims

The claims included in the MAG Debtor Class 2 — Secured Claims are (1) tax claims secured by real property and (2) the $11,500,000 Allowed Claim of Dick Corporation on account of a mechanics' lien.

#### a. Treatment of Secured Claims against the MAG Debtors

Each holder of an Allowed Secured Claim against any of the MAG Debtors (other than the MAG Debtor Class 3 — Allowed New York Taxing Authorities Secured Claims) shall, at the sole option of the Debtors, receive on the Distribution Date:

(i) a Plan Secured Note (providing for simple interest at 5% per annum and shall be payable in twenty equal quarterly payments);

(ii) the collateral that secures payment of such Allowed Secured Claim;

(iii) a single Cash payment in an amount equal to the amount of such Allowed Secured Claim; or

(iv) if applicable, the implementation of any applicable valid right of setoff permitted under section 553 of the Bankruptcy Code.

If the holder of an Allowed MAG Debtor Class 2 — Secured Claim receives treatment as provided in (i) above, such holder shall retain the liens securing the Allowed Secured Claim (or at the Debtors' election, receive alternative collateral having a value at least equivalent to the existing collateral) until paid in full. Any

deficiency amount related to a Secured Claim against any of the MAG Debtors shall be treated as a MAG Debtor Class 5 — Unsecured Claim.

Notwithstanding the specified distribution set forth above, the MAG Debtors and any holder of an Allowed MAG Debtor Class 2 — Secured Claim may agree to any alternate treatment of such Secured Claim; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of the amount of such holder's Allowed Secured Claim.

### b. Debtors' Estimate

The Debtors estimate that the aggregate amount of Allowed Claims in MAG Debtor Class 2 — Secured Claims to be approximately $39,200,000 plus $1,000,000 of interest accrued from the Petition Date through the Effective Date.

### 3. MAG Debtor Class 3 — New York Taxing Authorities Secured Claims

As discussed above in "Material Claims, Litigation, and Investigations — Disputed Claims With Associated Estate Causes of Action — NY Tax — New York Real Property Tax Litigation," the Debtors and the New York Taxing Authorities have been mired in acrimonious litigation for years. The Plan incorporates a framework for a settlement, subject to appropriate internal approvals and other conditions precedent, which would resolve fully all disputes with the New York Taxing Authorities as described in detail later in "Settlements and Compromises — Proposed New York Tax Settlement."

In general, the New York Taxing Authorities Secured Claims would be satisfied pursuant to the Proposed New York Tax Settlement subject to the satisfaction of all conditions precedent thereto. On the New York Debtors Effective Date, each holder of the New York Taxing Authorities Secured Claims would receive the treatment specified in the Proposed New York Tax Settlement. In the event (a) the Debtors and/or New York Taxing Authorities fail to obtain final internal approval of and satisfy all other conditions precedent to the Proposed New York Tax Settlement, (b) the New York Supreme Court fails to approve the Proposed New York Tax Settlement, or (c) the Bankruptcy Court does not approve the Proposed New York Tax Settlement, the New York Debtors will remain in chapter 11 until such matters are resolved. Even if the Proposed New York Tax Settlement is approved and the Plan confirmed for the New York Debtors, the Debtors anticipate that the New York Debtors will remain in chapter 11 while the Proposed New York Tax Settlement is being consummated.

The aggregate amount of New York Taxing Authorities Secured Claims in MAG Debtor Class 3 — New York Taxing Authorities Secured Claims is undetermined but the expected total recovery for the holders is 100%.

### 4. MAG Debtor Class 4 — PG&E/RMR Claims

Part of the Debtors' resolution of Claims relating to the California energy crisis is the resolution of the Claims of PG&E as part of the California Settlement. See "The Chapter 11 Case — Settlements and Compromises — California Settlement." The PG&E/RMR Claims are three separate Claims granted to PG&E pursuant to the California Settlement Agreement which relate to certain RMR agreements and to the asset purchase agreements pursuant to which Mirant Delta and Mirant Potrero acquired the Contra Costa, Pittsburg and Potrero power plants. PG&E as the holder of the PG&E/RMR Claims shall receive on the Distribution Date the treatment, releases and other consideration specified in the California Settlement for each of its Claims.

The Debtors estimate the aggregate amount of Allowed Claims in MAG Debtor Class 4 — PG&E/RMR Claims is approximately $133,000,000 (excluding any entitlement to interest under the Plan) and the expected total recovery for PG&E to be 100% of the Allowed Claims. Allowed Claims in MAG Debtor Class 4 — PG&E/RMR Claims will receive the same mix of securities and/or cash as the holders of MAG Class 5 Debtor Claims —Unsecured Claim and shall receive (a) at the option of the Debtors as exercised with respect to MAG Debtor Class 5 — Unsecured Claims, $119,700,000 either in Cash or New MAG Holdco Notes and (b) 0.2% of the shares of New Mirant Common Stock issued under the Plan (less the shares

147

reserved for issuance pursuant to the New Mirant Employee Stock Programs) except that the Allowed PG&E/RMR Claims shall not include any accrued interest.

Although the treatment of MAG Debtor Class 4 — PG&E/RMR Claims are similar to the allocation and mix of securities provided to that of MAG Debtor Class 5 — Unsecured Claims, the California Settlement Agreement requires separate classification and contains terms and provisions that are inapplicable to the holders of MAG Debtor Class 5 Claims. See "The Chapter 11 Cases — California Settlement."

### 5. MAG Debtor Class 5 — Unsecured Claims

#### a. Description of MAG Debtor Class 5 — Unsecured Claims.

The holders of MAG Debtor Class 5 — Unsecured Claims are summarized as follows:

| Claim | Principal and Prepetition Interest | Postpetition Interest | Total |
|-------|------|------|------|
| MAG Revolver | $ 300.4 | $ 39.3 | $ 339.7 |
| MAG Bonds (7.625%, 2006)[a] | $ 507.7 | $108.4 | $ 616.1 |
| MAG Bonds (7.20%, 2008)[b] | $ 306.2 | $ 61.7 | $ 367.8 |
| MAG Unsecured Claims | $ 43.1 | 1.1 | $ 44.2 |
| Total General Unsecured Claims | $1,157.4 | $210.5 | $1,367.9 |

[a] MAG bondholders will receive additional interest of 50 basis points beyond the stated rate from August 28, 2003 through July 28, 2005, when 10-K for the year ended December 31, 2004 was filed with the SEC.

[b] Same as above.

#### b. Treatment Under the Plan

Each holder of an Allowed Unsecured Claim against the MAG Debtors, including, without limitation, MAG Short-term Debt Claims (but excluding MAG Long-term Note Claims) will be paid in full through issuance to such holders of:

i. At the option of the Debtors, a Pro Rata Share of $1,231,110,000 in Cash or New MAG Holdco Notes. The Debtors intend to provide Cash distributions derived from the proceeds of the "Term Facility," issuance of the "Senior Notes" and/or the "Bridge Facility," or some combination thereof. See "Chapter 11 Plan — Exit Financing." To the extent the Debtors are unable to consummate the Exit Financing in full to provide sufficient Cash proceeds to permit all Cash distributions hereunder, the Debtors will issue New MAG Holdco Notes to satisfy any deficiency. Pursuant to the Mirant Plan Term Sheet, the Debtors have agreed to engage in good faith negotiations with the MAG Committee and the MAG Ad Hoc Committee regarding the terms of the New MAG Holdco Notes. The terms of the New MAG Holdco Notes contained on Schedule 10 hereof, and otherwise contained herein, do not yet necessarily reflect such negotiations. Further, the Debtors have agreed to use commercially reasonable efforts to obtain a Standard & Poor's rating and a Moody's rating for each series of the New MAG Holdco Notes (if they are issued); and

ii. A Pro Rata Share of 2.1% of the shares of New Mirant Common Stock issued under the Plan (excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs).

The treatment of Allowed Unsecured Claims against the MAG Debtors (excluding MAG Long-term Note Claims) is based upon an assumed Effective Date of December 31, 2005. To the extent the Effective Date occurs before or after December 31, 2005, the Plan Distributions will be adjusted to reflect the amount of accrued interest payable under subparagraph 5(c) below.

In determining the amount of New Mirant Common Stock and/or percentage of the Debtors post-emergence equity value (or total enterprise value, as applicable) to be received by holders of MAG Debtor Class 5 — Unsecured Claims, the Debtors have used a value and calculation methodology that is consistent with that used to determine the amount of New Mirant Common Stock or other value to be distributed to other constituencies under the Plan. This included, but is not limited to, the cash exercise price of the New

Mirant Warrants. Any change in such methodology applicable to the holders of MAG Debtor Class 5 — Unsecured Claims will be subject to the approval of the MAG Committee.

The Debtors estimate the aggregate of Allowed Claims in MAG Debtor Class 5 — Unsecured Claims to be $1,157,400,000 plus $210,500,000 of interest accrued from the Petition Date through the Effective Date. The expected total recovery for the holders is 100%. The face amount of the Cash or New MAG Holdco Notes and the percentage of New Mirant Common Stock are the result of negotiations by and among the Debtors, the Corp Committee, the Equity Committee, the MAG Committee and Phoenix, and reflects arms-length negotiations between the major constituencies. Such negotiations remain ongoing.

### c. Inclusion of Postpetition Interest

Disputes existed among the Debtors and their major constituencies regarding rates and methodologies for determining postpetition interest. The agreement on postpetition interest (embodied in the Plan and Mirant Plan Term Sheet) provides that, for purposes of making Plan Distributions to the holders of Allowed MAG Debtor Class 5 — Unsecured Claims including, but not limited to, the MAG Short-term Debt Claims, interest will be accrued at the contractual non-default rate from the Petition Date through the Effective Date for each holder (including (i) interest on interest, as contemplated by section 503 of the MAG Indenture, with semi-annual compounding on the date of each scheduled payment, and section 2.06(b)(ii) of each of the MAG Revolvers; and (ii) "Additional Interest," as such term is defined in section 2(e) of the MAG Registration Rights Agreements for the period August 28, 2003 through July 28, 2005, during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements). With respect to holders of Allowed Unsecured Claims against the MAG Debtors that do not have a contractual rate of interest, interest will be accrued at the Federal Judgment Rate, from the Petition Date through the Effective Date without compounding.

### 6. MAG Debtor Class 6 — MAG Long-term Note Claims

#### a. Description of MAG Debtor Class 6 — MAG Long-term Note Claims

The holders of MAG Debtor Class 6 — MAG Long-term Note Claims are summarized as follows (in millions):

| Claim | Principal and Prepetition Interest | Postpetition Interest | Total in Billions |
|---|---|---|---|
| MAG Bonds (8.30%, 2011)[a] . . . . . . . . . . . . . . . . . . | $ 864.3 | $201.5 | $1,065.8 |
| MAG Bonds (8.50%, 2021)[b] . . . . . . . . . . . . . . . . . . | $ 461.0 | $110.1 | $ 571.1 |
| MAG Bonds (9.125%, 2031)[c] . . . . . . . . . . . . . . . . . | $ 407.4 | $104.8 | $ 512.2 |
| Total MAG Long-term Note Claims . . . . . . . . . . . . | $1,732.7 | $416.4 | $2,149.1 |

[a] MAG Bondholders will receive additional interest of 50 basis points beyond the stated rate for the period beginning August 28, 2003 through July 28, 2005 when MAG's Annual Report on Form 10-K for the year ended December 31, 2004 was filed with the SEC.

[b] See above footnote.

[c] See above footnote.

#### b. Treatment Under the Plan

Each holder of an Allowed MAG Long-term Note Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code: (a) all of the legal, equitable and contractual rights to which such Claim entitles such holder against the MAG Debtors in respect of such Claim shall be fully reinstated and retained; (b) all defaults, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, shall be cured; (c) the maturity of such MAG Long-term Note Claim shall be reinstated; and (d) all amounts owed in respect of such Allowed MAG Long-term Note Claim (including (i) accrued

interest as collectible pursuant to Section 10.14(c) of the Plan, in respect of such Allowed MAG Long-term Note Claim, (ii) any amounts to which such holder is entitled pursuant to sections 1124(2)(C) and (D) of the Bankruptcy Code), and (iii) fees and expenses of the Old Indenture Trustees under MAG Long-term Notes) shall be paid in full on the later of the Effective Date and the date such amount otherwise becomes due and payable under the MAG Indenture and the MAG Long-term Notes, as reinstated, including the payment in Cash on the Effective Date of all unpaid interest accrued at the contractual rate through the Effective Date (including "Interest on Interest" and "Additional Interest," as defined in the MAG Indenture).

In addition, the Debtors have agreed to new covenants enforceable by the MAG Indenture Trustee and to be implemented by the Confirmation Order under the MAG Indentures for the benefit of holders of MAG Long-term Notes (a) that will provide that any payments from MAG to New Mirant at a time when MAG or its subsidiaries owe debt to New Mirant (or any of its non-MAG subsidiaries), shall be treated as a repayment of such debt, rather than as dividends, until all such debt is repaid and (b) that would limit the ability of MAG and its subsidiaries to incur additional debt (other than certain permitted debt), unless the consolidated ratio of net debt to EBITDA for MAG and its subsidiaries was 6.75:1 or less based on the most recently delivered financial statements and after giving pro forma effect. For purposes of this covenant, all terms are as defined in in the Exit Facility; provided that "Permitted Debt" would include (i) all debt at MAG and its subsidiaries as of the Effective Date, (ii) debt at MIRMA as permitted by the MIRMA Leases, (iii) debt arising under or permitted by the Exit Facility (excluding (A) "Subordinated Debt" as defined in the Exit Facility, and (B) intercompany loans not made in the ordinary course of business), (iv) an amount up to $200,000,000 of additional pari passu indebtedness at MAG, and (v) the refinancing of any of the foregoing debt; provided, that with respect to the refinancing of the MAG Long-term Notes maturing in 2011, subsidiaries of MAG may only incur up to $250 million of debt in addition to any unused portion of the $250 million additional debt basket provided for in the Exit Facility. The Debtors believe that the new covenants will not impair operations and/or anticipated available borrowings. Subject to the determination of the Indenture Trustee that it may amend the MAG Indenture without consent of the holders of MAG Long-term Notes, the Debtors have agreed to work with the MAG Committee and the Indenture Trustee toward issuing a supplement to the MAG Indenture incorporating the New MAG Debt Covenants, in addition to their inclusion in the confirmation order. The Debtors also have agreed to use reasonable commercial efforts to obtain a Standard & Poor's rating and a Moody's rating for each series of the MAG Long-term Notes.

The Debtors estimate the aggregate of Allowed Claims in the MAG Debtor Class 6 — MAG Long-term Note Claims to be approximately $1,732,700,000 plus $416,400,000 required to be paid pursuant to section 1124 of the Bankruptcy Code.

### c. Inclusion of Postpetition Interest

For purposes of making Plan Distributions to the holders of MAG Debtor Class 6 — MAG Long-term Note Claims, interest will be accrued at the contractual rate from the Petition Date through the Effective Date (with compounding on a semi-annual basis on the date of scheduled payments and "Additional Interest," as such term is defined in Section 2(e) of the MAG Registration Rights Agreements for the period of August 28, 2003 through July 28, 2005 during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements).

### d. Issues Relating to Unimpairment

The MAG Committee, Wells Fargo Bank, National Association, as Indenture Trustee, and the MAG Ad Hoc Committee (collectively, the "MAG Parties") sought determinations of the Bankruptcy Court that the treatment provided to the holders of MAG Long-term Note Claims as set forth in the Debtors' March 2005 Plan did not meet the standards of section 1124 of the Bankruptcy Code for unimpairment on the grounds that, among other things, certain restructuring transactions contemplated by the Plan violated the terms of the MAG Indenture and that such treatment was generally inequitable.

In particular, the MAG Parties asserted that the merger of MIRMA into a subsidiary of New MAG Holdco and/or the proposed so-called "substantive consolidation" of the MAG Debtors, each as initially contemplated under the First Amended Plan, may constitute transfers of MAG's assets "substantially as an entirety", triggering Sections 801 and 802 of the MAG Indenture and requiring New MAG Holdco to assume MAG's obligations under the MAG Long-term Notes. The MAG Parties asserted that to the extent Sections 801 and 802 of the MAG Indenture were triggered, the issuance of debt and incurrence of liens by New MAG Holdco may violate Sections 109 (limiting the granting of liens by MAG) and 111 (limiting the incurrence of debt of MAG) of the MAG Indenture. The MAG Parties also asserted that, in their view, the Plan seemed to fail to provide for the cure of all defaults under the MAG Long-term Notes, including payment of the full amount of accrued but unpaid interest on those notes, certain cross-default provisions under the MAG Indenture, including Section 501(3), and defaults related to MAG's obligation to provide financial reports to the holders of the MAG Long-term Notes under Section 1005 of the MAG Indenture. Finally, the MAG Parties asserted that the Plan may violate Section 110 of the MAG Supplemental Indentures, which prohibits certain disposition of assets by MAG. The Debtors contested and continue to contest all such assertions by the MAG Parties.

The Bankruptcy Court issued a Memorandum Opinion on May 24, 2005, concluding that certain restructuring transactions did not violate the MAG Indenture as a matter of law but reserved on certain other issues for a determination on the facts. In so ruling, the Bankruptcy Court noted that "[so] long as [the Debtors] are able to do so while leaving the Senior Notes unimpaired (or satisfied under section 1129(b)), even in the absence of the consent of the holders of the Senior Notes, as required by section 1126 of the Code, it is an appropriate step for Debtors to take in aid of reorganization. The strictures applicable to such a strategy are found in the requirement of feasibility (section 1129(a)(1)) and, where impairment is at issue, the terms of the documents governing the rights of the holder of the Senior Notes. Debtors, acting as they have, are not proceeding inequitably or in bad faith as long as they remain within those strictures. There is nothing before the court to suggest the Plan does not meet this test."

On June 3, 2005, the MAG Committee and the MAG Ad Hoc Committee filed notices of appeal to this Memorandum Opinion. This appeal was docketed before Judge Terry Means of the United States District Court for the Northern District of Texas.

The Debtors believe that the treatment provided to the holders of MAG Long-term Note Claims as initially set forth in the March 2005 Plan satisfied the standards of section 1124 of the Bankruptcy Code and that the Debtors would ultimately prevail on the merits; however, to avoid the uncertainty and risk of certain delay associated with further litigation over the impairment issues, in connection with the negotiation of the Mirant Plan Term Sheet, the Debtors agreed to modify the Plan upon the satisfaction of certain conditions precedent, including the agreement of the MAG Parties to withdraw all pending opposition to and to not further oppose approval of the Disclosure Statement and confirmation of the Plan. Such modifications, which include the additions of the New MAG Debt Covenants and the clarification of the methodology for determining postpetition accrued interest are reflected in the Plan in anticipation of all such conditions precedent being satisfied. The Debtors will seek a determination by the Bankruptcy Court in connection with confirmation of the Plan that the New MAG Debt Covenants may be implemented through the execution by the Indenture Trustee under the MAG Indenture without obtaining the consent of the holders of the MAG Long-term Notes and without creating a default under the MAG Indenture. If such a determination is not made, the New MAG Debt Covenants will be made enforceable by the Indenture Trustee pursuant to the Confirmation Order.

### 7. MAG Debtor Class 7 — Convenience Claims

The Plan creates a separate class of unsecured Creditors designed to avoid the inefficiencies associated with distributions of securities to numerous creditors holding relatively small claims.

Under the Plan, a Convenience Claim with respect to the MAG Debtors is any Unsecured Claim in an amount equal to or less than $25,000, other than a MAG Short-term Debt Claim or a MAG Long-term Note Claim (i.e., a claim evidenced by a promissory note or similar instrument) or a Claim of a current or former director, manager, officer or employee of a Debtor. Each holder of an Allowed Convenience Claim

151

against the MAG Debtors shall receive on the Distribution Date a single Cash payment in an amount equal to the amount of such holder's Allowed Convenience Claim.

The Debtors estimate the aggregate amount of Allowed Claims in MAG Debtor Class 7 — Convenience Claims to be approximately $4,800,000 and the expected total recovery for the holders is 100%.

### 8. MAG Debtor Class 8 — Equity Interests

The holders of the Allowed Equity Interests in MAG shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interests entitle such holder in respect of such Equity Interests shall be fully reinstated and retained.

### F. Designated Net Litigation Distributions

As part of the overall compromise and settlement set forth in the Mirant Plan Term Sheet, the Debtors, the Committees and Phoenix agreed that Allowed Mirant Debtor Class 3 — Unsecured Claims and Allowed Mirant Debtor Class 5 — Equity Interests would share payments triggered by Cash recoveries from the Designated Avoidance Actions. The Designated Avoidance Actions, which are identified on Schedule 8, include pending Causes of Action as well as specified Causes of Action as to which tolling agreements have been reached, except for certain Causes of Action against parties with which the Debtors have material ongoing business relationships. Designated Avoidance Actions include, without limitation, the Southern Company Causes of Action and related Causes of Action against various financial institutions, Arthur Andersen and Troutman Sanders, LLP. Designated Avoidance Actions do not include the Debtors' pending law suit against Pepco and their potential Causes of Action against Orange & Rockland, both of which have substantial business relationships with the Debtors. See "Material Claims, Litigation and Investigations — Other Estate Claims — Avoidance Actions."

In reaching this sharing agreement, which constitutes an essential component of the parties' overall agreement regarding the Plan, the parties took into account the fact that different structures could carry different consequences for the prosecution of the Designated Avoidance Actions and tax implications to New Mirant. In the event the parties ultimately determine it is beneficial for New Mirant or an affiliate to pursue the Designated Avoidance Actions, the potential exists that a recovery will generate tax consequences to New Mirant. If this approach is taken, the parties have reached agreement regarding how such tax consequences will impact the payments that are to be made. In particular, New Mirant is to bear the tax consequences associated with the first $175,000,000 in recoveries (after the payment or reimbursement of all fees and costs associated with the prosecution of such actions and net of any offsets).[1] For all net recoveries over this amount, the tax consequences to New Mirant (regardless of whether such tax consequences involve the actual payment of additional taxes or the reduction or offset of tax attributes) will be applied to reduce the amount of the payments to be made to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims and Allowed Mirant Debtor Class 5 — Equity Interests. In addition, the parties have reached agreement regarding how the

---

[1] The allocation of tax implications is part of a settlement and compromise and should not be construed as an admission by any party that Designated Avoidance Action recoveries are taxable to New Mirant or any of its affiliates. In fact, New Mirant will take the position on its tax returns that any recoveries received by New Mirant or any of its subsidiaries in respect of the Designated Avoidance Actions are not taxable to the greatest extent permitted by applicable law.

reduction arising from the adverse tax consequences to New Mirant will be applied to reduce the payments to be made to the two classes, as follows:

| Net Recovery | Tax Consequences Borne by Allowed Mirant Debtor Class 5 — Equity Interest | Tax Consequence Borne by Allowed Mirant Debtor Class 3 — Unsecured Claims |
|---|---|---|
| $175,000,000 or less | 0% | 0% |
| Greater than $175,000,000 but less than $275,000,000 | 40% | 60% |
| Greater than $275,000,000 but less than $375,000,000 | 30% | 70% |
| Greater than $375,000,000 but less than $475,000,000 | 20% | 80% |
| Equal to or greater than $475,000,000 | 10% | 90% |

The sharing agreement is an essential component of the compromise that was reached with respect to the terms of the Plan. Absent this agreement, it is likely that the Debtors, the Committees and Phoenix would not have been able to finalize the Mirant Plan Term Sheet that forms the basis for the Plan. In such case, the Debtors' emergence from chapter 11 would likely have been delayed, administrative expenses would have increased and the ultimate result would be uncertain, all to the detriment of the Debtors' Estates and their stakeholders.

Because of the complexity of the issues surrounding the optimization of the net recoveries on the Designated Avoidance Actions, the Debtors, the Committees and Phoenix have agreed to defer final agreement regarding various material issues, including, in particular: (a) whether the litigation should be prosecuted for the benefit of the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims and Allowed Mirant Debtor Class 5 — Equity Interests through the vehicle of a trust, by New Mirant or an affiliate of New Mirant; (b) how the litigation will be controlled and managed; (c) how the litigation will be funded; (d) the duties owed by New Mirant with respect to the prosecution or settlement of the litigation (including the provision of reasonable access to personnel and records in connection with the litigation); and (e) whether the right of a beneficiary to participate in the payments shall be transferable.

The sharing agreement provides a substantial benefit to the Estates and stakeholders. The most obvious benefit is that it has the potential to enhance creditor recoveries. The sharing agreement also provides certainty concerning distributions of the Designated Avoidance Action recoveries, thereby eliminating litigation among the key constituencies. Finally, as an added benefit, the sharing agreement ensures that the Estates will be reimbursed from the recoveries for out-of-pocket fees and expenses associated with prosecuting the Designated Avoidance Actions.

## G.   Transfers and Restructuring to Implement the Plan

### 1.   General

In order to ensure the feasibility of the Plan as it relates to the MAG Debtors, including the provision of assets and future credit support, a series of asset transfers and entity restructuring is provided for under the Plan. These transactions and the resulting organizational structure are described below. The order of presentation of the asset transfers and restructuring activities set forth below do not reflect the sequencing of such actions which shall be determined prior to the Effective Date.

The purpose and effect of the restructuring is as follows:

- organize the Debtors' business under a new parent company;
- consolidate the Debtors' power generation and energy trading and marketing businesses;
- transfer value to the MAG Debtors;
- provide credit support for ongoing debt obligations;

153

- obtain favorable exit financing terms;

- isolate the lease obligations under MIRMA Leases;

- promote post confirmation operating efficiencies among the Debtors and New Mirant; and

- effect the above in a tax-efficient manner.

The relevant corporate entities and business units of the Mirant group for the purposes of the restructuring are set out in the chart below:

## PRE-REORGANIZED STRUCTURE[1]



[1] This diagram represents a simplified presentation of the corporate structure of the Debtors and their affiliates with a number of entities excluded.

### 2. Organization of Parent Company

As Mirant, through certain of its subsidiaries, derives a substantial portion of its consolidated EBITDA from operations outside the United States, the Debtors explored the option of registering and incorporating New Mirant in a non-U.S. jurisdiction. Although the Debtors identified several strategic advantages of restructuring under a non-U.S. parent, including being better positioned to attract non-U.S. equity and debt capital, pursue strategic mergers or acquisitions and possibly reduce the group's after-tax cost of capital, the Debtors determined that incorporating New Mirant in a non-U.S. jurisdiction might result in unfavorable tax consequences following the Debtors' emergence from bankruptcy. After weighing the benefits and the detriments of incorporating New Mirant in a non-U.S. jurisdiction, the Debtors determined, in consultation with the Committees, that the risks and burdens of incorporating New Mirant in a foreign jurisdiction outweigh the benefit. Accordingly, the Debtors will not pursue a foreign restructuring.

On September 23, 2005, Mirant created a wholly owned subsidiary, Newco 2005 Corporation, registered and incorporated in Delaware. On September 26, 2005, Newco 2005 Corporation filed its chapter 11 petition in the Bankruptcy Court. On September 28, 2005, the Bankruptcy Court entered an order: (a) providing that Newco 2005 Corporation's chapter 11 case would be jointly administered with the Chapter 11 Cases; (b) directing that all orders entered in the Chapter 11 Cases would be applicable to Newco 2005 Corporation; (c) authorizing Newco 2005 Corporation to join the Plan; (d) setting the bar date to file proofs of claim against Newco 2005 Corporation, and (e) establishing the meeting of the creditors of Newco 2005 Corporation pursuant to section 341(a) of the Bankruptcy Code. The bar date for filing proofs of claim against Newco 2005 Corporation is October 20, 2005 at 5:00 p.m. EST. The meeting of the creditors is scheduled for October 20, 2005 at 10:00 a.m. CST. A notice of this bar date and meeting of the creditors was served on September 28, 2005 to the persons on the Debtors' limited service list.

Pursuant to the Plan, Newco 2005 Corporation will assume all obligations of, and shall be considered for all purposes, New Mirant under the Plan. Substantially all of Mirant's Assets will be transferred to New Mirant, which will serve as the corporate parent of the Debtors' business enterprise and **WHICH SHALL HAVE NO SUCCESSOR LIABILITY FOR ANY UNASSUMED OBLIGATIONS OF MIRANT**. As discussed above, holders of certain Unsecured Claims and holders of certain Equity Interests will receive Pro Rata Shares of 96.25% and 3.75%, respectively, of the shares of New Mirant Common Stock to be issued pursuant to the Plan.

### 3. Transfer of Assets to New Mirant

New Mirant is to be the principal holding company, which will serve as the corporate parent of the Debtors and their affiliated businesses. Mirant shall transfer to New Mirant (or New Mirant's subsidiaries) each of the following:

- its Intellectual Property;

- its Equity Interest in Mirant Americas Holdings, Inc., which entity indirectly holds Mirant's interest in Jamaica Public Service Company Limited ("JPS");

- its Equity Interest in Mirant International Investments, Inc., which entity indirectly holds Mirant's business interests in the Philippines and the Caribbean, excluding JPS;

- its Equity Interest in Mirant Services, LLC; and

- its Equity Interest in MAI, of which MAG remains a subsidiary.

Through its subsidiaries, New Mirant shall continue to, indirectly, own and operate certain North American generation facilities, including West Georgia, Shady Hills, Sugar Creek, Apex and Wichita Falls. Furthermore, New MAEM Holdco is to transfer to New Mirant the right to recover postpetition transfers made to Pepco under the Back-to-Back Agreement (or the APSA, as applicable). **EXCEPT AS PROVIDED IN THE PLAN, NEW MIRANT SHALL NOT OTHERWISE INCUR OR HAVE ANY LIABILITY, CLAIM OR OBLIGATION BASED ON ANY ACT, OMISSION, TRANSACTION OR EVENT OCCUR-RING ON OR PRIOR TO THE EFFECTIVE DATE, AS A SUCCESSOR TO MIRANT OR OTHERWISE.**

### 4. New Corporate Vehicles

In addition to New Mirant, several new companies will be either incorporated or created out of existing Debtors underneath MAG. The new structure under the Plan enables MAG and its subsidiaries to maximize their ability to obtain capital (debt and/or equity) from the capital markets as well as more favorable terms for the Exit Facility by the consolidation of holding companies in a single entity which will own the operating assets.

#### a. New MAG Holdco

MAG will merge certain of its existing Debtor subsidiaries to form a new subsidiary to be named "Mirant North America, LLC" (referred herein and in the Plan as New MAG Holdco). New MAG Holdco will be the principal obligor under the Exit Financing.

155

### b. MD Leaseco

MIRMA will form a new Delaware limited liability company as a direct, wholly owned subsidiary, to be named "MD Leaseco." MD Leaseco will be a single purpose entity to own and hold the MIRMA Leases.

### c. New MAEM Holdco

New MAG Holdco will form a new Delaware limited liability company as a direct, wholly owned subsidiary, to be named "New MAEM Holdco." New MAEM Holdco will serve as a separate holding company for all of the Trading Debtors.

### d. Second Tier MAG Holdco

New MAG Holdco will form a new Delaware limited liability company as a wholly owned subsidiary to be named "Second Tier MAG Holdco." Second Tier MAG Holdco will serve as the corporate vehicle into which MIRMA will be merged. MIRMA will be the surviving entity after the merger.

### 5. Transfer of the Energy Trading Business

Historically, the energy trading business has been operated by MAEM and the other Trading Debtors, serving the needs of the North American generation business. The Debtors will consolidate the energy trading and marketing business operated by the Trading Debtors under New MAEM Holdco (excluding the rights and obligations under the Back-to-Back Agreement (or the APSA, as applicable)).

The restructuring includes the conversion of each of MAEMI and MADI into Georgia limited liability companies and MAPCO into a Delaware limited liability company. Various transfers of Equity Interests will then take place between MAEMI, MAPCO and New MAEM Holdco, resulting in the Trading Debtors organized under New MAEM Holdco. For internal operating efficiencies, a separate effective date will be set for the transfer of the energy trading and marketing business from the Trading Debtors to MET (referred to in the Plan as the MAEM/MET Effective Date).

The Mirant Debtors will also transfer the Equity Interest in MET to New MAG Holdco. Prior to this transfer, MET will transfer the Carved-Out Receivables to New Mirant or MAI. After the transfer of the Assets of the Trading Debtors to MET, New MAG Holdco will also transfer $250,000,000 in Cash to New Mirant or MAI. These assets represent imbedded cash collateral which has been provided to MET by other Debtors.

Following the transfer of the energy trading and marketing assets of the Trading Debtors to MET, New MAG Holdco shall transfer the Equity Interests in the Trading Debtors to the Plan Trust. The purpose of transferring the Trading Debtors to the Plan Trust is to ensure that, except as otherwise provided in the Plan, MET shall not have, and shall not be construed to have or maintain, any liability, claim, or obligation that is based in whole or in part on any act, omission, transaction, event, or other occurrence or thing occurring or in existence on or prior to the Effective Date (including, without limitations, any liability or claims arising under applicable non-bankruptcy law as a successor to any of the Trading Debtors) and no such liabilities, claims or obligations for any such acts shall attach to MET.

### 6. Credit Support for MAG Debtors

The Mirant Debtors have agreed to provide certain credit support to the MAG Debtors, in the form of an issuance of preferred shares of MAI.

- The MAI Series A Preferred Shares will provide credit support to New MAG Holdco for environmental capital expenditure (including the installation of control technology relating to $SO_2$ emissions from MIRMA generating facilities in the Mid-Atlantic Region). The terms of the MAI Series A Preferred Shares are summarized in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — MAI Series A Preferred Shares." As an incentive for the MIRMA Owner/Lessors to support the Plan, if the MIRMA Owner/Lessors do not oppose confirmation of the Plan or vote to accept the Plan, the MAI Series A Preferred Shares will be issued to MIRMA instead of New MAG Holdco.

- The MAI Series B Preferred Shares will provide credit support for refinancing the first portion of the MAG Long-term Notes, which become due in 2011. The terms of the MAI Series B Preferred Shares are summarized in "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — MAI Series B Preferred Shares."

Each issuance will be the subject of a put agreement which will enable the holder of the shares to put the obligations to New Mirant for a specified amount.

### 7. Transfer of Generation Assets to MAG

To effectuate the consolidation of certain of their generation Assets under New MAG Holdco and provide additional credit support to MAG, Mirant will cause its Equity Interests in Mirant Peaker and Mirant Potomac to be contributed to MIRMA, and MAI will cause its Equity Interest in Mirant Zeeland to be contributed New MAG Holdco, in each case prior to MIRMA's merger into Second Tier MAG Holdco.

### 8. Transfer of MIRMA Lease Obligations and Assets

The Debtors intend to consolidate the obligations and assets relating to the MIRMA Leases in MD Leaseco. Therefore, MIRMA will transfer all of its rights, title and interest in both the Dickerson Power Station and the Morgantown Power Station to MD Leaseco, and assign the MIRMA Leases to MD Leaseco as provided in Section 14.6 of the Plan. As discussed in "The Chapter 11 Plan — Executory Contracts and Unexpired Leases — Special Provisions relating to the MIRMA Lease," the assignment of the MIRMA Leases to MD Leaseco is intended to have beneficial consequences regarding certain covenants under the MIRMA Leases.

### 9. Mirant and Plan Trust

Following the transfers referred to above, Mirant shall continue to exist as a separate legal entity on and after the Effective Date. It is to be renamed "MC 2005 Corporation." The Equity Interests in Mirant shall be cancelled and Mirant shall issue shares of common stock (evidencing 100% of the Equity Interests in Mirant) to the Plan Trust.

The Trustees of the Plan Trust shall convert Mirant to a Delaware limited liability company and its 100% equity interests will be replaced with member interests. The Plan Trust will be created to protect, maintain, liquidate to cash and maximize the value of assets which shall be comprised of equity interests in Mirant and the Trading Debtors.

## 10. Effect of Transfers and Restructuring to Implement the Plan

After the transfers, formation of new entities and restructuring described above, the reorganized structure of the Debtors will be as follows:

### REORGANIZED STRUCTURE[a]



---

[a]  This diagram represents a simplified presentation of the corporate structure of the Debtors and their affiliates with a number of entities excluded.

[b]  Mirant Peaker will be merged into Mirant Potomac as part of the restructuring and Mirant Potomac will be the surviving entity.

**H.  Description of Certain Securities to be Issued Pursuant to the Plan**

Pursuant to the Plan, the following debt, equity and rights will be issued:

**1.  New Mirant Common Stock**

As consideration to satisfy the Unsecured Claims of the Mirant Debtors and the MAG Debtors, the Mirant Debtor Class 5 — Equity Interests and the MAG Debtor Class 4 — PG&E/RMR Claims, New Mirant will issue New Mirant Common Stock on the Effective Date. Except as provided in the Plan, no additional shares of New Mirant Common Stock may be issued other than as authorized by the post-Confirmation board of New Mirant after the Effective Date.

**a.  Material Terms of New Mirant Common Stock**

| | |
|---|---|
| Par Value: . . . . . . . . . . . . . . . . . . . . . . . | The New Mirant Common Stock shall have a par value per share as set forth in its certificate of incorporation. |
| Rights of Holders: . . . . . . . . . . . . . . . . . | The holders of the New Mirant Common Stock shall have such rights with respect to dividends, liquidation, voting, and other matters as set forth in the New Mirant Constituent Documents. |
| Listing of New Mirant Common Stock | New Mirant shall use its reasonable efforts to cause the New Mirant Common Stock to be listed for trading on the New York Stock Exchange. In the event New Mirant's efforts are unsuccessful, New Mirant shall use its reasonable efforts to cause the New Mirant Common Stock to be listed on another national securities exchange or automated interdealer quotation system as may be appropriate. |
| Transfer Restrictions . . . . . . . . . . . . . . . | In order to protect certain tax attributes of the Debtors and New Mirant post confirmation, any attempted sale, transfer, exchange, assignment, conveyance or other disposition for value ("Transfer") of any New Mirant Common Stock to any Person (including a group of Persons making a coordinated acquisition) who owns, or would own after such Transfer, more than 5% of the total value of outstanding New Mirant Common Stock (calculated in accordance with the Treasury Regulations under the Internal Revenue Code), will be void and will not be effective to Transfer any New Mirant Common Stock, unless the transferee submits a written notice to New Mirant's Board of Directors at least seven, and not more than twelve, Business Days prior to completion of the attempted Transfer and the Board of Directors does not provide written notice to the transferee within five Business Days after receiving such notice that the Restriction Period (as defined below) has commenced. |

The period during which the transfer restrictions described above (the "Restriction Period") apply will commence on the earliest date following the Effective Date that the percentage increase in New Mirant Common Stock owned by all 5% shareholders of New Mirant exceeds 35% minus the aggregate percentage stock ownership of 5% shareholders of New Mirant on the Effective Date and will remain in effect until the earlier of (a) two years following the Effective Date, and (b) the date that the Board of Directors of New Mirant determines the transfer restrictions shall no longer remain in effect since (1) the consummation of the Plan did not satisfy the requirements of section 381(1)(5) of the Internal Revenue Code, (2) treatment under that section of the Internal Revenue Code is not in the best interests of New Mirant, (3) an ownership change, as defined under the Internal Revenue Code, would not result in a substantial limitation on the ability of New Mirant to use otherwise available net operating loss carryovers and net unrealized built-in loss, or (4) no significant value attributable to such tax benefits would be preserved by continuing the transfer restrictions.

The transfer restrictions relating to New Mirant Common Stock are set out in more detail in Schedule 13.

**b.   Hypothetical Effective Date Distribution of New Mirant Common Stock Under the Plan**

Assuming that all Claims and all Equity Interests entitled to receive New Mirant Common Stock under the Plan are Allowed on the Effective Date and that all shares of New Mirant Common Stock to be issued under the Plan are issued on the Effective Date, the common ownership of New Mirant on the Effective Date would be as follows:

| Class of Creditor or Interest Holder | % of Issued Shares |
|---|---|
| **MAG Classes (total 2.3%)** | |
| Holders of Allowed MAG Debtors Class 4 — PG&E/RMR Claims . . . . . . . . . . . . . . | 0.2% |
| Holders of Allowed MAG Debtors Class 5 — Unsecured Claims . . . . . . . . . . . . . . . . | 2.1% |
| **Mirant Classes (total 97.7%)** | |
| Allowed Mirant Debtor Class 3 — Unsecured Claims | |
| • Unsecured Claims (other than holders Subordinated Note Claims) . . . . . . . . . . . | 90.62% (92.75%[a] of 97.7%) |
| • Subordinated Note Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3.42% (3.5% of 97.7%) |
| Holders of Allowed Mirant Debtor Class 5 — Equity Interests . . . . . . . . . . . . . . . . . . | 3.66% (3.75% of 97.7%) |
| **TOTAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100% |

[a] This is the difference between the total allocation of New Mirant Common Stock to holders of Allowed Mirant Class 3 – Unsecured Claims (96.25%) **less** the allocation of New Mirant Common Stock to the holders of Subordinated Note Claims under the settlement provided in the Plan (3.5%).

## 2. **New Mirant Warrants**

Upon the occurrence of the Effective Date, the Debtors shall issue New Mirant Series A Warrants to those holders of Allowed Equity Interests in Mirant and New Mirant Series B Warrants to holders of Subordinated Notes pursuant to the compromise and settlement agreement with indenture senior debt holders. The terms of the New Mirant Warrants are set out in Exhibit E to the Plan. The material terms of the New Mirant Warrants are summarized as follows:

| | |
|---|---|
| Exercise Right: . . . . . . . . . . . . . . . . . . . . | Each New Mirant Warrant, when exercised, shall entitle the holder thereof to acquire one share of New Mirant Common Stock. |
| Term: . . . . . . . . . . . . . . . . . . . . . . . . . . | The New Mirant Warrants shall be exercisable until the fifth anniversary of the Effective Date. |
| Exercise Price: . . . . . . . . . . . . . . . . . . . . | *Series A:* The cash exercise price of the New Mirant Series A Warrants shall be set at an amount per share of New Mirant Common Stock that would be required for the consolidated enterprise value of New Mirant to be $11,400,000,000. |
| | *Series B:* The cash exercise price of the New Mirant Series B Warrants shall be set at an amount per share of New Mirant Common Stock that would be required for the consolidated enterprise value of New Mirant to be $11,000,000,000. |
| Percentage of Common Acquirable: . . . | *Series A:* The New Mirant Series A Warrants shall, if exercised, represent the right to acquire in the aggregate up to 10.0% of the New Mirant Common Stock issued, or reserved for issuance, pursuant to the Plan and excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs. |
| | *Series B:* The New Mirant Series B Warrants shall, if exercised, represent the right to acquire in the aggregate up to 5.0% of the New Mirant Common Stock issued, or reserved for issuance, pursuant to the Plan and excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs. |
| Antidilution Adjustments: . . . . . . . . . . . | The New Mirant Warrants shall contain customary terms to prevent dilution from occurring due to various events undertaken by New Mirant after the Effective Date. |

### 3. Plan Secured Notes

The Debtors may elect for holders of Secured Claims in the Mirant Debtors and the MAG Debtors to receive a promissory note in lieu of cash, collateral or an applicable right of setoff. The provisions of these notes are summarized as follows:

| | |
|---|---|
| Issuers: | The Debtor(s) obligated under the Allowed Secured Claim |
| Principal Amount: | Amount of the applicable Allowed Secured Claim |
| Maturity: | The fifth anniversary of the Effective Date |
| Interest Rate: | 5.0% per annum |
| Interest Payment: | Quarterly in arrears |
| Amortization: | Straight-line |
| Collateral: | Assets that secure payment of the Allowed Secured Claim |

### 4. West Georgia Secured Note

The holders of West Georgia Facility Claims will receive, in addition to cash, a secured note if they do not vote in favor of the Plan. The provisions of these notes are summarized as follows:

| | |
|---|---|
| Issuer: | West Georgia |
| Principal Amount: | Approximately $109,700,000 |
| Maturity: | June 30, 2014 |
| Interest Rate: | 7% per annum |
| Interest Payment: | Quarterly in arrears |
| Amortization: | $10,000,000 per annum through June 30, 2014, with the balance due on June 30, 2014 |
| Collateral: | All assets of West Georgia that secure the Allowed Secured Claim of the agent for the lenders under the West Georgia Credit Agreement |

### 5. New MAG Holdco Notes

In the event the Debtors determine not to issue new securities pursuant to the Exit Financing, New MAG Holdco will issue two series of promissory notes, the terms of which will be negotiated with the MAG Committee and the MAG Ad Hoc Committee. The following is a summary of proposed terms that do not necessarily reflect such negotiations which are summarized as follows:

| | |
|---|---|
| Issuer: | New MAG Holdco |
| Principal Amount: | 8.00% Senior Notes, $500,000,000<br>8.25% Senior Notes, Up to $850,000,000 |
| Maturity: | 8.00% Senior Notes, 2015<br>8.25% Senior Notes, 2017 |
| Other Material Terms | As set forth in the New MAG Holdco Indenture, including the terms there of set forth on Schedule 10 |

### 6. MAI Series A Preferred Shares

The MAI Series A Preferred Shares will provide credit support to New MAG Holdco (or, in the event of a settlement with the MIRMA Owner/Lessors, MIRMA) for environmental capital expenditures (including the installation of control technology relating to $SO_2$ emissions from MIRMA's generating facilities in the Mid-Atlantic region). The terms of the MAI Series A Preferred Shares are summarized as follows:

| | |
|---|---|
| Issuer: | MAI |
| Liquidation Preference: | $265,000,000 |
| Issue: | Series A preferred stock with par value of $0.001 per share |
| Dividends | None |
| Mandatory Redemption: | Subject to the deferral described below, the MAI Series A Preferred Shares shall be called for redemption by MAI on June 30 of each year indicated below (each such June 30, a "Scheduled Redemption Date") at a price equal to the portion of the liquidation preference set forth in the following table (the "Specified Redemption Amount"): |

| Year | Amount |
|---|---|
| 2007 | $ 5,000,000 |
| 2008 | 31,000,000 |
| 2009 | 84,000,000 |
| 2010 | 95,000,000 |
| 2011 | 50,000,000 |

The redemption of any MAI Series A Preferred Shares on any Scheduled Redemption Date shall be deferred to the extent that MIRMA has not incurred prior to the Scheduled Redemption Date, or New MAG Holdco does not reasonably expect MIRMA to incur within 180 days of such Scheduled Redemption Date, expenditures with respect to the installation of control technology relating to environmental capital expenditures of facilities owned or leased by MIRMA (the "Required Use"). Any amounts so deferred shall be added to the amount of MAI Series A Preferred Shares to be redeemed on the next Scheduled Redemption Date.

The outstanding balance of MAI Series A Preferred Shares, if any, shall be redeemed by MAI on December 31, 2020 at a price equal to the par value of the outstanding MAI Series A Preferred Shares.

| | |
|---|---|
| Use of Proceeds: | New MAG Holdco (or MIRMA, as applicable) shall apply the proceeds of any redemption of MAI Series A Preferred Shares to fund the installation of control technology relating to environmental capital expenditures at facilities owned or leased by MIRMA within 180 days of any such redemption, including the reimbursement of previously incurred costs for which the proceeds received by New MAG Holdco upon a redemption of MAI Series A Preferred Shares were not used to fund. |

| | |
|---|---|
| Series A Put Right to New Mirant: . . . | Pursuant to the Series A Put Agreement, New MAG Holdco will have the right ("Series A Put Right") to put the MAI Series A Preferred Shares to New Mirant at an amount equal to the Specified Redemption Amount in the event that MAI fails to redeem the MAI Series A Preferred Shares on a Scheduled Redemption Date. |
| Release of Obligations Under Series A Put Right: . . . . . . . . . . . . . . . . . . . . . . | New Mirant shall be released from its obligations under the Series A Put Agreement upon the assumption thereof by a substitute obligor; provided, however, that such substitute obligor shall either: (a) have a credit rating of at least BBB−/Baa3 or an equivalent rating by a nationally recognized ratings agency or (b) secure its obligations under the Series A Put Agreement with assets with a fair market value of equal or greater than 110% of an amount equal to the aggregate Specified Redemption Amount relating to the MAI Series A Preferred Shares that have not been redeemed (as determined by an investment bank or appraiser of national reputation). |
| | New Mirant or any substitute obligor shall be released from its obligations under the Series A Put Agreement if New Mirant or the substitute obligor, as the case may be, deposits with a trustee in a collateral account for the benefit of MIRMA cash in U.S. dollars or government securities, or a combination thereof, in amounts equal to the aggregate Specified Redemption Amount relating to the MAI Series A Preferred Shares that have not been redeemed (a "Security Release"). |
| Covenant: . . . . . . . . . . . . . . . . . . . . . . . . | Under the Series A Put Agreement, New Mirant shall be restricted from (a) incurring, except in certain circumstances, indebtedness, as provided in Exhibit "D" to the Plan and (b) paying any dividends or making distributions on, or redeeming or repurchasing, any shares of New Mirant Common Stock except in certain circumstances, as provided in Exhibit "D" to the Plan. |

### 7. **MAI Series B Preferred Shares**

The MAI Series B Preferred Shares will provide credit support for refinancing in 2011 when the first portion of the MAG Long-term Notes becomes due. The terms of the MAI Series B Preferred Shares are summarized as follows:

| | |
|---|---|
| Issuer: . . . . . . . . . . . . . . . . . . . . . . . . . . . . | MAI |
| Liquidation Preference . . . . . . . . . . . . . . | $150,000,000 |
| Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | MAI Series B Preferred Shares with par value of $0.001 per share. |
| Dividends: . . . . . . . . . . . . . . . . . . . . . . . . | None |
| Mandatory Redemption . . . . . . . . . . . . . | April 1, 2011 |
| Series B Put Right to New Mirant . . . . | Pursuant to the Series B Put Agreement, MAG will have the right (the "Series B Put Right"), at any time after June 30, 2010 to require New Mirant to purchase the MAI Series B Preferred Shares at an amount equal to the Liquidation Preference. |

| | |
|---|---|
| Release of Obligations Under Series B Put Right . . . . . . . . . . . . . . . . . . . . . . . | New Mirant shall be released from its obligations under the Series B Put Agreement upon the assumption thereof by a substitute obligor; provided, however, that such substitute obligor shall either: (a) have a credit rating of at least BBB−/Baa3 or an equivalent rating by a nationally recognized ratings agency, or (b) secure its obligations under the Series B Put Agreement with assets with a fair market value of equal or greater than 110% of an amount equal to the Liquidation Preference (as determined by an investment bank or appraiser of national reputation). |
| | New Mirant or any substitute obligor shall be released from its obligations under the Series B Put Agreement if New Mirant or the substitute obligor, as the case may be, deposits with a trustee in a collateral account for the benefit of New MAG Holdco cash in U.S. dollars or government securities, or a combination thereof, in amounts equal to the Liquidation Preference (a "Security Release"). |
| Covenant . . . . . . . . . . . . . . . . . . . . . . . . | Under the Series B Put Agreement, New Mirant shall be restricted from (a) incurring, except in certain circumstances, indebtedness, as provided in Exhibit D to the Plan, and (b) paying any dividends or making distributions on, or redeeming or repurchasing, any shares of New Mirant Common Stock except in certain circumstances, as provided in Exhibit D to the Plan. |

## I. Exit Financing

### 1. Bidding Process for Exit Financing

The Debtors' North American business operations require access to a revolving credit facility to fund day-to-day operations as well as to provide liquidity to meet working capital requirements, including potential collateral requirements resulting from changes in commodity prices. Accordingly, a condition to consummation of the Plan is the availability to New MAG Holdco of a revolving credit facility in an amount not less than $750,000,000.

In late 2004, in apparent anticipation of the Debtors' impending filing of a proposed chapter 11 plan of reorganization, a number of financial institutions expressed interest in providing financing in connection with the Debtors' emergence from bankruptcy. Through various conversations and an exchange of information with such institutions, the Debtors were able to gauge the then current market conditions for exit financing for emerging chapter 11 companies. At that time, the Debtors recognized the potential to not only obtain a revolving credit facility to fulfill the Debtors' working capital needs post-emergence, but also to access capital markets in a manner that would allow the Debtors to satisfy in cash a substantial amount of the Debtors' Unsecured Claims upon emergence.

In late 2004, the Debtors initiated a competitive process for the acquisition of the exit financing with the goal of securing such financing on the best terms available. Over several months, the Debtors engaged in several rounds of exchanges of detailed commitment proposals with several traditional lending sources, which, in the Debtors' view, possessed the necessary capabilities and access to capital to provide exit financing of the magnitude required by the Debtors as well as an existing familiarity with the energy industry and the Debtors' business. On May 12, 2005, certain financial institutions (together the "Commitment Parties") delivered a commitment letter (the "Commitment Letter") to the Debtors. On May 13, 2005, the Debtors' Board of Directors approved the proposed financing and the Debtors executed the Commitment Letter. Pursuant to the

Commitment Letter and subject to the conditions set forth therein, the Commitment Parties have agreed to provide up to $2,350,000,000 of exit financing to New MAG Holdco (the "Exit Financing").

Under the Commitment Letter, as initially executed, the Debtors were required to obtain Bankruptcy Court approval of their obligations thereunder and under certain related documents no later than June 6, 2005. As a result of uncertainty with respect to the timing and structure of a proposed plan of reorganization, including uncertainty that ensued from the valuation hearing before the Bankruptcy Court and the implementation of the Bankruptcy Court's ruling in respect of valuation, the Debtors and Commitment Parties entered into a series of amendments that, among other things, extended the date by which the Debtors were obligated to obtain Bankruptcy Court approval. On September 21, 2005, the Bankruptcy Court approved the Commitment Letter and related documents.

The Debtors believe that, based upon their extensive marketing efforts and the negotiation process, the Exit Financing provides the most flexibility to the Debtors' business on a going forward basis and the best terms available in the current market.

## 2. Terms of Exit Financing

The Exit Financing will consist of: (i) a $1,000,000,000 senior secured revolving credit facility (the "Revolving Credit Facility") and an up to $500,000,000 senior secured tranche B term loan facility (the "Term Facility" and together with the Revolving Credit Facility, the "Senior Secured Facilities") and (ii) up to $1,350,000,000 (to be reduced dollar for dollar by the amount of the Term Facility) in Cash proceeds from an issue or placement of senior notes (the "Senior Notes"). An interim facility of no less than $850,000,000 is also available to the Debtors in the event the Debtors are unable to issue all or some of the Senior Notes as of the Effective Date (the "Bridge Facility", the Bridge Facility, if any, together with the Senior Secured Facilities, the "Credit Facilities").

The Senior Secured Facilities will be senior secured obligations of New MAG Holdco. The Senior Secured Facilities will be guaranteed by the subsidiaries of New MAG Holdco (other than (x) MET, MIRMA and the subsidiaries of MIRMA), (y) Mirant New York, Inc., Mirant Lovett, LLC, Mirant Bowline, LLC, Mirant NY-Gen, and Hudson Valley Gas Corporation until such time as such entities emerge from Chapter 11 and (z) certain other permitted exceptions) (the "Subsidiary Guarantors"). The Senior Secured Facilities will be secured by first priority security interests in substantially all of the assets of New MAG Holdco and the Subsidiary Guarantors (with certain permitted exceptions). The obligations under the Senior Notes and the Bridge Facility will be guaranteed on a senior unsecured basis by all of the guarantors of the Senior Secured Facilities.

The Revolving Credit Facility will mature in six years and the Term Facility will mature in seven years. The Term Facility will amortize in nominal quarterly installments aggregating 0.25% per quarter for the first twenty-seven quarters. If utilized, the Bridge Facility, or the exchange notes issued thereunder, will mature in ten years.

In general, the Revolving Credit Facility will be available for the general working capital and corporate purposes of New MAG Holdco. The proceeds under the Term Facility and the Senior Notes will be used to fund cash distributions to holders of MAG Class 4 — PG&E/RMR Claims and MAG Class 5 — Unsecured Creditors under the Plan. Although the terms of the Senior Secured Facilities restrict the ability of New MAG Holdco and certain of its subsidiaries from making certain types of restricted payments, it will permit the payment of dividends and other distributions within five (5) Business Days of the Effective Date, as contemplated by the Plan, in an amount not to exceed $250,000,000. The Bridge Facility is available to provide interim financing if the Senior Notes are not issued on or prior to the Effective Date, and will be repaid from the issue of the Senior Notes. If such repayment of the Bridge Facility does not occur within a year after the Effective Date, the loans under the Bridge Facility may be converted into exchange notes with a ten year maturity, or the maturity of such loans may be extended for an additional nine years.

The terms of the Senior Secured Facilities will permit New MAG Holdco to make dividends, distributions and other restricted payments, so long as there is no default or event of default and none would result therefrom (x) if the ratio of EBITDA to corporate interest is a least 3:1 as at the end of the last fiscal

quarter and the aggregate amount of such payments (including payments under (y) below) is less than the sum of 100% of Cash on hand on the Closing Date plus 100% of free cash flow since the Effective Date (less amounts of free cash flow required to prepay amounts under the Term Loan) and (y) in an amount equal to the interest payable by MAG on the MAG Long-term Notes within five (5) Business Days of such distribution or dividend.

The Commitment Parties will receive, among other things, various fees, including customary commitment, ticking, take-down, rollover, underwriting, arrangement and administration fees. While the aggregate fees payable will depend upon a variety of factors, the Debtors estimate that the total fees to be incurred by the Debtors at closing under the Exit Financing are approximately $44,500,000 to $48,500,000, subject to ratings. In the event that the Debtors never close on the Exit Financing, the Debtors will be liable for a commitment fee in the amount of 0.375% of the full amount of the commitments under the Commitment Letter in respect of the Bridge Facility, if any, payable on the Effective Date, or if earlier the termination of the Commitment Letter (other than any termination as a result of failure to obtain an order from the Bankruptcy Court approving the Commitment Letter and Fee Letter).

Except as otherwise provided by the immediately following sentence (which applies in the event the Debtors pursue a materially different plan of reorganization than the one currently contemplated), in the event that Debtors fail to enter into the Credit Facilities and (x) during the ninety day period following the date of termination of the commitments under the Commitment Letter, the Debtors or their affiliates incur any alternative bank or syndicated credit financing (any such transaction, the "Alternate Transaction") and (y) fail to grant the Commitment Parties a bona fide right of first refusal to provide, arrange, place or underwrite such Alternate Transaction on mutually acceptable terms, the Debtors are obligated to pay an amount equal to the underwriting, commitment and arrangement fees that would have been payable to such parties if the Credit Facilities had been consummated in an aggregate amount equal to the amount of such Alternate Transaction. In the event that following the date of entry into the Fee Letter, the Debtors confirm a plan of reorganization that is materially different from the Plan which requires a financing structure materially different from that described in the Commitment Letter and the Debtors or any of their affiliates consummate any Alternate Transaction in connection with such alternate plan without engaging the Commitment Parties to provide, arrange, place or underwrite such Alternate Transaction, on mutually acceptable terms, the Debtors are obligated to pay to the Commitment Parties an amount equal to $15,000,000.

### 3.  Conditions to Exit Financing

The obligation of each Commitment Party to provide the Exit Financing is subject to certain conditions, including:

- Not occurring or becoming known to such Commitment Party, any event, development or circumstance that has, had or would reasonably be expected to have, a material adverse effect on the financial condition, operations, business or assets of New MAG Holdco and its subsidiaries, taken as whole, that would reasonably be expected to have a material adverse effect on the ability of New MAG Holdco to pay the obligations under the Credit Facilities;

- Such Commitment Party not becoming aware after June 27, 2005 of any information or other matter (including any matter relating to financial models and underlying assumptions relating to the projections) affecting New MAG Holdco that is inconsistent in a material and adverse manner with any such information or other matter included in certain public filings or otherwise disclosed to the Commitment Parties (and which New MAG Holdco represents and covenants to the Commitment Parties is correct in all material respects except for projections and other forward looking information which were prepared in good faith and based upon estimates and assumptions that New MAG Holdco believed to be reasonable at the time delivered), as of June 27, 2005;

- The lenders shall have received (i) certification from New MAG Holdco that MIRMA is not prohibited from making distributions or dividends as of the Effective Date and, based upon financial projections of MIRMA and its subsidiaries prepared in good faith and based upon estimates and assumptions that New MAG Holdco believes to be reasonable at the time delivered, MIRMA is not

167

projected to be prohibited from making distributions and dividends during the term of the Senior Secured Facilities (unless such prohibition arises solely from the requirement under the facility lease agreements with respect to MIRMA and its subsidiaries that MIRMA and its subsidiaries deliver financial statements for the most recently completed fiscal year or fiscal quarter, as the case may be, and the date of determination is less than 90 or 60 days, as the case may be, from the end of such fiscal year or fiscal quarter) and (ii) reasonably detailed computations that demonstrate to the reasonable satisfaction of the lead arrangers under the Senior Secured Facilities compliance with any restrictions on restricted payments applicable to MIRMA;

- If the syndication of the Credit Facilities has not begun prior to December 31, 2005, there not having occurred a material disruption of or materially adverse change in conditions in the financial, banking or capital markets (including, without limitation, the high-yield market) following December 31, 2005, that would reasonably be expected to materially impair such syndication, sale or placement, as the case may be;

- Prior to the successful syndication of the Senior Secured Facilities, there shall be no competing offering, placement or arrangement of any debt securities (other than the Senior Notes, if any, or the New MAG Holdco Notes, if any) or bank financing by or on behalf of Mirant or any of its subsidiaries, other than specified exceptions set forth in a schedule to the Commitment Letter;

- Prior to the earlier of (a) the date that is 90 days after the initial maturity date of the Bridge Facility and (b) the termination of all obligations under the Bridge Facility, there shall be no competing offering, placement or arrangement of any debt securities (other than the Senior Notes, if any, or the New MAG Holdco Notes, if any) or bank financing by or on behalf of MAG, or any of its subsidiaries;

- The receipt of ratings and/or indicative ratings from Moody's and S&P with respect to the Senior Secured Facilities, if New MAG Holdco elects to enter into the Term Facility, and the Senior Notes, and if New MAG Holdco elects to enter into the Bridge Facility; and

- The closing of the Credit Facilities on or before March 31, 2006.

### J.  Claims Against Insiders

The Plan provides for the assumption by the Debtors (and in the case of Mirant and the Trading Debtors, by New Mirant and MET, respectively) of all obligations of the Debtors to indemnify and hold harmless their directors, officers and employees. Furthermore, the Plan enjoins and prohibits the prosecution of any such indemnified claim except to the extent of any recovery from the issuers of any insurance policies which are available to provide a recovery with respect to such indemnified claims.

The Plan also releases all Causes of Action (other than the Southern Company Causes of Action or other Causes of Action preserved by, or to enforce the terms of, the Plan and the Plan Documents) relating to any act occurring or existing on or prior to the Effective Date which relates to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement and could have been asserted by the Debtors against their respective current and former directors, officers, employees, managers, agents and/or professionals. As a result, all Causes of Actions which have been or could be prosecuted on a derivative basis are effectively released and discharged and the Debtors are authorized upon the Effective Date to take appropriate actions to terminate all such derivative actions, including, without limitation, all of the derivative actions described in "Material Claims, Litigation and Investigations — Detailed Description of Material Claims — Shareholder-Bondholder Litigation."

The Plan further provides that the Disbursing Agent and its officers, directors, employees, agents and representatives are exculpated from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent, other than willful misconduct or gross negligence. In addition to the exculpation of the Disbursing Agent, none of the Debtors or their respective directors, officers, members, managers, employees, agents, representatives, advisors, attorneys, successors and assigns are liable for any Causes of Action arising in connection with or out of the administration of the Chapter 11 Cases,