pursuit of confirmation of the Plan, consummation of the Plan, administration of the Plan, or property to be distributed under the Plan, other than gross negligence or willful misconduct.

Lastly, except with respect to holders of Allowed MAG Long-term Note Claims with respect to their legal, equitable and contractual rights and Causes of Action against MAG, MAG's Assets and any MAG managers, officers, employees, agents and professionals, all Persons who have been or may be holders of Claims against or Equity Interests in the Debtors are permanently enjoined from taking any of the actions set forth below against or affecting New Mirant and its Affiliates, the Debtors, the Estates, the Assets or the Disbursing Agent or any of their respective members, directors, managers, officers, employees, agents, professionals, successors and assigns with respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):

a. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

b. enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

c. creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

d. asserting any right of setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above-referenced Claims are fully preserved in accordance with Section 17.16 of the Plan.

## K.    Settlements and Compromises

### 1.    California Settlement

On April 15, 2005, the Bankruptcy Court approved the California Settlement Agreement, and that agreement became effective. See "The Chapter 11 Cases — California Settlement."

Pursuant to the California Settlement and a related Trading Practices Settlement with FERC, Claims in the amount of approximately $180,900,000 were allowed as Mirant Debtor Class 3 — Unsecured Claims and Claims in the amount of approximately $63,000,000 were allowed as MAG Debtor Class 4 — PG&E/RMR Claims. Additionally, the California Settlement provides that to the extent that the Debtors do not transfer the CC8 Assets to PG&E, PG&E will retain the proceeds from the liquidation of the Plan Distributions made on account of an additional Allowed MAG Debtor Class 4 — PG&E/RMR Claim in the amount of approximately $70,000,000.

### 2.    Proposed New York Tax Settlement

Beginning in the fall of 2004, the Debtors entered into settlement discussions with the New York Taxing Authorities regarding the property taxes associated with the Mirant Bowline and Mirant Lovett facilities. Representatives of the Debtors and the New York Taxing Authorities have developed a framework for settlement that said representatives are prepared to recommend for approval to their respective management and/or boards. To be clear, any settlement framework is subject to, among other things, final approval on the part of the New York Taxing Authorities. The Proposed New York Tax Settlement would be enforceable under New York law and consistent with the Debtors' financial projections. While many details of the Proposed New York Tax Settlement have yet to be finalized, a summary of the proposed terms follows. The Plan shall constitute a motion under sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019 seeking approval of the proposed settlement.

a. Mirant Lovett. Mirant Lovett would enter into a Payment in Lieu of Taxes Agreement (the "Lovett PILOT Agreement") with the Town of Stony Point ("Stony Point"), the Haverstraw-Stony Point Central School District ("Stony Point District"), the County of Rockland and the Rockland County IDA (collectively "Rockland" and with the foregoing entities, the "Lovett New York Taxing Authorities") which relates

to certain taxes previously levied, and taxes that would otherwise be levied in the future absent the Lovett PILOT Agreement, upon the Mirant Lovett generating plant and related real property. The Lovett PILOT Agreement would be effective as of January 1, 2005 and would apply to taxes that would be otherwise assessed and due for the years 2005 through 2012. The proposed material terms and conditions are as follows:

- Any new construction at Mirant Lovett that does not add generating capacity beyond Mirant Lovett's current rated capacity of 453 MW would be encompassed by the Lovett PILOT Agreement and not subject to additional taxation.

- The parties would dismiss all outstanding real property tax proceedings concerning Mirant Lovett.

- Mirant Lovett would receive an immediate payment or refund of $12,900,000 from the Lovett New York Taxing Authorities (the "Initial Lovett Tax Refund"), $6,000,000 of which would be used to pay outstanding 2003 and 2004 real property taxes to the Lovett New York Taxing Authorities, leaving to Mirant Lovett a net refund amount of $6,900,000.

- The Lovett New York Taxing Authorities would pay an additional $15,000,000 in real property tax refunds into an interest bearing trust account (the "Lovett Trust Account") naming Rockland as Mirant "Trustee." Under no circumstance would the Debtors have access to the Lovett Trust Account. The Lovett PILOT Agreement would provide for: (a) Mirant Lovett to pay (each payment, a "Mirant Lovett Base Payment") to the Lovett New York Taxing Authorities $7,000,000 annually for the first three years and $6,500,000 annually for the remaining five years, and (b) the Trustee to pay the Lovett New York Taxing Authorities annual scheduled amounts with funds from the Lovett Trust Account (the "Trustee Lovett Payments").

- Mirant Lovett would have no liability for any penalties (including tax relevy) and accrued interest relating to any currently due and unpaid real property taxes.

- In the event up to two of Mirant Lovett Unit 3, Unit 4, and Unit 5 are permanently retired, the Mirant Lovett Base Payments would be reduced pursuant to a formula in accordance with the corresponding MW reduction, as applicable. The Trustee Lovett PILOT Payments would remain unaffected in such an event and the Trustee would continue to make such payments to the Lovett New York Taxing Authorities from the Lovett Trust Account as they come due.

- In the event of a permanent shutdown of all units compromising the Mirant Lovett generating station, then upon the due date of the next PILOT payment, Mirant Lovett would pay to the County a "Recapture Payment" which is $13,100,000 in year 2005 and reduced by approximately $1,600,000 each year thereafter through year 2012. Upon payment of the Recapture Payment, Mirant Lovett would have no further obligations to pay any other amounts under the Lovett PILOT Agreement to any of the Lovett New York Taxing Authorities with respect to Mirant Lovett through 2012. In such an event, the Trustee would continue to make the Lovett Trustee PILOT Payments to the Lovett New York Taxing Authorities from the Lovett Trust Account as they come due. Mirant Lovett would have the option of eliminating the Recapture Payment obligation by sending notice to the Lovett New York Taxing Authorities, which will result in reducing the Initial Lovett Tax Refund by $3,500,000.

- The PILOT Agreement would be contingent upon Bankruptcy Court approval, execution of the Bowline PILOT Agreement (discussed below) and execution of an Annual Load Pocket Availability Agreement with Orange & Rockland Utilities that is in form and substance acceptable to Mirant Lovett. Settlement of outstanding assessment claims would require New York Supreme Court approval.

- The Lovett PILOT Agreement would be binding upon any purchaser of the Mirant Lovett generating facility.

b. Mirant Bowline. Mirant Bowline would enter into a Payment in Lieu of Taxes Agreement (the "Bowline PILOT Agreement") with the Town of Haverstraw ("Haverstraw"), the Villages of Haverstraw and West Haverstraw ("Villages"), the Stony Point District, and Rockland (collectively the "Bowline New York Taxing Authorities") which relates to certain taxes previously levied, and taxes that would otherwise be levied in the future absent the Bowline PILOT Agreement, upon the Mirant Bowline generating plant and

related real property. The Bowline PILOT Agreement will be effective as of January 1, 2005 and apply to taxes that would be otherwise assessed and due for the years 2005 through 2012. The proposed material terms and conditions are as follows:

- Any new construction at Mirant Bowline that does not add generating capacity beyond Mirant Bowline's current rated capacity of 1,200 MW will be encompassed by the Bowline PILOT Agreement and not subject to additional taxation.

- The parties would dismiss all outstanding real property tax proceedings concerning Mirant Bowline.

- Mirant Bowline would receive an immediate payment or refund of $17,600,000 from the Bowline New York Taxing Authorities (the "Initial Bowline Tax Refund"), $9,600,000 of which would be used to pay outstanding 2003 and 2004 real property taxes to the Bowline New York Taxing Authorities, leaving to Mirant Bowline a net refund amount of $8,000,000.

- The Bowline New York Taxing Authorities will pay an additional $96,000,000 in real property tax refunds into an interest bearing trust account (the "Bowline Trust Account") naming Rockland as "Trustee." Under no circumstances would the Debtors have access to the Bowline Trust Account. The Bowline PILOT Agreement would provide for: (a) Mirant Bowline to pay (each payment a "Mirant Bowline Base Payment") to the Bowline New York Taxing Authorities $12,000,000 annually for the first four years, $14,000,000 annually for the next two years, and $15,500,500 for the remaining two years, and (b) the Trustee to pay the Bowline New York Taxing Authorities annual scheduled amounts with funds from the Bowline Trust Account (the "Trustee Bowline PILOT Payments").

- Mirant Bowline would have no liability for any penalties (including tax relevy) and accrued interest relating to any currently due and unpaid real property taxes.

- In the event Mirant Bowline Unit 1 or Unit 2 is permanently retired and removed, the Mirant Bowline Base Payments would be reduced pursuant to a formula in accordance with the corresponding MW reduction, as applicable. The Trustee Bowline PILOT Payments would remain unaffected in such an event and the Trustee would continue to make such payments to the Bowline New York Taxing Authorities as they come due.

- In the event of a permanent shutdown of all units comprising the Mirant Bowline generating station, then upon the due date of the next PILOT Payment, Mirant Bowline shall pay to the County a "Recapture Payment" which is $22,000,000 in year 2005 and reduced by approximately $2,700,000 each year thereafter through year 2012. Upon payment of the Recapture Payment, Mirant Bowline shall have no further obligations to pay any other amounts under the Bowline PILOT Agreement to any of the Bowline New York Taxing Authorities with respect to Mirant Bowline through 2012. In such an event, the Trustee will continue to make the Bowline Trustee PILOT Payments to the Bowline New York Taxing Authorities from the Bowline Trust Account as they come due. Mirant Bowline has the option of eliminating the Recapture Payment obligation by sending notice to the Bowline New York Taxing Authorities, which will result in reducing the Initial Bowline Tax Refund by $8,000,000.

- The Bowline PILOT Agreement is contingent upon Bankruptcy Court approval and execution of the Lovett PILOT Agreement. Settlement of outstanding assessment claims would require New York State Supreme Court approval.

- The Bowline PILOT Agreement would be binding upon any purchaser of the Mirant Bowline generating facility.

c. If the Plan is not accepted by each of the New York Taxing Authorities, and notwithstanding the voting requirements of section 1126 of the Bankruptcy Code, the Plan shall be deemed amended without further action of the Debtors to exclude the New York Debtors from the MAG Debtors, and the confirmation hearing with respect to the New York Debtors shall be adjourned until further notice or order of the Bankruptcy Court. If this occurs, the Confirmation Order shall: (i) authorize New Mirant or its subsidiaries to operate the business of, and provide debtor-in-possession financing to, the New York Debtors and (ii) provide an extension of the periods in which the New York Debtors possess the exclusive right to file a plan of

reorganization and solicit acceptances thereto for an additional 180 days without prejudice to the rights of the New York Debtors to seek additional extensions of the rights of parties without prejudice to the rights of the New York Debtors to further amend, modify or revoke the Plan and/or submit any new plan of reorganization as it relates to the New York Debtors. The Debtors do not intend to seek a cramdown of the New York Debtors' respective plans if the Plan is not accepted by the New York Taxing Authorities; provided however, this is without prejudice to the Debtors' right to modify the Plan and seek cramdown of the Plan as amended, or with respect to a different plan. If the Debtors and the New York Taxing Authorities consummate all conditions precedent to implementation of the Proposed New York Tax Settlement prior to confirmation, voting by the New York Taxing Authorities may not be necessary and the Debtors and the New York Taxing Authorities may seek amendment to the Plan consistent therewith.

d.  As noted in "Certain Affiliate Transactions — Material Intercompany Transactions and Relationship Among the Debtors — Credit and Capital Support" above, Mirant historically provided credit and capital support to affiliated Debtors. The New York Debtors did not (and do not currently) have separate access to third-party capital and financing. Accordingly, as debtors-in-possession, the New York Debtors will require cash and liquidity support for their ongoing operations (in addition to the maintenance of agreements with both Mirant Services and MAEM, as succeeded by MET after the Effective Date). If the New York Debtors remain as debtors-in-possession from and after the Effective Date of the Plan as set forth above, the Debtors anticipate that either the Mirant Debtors or the MAG Debtors will provide the New York Debtors with a two-year debtor-in-possession financing facility providing for borrowings in an aggregate sum of $18,500,000 at a current market rate of interest and under current market terms. The Debtors further anticipate that such financing will be provided pursuant to section 364(d) of the Bankruptcy Code. More specifically, the obligations due by the New York Debtors under the debtor-in-possession facility will constitute a superpriority claim, having priority over all administrative expenses, and a first priority perfected security interest on all assets of the New York Debtors. In addition, notwithstanding any other provision in the Plan, (i) both the Mirant Debtors and the MAG Debtors will reserve the rights to assert claims against the New York Debtors arising from and after July 15, 2003 (the date the New York Debtors filed their respective petitions for relief under chapter 11); (ii) the New York Debtors will reserve the rights to assert claims against the Mirant Debtors; and (iii) Intercompany Claims held by the New York Debtors (and those held by any other Debtor) will also be reserved, the treatment of which shall be subject to the Plan. The Debtors shall seek DIP financing referenced above on separate motion after notice and a hearing.

**3.  Settlement of Certain Prepetition Employee Obligations**

The Plan provides for the settlement of most existing employee obligations (both with active and inactive employees). Specifically, the settlement embodied in the Plan provides claimants with (i) a resolution of claims by employees regarding 26 prepetition retention agreements and (ii) reinstatement of three non-qualified retirement programs.

With respect to the prepetition retention agreements, (i) for employee-related services rendered before the Petition Date, each employee will receive an Allowed Unsecured Claim against the Mirant Debtors; and (ii) for employee-related services rendered after the Petition Date, each employee will receive an Allowed Administrative Claim for any and all payments due and owing during the Debtors' Chapter 11 Cases, provided that each affected employee was employed on the Petition Date continues to be employed on the postpetition contractual payment date. Of the total 26 employees that are parties to these prepetition retention agreements, 19 employees participate in KERP. To the extent such employee participates in KERP, the applicable amount paid under KERP will be a direct dollar-for-dollar offset of any payment due under a retention agreement related to post-KERP employment. If an employee accepts this settlement, the respective prepetition retention agreement will be terminated (the employee must continue to be employed on the contractual payment date as a condition precedent to receiving the treatment provided in this settlement) and the employee's claim will be treated pursuant to the terms of the settlement. Alternatively, if the employee chooses to opt out of this settlement, the respective prepetition retention agreement will be rejected and the employee will be permitted to file a rejection claim in accordance with the rejection procedures. The Disbursing Agent will review each rejection claim and, if appropriate, the Disbursing Agent may object to the amount of said rejection claim.

The Debtors have determined that the cost of this settlement is less than aggregate cost of the claims and the additional litigation cost. If the Debtors reject all the prepetition retention agreements, the Debtors believe that these employees will assert an aggregate of $3,342,444 in claims.

The Debtors have calculated that the estimated total value under the proposed settlement to employees who have claims based on these prepetition retention agreements is $2,761,009, with the following allocation: (i) the aggregate amount of each prepetition retention agreement earned prior to the Petition Date and payable as Allowed Unsecured Claims against the Mirant Debtors is $1,573,306; and (ii) the aggregate amount (with any applicable KERP offsets) earned subsequent to the Petition Date and payable as Allowed Administrative Claims following the Effective Date, if the certain employees remain employed on the contractual payment date, is $1,187,703. Notably, however, the employees may disagree with the Debtors' gross claim amount and the Debtors' allocation of the unsecured and administrative priority portions of their claims.

With respect to the non-qualified retirement programs for former employees, the following three plans are reinstated and assumed by the Debtors: (i) the Mirant Services Supplemental Benefit Plan; (ii) the Mirant Services Supplemental Executive Retirement Plan; and (iii) the Deferred Compensation Plan for Directors and Select Employees. The Debtors have also determined that the assumption of these non-qualified retirement programs pursuant to this settlement is less than the sum of (i) the estimated aggregate cost of these claims, which is $5,200,000; and (ii) the attendant cost incurred by the ensuing contested, piecemeal litigation that requires the analysis of each individual claim by an independent actuary, given that these claims are difficult to quantify since it would be difficult for most (and impossible for many) of the affected employees to obtain these benefits cost effectively under current market conditions.

The Debtors, moreover, believe that this settlement will increase goodwill and morale of the current employees; avoid public disputes with former employees, many of whom have earned their benefits over long careers; avoid disputes over small dollar amounts as the Debtors progress to emergence from their Chapter 11 Cases; and avoid the cost, complexity, and uncertainty of litigation. Specifically regarding the prepetition retention agreements for employees with payments not yet due, the Debtors also realize that this settlement will result in the motivation of their retention through payment dates in late 2005. The Debtors believe that these benefits exceed the cost of this settlement.

## 4. Settlement of Certain Subordination Rights

As permitted by Section 17.3 of the Plan, the Plan constitutes a motion pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019 to compromise and settle the right of the holders of Mirant Debt Claims to enforce contractual subordination provisions against all holders of the Subordinated Notes. In furtherance of this compromise and settlement, the Confirmation Order and Plan shall provide the following:

(a) the right of the holders of "Senior Debt" (as defined in the applicable indenture) to enforce contractual subordination provisions against all holders of the Subordinated Notes shall be compromised and settled under the Plan on the following terms: (i) each holder of an Allowed Subordinated Note Claim shall receive a Pro Rata Share of (i) 3.5% of the shares of New Mirant Common Stock to be issued under the Plan (excluding the shares (A) to be issued to the holders of Allowed MAG Debtor Class 5 — Unsecured Claims and Allowed MAG Debtor Class 4 — PG&E/RMR Claims; provided, that, if any such shares to be issued to the holders of Allowed MAG Debtor Class 5 — Unsecured Claims and Allowed MAG Debtor Class 4 — PG&E/RMR Claims are issued to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, then the holders of Subordinated Note Claims shall receive 3.5% of such issued shares; and (B) to be reserved for issuance pursuant to the New Mirant Employee Stock Programs), (ii) the New Mirant Series B Warrants and (iii) the right to share on a pari passu basis the Designated Net Litigation Distributions allocated to holders of Allowed Mirant Class 3 — Unsecured Claims as provided in Section 10.13 of the Plan;

(b) except for the Plan Distributions contemplated by Sections 15.4(a) and (b) and 10.13 of the Plan, any Plan Distribution that would otherwise be distributable under the Plan to the holders of the Subordinated Notes but for the enforcement of the subordination provision in the applicable indenture, shall be distributed to the holders of Allowed Mirant Debt Claims; and

173

(c) The reimbursement of the professional fees of Phoenix as contemplated by Section 6.2(d)(i) of the Plan.

## L.  Means of Implementation of the Plan

### 1.  Operations between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtors shall continue to operate their businesses as Debtors-in-Possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules and all orders of the Bankruptcy Court that are then in full force and effect.

### 2.  Corporate Action

The entry of the Confirmation Order shall constitute authorization for New Mirant, the Debtors and their Affiliates to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation, any action required by the stockholders or directors of New Mirant, the Debtors and their Affiliates, including, among other things, (a) the adoption of the New Mirant Constituent Documents, (b) the termination and cancellation of any outstanding instrument, document or agreement evidencing Mirant Debt Claims, Subordinated Note Claims, MAG Short-term Debt Claims or Equity Interests in Mirant, MADI and MAEMI, (c) the formation of New MAG Holdco, MD Leaseco, New MAEM Holdco and Second Tier MAG Holdco, (d) the issuance of the New MAG Holdco Notes, the New Mirant Common Stock, the New Mirant Warrants, the MAI Series A Preferred Shares, the MAI Series B Preferred Shares and any other securities to be issued under the Plan, (e) the execution and delivery of the Exit Facility and the New MAG Holdco Indenture, (f) all transfers of Assets that are to occur pursuant to the Plan, including without limitation, the intercompany restructuring transactions set forth in Sections 8.2, 8.3 and 8.4 of the Plan, (g) the incurrence of all obligations contemplated by the Plan and the making of all Plan Distributions, (h) the formation of the Plan Trust, the qualification of the Plan Trustees and the transfers to the Plan Trust as contemplated by the Plan, (i) the implementation of all settlements and compromises as set forth in or contemplated by the Plan including, without limitation, the California Settlement and the Proposed New York Tax Settlement (if the Plan is unanimously accepted by the New York Taxing Authorities), (j) the adoption of the New Mirant Employee Stock Programs, (k) taking all actions to preserve and provide for the prosecution of the Designated Avoidance Actions as contemplated by Section 10.13 of the Plan, and (l) entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation including, without limitation, intercompany contracts necessary, appropriate, or advisable to permit the funding and the provision of intercompany corporate services, intercompany commodity purchases and sales, intercompany commodity hedging arrangements (including the allocation of existing hedge transactions), and intercompany loans. On the Effective Date, the officers of the Debtors are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.

All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, who served in such capacity at any time after April 2, 2001, the date Mirant was spun-off from Southern (the "Indemnified Parties") whether arising under the Debtors' constituent documents, contract, law or equity, (collectively the "Indemnification Obligations") shall be assumed by, and assigned to, the Debtors (and in the cases of Mirant and the Trading Debtors, assumed by, and assigned to, New Mirant and MET, respectively) upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. The prosecution of any so-indemnified Cause of Action shall upon the occurrence of the

Effective Date be enjoined and prohibited, except solely for the purpose of obtaining a recovery from the issuer of any available insurance policy proceeds.

The Debtors have determined to assume and assign the Indemnification Obligations as described above based upon the following considerations. First, if the Debtors do not assume and assign the Indemnification Obligations, and an Indemnified Party is subsequently sued by a third party on account of conduct which the Debtors would otherwise be obligated to indemnify, the Debtors' insurance providers may assert a defense denying coverage. Accordingly, in order to preserve insurance coverage, the Debtors have determined to assume and assign the Indemnification Obligations. Second, the Indemnified Parties are limited to those current and former directors, officers and employees who served in such capacity after the Spin-Off from Southern. Any indemnification obligations for individuals who served in such capacity prior to the Spin-Off should be covered by Southern and any applicable Southern insurance policy. Third, as noted above, the Plan also contains an injunction enjoining the prosecution of indemnified causes of action, except solely for the purpose of obtaining a recovery from the issuer of any available insurance proceeds. As a consequence, the Debtors' Indemnification Obligations would be limited to available insurance proceeds.

### 3. Termination of Certain Debt Obligations

Upon the occurrence of the Effective Date, the Mirant Notes, the Mirant "C" Facility, the Mirant 364-Day Revolver, the Mirant 4-Year Revolver, the MAG Revolvers, the Subordinated Notes and the MAG Short-term Notes shall be cancelled and annulled. Immediately upon the completion of all Plan Distributions to the holders of the Mirant Notes, the Subordinated Notes and the MAG Short-term Notes, the Old Indenture Trustees shall be authorized and directed (without further approval, act or other determination under applicable law, regulation, order or rule) to take such action as shall be necessary or appropriate to terminate and extinguish (a) all of the Debtors' obligations with respect to the MAG Short-term Notes under the MAG Indenture, following which, each of the Mirant Indentures and the MAG Indenture (to the extent it relates to the MAG Short-term Notes) shall terminate.

### 4. Continued Corporate Existence of the Debtors

Except as otherwise provided in the Plan, each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to the New Mirant Constituent Documents, which shall become effective upon the occurrence of the Effective Date. On or after the Effective Date, the Debtors may, within their sole and exclusive discretion take such action as permitted by applicable law and their constituent documents, as they determine is reasonable and appropriate, including to (a) cause any or all of the Debtors to be merged into one or more of the other Debtors or other legal entities; and (b) change the legal name of any of the Debtors, including, but not limited to, the mergers and name changes provided for in Sections 8.2, 8.3 and 8.4 of the Plan.

### 5. Re-vesting of Assets

Upon the occurrence of the Effective Date, except as otherwise provided in the Plan, and without further order of the Bankruptcy Court, title to all of the Assets of the Debtors shall vest in the Debtors free and clear of all liens, Claims, Causes of Action, interests, security interests and other encumbrances. On and after the occurrence of the Effective Date, except as otherwise provided in the Plan, the Debtors may operate their business and may use, acquire and dispose of their Assets free of any restrictions of the Bankruptcy Code.

### 6. Sale Provisions Relating to Mint Farm

Consistent with section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer in connection with the sale of the generating facility owned by Mint Farm shall be deemed to have been made or delivered under the Plan. In the event a sale of the Mint Farm generating facility does not close within one year after the Effective Date, the Debtors may liquidate the Mint Farm generating facility and related assets.

### 7. Management

Except as set forth in Section 8.10(b) of the Plan, upon the occurrence of the Effective Date, the management, control and operation of each of New Mirant and its Affiliates, including the Debtors (except for Mirant and the Trading Debtors) shall be the general responsibility of each such entity's current board and management. Entry of the Confirmation Order shall ratify and approve all actions taken by each of the Debtors from the Petition Date through and until the Effective Date.

### 8. Initial Boards of Directors

a. On the Effective Date, the initial board of directors (or managers, as applicable) of each Debtor, except New Mirant, shall be comprised of the individuals who hold such positions as of the Effective Date. The board of directors of New Mirant shall consist of nine members comprised as follows:

(i) The following seven individuals

| Name | Age | Position and Experience |
|---|---|---|
| A.D. Correll . . . . . . . . . . . . . | 64 | Director of Mirant since 2000. Chairman of the Board and Chief Executive Officer (1993-present) and President (1991-2002) of Georgia-Pacific Corporation, manufacturers and distributors of building products, pulp and paper from 1993-present. He is a director of Georgia-Pacific Corporation, Norfolk Southern Corporation, and SunTrust Banks, Inc. |
| Edward R. Muller . . . . . . . . | 53 | President and Chief Executive Officer of Edison Mission Energy, a California-based independent power producer, from 1993-2000. He is a director of GlobalSantaFe Corp., Ormat Technologies, Inc., RigNet, Inc., and Strategic Data Corp. |
| Thomas M. Johnson . . . . . . | 55 | Chairman and Chief Executive Officer of Chesapeake Corporation, a specialty packaging manufacturer, from 1997-present. He is also a director of Universal Corporation. |
| Robert C. Murray . . . . . . . . | 59 | Chairman (2002-2004) and Interim CEO (2002-2003) of Pantellos Corporation, an E-Commerce procurement marketplace for the utility industry. He is also a director of Perfect Commerce, Inc. |
| John M. Quain . . . . . . . . . . | 51 | Chairman of the Energy and Utility Law Practice Group of Klett Rooney Lieber & Schorling, a strategic planning and regulatory consultative services provider for energy and utility companies, from 2001-present. |
| William L. Thacker . . . . . . . | 60 | President, CEO, Chairman and Advisor to President and CEO of Texas Eastern Products Pipeline Company, LLC, owner and operator of petroleum product pipelines in the United States, at various times from 1992-2002. He is a director of Pacific Energy Management, LLC, the General Partner of Pacific Energy Partners L.P. and Copano Energy, LLC. |
| John T. Miller . . . . . . . . . . . | 58 | Chief Financial Officer (1998-2002) and Chief Executive Officer (2001-June 2005) of American Ref-Fuel Company, operator of waste-to-energy generation facilities in the northeastern United States. |

Mr. Muller was introduced to the Debtors through a CEO search process that had been initiated by Mirant's Board of Directors, with the assistance of a nationally recognized executive search firm, during the first quarter of 2004. Following the invitation of the Board to participate in the process, the Corp Committee met with Mr. Muller. The Debtors and the Corp Committee believe that Mr. Muller has the experience, knowledge, and insight to lead the Board of New Mirant. Mr. Muller has no direct affiliation with any of the Committees and was a consensual pick by the Debtors and the Committees in the Mirant Plan Term Sheet to lead New Mirant and the Debtors following the Effective Date. Upon entry of the Disclosure Statement Order, Mr. Muller shall be elected to the Board of Directors of Mirant and named Chairman thereof. On September 26, 2005, the Debtors filed a motion seeking approval to enter into a definitive employment

agreement with Mr. Muller, which was negotiated in consultation with the Committees. On September 28, 2005, the Bankruptcy Court authorized the Debtors to enter into such employment agreement and upon execution of the employment agreement, Mr. Muller shall be appointed CEO.

A.D. Correll is an existing director of Mirant.

Mr. Johnson, Mr. Murray, Mr. Quain, Mr. Thacker and Mr. Miller were selected by the Joint Selection Committee. The Joint Selection Committee is comprised of two current "independent" members of the Board (Stuart E. Eizenstat and Robert F. McCullough) and four individuals who are or were representatives of the Corp Committee. The Joint Selection Committee retained Russell Reynolds Associates, Inc., ("Russell Reynolds"), a nationally recognized executive firm, to identify potential candidates for the Board. Russell Reynolds identified 25 potential candidates. The Joint Selection Committee chose to interview 12 of the potential candidates before selecting six individuals to serve on the Board. One individual has since resigned. Each of the remaining five individuals selected is uniquely qualified to serve on the Board of New Mirant following the Effective Date. All of the six satisfy the New York Stock Exchange Definition of "Independent Director" and none of the six have a direct affiliation with any of the members of the Committees.

(ii) An eighth member remains to be selected by the Joint Selection Committee from a list of candidates to be formulated by Russell Reynolds, which individual shall both satisfy The New York Stock Exchange definition of "Independent Director" and not be a member or Affiliate, Insider or relative of a member of the Equity Committee.

(iii) The final member will be an individual to be selected by a committee comprised of members of the Equity Committee, one member of the Nominating and Governance Committee of Mirant's Board of Directors and Edward R. Muller, from a list to be formulated by a national executive search firm of the Equity Committee's choosing, which individual shall both satisfy The New York Stock Exchange definition of "Independent Director" and not be a member or Affiliate, Insider or relative of a member of the Equity Committee.

b. From and after the Effective Date, the members of the board of directors (or managers, as applicable) of New Mirant and its Affiliates shall be selected and determined in accordance with the provisions of the respective New Mirant Constituent Documents and applicable law.

**9. Officers**

Except as set forth in paragraph 8(b) above, the current officers of each of the Debtors (except for Mirant and the Trading Debtors) shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, and applicable law. Except as otherwise determined by the Board of Directors of New Mirant, the current officers of Mirant shall serve in such positions after the Effective Date at New Mirant in accordance with their respective employment agreements, if any, and applicable law. Subject to any applicable employment agreements and applicable law, from and after the Effective Date, the officers of New Mirant and its Affiliates shall be selected and appointed by the respective boards of directors of such entities, in accordance with, and pursuant to, the provisions of applicable law and the respective New Mirant Constituent Documents.

**10. Causes of Action**

Except as otherwise provided in the Plan, all Causes of Action, including Avoidance Actions (including, without limitation, the Southern Company Causes of Action and the Pepco Causes of Action), shall, upon the occurrence of the Effective Date, be transferred to, and be vested in, New Mirant for the benefit of the Debtors and their Estates. Except as otherwise provided in the Plan, New Mirant's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Person or Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Action against them. The Debtors, the Estates, the Plan Trustees and the Plan Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person or**

**Entity, <u>except</u> as otherwise provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, <u>including</u> without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.**

### 11. <u>Appointment of the Disbursing Agent</u>

Upon the occurrence of the Effective Date, New Mirant shall be appointed to serve as the Disbursing Agent, and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### 12. <u>Sources of Cash for Plan Distributions</u>

All Cash necessary for the Disbursing Agent to make payments and Plan Distributions shall be obtained from proceeds of the Exit Financing and the Debtors' existing Cash balances.

### 13. <u>New Mirant Employee Stock Programs</u>

New Mirant shall reserve sufficient shares of New Mirant Common Stock for issuance under the New Mirant Employee Stock Programs in order that such shares shall represent 5% of the New Mirant Common Stock. The Plan shall be deemed a solicitation to holders of Equity Interests in Mirant and/or holders of New Mirant Common Stock for approval of the New Mirant Employee Stock Programs, and the Confirmation Order shall constitute approval of the New Mirant Employee Stock Programs for purposes of the shareholder approval requirements under the Internal Revenue Code, and, to the fullest extent permissible by law, such other requirements for shareholder approval under the laws of the jurisdiction of formation of New Mirant.

### 14. <u>Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent</u>

The Disbursing Agent may, but shall not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (<u>including</u> the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may: (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 *et seq.*), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

### 15. <u>Releases by the Debtors</u>

**<u>Except</u> for the Southern Company Causes of Action, as of the Effective Date, each of the Debtors shall forever release, waive and discharge all Causes of Action (other than Causes of Action to enforce the terms of the Plan and the Plan Documents), then existing or thereafter arising, that are based in whole or in part on any act, omission, transaction, event, other occurrence or thing occurring or in existence on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement and that could have been asserted by the Debtors against any Protected Persons identified in a Schedule to be filed with the Bankruptcy Court (and served upon persons who file an objection to the Plan and those who have requested special notice) not less than five days before the commencement of the Confirmation Hearing, <u>including</u>, without limitation such Causes of Action that have been or could be asserted derivatively on behalf of such Debtor by another Person. The Schedule will contain: (i) the names of the present and former officers, directors and managers (as applicable) of Mirant and MAG who are beneficiaries of the release described in this paragraph and (ii) general categories of individuals who are also beneficiaries of the release described in this paragraph.**

### 16. <u>Appointment Of New Mirant And MET As Attorneys-In-Fact</u>

Each of Mirant and the Trading Debtors hereby appoint New Mirant and MET, with full power of substitution, as their true and lawful agents and attorneys-in-fact with full irrevocable power and authority on

behalf of and in the place and stead of Mirant or the Trading Debtors, to take any and all actions deemed necessary or appropriate by New Mirant or MET to carry out the asset transfers contemplated under Sections 8.2, 8.3 and 8.4 of the Plan, including, without limitation, the preparation, execution and delivery of any and all documents, the making of any and all filings or registrations and the payment of any all fees and expenses relating to the foregoing, as New Mirant or MET shall deem necessary or appropriate to give effect to the asset transfers contemplated under Sections 8.2, 8.3 and 8.4 of the Plan. Each of New Mirant and MET shall have full and unqualified authority to delegate any or all of the foregoing powers to any of its respective officers or agents. The powers granted in Section 8.18 of the Plan shall survive the winding up and dissolution of Mirant and/or the Trading Debtors.

## M.   The Plan Trust

### 1.   Creation of Plan Trust and Appointment of Plan Trustees

On the Effective Date, the Plan Trust will be created pursuant to the Plan Trust Declaration.

The Plan Trust shall be administered by the Plan Trustees who shall be identified prior to the conclusion of the Confirmation Hearing. The appointment of the initial Plan Trustees and the terms of their compensation shall be subject to the approval of the Bankruptcy Court.

During the period from the Confirmation Date to the Effective Date, the Debtors shall reimburse each Plan Trustee for actual and necessary out-of-pocket expenses incurred by them in preparing to assume their responsibilities under the Plan Trust Declaration in an aggregate amount not to exceed $50,000. On the Effective Date, New Mirant shall advance $500,000 to the Plan Trust to pay the reasonable costs and expenses associated with the administration of the Plan Trust. After the Effective Date, New Mirant shall have the obligation to advance funds to pay the reasonable costs and expenses associated with the administration of the Plan Trust up to an aggregate unreimbursed amount of $1,000,000 inclusive of New Mirant's initial advancement on the Effective Date.

### 2.   Property of the Plan Trust

As contemplated by Sections 8.2(b) and 8.3(b) of the Plan, the shares of common stock in Mirant (evidencing 100% of the Equity Interests) and 100% of the equity interests in New MAEM Holdco, which will include all of the Equity Interests in the Trading Debtors as set forth in Article VIII of the Plan, shall be issued to the Plan Trust.

### 3.   Powers and Duties of the Plan Trustees

Subject to the terms and provisions of the Plan Trust Declaration, the Plan Trustees shall have the duty and authority to take all actions, including but not limited to, the retention of professionals, deemed by the Plan Trustees to be necessary or appropriate: (i) to protect, maintain, liquidate to Cash, and maximize the value of the Assets transferred to the Plan Trust, whether by litigation, settlement or otherwise, and (ii) to prepare and make available to the holders of beneficial interests in the Plan Trust periodic reports regarding the results of the Plan Trust's operations. To the extent that the legal names of Mirant and the Trading Debtors have not already been changed prior to their transfer to the Plan Trust, the Plan Trustees shall have the duty and authority to change the legal name of Mirant and any of the Trading Debtors whose legal name contains the word "Mirant" to another legal name that does not contain the word "Mirant."

Except as otherwise provided in the preceding paragraph, the Plan Trustees, together with their officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, holders of Claims and Equity Interests, and parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Plan Trustees by the Plan Trust Declaration, the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Plan Trustees' gross negligence or willful misconduct. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any claim or Cause of Action against the Plan Trustees or their officers, directors, employees, agents, and

representatives for making payments in accordance with the Plan Trust Declaration, or for liquidating assets to make payments under the Plan Trust Declaration.

### 4. No Successor Liability

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEITHER NEW MIRANT NOR MET SHALL HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITATION ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO MIRANT OR ANY OF THE TRADING DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO NEW MIRANT OR MET.**

**FURTHERMORE, ALL OBLIGATIONS ARISING UNDER THE BEWAG CONTRACT SHALL REMAIN THE SOLE AND EXCLUSIVE OBLIGATION OF MIRANT FROM AND AFTER THE ISSUANCE OF THE MEMBER INTERESTS IN MIRANT TO THE PLAN TRUSTS. IN NO EVENT SHALL THE OBLIGATIONS ARISING UNDER THE BEWAG CONTRACT CONSTI-TUTE OBLIGATIONS OF, OR BE ENFORCEABLE AGAINST, NEW MIRANT, ITS SUBSIDIAR-IES OR THEIR ASSETS. THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE BEWAG COUNTERPARTIES FROM TAKING ANY ACTION TO ENFORCE THE BEWAG CONTRACT AND THE OBLIGATIONS ARISING THEREUNDER AGAINST NEW MIRANT, ITS SUBSIDIARIES AND THEIR ASSETS.**

## N. Distribution Provisions

### 1. Plan Distributions

The Disbursing Agent shall make all Plan Distributions. In the event that a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be deemed payable on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of the Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### 2. Timing of Plan Distributions

Except for Plan Distributions to holders of Allowed DIP Claims which, pursuant to Section 6.2(f) of the Plan shall be made on the Effective Date, each Plan Distribution shall be made on the relevant Distribution Date therefor and shall be deemed to have been timely made if made on such date or within ten (10) days thereafter; provided that Plan Distributions to holders of Letter of Credit Claims shall not be made unless and until such Claims become fixed and, as a result, become Allowed Claims against the Mirant Debtors.

### 3. Address for Delivery of Plan Distributions

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed on the claims agent with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e), (d) in any notice served by such holder giving details of a change of address, (e) in the case of the holder of a California Party Unsecured Claim in the California Settlement Agreement, or as otherwise directed by such holder in writing, or (f) in the case of the holders of Mirant Notes, Subordinated Notes, MAG Short-term Notes and MAG Long-term Notes, to the applicable Old Indenture Trustees for distribution to the holders of such notes subject to the provisions of Section 10.9 of the Plan. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address

within ninety days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to New Mirant, except for the forfeited Plan Distribution of holders of Allowed Mirant Debtor Class 3 — Unsecured Claims and Allowed Mirant Debtor Class 5 — Equity Interests, which shall be distributed on a pro rata basis to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims and Allowed Mirant Debtor Class 5 — Equity Interests, respectively, that have not forfeited their Plan Distributions. Such supplemental Plan Distributions shall be made from time to time at the discretion of the Disbursing Agent.

### 4. De Minimis Distributions

No Plan Distribution of less than twenty-five dollars ($25.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefor is made writing to the Disbursing Agent. If no request is made as provided in the preceding sentence within ninety days following the Effective Date, all such Plan Distributions shall revert to New Mirant.

### 5. Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made on or before the later of: (a) the first anniversary of the date on which such Plan Distribution or payment was made, and (b) 180 days after the date of the issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to New Mirant.

### 6. Manner of Payment under the Plan

Unless the Person or Entity receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors, in addition to the foregoing, may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 7. Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court or as provided herein, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent and the Old Indenture Trustees (including any paying or transfer agents for such Old Indenture Trustees) on or after the Effective Date (including, but not limited to, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent and the Old Indenture Trustees (including any paying or transfer agents for such Old Indenture Trustees) from and after the Effective Date (including, but not limited to, taxes) shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

### 8. Fractional Plan Distributions

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or notes) will be made. Fractional shares and fractions of dollars (whether in Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

### 9. Special Distribution Provisions for MAG Short-term Debt Claims, MAG Long-term Note Claims and Mirant Debt Claims

The following additional provisions shall apply specifically to Plan Distributions to be made to the holders of Allowed MAG Short-term Debt Claims, MAG Long-term Note Claims and Mirant Debt Claims under the Plan:

#### a. Distributions to Holders of MAG Short-term Note Claims and Mirant Note Claims

Plan Distributions on account of the MAG Short-term Note Claims and the Mirant Note Claims shall be made by the Disbursing Agent to the Old Indenture Trustees for the MAG Short-term Notes and the Mirant Notes, respectively. The Old Indenture Trustees for the MAG Short-term Notes and the Mirant Notes, or their agents, shall make such Plan Distributions in accordance with the Old Indentures and such Plan Distributions shall be made directly to the registered holders of the MAG Short-term Notes and Mirant Notes in accordance with Section 10.9(f) of the Plan. For purposes of making Plan Distributions, the transfer ledger in respect of the MAG Short-term Note Claims and Mirant Note Claims shall be closed as of the close of business on the Effective Date. The Disbursing Agent, the Plan Trustees, the Old Indenture Trustees, and their respective agents, as applicable, shall have no obligation to recognize any transfer after the Effective Date of a MAG Short-term Debt Claim, or a Mirant Debt Claim.

#### b. Distribution to Holders of MAG Long-term Note Claims

Plan Distributions on account of the MAG Long-term Note Claims shall be made by the Disbursing Agent to the Old Indenture Trustee for the MAG Long-term Notes. The Old Indenture Trustee for the MAG Long-term Notes, or its agent, shall make such Plan Distributions in accordance with the MAG Indenture and such Plan Distributions shall be made directly to the registered holders of the MAG Long-term Notes in accordance with Section 10.9(f) of the Plan. The record date for plan distributions on account of the MAG Long-term Note Claims shall be the Effective Date or such other date as established by the Old Indenture Trustee for the MAG Long-term Notes with the cooperation of the Debtors, under the MAG Indenture.

#### c. Service by the Old Indenture Trustees

(i) The Old Indenture Trustees and their agents, successors and assigns shall facilitate the making of Plan Distributions to the holders of the Mirant Notes and the MAG Short-term Notes, as applicable, and upon the completion thereof, shall be discharged of all their respective obligations associated with the Mirant Notes and the MAG Short-term Notes. The rights of holders of Allowed MAG Short-term Note Claims and Mirant Note Claims, as established under the Old Indentures, shall continue in effect, for the sole purpose of (i) allowing the holders of Mirant Note Claims and the MAG Short-term Note Claims, as applicable to receive their distributions hereunder, (ii) allowing and requiring the Old Indenture Trustees to make the distributions to be made on account of the Mirant Notes and MAG Short-term Notes, as applicable, and (iii) permitting the Old Indenture Trustees to assert their Charging Lien against such distributions for payment of the Indenture Trustee Fees. Notwithstanding any provision contained in the Plan to the contrary, the distribution provisions contained in the Old Indentures for Mirant Notes and the MAG Short-term Notes shall continue in effect to the extent necessary to authorize the Old Indenture Trustees to receive and distribute to the holders of Allowed Claims, as applicable, distributions to the Plan on account of any Allowed Claims and shall terminate completely upon completion of all such distributions. Any actions taken by the Old Indenture Trustees with respect to the MAG Short-term Notes and the Mirant Notes that are not for the purposes authorized in the Plan shall be null and void.

(ii) The Old Indenture Trustee under the MAG Indenture with respect to the MAG Long-term Notes, together with its agents, successors and assigns, shall facilitate the making of Plan Distributions to the holders of the MAG Long-term Notes. All of the rights, privileges and indemnities under the MAG Indenture with respect to the MAG Long-term Notes shall be reinstated and remain in full force and effect. Any actions taken by the Old Indenture Trustee under the MAG Indenture with respect to the MAG Long-term Notes that are not for the purposes authorized under the MAG Indenture and the Plan shall be null and void.

### d. Service by Facility Agents

The Facility Agents and their agents, successors and assigns shall facilitate the making of Plan Distributions to the holders of the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims, as applicable, and upon the completion thereof, shall be discharged of all their respective obligations associated with the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims. The rights of holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall continue in effect for the sole purpose of allowing and requiring the Facility Agents to make Plan Distributions to be made on account of such Claims. Any actions taken by the Facility Agents with respect to the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims that are not for the purposes authorized by the Plan shall be null and void.

### e. Substitution of the Old Indenture Trustees; Distributions

Upon the occurrence of the Effective Date, the Claims of the Old Indenture Trustees shall, for all purposes under the Plan, including, without limitation, the right to receive distributions thereunder, be substituted for all Claims of individual holders of MAG Short-term Note Claims and Mirant Note Claims arising under, based upon, or evidenced by the notes or debentures issued under the Old Indentures. On the Distribution Date, all MAG Short-term Note Claims and Mirant Note Claims shall be settled and compromised in exchange for the distribution to the Old Indenture Trustees of the applicable Plan Distributions to the holders of Allowed MAG Short-term Note Claims and Mirant Note Claims as specified in Sections 5.2(e) and 5.1(c), respectively, of the Plan; provided, that the Old Indenture Trustees shall return to the Disbursing Agent any Plan Distributions held on account of any MAG Short-term Note Claims and Mirant Note Claims as to which the requirements of Section 10.9(f) of the Plan are not satisfied by the first anniversary of the Effective Date.

### f. Distributions by Old Indenture Trustees

On the Distribution Date, all distributions on behalf of the Allowed MAG Short-term Note Claims and Mirant Note Claims shall be made by the applicable Old Indenture Trustees and the Old Indenture Trustees shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that Old Indenture Trustees are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by New Mirant. As soon as practicable after such surrender or exchange as described in Section 10.12 of the Plan, the Old Indenture Trustees shall distribute to their respective holders such holder's share of the distributions in accordance with the Plan, after the Plan but subject to the rights of the Old Indenture Trustee in accordance with Section 10.9(h) of the Plan.

### g. Substitution of the Facility Agents; Distributions

Upon the occurrence of the Effective Date, the Claims of the applicable Facility Agents shall, for all purposes under the Plan, including, without limitation, the right to receive distributions thereunder, be substituted for all Claims of individual holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claim. On the Distribution Date, all MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall be settled and compromised in exchange for the distribution to the Facility Agents of the applicable Plan Distributions to the holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims as specified in Sections 5.2(e) and 5.1(c), respectively, of the Plan; provided, that the Facility Agents shall return to the Disbursing Agent any Plan Distributions held on account of any MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims as to which the requirements of Section 10.12 of the Plan are not satisfied by the first anniversary of the Effective Date.

### h. Enforcement of Rights of Old Indenture Trustees

The rights, liens, (including the Charging Lien), and Claims of the Old Indenture Trustees under the Old Indentures with respect to the collection of their fees and expenses from the holders of MAG Short-term Note Claims, MAG Long-term Note Claims and Mirant Note Claims or from Plan Distributions made on account of such Claims (including the fees and expenses of counsel) shall survive confirmation of the Plan and may be fully enforced by the Old Indenture Trustees; provided, however, that such fees and expenses shall be subject to Bankruptcy Court approval under section 1129(a)(4) of the Bankruptcy Code, to the extent that section applies. All distributions to the Old Indenture Trustees on behalf of the holders of Allowed MAG Short-term Note Claims, MAG Long-term Note Claims and Mirant Note Claims shall be applied by the Old Indenture Trustees as provided by the Old Indentures.

### i. Payment of Indenture Trustee Fees and Agent Fees

Prior to the Effective Date, the Old Indenture Trustees and the agent under the MAG Revolvers shall provide statements of fees and expenses to the Debtors. All reasonable fees and expenses owed to the Old Indenture Trustees under the Old Indentures and to the agent of the MAG Revolvers shall be paid in Cash on the Effective Date. Unless contested by the Debtors, the fees and expenses owed to the Old Indenture Trustees and the Agent under the MAG Revolver shall be deemed reasonable, without further order of the Bankruptcy Court. The Bankruptcy Court shall resolve any of the Debtors' objections to such fees and expenses. The respective rights, liens, and claims of the respective Old Indenture Trustee under the Old Indentures (other than those related to the MAG Long-term Note Claims) shall be discharged upon payment of these fees and expenses.

### j. Enforcement of Rights of Facility Agents

The rights, liens (including the Charging Lien), and Claims of the Facility Agents with respect to the collection of their fees and expenses from the holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims, or from Plan Distributions made on account of such Claims, shall survive confirmation of the Plan and may be fully enforced by the Facility Agents. All distributions to the Facility Agents on behalf of the holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall be applied by the Facility Agents as provided by the Old Indentures or the MAG Revolvers.

### 10. Special Distribution Provisions for Equity Securities

The Effective Date shall be the date for determining the holders of Allowed Equity Interests in Mirant entitled to receive Plan Distributions. For the purpose of making Plan Distributions, the transfer ledger in respect of the Allowed Equity Interests in Mirant shall be closed as of the close of business on the Effective Date, and the Disbursing Agent, the Plan Trustees and their respective agents shall be entitled to recognize and deal for all purposes herein with only those holders of record stated on the transfer ledger maintained by the stock transfer agent for the Allowed Equity Interests in Mirant as of the close of business on the Effective Date. On the Effective Date, all Equity Interests in Mirant shall be cancelled and annulled, and all rights thereunder shall be settled and compromised in full in exchange for the Plan Distributions to be made to the holders on the Effective Date of all such Allowed Equity Interests.

### 11. Special Distribution for California Parties

The following additional provisions apply specifically to any distributions to the California Parties under the Plan on account of the California Party Unsecured Claims:

(a) CERS. If CERS (as such term is defined in Section 1.1.35 of the California Settlement Agreement) is the holder of any portion of the California Party Unsecured Claims on the Distribution Date, then any distributions to CERS on account of its allocable share of those claims shall be made by the Disbursing Agent (i) to the trustee of the liquidating trust required to be created by Section 3.7 of the California Settlement Agreement (respectively, the "Liquidating Trustee" and the "Liquidating Trust") or (ii) if a stock transfer agent has been identified in writing to the Mirant Parties (as defined in the California Settlement Agreement) by CERS in accordance with the notice provisions of the California Settlement Agreement at least ten

184

Business Days prior to the Distribution Date, then to such stock transfer agent for sale thereafter until further written notice by CERS to the Mirant Parties. The Liquidating Trustee shall, if no stock transfer agent has been identified in writing to the Mirant Parties by CERS as provided above, thereafter administer such distributions in accordance with the terms of the written agreement establishing and governing the Liquidating Trust (the "California Liquidating Trust Agreement").

(b) Other California Parties. If, pursuant to Section 5.1.4 of the California Settlement Agreement, any of the California Parties timely elect to have their respective allocable share of the California Party Unsecured Claims distributed to the Liquidating Trust, then any distributions to such California Parties on account of their respective allocable share of those claims, except to the extent expressly provided for in their Section 5.1.4 election notices to Mirant, shall be made by the Disbursing Agent to the Liquidating Trustee and thereafter administered by the Liquidating Trustee in accordance with the terms of the California Liquidating Trust Agreement.

(c) Establishment of Liquidating Trust. The terms of the California Liquidating Trust Agreement shall be agreed upon by the Mirant Parties (as defined in the California Settlement Agreement) and the California Parties on or before the Confirmation Date. The California Liquidating Trust Agreement shall be a Plan Document.

## 12. Surrender and Cancellation of Instruments

(a) As a condition to receiving any Plan Distribution, on or before the Distribution Date, any holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (a) surrender such certificate, instrument or note representing such Claim, including, without limitation, any guaranties except to the extent assumed by the Debtors, and subject to Section 12.1(i) of the Plan, and (b) execute and deliver such other documents as may be necessary to effectuate the Plan. Such certificate, instrument or note (including any such guaranties) shall thereafter be cancelled and extinguished. The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (i) such certificates, notes or instruments, including any such guaranties, are surrendered, or (ii) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by such Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, including any such guaranties, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to New Mirant.

(b) In the event such instrument or note is held in the name of, or by a nominee of, the Depository Trust Company, the Debtors shall seek the cooperation of the Depository Trust Company in facilitating distributions.

## 13. Accrual of Interest for Purposes of Calculating Plan Distributions

### a. Mirant Debtors

For purposes of calculating Plan Distributions, the accrual of interest from the Petition Date through the Effective Date on Allowed Mirant Debtor Class 3 — Unsecured Claims (including Allowed Claims in respect of Subordinated Notes) that have a contractual interest rate shall be at the applicable non-default contractual rate with compounding to occur on the date of scheduled payments. With respect to holders of Allowed Unsecured Claims against the Mirant Debtors that do not have a contractual rate of interest, interest from the Petition Date through the Effective Date shall be accrued at the Federal Judgment Rate without compounding.

### b. MAG Debtors; Unsecured Claims

For purposes of making Plan Distributions to the holders of an Allowed MAG Debtor Class 5 — Unsecured Claims, including, but not limited to, the MAG Short-term Debt Claims, interest will be accrued at the contractual non-default rate from the Petition Date through the Effective Date for each holder

185

(including, with respect to MAG Short-term Note Claims (i) interest on interest, as contemplated by Section 503 of the MAG Indenture, with semi-annual compounding on the date of each scheduled payment; and (ii) "Additional Interest," as such term is defined in Section 2(e) of the MAG Registration Rights Agreements for the period from August 28, 2003 to July 28, 2005 during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements. With respect to holders of Allowed Unsecured Claims against the MAG Debtors that do not have a non-default contractual rate of interest, interest will be accrued at the Federal Judgment Rate, from the Petition Date through the Effective Date without compounding.

### c. MAG Debtors; MAG Long-term Note Claims

For purposes of making Plan Distributions to the holders of MAG Debtor Class 6 — MAG Long-term Note Claims, interest will be accrued at the contractual rate from the Petition Date through the Effective Date including (i) interest on interest, as contemplated by Section 503 of the MAG Indenture, with semi-annual compounding on the date of each scheduled payment; and (ii) "Additional Interest," as such term is defined in Section 2(e) of the MAG Registration Rights Agreements for the period from August 28, 2003 to July 28, 2005 during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements).

### O. Supplemental Distributions to Holders of Allowed Mirant Debtor Class 3 — Unsecured Claims

Each holder of an Allowed Mirant Debtor Class 3 — Unsecured Claim shall receive a Pro Rata Share of all Plan Distributions reserved in respect of Mirant Debtor Class 3 — Unsecured Claims that are Contested Claims as of the Effective Date that subsequently become Disallowed Claims, in whole or in part. Such supplemental Plan Distributions shall be made from time-to-time at the discretion of the Disbursing Agent; provided, that in no event shall the final such supplemental Plan Distribution be made later than 60 days after the last Contested Mirant Debtor Class 3 — Unsecured Claim becomes an Allowed Claim or a Disallowed Claim.

### P. Procedures for Resolving and Treating Contested Claims

#### 1. Objection Deadline

As soon as practicable, but in no event later than 180 days after the Effective Date (subject to being extended by the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made. The Disbursing Agent shall not object to any Letter of Credit Claim on the basis that such Claim is contingent at any time prior to the expiration date of such letter of credit.

#### 2. Prosecution of Contested Claims

The Disbursing Agent may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 11.3 of the Plan.

#### 3. Claims Settlement

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court, other than (a) the settlement or compromise of a Claim where the difference between the amount of the Claim listed on the Debtors' Schedules and the amount of the Claim proposed to be Allowed under the settlement is in excess of $1,000,000, or (b) any settlement or compromise of a Claim or Cause of Action that involves an Insider.

### 4. **Entitlement to Plan Distributions Upon Allowance**[1]

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights as provided in Section 17.17 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date (including, without limitation, any Claims of Pepco and SMECO that arise from the resolution of the matters set forth in Sections 14.5 and 14.8 of the Plan) becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

### 5. **Estimation of Claims**

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan or the Bankruptcy Code, neither the Disbursing Agent nor any holder of a Letter of Credit Claim may seek to estimate a Letter of Credit Claim.

### Q. **Conditions Precedent to Confirmation of the Plan**

The Plan provides that the confirmation of the Plan is subject to satisfaction of the following conditions precedent:

a. The Clerk of the Bankruptcy Court shall have entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (ii) authorizing the solicitation of votes with respect to the Plan; (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejection of the Plan; (iv) confirming and giving effect to the terms and provisions of the Plan; (v) determining that the settlements of certain inter-Debtor matters as set forth in Article II of the Plan is appropriate; (vi) determining that all applicable tests, standards and burdens in connection therewith have been duly satisfied and met by the Debtors and the Plan; (vii) approving the Plan Documents; and (viii) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions and transfer of Assets contemplated by the Plan and the Plan Documents;

b. The Confirmation Order, the Plan Documents and the Plan, subject to provisions of Section 17.23 of the Plan, are each in a form satisfactory to the Debtors;

c. The Confirmation Order shall determine that the rights of the MIRMA Owner/Lessors shall have been resolved as set forth in Section 14.6 of the Plan;

d. The Confirmation Order shall include a determination that the treatment provided in the Plan with respect to MAG Debtor Class 6 — MAG Long-term Note Claims satisfies all of the requirements of reinstatement pursuant to section 1124 of the Bankruptcy Code and that the MAG Long-term Notes are, as of the Effective Date, reinstated and not in default, in particular, a finding by the Bankruptcy

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

Court that (i) the MAG Long-term Notes are unimpaired under section 1124 of the Bankruptcy Code, (ii) all existing defaults under the MAG Long-term Notes are cured (save in respect of section 365(b)(2) of the Bankruptcy Code), and (iii) the transactions contemplated by the Plan do not cause any default under the MAG Indenture in respect of the MAG Long-term Notes (giving effect to the New MAG Debt Covenants);

e. The Confirmation Order shall include a determination that the BEWAG Contract is not an obligation of New Mirant or its Affiliates and that the BEWAG Counterparties shall have no rights or Claims against New Mirant or its Affiliates or their assets under the BEWAG Contract;

f. The Confirmation Order shall include a determination that confirmation of the Plan does not terminate the Debtors' right to continue to pursue assumption or rejection, pursuant to section 365 of the Bankruptcy Code, of (i) any agreement with Pepco or its subsidiaries as to which the Debtors have commenced an action seeking to reject, recharacterize or avoid the Debtors' obligations thereunder, but as to which such actions have not been determined by a Final Order prior to entry of the Confirmation Order, (ii) the FCC Agreement, or (iii) the Site Lease;[1]

g. The Confirmation Order shall include findings that if the reasonable consent of any counterparty to an executory contract of the Trading Debtors is required in connection with the transfer of such contract to MET under the Plan (i) the refusal to grant such consent is *per se* unreasonable, and (ii) such consent shall be deemed to have been given;

h. The Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation; and

i. The Bankruptcy Court shall have entered the Implementation Order ordering that (A) no later than five Business Days after written notification by MET that the Effective Date has occurred, (i) each applicant with respect to each letter of credit issued to a Trading Debtor as beneficiary securing a Transferred Trading Obligation shall cause each such letter of credit to be amended, modified or reissued by the applicable issuer to name MET instead of such Trading Debtor as a beneficiary thereof or provide such other replacement collateral as is acceptable to MET in its sole discretion, and (ii) each guarantor that has issued a guarantee in favor of a Trading Debtor with respect to a Transferred Trading Obligation shall amend or modify such guarantee to name MET as the beneficiary of such guarantee in place of such Trading Debtor, and (B) as of the Effective Date, (1) all other collateral held by a Trading Debtor securing a Transferred Trading Obligation, <u>including</u> any and all rights to exercise remedies with respect to such collateral, shall be assigned or otherwise transferred by such Trading Debtor to MET without further order of the Bankruptcy Court, (2) the right to draw or make a demand on any existing letter of credit, guarantee or other collateral securing a Transferred Trading Obligation shall be fully assigned or otherwise transferred by each applicable Trading Debtor to MET and MET shall be fully empowered, authorized and directed without further order of the Bankruptcy Court to draw or make a demand on any such letter of credit, guarantee or other collateral according to the terms of applicable letter of credit, guarantee or agreement pursuant to which such collateral is held and to retain any such draws for its own account, (3) any letter of credit for which a Debtor is the applicant securing a Transferred Trading Obligation shall be deemed automatically to secure such Transferred Trading Obligation after such Transferred Trading Obligation has been transferred to MET; <u>provided</u>, that any such letter of credit shall be deemed automatically cancelled upon the issuance of a substantially similar replacement letter of credit securing such Transferred Trading Obligation, (4) any guarantee previously issued by any of the Debtors to secure a Transferred Trading Obligation shall be deemed automatically to secure such Transferred Trading Obligation after such Transferred Trading Obligation has been transferred to MET; <u>provided</u>, that any guarantee shall be deemed automatically cancelled upon the issuance of a substantially similar replacement guarantee by securing such Transferred Trading Obligation, (5) any cash posted by

---

[1] Pepco requested modifications to this paragraph that the Debtors find objectionable. For the full text of Pepco's proposed alternative language, see Exhibit E.

any of the Debtors to secure a Transferred Trading Obligation shall be deemed automatically to be property of MET and posted thereby to secure such Transferred Trading Obligation, and (6) all applicable parties shall take all actions reasonably required to implement the terms of the Implementation Order. The Implementation Order shall further clarify that any failure to amend, modify or reissue a letter of credit or to amend or modify a guarantee within the five Business Day period referred to in subclause (A) of this section shall constitute an event of default under the trading contract or agreement giving rise to the relevant Transferred Trading Obligation notwithstanding any cure period that might be set forth in such trading contract or agreement.

The Plan provides that each of the conditions precedent described above, other than the conditions set forth in Clause (a) and (d) above may be waived, in whole or in part, by the Debtors, subject to Section 17.23 of the Plan. The Plan further provides that any such waiver may be effected at any time, without notice or order of the Bankruptcy Court and without any formal action other than proceeding to consummate the Plan.

**R.   Conditions Precedent to Consummation of the Plan**

### 1. Effective Date

The Plan provides that the occurrence of the Effective Date is subject to satisfaction of the following conditions precedent:

   a. The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

   b. All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to: (i) the obligations of the Debtors under the Plan and the Plan Documents, and (ii) the obligations of the Exit Lenders to make loans under the Exit Facility; and

   c. The New MAG Holdco Indenture, the New MAG Holdco Notes, and the Exit Facility shall have become effective and all conditions to the effectiveness thereof shall have been satisfied or waived.

### 2. Waiver of Conditions Precedent

The Debtors may waive any one or more of the conditions set forth in  Sections 12.1(c), (e), (f), (g), (h) or (i) of the  Plan or Section 12.2(b) or (c) of the Plan in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest subject to Section 17.23 of the Plan.

### 3. Effect of Non-Occurrence of the Effective Date

If the Effective Date does not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of the Debtors, including without limitation, the right to seek a further extension of the exclusivity periods under section 1121(d) of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

**S.   The Disbursing Agent**

### 1. Powers and Duties

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims and Equity Interests; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article XI of the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article XI of the Plan; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time, such reports to be made available

upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### 2. Plan Distributions

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

### 3. Exculpation

**Except as otherwise provided in this paragraph, the Disbursing Agent, including the Old Indenture Trustees (and each of their respective paying agents), as applicable, as Disbursing Agent for the holders of the MAG Short-Term Note Claims, MAG Long-Term Note Claims, Mirant Debt Claims and Subordinated Notes Claims together with their officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent and the Old Indenture Trustees (and each of their respective paying agents) by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent and/or such Old Indenture Trustees' willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or such Old Indenture Trustees, or their respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in this paragraph shall preclude or impair any holder of an Allowed Claim or Equity Interest from bringing an action in the Bankruptcy Court against the Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.**

## T.   Executory Contracts and Unexpired Leases

### 1. Executory Contracts and Unexpired Leases

The Bankruptcy Code entitles the Debtors, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. The Bankruptcy Code further entitles the Debtors, subject to satisfaction of certain conditions, to assign assumed executory contracts and unexpired leases to another entity. Rejection or assumption and assignment may be effected under a plan of reorganization.

### 2. Assumption and Rejection of Executory Contracts and Unexpired Leases[1]

On the Effective Date, all executory contracts and unexpired leases of the Debtors shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, including, but not limited to, those agreements listed and described in Schedule 11, except: (a) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (b) contracts and leases listed in Schedule 12 and any subsequently filed "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of the Confirmation Order; (c) all executory contracts and unexpired leases assumed or assumed and assigned under the Plan or by order of the Bankruptcy Court entered before the Effective Date; (d) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the next section hereof and for which the Debtors make a motion to reject such contract or lease based upon the existence of such dispute filed at any time; (e) any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy

---

[1]  Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

Code; (f) any agreement between the Debtors and Pepco or any of its subsidiaries; (g) the MIRMA Leases; (h) the BEWAG Contract; (i) the FCC Agreement and the Site Lease, and (j) any executory contracts or unexpired leases constituting CC8 Assets, which shall be treated as set forth in the California Settlement Agreement and in the related implementing agreements; (j) any oral or written joint defense agreements relating to actual, potential or threatened litigation or investigations involving any of the Debtors, which shall be assumed; (k) any Western Systems Power Pool Agreement with any counterparty, which shall be assumed unless specifically listed as an agreement to be rejected on Schedule 11; (l) any unexecuted service agreement to an electric sales or transmission and natural gas transportation tariff on file with FERC, which shall be assumed unless specifically listed as an agreement to be rejected on Schedule 11; (m) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; (n) any guaranty or similar agreement executed by a third party which guarantees repayment or performance of an obligation owed to any of the Debtors or to indemnify the Debtors; and (o) agreements with third parties(including governmental entities and agencies) regarding preservation of the confidentiality of documents produced by the Debtors. Any order entered postconfirmation by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered preconfirmation. The Debtors reserve the right to amend Schedules 11 and 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpected Leases" prior to entry of the Confirmation Order. Each executory contract and unexpired lease to be assumed or assumed and assigned by the Debtors shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases.

The purpose of Schedule 11 is to provide adequate and sufficient notice that (a) any Claims arising thereunder or related thereto are characterized as Unsecured Claims under the Plan, and (b) the Debtors are no longer bound by, or otherwise obligated to perform, any such obligations, transactions, or undertakings relating thereto or arising out of the foregoing after the Effective Date. The inclusion of a contract, lease or other agreement on either Schedule 11 or 12, or the "Schedule of Assumed, and Assumed and Assigned Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time barred from asserting Claims against the Debtors. The Debtors reserve all rights with respect to the characterization of any such agreements.

The Plan shall constitute a motion to reject such executory contracts and unexpired leases rejected pursuant to Section 14.1(a) of the Plan, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired leases is burdensome and that the rejection thereof is in the best interests of the Debtors and their Estates.

### 3. Cure

At the election of the Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable, or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease. In the event of a dispute regarding (x) the amount of any cure payments; (y) the ability of a Debtor to provide adequate assurance of future performance under the contract or lease to be assumed or assigned, or (z) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable. Schedule 12 and the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" sets forth the Debtors' cure obligations for each

agreements which must be satisfied as a condition to the assumption or assumption and assignment of such agreement. Any non-Debtor counterparty to an agreement listed on Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the cure obligation which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related thereto by no later than ten Business Days prior to the Confirmation Hearing. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the cure amount as scheduled by the Debtors.

### 4. Assumption and Assignment of Executory Contracts and Unexpired Leases

Schedule 12 and the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" also sets forth those executory contracts and unexpired leases which the Debtors intend to assume and assign to another entity. The Plan shall constitute a motion to assume and assign such executory contracts and unexpired leases pursuant to Section 14.1 of the Plan, and the Debtors shall have no liability thereunder for any breach of such assumed and assigned executory contract or lease occurring after such assignment pursuant to section 365(k) of the Bankruptcy Code, except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. Any non-Debtor counterparty to an agreement listed on Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" who disputes the assumption or assumption and assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors and the Committees, a written objection to the assumption and assignment, which objection shall set forth the basis for the dispute by no later than ten days before the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases.

### 5. Claims Arising from Rejection, Expiration or Termination

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors (a) in the case of an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, in accordance with the Bar Date Notice, or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date, or (ii) is rejected pursuant to Section 14.1 of the Plan, no later than thirty days after the Confirmation Date. Any such Claims for which a proof of claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtors, New Mirant, their respective Affiliates, or the Assets. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

### 6. Special Provisions Relating to the BEWAG Contract

In 1997, Mirant, through certain of its subsidiaries, acquired a 26% interest in Berliner Kraft- und Licht Aktiengesellschaft & Co. KG ("BEWAG"), a Berlin-based utility. In 2001, Mirant, through certain of its subsidiaries, increased its ownership in BEWAG to 44.8%. On February 11, 2002 (the "Closing Date"), pursuant to the BEWAG Contract, Mirant, through certain of its subsidiaries, transferred its 44.8% interest in BEWAG (through the transfer of Mirant's indirect ownership interest in Mirant Holdings Germany GmbH ("Mirant Holdings")) for $1,632,000,000 to Hamburgische Electrictiäts-Werke Aktiengesellschaft ("HEW"), a subsidiary of Vattenfall, AB. As a result of such transfer, Mirant received more than $1,000,000,000 in net proceeds after repayment of approximately $550,000,000 of debt associated with its BEWAG investment. Pursuant to the BEWAG Contract, Mirant guaranteed to HEW the full and timely

fulfillment of any and all obligations, liabilities, claims against or any other duties of its seller-subsidiaries in conjunction with the BEWAG Contract.

As of the Petition Date, Mirant, in its role as guarantor, had remaining obligations under the BEWAG Contract to indemnify HEW (or its successor) for, among other things, taxes imposed on Mirant Holdings and Mirant Holdings Beteiligungsgesellschaft mbH (a subsidiary of Mirant Holdings) attributable to the period prior to the Closing Date. The Debtors believe that all remaining obligations under the BEWAG Contract as of the Petition Date were either immaterial or otherwise financial obligations. Accordingly, the Debtors believe that the BEWAG Contract is not executory.

On February 11, 2005, the Debtors served an amended notice of bar date establishing March 14, 2005 as the last date for, among others, HEW and Vattenfall to file proofs of claims against the Debtors (the "BEWAG Bar Date"). Neither Vattenfall nor HEW (nor any successor) filed a proof of claim against any of the Debtors by the BEWAG Bar Date. Accordingly, pursuant to the Initial Bar Date Order, both HEW and Vattenfall are forever barred from asserting any claims against the Debtors under the BEWAG Contract.

In the event that the Bankruptcy Court determines that the BEWAG Contract is an executory contract, the BEWAG Contract will not be assumed or rejected pursuant to section 365 of the Bankruptcy Code and will instead ride through the chapter 11 process. From and after the Effective Date, the BEWAG Contract will constitute an asset and obligation of Mirant with the same force and effect and to the extent that the BEWAG Contract was an asset and obligation of Mirant prior to the Petition Date. From and after the Effective Date, the BEWAG Counterparties will be entitled to exercise all rights and remedies available, if any, to enforce the BEWAG Contract against Mirant. In no event shall the obligations arising under the BEWAG Contract constitute obligations of, or be enforceable against, New Mirant, its subsidiaries or their assets. The Confirmation Order will permanently enjoin the BEWAG Counterparties from taking any action to enforce the BEWAG Contract and the obligations arising thereunder against New Mirant and its subsidiaries or their assets.

### 7. Special Provisions Relating to the MIRMA Leases

Solely for purposes of the Plan, the MIRMA Leases shall be treated as unexpired true leases under section 365 of the Bankruptcy Code. On or before the Effective Date, MIRMA Leases will be assumed and all cure obligations and all obligations to provide adequate assurance of future performance will be satisfied as required by the Bankruptcy Code. MIRMA will (i) assign the MIRMA Leases to MD Leaseco pursuant to section 365(f) of the Bankruptcy Code, and (ii) be relieved of any obligations under the MIRMA Leases pursuant to section 365(k) of the Bankruptcy Code. The treatment of the MIRMA Leases as unexpired true leases shall not constitute admissions by the Debtors regarding the appropriate characterization of the MIRMA Leases or that the Debtors' obligations under the MIRMA Leases do not constitute prepetition debt obligations subject to compromise and all rights of the Debtors are hereby reserved consistent with the MIRMA Lease Litigation Dismissal Order.

The Debtors believe that with the possible limited exception of reimbursement of fees and expenses incurred by the MIRMA Owner/Lessors and the MIRMA Indenture Trustee, as of the date hereof, MIRMA is current with respect to all monetary obligations owing under the MIRMA Leases. The MIRMA Owner/ Lessors and the MIRMA Indenture Trustee have informed the Debtors that they incurred approximately $20,000,000 in the aggregate of fees and expenses in connection with the Chapter 11 Cases and that each will seek to have its respective share reimbursed as part of MIRMA's cure obligations owing upon assumption of the MIRMA Leases. MIRMA disputes that the full amount of such fees and expenses are compensable appropriately under the terms of the MIRMA Leases and pursuant to applicable law. To the extent that the Bankruptcy Court determines that all or part of such fees and expenses are due and owing under the MIRMA Leases and applicable law, MIRMA will pay such amounts before or upon assumption of the MIRMA Leases. The Debtors believe that no other obligations are required to be cured as a condition to assumption of the MIRMA Leases. The MIRMA Owner/Lessors and/or the MIRMA Lease Indenture Trustee may assert that additional obligations remain owing or otherwise require cure. In such event, MIRMA's cure obligations will be subject to a determination of the Bankruptcy Court. MIRMA reserves the right to seek alternative relief from the Bankruptcy Court, including a reconsideration of the recharacterization of the MIRMA Leases

as contemplated by the MIRMA Lease Litigation Dismissal Order, in the event MIRMA were to determine that such cure obligations are unduly burdensome.

MIRMA believes that certain provisions relating to the creditworthiness of the lessee contained in the MIRMA Lease documentation are unenforceable under applicable bankruptcy law on and after the Effective Date as to MIRMA and MD Leaseco as MIRMA's assignee as de facto anti assignment clauses, provisions relating to the financial condition of the debtor and/or otherwise being statutorily superseded by the debtor's (and its assignee's) obligation to provide adequate assurance of future performance upon assumption and assignment of the unexpired lease. These provisions, hereinafter referred to as the "Unenforceable Covenants," include Section 5.13 of the respective Participation Agreements relating to "Qualifying Credit Support," Section 5.14 of the respective Participation Agreements, relating to distributions from subsidiaries, Section 6.3 of the respective Participation Agreements relating to limitations on the incurrence of liens, Section 6.7 of the respective Participation Agreements relating to limitations on the incurrence of indebtedness and Section 6.8 of the respective Participation Agreements relating to limitations on the ability to make certain payments, including the making of dividends by the lessee. MIRMA and MD Leaseco reserve the right at any time, including after the Effective Date, to seek a determination that other provisions of the MIRMA Lease documentation are unenforceable under the Bankruptcy Code.

The Debtors anticipate that the MIRMA Owner/Lessors and the MIRMA Indenture Trustee will contest the unenforceability of the Unenforceable Covenants as asserted by MIRMA and MD Leaseco. In the event that the Bankruptcy Court were to determine that some or all of the Unenforceable Covenants are in fact enforceable against MD Leaseco upon assignment of the MIRMA Leases thereto, the Debtors believe that as a result of such assignment, none of the Unenforceable Covenants will apply directly or indirectly to any entity that is not a wholly owned subsidiary of MD Leaseco, including Mirant Chalk Point, Mirant Potomac and Mirant Peaker. The Debtors anticipate that the MIRMA Owner/Lessors and the MIRMA Indenture Trustee will dispute such conclusions.

In connection with entry of the Confirmation Order, the Debtors intend to seek from the Bankruptcy Court certain findings of fact and conclusions of law, as appropriate, providing that (i) the MIRMA Dickerson Leases constitute a single integrated transaction, (ii) the MIRMA Morgantown Leases constitute a single integrated transaction, (iii) Sections 5.13, 5.14, 6.3, 6.7 and 6.8 of the relevant Participation Agreement in respect of the MIRMA Leases are unenforceable against the MIRMA or MD Leaseco, as assignee, pursuant to sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code; (iv) upon assignment of the MIRMA Leases, Mirant Chalk Point, LLC, Mirant Peaker and Mirant Potomac or any other entity other than a wholly owned subsidiary of MD Leaseco shall not be considered "Designated Subsidiaries" or "Subsidiaries" as such terms are used in the relevant Participation Agreement in respect of the MIRMA Leases; and (v) any failure of MIRMA and/or MD Leaseco to comply with the Unenforceable Covenants shall not constitute a default or event of default under any of the MIRMA Leases. All parties to the MIRMA Leases shall be permanently enjoined from taking any action or exercising any remedies against any other party to the MIRMA Leases on account of the Debtors' and/or MD Leaseco's failure to comply with the Unenforceable Covenants.

During the pendency of the Chapter 11 Cases, MIRMA has not made any distributions or other restricted payments and thus has not been required to determine and report the "Fixed Charge Coverage Ratio" or "FCCR" under the MIRMA Leases. The FCCR, which must meet or exceed certain predetermined contractual amounts before MIRMA may make a restricted payment includes a historical look-back of actual business performance as well as a look forward component of projected performance. Pursuant to the terms of the MIRMA Lease documentation, MIRMA is, subject to certain conditions, permitted to reserve cash in a current period and treat such cash as available for the payment of capital expenditures in a future period. In the event that the Bankruptcy Court determines that Section 6.8 of the respective Participation Agreements relating to restrictions on restricted payments is enforceable against MIRMA or MD Leaseco on and after the Effective Date and the cash flows from Mirant Chalk Point, Mirant Potomac River and Mirant Peaker are subject to such restrictions, for the purposes of determining the historical look back component of the FCCR as of the Effective Date, MIRMA intends to treat cash generated and not distributed during the Chapter 11 Cases as being reserved in such period for the payment of capital expenditures in a future period.

194

Furthermore, ambiguity exists as to whether certain sources of income (or loss), such as unrealized marked-to-market gains and losses, should be considered in determining "Consolidated EBITDA," which is a component of the FCCR under the Participation Agreements. The Debtors believe that the phrase "similar non-cash charges and reserves" as used in the definition of "consolidated EBITDA" is intended to deduct all non cash income (or loss) when calculating Consolidated EBITDA under the Participation Agreement. The Debtors are seeking a determination of the Bankruptcy Court in connection with the entry of the Confirmation Order that the interpretations set forth in this paragraph are fair and appropriate.

The Debtors and the MIRMA Owner/Lessors have engaged in active discussions regarding the settlement of all disputes between the parties, including all issues relating to the assumption and assignment of the MIRMA Leases by MIRMA to MD Leaseco, the enforceability of the Unenforceable Covenants and MIRMA's cure obligations and obligations to provide adequate assurance of future performance. To the extent the parties are unable to reach an affirmative agreement, to avoid the expense and risk associated with litigation of these complicated issues, the Plan constitutes an offer of settlement by the Debtors, which, in light of the non-voting status of the MIRMA Owner/Lessors, without concession of the validity or likelihood of success on the merits of any of the Debtors' positions, will be deemed to have been accepted and consented to by the MIRMA Owner/Lessors unless confirmation of the Plan is affirmatively objected to by any of the MIRMA Owner/Lessors. The terms of the proposed settlement are as follows:

a. As, among other things, adequate assurance of future performance with respect to the MIRMA Leases, (A) in lieu of assigning the MIRMA Leases to MD Leaseco, MIRMA will assume, affirm and agree to be bound from and after the Effective Date by the MIRMA Leases, including each section identified as an Unenforceable Covenant, except for (I) Section 6.8 of each Participation Agreement, which, as stated therein, shall be deemed to be unenforceable under sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code, provided that in lieu thereof MIRMA will agree to be bound by the provisions of Section 6.8 of each Participation Agreement subject to (aa) the threshold for the "Fixed Charge Coverage Ratio" (as defined in each Participation Agreement) being 1.4 to 1.0. 1.35 to 1.0, 1.30 to 1.0, 1.25 to 1.0 and 1.20 to 1.0, in clauses (1), (2), (3), (4) and (5), respectively, of Subsections 6.8(B) and (C) of each Participation Agreement, (bb) "Consolidated EBITDA" as used there shall have the same meaning as set forth in the relevant Participation Agreement, except that the word "similar" shall be deleted, (cc) MIRMA may treat "Consolidated EBITDA" generated and not distributed during the Chapter 11 Cases as being specifically reserved in such period for the payment of "Capital Expenditures" (as defined in the relevant Participation Agreements) in a future period, and (dd) MIRMA may make "Restricted Payments" (as defined in the relevant Participation Agreements) under Section 6.8 of the Participation Agreement based upon the "Fixed Charge Coverage Ratios" for the most recently ended four full Fiscal Quarters for which financial statements are available, and (II) Section 5.13 of each Participation Agreement, which, as stated therein, shall be deemed to be unenforceable under sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code, provided that in lieu thereof MIRMA will agree to be bound by the provisions of Section 5.13 of each Participation Agreement except that an irrevocable, unconditional, collateralized stand by letter of credit shall also constitute "Qualifying Credit Support" as such term is used therein; and (C) as set forth in Section 8.2(d)(iv) of the Plan, the MAI Series A Preferred Shares will be contributed to MIRMA; and

b. As, among other things, part of MIRMA's cure obligations upon assumption of the MIRMA Leases, MIRMA agrees to pay (and not withstanding anything to the contrary, will not contest payment of) on the Effective Date all reasonable and documented legal and consulting fees incurred by the MIRMA Owner/Lessors in connection with the Chapter 11 Cases, up to $10,000,000 and shall hold harmless and indemnify the MIRMA Owner/Lessors against the payment of fees incurred by the MIRMA Indenture Trustee in connection with the Chapter 11 Cases. The Confirmation Order shall provide that the MIRMA Indenture Trustee is enjoined from seeking reimbursement of fees and expenses incurred in connection with the Chapter 11 Cases from the Debtors, MD Leaseco, the MIRMA Owner/Lessors or any affiliates thereof except as approved by the Bankruptcy Court. If the MIRMA Indenture Trustee does not object to confirmation of the Plan, MIRMA agrees to pay (and not withstanding anything to the contrary, will not contest payment of) on the Effective Date all reasonable and documented legal and consulting fees incurred by the MIRMA Indenture Trustee in connection with the Chapter 11 Cases, up to $10,000,000.

The Debtors intend to continue a dialogue with the MIRMA Owner/Lessors in an attempt to reach an affirmative agreement. If an affirmative agreement is reached, which agreement may differ materially from the proposed settlement set forth herein, MIRMA will seek appropriate approval of such agreement at or before the Confirmation Hearing and such agreement shall be deemed to be incorporated into the Plan. MIRMA reserves the right to alter the structure of the proposed settlement, provided that such alteration does not have a material negative economic impact on the MIRMA Owner/Lessors as compared with the current proposed settlement structure, including providing for MIRMA to assume and assign the MIRMA Leases to MD Leaseco and to contribute all of its assets to MD Leaseco, including all of MIRMA's equity interests in Mirant Chalk Point, Mirant Potomac River and Mirant Peaker and providing for each to be considered a "Designated Subsidiary" or "Subsidiary" under the MIRMA Leases.

In the event the MIRMA Owner/Lessors object to confirmation of the Plan, the provisions of the proposed settlement shall be of no effect and shall not be binding on the Debtors in any manner, including in connection with any determination by the Bankruptcy Court regarding adequate assurance of future performance and cure. Although the Debtors will also seek the affirmative or deemed consent of the MIRMA Indenture Trustee, the Debtors believe that the proposed settlement or such other affirmative settlement that may be reached with the MIRMA Owner/Lessors may be implemented over the objection of the MIRMA Indenture Trustee.

The MIRMA Owner/Lessors and MIRMA Indenture Trustee (collectively, the "MIRMA Lease Parties") do not consent to, and oppose, the Debtors' proposals for assuming and assigning the MIRMA Leases under the Plan. The MIRMA Lease Parties contend that, pursuant to section 365 of the Bankruptcy Code, the MIRMA Leases cannot be assumed and assigned in accordance with the Debtors' proposal. The MIRMA Lease Parties believe that the subject power plants are a critical component of the Plan in that the Plan assumes that the power plants will continue to be operated by MIRMA or its assignee post-confirmation. Further, the MIRMA Lease Parties contend that MIRMA can perform all of its obligations under the MIRMA Leases pursuant to their present terms, including the terms and provisions which MIRMA seeks to eliminate or otherwise preclude the MIRMA Lease Parties from enforcing pursuant to the Plan. If the Court does not permit MIRMA to assume and assign the MIRMA Leases pursuant to the terms and conditions proposed in the Plan, or the Debtors and the MIRMA Lease Parties do not reach an agreement on the terms and conditions of assumption, or assumption and assignment of the MIRMA Leases, confirmation of the Plan may not be possible.

## 8. Special Provisions Relating to Agreements with Pepco and its Subsidiaries

### a. Interim Performance

Pending a determination by Final Order of the disputes regarding the Debtors' right to reject the Back-to-Back Agreement (or the APSA, if it is determined by Final Order that the Back-to-Back Agreement is not severable from the APSA for purposes of rejection under section 365 of the Bankruptcy Code) and the Claims of Pepco thereunder, (i) the Debtors' obligations under the Back-to-Back Agreement, the APSA, and the Assumption/Assignment Agreement shall be interim obligations of Mirant Oregon (to be renamed "Mirant Power Purchase, LLC") and unconditionally guaranteed by New Mirant, and no other subsidiary of New Mirant shall have any liability with respect to such interim performance, and (ii) any Debtor's obligations under any other agreement with Pepco or its subsidiaries shall be interim obligations of such Debtor, and no other subsidiary of New Mirant shall have any liability with respect to such interim performance. During this period, Pepco shall not be permitted to exercise any right or remedy arising from any default occurring under any such agreement prior to the Petition Date.

### b. Reservation of Rights

The Debtors shall have the right, at any time prior to the commencement of the Confirmation Hearing, to commence an action or proceeding to obtain a Final Order (i) authorizing the Debtors to assume or reject any or all of the agreements with Pepco or any of its subsidiaries, (ii) determining that the Debtors' obligations under any of such agreements constitute prepetition debt obligations, (iii) determining that any postpetition amounts paid (in excess of the value of any actual benefits received) by the Debtors, Mirant Oregon, and/or

New Mirant to Pepco (including payments made after the Effective Date) are recoverable by the Debtors pursuant to sections 105, 503, and 549 of the Bankruptcy Code; (iv) recharacterizing obligations under the agreement arising on or before the Petition Date; (v) avoiding any or all of the obligations under the agreements under the Pepco Causes of Action; or (vi) otherwise resolving the disputes between the Debtors and Pepco. Nothing herein shall (A) preclude the Debtors and Pepco from seeking approval of a negotiated settlement of any such disputes, actions or matters at any time after the Effective Date, or (B) limit the rights, remedies, claims or defenses of Pepco with respect to the matters set forth herein or in connection with any pending litigation. Pepco has advised the Debtors that it will dispute the jurisdiction of the Bankruptcy Court over any rejection, recharacterization, avoidance and disgorgement matters or proceedings. Pepco also disputes that any payments under the APSA (including the Back-to-Back Agreement) are avoidable or recoverable.

### c. Condition Subsequent

Upon a determination by Final Order (i) authorizing the assumption or rejection of any agreement with Pepco or its subsidiaries; (ii) recharacterizing the obligations arising under any such agreement; or (iii) avoiding the obligations under such agreements, then (A) such agreement shall be rejected, recharacterized, and/or avoided, as the case may be, (B) the interim performance obligations set forth in Section 14.5(a) of the Plan (and any guarantee thereof) shall terminate and be of no further force or effect, (C) New Mirant (for itself or as agent) may pursue any claims it may have against Pepco or third parties for rescission damages, (D) any Claim of Pepco resulting therefrom shall, upon becoming Allowed, be entitled to the treatment specified in the Plan the same as though such Claim became Allowed as of the Effective Date. If the Debtors are unable to obtain a Final Order authorizing the rejection, recharacterization or avoidance of any agreement with Pepco or its subsidiaries, to the extent such agreement constitutes an executory contract pursuant to section 365 of the Bankruptcy Code, such agreement shall be assumed by the Debtor that is a party thereto (and in the case of the Back-to-Back Agreement, the APSA and the Assumption/Assignment Agreement, assigned to Mirant Oregon and unconditionally guaranteed by New Mirant) and in connection therewith all required cure obligations under section 365 of the Bankruptcy Code shall then be performed pursuant to Section 14.2 of the Plan.[1]

## 9.   Special Provisions Relating to Mint Farm

As described in "The Chapter 11 Cases — Material Assets Sales — Mint Farm," and Mint Farm is in the process of selling its generating plant (and related assets). As part of the sale, Mint Farm expects that the purchaser will request that Mint Farm assume and assign certain executory contracts (and/or unexpired leases) to it (or its designer), which are beneficial and necessary to operate the generating plant on a going forward basis. The sale of the generating plant (and related assets) will be subject to overbid, and consequently, the ultimate purchaser of the generating plant is unknown. Therefore, at this time, the executory contracts (and/or unexpired leases) which the ultimate purchaser may request be assumed and assigned to them in connection with a sale of the generating plants are unknown. As a result, Mint Farm cannot ascertain at this time which of its executory contracts and unexpired leases should be assumed (in order to be subsequently assigned to a purchaser) or rejected.

To preserve the ability of the Debtors to maximize the value of the sale of the Mint Farm generating plant, it is necessary to extend the time within which the Debtors may reject, assume, or assume and assign their executory contracts and unexpired leases that are associated with the Mint Farm generating plant. Therefore, notwithstanding anything in Article XIV of the Plan to the contrary, but except with respect to any executory contract that is specifically listed on Schedules 11, 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases," or has already been assumed or rejected prior to the Confirmation Date, the deadline for the Debtors to assume or reject executory contracts and unexpired leases that relate to the Mint Farm generating plant is extended to the earlier to occur of the following: (a) the date upon which the sale of the Mint Farm generating plant (and related assets) closes; and (b) one year after

---

[1] Pepco and SMECO requested modifications to this paragraph (and other paragraphs of the Disclosure Statement) that the Debtors find objectionable. For the full text of Pepco's and SMECO's proposed alternative language, see Exhibit E.

the Effective Date, or such later date determined by the Bankruptcy Court after notice and a hearing. Section 365 of the Bankruptcy Code shall apply to any motion to reject, assume and assign any executory contracts that are subject to this Section. Any rejection damages Claim with respect to an executory contract or unexpired lease relating to Mint Farm shall be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the rejection has become effective. The Debtors reserve all rights to object to such claims.

## 10. Special Provisions Relating to the New York Debtors

As described in "NY Tax — New York Real Property Tax Litigation," the New York Debtors are currently parties to ongoing tax litigation with the New York Taxing Authorities. As described in "Proposed New York Tax Settlement," the parties have negotiated a favorable framework for settlement, as set forth in the Proposed New York Tax Settlement. However, the Proposed New York Tax Settlement contains a number of conditions precedent, which may not be satisfied. In such an event, the Debtors may be required to reconsider the reorganization of the New York Debtors. Consequently, the New York Debtors cannot ascertain at this time which of their executory contracts and unexpired leases should be assumed, and possibly assigned, pursuant to section 365 of the Bankruptcy Code.

To preserve the ability of the Debtors to maximize the value of the contracts relating to the New York Debtors, it is necessary to extend the time within which the Debtors may reject, assume, and assume and assign their executory contracts and unexpired leases that are associated with the New York Debtors. Therefore, notwithstanding anything in Article XIV of the Plan to the contrary, but except with respect to any executory contract or unexpired lease that is specifically listed on Disclosure Statement Schedule 11, 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases", or has already been assumed or rejected prior to the Confirmation Date, the deadline for the Debtors to assume or reject executory contracts and unexpired leases that relate to the New York Debtors is extended to the later of: (a) the first Business Day that is at least thirty (30) days after the New York Debtors Effective Date, and (b) ninety (90) days after the Debtors determine that the New York Debtors Effective Date will not occur. section 365 of the Bankruptcy Code shall apply to any motion to reject, assume, or assume and assign any executory contracts that are subject to Section 15.3(c) of the Plan.

Any rejection damages Claim with respect to an executory contract or unexpired lease relating to the New York Debtors shall be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the rejection has become effective. The Debtors reserve all rights to object to such claims.

## 11. Special Provisions Relating to the FCC Agreement and Site Lease

### a. Interim Performance

Pending a determination by Final Order of the disputes regarding the proper characterization of the FCC Agreement and whether any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code, the Debtors' postpetition obligations under the FCC Agreement shall be performed by Mirant Peaker and the Debtors' postpetition obligations under the Site Lease shall be performed by Mirant Chalk Point. Neither New Mirant nor any other subsidiary of New Mirant shall have any liability with respect to such interim performance of the FCC Agreement or Site Lease. During this period, neither SMECO nor Pepco shall be permitted to exercise any right or remedy arising from any default occurring under the FCC Agreement or Site Lease prior to the Petition Date.

### b. Reservation of Rights

Subject to the provisions of paragraph (c) below, the Debtors shall have the right, at any time prior to the Confirmation Hearing to commence an action, to seek a Final Order (i) authorizing the Debtors to assume or reject FCC Agreement and Site Lease, (ii) determining that the FCC Agreement constitutes a lease of non-residential real property and that any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code, (iii) determining that the Debtors' obligations under the FCC Agreement constitute prepetition debt obligations, (iv) determining that any