postpetition amounts paid (in excess of the value of any actual benefits received) by the Debtors to SMECO (including payments made after the Effective Date) are recoverable by the Debtors pursuant to sections 105, 503, and 549 of the Bankruptcy Code; (v) recharacterizing obligations under the FCC Agreement as Claims arising on or before the Petition Date; or (vi) otherwise resolving the disputes between the Debtors and SMECO and Pepco relating to the FCC Agreement. Nothing under the Plan shall (A) preclude the Debtors, SMECO and Pepco from seeking approval of any negotiated settlement of any such disputes, actions or matters, or (B) limit the rights, remedies, claims or defenses of Pepco or SMECO with respect to the matters set forth herein or in connection with the pending litigation. SMECO and Pepco have advised the Debtors that they will dispute the jurisdiction of the Bankruptcy Court over any rejection, recharacterization, avoidance and disgorgement matters or proceedings. SMECO and Pepco also dispute that any payments under the FCC Agreement are avoidable or recoverable.

### c. Time for Assumption or Rejection

The Debtors contend that the FCC Agreement constitutes a lease of non-residential real property and that any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code. Until this issue is determined by Final Order, the Debtors cannot ascertain whether assumption or rejection of the FCC Agreement is in the best interests of Debtors or their estates. In order to preserve the ability of the Debtors to take appropriate action, it is necessary to extend the time within which the Debtors may assume or reject the FCC Agreement. Therefore, notwithstanding anything in Article XIV of the Plan to the contrary, the deadline for the Debtors to assume or reject the FCC Agreement and the Site Lease is extended to sixty (60) days after determination by Final Order of the disputes regarding the proper characterization of the FCC Agreement and whether any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code. To the extent practical and applicable, section 365 of the Bankruptcy Code and Subsections 3 and 4 above shall apply to assumption or rejection of the FCC Agreement and the Site Lease. Any rejection damages Claim with respect to the FCC Agreement or the Site Lease shall be filed with the Bankruptcy Court and served on the Debtors no later than thirty days after the rejection has become effective. The Debtors reserve all rights to object to such claims. If the Debtors are unable to obtain a Final Order (i) authorizing recharacterization of the FCC Agreement and limiting rejection damages thereunder pursuant to section 502(b)(6) of the Bankruptcy Code, or (ii) otherwise authorizing the rejection of the FCC Agreement or the Site Lease, the FCC Agreement shall be assumed by Mirant Peaker and the Site Lease shall be assumed by Mirant Chalk Point (and in connection therewith all required cure obligations under section 365 of the Bankruptcy Code shall then be performed pursuant to Section 14.2 of the Plan).

### 12. <u>Special Provisions Relating to Mirant NY-Gen, LLC</u>

Mirant NY-Gen operates four hydroelectric generating stations located in southeast New York: (a) three of the stations are located in the Mongaup River Basin and owned by Mirant NY-Gen: the Swinging Bridge Station, Mongaup Station and Rio Station; and (b) the fourth station is leased by Mirant NY-Gen: the Grahamsville Station. The Swinging Bridge Station includes the Toronto, Cliff Lake and Swinging Bridge facilities; the Mongaup Station includes the Mongaup and Black Brook facilities, and the Rio Project consists of facilities located at Rio. As described in "Financial Projections and Assumptions — Summary of Significant Assumptions — Operating Expenses," repairs at the dam at Swinging Bridge Project related to a sinkhole will cause O&M expenses to increase by approximately $5,600,000 in 2005, of which $3,200,000 should be covered by insurance proceeds to be received in 2006. The actual cost of the remedial repairs is currently unknown and may be substantially in excess of this amount. The Debtors are required to perform a flood study, the results of which will not be known until the fourth quarter of 2005, relating to the Swinging Bridge, Rio and Mongaup Stations to determine the maximum capacity of the reservoirs and the down stream consequences of a rain event resulting in a greater than the maximum capacity event. While the costs of any remedial work resulting from such flood study are unknown, such costs could be significantly greater than the repair costs referred to above. Mirant NY-Gen may continue to require chapter 11 protection to resolve these issues. The Debtors, accordingly, reserve their right and ability, at their sole and exclusive discretion, to leave Mirant NY-Gen in chapter 11.

**U.   Retention of Jurisdiction[1]**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and except as expressly limited by the California Settlement Agreement and related agreements, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter: (1) arising under the Bankruptcy Code; (2) arising in or related to the Chapter 11 Cases or the Plan, or (3) that relates to the following:[2]

a. To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XIV of the Plan for the assumption and/or assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

b. To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the Debtors, as applicable, after the Effective Date;

c. To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

d. To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

e. To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

f. To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

g. To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

h. To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

i. To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or cause of action by, on behalf of, or against the Estates;

j. To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

k. To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which New Mirant and its Affiliates, the Debtors, the Debtors-in-Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

---

[1] The Debtors remain subject to regulation by various regulatory authorities, including in connection with the consent decree among Mirant New York, Mirant Lovett and the State of New York described in V.A.ii.(C) herein, and remain subject to the jurisdiction governing such regulatory activities to the extent provided by law.

[2] Pepco and SMECO have requested modifications to this paragraph (and other portions of the Disclosure Statement) that the Debtors find objectionable. For the full text of Pepco's and SMECO's proposed alternative language, see Exhibit E.

l. To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

m. To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors (including Avoidance Actions) commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

n. To enter an order or final decree closing the Chapter 11 Cases;

o. To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

p. To enter any and all appropriate orders necessary to effectuate and otherwise enforce the Implementation Order; and

q. To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## V.   Other Material Provisions of the Plan

### 1. <u>Payment of Statutory Fees</u>

All fees payable pursuant to 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

### 2. <u>Satisfaction of Claims</u>

The rights afforded in the Plan and the treatment of all Claims and Equity Interests therein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued interest, as calculated under Section 10.14 of the Plan, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property. Except as otherwise provided the Plan, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full. Neither New Mirant, its Affiliates nor the Debtors shall be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by New Mirant, its Affiliates or any such Debtor, as applicable. Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against New Mirant and its Affiliates, the Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property, any event, occurrence, thing, or other further Claims or Causes of Action based upon any act or omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

### 3. <u>Third Party Agreements; Subordination</u>

The Plan Distributions to the various classes of Claims hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto shall remain in full force and effect, except as compromised and settled pursuant to the Plan. Plan Distributions under the Plan shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved (except as otherwise released pursuant to the California Settlement), and the treatment afforded any Claim that becomes a Subordinated Claim or Subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distribution shall be made on account of a Subordinated Claim or Subordinated Equity Interest. Notwithstanding any other term or provision of the Plan (including, without limitation, any releases, exculpation or injunctions) the right of the Equity Committee to seek subordination, disallowance or related relief (including, without limitation, by prosecuting motions, commenc-

ing causes of action or otherwise) with respect to any Equity Interest (including, without limitation, with respect to the Debtors' officers and directors and/or any Protected Persons) is fully reserved, and the treatment afforded any Equity Interest or is otherwise made the subject of any relief in accordance with this sentence at any time shall be modified to reflect such subordination or relief.

### 4. Exculpation

**None of the Debtors and the Old Indenture Trustees or any Protected Persons shall be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court. The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim for a Cause of Action against any Protected Person as to which such Protected Person has been exculpated from liability pursuant to the preceding sentence.**

### 5. Discharge of Liabilities

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against New Mirant and its Affiliates, the Debtors, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, NEITHER NEW MIRANT NOR MET SHALL HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN, ANY LIABILITY, CLAIM, OR OBLIGATION THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (INCLUDING, WITHOUT LIMITA-TION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO MIRANT OR ANY OF THE TRADING DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO NEW MIRANT OR MET.**

### 6. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

### 7. Expedited Determination

The Disbursing Agent is authorized under the Plan to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

### 8. Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 9. Retiree Benefits

Pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 10. Notice of Confirmation

In accordance with Section 17.13 of the Plan, the Debtors will serve and publish notice of the entry of the Confirmation Order in a form approved by the Bankruptcy Court which will include, among other things, notice of relevant deadlines and dates.

### 11. Modification of the Plan

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications; provided further that any amendments will be made in accordance with Section 17.23 of the Plan. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder. Notwithstanding the foregoing, the California Settlement cannot be modified by the Plan without the consent of the California Parties.

### 12. Revocation of the Plan

Subject to Section 17.23 of the Plan, the Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date. If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing of the Plan has not been adjourned. With respect to those Debtors with respect to which confirmation of the Plan has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### 13. Setoff Rights[1]

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to the provisions of section 553, 556 and 560 of the Bankruptcy Code, provided, however, that the TPA Claim shall be governed by the TPA Order with respect to the foregoing and that nothing in the Plan shall constitute a waiver of Southern's setoff rights set forth in Section 9.15 of the Tax Indemnification

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

Agreement; provided, further, that this Section of the Plan is subject to the California Settlement Agreement and the Debtors may not effectuate a setoff in violation thereof. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

### 14. Rates

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

### 15. Injunctions[1]

**a. On the Effective Date and except as otherwise provided herein, all Persons and Entities who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting New Mirant and its Affiliates, the Debtors, Protected Persons, the Estates, the Assets, or the Disbursing Agent, or any of their respective current or former members, directors, managers, officers, employees, agents, members, shareholders, professionals, successors and assigns or their respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

**i. commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

**ii. enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

**iii. creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

**iv. asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 17.16 of the Plan, except that Pepco's TPA Claims are not subject to any such defenses, offsets or counterclaim objections.**

**b. The foregoing provisions shall not apply to holders of Allowed MAG Long-term Note Claims with respect to their legal, equitable and contractual rights, and personal Causes of Action against MAG, MAG's Assets and any of MAG's current or former managers, officers, employees, agents and professionals.**

### 16. Binding Effect

The Plan shall be binding upon New Mirant and its Affiliates, the Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns. To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

### 17. Severability

In the event the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest or transaction, the Debtors may modify the Plan in accordance with Section 17.15 of the Plan so that such provision shall not be applicable to the holder of any such Claim or Equity Interest or transaction; provided that the Debtors may not modify the Plan to sever any provision of the California Settlement Agreement from another. Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan, or

---

[1] Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

(b) require the resolicitation of any acceptance or rejection of the Plan. Nothing in the Plan shall permit the Debtors to sever the provisions of the California Settlement Agreement or any implementing agreements related thereto.

### 18.  Plan Controls[1]

Unless otherwise specified, all section, article, and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

### 19.  Charter and Bylaws of New Mirant

The New Mirant Constituent Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

### 20.  Discharge of Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever shall be automatically discharged forever. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto shall be deemed fully discharged and released from any and all Claims, including, but not limited, to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against New Mirant and it Affiliates or property of the Debtors or their Estates to the extent it relates to a discharged Claim.


## XIII.

## ACCEPTANCE OR REJECTION OF THE PLAN

### A.  Overview

A plan of reorganization may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, that would enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.**

---

[1]  Pepco and SMECO requested modifications to the following section that the Debtors find objectionable. For the full text of Pepco's and SMECO's alternative language, see Exhibit E.

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible." The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims or equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the bankruptcy court generally must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization. **The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the best interests of creditors test and the feasibility requirement.**

Chapter 11 does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. Rather, a class of creditors will be determined to have accepted the plan if the bankruptcy court determines that the plan has been accepted by a majority in number and two-thirds in amount of those claims actually voting in such class. Similarly, a class of equity security holders will have accepted the plan if the bankruptcy court determines that the plan has been accepted by holders of two-thirds of the number of shares actually voting in such class.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights associated with the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include the curing defaults and reinstating maturity on the effective date of the plan. **Except for Mirant Debtor Class 1 — Priority Claims, MAG Debtor Class 1 — Priority Claims, MAG Debtor Class 6 — MAG Long-term Note Claims and MAG Debtor Class 8 — Equity Interests which are unimpaired, all classes of Claims and Equity Interests are impaired under the Plan and entitled to vote on the Plan.**

The bankruptcy court also may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a rejecting class of claims or equity interests if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim or equity interest any property from the estate, unless the senior class receives property having a value equal to the full amount of its allowed claim.

A plan does not "discriminate unfairly" against a rejecting class of claims or equity interests if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims or equity interests, and (b) no senior class of claims or equity interests is to receive more than 100% of the amount of the claims or equity interest in such class.

The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claim or Equity Interests, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.

### B.   Confirmation of the Plan

#### 1.   Elements of Section 1129 of the Bankruptcy Code

At the confirmation hearing, the Bankruptcy Court will confirm the Plan only if all of the conditions to confirmation under section 1129 of the Bankruptcy Code are satisfied.

Such conditions include the following:

1.   The Plan complies with the applicable provisions of the Bankruptcy Code.

2.   Each of the Debtors has complied with the applicable provisions of the Bankruptcy Code.

3.   The Plan has been proposed in good faith and not by any means proscribed by law.

4.   Any payment made or promised by the Debtors or by an entity issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court; and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.   The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors or a successor to the Debtors under the Plan and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by such Debtor, and the nature of any compensation for such insider.

6.   With respect to each impaired class of Claims or Equity Interests, each holder of an impaired Claim or impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Equity Interests held by such entity, property of a value, as of the applicable consummation date under the Plan, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

7.   In the event that the Debtors do not move to confirm the Plan nonconsensually, each Class of Claims or Equity Interests entitled to vote has either accepted the Plan or is not impaired under the Plan.

8.   Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the applicable consummation date and that Priority Tax Claims will be paid in full, in cash, on the applicable consummation date or as soon as practicable thereafter; however, the Debtors shall have the right to make deferred cash payments on account of such Priority Tax Claims over a period not exceeding six (6) years after the date of assessment of such Claims, having a value, as of the applicable consummation date, equal to the allowed amount of such Claims.

9.   At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such class.

10.   Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any other successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.   All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

12.   The Plan provides for the continuation after the consummation of the Plan of payment of all retiree benefits at the level established under section 1114(e)(1)(B) or (g) of the Bankruptcy Code at

any time prior to confirmation of the Plan, for the duration of the period each of the Debtors has obligated itself to provide such benefits.

**The Debtors believe that the Plan will satisfy all the statutory provisions of chapter 11 of the Bankruptcy Code, that they have complied or will have complied with all of the provisions of the Bankruptcy Code, and that the Plan is being proposed and will be submitted to the Bankruptcy Court in good faith.**

### 2. Acceptance.

A Class of Claims will have accepted the Plan if the Plan is accepted, with reference to a Class of Claims, by at least two-thirds in amount and more than one-half in number of the Allowed Claims of each such Class of Claims. Each Class of Equity Interests will have accepted the Plan if the Plan is accepted with reference to a Class of Equity Interests, by at least two-thirds in amount of the Allowed Equity Interests of each Class of Equity Interests.

Notwithstanding Section 2.1 of the Plan, the Debtors will tabulate all votes on the Plan on a non-consolidated basis, by-class and by-Debtor, for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor. For each Debtor that satisfies 1129(a)(8) and/or (10) of the Bankruptcy Code, and provided that all other requirements to confirmation of the Plan are met, the inclusion of such Debtor into the applicable Debtor Group as set forth in Article II of the Plan shall be deemed to occur by operation of the Plan. For each Debtor that fails to satisfy either sections 1129(a)(8) or (10) of the Bankruptcy Code, the inclusion of such Debtor into the applicable Debtor Group as set forth in Article II of the Plan shall be subject to a determination of the Bankruptcy Court that the settlement satisfies the requirements for approval under sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, which determination may be made at the Confirmation Hearing. If all classes of a Debtor accept the Plan, then the settlement set forth in Article II of the Plan as to that Debtor occurs without any evidentiary showing. If a single class of a Debtor accepts the Plan, then the settlement set forth in Article II as to that Debtor shall be addressed as part of the section 1129(b) case as to that Debtors' rejecting classes in order to implement the settlement set forth in Article II as to that Debtor.

In lieu of obtaining the approval of the settlement of Intercompany Claims and related matters as contemplated by Article II of the Plan with respect to any Mirant Debtor, the Debtors may modify the Plan to appropriately address the rights of holders of Allowed Claims against such Mirant Debtor.

### 3. Best Interests Test.

With respect to each impaired class of holders of Claims and Equity Interests, confirmation of the Plan requires that each such holder either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the applicable consummation date under the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

To determine what holders of Claims and Equity Interests of each impaired class would receive if the Debtors were liquidated, the Bankruptcy Court must determine the proceeds that would be generated from the liquidation of the properties and interests in property of the Debtors in a Chapter 7 liquidation case. The proceeds that would be available for satisfaction of Unsecured Claims against and Equity Interests in the Debtors would consist of the proceeds generated by disposition of the unencumbered equity in the properties and interests in property of the Debtors and the cash held by the Debtors at the time of the commencement of the liquidation case. Such proceeds would be reduced by the costs and expenses of the liquidation and by such additional administration and priority claims that may result from the termination of the business of the Debtors and the use of Chapter 7 for the purposes of liquidation.

The costs of liquidation under Chapter 7 of the Bankruptcy Code would include the fees payable to a trustee in bankruptcy, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the Chapter 11 Cases, such as compensation for attorneys, financial advisors, accountants and costs that are allowed in the Chapter 7 case. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and executory contracts entered into or assumed by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims and such other Claims which may arise in the liquidation cases or result from the pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay Unsecured Claims arising on or before the Petition Date.

To determine if the Plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of the liquidation of the properties and interests in property of the Debtors (net of the amounts attributable to the aforesaid claims) is then compared with the present value offered to such classes of Claims and Equity Interests under the Plan.

In applying the "best interests" test, it is possible that Claims and Equity Interests in the chapter 7 cases may not be classified according to the seniority of such Claims and Equity Interests as provided in the Plan. In the absence of a contrary determination by the Bankruptcy Court, all Unsecured Claims arising on or before the Petition Date which have the same rights upon liquidation would be treated as one class for the purposes of determining the potential distribution of the liquidation proceeds resulting from the chapter 7 cases of the Debtors. The distributions from the liquidation proceeds would be calculated ratably according to the amount of the Claim held by each creditor. Therefore, creditors who claim to be third-party beneficiaries of any contractual subordination provisions might have to seek to enforce such contractual subordination provisions in the Bankruptcy Court or otherwise. The Debtors believe that the most likely outcome of liquidation proceedings under chapter 7 would be the application of the rule of absolute priority of distributions. Under that rule, no junior creditor receives any distribution until all senior creditors are paid in full with interest, and no stockholder receives any distribution until all creditors are paid in full with interest.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the chapter 11 cases, including: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (iii) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (iv) the substantial increases in claims which would be satisfied on a priority basis or on parity with creditors in the chapter 11 cases, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The liquidation analysis is attached hereto as Exhibit "C."

### 4. Feasibility.

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. For purposes of determining whether the Plan satisfies this condition, the Debtors have analyzed the capacity of each Debtor to service its obligations under the Plan. Based upon their analysis of their Projections, the Debtors believe they will be able to make all payments required to be made under the Plan. See "Financial Projections and Assumptions."

### C. Cramdown

In the event that any impaired class does not accept the Plan, the Debtors nevertheless may move for confirmation of the Plan. To obtain such confirmation, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such classes and any other classes of Claims that vote to reject the Plan.

### 1. No Unfair Discrimination.

A plan of reorganization "does not discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to the legal rights of the nonaccepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or Equity Interests. The Debtor believe that under the Plan all impaired classes of Claims and Equity Interests are treated in a manner that is consistent with the treatment

209

of other classes of Claims and Equity Interests to which their legal rights are related, if any, and no class of Claims or Equity Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and Allowed Equity Interests in such class. Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any impaired class of Claims or Equity Interests.

### 2. Fair and Equitable Test.

The Bankruptcy Code establishes different "fair and equitable" tests for secured creditors, unsecured creditors and holders of equity interest as follows:

*Secured Creditors.* Either (i) each impaired secured creditor retains its liens securing its secured claim and it receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the indubitable equivalent of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds and the treatment of such liens on proceeds as provided in clause (i) or (ii) of this subparagraph.

*Unsecured Creditors.* Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

*Holders of Equity Interests.* Either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock or (b) the value of the stock or (ii) the holders of interests that are junior to the stock will not receive any property under the plan of reorganization, subject to the applicability of the judicial doctrine of contributing new value.

THE DEBTORS MAY MOVE FOR CONFIRMATION OF THE JOINT PLAN IF LESS THAN THE REQUISITE HOLDERS OF CLAIMS OR EQUITY INTERESTS IN ANY CLASS VOTE TO ACCEPT THE JOINT PLAN.

## XIV.

### RISK FACTORS

#### A. Holders of Unsecured Claims and Equity Interests in the Debtors may Face Significant Losses in the Event of a Subsequent Liquidation or Financial Reorganization by the Debtors

The management of the Debtors reasonably believes that, if it is permitted to implement its business plan and if the Debtors meet their current financial projections as updated by the subsequently identified variances discussed herein, the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors. Nevertheless, there can be no assurance that such liquidation will not occur or that the need for such financial reorganization will not arise. Substantially all the unencumbered assets of the Debtors will be pledged to secure the Debtors' obligations under the Exit Facility. Furthermore, certain of the Debtors will be highly leveraged, which may affect their ability to meet their debt service obligations, to operate and compete effectively and to realize the results set forth in the Projections. Accordingly, after consummation of the Plan, if the Debtors were to be liquidated or if the need for a further financial reorganization were to arise, the unencumbered assets of the Debtors likely would be insufficient to provide the holders of: (1) Unsecured Claims against the Debtors with a significant recovery, and (2) Equity Interests in the Debtors with any material recovery.

#### B. The Debtors' Actual Financial Results may vary Significantly from the Projections included in this Disclosure Statement

The financial projections included in this Disclosure Statement are dependent upon the successful implementation of the business plan of the Debtors and the validity of the numerous assumptions contained

therein. In particular, the Projections assume that: (a) as power markets return to equilibrium through 2008 to 2010, marginal new generation will be compensated for its long run marginal cost through a combination of energy and capacity prices, and (b) markets that currently do not have a traded capacity market will develop a mechanism to compensate for capacity by 2006. Since the Projections were prepared, the terms of the Plan have been revised, actual results have been realized that differ from the results forecast in the projections and the forward looking view of the Debtors has changed with respect to certain assumptions and expectations. The significant assumptions underlying the Projections, including certain updates to those assumptions, are discussed in greater detail in this Disclosure Statement under "Financial Projection and Assumptions — Summary of Significant Assumptions."

Many of these assumptions are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Debtors. Although the Debtors believe that the Projections and assumptions as updated by the subsequently identified variances, are reasonable, variations between the actual financial results and those projected may be material.

**C.   The Debtors' Revenues are Unpredictable because many of their Facilities Operate without Long-Term Power Purchase Agreements, and their Revenues and Results of Operations depend in part on Market and Competitive Forces that are beyond the Debtors' Control**

The Debtors sell capacity, energy and ancillary services from many of their North America generating facilities into competitive power markets or on a short-term fixed price basis through power sales agreements. The market for wholesale electric energy and energy services is largely based on prevailing market forces, subject to regulatory caps, and, therefore, the Debtors are not guaranteed any return on their capital investments through mandated rates. The price for which the Debtors can sell their output can fluctuate on a day-to-day basis. There are rules, however, regarding price and bid caps that restrict the absolute movement of prices, as would occur in a truly deregulated market. The Debtors' revenues and results of operations are likely to depend upon prevailing market prices, which are influenced by factors that are beyond the Debtors' control, including:

- prevailing market prices for fuel oil, coal and natural gas and emissions;

- the extent of additional supplies of electric energy and energy services from the Debtors' current competitors or new market entrants, including the development of new generating facilities that may be able to produce electricity less expensively than the Debtors' generating facilities;

- the extended operation of nuclear generating plants and other older power plants beyond their presently expected dates of decommissioning;

- prevailing regulations by FERC that affect the Debtors' markets and regulations governing the independent system operators that oversee these markets, including any price limitations and other mechanisms to address some of the volatility or illiquidity in these markets or the physical stability of the system;

- the failure of market rules to develop mechanisms that provide for capacity compensation in markets where the mechanisms do not currently exist;

- actions by regulators, ISOs/RTOs and other bodies that could prevent capacity and energy prices from rising to the level sufficient for full recovery of long run marginal costs of new entrants where supply/demand equilibrium is reached;

- weather conditions; and

- changes in the rate of growth in electricity usage as a result of such factors as regional economic conditions and implementation of conservation programs.

211

In addition, unlike most other commodities, electric energy can only be stored on a very limited basis and generally must be produced at the time of use. As a result, the wholesale power markets are subject to significant price fluctuations over relatively short periods of time and can be unpredictable.

**D. Operation of the Debtors' Generating Facilities involves Risks that may have a Material Adverse Impact on the Debtors' Cash Flows and Results of Operations**

The operation of the Debtors' generating facilities involves various operating risks, including:

- the output and efficiency levels at which those generating facilities perform;
- interruptions in fuel supply;
- disruptions in the delivery of electricity;
- adverse zoning;
- breakdown or failure of equipment (whether due to age or otherwise) or processes;
- violation of the Debtors' permit requirements or revocation of permits;
- shortages of equipment or spare parts;
- labor disputes;
- operator errors;
- curtailment of operations due to transmission constraints;
- restrictions on emissions;
- implementation of unproven technologies in connection with environmental improvements; and
- catastrophic events such as fires, explosions, floods, earthquakes or other similar occurrences.

A decrease in or elimination of revenues generated by the Debtors' facilities or an increase in the costs of operating such facilities could materially impact the cash flows and results of operations of the Debtors, including cash flows available to the Debtors to make payments on their debt or their other obligations.

**E. Restrictions and Covenants in the Exit Facility and other Debt Instruments may Limit the Ability of New MAG Holdco and certain of its subsidiaries to take Certain Actions; the Failure to Comply with these Restrictions and Covenants can have Adverse Consequences on their Businesses**

The Exit Facility is expected to contain restrictive covenants which, among other things, can limit or prohibit New MAG Holdco's and certain of its subsidiaries' ability to:

- incur additional debt;
- prepay, redeem, or repurchase indebtedness;
- pay dividends or repurchase shares of capital stock;
- make loans or investments;
- create liens;
- sell assets;
- acquire businesses;
- enter into sale and lease back arrangements;
- enter into mergers and consolidations;
- change the nature of the businesses; and

212

- amend organizational documents, debt documents and other material agreements.

The Exit Facility will be secured by substantially all the Assets of the Debtors. In addition, the Exit Facility will likely require New MAG Holdco and certain of its subsidiaries to maintain certain financial ratios and meet certain tests, including minimum leverage and interest coverage ratios, and restrict its ability and the ability of its subsidiaries to make capital expenditures. These covenants may have important consequences on the Debtors' operations, including, but not necessarily limited to, restricting their ability to obtain additional financing and potentially limiting their ability to adjust to rapidly changing market conditions.

The Debtors cannot assure you that New MAG Holdco and certain of its subsidiaries will be able to comply with the provisions of their respective debt instruments, including the financial covenants in the Exit Facility. Breaching any of these covenants or restrictions or the failure to comply with obligations under the Exit Facility after the lapse of any applicable grace periods could result in a default under the applicable debt instruments, including the Exit Facility. If there were an event of default, holders of such defaulted debt could cause all amounts borrowed under these instruments to be due and payable immediately. The Debtors cannot provide assurance that New MAG Holdco and certain of its subsidiaries assets or cash flow would be sufficient to fully repay borrowings under the outstanding debt instruments, either upon maturity or if accelerated upon an event of default or that they would be able to refinance or restructure the payments on such debt. In addition, any event of default or declaration of acceleration under one debt instrument could also result in an event of default under one or more of their or their subsidiaries' other debt instruments.

A substantial portion of the Debtors' cash provided by operating activities is generated by MIRMA. In the event it were subject to the leveraged leases as currently constituted after it emerged from bankruptcy, MIRMA would not be permitted to make any dividends, distributions and other restricted payments unless (1) it satisfies the fixed charge coverage ratio on a historical basis for the last period of four fiscal quarters, (2) it is projected to satisfy the fixed charge coverage ratio for the next two periods of four fiscal quarters, and (3) no significant lease default or event of default has occurred and is continuing. Based on the Debtors' calculation of the fixed charge coverage ratios under the leveraged leases as of June 30, 2005, MIRMA meets the required 1.7 to 1.0 ratio for restricted payments, both on an historical and projected basis. However, the expected historical ratio for June 30, 2005 and the projected historical ratio for September 30, 2005 are close to the required ratio. In the event of a default under the leveraged leases or if the restricted payments test is not satisfied, the cash of Mirant Mid-Atlantic would not be available for use in connection with the implementation of the Plan.

**F.   The Debtors may be Unable to Generate Sufficient Liquidity to Service their Debt and to Post Required Amounts of Collateral Necessary to Economically Hedge Market Risks Effectively**

The Debtors' ability to pay principal and interest on their debt depends on their future operating performance. If the Debtors' cash flows and capital resources are insufficient to allow them to make scheduled payments on their debt, the Debtors may have to reduce or delay capital expenditures, sell assets, seek additional capital, restructure or refinance the debt or sell equity. There can be no assurance that the terms of the debt will allow these alternative measures, that the debt or equity will be available to the Debtors on acceptable terms or that such measures would satisfy their scheduled debt service obligations.

Furthermore, the Debtors seek to manage the market risks and exposure to fluctuating power and fuel prices by entering into forward and other contracts that economically hedge the amount of exposure for their net transactions. As such, the effectiveness of the Debtors' hedging strategy may be dependent on the amount of collateral available to enter into these hedging contracts, and liquidity requirements may be greater than the Debtors anticipate or are able to meet.

If the Debtors' facilities experience unplanned outages, they may be required to procure replacement power in the open market to satisfy contractual commitments. Without adequate liquidity to post margin and collateral requirements, the Debtors may be exposed to significant losses and may miss significant opportunities, and the Debtors may have increased exposure to the volatility of spot markets.

**G.    Changes in Commodity Prices May Negatively Impact the Debtors' Financial Results by Increasing the Cost of Producing Power or Lowering the Price at Which the Debtors are Able to Sell Their Power, and the Debtors May Be Unsuccessful at Managing this Risk**

The Debtors' generation business is subject to changes in power prices and fuel costs, which may impact their financial results and financial position by increasing the cost of producing power and decreasing the amounts they receive from the sale of power. In addition, actual power prices and fuel costs may differ from their expectations and those assumed in the Debtors' financial models.

MAEM engages (and MET will engage) in price risk management activities related to sales of electricity and purchases of fuel. The income and losses from these activities are allocated to the Debtors' generation businesses. MAEM (and following the transfer of the Debtors' energy trading and marketing business, MET) may use forward contracts and derivative financial instruments to manage market risk. and exposure to volatility in electricity, coal, natural gas and oil prices. The Debtors cannot provide assurance that these strategies will be successful in managing the Debtors' price risks, or that they will not result in net losses to the Debtors as a result of future volatility in electricity and fuel markets.

Many factors influence commodity prices, including weather, market liquidity, transmission and transportation inefficiencies, availability of competitively priced alternative energy sources, demand for energy commodities, natural gas, crude oil and coal production, natural disasters, wars, embargoes and other catastrophic events, and federal, state and foreign energy and environmental regulation and legislation.

Additionally, the Debtors expect to have an open position in the market, within their established guidelines, resulting from the management of their portfolio. To the extent open positions exist, fluctuating commodity prices can impact financial results and financial position, either favorably or unfavorably. Furthermore, the risk management procedures the Debtors have in place may not always be followed or may not always work as planned. As a result of these and other factors, the Debtors cannot predict with precision the impact that risk management decisions may have on their businesses, operating results or financial position. Although management devotes a considerable amount of attention to these issues, their outcome is uncertain.

**H.    Some of the Generation Facilities of the Debtors or their Subsidiaries Depend on Only One or a Few Customers or Suppliers. These Parties, as well as Other Parties with whom the Debtors and their Subsidiaries have Contracts, may Fail to Perform their Obligations, or may Terminate their Existing Agreements, which may Result in a Default on Project Debt or a Loss in Revenues and may Require the Debtors to Institute Legal Proceedings to Enforce the Relevant Agreements**

Several of the power production facilities of the Debtors or their subsidiaries rely on a single customer or a few customers to purchase most or all of the facility's output or on a single supplier or a few suppliers to provide fuel, water and other services required for the operation of the facility. The sale and procurement agreements for these facilities may also provide support for any project debt used to finance the related facilities. The failure of any supplier or customer to fulfill its contractual obligations to the facility could have a material adverse effect on such facility's financial results. The financial performance of these facilities is dependent on the continued performance by customers and suppliers of their obligations under their long-term agreements. The Debtors' facilities in the Philippines are exposed to significant risks, as a result of their reliance on their contracts with NPC, which purchases almost all of the power generated by those facilities. These risks include political instability, changes in governmental leadership, regulation of the electricity business and the credit quality of the Philippine government. If NPC were to fail to perform its obligations under its energy conversion agreements with Mirant's subsidiaries, the resulting loss of cash flow and revenue would have a material adverse effect on our financial condition and results of operations.

Revenue under some of the Debtors' power sales agreements may be reduced significantly upon their expiration or termination. Some of the electricity the Debtors generate from their existing portfolio is sold under long-term power sales agreements that expire at various times. When the terms of each of these power sales agreements expire, it is possible that the price paid to the Debtors for the generation of electricity may be reduced significantly, which would substantially reduce their revenue.

214

**I.  The Debtors are Exposed to the Risk of Fuel and Fuel Transportation Cost Increases and Volatility and Interruption in Fuel Supply because their Facilities Generally do not have Long-Term Natural Gas, Coal and Oil Fuel Supply Agreements**

Most of the Debtors' domestic power generation facilities purchase their fuel requirements under short-term contracts or in the spot market. Although the Debtors attempt to purchase fuel based on their known fuel requirements, they still face the risks of supply interruptions and fuel price volatility as fuel deliveries may not exactly match energy sales due in part to their need to prepurchase inventories for reliability and dispatch requirements. The price they can obtain for the sale of energy may not rise at the same rate, or may not rise at all, to match a rise in fuel costs. This may have a material adverse effect on the Debtors' financial performance. The volatility of fuel prices could adversely affect the Debtors' financial results and operations.

**J.  The Debtors' Credit Ratings Impact their Ability to Access the Capital Markets for New Borrowings on Acceptable Terms and their Collateral Requirements with Counterparties. If the Debtors are not able to Achieve their Anticipated Rating Levels after Emergence from Chapter 11 and Maintain those Levels, their Financial Condition and Ability to Achieve their Projections may be Materially Adversely Affected**

If the Debtors are not able to achieve their anticipated credit ratings after emergence from chapter 11 or if their ratings are lowered significantly from these levels, the Debtors' business could be materially adversely impacted. For example, significant downgrades could increase negative sentiment and reactions from the Debtors' customers, regulators, investors, suppliers, lenders or other credit rating agencies, increase pressure on the Debtors' liquidity and reduce the Debtors' ability to raise capital on acceptable terms. These reactions could impair the Debtors' ability to achieve their business plan.

**K.  The Debtors are Exposed to Credit Risk from Third Parties under Contracts and in Market Transactions**

The Debtors' operations are exposed to the risk that counterparties that owe money as a result of market transactions will not perform their obligations. A facility's financial results may be materially adversely affected if any one customer fails to fulfill its contractual obligations and the Debtors are unable to find other customers to produce the same level of profitability. As a result of the failure of a major customer to meet its contractual obligations, the Debtors may be unable to repay obligations under their debt agreements.

**L.  The Debtors' Operations and Activities are subject to Extensive Environmental Regulation and Permitting Requirements and Could be Adversely Affected by Future Changes in Environmental Laws and Requirements**

The Debtors' business is subject to extensive environmental regulation by federal, state and local authorities, which requires continuous compliance with conditions established by their operating permits. To comply with these legal requirements, the Debtors must spend significant sums on environmental monitoring, pollution control equipment and emissions allowances. The Debtors may also be exposed to compliance risks from plants they have acquired. Although the Debtors have budgeted for significant expenditures to comply with these requirements, actual expenditures may be greater than budgeted amounts. If the Debtors were to fail to comply with these requirements, they could be subject to civil or criminal liability and the imposition of liens or fines. With the trend toward stricter standards, greater regulation, more extensive permitting requirements and an increase in the number and types of assets operated by the Debtors subject to environmental regulation, the Debtors expect their environmental expenditures to be substantial in the future. The Debtors' business, operations and financial condition could be adversely affected by this trend.

In general, environmental laws, particularly with respect to air emissions, are becoming more stringent, which may require the Debtors to install expensive plant upgrades or restrict their operations to meet more stringent standards. The Debtors cannot always predict the level of capital expenditures that will be required due to changing environmental and safety laws and regulations, deteriorating facility conditions and

unexpected events (such as natural disasters or terrorist attacks). The unexpected requirement of large capital expenditures could have a material adverse effect on their financial performance and condition.

The Debtors may not be able to obtain from time to time desired environmental regulatory approvals. Such approvals could be delayed or subject to onerous conditions. If there is a delay in obtaining any environmental regulatory approvals or if onerous conditions are imposed, the operation of the Debtors' generating facilities or the sale of electricity to third parties could be prevented or become subject to additional costs. The Debtors generally are responsible for all on-site environmental liabilities. Unless their contracts with customers expressly permit them to pass through increased costs attributable to new statutes, rules and regulations, the Debtors may not be able to recover capital costs of complying with new environmental regulations, which may adversely affect their profitability.

**M.   The Debtors' Business is Subject to Complex Government Regulations. Changes in these Regulations, or their Administration, by Legislatures, State and Federal Regulatory Agencies, or other Bodies may Affect the Costs of Operating the Debtors' Facilities or their Ability to Operate their Facilities. Such Cost Impacts, in turn, may Negatively Impact the Debtors' Financial Condition and Results of Operations**

Currently, the Debtors' facilities are Exempt Wholesale Generators (EWGs) that sell electricity primarily into the wholesale market. Generally, the Debtors are subject to regulation by FERC regarding the terms and conditions of wholesale service and rates, as well as by state agencies regarding physical aspects of the generating facilities. The majority of the Debtors' generation is sold at market prices under the market based rate authority granted by FERC. If certain conditions are not met, FERC has the authority to withhold or rescind market based rate authority, and the Debtors would have to file for authority to make sales based on cost of service rates. Such cases are typically settled rather than litigated to completion, adding additional uncertainty to the process. A loss of the Debtors' market based rate authority could severely impair their execution of the business plan and could have a materially negative impact on the Debtors' generation business.

Even where market based rate authority has been granted, FERC frequently imposes various forms of price and operating restrictions where it determines that market power exists and that the public interest requires such market power to be mitigated. These restrictions are frequently administered via bidding and scheduling rules administered by ISOs and RTOs. PJM has significantly expanded its system over the last two years, with the addition of the service areas of Allegheny Power, Commonwealth Edison, AEP-East, Duquesne Light, Dayton Power & Light ("DP&L") and Dominion-Virginia Power. In the fall of 2004, PJM completed its integration of AEP and DP&L into the PJM RTO, and AEP and DP&L were deemed to be capable of providing capacity to all areas of PJM. This has severely depressed forward pricing for capacity.

Certain of the Debtors' Assets are located in the ERCOT. Such assets are not generally subject to regulation by FERC, but are subject to similar types of regulation by agencies of the state of Texas. In addition to direct regulation by FERC and ERCOT, most of the Debtors' Assets are subject to rules and terms of participation imposed and administered by various RTOs and ISOs. While these entities are themselves ultimately regulated by FERC, they can impose rules, restrictions, and terms of service that are quasi-regulatory in nature and can have a material adverse impact on the Debtors' business.

To conduct their business, the Debtors' must obtain licenses, permits and approvals for their plants. These licenses, permits and approvals can be in addition to any environmental permits required. No assurance can be provided that the Debtors will be able to obtain and comply with all necessary licenses, permits and approvals for these plants. If the Debtors cannot comply with all applicable regulations, their business, results of operations, and financial condition could be adversely affected.

Currently, the state of California is asserting jurisdiction over EWGs to impose operating and maintenance standards. Included in these proposed standards are certain provisions that would restrict the ability of the Debtors to control economic decisions with regard to the use, ownership transfer and retirement of their Assets in California. The state's ability to legally impose such proposed restrictions is uncertain. However, if the regulations are imposed in their current form, and such imposition withstands any legal

216

challenge that might be undertaken, then the Debtors' business, financial condition and results of operation may be materially adversely affected.

The Debtors cannot predict whether the federal or state legislatures will adopt legislation relating to the restructuring of the energy industry. There are proposals in many jurisdictions to both advance and to roll back the movement toward competitive markets for supply of electricity, at both the wholesale and retail level. For example, on November 8, 2005, California voters will consider a ballot initiative that would return the state to cost of service regulation, and eliminate the ability of individual consumers to shop for an electricity supplier. If the initiative passes, its ultimate impact on the business of the Debtors is uncertain. However, it is probable that it will have an adverse impact, and the possibility of any partially offsetting improvements in business conditions is minimal. Furthermore, on August 8, 2005, the Energy Policy Act of 2005 was enacted. Although it did not directly harm competitive markets, there are many regulations that will be issued pursuant to the Act that could have an impact on the Debtors' business. In addition, any legislation resulting in an environment dominated by large, vertically integrated utilities and a concentration of ownership of such utilities, could impact the ability of the Debtors to successfully compete, and their business and results of operation could suffer. We cannot provide assurance that the introductions of new laws, or other future regulatory developments, will not have a material adverse impact on our business, operations, or financial condition.

## N.   Changes in Technology may Significantly Impact the Debtors' Generation Business by Making their Power Plants Less Competitive

A basic premise of the Debtors' generation business is that generating power at central plants achieves economies of scale and produces electricity at a low price. There are other technologies that can produce electricity, most notably fuel cells, microturbines, windmills and photovoltaic solar cells. It is possible that advances in technology will reduce the cost of alternative methods of electricity production to levels that are equal to or below that of most central station electric production, which could have a material impact on the Debtors' results of operations.

## O.   Terrorist Attacks, Future War or Risk of War may Adversely Impact the Debtors' Results of Operations, their Ability to Raise Capital or their Future Growth

As power generators, the Debtors face above-average risk of an act of terrorism, including with respect to their facilities outside the United States, either a direct act against a generating facility of the Debtors or an inability to operate as a result of systemic damage resulting from an act against the transmission and distribution infrastructure that they use to transport their power. If such an attack were to occur, the Debtors' business, financial condition and results of operations could be materially adversely impacted. In addition, such an attack could impact their ability to service their indebtedness, their ability to raise capital and their future growth opportunities.

## P.   The Debtors' Operations are Subject to Hazards Customary to the Power Generation Industry. The Debtors may not have Adequate Insurance to Cover all of these Hazards

The Debtors' operations are subject to many hazards associated with the power generation industry, which may expose them to significant liabilities for which they may not have adequate insurance coverage. Power generation involves hazardous activities, including acquiring, transporting and unloading fuel, operating large pieces of rotating equipment and delivering electricity to transmission and distribution systems. In addition to natural risks such as earthquake, flood, lightning, hurricane and wind, hazards, such as fire, explosion, collapse and machinery failure are inherent risks in our operations. These hazards can cause significant personal injury or loss of life, severe damage to and destruction of property, plant and equipment, contamination of, or damage to, the environment and suspension of operations. The occurrence of any one of these events may result in our being named as a defendant in lawsuits asserting claims for substantial damages, environmental cleanup costs, personal injury and fines and/or penalties. The Debtors maintain an amount of insurance protection that they consider adequate, but they can make no assurance that their insurance will be sufficient or effective under all circumstances and against all hazards or liabilities to which they may be

subject. A successful claim for which they are not fully insured could hurt their financial results and materially harm their financial condition.

**Q.    Certain Participants in the Wholesale Power Markets are Able to Recover Fixed Costs through Rate Base Mechanisms, Allowing them to Build, Buy and Upgrade Generation Assets without Relying Exclusively on Market Clearing Prices to Recover their Investments, which may give them a Competitive Advantage to Mirant**

Certain participants in the wholesale power markets, including many regulated utilities, enjoy a lower cost of capital than most merchant generators and often are able to recover fixed costs through rate base mechanisms, allowing them to build, buy and upgrade generation assets without relying exclusively on market clearing prices to recover their investments. This could impact the Debtors' ability to compete effectively and could have an adverse impact on the revenues generated by the Debtors' facilities.

**R.    The Debtors' Rejection or Recharacterization of the Back-to-Back Agreement may be Unsuccessful and if they Consequently Remain Liable under the Back-to-Back Agreement, the Debtors' Future Cash Flows and Operating Income would be Materially Adversely Impacted**

The Debtors expect that the obligations evidenced by the Back-to-Back Agreement will be resolved either through rejection pursuant to section 365 or recharacterization of such obligations as a financing transaction by the Bankruptcy Court or a negotiated settlement. In the event the Debtors were unable to reject or recharacterize the obligations under the Back-to-Back Agreement, or reach a negotiated settlement and therefore were to remain liable under the Back-to-Back Agreement the resulting negative impact on cash from operations would be at least approximately $80,000,000 in the year ended December 31, 2005 and at least $44,000,000 per year thereafter, which would materially adversely impact the Debtors' future cash flows and operating income.[1]

**S.    Certain transfer restrictions on New Mirant Common Stock imposed by its Certificate of Incorporation may inhibit market activity in New Mirant Common Stock**

To protect certain tax attributes of the Debtors, New Mirant Common Stock is subject to certain transfer restrictions imposed by New Mirant's Certificate of Incorporation. Under these restrictions, any attempted sale, transfer, exchange, assignment, conveyance or other disposition for value (a "Transfer") of any New Mirant Common Stock to any Person (including a group of Persons making a coordinated acquisition) who owns, or would own after such Transfer, more than 5% of the total value of outstanding New Mirant Common Stock (calculated in accordance with the Treasury Regulations under the Internal Revenue Code), will be void and will not be effective to Transfer any of such Common Stock, unless the transferee submits a written notice to New Mirant's Board of Directors at least seven, and not more than twelve, Business Days prior to completion of the attempted Transfer and the Board of Directors does not provide written notice to the transferee within five Business Days after receiving such notice that the Restricted Period (as defined below) has commenced. The restrictions are not applicable to transfers pursuant to a tender offer to purchase more than 50% of New Mirant Common Stock so long as such tender offer results in beneficial ownership of more than 50% of New Mirant Common Stock. The period during which the transfer restrictions described above (the "Restriction Period") apply will commence on the earliest date following the Effective Date that the percentage increase in New Mirant Common Stock owned by all 5% shareholders of New Mirant exceeds 35% minus the aggregate percentage stock ownership of 5% shareholders of New Mirant on the Effective Date and will remain in effect until the earlier of (a) two years following the Effective Date and (b) the date that the Board of Directors of New Mirant determines, based on reasons set forth in New Mirant's Certificate of Incorporation, that the transfer restrictions shall no longer remain in effect ("Restriction Period"). These transfer restrictions may inhibit market activity in New Mirant Common Stock.

---

[1] Pepco requested modifications to this paragraph that the Debtors find objectionable. For the full text of Pepco's proposed alternative language, see Exhibit E.

**T.  The Recovery and Distributions of Designated Net Litigation Distributions is Uncertain**

The uncertain nature of litigation makes it impossible to predict the recovery and subsequent distribution to both Mirant Unsecured Creditors and Mirant Equity Interests of any proceeds from the Designated Net Litigation Distributions. There can be no assurance that New Mirant will be successful in the prosecution of any of the Designated Avoidance Actions.

**U.  Operating in Foreign Countries Involves a Number of Risks**

The operations and earnings of the Debtors and their affiliates throughout the world have been, and may in the future be, affected from time to time in varying degree by political instability and by other political developments and laws and regulations which may affect both operations and financial affairs, such as forced divestiture of assets; restrictions on production, imports and exports; war or other international conflicts; civil unrest and local security concerns that threaten the safe operation of company facilities; price controls; tax increases and retroactive tax claims; expropriation of property; cancellation of contract rights; currency fluctuations and environmental regulations. Both the likelihood of such occurrences and their overall effect upon the Corporation vary greatly from country to country and are not predictable.

## XV.

### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), in effect on the date of this Disclosure Statement, on United States Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a holder of an Allowed Claim or Equity Interest may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and holders of an Allowed Claim or Equity Interest. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an Allowed Claim or Equity Interest in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an Equity Interest or an instrument that is treated as a security for federal income tax purposes ("Security") in a Debtor in connection with the performance of services and persons who are not United States persons (as defined in the Tax Code).

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CON-SULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION

CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENAL-
TIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE
CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED
HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT
THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE
DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PRO-
VIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAY-
ERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES
FROM AN INDEPENDENT TAX ADVISOR.

### A.   U.S. Federal Income Tax Consequences to the Debtors

Mirant files consolidated U.S. federal income tax returns which take into account the income and losses of all of the Debtors (some of which are treated as partnerships or disregarded entities for U.S. federal income tax purposes) (the "Mirant Group"). The consolidated net operating loss ("NOL") carryforwards of the Mirant Group for U.S. federal income tax purposes are expected to be at least $2,800,000,000 as of December 31, 2004.

As discussed below, in connection with the implementation of the Plan, the amount of the Debtors' NOL carryforwards may be reduced or eliminated and the tax basis of the Debtors' assets may be reduced. In addition, the New Mirant's utilization of any losses, any remaining NOL carryforwards, and certain other tax attributes may be restricted following the Effective Date.

#### 1.   COD Income

Generally, a taxpayer must recognize cancellation of indebtedness ("COD") income to the extent that the taxpayer's indebtedness is discharged for less than the amount of the indebtedness. For this purpose, COD income is the amount by which the discharged indebtedness exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (as in the case where the payment of the cancelled debt would have given rise to a tax deduction). The amount of consideration paid to a creditor generally would equal the amount of cash, the fair market value of property (including stock), and/or the issue price of any new debt instrument paid to such creditor. If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either section 1273 or 1274 of the Tax Code. Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal of any other debt instrument as its issue price if its terms provide for adequate stated interest.

The Tax Code provides that a debtor in bankruptcy is entitled to exclude its COD income from its gross income, but is required to reduce its tax attributes — such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets — by the amount of the excluded COD income. Recently issued Treasury Regulations address the application of the rules for the reduction of tax attributes in situations where a member of a U.S. consolidated group recognizes excluded COD income. Under the ordering rules of the Treasury Regulations, the tax attributes of the separate debtor member are reduced first (including its tax basis in its assets and the stock of its subsidiaries). In this regard, the Treasury Regulations adopt a "tier-down" approach such that, if the debtor reduces its tax basis in its stock in a member of the consolidated group, corresponding reductions must be made to that member's tax attributes, including such member's tax basis in its assets. To the extent that the amount of excluded COD income exceeds the tax attributes of the separate debtor member, the Treasury Regulations generally require the reduction of certain consolidated tax attributes of all members (e.g., NOLs, capital loss carryovers and credits), but do not require the reduction of the tax basis in their assets. To the extent that the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income continues to be excluded from gross income. Generally, a debtor is required to reduce its tax attributes with respect to excluded COD income after the calculation of its tax for the year in which its debt is discharged. However, recently issued Treasury Regulations provide that in the case of certain tax-free reorganizations resulting in the close of the debtor's taxable year, the required reduction of the debtor's tax attributes occurs immediately prior to such transaction.

Under section 108(b)(5) of the Tax Code, a debtor that realizes excluded COD income can elect to reduce its tax basis in depreciable assets prior to the reduction of its other tax attributes, with any remaining COD income applied next to reduce NOLs and other tax attributes in the prescribed statutory order. In addition, under section 1017(b)(3)(D) of the Tax Code, a debtor can elect to treat the stock of a subsidiary in its consolidated group as a depreciable asset to the extent that the subsidiary consents to a corresponding reduction in the tax basis of its depreciable assets.

As a result of the discharge of a portion of the Allowed Claims in exchange for consideration that does not constitute full satisfaction of such Allowed Claims, the Debtors will realize COD income. The extent of such COD income will depend, in significant part, on the value of the New Mirant Common Stock and other property that is distributed pursuant to the Plan. It is anticipated that the Debtors will recognize a significant amount of COD income. The actual amount of such COD income cannot be determined prior to the Effective Date.

Because the Debtors will realize COD income with respect to the discharge of the Allowed Claims as a result of the Plan, they will not be required to include such COD income in gross income, but will be required to reduce certain of their tax attributes by the amount of the excluded COD income. As a result of the implementation of the Plan, the required reduction of the tax attributes of Mirant and the other Debtors is expected to occur at the end of the tax year of the Mirant Group that includes the Effective Date.

Under the rules for the reduction of tax attributes, the amount of excluded COD income that is realized by Mirant will be applied first to reduce Mirant's NOL carryforwards and certain other tax attributes, including its tax basis in its assets. To the extent that the amount of excluded COD income exceeds such tax attributes, it would be applied then to reduce the consolidated tax attributes of other members of the Mirant Group to the extent that such attributes could offset income of Mirant. Mirant may elect to reduce its tax basis in depreciable assets prior to the reduction of its NOLs and other tax attributes. In addition, Mirant may elect under section 1017(b)(3)(D) of the Tax Code to treat the stock of its direct U.S. subsidiaries as depreciable assets. In such event, each subsidiary the stock of which is treated as a depreciable asset must reduce the tax basis of its depreciable assets in an amount equal to any reduction in the tax basis of the subsidiary stock. Mirant has not determined whether it will make these elections.

Similar rules will apply with respect to COD income that is realized by other Debtors. The above-described elections are made separately for each Debtor that is a taxpayer. The Debtors have not determined whether they will make elections first to reduce their basis in depreciable assets or to treat the stock of direct U.S. subsidiaries as depreciable assets.

The extent to which NOLs and other tax attributes remain following the required reduction of tax attributes, and the extent of the reduction in the tax basis of the Debtors' assets, will depend upon a number of factors, including (a) the amount of gain recognized as a result of the proposed transactions that are part of the Plan; (b) the amount of the COD income; and (c) whether these above-described elections are made by Mirant and/or the other Debtors. However, it is anticipated that the Debtors will retain a significant amount of NOL carryforwards and asset basis after the reductions with respect to excluded COD income.

## 2. Limitation on Net Operating Loss Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any remaining NOL and tax credit carryforwards and, possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation as a result of a change in ownership of the Debtors.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and does not qualify for (or elects out of) the Bankruptcy Exception (as discussed below), then the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such annual limitation may also apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and recognized within five years beginning on the date of such ownership change. See discussion under "U.S. Federal Income Tax Consequences to the Debtors — Limitation on Net Operating Loss Carryforwards and Other Tax Attributes — Built-in Gains and Losses."

Pursuant to the Plan, it is expected that all of the stock of Mirant will be cancelled, Mirant will be reorganized as New Mirant, and the holders of equity and certain creditors of Mirant and MAG Holdco will receive New Mirant stock. As a result, the Debtors will undergo an ownership change as a result of the Plan and, unless the Mirant Group qualifies for and does not elect out of the Bankruptcy Exception (as discussed below), the Debtors' pre-change losses will be subject to an annual limitation (as discussed below).

### a. General Section 382 Limitation

In general, unless the Bankruptcy Exception applies (as discussed below), the amount of the annual limitation on the utilization of pre-change NOLs to which a corporation (or a consolidated group) would be subject is equal to (a) the fair market value of the stock of the corporation (or in the case of a consolidated group, the stock of the common parent and the stock of any other member that is not owned by a member of the group) immediately before the ownership change (with certain adjustments), multiplied by (b) the highest federal "long-term tax-exempt rate" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs (the "Annual Limitation"). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan of reorganization, the stock value generally is determined immediately after (rather than before) the ownership change, and certain adjustments that ordinarily would apply do not apply.

Unless the Bankruptcy Exception applies, for any taxable year ending after an ownership change, the pre-change NOLs that can be used in that year to offset taxable income of the corporation cannot exceed the amount of the Annual Limitation. Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero. Furthermore, if the corporation (or the consolidated group) undergoes a second ownership change, the second ownership change may result in a lesser (but never greater) Annual Limitation with respect to any losses that existed at the time of the first ownership change.

In the case of the Debtors, the utilization of pre-change NOLs will be limited on an annual basis to the fair market value of the stock of New Mirant (and the stock of other members of the Mirant Group not owned by another member) immediately after the date on which the ownership change occurs, multiplied by the highest federal "long-term tax-exempt rate" in effect for any month in the three-calendar-month period ending with the month in which the ownership change occurs. The long-term tax-exempt rate in effect for September 2005 is 4.24 percent.

### b. Built-in Gains and Losses

Under certain circumstances, section 382 of the Tax Code also limits the deductibility of certain built-in losses that are recognized during the five years following the date of the ownership change. In particular, if a loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in loss at the time of an ownership change (taking into account its assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a pre-change loss and will be subject to the Annual Limitation. Conversely, if the loss corporation (or loss consolidated group or subgroup) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the Annual Limitation in the year recognized, such that the loss corporation (or loss consolidated group or subgroup) would be permitted to use its pre-change losses in addition to its regular Annual Limitation. Under current law, it is unclear whether COD income will be taken into account as an item of built-in income for purposes of determining whether the Debtors have a net unrealized built-in gain or loss.

Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, a corporation that joins the consolidated group within five years prior to the ownership change may not be taken into account in the computation of the group's net unrealized built-in loss. In such event, the limitation on such corporation's built-in losses, if any, would be determined separately from that of

the group. Nevertheless, such corporation would be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or loss consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of: (i) $10,000,000, or (ii) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

Unless the Bankruptcy Exception (as discussed below) applies, or COD income is included in the determination of net unrealized built-in gain or loss, Mirant and the other Debtors may have a net unrealized built-in loss in their assets, and the ability of these entities to utilize such losses could be limited.

### c. Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing Annual Limitation rules generally applies where (i) shareholders of the debtor immediately before an ownership change, and (ii) qualified (so-called "historic") creditors of the debtor, in respect of their claims, receive stock with at least 50 percent of the vote and value of all the stock of the reorganized debtor (or of a controlling corporation if such corporation is also in bankruptcy) pursuant to a confirmed bankruptcy plan of reorganization (the "Bankruptcy Exception"). For this purpose, a "historic creditor" is a creditor that (i) held its indebtedness for at least eighteen months before the date on which the debtor filed its petition with the Bankruptcy Court, or (ii) whose indebtedness arose in the ordinary course of the business of the debtor and is held by the creditor who at all times was the beneficial owner of such claim. In determining whether the Bankruptcy Exception applies, certain holders of creditor claims that would own directly or indirectly less than 5 percent of the total fair market value of the stock of the debtor pursuant to the bankruptcy plan of reorganization are presumed to have held their claims since the origination of such claims. The Bankruptcy Exception applies to a reorganized debtor pursuant to a confirmed bankruptcy plan of reorganization unless the debtor files an election for the Bankruptcy Exception not to apply. Such an election must be filed with its tax return that includes the effective date of such bankruptcy plan of reorganization.

Under the Bankruptcy Exception, a debtor's pre-change losses are not subject to the Annual Limitation, but instead are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the year that includes the effective date of the reorganization, and during the part of the taxable year that includes the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if the Bankruptcy Exception applies, an ownership change of the debtor within a two-year period after the consummation of the bankruptcy plan of reorganization will preclude the debtor's future utilization of any pre-change losses existing at the time of such ownership change.

For purposes of the Bankruptcy Exception, the New Mirant Common Stock received by the holders of Allowed Claims against the Mirant Debtors should be included in the 50 percent calculation if, and to the extent that, such holders constitute "historic creditors" of Mirant ("Historic Mirant Creditors"). A Historic Mirant Creditor is a holder of a Mirant Debtor Claim that: (i) was held by such holder since January 13, 2002 (the date that is eighteen months before the day in which the Debtors filed their petition with the Bankruptcy Court), or (ii) arose in the ordinary course of business and is held by the person who at all times was the beneficial owner of such Allowed Claim. In determining whether the Bankruptcy Exception applies, certain holders of Allowed Claims that would own directly or indirectly less than 5 percent of the total fair market value of New Mirant Common Stock pursuant to the Plan are presumed to have held their Allowed Claims since the origination of such Allowed Claims.

In order to preserve the potential applicability of the Bankruptcy Exception to Mirant's and the other Debtors' pre-change losses, the Debtors sought and received an order from the Bankruptcy Court requiring advance notification of transfers of certain claims against and interests in the Debtors. The Debtors could later oppose such transfers. Such order permits an entity to acquire claims against the Debtors without providing notice if the entity agrees that, upon notice by the Debtors, the entity will sell its claims to unrelated parties in an amount sufficient to reduce its beneficial ownership of claims to a specified amount necessary for the Debtors to satisfy the requirements of section 382(1)(5) of the Tax Code.

The Company believes that the Bankruptcy Exception should apply to the ownership change on the Effective Date because the New Mirant Common Stock owned by those persons who are shareholders of Mirant immediately before the ownership change, together with the New Mirant Common Stock received by holders of Allowed Claims against the Mirant Debtors pursuant to the Plan, will comprise 50 percent or more of the value of all of the New Mirant Common Stock. If the Company is eligible for and does not elect out of the Bankruptcy Exception, although the Annual Limitation will not restrict the deductibility of the Debtors' pre-change losses, the Debtors' pre-change losses will be reduced by any interest paid or accrued by the Debtors during the three taxable years preceding the taxable year in which the ownership change occurs, and during the portion of the taxable year of the ownership change, with respect to all Allowed Claims that are converted into New Mirant Common Stock. The Debtors can elect not to have the Bankruptcy Exception apply, in which event the Annual Limitation would apply. Such election would have to be made in the Debtors' U.S. federal income tax return for the taxable year that includes the Effective Date.

As discussed above, if the Bankruptcy Exception applies, a subsequent ownership change with respect to New Mirant that occurs within two years after the Effective Date will result in the loss of the Bankruptcy Exception and the reduction to zero of the Annual Limitation that would otherwise be applicable to the subsequent ownership change. Thus, a subsequent ownership change within two years after the Effective Date would eliminate the ability of a Debtor to use its pre-change losses after that ownership change. In order to avoid a subsequent ownership change and protect these tax attributes, in certain circumstances the Debtors would restrict for a period of two years after the Effective Date the transfer of New Mirant Common Stock to a holder which, after such transfer, would hold 5 percent or more of the total fair market value of New Mirant Common Stock ("Transfer Restriction"). See "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — New Mirant Common Stock." The purpose of the Transfer Restriction is to reduce the risk that a change in ownership of New Mirant may result in the loss or reduction of federal income tax attributes of New Mirant and its subsidiaries for purposes of sections 382 and 383 of the Tax Code.

With respect to New Mirant Common Stock attributable to Claims or Equity Interests that are not Allowed Claims or Allowed Equity Interests, excluding shares of New Mirant Common Stock for issuance under the New Mirant Employee Stock Programs, such shares will be issued on the Effective Date and placed in escrow pending resolution of such Contested Claims. See "The Chapter 11 Plan — Procedures for Resolving and Treating Contested Claims — Disputed Claims Reserve." To the extent that a Contested Claim is subsequently allowed, payments and distributions of New Mirant Common Stock will be made from the Escrowed Distribution Amount to the holder of such claim in accordance with the provisions of the Plan governing the class of Claims to which the respective holder belongs. A holder receiving a distribution from the Escrowed Distribution Amount should be treated as if it had owned such New Mirant Common Stock as of the Effective Date, so that a distribution of shares from the Escrowed Distribution Amount should not create a subsequent ownership change for purposes of the Bankruptcy Exception. However, the IRS could take a different view and instead treat such holder as receiving New Mirant Common Stock at the time such shares are actually distributed from the Escrowed Distribution Amount, in which case, such transfer may be applied towards determining whether there is an ownership change after the Effective Date.

The Debtors believe that the Bankruptcy Exception may be advantageous as compared to the Annual Limitation. Thus, the Debtors currently intend to apply the Bankruptcy Exception and to restrict the transfer of New Mirant Common Stock. The determination of whether to apply the Bankruptcy Exception will be reassessed prior to the filing of the consolidated U.S. federal tax return of Mirant and its subsidiaries for the year that includes the Effective Date.

### 3. Intercompany Restructuring Transactions

Mirant will resolve its prepetition intercompany debts through set-off, distribution, contribution, and cancellation. Following the resolution of the prepetition intercompany debts, Mirant will transfer or contribute various assets to New MAG Holdco. The Debtors do not believe that such restructuring and transfer should result in a material tax liability (and any taxable income resulting from these transactions would be offset by current year losses and NOLs of the Debtors). In addition, the contribution to New MAG Holdco or other

Debtors of assets with a tax basis in excess of their value may require that the Debtors reduce their tax basis in such assets unless the Debtors elect to reduce the tax basis of the stock of the transferee entities.

### 4. Transfer of Assets to New Mirant

In order to qualify as a reorganization described in section 368(a)(1)(G) of the Tax Code (a "G reorganization"), certain statutory requirements must be met, including: (a) substantially all of the assets of the transferor corporation must be transferred to the acquiror corporation; (b) the holders of the transferor corporation's securities or stock must receive stock or securities of the acquiror corporation; and (c) the transferor corporation's remaining assets, if any, must be distributed in dissolution of the transferor corporation. In addition, certain non-statutory requirements must be met, including the requirements that the reorganization have a business purpose and that continuity of both proprietary interest and business enterprise be preserved.

Pursuant to the Plan and on the Effective Date, Mirant will transfer substantially all of its assets to New Mirant in exchange for New Mirant Common Stock, which will be distributed by Mirant to certain holders of Allowed Claims and Allowed Equity Interests. Mirant believes that certain of the Allowed Claims against it constitute Securities. Holders of Allowed Claims against Mirant that receive stock of New Mirant should be considered to hold a sufficient proprietary interest in New Mirant and New Mirant will continue the historic business of Mirant. In addition, the creation of New Mirant has a valid business purpose. As a result, the Debtors believe that this transfer of assets and distribution of stock should qualify as a G reorganization.

Provided that the asset transfer qualifies as a G reorganization, Mirant should recognize no gain or loss with respect to such transfer. Further, pursuant to section 381 of the Tax Code, all of Mirant's tax attributes that exist on the Effective Date, including its NOLs and other loss and credit carryovers, will be inherited by New Mirant as of the close of the Effective Date. The tax attributes of each of Mirant's subsidiaries existing on the Effective Date, including their allocable share of the Mirant consolidated group attributes, will remain with each respective subsidiary following the Effective Date.

Mirant is the parent corporation of a U.S. consolidated group. As a result of the transfer to New Mirant of the stock of the U.S. subsidiaries of Mirant, New Mirant will become the parent of the Mirant Group, and the tax year of the Mirant Group will continue.

### 5. Section 269 of the Tax Code

In addition to the potential limitation on the utilization of pre-change losses under section 382 of the Tax Code, the IRS could assert that section 269 of the Tax Code applies to limit the ability of the Debtors to utilize their tax attributes. Under section 269 of the Tax Code, if the IRS determines that the principal purpose of an acquisition was to evade or avoid federal income tax by allowing the taxpayer to secure the benefit of a deduction, credit, or other allowance which such taxpayer would not otherwise enjoy, the IRS may disallow the deduction, credit, or other allowance. Section 269(a) of the Tax Code applies to a direct or indirect acquisition of 50 percent or more (in vote or value) of the stock of a corporation (an "Applicable Stock Acquisition"), and to an acquisition of assets from a corporation that is not controlled by the acquiring corporation or its shareholders in a transaction in which the tax basis of property in the hands of the acquiring corporation is determined by reference to the tax basis of the property in the hands of the transferor corporation (an "Applicable Asset Acquisition").

If the principal purpose of the Plan was to evade or avoid federal income tax, the acquisition of the stock of New Mirant could be an Applicable Stock Acquisition because the holders of the Allowed Claims would acquire direct or indirect control of New Mirant pursuant to the Plan. Similarly, if the principal purpose of the Plan was to evade or avoid federal income tax, New Mirant's acquisition of the assets of Mirant pursuant to the Plan could be an Applicable Asset Acquisition since New Mirant's shareholders (the holders of the Allowed Claims) would not be in control of Mirant at the time of the transaction, and the transaction would be a transaction in which New Mirant's tax basis in its assets is determined by reference to Mirant's tax basis in its assets (i.e., a G reorganization).

The determination of whether the principal purpose of an acquisition was to evade or avoid federal income tax is primarily a question of fact. If the IRS asserts that section 269 of the Tax Code applies to an acquisition, the taxpayer has the burden of proof to demonstrate that the principal purpose of an acquisition was not to evade or avoid federal income tax.

The Treasury Regulations provide that, in cases where the Bankruptcy Exception applies, there is a presumption that section 269(a) of the Tax Code will disallow any deduction of the debtors' NOLs and built-in items if the debtors do not carry on more than an insignificant amount of an active trade or business during and subsequent to the Chapter 11 Cases. The Debtors intend that New Mirant and its subsidiaries will retain and continue to operate substantially all of its businesses. Accordingly, the Debtors do not believe that this presumption should apply to New Mirant. However, if New Mirant substantially reduces the amount of its business either during or subsequent to the Chapter 11 Cases, the IRS, on the basis of hindsight, could attempt to apply the presumption to disallow New Mirant's utilization of NOLs and built-in items.

The Debtors believe that, if the Plan were challenged by the IRS, the Debtors could show that the principal purpose of the Plan was not to evade or avoid federal income tax. The acquisition of the assets of Mirant by New Mirant and the acquisition of control of New Mirant by holders of Allowed Claims against Mirant and its Debtor subsidiaries will be made for non-tax business purposes. Accordingly, the Debtors believe that section 269 of the Tax Code should not apply to the reorganization of Mirant into New Mirant. If the IRS were to assert that section 269 of the Tax Code applies to the Plan and if such assertion were sustained, section 269 of the Tax Code would severely limit or even extinguish the Debtor's ability to utilize its pre-ownership change NOLs and built-in loss items.

### 6. Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a 20 percent rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation may otherwise be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90 percent of a corporation's alternate minimum taxable income may be offset by available NOL carryforwards as computed for AMT purposes.

In addition, if a corporation (or consolidated group) undergoes an "ownership change" within the meaning of section 382 of the Tax Code, and the aggregate tax basis of the corporation's assets exceeds the fair market value of such assets on the date of the ownership change, the corporation's (or consolidated group's) aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the date of the ownership change. This could increase the amount of the Debtors' federal income tax liability following the Effective Date. It appears that the application of this provision to the Debtors would be unaffected by whether the Debtors qualify for the Bankruptcy Exception.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT. Any unused credit is carried forward indefinitely.

### B.  U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests

### 1.  General Tax Considerations for Holders of Allowed Claims and Equity Interests

The U.S. federal income tax consequences to holders of Allowed Claims and Equity Interests arising from the distributions to be made in satisfaction of their claims pursuant to the Plan may vary, depending upon, among other things: (a) the type of consideration received by the holder of a claim in exchange for the interest it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless securities deduction in respect of its claim against the corporation; (d) whether such claim constitutes a Security; (e) whether the holder of a claim is a resident of the United States for tax purposes; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the

holder of a claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place.

### a. Securities for Tax Purposes

The tax consequences to the holders of a claim against a corporation in bankruptcy will depend in part on whether the claim is a "Security". There is no precise definition of what constitutes a Security, and all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether or not it is a Security. Courts have held that a corporate debt instrument with an original maturity of ten years or more generally will be considered a Security, while an instrument with an original maturity of less than five years generally will not be considered a Security. Additional relevant factors for purposes of making this determination may include: (i) whether the instrument is secured; (ii) the degree of subordination of the instrument; (iii) the ratio of debt to equity of the issuer; (iv) the negotiability of the instruments; (v) the creditworthiness of the obligor; (vi) the right to vote or otherwise participate in the management of the obligor; (vii) the convertibility of the instrument into an equity interest of the obligor; (viii) whether payments of interest are fixed, variable, or contingent; and (ix) whether such payments are made on a current basis or are accrued.

Each holder of an Allowed Claim is urged to consult its tax advisor to determine whether its claim constitutes a Security.

### b. Consequences of an Exchange Pursuant to a Tax-Free Reorganization

If a holder's claim constitutes stock or a Security, and such holder receives stock or Securities of New Mirant in satisfaction of its claim in a tax-free reorganization, then the holder generally will not recognize gain or loss on the exchange, except that a holder may recognize ordinary income to the extent that the consideration received is treated as received in satisfaction of accrued but unpaid interest. See "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Consideration for Holders of Allowed Claims — Accrued but Unpaid Interest". In addition, if a holder of a claim constituting stock or a Security receives consideration other than stock or Securities in a tax-free reorganization, such holder will recognize gain (but not loss) on the exchange, to the extent of the cash or fair market value of any consideration other than stock or Securities (or, in the case of a note that is not a Security, the issue price of such note) received.

Where gain is recognized by such holder in connection with a tax-free reorganization, the character of such gain as long-term or short-term capital gain or as ordinary income will be determined by a number of factors, including the tax status of the holder, whether the claim constituting stock or Securities constitutes a capital asset in the hands of the holder, how long the claim has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction or worthless securities deduction. A holder's aggregate tax basis in stock or Securities received in exchange for a claim constituting stock or Securities generally will equal the holder's tax basis in the stock or Securities surrendered, decreased by the amount of cash and the fair market value of any consideration other than stock or Securities received, and increased by any income or gain recognized in the transaction. The aggregate tax basis should be allocated among individual shares of stock or Securities received under the Plan in proportion to their fair market values on the date of the exchange. The holding period for stock or Securities received in the exchange generally will include the holding period of the stock or Securities surrendered.

### c. Consequences of a Taxable Exchange

If a holder's claim does not constitute stock or Securities, and/or the holder does not receive stock or Securities qualifying for non-recognition treatment in exchange for its claim, then the holder likely will recognize gain or loss equal to the amount realized under the Plan in respect of its claim, less its respective tax basis in such claim. The amount realized for this purpose generally will equal the sum of the cash and the fair market value of any other consideration received under the Plan, and, if the consideration consists of a note, the issue price of such note. See discussion under "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Original Issue Discount."

Where gain or loss is recognized by such holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction or worthless securities deduction. The holder's aggregate tax basis for any consideration received under the Plan generally will equal the fair market value of the consideration received. The holding period for any consideration received under the Plan generally will begin on the day following the receipt of that consideration.

### d. Accrued but Unpaid Interest

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("OID") was previously included in its gross income and is not paid in full.

The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for tax purposes.

### 2. Certain Other Tax Considerations for Holders of Allowed Claims

### a. Reinstatement of a Debt Instrument

Holders generally should not recognize gain, loss or other taxable income upon the reinstatement of their Allowed Claims under the Plan, provided the reinstatement is not a substantial modification of the terms of the Allowed Claim. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement, or if the reinstatement is considered for tax purposes to involve a significant modification of the Allowed Claim. The reinstatement of an old debt instrument generally will be treated as an exchange for U.S. federal income tax purposes if the reinstatement results in a significant modification of the terms of the old debt instrument. A reinstatement will generally constitute a significant modification of the old debt instrument if, based on all of the facts and circumstances, the legal rights and obligations under the reinstated obligation differ from those under the original obligation to a degree that is economically significant. If a reinstatement of a debt instrument constitutes an exchange for U.S. federal income tax purposes due to a significant modification of terms, and such an exchange is not pursuant to a tax-free reorganization, the holder should recognize gain or loss in an amount equal to the difference between the amount realized on such exchange (the issue price of the new debt instrument) and such holder's adjusted tax basis in the old debt instrument.

### b. Bad Debt Deduction and Worthless Securities Deduction

A holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount of consideration that is less than such holder's tax basis in the claim in exchange for that claim, may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code, or may be entitled to a loss under section 165(a) in the year of receipt. A holder of stock or securities, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. The rules governing the timing and amount of such deductions place considerable emphasis on the facts and

228