circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Any such loss would be limited to the holder's tax basis in the indebtedness or equity interest underlying its claim. Holders of Allowed Claims or Equity Interests, therefore, are urged to consult their tax advisors with respect to their ability to claim such deductions.

### c. Market Discount

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange. Any additional accrued but unrecognized market discount should carry over to any securities or debt obligation received in a tax-free exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date. Any gain recognized by such holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

### 3. Tax Consequences to Certain Holders of Allowed Mirant Debtor Claims and Equity Interests in Mirant

The following summary describes the material U.S. federal income tax consequences to certain holders of Allowed Claims against the Mirant Debtors, and to holders of Equity Interests in Mirant. A holder's tax treatment may vary depending on the holder's particular situation. All holders of Allowed Claims against the Mirant Debtors or Equity Interests in Mirant are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of the Plan.

### a. Mirant Debtor Class 2 — Secured Claims

Pursuant to the Plan, each holder of an Allowed Mirant Debtor Class 2 Secured Claim, at the sole option of the Debtors, will receive (to the extent of the value of the holder's interest in the collateral) on the Distribution Date either: (i) a Plan Secured Note; (ii) the collateral that secures payment of such Secured Claim; (iii) a single cash payment in an amount equal to the amount of the Allowed Secured Claim; or (iv) if applicable, the implementation of any applicable valid right of setoff permitted under section 553 of the Bankruptcy Code. See "The Chapter 11 Plan — Provisions for Treatment of Mirant Debtor Claims and Equity Interests — Mirant Debtor Class 2 — Secured Claims." If a holder receives a Plan Secured Note, the principal amount of the Plan Secured Note would equal the amount of the applicable Allowed Secured Claim. The Plan Secured Notes would mature on the fifth anniversary of the Effective Date, and would bear interest at 5.0 percent per annum. The Plan Secured Notes would be collateralized by the assets that secure payment of the Allowed Secured Claim. See "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — Plan Secured Notes." The Debtors do not believe that the Plan Secured Notes constitute Securities.

If the Allowed Secured Claim or the Plan Secured Note do not constitute Securities, such holder will recognize gain or loss in an amount equal to the difference between (i) such holder's "amount realized" in respect of its Allowed Secured Claim, which is the issue price (as determined under sections 1273 or 1274 of the Tax Code) of the Plan Secured Note received by the holder in satisfaction of its claim (other than amounts that are in respect of any Allowed Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Allowed Secured Claim (other than any claim for accrued but unpaid interest). See discussion under "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Original Issue Discount." If the Allowed Secured Claim and the Plan Secured Note constitute Securities, a holder that receives a Plan Secured Note with respect to its Allowed Secured Claim may not have to recognize gain or loss with respect to such Allowed Secured Claim.

If a holder of an Allowed Secured Claim receives the collateral that secures payment of such Allowed Secured Claim or a single cash payment in an amount equal to the amount of such Allowed Secured Claim, such holder will recognize gain or loss in an amount equal to the difference between (i) such holder's "amount

realized" in respect of its Allowed Secured Claim, which is the amount of cash and/or the fair market value of such collateral that is received by such holder in satisfaction of its Allowed Secured Claim (other than amounts that are in respect of any allowed claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Allowed Secured Claim (other than any claim for accrued but unpaid interest).

With respect to holders of the West Georgia Facility Claims that do not enter into and comply with their obligations under the West Georgia Settlement Agreement and do not vote to accept the Plan, on the Distribution Date the holders of the Allowed West Georgia Facility Claims will receive, to the extent that the West Georgia Facility Claims are determined by the Bankruptcy Court to be Secured Claims (i) a Cash payment of up to $30,000,000 and (ii) to the extent that the secured portion of the West Georgia Facility Claims exceeds $30,000,000, the West Georgia Secured Note. The aggregate principal amount of the West Georgia Secured Note is anticipated to be approximately $109,700,000. The West Georgia Secured Note will mature on June 30, 2014, and will bear interest at a rate of 7.0 percent per annum. See "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — West Georgia Secured Note."

Holders of the West Georgia Facility Claims that do not enter into and comply with their obligations under the West Georgia Settlement Agreement and vote to accept the Plan and receive cash and the West Georgia Secured Note may have to recognize gain. It is unclear whether the West Georgia Secured Note is a Security. If the West Georgia Secured Note is a Security, and the West Georgia Secured Note and cash are received in exchange for an Allowed Secured Claim that is a Security, then the holder of such Allowed Secured Claim would recognize gain (but not loss) on the exchange, but only to the extent of the lesser of the gain realized or the amount of cash received. The character of any gain that is recognized will be determined based upon the nature of the surrendered Security in the hands of the holder. The tax basis of the West Georgia Secured Note received in such case will be the same as the tax basis of the surrendered Security, increased by any gain recognized on the exchange, and decreased by the fair market value of any other property and the amount of any cash received. If the West Georgia Secured Note is not a Security, a holder of an Allowed West Georgia Facility Claim would recognize the full amount of gain or loss with respect to the receipt of the West Georgia Secured Note and cash, in an amount equal to the issue price of the West Georgia Secured Note and cash received minus such holder's tax basis in the Allowed Secured Claim. The tax basis of the West Georgia Secured Note received in a fully taxable transaction will be the issue price of the West Georgia Secured Note. See "U.S. Federal Income Tax Consequences of Ownership of New Mirant Common Stock and Notes — U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Original Issue Discount."

If the holders of the West Georgia Facility Claims enter into and comply with their obligations under the West Georgia Settlement Agreement and vote to accept the Plan, on the Distribution Date (i) the holders of the Allowed West Georgia Secured Claims will receive (i) a Cash payment in the amount of $45,000,000 and (ii) rights under the West Georgia Amended Loan Documents restructuring the claims.

Holders of the West Georgia Facility Claims that enter into and comply with their obligations under the West Georgia Settlement Agreement and vote to accept the Plan and receive cash and rights under the West Georgia Amended Loan Documents to restructure their claims under the West Georgia Credit Agreement may have to recognize gain. The restructuring of their claims may be considered for tax purposes to involve a significant modification of their claims and thus a deemed exchange of the old debt instrument for a new debt instrument. If the modification constitutes an exchange for U.S. federal tax purposes due to a significant modification of the terms of the debt instrument, the holder should recognize gain or loss in an amount equal to the difference between (i) the issue price of the new debt instrument and the amount of cash that is received (other than amounts that are received in respect of any allowed claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in the old debt instrument (other than any claim for accrued but unpaid interest). If the restructuring of the claims does not constitute a significant modification of the terms of the debt instrument, then the holder should not recognize gain except to the extent the cash received is allocable to the repayment of accrued but unpaid interest.

It is possible that the holders of the West Georgia Facility Claims that enter into and comply with their obligations under the West Georgia Settlement Agreement and vote to accept the Plan will also be treated as

receiving some portion of their consideration as compensation in exchange for voting for the Plan. If the holders of the West Georgia Secured Claims are so treated, the receipt by such holders of that portion of the consideration treated as compensation in exchange for voting for the Plan may result in ordinary income to such holders.

Holders of the West Georgia Facility Claims that enter into and comply with their obligations under the West Georgia Settlement Agreement are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of the restructuring of their claims.

The character of any gain or loss that is recognized by holders of Allowed Mirant Debtor Class 2 — Secured Claims as long-term or short-term capital gain or loss or as ordinary income is, as discussed above, dependant on a number of factors, including the tax status of the holder, whether such claim constitutes a capital asset in the hands of the holder, how long the claim has been held, whether such claim was acquired at a market discount, and whether and to what extent the holder claimed a bad debt deduction. Payments attributable to accrued but unpaid interest will be ordinary income to the extent not previously taken into income.

### b. Mirant Debtor Class 3 — Unsecured Claims

Pursuant to the Plan, each holder of an Allowed Mirant Debtor Class 3 — Unsecured Claim will receive a Pro Rata Share of (i) 96.25 percent of the shares of New Mirant Common Stock to be issued pursuant to the Plan, except for the shares to be issued to holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims, and the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs, and (ii) the right to share on a pari passu basis in the Designated Net Litigation Distributions in accordance with Section 10.13 of the Plan. See "The Chapter 11 Plan — Provisions for Treatment of Mirant Debtor Claims and Equity Interests — Mirant Debtor Class 3 — Unsecured Claims."

Holders of Allowed Subordinated Note Claims shall receive a Pro Rata Share of (i) 3.5 percent of the shares of New Mirant Common Stock to be issued under the Plan (which shares are included in the 96.25% referred to in the immediately preceding paragraph and excluding the shares (A) to be issued to the holders of Allowed MAG Debtor Class 5 — Unsecured Claims and Allowed MAG Debtor Class 4 — PG&E/RMR Claims, provided that, if any such shares are issued to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, then the holders of Allowed Subordinated Note Claims shall receive 3.5 percent of such shares and (B) to be reserved for issuance pursuant to the New Mirant Employee Stock Program), (ii) the New Mirant Series B Warrants, and (iii) the right to share on a pari passu basis in the Designated Net Litigation Distributions allocated to the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims.

The U.S. federal income tax consequences of the Plan to a holder of a Mirant Debtor Class 3 — Unsecured Claim will depend, in part, on: (i) whether such holder's Allowed Claim constitutes a Security; and (ii) whether the transfer by Mirant of substantially all of its assets to New Mirant in exchange for New Mirant Common Stock qualifies as a G reorganization. The Debtors believe that the transfer by Mirant of substantially all of its assets to New Mirant in exchange for New Mirant Common Stock, followed by the distribution of the New Mirant Common Stock to holders of certain Claims, should qualify as a G reorganization. Accordingly, the federal income tax consequences of the Plan to the Allowed Mirant Debtor Class 3 — Unsecured Claim should principally depend on whether that holder's claim constitutes a Security. See "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Considerations for Holders of Allowed Claims — Securities for Tax Purposes."

Except as provided in the two immediately succeeding paragraphs, if the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims exchange Securities for New Mirant Common Stock (and New Mirant Series B Warrants in the case of Accepting Sub Note Holders), no gain or loss should be recognized on such exchange, except that New Mirant Common Stock (and New Mirant Series B Warrants in the case of holders of Allowed Subordinated Note Claims) received that is attributable to accrued but unpaid interest will be taxable as ordinary income to the extent not previously taken into income. See "U.S. Federal Income Tax

Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Consideration for Holders of Allowed Claims — Consequences of an Exchange Pursuant to a Tax-free Reorganization" and "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Considerations for Holders of Allowed Claims — Accrued but Unpaid Interest." Such holders should have a tax basis in the New Mirant Common Stock (and in New Mirant Series B Warrants in the case of holders of Allowed Subordinated Note Claims) equal to their adjusted tax basis in the Allowed Claim exchanged therefor (such basis being allocated between the New Mirant Common Stock and New Mirant Series B Warrants according to fair market value in the case of holders of Allowed Subordinated Note Claims). If the holders of Allowed Mirant Debtor Class 3 Unsecured Claims exchange Allowed Claims that do not constitute Securities, such holders should recognize gain or loss equal to the difference between the fair market value of the New Mirant Common Stock (and New Mirant Series B Warrants in the case of holders of Allowed Subordinated Note Claims) and their adjusted tax basis in the Allowed Claims so exchanged. New Mirant Common Stock (and New Mirant Series B Warrants in the case of holders of Allowed Subordinated Note Claims) received that is attributable to accrued but unpaid interest will be taxable as ordinary income to the extent not previously taken into income. See "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Consideration for Holders of Allowed Claims — Consequences of Taxable Exchange" and "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Considerations for Holders of Allowed Claims — Accrued but Unpaid Interest."

It is possible that holders of Allowed Subordinated Note Claims will be treated as receiving the New Mirant Series B Warrants as compensation in exchange for voting for the Plan. If such holders are so treated, (i) the receipt of New Mirant Series B Warrants by such holders may result in ordinary income to such holders and (ii) all references to the New Mirant Series B Warrants in the immediately preceding paragraph should be disregarded. Such holders are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of the receipt of New Mirant Series B Warrants.

Under the Plan, the holders of Allowed Mirant Debtor Class 3 — Unsecured Claims (including holders of Allowed Claims in respect of Subordinated Notes) will receive the right to share on a pari passu basis in the Designated Net Litigation Distributions in the form of cash payments equal to 50 percent of Designated Net Litigation Recoveries after certain reductions for adverse tax consequences to New Mirant as provided for in Section 10.13 of the Plan. The federal, state and local tax consequences of receiving an interest in such Designated Net Litigation Distribution or payments with respect to such Designated Net Litigation Distribution ultimately will depend upon the structure chosen to grant rights in and make payments of such Designated Net Litigation Distribution. In general, the receipt of an interest in such Designated Net Litigation Distribution may be treated as consideration distributed pursuant to the Plan, and may increase the amount of gain required to be recognized by, and/or the amount of accrued but unpaid interest taxable as ordinary income to, a holder of Mirant Debtor Class 3 — Unsecured Claims. In addition, Designated Net Litigation Distributions (and subsequent distributions with respect thereto) may be taxable to the recipient.

### c. Mirant Debtor Class 4 — Convenience Claims

Pursuant to the Plan, holders of Allowed Convenience Claims will receive a single cash payment equal to the amount of such holder's Claim. See "The Chapter 11 Plan — Provisions for Treatment of Mirant Debtor Claims and Equity Interests — Mirant Debtor Class 4 — Convenience Claims." In general, holders of Allowed Convenience Claims should recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by such holder in satisfaction of its Allowed Claim (other than any claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed Claim (other than any claim for accrued but unpaid interest).

The character of any gain or loss that is recognized by a holder of an Allowed Convenience Claim as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder, how long the claim has been held, whether the Allowed Claim was acquired at a market

232

discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Payments attributable to accrued but unpaid interest will be taxable as ordinary income to the extent not previously taken into income. A holder of an Allowed Convenience Claim that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.

### d. Mirant Debtor Class 5 — Equity Interests

Pursuant to the Plan, on the Effective Date, all Equity Interests in Mirant will be cancelled, and each holder of an Allowed Mirant Debtor Class 5 — Equity Interest will receive a Pro Rata Share of (i) 3.75 percent of the shares of New Mirant Common Stock to be issued under the Plan (excluding the shares (A) to be issued to the holders of Allowed MAG Debtor Class 4 — PG&E/RMR Claims and Allowed MAG Debtor Class 5 — Unsecured Claims; provided that, if such shares are distributed to holders of Allowed Mirant Debtor Class 3 — Unsecured Claims, the holders of Allowed Mirant Equity Interest will receive 3.75 percent of such shares, and (B) to be reserved for issues pursuant to the New Mirant Employee Stock Programs), (ii) the New Mirant Series A Warrants, and (iii) the right to receive Designated Net Litigation Distributions in accordance with Section 10.13 of the Plan. See "The Chapter 11 Plan — Provisions for Treatment of Mirant Debtor Claims and Equity Interests — Mirant Debtor Class 5 — Equity Interests."

Except as provided in the immediately succeeding paragraph, the holders of Equity Interests in Mirant should not recognize gain or loss upon receipt of New Mirant Common Stock and New Mirant Series A Warrants in exchange for their claims if the transactions under the Plan qualify as a G reorganization. In such case, a holder's tax basis in the New Mirant Common Stock and New Mirant Series A Warrants generally should equal its tax basis in the Equity Interest in Mirant that is surrendered therefor (such basis being allocated between the New Mirant Common Stock and New Mirant Series A Warrants according to fair market value). If the transactions under the Plan do not qualify as a G reorganization, a holder should recognize gain or loss equal to the fair market value of New Mirant Common Stock and New Mirant Series A Warrants received, less the holder's tax basis in its Equity Interest in Mirant that is surrendered therefor. In a taxable transaction, a holder's tax basis in the New Mirant Common Stock and New Mirant Series A Warrants generally should equal their fair market value.

Under the Plan, the holders of Allowed Mirant Debtor Class 5 — Equity Interests will receive Special Litigation Distributions in the form of cash payments equal to 50 percent of Designated Net Litigation Recoveries after certain reductions for adverse tax consequences to New Mirant as provided for in Section 10.13 of the Plan. The federal, state and local tax consequences of receiving an interest in such Designated Net Litigation Distribution or payments with respect to such Designated Net Litigation Distribution are uncertain and will ultimately depend upon the structure chosen to grant rights in and make payments of such Designated Net Litigation Distribution. In general, the receipt of an interest in such Designated Net Litigation Distribution may be treated as consideration distributed pursuant to the Plan, and may increase the amount of gain required to be recognized by a holder of Mirant Debtor Class 5 — Equity Interests. In addition, Designated Net Litigation Distributions (and subsequent distributions with respect thereto) may be taxable to the recipient.

### 4. <u>Tax Consequences to Certain Holders of Allowed Claims Against the MAG Debtors</u>

The following summary describes the material U.S. federal income tax consequences to certain holders of Allowed Claims against the MAG Debtors. As discussed above, a holder's tax treatment may vary depending on the holder's particular situation. All holders of Allowed Claims against the MAG Debtors are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.

### a. MAG Debtor Class 2 — Secured Claims

Pursuant to the Plan, each holder of an Allowed MAG Debtor Class 2 Secured Claim, at the sole option of the Debtors, will receive (to the extent of the value of the holder's interest in the collateral) on the Distribution Date either: (i) a Plan Secured Note; (ii) the collateral that secures payment of such Secured Claim; (iii) a single cash payment in an amount equal to the amount of the Allowed Secured Claim; or (iv) if applicable, the implementation of any applicable valid right of setoff permitted under section 553 of the Bankruptcy Code. See "The Chapter 11 Plan — Treatment of MAG Debtor Claims and Equity Interests —

233

MAG Debtor Class 2 — Secured Claims". If a holder receives a Plan Secured Note, the principal amount of the Plan Secured Notes would equal the amount of the Allowed Secured Claim. The Plan Secured Notes would mature on the fifth anniversary of the Effective Date, and would bear interest at 5.0 percent per annum. The Plan Secured Notes would be collateralized by the assets that secure payment of the Allowed Secured Claim. See "The Chapter 11 Plan — Description of Certain Securities to be Issued Pursuant to the Plan — Description of the Plan Secured Notes." The Debtors do not believe that the Plan Secured Notes constitute Securities.

If the Allowed Secured Claim or the Plan Secured Note do not constitute Securities, such holder would have to recognize gain or loss in an amount equal to the difference between (i) such holder's "amount realized" in respect of its Allowed Secured Claim, which is the issue price (as determined under sections 1273 and 1274 of the Tax Code) of the Plan Secured Note received by the holder in satisfaction of its claim (other than amounts that are in respect of any Allowed Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Allowed Secured Claim (other than any claim for accrued but unpaid interest). See discussion under "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Original Issue Discount". If the Allowed Secured Claim and the Plan Secured Note constitute Securities, a holder that receives a Plan Secured Note with respect to its Allowed Secured Claim may not have to recognize gain or loss with respect to such Allowed Secured Claim.

If a holder of an Allowed Secured Claim receives the collateral that secures payment of such Allowed Secured Claim or a single cash payment in an amount equal to the amount of such Allowed Secured Claim, such holder will recognize gain or loss in an amount equal to the difference between (i) such holder's "amount realized" in respect of its Allowed Secured Claim, which is the amount of cash and/or the fair market value of such collateral that is received by such holder in satisfaction of its Allowed Secured Claim (other than amounts that are in respect of any allowed claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Allowed Secured Claim (other than any claim for accrued but unpaid interest).

The character of any gain or loss that is recognized by holders of Allowed MAG Debtor Class 2 — Secured Claims as long-term or short-term capital gain or loss or as ordinary income is, as discussed above, dependant on a number of factors, including the tax status of the holder, whether such claim constitutes a capital asset in the hands of the holder, how long the claim has been held, whether such claim was acquired at a market discount, and whether and to what extent the holder claimed a bad debt deduction. Payments attributable to accrued but unpaid interest will be ordinary income to the extent not previously taken into income.

### b. MAG Debtor Class 5 — Unsecured Claims

Pursuant to the Plan, each holder of an Allowed MAG Debtor Class 5 — Unsecured Claim will receive a Pro Rata Share of: (i) at the option of the Debtors, $1,231,110,000 either in Cash or New MAG Holdco Notes; and (ii) 2.1% shares of New Mirant Common Stock issued under the Plan (excluding the shares to be reserved for issuance pursuant to the New Mirant Employee Stock Program). The treatment set forth herein is based upon an assumed Effective Date of December 31, 2005. To the extent the Effective Date occurs on a date other than December 31, 2005, the Plan Distributions set forth in subclause (i) shall be adjusted to reflect the appropriate amount of accrued interest payable, calculated in accordance with Section 10.14(b) of the Plan.

The federal income tax consequences of the Plan to a holder of a MAG Debtor Class 5 — Unsecured Claim depend, in part, on: (i) whether such holder's Allowed Claim constitutes a Security; (ii) whether the New MAG Holdco Notes constitute Securities; and (iii) whether the holder's exchange of its Allowed Claim for New MAG Holdco Notes qualifies as a recapitalization for federal income tax purposes. The Debtors believe that the New MAG Holdco Notes should constitute Securities. In addition, the Debtors believe that if a holder's Allowed Claim constitutes a Security, then the exchange of such Security for New MAG Holdco Notes should qualify as a recapitalization for federal income tax purposes. As the New Mirant Common Stock is not stock of the issuing company in the recapitalization, it may not be qualifying consideration in a tax-free reorganization, in which event, the holder would realize gain on such exchange to the extent of the fair market value of the New Mirant Common Stock received. Accordingly, the federal income tax consequences of the

234

Plan to a holder of a claim should principally depend on whether that holder's Allowed Claim constitutes a Security. See "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Considerations for Holders of Allowed Claims — Security for Tax Purposes".

### i. Consequences if the Exchange is a Tax-Free Recapitalization

If a holder's Allowed Claim constitutes a Security, the Debtors believe that the exchange of such Security for New MAG Holdco Notes and New Mirant Common Stock should qualify as a recapitalization for federal income tax purposes. In such event, the holder would realize gain or loss on such exchange in an amount equal to the difference between (A) the amount realized on the exchange, which is the issue price of the New MAG Holdco Notes and the fair market value of the New Mirant Common Stock, and (B) the holder's adjusted basis in the Securities surrendered. The holder may be required to recognize the gain realized on such exchange only to the extent of the lesser of the gain realized or the fair market value of New Mirant Common Stock received. The holder would not be permitted to recognize any loss realized on the exchange. In addition, payments attributable to accrued but unpaid interest will be recognized as interest income to the extent not previously taken into income.

Any gain should be capital gain (subject to the discussion under "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Market Discount"), and such gain should be long-term capital gain if such holder's holding period of its Allowed Claim exceeded one year at the time of the exchange. Income recognized due to accrued but unpaid interest will be ordinary income. If the New Mirant Common Stock is not qualifying consideration in a tax-free reorganization, the aggregate tax basis of a holder in the New MAG Holdco Notes would be equal to such holder's adjusted tax basis in the Securities that are surrendered therefor, reduced by the fair market value of the New Mirant Common Stock that is received, and increased by the amount of gain that is recognized on the exchange. A holder's holding period of the New MAG Holdco Notes would include its holding period of the Securities that are surrendered therefor. A holder's adjusted tax basis in its New Mirant Common Stock would be the fair market value thereof on the date of the exchange. A holder's holding period of such New Mirant Common Stock would begin on the day following the date of the exchange. If, however, the New Mirant Common Stock is qualifying consideration in a tax-free reorganization, then the tax basis of a holder in the Securities surrendered therefor would be apportioned between the New MAG Holdco Notes and the New Mirant Common Stock received, and the holder's holding period of the New MAG Holdco Notes and New Mirant Common Stock would include its holding period of the Securities that are surrendered therefor.

### ii. Consequences if the Exchange is Taxable

If a holder's Allowed Claim does not constitute a Security, or if the Company distributes cash in lieu of New MAG Holdco Notes, then the exchange of a Claim for New MAG Holdco Notes and/or cash, and New Mirant Common Stock, does not qualify as a recapitalization for federal income tax purposes. The holder would recognize gain or loss in an amount equal to the difference between (A) the amount realized on such exchange (the sum of the issue price of the New MAG Holdco Notes and/or the amount of cash received, and the fair market value of the New Mirant Common Stock) and (B) such holder's adjusted tax basis in its surrendered Claim. The gain or loss recognized by a holder generally should be capital gain or loss (except that part or all of such gain may be treated as ordinary income to the extent it is attributable to accrued market discount, see "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Market Discount"), and would be long-term capital gain or loss if such holder's holding period of its Allowed Claim exceeded one year at the time of the exchange. A holder's tax basis in the New MAG Holdco Notes, if received, should be the issue price thereof. A holder's tax basis in the New Mirant Common Stock should be the fair market value thereof on date of the exchange. A holder's holding period of the New MAG Holdco Notes and the New Mirant Common Stock would begin on the day following the date of the exchange.

### c. MAG Debtor Class 6 — MAG Long-term Note Claims

Under the Plan, the MAG Long-term Note Claims are the Allowed Claims of the holders of the following senior notes issued by MAG pursuant to the MAG Indenture: (i) due 2011, in the aggregate

principal amount of $850 million; (ii) due 2021, in the aggregate principal amount of $450 million; and (iii) due 2031, in the aggregate principal amount of $400 million (collectively, the "MAG Long-term Notes"). Pursuant to the Plan, all rights to which the MAG Long-term Note Claims entitle their holders will be fully reinstated, including the same maturity, terms, and amount owed. It is expected that Postpetition Accrued Interest of approximately $416,400,000 million will be paid in cash to holders of MAG Long-term Note Claims, subject to the Final Order. See "The Chapter 11 Plan — Treatment of MAG Debtor Claims and Equity Interests — MAG Debtor Class 6 — MAG Long-term Note Claims."

The formal exchange of an old debt instrument for a new debt instrument generally would be treated as an exchange for U.S. federal income tax purposes if the exchange results in a significant modification of the terms of the old debt instrument. See "Certain U.S. Federal Income Tax Consequences — Certain Other Tax Considerations for Holders of Allowed Claims — Reinstatement of a Debt Instrument." The Debtors believe that the reinstatement of the MAG Long-term Notes does not constitute a significant modification of the terms of the MAG Long-term Notes. If the reinstatement of the MAG Long-term Notes constitutes a significant modification of its terms, then the reinstatement would be treated as an exchange of "old" MAG Long-term Notes for "new" MAG Long-term Notes. The Debtors believe that the MAG Long-term Notes are Securities for federal income tax purposes. See "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — General Tax Considerations for Holders of Allowed Claims — Security for Tax Purposes." If both the "old" MAG Long-term Notes and "new" MAG Long-term Notes are Securities, such exchange may qualify as a tax-free recapitalization whereby the holder may recognize neither gain nor loss upon the exchange. If the exchange does not qualify as a tax-free recapitalization, the holder would recognize gain or loss in an amount equal to the difference between the amount realized on such exchange (the difference between the issue price of the "new" MAG Long-term Notes and the holder's adjusted tax basis in the "old" MAG Long-term Notes surrendered therefor).

In general, to the extent that any distribution to a holder of a MAG Long-term Note Claim is received in satisfaction of accrued interest during its holding period, such amount should be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder may recognize a deductible loss to the extent that any accrued interest was previously included in its gross income and is not paid in full.

Pursuant to the Plan, holders of MAG Long-term Notes will receive cash in satisfaction of accrued but unpaid postpetition interest through the Effective Date. Each holder of a MAG Long-term Note Claim is urged to consult its tax advisor concerning the federal, state, local, and other tax consequences of the receipt of a cash payment for accrued interest.

### d. MAG Debtor Class 7 — Convenience Claims

Pursuant to the Plan, holders of Allowed Convenience Claims against the MAG Debtors will receive a single cash payment equal to the amount of such holder's Claim. See "The Chapter 11 Plan — Treatment of MAG Debtor Claims and Equity Interests — MAG Debtor Class 7 — Convenience Claims." In general, holders of such Allowed Convenience Claims should recognize gain or loss in an amount equal to the difference between (i) the amount of cash received by such holder in satisfaction of its Allowed Claim (other than any claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Allowed Claim (other than any claim for accrued but unpaid interest).

The character of any gain or loss that is recognized by a holder of an Allowed Convenience Claim as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed Claim constitutes a capital asset in the hands of the holder, how long the claim has been held, whether the Allowed Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction. Payments attributable to accrued but unpaid interest will be taxable as ordinary income to the extent not previously taken into income. A holder of an Allowed Convenience Claim that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. See "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Market Discount."

### C.  U.S. Federal Income Tax Consequences to Holders of Contested Claims

New Mirant Common Stock attributable to Claims or Equity Interests that are contested, excluding shares of New Mirant Common Stock for issuance under the New Mirant Employee Stock Programs, will be issued and placed in escrow pending resolution of such Contested Claims. See "The Chapter 11 Plan — Procedures for Resolving and Treating Contested Claims — Disputed Claims Reserve." To the extent a Contested Claim is allowed, payments and distributions of New Mirant Common Stock will be made from the Escrowed Distribution Amount to the holder of such claim in accordance with the provisions of the Plan governing the class of Allowed Claims to which the respective holder belongs, and will be subject to the same tax consequences that apply to the class of Allowed Claims to which the respective holder belongs.

### D.  U.S. Federal Income Tax Consequences of Ownership of New Mirant Common Stock and Notes

#### 1.  U.S. Holders

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of Plan Secured Notes, the West Georgia Secured Note, New MAG Holdco Notes (collectively, the "Notes"), New Mirant Common Stock, and New Mirant Warrants. This discussion addresses only the U.S. federal income tax considerations of holders that will receive New Mirant Common Stock, Notes, or New Mirant Warrants under the Plan and that will hold such New Mirant Common Stock, Notes, or New Mirant Warrants as capital assets. For purposes of this description, a "U.S. Holder" is a beneficial owner of New Mirant Common Stock, Notes, or New Mirant Warrants that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a partnership or corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust. A "Non-U.S. Holder" is a beneficial owner of New Mirant Common Stock, Notes or New Mirant Warrants that is not a U.S. Holder.

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds New Mirant Common Stock, Notes or New Mirant Warrants, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

#### 2.  U.S. Federal Income Tax Consequences of Ownership of New Mirant Common Stock

##### a.  Distributions

The gross amount of any distribution by New Mirant of cash or property with respect to the New Mirant Common Stock (other than certain distributions, if any, of New Mirant Common Stock distributed pro rata to all shareholders of New Mirant with respect to New Mirant Common Stock) would be includible in income by a U.S. Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of New Mirant as determined under U.S. federal income tax principles. Under current law, individuals who are U.S. Holders should be taxed on such distributions made in taxable years beginning before December 31, 2008 at the lower rates applicable to long-term capital gains if such individuals satisfy certain holding period and risk requirements. The amount of any distribution of property other than cash would be the fair market value of such property on the date of distribution.

##### b.  Sale or Exchange of New Mirant Common Stock

A U.S. Holder generally will recognize gain or loss on the sale or exchange of New Mirant Common Stock equal to the difference between the amount realized on such sale or exchange and the U.S. Holder's adjusted tax basis in the New Mirant Common Stock. Any gain recognized by such holder upon a subsequent taxable disposition of New Mirant Common Stock received in satisfaction of an Allowed Claim pursuant to the Plan (or any stock or property received for it in a later tax-free exchange) will be treated as ordinary income to the extent of (i) any bad debt deductions (or additions to a bad debt reserve) claimed with respect

to its Claim and any ordinary loss deductions incurred upon satisfaction of its Claim; and (ii) with respect to a cash basis holder, any amount that would have been included in its gross income if the holder's claim had been satisfied in full but that was not included by reason of the cash method of accounting. In addition, as discussed below, a holder that receives its New Mirant Common Stock in exchange for a Claim that constitutes a Security in a tax-free reorganization may be required to treat all or a portion of any gain recognized as ordinary income under the market discount provisions of the Tax Code. See "U.S. Federal Income Tax Consequences of Ownership of Notes — U.S. Holders — Market Discount." To the extent that any gain recognized is not treated as ordinary income, then such gain would be capital gain. In the case of a noncorporate U.S. Holder, the maximum marginal U.S. federal income tax rate applicable to such gain will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income (other than certain dividends) if such U.S. Holder's holding period for such New Mirant Common Stock exceeds one year. Gain or loss, if any, recognized by a U.S. Holder generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

### 3. U.S. Federal Income Tax Consequences of Ownership of Notes

#### a. U.S. Holders

Qualified stated interest (as defined below) that is payable on a Note will be includible in a U.S. Holder's gross income as ordinary interest income in accordance with the U.S. Holder's usual method of tax accounting.

Upon the sale, exchange or retirement of a Note, a U.S. Holder will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and such U.S. Holder's adjusted tax basis in the Note. The character of any such gain or loss will depend upon whether consideration is received in satisfaction of accrued but unpaid interest, whether the Notes were issued with OID, and whether the market discount rules apply. The deductibility of capital losses is subject to limitations. Holders are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences of any sale, exchange, or retirement of a Note.

#### i. Original Issue Discount

If the Notes are issued with original issue discount ("OID"), the rules governing OID that are set forth in sections 1271 through 1275 of the Tax Code and in the Treasury Regulations thereunder (the "OID Regulations") may be applicable. A Note, other than a Note with a term of one year or less (a "Short-Term Note"), will be treated as issued with OID (an "OID Note") if the excess of the Note's "stated redemption price at maturity" over its issue price is more than a de minimis amount as defined under the OID Regulations. The stated redemption price at maturity of a Note is the total of all payments provided by the Note that are not payments of "qualified stated interest". A qualified stated interest payment generally is any one of a series of stated interest payments on a Note that is unconditionally payable at least annually at a single fixed rate (with certain exceptions for lower rates paid during some periods), applied to the outstanding nominal amount of the Note. Interest that is not qualified stated interest is OID. Solely for purposes of determining whether a Note has OID, the issuer of the Note will be deemed to exercise any call option that has the effect of decreasing the yield on the Note, and a U.S. Holder of such Note will be deemed to exercise any put option that has the effect of increasing the yield on such Note.

The "issue price" of the Notes will depend upon whether they are traded on an "established securities market" during the sixty-day period ending thirty days after the Effective Date, or whether a significant portion of the Allowed Claims that will be exchanged for such Notes is so traded. Pursuant to Treasury Regulations, an "established securities market" need not be a national securities exchange. It is sufficient that the Notes or Allowed Claims appear on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions, or that price quotations for such notes are readily available from brokers, dealers or traders.

It is anticipated that some Notes will be traded on an established securities market (and it is also believed that a significant portion of the Allowed Claims that will be exchanged for such Notes are so traded) and that

the "issue price" of such Notes will be their fair market value. If neither the Notes nor a significant portion of the Allowed Claims exchanged for such notes are traded on an established securities market, then the issue price of the Notes generally will be their stated principal amount if, as is also expected, the stated interest rate for such Notes is greater than the applicable federal rate in effect on the Effective Date, as provided by IRS administrative guidance.

U.S. Holders of OID Notes must include OID in income calculated using a constant-yield method before the receipt of cash attributable to the income, and generally will have to include in income increasingly greater amounts of OID over the life of the OID Notes. The amount of OID includable in income by a U.S. Holder of an OID Note is the sum of the daily portions of OID with respect to the OID Note for each day during the taxable year or portion of the taxable year on which the U.S. Holder holds the OID Note ("accrued OID"). The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The amount of OID allocable to an accrual period equals the excess of (a) the product of the OID Note's adjusted issue price at the beginning of the accrual period and the OID Note's yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (b) the sum of the payments of qualified stated interest on the OID Note allocable to the accrual period. The "adjusted issue price" of an OID Note at the beginning of any accrual period is the issue price of the OID Note increased by (I) the amount of accrued OID for each prior accrual period and decreased by (II) the amount of any payments previously made on the OID Note that were not qualified stated interest payments.

### ii. Acquisition and Bond Premium

If a holder of an Allowed Claim has a tax basis in Notes received in exchange for such Allowed Claim that exceeds the issue price of such Notes, but which is less than or equal to the stated redemption price at maturity of such Notes, then the holder has acquisition premium on the Notes. Generally, this acquisition premium will offset accrued OID over the life of the debt.

If a holder has a tax basis in any of the Notes received that exceeds the stated redemption price at maturity of such Notes, i.e., bond premium, then the holder will not include any of the OID in income. Moreover, a holder may elect to deduct any bond premium over the period from its acquisition of such Note to the maturity date of such Note as an offset of the qualified stated interest as provided in the Treasury Regulations under section 171 of the Tax Code. The holder's tax basis in its Note will be reduced by any bond premium deducted (or that offsets qualified stated interest). If such an election to amortize bond premium is not made, a holder will receive a tax benefit from the premium only in computing such holder's gain or loss upon the sale or other taxable disposition of the Note, or upon the full or partial payment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all Notes and other bonds the interest on which is includable in the holder's gross income that are held at, or acquired after, the beginning of the holder's taxable year as to which the election is made. The election may be revoked only with the consent of the IRS.

### iii. Market Discount

Market discount is defined generally as the excess, if any, of (A) the "stated redemption price at maturity" (as defined above) of a debt obligation (or, in the case of a debt obligation issued with OID, its "revised issue price"), over (B) the tax basis of the debt obligation in the hands of a holder immediately after its acquisition. A market discount bond is defined as any debt obligation having market discount.

Debt obligations in the hands of original holders generally are not market discount bonds. Moreover, under a de minimis exception, there is no market discount if the excess of the stated redemption price at maturity of a debt obligation (or its revised issue price in the case of a debt instrument issued with OID) over the holder's tax basis in the debt is less than 0.25 percent of the stated redemption price at maturity (or, if applicable, its revised issue price) multiplied by the number of complete years after the acquisition date to the obligation's date of maturity. Unless the holder elects otherwise, the accrued market discount for a market discount bond generally would be the amount calculated by multiplying the market discount for such bond by a fraction, the numerator of which is the number of days after the holder's acquisition of such obligation up to

and including its maturity date. Holders of Allowed Claims in whose possession such instruments are market discount bonds should be required to treat as ordinary income any gain recognized on the exchange of such instruments pursuant to the Plan to the extent of the market discount accrued during the holder's period of ownership, unless the holder has elected to include the market discount in income as it accrued. Any additional gain would be characterized as discussed under "U.S. Federal Income Tax Consequences of Receipt of Plan Consideration to Holders of Allowed Claims and Equity Interests — Certain Other Tax Considerations for Holders of Allowed Claims — Market Discount."

Any accrued market discount that is not treated as ordinary income upon an exchange in which gain or loss is not recognized in whole or in part would carry over to the nonrecognition property received in the exchange. Accordingly, any holder of an Allowed Claim that constitutes a Security would carry over any accrued market discount incurred in respect of such Allowed Claim to any New Mirant Common Stock or Security received for such Allowed Claim in a tax-free exchange pursuant to the Plan, such that any gain recognized by the holder upon a subsequent disposition of New Mirant Stock or Notes (including a repayment of principal) also would be treated as ordinary income to the extent of any such accrued market discount not previously included in income.

Any holder of an Allowed Claim that has a tax basis in any Notes received that is less than the issue price of such Notes generally will be subject to the market discount rules of the Tax Code (unless such difference is less than a de minimis amount). In addition, as discussed below, a holder which acquired its Allowed Claim at a market discount and that receives its Notes as part of a tax-free exchange may be required to carry over to such Notes and other Securities received by such holder any accrued market discount with respect to its Allowed Claim to the extent not previously included in income.

Under the market discount rules, a holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other disposition of, a Note as ordinary income to the extent of the market discount that has not previously been included in income and is treated as having accrued on such Note at the time of such payment or disposition. A holder could be required to defer the deduction of a portion of the interest expense on any indebtedness incurred or maintained to purchase or to carry a market discount note, unless an election is made to include all market discount in income as it accrues. Such an election would apply to all notes and other bonds acquired by the holder on or after the first day of the first taxable year to which such election applies, and may not be revoked without the consent of the IRS.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Notes to the maturity date of the notes, unless the holder irrevocably elects to compute the accrual on a constant yield basis. This election can be made on a note-by-note basis.

### b. Non-U.S. Holders

Subject to the discussion under "Certain U.S. Federal Income Tax Consequences — Backup Withholding Tax and Information Reporting", payments of principal of, and interest on, any Note to a Non-U.S. Holder other than: (i) a controlled foreign corporation, as such term is defined in the Tax Code, which is related to New Mirant through stock ownership; (ii) a person owning, actually or constructively, Securities representing at least 10 percent of the total combined outstanding voting power of all classes of voting stock of New Mirant; and (iii) banks which acquire such Note in consideration of an extension of credit made pursuant to a loan agreement entered into in the ordinary course of business, will not be subject to any U.S. withholding tax provided that the beneficial owner of the Note provides certification completed in compliance with applicable statutory and regulatory requirements, which requirements are discussed below under "Certain U.S. Federal Income Tax Consequences — Backup Withholding Tax and Information Reporting", or if an exemption is otherwise established.

Subject to the discussion below under "Certain U.S. Federal Income Tax Consequences — Backup Withholding Tax and Information Reporting", any gain realized by a Non-U.S. Holder upon the sale, exchange or retirement of a Note generally will not be subject to U.S. federal income tax, unless: (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States, or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the United

States for 183 days or more in the taxable year of such sale, exchange or retirement and certain other conditions are met.

### 4. U.S. Federal Income Tax Consequences of Ownership of New Mirant Warrants

#### a. Sale or Exchange

The sale or exchange of a New Mirant Warrant will result in the recognition of gain or loss to a U.S. Holder in an amount equal to the difference between the amount realized and such holder's adjusted tax basis in such New Mirant Warrant. Such gain or loss will be capital gain or loss. In the case of a noncorporate U.S. Holder, generally the maximum U.S. federal income tax rate applicable to such gain will be lower than the maximum U.S. federal income tax rate applicable to ordinary income if the New Mirant Warrants that are being sold or exchanged have been held for more than one year at the time of such sale or exchange. Any gain or loss recognized by a U.S. Holder generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of any capital losses is subject to limitations.

Subject to the discussion under "Certain U.S. Federal Income Tax Consequences — Backup Withholding Tax and Information Reporting Requirements", any gain realized by a Non-U.S. Holder upon the sale or exchange of New Mirant Warrants generally will not be subject to U.S. federal income or withholding tax, unless (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States, or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the U.S. for 183 days or more in the taxable year of such sale or exchange and some other conditions are met.

#### b. Adjustments

Under section 305 of the Tax Code, certain actual or constructive distributions of stock may be taxable to a holder of a New Mirant Warrant. Adjustments or the failure to make adjustments in the exercise price of the New Mirant Warrants or in the number of New Mirant Common Stock shares purchasable upon exercise of the New Mirant Warrants, in each case made pursuant to the antidilution provisions of the warrants, may result in a constructive distribution if and to the extent there is an increase in the proportionate interest of a holder of a New Mirant Warrant in the fully diluted New Mirant Common Stock, whether or not the New Mirant Warrant is exercised. Such a distribution may be taxable as a dividend under the Tax Code to the U.S. Holders of the New Mirant Warrants.

#### c. Exercise

No gain or loss will be recognized by a holder of New Mirant Warrants on such holder's purchase of New Mirant Common Stock for cash upon exercise of the New Mirant Warrants. The initial tax basis of the New Mirant Common Stock so acquired would be equal to the adjusted tax basis of the exercised New Mirant Warrants plus the exercise price. For U.S. federal income tax purposes, the holding period of the New Mirant Common Stock acquired upon the exercise of the New Mirant Warrants will begin on the date of exercise.

#### d. Lapse

If the New Mirant Warrants are not exercised and expire, the New Mirant Warrants will be deemed to have been sold or exchanged on the expiration date resulting in a loss equal to the holder's adjusted tax basis in the New Mirant Warrants. Any loss to a U.S. Holder of New Mirant Warrants will be a capital loss, and the classification of the loss as long-term or short-term will depend upon the date the New Mirant Warrants were acquired and the length of time the New Mirant Warrants were held. The deductibility of any capital losses is subject to limitations.

### E. Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain noncorporate holders of New Mirant Common Stock, Notes, New Mirant Warrants or Allowed Claims. Information reporting generally will apply to payments under the Plan and to payments of dividends on, interest on, and proceeds from the sale or redemption of, New Mirant Common Stock, Notes, or New Mirant Warrants made within the United States to a holder of New Mirant Common Stock, a holder of

Notes, a holder of New Mirant Warrants or a holder of an Allowed Claim, other than an exempt recipient or a payee that is not a United States person that provides an appropriate certification or certain other persons. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of, New Mirant Common Stock, Notes or New Mirant Warrants within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is 28 percent for years 2003 through 2010.

In the case of such payments made within the United States to a foreign simple trust, a foreign grantor trust or a foreign partnership, other than payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that qualifies as a "withholding foreign trust" or a "withholding foreign partnership" within the meaning of certain Treasury Regulations, and payments to a foreign simple trust, a foreign grantor trust or a foreign partnership that are effectively connected with the conduct of a trade or business in the United States, the beneficiaries of the foreign simple trust, the persons treated as the owners of the foreign grantor trust or the partners of the foreign partnership, as the case may be, will be required to provide the certification discussed above in order to establish an exemption from backup withholding tax and information reporting requirements. Moreover, a payor may rely on a certification provided by a payee that is not a United States person only if such payor does not have actual knowledge or a reason to know that any information or certification stated in such certificate is incorrect.

**THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.**

## XVI.

## CERTAIN SECURITIES LAW MATTERS

### A.  Issuance of New Debtor Securities

Section 1145 of the Bankruptcy Code exempts the original issuance of securities under a plan of reorganization from registration under section 5 the Securities Act and state law. Under section 1145(a)(1) of the Bankruptcy Code, the issuance of the New Mirant Common Stock, the New MAG Holdco Notes and the New Mirant Warrants pursuant to the Plan is exempt from registration if three principal requirements are satisfied: (1) the securities must be issued by a debtor, its successor, or an affiliate participating in a joint plan with a debtor, under a plan of reorganization; (2) the recipients of the securities must hold a claim against a debtor or such affiliate, an interest in a debtor or such affiliate, or a claim for an administrative expense against a debtor or such affiliates; and (3) the securities must be issued entirely in exchange for the recipient's claim against or interest in a debtor or such affiliate, or principally in such exchange and partly for cash or property. Similarly, under section 1145(a)(2) of the Bankruptcy Code, the issuance of New Mirant Common Stock upon the exercise of the New Mirant Warrants is exempt from registration assuming that the issuance of the New Mirant Warrants satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code. The New Mirant Common Stock, the New Mirant Warrants (and the New Mirant Common Stock issuable upon the exercise of the New Mirant Warrants) and the New MAG Holdco Notes are collectively referred to herein as the "New Debtor Securities." The Debtors believe that the issuance of the New Debtor Securities under the Plan satisfies the requirements of sections 1145(a)(1) and (2) of the Bankruptcy Code and is, therefore, exempt from registration under the Securities Act and state securities laws.

### B.  FERC Approval

In submitting an application to FERC pursuant to section 203 of the Federal Power Act concerning the proposed internal restructuring contemplated in the Plan, the Debtors stated that such internal restructuring, will not, as of the Effective Date, result in any entity owning more than 5% of the equity interest in, or

otherwise having a controlling interest in, New Mirant and/or Mirant (or in MAEM, if MAEM is held by the Plan Trust and therefore is not a subsidiary of Mirant or New Mirant as of the Effective Date) without prior FERC approval if and as required under section 203 of the Federal Power Act. The Debtors further stated that any acquisition of ownership or other controlling interests in New Mirant and/or Mirant (or MAEM, as applicable) following FERC's approval of the internal restructuring contemplated in the Plan would be brought before FERC if and as required under section 203 of the Federal Power Act. FERC precedent under section 203 of the Federal Power Act suggests that acquisition of 5% or more of the voting stock of a FERC-jurisdictional public utility, or a holding company that directly or indirectly owns or controls a FERC-jurisdictional public utility, may require FERC approval under section 203 of the Federal Power Act. Accordingly, any entity that will receive 5% or more of the voting stock in New Mirant and/or Mirant upon confirmation of the Plan may need to obtain approval under section 203 of the Federal Power Act before receiving such stock.

### C. Subsequent Transfers of New Debtor Securities

Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to section 1145(a)(1) of the Bankruptcy Code is deemed to be a public offering. Therefore, none of the New Debtor Securities to be issued under the Plan will, if offered and sold in accordance with section 1145(a)(1) of the Bankruptcy Code, be deemed to be "restricted securities" as defined in the Securities Act and resales of and subsequent transactions in the New Debtor Securities will be exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

1. persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest;

2. persons who offer to sell securities offered under a plan for the holders of such securities;

3. persons who offer to buy such securities from holders of such securities, if the offer to buy is: (A) with a view to distributing such securities; and (B) made under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; and

4. persons who are "issuers" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

To the extent that persons who receive New Debtor Securities pursuant to the Plan are deemed to be "underwriters," resales by such persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to resell such New Debtor Securities without registration pursuant to the provisions of Rule 144 under the Securities Act (other than the holding period requirement provided in Rule 144(d)), subject to compliance with these rules. These rules permit the resale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met. In addition, any person who is an "underwriter" but not an "issuer" with respect to the New Debtor Securities is, however, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Debtor Securities to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving New Debtor Securities under the Plan would be an "underwriter" with respect to such New Debtor Securities.

GIVEN THE COMPLEX AND SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN NEW DEBTOR SECURITIES. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF NEW DEBTOR SECURITIES CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE NEW DEBTOR SECURITIES WITHOUT COMPLIANCE WITH THE SECURITIES ACT OR SIMILAR STATE AND FEDERAL LAWS. THE DEBTORS HAVE NOT UNDERTAKEN, AND DO NOT INTEND, TO FILE A REGISTRATION STATEMENT IN RESPECT OF ANY NEW DEBTOR SECURITIES HELD BY A HOLDER THAT IS AN UNDERWRITER.

### D.    Antitrust Requirements

The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), requires parties to certain acquisitions of assets and/or voting securities to file notification with the Federal Trade Commission (the "FTC") and the Antitrust Division of the U.S. Department of Justice (the "DOJ"), and to observe certain statutory waiting periods. Persons who will hold as a result of an acquisition in excess of $53.1 million of New Mirant Common Stock (as valued in accordance with the HSR Act) may be required to file a Notification and Report Form with the FTC and the DOJ, observe a statutory waiting period, and pay the requisite filing fee, provided certain jurisdictional thresholds are satisfied. Persons filing the Notification and Report Form are required to provide, among other information, a description of the transaction, certain financial statements of the person filing notification, a classification by North American Industry Classification System Code of the revenues the person filing notification derived from U.S. operations, detail on the person filing notification's corporate structure, including significant minority holdings and, where applicable, certain filings made by the person filing notification with the Securities and Exchange Commission. Both the HSR Act and its implementing regulations contain exemptions from the application of the HSR Act. Persons acquiring New Mirant Common Stock should consult with independent legal counsel to determine whether they may be subject to the HSR Act.

### XVII.

### ALTERNATIVES TO CONFIRMATION AND
### CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of Claims and Equity Interests. The following discussion provides a summary of the analysis of the Debtors supporting their conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

### A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. As set forth in the liquidation analysis in Exhibit "C," the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

### B.    Alternative Plans of Reorganization

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the business of the Debtors, the sale of the Debtors as a going concern or an orderly liquidation of the properties

and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in greater recoveries as compared with recoveries under a chapter 7 liquidation. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

## XVIII.

### <u>CONCLUSION</u>

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying the Disclosure Statement.

Respectfully submitted,

**Mirant Corporation**

By: _____ /s/ _____

    Name:  M. Michele Burns
    Title:  Executive Vice President, Chief Financial
           Officer and Chief Restructuring Officer

**Mirant Americas Energy Capital, LP**

**By: Mirant Americas Development, Inc., its general partner**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:  Sr. Vice President

**Mirant Americas Energy Capital Assets, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:  Sr. Vice President

**Mirant Wrightsville Investments, Inc.**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:  Sr. Vice President

**Mirant Wrightsville Management, Inc.**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Wrightsville Power Facility, L.L.C.**

**By: Mirant Wrightsville Management, Inc., its member and sole manager**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Wrightsville Development Funding, L.L.C.**

**By: Mirant Wrightsville Management, Inc., its member and sole manager**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant EcoElectrica Investments I, Ltd.**

**By: Mirant Caribbean, Inc., its sole member**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

247

**Puerto Rico Power Investments, Ltd.**

**By: Mirant Caribbean, Inc., its member**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Vice President

**By: Mirant South America and Caribbean Finance, Ltd., its member**

By: _____ /s/ _____

    Name:  Pedro Cherry
    Title:    Vice President

**Mirant Sugar Creek, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Portage County, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Zeeland, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Wyandotte, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Peaker, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Gastonia, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Mid-Atlantic Services, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant New England, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Potomac River, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Michigan Investments, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Sugar Creek Ventures, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Texas Investments, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Vice President

**Mirant Las Vegas, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Dickerson Development, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Wichita Falls, LP**

**By: Mirant Wichita Falls Management, Inc., its general partner**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Wichita Falls Management, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Wichita Falls Investments, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Vice President

**Shady Hills Power Company, L.L.C.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

251

**West Georgia Generating Company, L.L.C.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Special Procurement, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Parker, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant MD Ash Management, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Fund 2001, LLC**

**By: Mirant Capital Management, LLC, its manager**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Services, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant NY-Gen, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Texas Management, Inc.**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Lovett, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Piney Point, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Sugar Creek Holdings, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Texas, LP**

**By: Mirant Texas Management, Inc., its general
    partner**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Kendall, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Intellectual Asset Management and
Marketing, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Potrero, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

254

**Mirant New York, Inc.**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Retail Energy Marketing, LP**

**By: Mirant Americas Development, Inc., its general
partner**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President and Chief Financial
           Officer

**Mirant Americas Gas Marketing VIII, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing IX, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing X, LLC**

By: _____ /s/ _____
    Name:  J. William Holden III
    Title:   Sr. Vice President

255

**Mirant Americas Gas Marketing VI, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing V, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing VII, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing III, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Gas Marketing XI, LLC**

By: _____/s/_____

    Name:  J. William Holden III
    Title:   Sr. Vice President

256

**Mirant Americas Gas Marketing I, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Energy Marketing, LP**

**By:   Mirant Americas Development, Inc., its general
     partner**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Development Capital, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**MLW Development, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Production Company**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:   Sr. Vice President

**Mirant Americas Development, Inc.**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President and Chief Financial
            Officer

**Mirant Americas Energy Marketing Investments, Inc.**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Americas, Inc.**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President and Chief Financial
            Officer

**Mirant Americas Gas Marketing II, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President

**Mirant Chalk Point, LLC**

By: _____ /s/ _____

    Name:  J. William Holden III
    Title:    Sr. Vice President