## WEST GEORGIA

## CASH FLOW STATEMENT

($ in millions)

| | Jul-Dec 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | | |
| Net Income | $ 6.7 | $ 4.2 | $ 12.2 | $ 14.0 | $ 14.9 | $ 16.0 | $ 16.9 |
| Adjustments to reconcile net (loss) income to net cash | | | | | | | |
| Equity in Income from Affiliates | — | — | — | — | — | — | — |
| Dividends received from Equity investments | — | — | — | — | — | — | — |
| Impairment Losses and Restructuring Charges | — | — | — | — | — | — | — |
| Gain on sales of assets and investments | — | — | — | — | — | — | — |
| Depreciation & Amortization | 3.7 | 7.5 | 7.5 | 7.5 | 7.7 | 7.9 | 8.1 |
| Non-Cash Charges for Reorganization items | — | — | — | — | — | — | — |
| Price Risk Management Activities, Net | — | — | — | — | — | — | — |
| Obligations Under Energy Delivery, (Net) | — | — | — | — | — | — | — |
| Deferred Taxes | — | — | — | — | — | — | — |
| Other, (Net) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Changes in Operating Assets & Liabilities | | | | | | | |
| Receivables, Net | 4.8 | (0.3) | (5.7) | (0.6) | 1.1 | (0.1) | (0.1) |
| Other Current Assets | 13.9 | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) | (0.0) |
| Accounts Payables and Accrued Liabilities | (1.2) | (0.6) | 14.1 | 6.6 | 3.5 | 0.0 | 0.0 |
| Taxes Accrued | (0.6) | (0.0) | 0.0 | 0.0 | (0.0) | (0.0) | (0.0) |
| Other Liabilities | — | — | — | — | — | — | — |
| **Net Cash (Used in) Provided by Operating Activities** | $ 27.3 | $ 10.8 | $ 28.0 | $ 27.4 | $ 27.2 | $ 23.8 | $ 24.9 |
| **Cash Flows from Investing Activities** | | | | | | | |
| Capital Expenditures | $ (0.5) | $ (1.0) | $ (1.1) | $ (4.0) | $ (3.0) | $ (3.5) | $ (1.4) |
| Repayments on Notes Receivable | — | — | — | — | — | — | — |
| Proceeds from the Sale of Assets | — | — | — | — | — | — | — |
| Proceeds from the Sale of Minority-owned Investments | — | — | — | — | — | — | — |
| Other Investing | — | — | — | 0.0 | — | (0.0) | — |
| **Net Cash (Used in) Provided by Investing Activities** | $ (0.5) | $ (1.0) | $ (1.1) | $ (4.0) | $ (3.0) | $ (3.5) | $ (1.4) |
| **Cash Flows from Financing Activities** | | | | | | | |
| Iss. of Stock | — | — | — | — | — | — | — |
| Capital Contribution | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Capital Contribution from Minority Interest | — | — | — | — | — | — | — |
| Payment of Dividends | (26.4) | (0.1) | (17.0) | (13.4) | (14.2) | (10.3) | (13.5) |
| Payment of Dividends to Minority Interest | — | — | — | — | — | — | — |
| Issuance of Short Term Debt, Net | — | — | — | — | — | — | — |
| Proceeds from Issuance of Long-term Debt | — | — | — | — | — | — | — |
| Proceeds from Issuance of Preferred Securities | — | — | — | — | — | — | — |
| Repayment of Long-term Debt | — | (10.0) | (10.0) | (10.0) | (10.0) | (10.0) | (10.0) |
| Change in Debt Service Reserve Fund | — | — | — | — | — | — | — |
| Other Financing | — | — | — | — | — | — | — |
| CapEx Credit Support from Mirant Corp | — | — | — | — | — | — | — |
| Other Credit Support from Mirant Corp | — | — | — | — | — | — | — |
| **Net Cash (Used in) Provided by Financing Activities** | $(26.4) | $(10.1) | $(27.0) | $(23.4) | $(24.2) | $(20.3) | $(23.5) |
| **Net Inc./(Dec.) in Cash and Cash Equivalents** | $ 0.4 | $ (0.4) | $ — | $ — | $ — | $ — | $ — |
| Cash and Cash Equivalents, Beginning of Period | (0.0) | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Cash and Cash Equivalents, End of Period | $ 0.4 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 | $ 0.0 |

15

(This page intentionally left blank)

**EXHIBIT E**

**VIEW OF PEPCO AND SMECO OF HOW CERTAIN
PARTS OF THE DISCLOSURE STATEMENT SHOULD READ**

(This page intentionally left blank)

**FOR SETTLEMENT PURPOSES ONLY
NOT ADMISSIBLE IN ANY PROCEEDING PURSUANT
TO FEDERAL RULE OF EVIDENCE ("FRE") 408**

Below are language changes requested by Pepco and SMECO to specific parts of the Second Amended Disclosure Statement Relating to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization (the "Second Amended Disclosure Statement"), dated September 22, 2005, which describes and relates to the Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors (the "Second Amended Plan"), dated September 22, 2005. The Debtors disagree with the view of Pepco and SMECO described herein.

a.  **Changes to Glossary of Defined Terms**

Certain of the defined terms in the glossary should be amended as follows:

4. "APSA" means the Asset Purchase and Sale Agreement, dated June 7, 2000, by and between Mirant and Pepco, together with its attachments, schedules, exhibits, ancillary agreements and other documents executed in connection therewith or as a result thereof, all of which as amended, modified and/or assigned, unless any such components are determined by a Final Order to be severable.

6. "Assumption/Assignment Agreement" means the Assignment and Assumption Agreement dated December 19, 2000, between Pepco and Mirant Americas Energy Marketing, LP, Mirant Mid-Atlantic, LLC, Mirant Potomac River, LLC, Mirant Peaker, LLC, Mirant Chalk Point, LLC, Mirant D.C. O&M, LLC, Mirant Piney Point, LLC, Mirant MD Ash Management, LLC, and Mirant Mid-Atlantic Services, LLC, which is an Ancillary Agreement under the APSA.

8. "Back-to-Back Agreement" means Debtors' back-to-back obligations under Section 2.4 and Schedule 2.4 of the APSA, unless determined by a Final Order to be severable from the APSA.

137. "Mirant Potomac" means Mirant Potomac River LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

180. "Pepco Causes of Action" means the action initiated by the Debtors by filing a complaint styled *Mirant Corporation et al. v. Potomac Electric Power Company,* Adv. No. 05-04138, and any other Causes of Action the Debtors may file against Pepco for recharacterization or disgorgement arising from or relating to the APSA, including the Back-to-Back Agreement.

b.  **Changes to the Section entitled "General Information — The Businesses of Mirant — The North American Business"**

The second and third paragraphs under the heading "i. Mid-Atlantic Region" should be amended to read as follows:

Power generated by Mirant's facilities in the Mid-Atlantic region is sold into the PJM Interconnection, L.L.C. ("PJM") market. In connection with the acquisition of the Mid-Atlantic facilities from Pepco under the APSA in 2000, Mirant, through MAEM, agreed to supply Pepco its full load requirement in the District of Columbia under a TPA, which expired in January 2005 (the "DC TPA"). MAEM also had a similar TPA in place to supply Pepco's load in Maryland, which expired in June 2004 (the "Maryland TPA"). On October 29, 2003, the Debtors filed a motion with the Bankruptcy Court for approval of a settlement (the "Pepco TPA Settlement") between the Debtors and Pepco regarding the TPAs. Under the Pepco TPA Settlement, the per megawatt hour ("MWh") prices for power delivered under the TPAs were increased by $6.40 and the TPAs were assumed by the Debtors. In addition, under the Pepco TPA Settlement, Pepco has an Allowed Claim, not subject to any offset or reduction for any reason, against Mirant and MAEM in the amount of $105 million. On November 19, 2003, the Bankruptcy Court approved the Pepco TPA Settlement and the assumption of the TPAs. See "Material Claims, Litigation and Investigations — Disputed Claims With Associated Estate Causes of Action – Pepco Litigation — Pepco TPA Settlement."

Also, as part of the Debtors' acquisition of the Mid-Atlantic facilities from Pepco under the APSA in 2000, the Debtors agreed to purchase from Pepco all power it received under long-term power purchase agreements ("PPAs") with, among other parties, Ohio Edison Company ("Ohio Edison") and Panda-Brandywine L.P. ("Panda"), which expire in 2005 and 2021, respectively. Since Pepco was not able to assign the PPAs to the Debtors at closing on the APSA transaction, the Debtors and Pepco effected a back-to-back arrangement under the APSA (known as the Back-to-Back Agreement) with respect to the PPAs, in accordance with certain terms of the APSA. Under the Back-to-Back Agreement, the Debtors are obligated to purchase from Pepco energy and capacity sold to Pepco under the terms of the PPAs, and the Debtors are obligated to pay Pepco for that energy and capacity under the terms of the PPAs. In practice, the parties have arranged for the energy sold to Pepco under the PPAs to be offered into the PJM daily market, at prices determined by the Debtors and under the scheduling direction of the Debtors. The market value of the energy is then credited to a Pepco account by PJM. The capacity of the PPAs is transferred from a Pepco PJM account to a Mirant PJM account. The Debtors have control of the capacity and determine how it will be sold in the PJM market. The prices under the Ohio Edison and Panda PPAs are higher than existing market prices. On August 28, 2003, the Debtors filed a motion to reject the Back-to-Back Agreement. On December 9, 2004, the Debtors' motion was denied by the United States District Court for the Northern District of Texas (the "District Court"). On January 21, 2005, the Debtors filed a second motion to reject the Back-to-Back Agreement. The District Court has stayed the second motion to reject. For more details, see "Material Claims, Litigation and Investigations — Disputed Claims With Associated Estate Causes of Action — Pepco Litigation."

c. **Changes to the Section entitled "General Information — History of Mirant Corporation and Events Precipitating the Chapter 11 Cases — Formation, Initial Public Offering and Spin-Off"**

The first paragraph under the heading "1. Formation, Initial Public Offering and Spin-Off" should be amended to read as follows:

Mirant was incorporated in Delaware on April 20, 1993 as SEI Holdings, Inc. From the date of its incorporation until September 27, 2000, Mirant was a wholly-owned subsidiary of Southern. Mirant was later spun-off from Southern as an independent, publicly traded company. This transition was accomplished in two steps. First, Mirant issued approximately 20% of its stock to the public in an initial public offering on October 3, 2000 (the "IPO"). Second, Southern "spun off" the remaining 80% of Mirant's stock as a tax-free stock dividend to its shareholders on April 2, 2001 (the "Spin-Off"). At the same time that preparations were underway for the IPO and Spin-Off, Mirant was also in the process of negotiating (and implementing) a transaction with Pepco, involving a $2.65 billion asset acquisition from Pepco. Until its delisting in July 2003, the common stock of Mirant was listed and traded on the New York Stock Exchange.

d. **Changes to the Section entitled "Certain Affiliate Transactions — Material Intercompany Transactions and Relationships Among the Debtors — Intercompany Relationships Involving MAEM"**

The paragraph after the heading "(b) Makewhole Agreement" should be amended to read as follows:

In December 2000, contemporaneously with its purchase of assets from Pepco, Mirant assigned to MAEM its Back-to-Back Agreement obligations under the APSA and the TPAs pursuant to the terms of a PPA and TPA Assignment and Assumption Agreement, dated December 18, 2000 (the "Mirant Assumption Agreement"). Pursuant to the Mirant Assumption Agreement, and in consideration of MAEM's assumption of the liabilities under the TPAs and the Back-to-Back Agreement obligations under the APSA, Mirant agreed to reimburse MAEM for the difference between (i) market value of energy used to meet the TPA/PPA obligations and (ii) amounts actually received by MAEM (the "Makewhole Obligation"). Subsequently, MAI assumed the obligation to pay MAEM the Makewhole Obligation pursuant to the terms of an Assignment and Assumption Agreement, dated September 1, 2001 (the "MAI Assumption Agreement") between Mirant and MAI and a Makewhole and Reimbursement Agreement, dated September 1, 2001 (the "Makewhole Agreement") between MAEM and MAI. Under the terms of these agreements, MAI agreed to assume liability for the Makewhole Obligations and

2

reimburse MAEM for its losses incurred under the TPAs and the Back-to-Back Agreement under the APSA.

These documents indicate no express consideration that was transferred to MAI in return for assuming the Makewhole Obligation. The Makewhole Agreement is analogous to a guaranty by MAI of MAEM's obligations under the TPAs and the Back-to-Back Agreement under the APSA, and, as such, the Makewhole Agreement may be compared to a downstream guaranty by MAI of MAEM's obligations because MAEM is a direct, wholly-owned subsidiary of MAI. If MAEM was solvent as of September 1, 2001, it may well be that MAI received sufficient consideration (or reasonably equivalent value) in return for incurring the Makewhole Obligation to the extent MAI gained the benefit of the increase in value of MAEM as a result of MAI's assumption of the Makewhole Obligation. The Debtors, however, have not performed any solvency analysis of either MAI or MAEM in connection with the MAI Assumption Agreement.

e. **Changes to the Section entitled "Certain Affiliate Transactions — Material Intercompany Transactions and Relationships Among the Debtors — Purchase of Mid-Atlantic Generation Assets"**

The first paragraph after the heading "8. Purchase of Mid-Atlantic Generation Assets" should be amended to read as follows:

Pursuant to the APSA, in December 2000, Mirant purchased Pepco's generation facilities in Maryland and Virginia for $2.65 billion in cash. Prior to closing on the APSA transaction, Mirant decided that it wanted to create various special purpose entities that would own individual generating assets. It is Pepco's position that Pepco agreed to this change with the understanding that those various entities would execute an agreement with Pepco that would provide that each entity is jointly and severally liable for all APSA obligations. Thus, on December 11, 2000, Mirant and certain of the Debtors executed an Assignment and Assumption Agreement, relating to the generating assets for the Dickerson, Morgantown, Potomac River and Chalk Point plants, and, on December 18, 2000, Mirant and MAEM executed the PPA and TPA Assignment and Assumption Agreement. At closing on December 19, 2000, Pepco and certain of the Debtors (but not Mirant) executed an Assignment and Assumption Agreement (the "AAA"). As discussed in greater detail below ("Material Claims, Litigation and Investigations — Disputed Claims With Associated Estate Causes of Action — Pepco Litigation"), the Debtors and Pepco disagree as to the legal effect of the AAA. Pepco believes that the AAA created joint and several liability among the Debtor-signatories to the AAA for all liabilities and obligations defined in the APSA as "Assumed Obligations."

f. **Changes to the Section entitled "Financial Projections and Assumptions — Summary of Significant Assumptions — North America"**

The paragraph after the heading "d. Back-to-Back Agreement" should be amended to read as follows:

The Projections assume that the APSA (including the Back-to-Back Agreement) is either rejected, recharacterized or avoided as of the Petition Date. Therefore, the Projections do not include any future payments under the APSA (including the Back-to-Back Agreement). Furthermore, the Projections assume that postpetition payments made under the APSA (including the Back-to-Back Agreement) form the basis of a claim against Pepco and consequently are included as a receivable on the balance sheet of New Mirant. As a result of recent decisions in the United States District Court for the Northern District of Texas, it is possible that neither New Mirant nor any of its subsidiaries will be able to reject, recharacterize or avoid the obligations under the APSA (including the Back-to-Back Agreement) and therefore will remain liable under the APSA (including the Back-to-Back Agreement). Similarly, it is possible that neither New Mirant nor any of its subsidiaries will be able to recover any postpetition payments made to Pepco under the APSA (including the Back-to-Back Agreement). As a result, the "Subsequently Identified Variances to Projected Gross Margins" set forth below reflect the resulting negative impact on cash from operations.

g.  **Changes to the Section entitled "Financial Projections and Assumptions — Subsequently Identified Variances to Projected Gross Margins"**

The section titled "D. Subsequently Identified Variances to Projected Gross Margins" should be amended to read as follows:

> As discussed above under "Summary of Significant Assumptions," the Debtors have identified a number of items that have caused them to revise their short-term cash gross margin projections, including updating their commodity forward market prices to utilize June 30, 2005 forward market prices, taking into account the tolling agreement for Contra Costa Unit 6 and Pittsburg Unit 7, reflecting the continuation of payments associated with the APSA (including the Back-to-Back Agreement) and reflecting the construction delay related to the new capacity in Jamaica.

h.  **Changes to the Section entitled "Financial Projections and Assumptions — Temporary Shut Down of Potomac River Station; Outage at Morgantown Station"**

The first four paragraphs of the section titled "E. Temporary Shut Down of Potomac River Station; Outage at Morgantown Station" should be amended to read as follows:

> Pursuant to an agreement between Mirant Potomac and the Virginia Department of Environmental Quality ("Virginia DEQ"), the parties commissioned an environmental computer modeling study of air quality in the vicinity of the Potomac River generating facility. The modeling study completed on August 19, 2005 showed that emissions from the Potomac River facility have the potential to contribute to localized, modeled instances of exceedances of some of the EPA Clean Air Act mandated national ambient air quality standards ("NAAQS") under certain conditions. As an immediate response, the Debtors submitted the study to the Virginia DEQ and, on August 21, 2005, voluntarily reduced output of all five units at the Potomac River facility to their lowest feasible levels. On August 24, 2005, Mirant Potomac completely shut down operations at the facility on a temporary basis. On August 24, 2005, the District of Columbia Public Service Commission filed a petition and complaint under sections 202(c), 207 and 309 of the Federal Power Act requesting that either FERC or DOE order the plant to remain in service. Such proceeding is pending. The Debtors plan to bring the facility back on line as soon as Mirant Potomac can satisfy the requirements of the Virginia DEQ with respect to NAAQS, unless the facility is ordered to return to operation sooner to support electric system reliability by the appropriate federal authority with the ability to order its operation.

> Following the shut down of the Potomac River facility, Mirant Potomac notified Pepco of an alleged occurrence of a "Force Majeure" event under the Local Area Support Agreement dated December 19, 2000 with Pepco (the "LASA"), which is a part of the APSA. By letter dated September 13, 2005, Pepco notified the Debtors of an alleged default under the APSA (including the LASA) as a result of the shut down of the Potomac River facility while acknowledging that to enforce its claims, it must either bring the claims in the Bankruptcy Court, the appropriate United States District Court, or obtain relief from the automatic stay under section 362(a) of the Bankruptcy Code. By letter dated September 23, 2005, the Debtors disputed the alleged default and alleged that Pepco's letter violated the automatic stay.

> Beginning on September 21, 2005, Mirant Potomac commenced partial operation of one unit of the Potomac River facility. Mirant Potomac will operate the unit approximately 16 hours a day, including approximately eight hours at maximum load (88MW) and approximately eight hours at minimum load (35 MW), as the Debtors reported to Virginia DEQ on September 20, 2005. Dispersion modeling conducted by the Debtors demonstrates no modeled exceedances of NAAQS under these operating conditions. The Debtors' engineers and plant technicians have been working to develop a longer-term solution that would allow the plant to return to normal operation as soon as possible.

> The Projections and "— Subsequently Identified Variances to Projected Gross Margins" do not reflect the impact of the shut down of the Potomac River generating facility. The Debtors project that a temporary shut down could have an unfavorable impact on gross margins of approximately $20,000,000 in 2005 and $85,000,000 in 2006, measured against projected gross margins as shown under "Subsequently

Identified Variances to Projected Gross Margins." If the shutdown continues after such time, the Debtors believe that its impact on EBITDA less capital expenditures is the more relevant measure and project that these amounts would be negatively impacted by a range of $41,800,000 to $57,800,000 per year over the remainder of the Projection Period. The Projections do not reflect any payments that the Debtors could be required to make under the APSA (including the LASA) for the cost of transmission upgrades as a result of the shutdown of the Potomac River generating facility.

**i. Changes to the Section entitled "Material Claims, Litigation and Investigations — Detailed Description of Material Claims — Environmental Liabilities"**

The subsection titled "d. Consent Decree Regarding Downwash Modeling" should be amended to include the following as a second paragraph under this heading:

On September 23, 2004, the Virginia DEQ and Mirant Potomac entered into an order by consent with respect to the Potomac River plant under which Mirant Potomac agreed to perform a modeling analysis to assess the effect of "downwash" from the plant: (i) on ambient concentrations of $SO_2$, $NO_2$, carbon monoxide ("CO"), and particulate matter less than or equal to 10 micrometers ("PM10") for comparison to the applicable NAAQS, and (ii) on ambient concentrations of mercury for comparison to Virginia Standards of Performance for Toxic Pollutants. Downwash is the effect that occurs when aerodynamic turbulence induced by nearby structures causes pollutants from an elevated source, such as a smokestack, to be mixed rapidly toward the ground resulting in higher ground level concentrations of pollutants. If the modeling analysis indicates that emissions from the facility may cause exceedances of the NAAQS for $SO_2$, $NO_2$, CO or PM10, or exceedances of mercury compared to Virginia Standards of Performance for Toxic Pollutants, the consent order requires Mirant Potomac to submit to the Virginia DEQ a plan and schedule to eliminate and prevent such exceedances on a timely basis. Upon approval by the Virginia DEQ of the plan and schedule, the approved plan and schedule are to be incorporated by reference into the consent order. The results of the computer modeling analysis completed on August 19, 2005 showed that emissions from the Potomac River plant have the potential to contribute to localized, modeled instances of exceedances of the NAAQS for $SO_2$, $NO_2$, and PM10 under certain conditions. As an immediate response, the Debtors submitted the study to the Virginia DEQ and, on August 21, 2005, voluntarily reduced output of all five units at the Potomac River facility to their lowest feasible levels. On August 24, 2005, Mirant Potomac completely shut down operations at the facility on a temporary basis. On August 24, 2005, the District of Columbia Public Service Commission filed a petition and complaint under sections 202(c), 207 and 309 of the Federal Power Act requesting that either FERC or DOE order the plant to remain in service. Such proceeding is pending. The Debtors plan to bring the facility back on line as soon as Mirant Potomac can satisfy the requirements of the Virginia DEQ with respect to NAAQS, unless the facility is ordered to return to operation sooner to support electric system reliability by the appropriate federal authority with the ability to order its operation.

On September 21, 2005, Mirant Potomac commenced partial operation of one unit of the Potomac River facility. The financial and operational implications of the discontinued operation of the Potomac River plant or any such modifications are not known at this time. See "Financial Projections and Assumptions — Temporary Shut Down of Potomac River Station."

**j. Changes to the Section entitled "Material Claims, Litigation and Investigations — Disputed Claims with Associated Estate Causes of Action — Pepco Litigation"**

The section titled "4. Pepco Litigation" should be deleted in its entirety and replaced with the following:

### 4. *Pepco Litigation*

As described more fully herein, the Debtors paid $2.65 billion to Pepco to purchase certain power generating facilities and related assets (the "Pepco Assets") pursuant to the terms of the APSA. Under the terms of the Back-to-Back Agreement contained within the APSA, the Debtors are obligated to purchase from Pepco energy and capacity sold to Pepco under the terms of certain PPAs, and the Debtors are obligated

5

to pay Pepco for that energy and capacity under the terms of the PPAs. In practice, the parties have arranged for the energy sold to Pepco under the PPAs to be offered into the PJM daily market, at prices determined by the Debtors and under the scheduling direction of the Debtors. The market value of the energy is then credited to a Pepco account by PJM. The capacity of the PPAs is transferred from a Pepco PJM account to a Mirant PJM account. The Debtors have control of the capacity and determine how the capacity will be sold in the PJM market. The prices for energy and capacity under the PPAs are higher than existing market prices for power. Thus, the Debtors pay Pepco the difference between the contract prices and the market prices.

a.  *Motions to Reject*

(i)  ***Motion to Reject the Back-to-Back Agreement***

On August 28, 2003, the Debtors filed a motion with the Bankruptcy Court to reject the Back-to-Back Agreement (the "First Motion to Reject"), along with an adversary proceeding to enjoin Pepco and FERC from taking certain actions against the Debtors (the "Injunction Litigation"). The Debtors forecast that it would cost the Debtors in excess of $300 million during 2004 and 2005 if the Back-to-Back Agreement were to remain in effect. Anticipated losses under the Back-to-Back Agreement would continue over the life of the PPAs, the last of which expires in 2021.

The reference to the Bankruptcy Court of the First Motion to Reject was withdrawn by the United States District Court for the Northern District of Texas (the "District Court"). Pepco and FERC objected to the First Motion to Reject for, among other reasons, that the courts did not have jurisdiction to authorize a utility to stop performing under an agreement for the sale of electric power. On December 23, 2003, the District Court denied the First Motion to Reject and held that the court did not have jurisdiction to authorize rejection of the Back-to-Back Agreement. On January 6, 2004, the District Court dismissed the Injunction Litigation on similar grounds.

The Debtors appealed the District Court's orders to the United States Court of Appeals for the Fifth Circuit (the "Fifth Circuit"). On appeal, the Fifth Circuit held that the District Court did have jurisdiction to authorize rejection. However, the Fifth Circuit also stated that the use of the traditional business judgment standard for rejecting executory contracts would be inappropriate because it would not account for the public interest inherent in the transmission and sale of electricity in interstate commerce. The Fifth Circuit suggested that the District Court, in the exercise of its discretion, adopt a rejection standard that protects the public interest.

On December 9, 2004, on remand, the District Court held that the Back-to-Back Agreement was an integral part of the APSA and was not severable from the APSA for purposes of rejection. The District Court also articulated the standard that would be applied as to any subsequent hearing on the motion to reject. Under the District Court's standard, for the Debtors to be entitled to an order authorizing rejection of the APSA, they must prove that (a) the APSA burdens their estates; (b) after careful scrutiny and giving significant weight to comments and findings of the FERC relative to the effect such a rejection would have on the public interest inherent in the transmission and sale of electricity in interstate commerce, the equities balance in favor of rejection; and (c) rejection would further the chapter 11 goal of permitting the successful rehabilitation of the Debtors. When applying this standard, the District Court stated that it would carefully scrutinize the impact of rejection upon the public interest and would, among other things, ensure that rejection will not cause any disruption in the supply of electricity to other public utilities or to consumers or lead to unjust or excessive rates. Finally, if rejection would compromise the public interest in any respect, the District Court stated that it would not authorize rejection unless the Debtors can show that they cannot reorganize without rejection. The Debtors have appealed the District Court's December 9, 2004 decision to the Fifth Circuit. The Fifth Circuit denied the Debtors' motion to expedite the appeal. Briefing has been completed and oral argument has not yet been set.

(ii)  ***Motion to Reject the Back-to-Back Agreement and Indemnification Provisions of the APSA***

On January 21, 2005, the Debtors filed a motion to reject parts of the APSA (the "Second Motion to Reject"). The only substantive difference between the First Motion to Reject and the Second Motion to

6

Reject is that the Debtors moved to reject, along with the Back-to-Back Agreement, the Debtors' indemnification obligations to Pepco. On March 1, 2005, the District Court withdrew the reference to the Second Motion to Reject. The District Court's March 1, 2005 Order, as supplemented by Orders dated March 7, 2005, and March 16, 2005, also directed the parties to brief, by March 28, 2005, the issue of whether the things referred to in the Second Motion to Reject as the "Interconnection Agreements," "Easement, License and Attachment Agreements," "Local Area Support Agreement," and "Site Lease Agreement" are separate agreements from the APSA for purposes of rejection. Although the Debtors believe that these agreements are separate and distinct from the APSA, Pepco believes that the APSA consists of these and other documents. On March 16, 2005, the District Court denied the Debtors' emergency motion for reconsideration of the District Court's March 1, 2005 Order. Earlier that same day, the Debtors filed in the Fifth Circuit a petition for a writ of mandamus and motion for stay, and, in the District Court, a notice of appeal of the March 1, 2005 Order (as supplemented on March 7, 2005 and March 16, 2005). On March 21, 2005, the Debtors filed a supplement to the petition for writ of mandamus and motion for stay, which related to the District Court's March 16, 2005 Order. On March 17, 2005, the Fifth Circuit issued a temporary stay of the District Court's March 1, 2005 Order. On April 11, 2005, the Fifth Circuit vacated the temporary stay and denied Mirant's petition for writ of mandamus and motion for stay. The parties are still briefing the issues on appeal in the Fifth Circuit and oral argument has not yet been set.

  b. *Suspension of Pepco Back-to-Back Payments*

On December 9, 2004, the Debtors filed a notice in the Bankruptcy Court that they were unilaterally suspending further payments to Pepco under the Back-to-Back Agreement (the "Suspension Notice").

On December 10, 2004, in response to the Suspension Notice, Pepco filed a motion in the District Court seeking a temporary restraining order and injunctive relief to require the Debtors to perform under the Back-to-Back Agreement (the "Injunctive Relief Motion"). On December 13, 2004, the District Court issued an order referring the Injunctive Relief Motion to the Bankruptcy Court. On December 21, 2004, the Bankruptcy Court issued an order denying the Injunctive Relief Motion.

On December 14, 2004, Pepco filed: (a) a motion to compel the Debtors to pay, as administrative expenses, the payments that they had suspended under the Back-to-Back Agreement (the "Administrative Expense Motion"); (b) a motion seeking relief from the automatic stay of section 362(a) of the Bankruptcy Code (the "Lift Stay Motion"); and (c) a complaint for injunctive and other relief seeking, among other relief, to compel payments under the Back-to-Back Agreement (the "Pepco Lawsuit"). On December 16, 2004, Pepco filed a motion to withdraw the reference to the Bankruptcy Court with respect to, among other things, the Administrative Expense Motion, the Lift Stay Motion and the Pepco Lawsuit (the "Second Withdrawal Motion"). On January 4, 2005, the District Court denied the Second Withdrawal Motion. However, the District Court's January 4 Order stated that "the standard that would be applied to a determination of whether rejection of the Back-to-Back Agreement should be approved is basically the same standard that should be applied in determining whether Debtors' obligations under the Back-to-Back Agreement are to be enforced, or, more generally, whether any action is to be permitted that would prevent Pepco from receiving the payments to which it is entitled under the Back-to-Back Agreement."

On January 14, 2005, the Bankruptcy Court denied the Administrative Expense Motion and the Lift Stay Motion, but required the Debtors to commence making payments to Pepco due under the Back-to-Back Agreement. The Bankruptcy Court's ruling permitted the Debtors to stop making payments under the Back-to-Back Agreement if they filed a motion to reject the APSA. In its Order, the Bankruptcy Court stated that, for the purposes of deciding Pepco's motions, the APSA is a "single, indivisible contract." Pepco appealed the Bankruptcy Court's decision to the District Court.

On January 21, 2005, the same day that the Bankruptcy Court's Order was docketed, the Debtors filed the Second Motion to Reject. As of January 21, 2005, the Debtors ceased making further payments to Pepco under the Back-to-Back Agreement. In its March 1, 2005 Order (as supplemented by Orders signed March 7, 2005 and March 16, 2005) withdrawing the reference to the Bankruptcy Court with respect to the Second Motion to Reject, the District Court directed the Debtors to resume performance of all obligations under the

7

Back-to-Back Agreement and to pay, by March 18, 2005, all past-due, unpaid postpetition obligations under the Back-to-Back Agreement. The District Court's March 1, 2005 Order also dismissed Pepco's appeal of the Bankruptcy Court's January 21, 2005 Order as moot, and withdrew the reference to the Bankruptcy Court with respect to the Administrative Expense Motion and the matter of whether the Debtors should be obligated to perform under the Back-to-Back Agreement during the pendency of the Chapter 11 Cases. On March 21, 2005, the Debtors filed a supplement to the petition for writ of mandamus and motion for stay, which related to the District Court's March 16, 2005 Order. On March 17, 2005, the Fifth Circuit issued a temporary stay of the District Court's March 1, 2005 Order. On April 11, 2005, the Fifth Circuit vacated the temporary stay and denied Mirant's petition for writ of mandamus and motion for stay.

c. *FERC's June 17, 2005 Order*

On March 11, 2005, the Debtors filed with FERC in Docket No. EC05-58-000, an application pursuant to section 203 of the Federal Power Act requesting approval for certain internal asset transfers and a corporate restructuring to be implemented pursuant to the Plan (the "203 Application"). On April 1, 2005, various parties, including Pepco, filed motions to intervene and protested the relief sought in the Debtors' 203 Application. On April 18, 2005, Mirant and the Corp. Committee each filed an answer to the motions to intervene. On June 17, 2005, FERC issued an Order approving the Debtors' proposed internal asset transfers based on the determination that there would be no change in the status quo as a result of the internal asset transfer (the "June 17 Order"). On July 18, 2005, Pepco, the Public Service Commission for the District of Columbia, and the Maryland Public Service Commission and the Maryland Office of People's Counsel (collectively, the "State Commissions"), each filed requests for rehearing of the June 17 Order. On August 2, 2005, the Debtors filed an answer to the requests for rehearing. On August 17, 2005, FERC entered an Order granting the requests for rehearing for the limited purpose of further consideration. On August 18, 2005, Pepco filed a response to Mirant's answer. The requests for rehearing are pending before FERC.

As a consequence of the June 17 Order, on July 1, 2005, the Debtors and the Corp. Committee filed a joint motion for leave to file supplemental briefs in the District Court regarding the Second Motion to Reject. On July 5, 2005, the District Court granted the motion and set a supplemental briefing schedule. Mirant, Pepco and the State Commissions each filed supplemental briefs. On July 27, 2005, the Debtors filed a motion for leave to file a supplemental reply brief. On July 29, 2005, the District Court granted the motion, requested responses from FERC, Pepco and the State Commissions regarding the supplemental briefs, and requested comments relative to the possibility of an informal stay in the case pending the outcome of the appeals from the Orders of the District Court signed December 9, 2004 and March 1, 2005 (as supplemented by Orders dated March 7, 2005 and March 16, 2005). Responses regarding the supplemental briefs and comments regarding the informal stay were filed with the District Court and on August 16, 2005, the District Court entered an informal stay indicating that it will withhold ruling on the Second Motion to Reject pending the outcome of the two appeals before the Fifth Circuit.

d. *Pepco TPA Settlement*

On October 29, 2003, the Debtors filed a motion with the Bankruptcy Court for approval of a settlement (the "Pepco TPA Settlement") between the Debtors and Pepco regarding two Transition Power Agreements (the "Pepco TPAs") under which MAEM sold power to Pepco. The TPAs were "Ancillary Agreements" under the APSA. See "General Information — The Businesses of Mirant — The North American Business — Regional Markets — Mid-Atlantic Region." The TPA Settlement was approved by Order of the Bankruptcy Court entered on November 19, 2003. Under the Pepco TPA Settlement, Pepco has an Allowed Claim, not subject to any offset or reduction for any reason, against Mirant and MAEM in the amount of $105 million (the "TPA Claims"). In return, Pepco agreed to amend the Pepco TPAs such that Pepco paid a higher price for power delivered under the Pepco TPAs. The Pepco TPAs have now expired.

e. *Asbestos Litigation*

As part of the APSA transaction, Mirant agreed to indemnify Pepco for certain liabilities arising in lawsuits related to the acquired assets, filed after December 19, 2000, even if such lawsuits relate to incidents

8

occurring prior to that date, with certain qualifications. Under intercompany agreements, the subsidiaries of MAG that acquired the generating facilities assumed Mirant's indemnity obligations to Pepco. Since the APSA transaction closed, Pepco has notified the Debtors of more than one hundred asbestos cases, distributed among three Maryland jurisdictions (Prince George's County, Baltimore City and Baltimore County), as to which it claims a right of indemnity. Based on information and relevant circumstances known at this time, the Debtors do not believe these suits will result in significant Allowed Claims. Pepco obtained relief from the automatic stay of section 362(a) of the Bankruptcy Code to proceed with certain litigation pending in the United States District Court for the District of Columbia against the Debtors (the "Indemnity Litigation"). The issue in the Indemnity Litigation is whether the Debtors are liable to Pepco for approximately $665,000 in defense costs relating to asbestos lawsuits brought against Pepco.

*f. Claims Litigation*

Pepco and its Affiliate, Pepco Energy Services, Inc., collectively filed fourteen separate proofs of claim against Mirant, MAEM and the following additional subsidiaries of Mirant that are referred to hereinafter as the "Other Mirant Parties:" Mirant Potomac River, LLC, Mirant Piney Point, LLC, Mirant Peaker, MAI, MIRMA, Mirant MD Ash Management, LLC, Mirant D.C. O&M, LLC, and Mirant Chalk Point, LLC. On December 23, 2004, Pepco amended certain of its proofs of claim for goods and services. Pepco's proofs of claim, as amended (collectively, the "Pepco Claims"), seek amounts ranging from $37,769.90 to approximately $136.2 million for unpaid prepetition obligations. Certain of the Pepco Claims also reserve Pepco's right to seek additional amounts in the event the Debtors are ever authorized to reject the Back-to-Back Agreement and/or the APSA. Pepco's claims consist largely of the $105 million TPA Claims. Most of the other amounts asserted in the Pepco Claims are pre-petition amounts arising from the Back-to-Back Agreement under the APSA.

The Debtors filed an omnibus objection, as amended, to the Pepco Claims (the "Pepco Claims Objection"), objecting to each one of the Pepco Claims. The Pepco Claims Objection as to the Pepco Claim filed by Pepco Energy Services, Inc. has been resolved and the proof of claim filed by Pepco Energy Services, Inc. has been withdrawn with prejudice. The Pepco Claims Objection focuses on three primary objections. First, the Debtors dispute that the Other Mirant Parties are jointly and severally liable for the amounts asserted in the Pepco Claims based on the AAA. See "Certain Affiliate Transactions — Material Intercompany Transactions and Relationships Among the Debtors — Purchase of Mid-Atlantic Generation Assets." Second, the Debtors object to several of the Pepco Claims on grounds that they fail to include necessary supporting documentation or are not otherwise due and owing. Third, the Debtors object to all the Pepco Claims on the basis that the Debtors have potential avoidance actions against Pepco, and that any liability on such actions must be paid in full before any of the Pepco Claims that become Allowed Claims may be satisfied, in accordance with section 502(d) of the Bankruptcy Code. The Debtors filed an amended claims objection relating to, among other things, Pepco's amended claims. Pepco has responded to the Pepco Claims Objection and vigorously disputes the Debtors' arguments.

On February 17, 2005, the Bankruptcy Court issued a scheduling order on the Pepco Claims Objection. The scheduling order states that no basis for the Debtors' defense under section 502(d) of the Bankruptcy Code exists at this time. The Debtors intend to assert a section 502(d) defense if they are authorized to reject the Back-to-Back Agreement and/or the APSA. The scheduling order also set a schedule to consider the issue of whether the Other Mirant Parties are jointly and severally liable as a result of the AAA. The Debtors and Pepco filed motions for summary judgment on the AAA issue, which were denied by the Bankruptcy Court on May 4, 2005. Trial on the Pepco Claims and the Pepco Claims Objection has not yet been set.

On February 24, 2005, the Bankruptcy Court issued an order directing the parties to mediate the Pepco Claims and the Pepco Claims Objection before the Honorable Russell F. Nelms, United States Bankruptcy Judge for the Northern District of Texas. In early March 2005, the parties met separately with Judge Nelms in Texas, and they submitted confidential position statements to Judge Nelms. On March 15, 2005, the Debtors cancelled the mediation session.

The Debtors filed a motion to estimate each of the Pepco Claims at an amount of $0.00 for all purposes. The Bankruptcy Court has indefinitely adjourned the estimation motion, and indicated that estimation of the Pepco Claims for all purposes was likely to be unnecessary since the AAA issue was to be submitted for decision prior to the commencement of the Confirmation Hearing.

### g. Fraudulent Transfer Complaint

On July 13, 2005, the Debtors filed a complaint styled *Mirant Corporation, et al. v. Potomac Electric Power Company,* Adv. No. 05-04138, with the Bankruptcy Court (the "Pepco Complaint"). In the Pepco Complaint, the Debtors seek an order declaring that the amounts paid for the Pepco Assets exceeded the fair value of such assets and was a transfer in fraud of the rights of creditors under state law, as made applicable by section 544(b) of the Bankruptcy Code, and recoverable under section 550(a) of the Bankruptcy Code. The Pepco Complaint constitutes a counterclaim to Pepco's previously filed proofs of claim, except for the TPA Claims. In addition, in the Pepco Complaint, the Debtor have objected to the Pepco Claims on the basis that: (i) the Pepco Claims should be disallowed under section 502(d) of the Bankruptcy Code; (ii) no amounts are due and owing to Pepco, and (iii) the obligations on which the Pepco Claims are based arose under agreements which were voidable, fraudulent and illegal transfers. On August 3, 2005, the Bankruptcy Court signed a stipulation between Mirant and Pepco extending Pepco's time to respond to the complaint to September 30, 2005. On September 20, 2005, Pepco filed a motion seeking an order from the District Court withdrawing the reference to the Bankruptcy Court of the Pepco Complaint.

### h. Potential Adjustment Related to Panda Power Purchase Agreement

At the time of the acquisition of the MIRMA assets from Pepco, Mirant entered into a letter agreement with Pepco that, as subsequently modified, provided that the price paid by Mirant for its December 2000 acquisition of Pepco's assets would be adjusted if by April 8, 2005, a binding court order has been entered finding that the Back-to-Back Agreement violates Pepco's power purchase agreement with Panda ("Panda PPA") as a prohibited assignment, transfer or delegation of the Panda PPA or because it effects a prohibited delegation or transfer of rights, duties or obligations under the Panda PPA that is not severable from the rest of the Back-to-Back Agreement. The agreement also provides that if a court order is entered that triggers the purchase price adjustment, the amount of the adjustment is to be negotiated in good faith by the parties or determined by binding arbitration so as to compensate Pepco for the termination of the benefit of the Back-to-Back Agreement while also holding Mirant economically indifferent from such court order. Panda initiated legal proceedings in 2000, asserting that the Back-to-Back Agreement violated provisions in the Panda PPA prohibiting Pepco from assigning the Panda PPA or delegating its duties under the Panda PPA to a third party without Panda's prior written consent. On June 10, 2003, the Maryland Court of Appeals, Maryland's highest court, ruled that the assignment of certain rights and delegation of certain duties by Pepco to Mirant did violate the non-assignment provision of the Panda PPA and was unenforceable. The court, however, left open the issues whether the provisions found to violate the Panda PPA could be severed and the rest of the Back-to-Back Agreement enforced and whether Panda's refusal to consent to the assignment of the Panda PPA by Pepco to Mirant was unreasonable and violated the Panda PPA.

### i. Shutdown of Potomac River Plant

On August 19, 2005, the Department of Environmental Quality for the Commonwealth of Virginia ("DEQ") sent a letter to Mirant Potomac in response to a downwash modeling study of the Potomac River plant's ("Potomac River Plant") air emissions. Although DEQ's letter requested that Mirant Potomac provide a summary of actions being taken to protect health and environmental concerns by 2:00 p.m. on August 24, 2005, DEQ did not order Mirant Potomac to shut down the Potomac River Plant.

On August 22, 2005, the Debtors issued a press release in response to the DEQ letter, which stated that they had reduced output to the Potomac River Plant to its lowest levels, and that, if no acceptable short-term solutions were found, they would shut down the Potomac River Plant by midnight on August 24, 2005. In the press release, the Debtors stated that the Potomac River Plant "has been identified as a critical component for the reliability of the electric grid in the Washington, D.C. area." On August 24, 2005, the Debtors announced

that they would "temporarily halt power production" at the Potomac River Plant. The Debtors acknowledged that the plant shutdown had reliability implications. Prior to midnight on August 24, 2005, the Debtors voluntarily shut down the Potomac River Plant.

On August 24, 2005, the District of Columbia Public Service Commission ("DC PSC") filed an emergency petition and complaint with FERC, Docket No. EL05-145-000, seeking orders from FERC and the Secretary of the Department of Energy directing the Debtors to continue operating the Potomac River Plant. On August 25, 2005, in response to the DC PSC's emergency petition and complaint, FERC issued a request for information to PJM, Pepco and Mirant requesting responses by August 26, 2005. FERC also issued a notice inviting interested parties to intervene and comment on the DC PSC's emergency petition and complaint. On August 26, 2005, Pepco filed an emergency motion for relief from the automatic stay. On August 30, 2005, the Bankruptcy Court granted Pepco's emergency motion, and entered an Order permitting Pepco to intervene and comment in the FERC proceeding. Numerous parties filed motions to intervene and comments. Certain of these parties, including Pepco, PJM, the Pennsylvania Public Utility Commission, the Virginia Electric and Power Company, and the DC PSC, argued that Mirant should be ordered to operate the Potomac River Plant to protect electric reliability. Other parties argued in favor of continuing the shutdown because of concerns about emissions from the Potomac River Plant. On September 1, 2005, Mirant Potomac filed an answer to the motions to intervene and comments. On September 6, 2005, FERC issued a supplemental request for information to PJM, Pepco and Mirant requesting responses by September 9, 2005. On September 9, 2005, Pepco filed an answer to the various motions to intervene and comments. This matter is pending before FERC.

Following the shut down of the Potomac River facility, Mirant Potomac notified Pepco of an alleged occurrence of a "Force Majeure" event under the Local Area Support Agreement dated December 19, 2000 with Pepco (the "LASA"), which is a part of the APSA. By letter dated September 13, 2005, Pepco notified the Debtors of an alleged default under the APSA (including the LASA) as a result of the shut down of the Potomac River facility while acknowledging that to enforce its claims, it must either bring the claims in the Bankruptcy Court, the appropriate United States District Court, or obtain relief from the automatic stay under section 362(a) of the Bankruptcy Code. On September 21, 2005, Mirant Potomac commenced partial operation of one unit of the Potomac River facility. By letter dated September 23, 2005, the Debtors disputed the alleged default and alleged that Pepco's letter violated the automatic stay.

**k. Changes to the Section entitled "Material Claims, Litigation and Investigations — Disputed Claims with Associated Estate Causes of Action — SMECO — Southern Maryland Electric Cooperative"**

The section titled "5. SMECO — Southern Maryland Electric Cooperative" on should be deleted in its entirety and replaced with the following:

**5.   *SMECO — Southern Maryland Electric Cooperative, Inc.***

On March 15, 2004, Mirant Peaker, Mirant Chalk Point, and Mirant commenced an adversary proceeding in the Bankruptcy Court, Adversary No. 04-4073, seeking declaratory judgment from the Bankruptcy Court that the Facility and Capacity Credit Agreement (the "FCC Agreement") with Southern Maryland Electric Cooperative, Inc. ("SMECO") constitutes an unexpired lease of nonresidential real property and that any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code. The complaint names both SMECO and Pepco as defendants, as the Debtors are Pepco's assignee under the FCC Agreement. Under the FCC Agreement, the Debtors purchase electric energy and capacity from SMECO and they are obligated to pay SMECO approximately $5,000,000 per year until 2015. Pepco has guaranteed the performance of the Debtors' obligations under the FCC Agreement to SMECO. The Debtors maintain that the FCC Agreement should be characterized as a real property lease. SMECO and Pepco dispute this characterization of the FCC Agreement.

On June 28, 2004, the Bankruptcy Court denied the defendants' motion to dismiss. The parties have filed motions for summary judgment, which are pending with the Bankruptcy Court. On August 22, 2005,

11

the Debtors filed a motion for leave to file a supplemental brief regarding new authority in support of their motion for summary judgment. On September 9, 2005, Pepco and SMECO filed a joint opposition to the Debtors' motion for leave. The motion for leave is pending with the Bankruptcy Court.

l.  **Changes to the Section entitled "The Chapter 11 Plan — Procedures for Resolving and Treating Contested Claims — No Plan Distributions Pending Allowance"**

The paragraph under the heading "4. No Plan Distributions Pending Allowance" should be amended by adding the following at the end of the paragraph:

> Notwithstanding the foregoing, Pepco's TPA Claims against Mirant and MAEM are Allowed Claims and are not subject to the setoff rights as provided in Section 17.16 of the Plan.

The paragraph under the heading "5. Estimation of Claims" should be amended by adding the following at the end of the paragraph:

> Notwithstanding the foregoing or anything to the contrary in the Plan or the Bankruptcy Code, any estimation of a Contested Claim shall be subject to the rights of the holder of such Claim under section 502(j) of the Bankruptcy Code.

m.  **Changes to the Section entitled "The Chapter 11 Plan — Retention of Jurisdiction"**

The first sentence under the heading "S. Retention of Jurisdiction" should be amended to read as follows:

> Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and subject to section 157 of the Judicial Code and except for actions, matters and/or proceedings for which the reference has been withdrawn or which are on appeal, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (1) arising under the Bankruptcy Code, (2) arising in or related to the Chapter 11 Cases or the Plan, or (3) that relates to the following:

n.  **Changes to the Section entitled "The Chapter 11 Plan — Other Material Provisions of the Plan — Setoff Rights"**

The first sentence under the heading "13. Setoff Rights" should be amended to read as follows:

> In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code; provided, however, that Pepco's TPA Claims against Mirant and MAEM are Allowed Claims and are not subject to any offset or reduction for any reason by any Debtors, whether under Section 17.17 of the Plan, sections 553, 556 and 560 of the Bankruptcy Code, or otherwise; provided, further, that nothing in the Plan shall constitute a waiver of Southern's setoff rights set forth in section 9.15 of the Tax Indemnification Agreement; provided, further, that section 17.17 of the Plan is subject to the California Settlement Agreement and the Debtors may not effectuate a setoff in violation thereof. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

o.  **Changes to the Section entitled "The Chapter 11 Plan — Other Material Provisions of the Plan — Injunctions"**

Subsection "b." under the heading "15. Injunctions" should be deleted in its entirety and replaced with the following:

> b. The foregoing provisions shall not apply to (i) holders of Allowed MAG Long-term Note Claims with respect to their legal, equitable and contractual rights, and personal Causes of Action against MAG, MAG's Assets and any of MAG's managers, officers, employees, agents and professionals, and (ii) the jurisdiction (and exercise thereof) of the District Court, the United States Court of Appeals for the Fifth

Circuit, the United States Supreme Court, the Federal Energy Regulatory Commission, the Maryland Public Service Commission, the District of Columbia Public Service Commission, or any other governmental unit or organization, or regulatory agency, relating to the Debtors' postconfirmation conduct and/or the Debtors' attempts to reject, recharacterize and/or avoid their obligations under the APSA (including the Back-to-Back Agreement).

**p.  Changes to the Section entitled "The Chapter 11 Plan — Other Material Provisions of the Plan — Plan Controls"**

The last sentence of the paragraph under the heading "18. Plan Controls" should be deleted in its entirety and replaced with the following:

> The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined to be ambiguous by the Bankruptcy Court, the District Court, the United States Court of Appeals for the Fifth Circuit, the United States Supreme Court, any governmental unit or organization, or regulatory agency, or any other forum with jurisdiction to interpret the Plan for any reason.

**q.  Changes to the Section entitled "Risk Factors — The Debtors' Rejection or Recharacterization of the Back-to-Back Agreement may be Unsuccessful and if they Consequently Remain Liable under the Back-to-Back Agreement, the Debtors' Future Cash Flows and Operating Income would be Materially Adversely Impacted"**

The section titled "R. The Debtors' Rejection or Recharacterization of the Back-to-Back Agreement may be Unsuccessful and if they Consequently Remain Liable under the Back-to-Back Agreement, the Debtors' Future Cash Flows and Operating Income would be Materially Adversely Impacted" should be deleted in its entirety and replaced with the following:

**R.  The Debtors' Rejection, Recharacterization or Avoidance of the APSA (including the Back-to-Back Agreement) may be Unsuccessful and if they or New Mirant Consequently Remain or Become Liable under the APSA (including the Back-to-Back Agreement), the Future Cash Flows and Operating Income of the Debtors or New Mirant would be Materially Adversely Impacted.**

The Debtors expect that the obligations under the APSA (including the Back-to-Back Agreement) will be resolved either through rejection pursuant to section 365, recharacterization of such obligations as a financing transaction, avoidance of such obligations, or a negotiated settlement. In the event the Debtors were unable to reject, recharacterize, or avoid the obligations under the APSA (including the Back-to-Back Agreement), or reach a negotiated settlement, and therefore the Debtors would remain, or New Mirant would become, liable under the APSA (including the Back-to-Back Agreement), the resulting negative impact on cash from operations would be approximately at least $80,000,000 in the year ended December 31, 2005, and approximately at least $44,000,000 per year thereafter, which would materially adversely impact the Debtors' (or New Mirant's) future cash flows and operating income.

**r.  Changes to Schedule 12 to the Second Amended Disclosure Statement — Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases**

Schedule 12 is the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases." On Schedule 12, the Debtors separately list the "Asset Purchase and Sale Agreement and Amendments 1 and 2" (No. 1031) and certain of the Ancillary Agreements under the APSA (Nos. 1030, 1032-1047). Schedule 12 fails to list certain of the other Ancillary Agreements under the APSA, including, but not limited to, the following:

> Assignment and Assumption Agreement, dated December 19, 2000, by and among Pepco, Mirant Americas Energy Marketing, LP, Mirant Mid-Atlantic, LLC, Mirant Potomac River, LLC, Mirant Peaker, LLC, Mirant Chalk Point, LLC, Mirant D.C. O&M, LLC, Mirant Piney Point, LLC, Mirant MD Ash Management, LLC, and Mirant Mid-Atlantic Services, LLC

13

> Guarantee Agreement, dated December 19, 2000, by and between Pepco and Mirant Corp.

> Operation and Maintenance Agreement, dated December 19, 2000, by and between Pepco and Mirant D.C. O&M, LLC

> Various side agreements and side letters to the APSA, including, without limitation, a letter dated December 19, 2000 from Pepco to Southern Energy, Inc. regarding the unassigned PPAs, a letter dated December 19, 2000, from SEI to Pepco regarding the settlement of outstanding issues, a Transfer of Assets and Indemnification Agreement by and between Pepco and Southern Energy Resources, Inc., dated December 8, 2000, a letter dated December 19, 2000, from Pepco to SEI, and a related Request for Services from Mirant Mid-Atlantic, LLC, Mirant Chalk Point, LLC, Mirant Potomac River, LLC and Mirant Peaker, LLC to Pepco, regarding emergency and unscheduled maintenance, all as amended, modified and/or supplemented from time to time.

Given the complex and significant relationships between Pepco and the Debtors, Schedule 12 should include some protective language to prevent contracts, which the Debtors and Pepco need or require (whether or not such contracts are integrated in or severable from the APSA) in order to continue performing their myriad responsibilities and obligations in the ordinary course of business, from being inadvertently rejected. Pepco proposes the following language:

> Various service level agreements and arrangements between Pepco and any one or more of the Debtors, including, without limitation, site work orders, requests for work and equipment orders, and retail accounts (including retail electric service accounts under Pepco's tariffs), all as amended, modified and/or supplemented from time to time.

It is Pepco's view that all Ancillary Agreements are integrated, non-severable parts of the APSA and must be assumed or rejected as a whole. Pepco believes that there should be one entry on Schedule 12 reflecting that the entire APSA will be assumed and assigned to New Mirant. Schedule 12 also should be amended to make clear that if no assignee or transferee is identified that means the Debtors do not propose assigning such contract or lease.

**s.   Changes to Exhibit C to the Second Amended Disclosure Statement — Liquidation Analysis**

The subpart titled "PEPCO PPA Liability" should be deleted in its entirety and replaced with the following:

> *Pepco PPA Liability:* The Liquidation Analysis assumes that MAEM would be subject to an unsecured claim in connection with its alleged obligations under the Pepco Back-to-Back Agreement. It is Pepco's position that the following Debtors are liable for all amounts due and to become due under the APSA (including the Back-to-Back Agreement): Mirant, MAEM, Mirant Mid- Atlantic, LLC, Mirant Potomac River, LLC, Mirant Peaker, LLC, Mirant Chalk Point, LLC, Mirant D.C. O&M, LLC, Mirant Piney Point, LLC, Mirant MD Ash Management, LLC, and Mirant Mid-Atlantic Services, LLC.