directed by such holder in writing, or (f) in the case of the holders of Mirant Notes, Subordinated Notes, MAG Short-term Notes and MAG Long-term Notes, to the applicable Old Indenture Trustees for distribution to the holders of such notes subject to the provisions of Section 10.9. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to New Mirant, except for the forfeited Plan Distributions of holders of Allowed Mirant Debtor Class 3 – Unsecured Claims and Allowed Mirant Debtor Class 5 – Equity Interests, which shall be distributed on a pro rata basis to the holders of Allowed Mirant Debtor Class 3 – Unsecured Claims and Allowed Mirant Debtor Class 5  – Equity Interests in Mirant, respectively, that have not forfeited their Plan Distributions. Such supplemental Plan Distributions shall be made from time to time at the discretion of the Disbursing Agent.

**10.4.    De Minimis Distributions.**

No Plan Distribution of less than twenty-five dollars ($25.00) shall be made by the Disbursing Agent to the holder of any Claim unless a request therefor is made in writing to the Disbursing Agent.  If no request is made as provided in the preceding sentence within ninety (90) days of the Effective Date, all such Plan Distributions shall revert to New Mirant.

**10.5.    Time Bar to Cash Payments.**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.  Any claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such void check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to New Mirant.

**10.6.    Manner of Payment under the Plan.**

Unless the Person or Entity receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**10.7.    Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent.**

Except as otherwise ordered by the Bankruptcy Court or as provided herein, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent

and the Old Indenture Trustees (<u>including</u> any paying or transfer agents for such Old Indenture Trustees) on or after the Effective Date (<u>including</u>, but not limited to, taxes) shall be paid when due. Professional fees and expenses incurred by the Disbursing Agent and the Old Indenture Trustees (<u>including</u> any paying or transfer agents for such Old Indenture Trustees) from and after the Effective Date in connection with the effectuation of the Plan shall be paid in the ordinary course of business. Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

**10.8. <u>Fractional Plan Distributions.</u>**

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars (whether in Cash or notes) will be made. Fractional shares and fractions of dollars (whether in Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

**10.9. <u>Special Distribution Provisions for MAG Short-term Debt Claims, MAG Long-term Note Claims and Mirant Debt Claims.</u>**

The following additional provisions shall apply specifically to Plan Distributions to be made to the holders of Allowed MAG Short-term Debt Claims, Allowed MAG Long-term Note Claims and Allowed Mirant Debt Claims under the Plan:

(a)     <u>Distributions to Holders of MAG Short-term Note Claims and Mirant Note Claims</u>. Plan Distributions on account of the MAG Short-term Note Claims and the Mirant Note Claims shall be made by the Disbursing Agent to the Old Indenture Trustees for the MAG Short-term Notes and the Mirant Notes, respectively. The Old Indenture Trustees for the MAG Short-term Notes and the Mirant Notes, or their agents, shall make such Plan Distributions in accordance with the Old Indentures and such Plan Distributions shall be made directly to the registered holders of the MAG Short-term Notes and Mirant Notes in accordance with Section 10.9(f). For purposes of making Plan Distributions, the transfer ledger in respect of the MAG Short-term Note Claims and Mirant Note Claims shall be closed as of the close of business on the Effective Date. The Disbursing Agent, the Plan Trustees, the Old Indenture Trustees, and their respective agents, as applicable, shall have no obligation to recognize any transfer after the Effective Date of a MAG Short-term Note Claim or a Mirant Note Claim.

(b)     <u>Distributions to Holders of MAG Long-term Note Claims</u>. Plan Distributions on account of the MAG Long-term Note Claims shall be made by the Disbursing Agent to the Old Indenture Trustee for the MAG Long-term Notes. The Old Indenture Trustee for the MAG Long-term Notes, or its agent, shall make such Plan Distributions in accordance with the MAG Indenture and such Plan Distributions shall be made directly to the registered holders of the MAG Long-term Notes in accordance with Section 10.9(f). The record date for the Plan Distributions on account of the MAG Long-term Note Claims shall be the Effective Date or such other date as established by the Old Indenture Trustee for the Long-term Notes, with the cooperation of the Debtors, under the MAG Indenture.

(c)    Service by the Old Indenture Trustees.

(i)    The Old Indenture Trustees and their agents, successors and assigns shall facilitate the making of Plan Distributions to the holders of the Mirant Notes and the MAG Short-term Notes, as applicable, and upon the completion thereof, shall be discharged of all their respective obligations associated with the Mirant Notes and the MAG Short-term Notes.  The rights of holders of Allowed MAG Short-term Note Claims and Mirant Note Claims, as established under the Old Indentures, shall continue in effect, for the sole purpose of (i) allowing the holders of Mirant Note Claims and the MAG Short-term Note Claims, as applicable, to receive their distributions hereunder, (ii) allowing and requiring the Old Indenture Trustees to make the distributions to be made on account of the Mirant Notes and the MAG Short-term Notes, as applicable, and (iii) permitting the Old Indenture Trustees to assert their Charging Lien against such distributions for payment of the Indenture Trustee Fees.  Notwithstanding any provision contained in this Plan to the contrary, the distribution provisions contained in the Old Indentures for Mirant Notes and the MAG Short-term Notes shall continue in effect to the extent necessary to authorize the Old Indenture Trustees to receive and distribute to the holders of Allowed Claims, as applicable, distributions pursuant to the Plan on account of any Allowed Claims and shall terminate completely upon completion of all such distributions.  Any actions taken by the Old Indenture Trustees with respect to the MAG Short-term Notes and the Mirant Notes that are not for the purposes authorized under the Plan shall be null and void.

(ii)    The Old Indenture Trustee under the MAG Indenture with respect to the MAG Long-term Notes, together with its agents, successors and assigns, shall facilitate the making of Plan Distributions to the holders of the MAG Long-term Notes. All of the rights, privileges and indemnities under the MAG Indenture with respect to the MAG Long-term Notes shall be reinstated and remain in full force and effect.  Any actions taken by the Old Indenture Trustee under the MAG Indenture with respect to the MAG Long-term Notes that are not for the purposes authorized under the MAG Indenture and the Plan shall be null and void.

(d)    Service by Facility Agents.  The Facility Agents and their agents, successors and assigns shall facilitate the making of Plan Distributions to the holders of the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims, as applicable, and upon the completion thereof, shall be discharged of all their respective obligations associated with the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims. The rights of holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall continue in effect for the sole purpose of allowing and requiring the Facility Agents to make Plan Distributions to be made on account of such Claims. Any actions taken by the Facility Agents with respect to the MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims that are not for the purposes authorized herein shall be null and void.

(e)    Substitution of the Old Indenture Trustees; Distributions.  Upon the occurrence of the Effective Date, the Claims of the Old Indenture Trustees shall, for all purposes under the

Plan, including, without limitation, the right to receive distributions hereunder, be substituted for all Claims of individual holders of MAG Short-term Note Claims and Mirant Note Claims arising under, based upon, or evidenced by the notes or debentures issued under the Old Indentures.  On the Distribution Date, all MAG Short-term Note Claims and Mirant Note Claims shall be settled and compromised in exchange for the distribution to the Old Indenture Trustees of the applicable Old Indenture Distributions to the holders of Allowed MAG Short-term Note Claims and Mirant Note Claims as specified in Sections 5.2(e) and 5.1(c), respectively, of the Plan; provided, that the Old Indenture Trustees shall return to the Disbursing Agent any Plan Distributions held on account of any MAG Short-term Note Claims and Mirant Note Claims as to which the requirements of Section 10.9(f) hereof are not satisfied by the first anniversary of the Effective Date.

(f)      Distributions by Old Indenture Trustees.  On the Distribution Date, all distributions on behalf of the Allowed MAG Short-term Note Claims and Mirant Note Claims shall be made by the applicable Old Indenture Trustees and the Old Indenture Trustees shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that Old Indenture Trustees are so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by New Mirant.  As soon as practicable after such surrender or exchange as described in Section 10.12, the Old Indenture Trustees shall distribute to their respective holders such holder's share of the distributions in accordance with the Plan, but subject to the rights of the Old Indenture Trustee in accordance with Section 10.9(h).

(g)      Substitution of the Facility Agents; Distributions.  Upon the occurrence of the Effective Date, the Claims of the applicable Facility Agents shall, for all purposes under the Plan, including, without limitation, the right to receive distributions hereunder, be substituted for all Claims of individual holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claim.  On the Distribution Date, all MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall be settled and compromised in exchange for the distribution to the Facility Agents of the applicable Plan Distributions to the holders of MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims as specified in Sections 5.2(e) and 5.1(c), respectively, of the Plan; provided, that the Facility Agents shall return to the Disbursing Agent any Plan Distributions held on account of any MAG Revolver Claims, Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims as to which the requirements of Section 10.12 are not satisfied by the first anniversary of the Effective Date.

(h)      Enforcement of Rights of Old Indenture Trustees.  The rights, liens  (including the Charging Lien) and Claims of the Old Indenture Trustees under the Old Indentures with respect to the collection of their fees and expenses from the holders of MAG Short-term Note Claims, MAG Long-term Note Claims and Mirant Note Claims or from Plan Distributions made on account of such Claims (including the fees and expenses of counsel) shall survive confirmation of the Plan and may be fully enforced by the Old Indenture Trustees; provided, however, that such fees and expenses shall be subject to Bankruptcy Court approval under section 1129(a)(4) of the Bankruptcy Code, to the extent that section applies.  All distributions to the Old Indenture Trustees on behalf of the holders of Allowed MAG Short-term Note Claims, MAG Long-term

Note Claims and Mirant Note Claims shall be applied by the Old Indenture Trustees as provided by the Old Indentures.

(i)      Payment of Indenture Trustee Fees and Facility Agent Fees.  Prior to the Effective Date, the Old Indenture Trustees and the agent under the MAG Revolvers shall provide statements of Indenture Trustees Fees to the Debtors.  All reasonable fees and expenses owed to the Old Indenture Trustees under the Old Indentures and to the Facility Agent under the MAG Revolvers shall paid in Cash on the Effective Date. Unless contested by the Debtors, the fees and expenses owed to the Old Indenture Trustees and the Agent under the MAG Revolver shall be deemed reasonable, without further order of the Bankruptcy Court.  The Bankruptcy Court shall resolve any of the Debtors' objections to such fees and expenses. The respective rights, liens, and claims of the respective Old Indenture Trustee under the Old Indentures (other than those related to the MAG Long-term Note Claims) and the Facility Agent under the MAG Revolvers shall be discharged upon payment of these fees and expenses.

(j)      Enforcement of Rights of Facility Agents.  The rights, liens (including the Charging Liens), and Claims of the Facility Agents with respect to the collection of their fees and expenses from the holders of Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall survive confirmation of the Plan and may be fully enforced by the Facility Agents.  All distributions to the Facility Agents on behalf of the holders of Mirant "C" Facility Claims, Mirant 364-Day Revolver Claims and Mirant 4-Year Revolver Claims shall be applied by the Facility Agents as provided by the applicable agreement.

**10.10. Special Distribution Provisions for Equity Interests.**

For the purpose of making Plan Distributions, the transfer ledger in respect of the Allowed Equity Interests in Mirant shall be closed as of the close of business on the Effective Date, and the Disbursing Agent, the Plan Trustees and their respective agents shall be entitled to recognize and deal for all purposes herein with only those holders of record stated on the transfer ledger maintained by the stock transfer agent for the Allowed Equity Interests in Mirant as of the close of business on the Effective Date.  On the Effective Date, all Equity Interests in Mirant shall be cancelled and annulled, and all rights thereunder shall be settled and compromised in full in exchange for the Plan Distributions to be made to the holders of all such Allowed Equity Interests.

**10.11. Special Distribution for California Parties.**

The following additional provisions shall apply specifically to any distributions to the California Parties under the Plan on account of the California Party Unsecured Claims:

(a)      CERS.  If CERS (as such term is defined in Section 1.1.35 of the California Settlement Agreement) is the holder of any portion of the California Party Unsecured Claims on the Distribution Date, then any distributions to CERS on account of its allocable share of those claims shall be made by the Disbursing Agent (i) to the trustee of the liquidating trust required to be created by Section 3.7 of the California Settlement Agreement (respectively, the "Liquidating Trustee" and the "Liquidating Trust") or (ii) if a stock transfer agent has been identified in writing to the Mirant Parties (as defined in the California Settlement Agreement) by CERS in

29

accordance with the notice provisions of the California Settlement Agreement at least ten (10) Business Days prior to the Distribution Date, then to such stock transfer agent for sale thereafter until further written notice by CERS to the Mirant Parties.  The Liquidating Trustee shall, if no stock transfer agent has been identified in writing to the Mirant Parties by CERS as provided above, thereafter administer such distributions in accordance with the terms of the written agreement establishing and governing the Liquidating Trust (the "California Liquidating Trust Agreement").

   (b) <u>Other California Parties</u>.  If, pursuant to Section 5.1.4 of the California Settlement Agreement, any of the California Parties timely elect to have their respective allocable share of the California Party Unsecured Claims distributed to the Liquidating Trust, then any distributions to such California Parties on account of their respective allocable share of those claims, <u>except</u> to the extent expressly provided for in their Section 5.1.4 election notices to Mirant, shall be made by the Disbursing Agent to the Liquidating Trustee and thereafter administered by the Liquidating Trustee in accordance with the terms of the California Liquidating Trust Agreement.

   (c) <u>Establishment of Liquidating Trust</u>.  The terms of the California Liquidating Trust Agreement shall be agreed upon by the Mirant Parties (as defined in the California Settlement Agreement) and the California Parties on or before the Confirmation Date.  The California Liquidating Trust Agreement shall be a Plan Document.

**10.12.  <u>Surrender and Cancellation of Instruments</u>.**

   As a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, <u>including</u>, without limitation, any guaranties <u>except</u> to the extent assumed by the Debtors, subject to Section 12.1(i), and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan.  Such certificate, instrument or note, <u>including</u> any such guaranties, shall thereafter be cancelled and extinguished.  The Disbursing Agent shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes, <u>including</u> any such guaranties, are surrendered, or (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form.  Any such holder who fails to surrender such certificates, instruments or notes, <u>including</u> any such guaranties, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution.  All property in respect of such forfeited Claims shall revert to New Mirant.  In the event such certificate, instrument or note is held in the name of, or by a nominee of, the Depository Trust Company, the Debtors shall seek the cooperation of the Depository Trust Company in facilitating distributions.

**10.13.  <u>Designated Net Litigation Distributions</u>.**

   As an essential bargained-for component of the global settlement between and among the Debtors, the Committees and Phoenix with regard to the Plan, Cash payments shall be

made in an amount equal to the aggregate Designated Net Litigation Distributions, such
payments to be shared on a 50/50 basis by the holders of the Allowed Mirant Debtor Class 3 –
Unsecured Claims (including holders of Allowed Claims in respect of Subordinated Notes) and
the holders of Allowed Mirant Debtor Class 5 – Equity Interests.  The mechanics of
implementing the foregoing sharing arrangement (including, without limitation, (a) whether the
litigation shall be prosecuted for the benefit of the above-noted holders of Claims and Equity
Interests through the vehicle of a trust, by New Mirant or an affiliate of New Mirant, (b) how the
litigation will be controlled and managed, (c) how the litigation will be funded, (d) the duties
owed by New Mirant with respect to the prosecution or settlement of the litigation (including the
provision of reasonable access to personnel and records in connection with the litigation), and (e)
whether the right of a beneficiary to participate in the payments shall be transferable), shall be
determined by the agreement of the Debtors, the Committees and Phoenix (such agreement not
to be unreasonably withheld). Payments triggered by the receipt of the first $175,000,000 in
aggregate Designated Net Litigation Distributions shall not be reduced by the amount of any
adverse tax consequences to New Mirant (regardless of whether such consequence is the
payment of taxes or the consumption of tax attributes) ("Adverse Tax Consequences"); with
respect to payments triggered by aggregate Designated Net Litigation Distributions over
$175,000,000, the amount of such payments shall be reduced by an amount equal to 100% of the
Adverse Tax Consequence to New Mirant, with the payment to holders of Allowed Mirant
Debtor Class 3 – Unsecured Claims to be reduced by an amount equal to 60% of the Adverse
Tax Consequences with respect to payments triggered by recoveries greater than $175,000,000
and less than $275,000,000; 70% with respect to payments triggered by recoveries equal to or
greater than $275,000,000 and less than $375,000,000; 80% with respect to payments triggered
by recoveries equal to or greater than $375,000,000 and less than $475,000,000; and 90% with
respect to payments triggered by recoveries equal to or greater than $475,000,000.  In each case,
for payments triggered by the receipt of amounts above $175,000,000, the amount of the
payments to the holders of Allowed Mirant Debtor Class 5 – Equity Interests shall be reduced by
an amount equal to (a) 100% of the Adverse Tax Consequences to New Mirant resulting from
any amount received on account of the Designated Net Litigation Distributions less (b) the
amount by which the payments made to the holders of Allowed Mirant Debtor Class 3 –
Unsecured Claims are reduced pursuant to this Section 10.13.  To the extent New Mirant
believes that a tax return reporting position at a level of authority not requiring separate
disclosures in its tax return can be reached, New Mirant will take the position on its tax returns
that any recoveries received by New Mirant or any of its subsidiaries in respect of Designated
Avoidance Actions are not taxable. The foregoing payment obligations shall be evidenced in a
fashion that shall be agreed upon by the Debtors, the Corp Committee, the Equity Committee
and Phoenix.

**10.14.  <u>Accrual of Interest for Purposes of Calculating Plan Distributions</u>.**

(a)      <u>Mirant Debtors</u>.  For purposes of calculating Plan Distributions, the accrual of
interest from the Petition Date through the Effective Date on Allowed Mirant Debtor Class 3 –
Unsecured Claims (including Allowed Claims in respect of Subordinated Notes) that have a
contractual interest rate shall be at the applicable non-default contractual rate with compounding
to occur on the date of scheduled payments.  With respect to holders of Allowed Unsecured
Claims against the Mirant Debtors that do not have a contractual rate of interest, interest from the

Petition Date through the Effective Date shall be herein accrued at the Federal Judgment Rate without compounding.

(b)      MAG Debtors; Unsecured Claims.  For purposes of making Plan Distributions to the holders of Allowed MAG Debtor Class 5 – Unsecured Claims, including, but not limited to, the MAG Short-term Debt Claims, that have a contractual rate of interest, interest will be accrued at the contractual non-default rate from the Petition Date through the Effective Date for each holder (including with respect to MAG Short-term Note Claims (i) interest on interest, as contemplated by Section 503 of the MAG Indenture, with semi-annual compounding on the date of each scheduled payment up and to the Effective Date; and (ii) "Additional Interest," as such term is defined in Section 2(e) of the MAG Registration Rights Agreements from August 28, 2003 to July 28, 2005, the period during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements).  With respect to holders of Allowed Unsecured Claims against the MAG Debtors that do not have a contractual rate of interest, interest will be accrued at the Federal Judgment Rate, from the Petition Date through the Effective Date without compounding.

(c)      MAG Debtors; MAG Long-term Note Claims.  For purposes of making Plan Distributions to the holders of MAG Debtor Class 6 – MAG Long-term Note Claims, interest will be accrued at the contractual rate from the Petition Date through the Effective Date for each holder (including (i) interest on interest, as contemplated by section 503 of the MAG Indenture, with semi-annual compounding on the date of each scheduled payment; and (ii) "Additional Interest," as such term is defined in Section 2(e) of the MAG Registration Rights Agreements from August 28, 2003 to July 28, 2005, the period during which MAG ceased to maintain its status as a reporting company under the Securities Exchange Act of 1934, as amended, as set forth in Section 2(e) of the MAG Registration Rights Agreements).

**10.15.  Supplemental Distributions to Holders of Allowed Mirant Debtor Class 3 – Unsecured Claims.**

Each holder of an Allowed Mirant Debtor Class 3 – Unsecured Claim shall receive a Pro Rata Share of all Plan Distributions reserved in respect of Mirant Debtor Class 3 – Unsecured Claims that are Contested Claims as of the Effective Date that subsequently become Disallowed Claims, in whole or in part.  Such supplemental Plan Distributions shall be made from time-to-time at the discretion of the Disbursing Agent; provided, that in no event shall the final such supplemental Plan Distribution be made later than 60 days after the last Contested Mirant Debtor Class 3 – Unsecured Claim becomes an Allowed Claim or a Disallowed Claim.

## ARTICLE XI.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

**11.1.  Objection Deadline.**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.  The Disbursing Agent shall not object to any Letter of Credit Claim on the basis that such Claim is contingent at any time prior to the expiration date of such letter of credit.

**11.2.  Prosecution of Contested Claims.**

The Disbursing Agent may object to the allowance of Claims filed with the Bankruptcy Court with respect to which liability is disputed in whole or in part.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 11.3.

**11.3.  Claims Settlement.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent shall have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court, other than (a) the settlement or compromise of a Claim where the difference between the amount of the Claim listed on the Debtors' Schedules and the amount of the Claim proposed to be Allowed under the settlement is in excess of $1,000,000, or (b) any settlement or compromise of a Claim or Cause of Action that involves an Insider.

**11.4.  Entitlement to Plan Distributions Upon Allowance.**

Notwithstanding any other provision of the Plan, no Plan Distribution shall be made with respect to any Claim to the extent it is a Contested Claim, unless and until such Contested Claim becomes an Allowed Claim, subject to the setoff rights as provided in Section 17.17.  When a Claim that is not an Allowed Claim as of the Effective Date (including, without limitation, any Claims of Pepco and SMECO that arise from the resolution of the matters set forth in Sections 14.5 and 14.8) becomes an Allowed Claim (regardless of when) the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

**11.5.  Estimation of Claims.**

The Disbursing Agent may, at any time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent has previously objected to such Claim or whether the Bankruptcy

Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contested Claim, that estimated amount will constitute the Allowed amount of such Claim for all purposes under the Plan.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding anything to the contrary in the Plan or the Bankruptcy Code, neither the Disbursing Agent nor any holder of a Letter of Credit Claim may seek to estimate a Letter of Credit Claim.

## ARTICLE XII.

### CONDITIONS PRECEDENT TO
### CONFIRMATION OF THE PLAN AND
### THE OCCURRENCE OF THE EFFECTIVE DATE

**12.1.** **Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan:

(a)    The Clerk of the Bankruptcy Court shall have entered an order or orders (i) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (ii) authorizing the solicitation of votes with respect to the Plan, (iii) determining that all votes are binding and have been properly tabulated as acceptances or rejection of the Plan, (iv) confirming and giving effect to the terms and provisions of the Plan, (v) determining that the settlements of certain inter-Debtor matters as set forth in Article II of the Plan are appropriate, (vi) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan, (vii) approving the Plan Documents, and (viii) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions and transfer of Assets contemplated by the Plan and the Plan Documents;

(b)    The Confirmation Order, the Plan Documents and the Plan subject to the provisions of Section 17.23 are each in a form satisfactory to the Debtors;

(c)    The Confirmation Order shall determine that the rights of the MIRMA Owner/Lessors shall have been resolved as set forth in Section 14.6;

(d)    The Confirmation Order shall include a determination that the treatment provided in the Plan with respect to MAG Debtor Class 6 – MAG Long-term Note Claims satisfies all of the requirements of reinstatement pursuant to section 1124 of the Bankruptcy Code and that the MAG Long-term Notes are, as of the Effective Date, reinstated and not in default, in particular, a finding by the Bankruptcy Court that (i) the MAG Long-term Notes are unimpaired under section 1124 of the Bankruptcy Code, (ii) all existing defaults under the MAG Long-term Notes are cured (save in respect of section 365(b)(2) of the Bankruptcy Code), and (iii) the transactions

contemplated by the Plan do not cause any default under the MAG Indenture in respect of the MAG Long-term Notes (giving effect to the New MAG Debt Covenants);

(e)     The Confirmation Order shall include a determination that the BEWAG Contract is not an obligation of New Mirant or its Affiliates and that BEWAG Counterparties shall have no rights or Claims against New Mirant or its Affiliates or their assets under the BEWAG Contract;

(f)     The Confirmation Order shall include a determination that confirmation of the Plan does not terminate the Debtors' right to continue to pursue assumption or rejection, pursuant to section 365 of the Bankruptcy Code, of (i) any agreement with Pepco or its subsidiaries as to which the Debtors have commenced an action seeking to reject, recharacterize or avoid the Debtors' obligations thereunder, but as to which such actions have not been determined by Final Order prior to entry of the Confirmation Order, (ii) the FCC Agreement, or (iii) the Site Lease;

(g)     The Confirmation Order shall include findings that if the reasonable consent of any counterparty to an executory contract of the Trading Debtors is required in connection with the transfer of such contract to MET under the Plan (i) the refusal to grant such consent is per se unreasonable, and (ii) such consent shall be deemed to have been given;

(h)     The Confirmation Order shall include determinations that all of the settlements and compromises contained in the Plan meet the applicable standards under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval and implementation; and

(i)     The Bankruptcy Court shall have entered the Implementation Order ordering that (A) no later than five Business Days after written notification by MET that the Effective Date has occurred, (i) each applicant with respect to each letter of credit issued to a Trading Debtor as beneficiary securing a Transferred Trading Obligation shall cause each such letter of credit to be amended, modified or reissued by the applicable issuer to name MET instead of such Trading Debtor as a beneficiary thereof or provide such other replacement collateral as is acceptable to MET in its sole discretion and (ii) each guarantor that has issued a guarantee in favor of a Trading Debtor with respect to a Transferred Trading Obligation shall amend or modify such guarantee to name MET as the beneficiary of such guarantee in place of such Trading Debtor and (B) as of the Effective Date, (1) all other collateral held by a Trading Debtor securing a Transferred Trading Obligation, including any and all rights to exercise remedies with respect to such collateral, shall be assigned or otherwise transferred by such Trading Debtor to MET without further order of the Bankruptcy Court, (2) the right to draw or make a demand on any existing letter of credit, guarantee or other collateral securing a Transferred Trading Obligation shall be fully assigned or otherwise transferred by each applicable Trading Debtor to MET and MET shall be fully empowered, authorized and directed without further order of the Bankruptcy Court to draw or make a demand on any such letter of credit, guarantee or other collateral according to the terms of applicable letter of credit, guarantee or agreement pursuant to which such collateral is held and to retain any such draws for its own account, (3) any letter of credit for which a Debtor is the applicant and securing a Transferred Trading Obligation shall be deemed automatically to secure such Transferred Trading Obligation after such Transferred Trading Obligation has been transferred to MET; provided, that any such letter of credit shall be deemed

automatically cancelled upon the issuance of a substantially similar replacement letter of credit securing such Transferred Trading Obligation, (4) any guarantee previously issued by any of the Debtors to secure a Transferred Trading Obligation shall be deemed automatically to secure such Transferred Trading Obligation after such Transferred Trading Obligation has been transferred to MET; provided, that any guarantee shall be deemed automatically cancelled upon the issuance of a substantially similar replacement guarantee securing such Transferred Trading Obligation, (5) any cash posted by any of the Debtors to secure a Transferred Trading Obligation shall be deemed automatically to be property of MET and posted thereby to secure such Transferred Trading Obligation, and (6) all applicable parties shall take all actions reasonably required to implement the terms of the Implementation Order.  The Implementation Order shall further clarify that any failure to amend, modify or reissue a letter of credit or to amend or modify a guarantee within the five Business Day period referred to in sub-clause (A) of this Section shall constitute an event of default under the trading contract or agreement giving rise to the relevant Transferred Trading Obligation notwithstanding any other cure period that might be set forth in such trading contract or agreement.

**12.2.   Conditions Precedent to the Occurrence of the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date:

(a)   The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(b)   All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments provided for or contemplated by the Plan, including, without limitation, satisfaction or waiver of all conditions to (i) the obligations of the Debtors under the Plan and the Plan Documents, and (ii) the obligations of the Exit Lenders to make loans under the Exit Facility; and

(c)   The New MAG Holdco Indenture, the New MAG Holdco Notes, and the Exit Facility shall have become effective and all conditions to the effectiveness thereof shall have been satisfied or waived.

**12.3.   Waiver of Conditions.**

Subject to Section 17.23, the Debtors may waive any one or more of the conditions set forth in Section 12.1(c), (e), (f), (g), (h) or (i) or Section 12.2(b) or (c) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

**12.4.   Effect of Non-Occurrence of the Effective Date.**

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of the Debtors, including without limitation, the right to seek a further extension of the exclusivity periods under section 1121(d)

of the Bankruptcy Code; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors.

## ARTICLE XIII.

## THE DISBURSING AGENT

### 13.1.   Powers and Duties.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims and Equity Interests; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article XI, and prosecute such objections; (e) compromise and settle any issue or dispute regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article XI; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time; such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

### 13.2.   Plan Distributions.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent shall make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

### 13.3.   Exculpation.

**Except as otherwise provided in this Section 13.3, the Disbursing Agent, including the Old Indenture Trustees (and each of their respective paying agents), as applicable, as disbursing agent for the holders of the MAG Short-term Note Claims, MAG Long-term Note Claims, Mirant Debt Claims and Subordinated Note Claims, together with their officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent and the Old Indenture Trustees (and each of their respective paying agents), by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Disbursing Agent and/or such Old Indenture Trustee's willful misconduct or gross negligence.  No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or such Old Indenture Trustees, or their respective officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan.  Nothing contained in this Section 13.3 shall**

**preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from
bringing an action in the Bankruptcy Court against any Debtor to compel the making of
Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.**

## ARTICLE XIV.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 14.1. Assumption and Rejection of Executory Contracts and Unexpired Leases.

(a)     On the Effective Date, all executory contracts and unexpired leases of the Debtors
shall be rejected pursuant to the provisions of section 365 of the Bankruptcy Code, including, but
not limited to, those agreements listed and described in Schedule 11 attached to the Disclosure
Statement, except: (i) any executory contracts and unexpired leases that are the subject of
separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy
Code by the Debtors before the Effective Date; (ii) contracts and leases listed in Schedule 12
attached to the Disclosure Statement and any subsequently filed "Schedule of Assumed and
Assumed and Assigned Executory Contracts and Unexpired Leases" to be filed by the Debtors
with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii)
all executory contracts and unexpired leases assumed or assumed and assigned under this Plan or
by order of the Bankruptcy Court entered before the Effective Date; (iv) any executory contract
or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to
the next section hereof and for which the Debtors make a motion to reject such contract or lease
based upon the existence of such dispute filed at any time; (v) any agreement, obligation,
security interest, transaction or similar undertaking that the Debtors believe is not executory or a
lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired
lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code; (vi)
any agreement between the Debtors and Pepco or any of its subsidiaries; (vii) the MIRMA
Leases; (viii) the BEWAG Contract; (ix) the FCC Agreement and the Site Lease; (x) any
executory contracts or unexpired leases constituting CC8 Assets, which shall be treated as set
forth in the California Settlement Agreement and in the related implementing agreements; (xi)
any oral or written joint defense agreements relating to actual, potential, or threatened litigation
or investigations involving any of the Debtors, which shall be assumed; (xii) any Western
Systems Power Pool Agreement with any counterparty, which shall be assumed unless
specifically listed as an agreement to be rejected on Schedule 11 attached to the Disclosure
Statement; (xiii) any unexecuted service agreement to an electric sales or transmission and
natural gas transportation tariff on file with the Federal Energy Regulatory Commission, which
shall be assumed unless specifically listed as an agreement to be rejected on Schedule 11
attached to the Disclosure Statement; (xiv) any guaranty or similar agreement executed by a third
party which guarantees repayment or performance of an obligation owed to any of the Debtors or
to indemnify the Debtors; and (xv) agreements with third parties (including governmental
entities and agencies) regarding preservation of the confidentiality of documents produced by the
Debtors.  Any order entered postconfirmation by the Bankruptcy Court, after notice and a
hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such
rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as
if such relief was granted and such order was entered preconfirmation.  The Debtors reserve the
right to amend Disclosure Statement Schedules 11 and 12 or the "Schedule of Assumed and

Assumed and Assigned Executory Contracts and Unexpired Leases" prior to the entry of the
Confirmation Order.  Each executory contract and unexpired lease to be assumed or assumed and
assigned by the Debtors shall include modifications, amendments, supplements, restatements or
other similar agreements made directly or indirectly by any agreement, instrument or other
document that affects such executory contract or unexpired lease, without regard to whether such
agreement, instrument or other document is listed on Disclosure Statement Schedule 12 or the
"Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases."

(b)      Inclusion of a contract, lease or other agreement on Disclosure Statement
Schedules 11 shall constitute adequate and sufficient notice that (i) any Claims arising
thereunder or related thereto shall be treated as Unsecured Claims under the Plan, and (ii) the
Debtors are no longer bound by, or otherwise obligated to perform, any such obligations,
transactions, or undertakings relating thereto or arising thereunder.  The inclusion of a contract,
lease or other agreement in Section 14.1(a) or on Disclosure Statement Schedule 11 or 12 or the
"Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases"
shall not constitute an admission by the Debtors as to the characterization of whether any such
included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease
or whether any claimants under any such contract, lease or other agreement are time-barred from
asserting Claims against the Debtors.  The Debtors reserve all rights with respect to the
characterization of any such agreements.

(c)      The Plan shall constitute a motion to reject such executory contracts and
unexpired leases rejected pursuant to this section, and the Debtors shall have no liability
thereunder <u>except</u> as is specifically provided in the Plan.  Entry of the Confirmation Order by the
Clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section
365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejected
agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is
in the best interests of the Debtors and their estates.

(d)      The Plan shall constitute a motion to assume and assign such executory contracts
and unexpired leases as set forth in Schedule 12 or the "Schedule of Assumed and Assumed and
Assigned Executory Contracts and Unexpired Leases" or as otherwise designated as being
assumed or assumed and assigned in Section 14.1(a) and the Debtors shall have no liability
thereunder for any breach of such assumed and assigned executory contract or lease occurring
after such assignment pursuant to section 365(k) of the Bankruptcy Code, <u>except</u> as is
specifically provided in the Plan.  Entry of the Confirmation Order by the Clerk of the
Bankruptcy Court shall constitute approval of such assumption and assignment pursuant to
sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that
the requirements of section 365(f) of the Bankruptcy Code have been satisfied.  Any non-Debtor
counterparty to an agreement listed on Schedule 12 or the "Schedule of Assumed and Assumed
and Assigned Executory Contracts and Unexpired Leases" or otherwise designated as being
assumed or assumed and assigned in Section 14.1(a) who disputes the assignment of an
executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the
Debtors and the Committees, a written objection to the assumption and assignment, which
objection shall set forth the basis for the dispute by no later than ten (10) days prior to the
Confirmation Hearing.  The failure to timely object shall be deemed a waiver of any and all
objections to the assumption and assignment of executory contracts and leases as set forth in

Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" or as otherwise designated as being assumed or assumed and assigned in Section 14.1(a).

**14.2.  Cure.**

At the election of the Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code: (a) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (b) on such other terms as agreed to by the parties to such executory contract or unexpired lease.  In the event of a dispute regarding: (i) the amount of any cure payments; (ii) the ability to provide adequate assurance of future performance under the contract or lease to be assumed or assigned; or (iii) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption or assignment, as applicable, except with respect to agreements subject to 14.1(a)(xi)-(xv) for which the cure amounts are zero.  Disclosure Statement Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" attached to the Disclosure Statement set forth the Debtors' cure obligations for each agreement which a cure obligation must be satisfied as a condition to the assumption or assumption and assignment of such agreement.  Any non-Debtor counterparty to an agreement listed on the Disclosure Statement Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" who disputes the scheduled cure obligation must file with the Bankruptcy Court, and serve upon the Debtors and the Committees, a written objection to the cure obligation, which objection shall set forth the basis for the dispute, the alleged correct cure obligation, and any other objection related to the assumption or assumption and assignment of the relevant agreement by no later than ten (10) Business Days prior to the Confirmation Hearing.  If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the cure obligation set forth on the Disclosure Statement Schedule 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption or assumption and assignment of the relevant agreement as proposed by the Debtors.

**14.3.  Claims Arising from Rejection, Expiration or Termination.**

Claims created by the rejection of executory contracts and unexpired leases or the expiration or termination of any executory contract or unexpired lease prior to the Confirmation Date must be filed with the Bankruptcy Court and served on the Debtors (a) in the case of an executory contract or unexpired lease rejected by the Debtors prior to the Confirmation Date, in accordance with the Bar Date Notice, or (b) in the case of an executory contract or unexpired lease that (i) was terminated or expired by its terms prior to the Confirmation Date, or (ii) is rejected pursuant to Section 14.1, no later than thirty (30) days after the Confirmation Date.  Any such Claims for which a proof of claim is not filed and served within such time will be forever barred from assertion and shall not be enforceable against the Debtors, New Mirant, their respective Estates, Affiliates, or the Assets.  Unless otherwise ordered by the Bankruptcy Court,

all such Claims that are timely filed as provided herein shall be treated as Unsecured Claims under the Plan subject to objection by the Disbursing Agent.

**14.4.    Special Provisions Relating to the BEWAG Contract.**

In the event the Bankruptcy Court determines that the BEWAG Contract is an executory contract, the BEWAG Contract shall not be assumed or rejected pursuant to section 365 of the Bankruptcy Code and shall instead ride through the chapter 11 process.  From and after the Effective Date, the BEWAG Contract shall constitute an asset and obligation of Mirant with the same force and effect and to the extent that the BEWAG Contract was an asset and obligation of Mirant prior to the Petition Date.  From and after the Effective Date, the counterparties under the BEWAG Contract shall be entitled to exercise all rights and remedies available, if any, to enforce the BEWAG Contract against Mirant.  IN NO EVENT SHALL THE OBLIGATIONS ARISING UNDER THE BEWAG CONTRACT CONSTITUTE OBLIGATIONS OF, OR BE ENFORCEABLE AGAINST, NEW MIRANT, ITS SUBSIDIARIES OR THEIR ASSETS.  THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE BEWAG COUNTERPARTIES FROM TAKING ANY ACTION TO ENFORCE THE BEWAG CONTRACT AND THE OBLIGATIONS ARISING THEREUNDER AGAINST NEW MIRANT, ITS SUBSIDIARIES AND THEIR ASSETS.

**14.5.    Special Provisions Relating to Agreements with Pepco and its Subsidiaries.**

(a)    <u>Interim Performance</u>.  Pending a determination by Final Order of the disputes regarding the Debtors' right to reject the Back-to-Back Agreement (or the APSA, if it is determined by Final Order that the Back-to-Back Agreement is not severable from the APSA for purposes of rejection under section 365 of the Bankruptcy Code) and the Claims of Pepco thereunder, (i) the Debtors' obligations under the Back-to-Back Agreement, the APSA, and the Assumption/Assignment Agreement shall be interim obligations of Mirant Oregon and unconditionally guaranteed by New Mirant, and no other subsidiary of New Mirant shall have any liability with respect to such interim performance, and (ii) any Debtor's obligations under any other agreement with Pepco or its subsidiaries shall be interim obligations of such Debtor, and no other subsidiary of New Mirant shall have any liability with respect to such interim performance.  During this period, Pepco shall not be permitted to exercise any right or remedy arising from any default occurring under any such agreement prior to the Petition Date.

(b)    <u>Reservation of Rights</u>**.**  The Debtors shall have the right, at any time prior to the commencement of the Confirmation Hearing, to commence an action or proceeding to obtain a Final Order (i) authorizing the Debtors to assume or reject any or all of the agreements with Pepco or any of its subsidiaries, (ii) determining that the Debtors' obligations under any of such agreements constitute prepetition debt obligations, (iii) determining that any postpetition amounts paid (in excess of the value of any actual benefits received) by the Debtors, Mirant Oregon, and/or New Mirant to Pepco (<u>including</u> payments made after the Effective Date) are recoverable by the Debtors pursuant to sections 105, 503, and 549 of the Bankruptcy Code; (iv) recharacterizing obligations under the agreement arising on or before the Petition Date; (v) avoiding any or all of the obligations under the agreements under the Pepco Causes of Action; or (vi) otherwise resolving the disputes between the Debtors and Pepco.  Nothing herein shall (A) preclude the Debtors and Pepco from seeking approval of a negotiated settlement of any such

41

disputes, actions or matters at any time after the Effective Date, or (B) limit the rights, remedies, claims or defenses of Pepco with respect to the matters set forth herein or in connection with any pending litigation.

(c)     Condition Subsequent.  Upon a determination by Final Order (i) authorizing the assumption or rejection of any agreement with Pepco or its subsidiaries; (ii) recharacterizing the obligations arising under any such agreement; or (iii) avoiding the obligations under such agreements, then (A) such agreement shall be rejected, recharacterized, and/or avoided, as the case may be, (B) the interim performance obligations set forth in Section 14.5(a) (and any guarantee thereof) shall terminate and be of no further force or effect, (C) New Mirant (for itself or as agent) may pursue any claims it may have against Pepco or third parties for rescission damages, (D) any Claim of Pepco resulting therefrom shall, upon becoming Allowed, be entitled to the treatment specified in the Plan the same as though such Claim became Allowed as of the Effective Date.  If the Debtors are unable to obtain a Final Order authorizing the rejection, recharacterization or avoidance of any agreement with Pepco or its subsidiaries, to the extent such agreement constitutes an executory contract pursuant to section 365 of the Bankruptcy Code, such agreement shall be assumed by the Debtor that is a party thereto (and in the case of the Back-to-Back Agreement, the APSA and the Assumption/Assignment Agreement, assigned to Mirant Oregon and unconditionally guaranteed by New Mirant) and in connection therewith all required cure obligations under section 365 of the Bankruptcy Code shall then be performed pursuant to Section 14.2.

**14.6.   Special Provisions Related to the MIRMA Leases.**

(a)     Solely for the purpose of the Plan, the MIRMA Leases shall be treated as unexpired leases under section 365 of the Bankruptcy Code.  On or before the Effective Date, (i) the MIRMA Leases shall be assumed and all cure obligations and all obligations to provide adequate assurance of future performance shall be satisfied as required by the Bankruptcy Code; and (ii) MIRMA shall (A) assign the MIRMA Leases to MD Leaseco pursuant to section 365(f) of the Bankruptcy Code, and (B) be relieved of any obligations under the MIRMA Leases pursuant to section 365(k) of the Bankruptcy Code.

(b)     The Confirmation Order shall contain findings of fact and conclusions of law, as appropriate, providing that (i) the MIRMA Dickerson Leases constitute a single integrated transaction, (ii) the MIRMA Morgantown Leases constitute a single integrated transaction, (iii) sections 5.13, 5.14, 6.3, 6.7 and 6.8 (collectively, the "Unenforceable Covenants") of the relevant Participation Agreement in respect of the MIRMA Leases are unenforceable against MIRMA or MD Leaseco, as assignee, pursuant to sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code; (iv) upon assignment of the MIRMA Leases, Mirant Chalk Point LLC, Mirant Peaker and Mirant Potomac or any other entity other than a wholly-owned subsidiary of MD Leaseco shall not be considered "Designated Subsidiaries" or "Subsidiaries" as such terms are used in the relevant Participation Agreement in respect of the MIRMA Leases; and (v) any failure of MIRMA and/or MD Leaseco to comply with the Unenforceable Covenants shall not constitute a default or event of default under any of the MIRMA Leases.

(c)      All parties to the MIRMA Leases shall be permanently enjoined from taking any action or exercising any remedies against any other party to the MIRMA Leases on account of the Debtors' and/or MD Leaseco's failure to comply with the Unenforceable Covenants.

(d)      The treatment of the MIRMA Leases as unexpired leases shall not constitute an admission by the Debtors regarding the appropriate characterization of the MIRMA Leases or that the Debtors' obligations under the MIRMA Leases do not constitute prepetition debt obligations subject to compromise, and all rights of the Debtors are hereby reserved consistent with the MIRMA Lease Litigation Dismissal Order.

(e)      Unless affirmatively objected to in writing by the MIRMA Owner/Lessors, the provisions of this subsection (e) shall constitute a proposal of settlement by the Debtors deemed to have been accepted by the MIRMA Owner/Lessors, of all issues and disputes relating to the assumption of the MIRMA Leases, including all issues relating to the enforceability of the Unenforceable Covenants, cure and adequate assurance of future performance. In exchange for the deemed acceptance of the proposed settlement contemplated hereby, the Debtors agree and the MIRMA Owner/Lessors are deemed to have agreed, without conceding the validity or likelihood of success on the merits of any of the Debtors' positions, as follows:

(i)      As, among other things, adequate assurance of future performance with respect to the MIRMA Leases, (A) in lieu of assigning the MIRMA Leases to MD Leaseco, MIRMA shall assume, affirm and agree to be bound from and after the Effective Date by the MIRMA Leases, including each section identified as an Unenforceable Covenant, except for (I) section 6.8 of each Participation Agreement, which, as stated therein, shall be deemed unenforceable under sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code, provided that in lieu thereof MIRMA shall agree to be bound by the provisions of Section 6.8 of each Participation Agreement subject to (aa) the threshold for the "Fixed Charge Coverage Ratio" (as defined in each Participation Agreement) being 1.4 to 1.0, 1.35 to 1.0, 1.30 to 1.0, 1.25 to 1.0 and 1.20 to 1.0, in clause (1), (2), (3), (4) and (5), respectively, of subsections 6.8(B) and (C) of each Participation Agreement; (bb) for the purposes of determining the "Fixed Charge Coverage Ratio" under subsections 6.8(B) and (C) of each Participation Agreement, "Consolidated EBITDA" as used therein shall have the same meaning as set forth in the relevant Participation Agreement except that the word "similar" shall be deleted; (cc) MIRMA may treat "Consolidated EBITDA" generated and not dividended during the Chapter 11 Cases as being reserved in such period for the payment of "Capital Expenditures" (as such term is defined in the relevant Participation Agreements) in a future period; and (dd) MIRMA may make "Restricted Payments" (as defined in the relevant Participation Agreement) under the section 6.8 of each Participation Agreement based on the "Fixed Charge Coverage Ratio" for the most recently ended four full Fiscal Quarters for which financial statements are available, and (II) section 5.13 of each Participation Agreement, which, as stated therein, shall be deemed unenforceable under sections 365(b)(2), (e)(1) and/or (f)(1) of the Bankruptcy Code, provided that in lieu thereof MIRMA shall agree to be bound by the provisions of section 5.13 except that an irrevocable, unconditional, collateralized stand by letter of credit shall also constitute "Qualifying Credit Support" as such term is used therein; and (B) as set forth in section 8.2(d)(vi) hereof, the Series A Preferred Shares shall be issued to MIRMA; and

(ii)     As, among other things, part of MIRMA's cure obligations upon assumption of the MIRMA Leases, MIRMA agrees to pay (and notwithstanding anything to the contrary, will not contest payment of) on the Effective Date all reasonable and documented legal and consulting fees incurred by the MIRMA Owner/Lessors in connection with the Chapter 11 Cases, up to $10,000,000 and shall hold harmless and indemnify the MIRMA Owner/Lessors against the payment of fees incurred by the MIRMA Indenture Trustee in connection with the Chapter 11 Cases.  The Confirmation Order shall provide that the MIRMA Indenture Trustee is enjoined from seeking reimbursement of fees and expenses incurred in connection with the Chapter 11 Cases from the Debtors, the MIRMA Owner/Lessors or any affiliates thereof except as approved by the Bankruptcy Court.  If the MIRMA Indenture Trustee does not object to confirmation of the Plan, MIRMA agrees to pay (and notwithstanding anything to the contrary, will not contest payment of) on the Effective Date all reasonable and documented legal and consulting fees incurred by the MIRMA Indenture Trustee in connection with the Chapter 11 Cases, up to $10,000,000.

(f)     In the event the MIRMA Owner/Lessors object to confirmation of the Plan, the provisions of the proposed settlement contained in subsection (e) shall be of no effect and shall not be binding on the Debtors in any manner, including in connection with any determination by the Bankruptcy Court regarding adequate assurance of future performance and cure.

**14.7.   Special Provisions Relating to Mint Farm.**

Notwithstanding anything in this Article XIV to the contrary, but except with respect to any executory contract or unexpired lease that is specifically listed on Disclosure Statement Schedules 11, 12 or the "Schedule of Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases," or has already been assumed or rejected prior to the Confirmation Date, the deadline for the Debtors to assume or reject executory contracts and unexpired leases that relate to the Mint Farm generating facilities is extended to the earlier to occur of the following:  (a) the date upon which the sale of the Mint Farm generating facility (and related assets) closes; and (b) one year after the Effective Date, or such later date extended by the Bankruptcy Court after notice and a hearing.  Bankruptcy Code section 365 shall apply to any motion to reject, assume, or assume and assign any executory contracts that are subject to this section.  Any rejection damages Claim with respect to an executory contract or unexpired lease relating to Mint Farm shall be filed with the Bankruptcy Court and served on the Debtors no later than thirty (30) days after the rejection has become effective.  The Debtors reserve all rights to object to such claims.

**14.8.   Special Provisions Relating to the FCC Agreement.**

(a)     Interim Performance.   Pending a determination by Final Order of the disputes regarding the proper characterization of the FCC Agreement and whether any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code, the Debtors' postpetition obligations under the FCC Agreement shall be performed by Mirant Peaker and the Debtors' postpetition obligations under the Site Lease shall be performed by Mirant Chalk Point.  Neither New Mirant nor any other subsidiary of New Mirant shall have any liability with respect to such interim performance of the FCC Agreement

or the Site Lease. During this period, neither SMECO nor Pepco shall be permitted to exercise any right or remedy arising from any default occurring under the FCC Agreement or Site Lease prior to the Petition Date.

(b)     Reservation of Rights.  Subject to the provisions of paragraph (c) below, the Debtors shall have the right, at any time prior to the commencement of the Confirmation Hearing to commence an action seeking a Final Order (i) authorizing the Debtors to assume or reject the FCC Agreement and the Site Lease, (ii) determining that the FCC Agreement constitutes a lease of non-residential real property and that any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code, (iii) determining that the Debtors' obligations under the FCC Agreement constitute prepetition debt obligations, (iv) determining that any postpetition amounts paid (in excess of the value of any actual benefits received) by the Debtors to SMECO (including payments made after the Effective Date) are recoverable by the Debtors pursuant to sections 105, 503, and 549 of the Bankruptcy Code; (v) recharacterizing obligations under the FCC Agreement as Claims arising on or before the Petition Date; or (vi) otherwise resolving the disputes between the Debtors and SMECO and Pepco relating to the FCC Agreement.  Nothing herein shall (A) preclude the Debtors, SMECO and Pepco from seeking approval of any negotiated settlement of any such disputes, actions or matters, or (B) limit the rights, remedies, claims or defenses of Pepco or SMECO with respect to the matters set forth herein or in connection with the pending litigation.

(c)     Time for Assumption or Rejection.  Notwithstanding anything in this Article XIV of the Plan to the contrary, the deadline for the Debtors to assume or reject the FCC Agreement and the Site Lease is extended to 60 days after determination by Final Order of the disputes regarding the proper characterization of the FCC Agreement and whether any Claims for damages arising from the rejection of the FCC Agreement should be limited by section 502(b)(6) of the Bankruptcy Code.  To the extent practical and applicable, Bankruptcy Code section 365 and Sections 14.2 and 14.3 above shall apply to assumption or rejection of the FCC Agreement and the Site Lease.  Any rejection damages Claim with respect to the FCC Agreement or the Site Lease shall be filed with the Bankruptcy Court and served on the Debtors no later than 30 days after the rejection has become effective. The Debtors reserve all rights to object to such claims. If the Debtors are unable to obtain a Final Order (i) authorizing recharacterization of the FCC Agreement and limiting rejection damages thereunder pursuant to section 502(b)(6) of the Bankruptcy Code, or (ii) otherwise authorizing the rejection of the FCC Agreement or the Site Lease, the FCC Agreement shall be assumed by Mirant Peaker and the Site Lease shall be assumed by Mirant Chalk Point (and in connection therewith all required cure obligations under section 365 of the Bankruptcy Code shall then be performed pursuant to Section 14.2).

## ARTICLE XV.

## SETTLEMENTS AND COMPROMISES

### 15.1.  California Settlement.

The California Settlement is hereby incorporated into the Plan by this reference. To the extent there is any conflict between the California Settlement Agreement and the Plan, the California Settlement Agreement shall prevail.

45

**15.2.    Settlement of Prepetition Employee Agreements.**

The Plan provides for the settlement of most existing employee obligations (both with active and inactive employees).  Specifically, the Plan shall constitute a motion under sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019 for approval of (i) the settlement of claims by employees regarding 26 prepetition retention agreements and (ii) three non-qualified retirement programs on the following terms:

(a)    With respect to the prepetition retention agreements, (i) for employee-related services rendered before the Petition Date, each employee will receive an Allowed Mirant Debtor Class 3 – Unsecured Claim; and (ii) for employee-related services rendered after the Petition Date, each employee will receive an Allowed Administrative Claim for any and all payments due and owing during the Debtors' Chapter 11 Cases; provided that each affected employee was employed on the Petition Date and continues to be employed on the postpetition contractual payment date. To the extent such affected employee participates in KERP, the applicable amount paid under KERP will be a direct dollar-for-dollar offset of any payment due and owing under a retention agreement related to post-KERP employment.  If an employee accepts this settlement, the respective prepetition retention agreement will be terminated (except the employee must continue to be employed on the contractual payment date as condition precedent to receiving the treatment provided in this settlement) and the employee's claim will be treated pursuant to the terms of the settlement.  Alternatively, if the employee chooses to opt out of this settlement, the respective prepetition retention agreement will be rejected and the employee will be permitted to file a rejection claim, in accordance with the rejection procedures. Any employee that is a party to a prepetition retention agreement that has been rejected by the Debtors is not eligible to opt-in to this settlement.

(b)    With respect to the non-qualified retirement programs for former employees, the following three plans are reinstated and assumed by the Debtors: (i) the Mirant Services Supplemental Benefit Plan; (ii) the Mirant Services Supplemental Executive Retirement Plan; and (iii) the Deferred Compensation Plan for Directors and Select Employees.

**15.3.    Proposed New York Tax Settlement.**

(a)    Motion to Compromise and Settle. The Plan shall constitute a motion under sections 1123(b) (3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019 seeking approval of a proposed settlement of the disputes with the New York Taxing Authorities whose rights will be modified as set forth in the definitive agreements filed as Plan Documents.

(b)    Acceptance of the Proposed New York Tax Settlement. If the Plan is unanimously and affirmatively accepted by each of the New York Taxing Authorities, then the Debtors and the New York Taxing Authorities shall work together in good faith to consummate all conditions precedent to the Proposed New York Tax Settlement for the New York Debtors Effective Date to occur as soon as is practicable.  The Confirmation Order shall provide that, to the extent that the New York Debtors Effective Date does not occur on or before the Effective Date for Mirant (i) New Mirant or its subsidiaries shall be authorized to operate the business of and provide debtor-in-possession financing to the New York Debtors, and (ii) in the event that New York Debtors Effective Date does not occur within 120 days of the Confirmation Date or the Proposed New

York Tax Settlement terminates at any time prior to the occurrence of the New York Debtors
Effective Date, unless otherwise ordered by the Bankruptcy Court, (A) the Plan shall without
further action of the Debtors be deemed terminated with respect to the New York Debtors and
otherwise amended to exclude the New York Debtors from the remaining MAG Debtors and (B)
the exclusive periods in which the New York Debtors possess the exclusive right to file a plan of
reorganization and solicit acceptances thereto shall be extended for an additional 180 days from
such date of termination and amendment of the Plan without prejudice to the rights of the New
York Debtors to seek additional extensions or the rights of parties in interest to seek to shorten or
terminate such exclusive periods.  Such deemed amendment shall be without prejudice to the
New York Debtors to further amend, modify or revoke the Plan and/or submit any new plan of
reorganization as it relates to the New York Debtors.  In addition, notwithstanding any other
provision in the Plan, (A) both the Mirant Debtors and the MAG Debtors will reserve the rights
to assert Claims against the New York Debtors arising from and after July 15, 2003 (the date the
New York Debtors filed their respective petitions for relief under chapter 11); (B) the New York
Debtors will reserve the rights to assert Claims against the Mirant Debtors and the MAG Debtors
arising from and after July 15, 2003, the treatment of which shall be subject to the Plan; and (C)
Intercompany Claims held by the New York Debtors (and those against them held by any other
Debtor) will also be reserved, the treatment of which shall be subject to the Plan.

        (c)      Rejection of the Proposed New York Tax Settlement. If the Plan is not accepted
by each of the New York Taxing Authorities, and notwithstanding the voting requirements of
section 1126 of the Bankruptcy Code, the Plan shall be deemed amended without further action
of the Debtors to exclude the New York Debtors from the MAG Debtors, and the Confirmation
Hearing in respect of the Plan as to the New York Debtors shall be adjourned until further notice
or order of the Bankruptcy Court.  If this occurs, the Confirmation Order shall (i) authorize New
Mirant or its subsidiaries to operate the business of and provide debtor-in-possession financing to
the New York Debtors, and (ii) provide an extension of the periods in which the New York
Debtors possess the exclusive right to file a plan of reorganization and solicit acceptances thereto
for an additional one hundred and eighty (180) days without prejudice to the rights of the New
York Debtors to seek additional extensions or the rights of parties in interest to seek to shorten or
terminate such exclusive periods.  Such deemed amendment shall be without prejudice to the
New York Debtors to further amend, modify or revoke the Plan and/or submit any new plan of
reorganization as it relates to the New York Debtors.  In addition, notwithstanding any other
provision in the Plan, (A) both the Mirant Debtors and the MAG Debtors will reserve the rights
to assert Claims against the New York Debtors arising from and after July 15, 2003 (the date the
New York Debtors filed their respective petitions for relief under chapter 11); (B) the New York
Debtors will reserve the rights to assert Claims against the Mirant Debtors and the MAG Debtors
arising from and after July 15, 2003, the treatment of which shall be subject to the Plan; and (C)
Intercompany Claims held by the New York Debtors (and those against them held by any other
Debtor) will also be reserved, the treatment of which shall be subject to the Plan.  If the Debtors
and the New York Taxing Authorities do not agree to definitive binding agreements in respect of
the Proposed New York Tax Settlement prior to the commencement of the Confirmation
Hearing, the New York Taxing Authorities shall be deemed to have rejected the Plan.

**15.4.**    <u>**Settlement of Certain Subordination Rights.**</u>

As permitted by Section 17.3, the Plan constitutes a motion pursuant to sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019 to compromise and settle the right of the holders of Mirant Debt Claims to enforce contractual subordination provisions against all holders of Subordinated Note Claims on the following terms:

(a)    each holder of an Allowed Subordinated Note Claim shall receive a Pro Rata Share of (i) 3.5% of the shares of New Mirant Common Stock to be issued under the Plan (<u>excluding</u> the shares (A) to be issued to the holders of Allowed MAG Debtor Class 5 – Unsecured Claims and Allowed MAG Debtor Class 4 – PG&E/RMR Claims; <u>provided</u>, that, if any such shares to be issued to the holders of Allowed MAG Debtor Class 5 – Unsecured Claims and Allowed MAG Debtor Class 4 – PG&E/RMR Claims are issued to the holders of Allowed Mirant Debtor Class 3 – Unsecured Claims, then the holders of Allowed Subordinated Note Claims shall receive 3.5% of such shares; and (B) to be reserved for issuance pursuant to the New Mirant Employee Stock Programs), (ii) the New Mirant Series B Warrants and (iii) the right to share on a <u>pari passu</u> basis in the Designated Net Litigation Distributions allocated to the holders of Allowed Mirant Debtor Class 3 – Unsecured Claims as provided in Section 10.13;

(b)    except for the Plan Distributions contemplated by Sections 15.4(a), and 10.13, any Plan Distribution that would otherwise be distributable under the Plan to the holders of Allowed Subordinated Note Claims but for the enforcement of the subordination provision in the applicable indenture, shall be distributed to the holders of Allowed Mirant Debt Claims; and

(c)    the reimbursement of the fees and expenses of Phoenix as contemplated by Section 6.2(d)(i).

**ARTICLE XVI.**

<u>**RETENTION OF JURISDICTION**</u>

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and <u>except</u> as expressly limited by the California Settlement Agreement and related agreements, the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)    To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XIV hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (<u>including</u>, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(ii)     To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the Debtors, as applicable, after the Effective Date;

(iii)    To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)    To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)    To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)   To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(viii)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)    To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)    To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which New Mirant and its Affiliates, the Debtors, the Debtors-in-Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)   To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors (including

Avoidance Actions) commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)    To enter an order or final decree closing the Chapter 11 Cases;

(xv)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(xvi)    To enter any and all appropriate orders necessary to effectuate and otherwise enforce the Implementation Order; and

(xvii)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XVII.

## MISCELLANEOUS PROVISIONS

### 17.1.    Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

### 17.2.    Satisfaction of Claims.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, as calculated under Section 10.14, against the Debtors and the Debtors-in-Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full.  Neither New Mirant, its Affiliates nor the Debtors shall be responsible for any pre-Effective Date obligations of the Debtors or the Debtors-in-Possession, except those expressly assumed by New Mirant, its Affiliates or any such Debtor, as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against New Mirant and its Affiliates, the Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

### 17.3.    Third Party Agreements; Subordination.

The Plan Distributions to the various classes of Claims and Equity Interests hereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other

legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise.  All of such rights and any agreements relating thereto shall remain in full force and effect, <u>except</u> as compromised and settled pursuant to the Plan.  Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan.  The right of the Debtors or the Committees to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved (<u>except</u> as otherwise provided pursuant to the California Settlement), and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest.  Notwithstanding any other term or provision of the Plan (<u>including</u>, without limitation, any releases, exculpation or injunctions) the right of the Equity Committee to seek subordination, disallowance or related relief (<u>including</u>, without limitation, by prosecuting motions, commencing causes of action or otherwise) with respect to any Equity Interest (<u>including</u>, without limitation, with respect to the Debtors' officers and directors and/or any Protected Persons) is fully reserved, and the treatment afforded any Equity Interest that becomes a subordinated Equity Interest or is otherwise made the subject of any relief pursuant to this sentence at any time shall be modified to reflect such subordination or relief.

**17.4.  <u>Exculpation.</u>**

**The Debtors, the Old Indenture Trustees and any Protected Persons shall not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court.  The Confirmation Order shall enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or cause of action against any Protected Person as to which such Protected Person has been exculpated from liability pursuant to the preceding sentence.**

**17.5.  <u>Discharge of Liabilities.</u>**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors shall be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests shall be precluded from asserting against New Mirant and its Affiliates, the Debtors, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**<u>EXCEPT</u> AS OTHERWISE PROVIDED IN THE PLAN, NEITHER NEW MIRANT NOR MET SHALL HAVE, AND SHALL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (<u>INCLUDING</u>, WITHOUT LIMITATION, ANY**

**LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW
AS A SUCCESSOR TO MIRANT OR ANY OF THE TRADING DEBTORS) AND NO
SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH
TO NEW MIRANT OR MET.**

**17.6.  <u>Discharge of Debtors</u>.**

      <u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the
Effective Date, without further notice or order, all Claims of any nature whatsoever shall be
automatically discharged forever.  <u>Except</u> as otherwise provided in the Plan or the Confirmation
Order, on the Effective Date, the Debtors, their estates, and all successors thereto shall be
deemed fully discharged and released from any and all Claims, <u>including</u>, but not limited to,
demands and liabilities that arose before the Effective Date, and all debts of the kind specified in
section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim
based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a
Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the
holder of a Claim based upon such debt has accepted the Plan.  The Confirmation Order shall be
a judicial determination of discharge of all liabilities of the Debtors, their estates, and all
successors thereto.  As provided in section 524 of the Bankruptcy Code, such discharge shall
void any judgment against the Debtors, their estates, or any successor thereto at any time
obtained to the extent it relates to a Claim discharged, and operates as an injunction against the
prosecution of any action against New Mirant and it Affiliates or property of the Debtors or their
estates to the extent it relates to a discharged Claim.

**17.7.  <u>Notices</u>.**

      Any notices, requests, and demands required or permitted to be provided under
the Plan, in order to be effective, shall be in writing (<u>including</u>, without express or implied
limitation, by facsimile transmission), and, unless otherwise expressly provided herein, shall be
deemed to have been duly given or made when actually delivered or, in the case of notice by
facsimile transmission, when received and telephonically confirmed, addressed as follows:

      Mirant Corporation
      Attention:  General Counsel
      1155 Perimeter Center West, Suite 100
      Atlanta, Georgia 30338
      Telephone:  (678) 579-5000
      Telecopier:  (678) 579-6767

      White & Case LLP
      Attention:  Gerard Uzzi, Esq.
      Wachovia Financial Center
      200 South Biscayne Boulevard, Suite 4900
      Miami, Florida 33131
      Telephone:  (305) 371-2700
      Telecopier:  (305) 358-5744

Shearman & Sterling LLP
Attention: Fredric Sosnick, Esq.
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Telecopier: (212) 848-7179

Andrews Kurth, L.L.P.
Attention: Paul Silverstein, Esq.
450 Lexington Avenue, 15th Floor
New York, NY 10017
Telephone: (212) 850-2800
Telecopier: (212) 850-2929

Cadwalader, Wickersham & Taft LLP
Attention: Bruce Zirinsky, Esq.
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Telecopier: (212) 504-6666

*and*

Brown Rudnick Berlack Israels LLP
Attention: Edward Weisfelner, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 704-0100
Telecopier: (212) 704-0196

**17.8.   Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**17.9.   Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

**17.10.  Expedited Determination.**

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

**17.11.  Exemption from Transfer Taxes.**

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**17.12.  Retiree Benefits.**

Pursuant to section 1129(a)(13), on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

**17.13.  Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan, including, but not limited to, the deadline for filing notice of Administrative Claims (Section 6.2), and the deadline for filing rejection damage Claims (Section 14.3).

**17.14.  Interest and Attorneys' Fees.**

Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in this Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.  No award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim, except as set forth in the Plan or as ordered by the Bankruptcy Court.

**17.15.  Modification of the Plan.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such

54