modifications; provided further that any amendments must be made in accordance with Section 17.23.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.  Notwithstanding the foregoing, the California Settlement cannot be modified by the Plan without the consent of the California Parties.

### 17.16.  Revocation of Plan.

Subject to Section 17.23, the Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

### 17.17.  Setoff Rights.

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder, subject to the provisions of sections 553, 556 and 560 of the Bankruptcy Code; provided, however, that the TPA Claim shall be governed by the TPA Order with respect to the foregoing and that nothing herein shall constitute a waiver of Southern Company's setoff rights set forth in section 9.15 of the Tax Indemnification Agreement (by and between Mirant and Southern Company); provided, further, that this Section 17.17 is subject to the California Settlement Agreement and the Debtors may not effectuate a setoff in violation thereof.  Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

### 17.18.  Compliance with Tax Requirements.

In connection with the Plan, the Debtors, the Disbursing Agent, and the Plan Trustees, as applicable, shall comply with all withholding and reporting requirements imposed

by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

**17.19. Rates.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

**17.20. Injunctions.**

(a)      **On the Effective Date and except as otherwise provided herein, all Persons and Entities who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting New Mirant and its Affiliates, the Debtors, Protected Persons, the Estates, the Assets, or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents, and professionals, successors and assigns or their respective assets and property with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

(i)      **commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);**

(ii)      **enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;**

(iii)      **creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and**

(iv)      **asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Section 17.17.**

(b)      **The foregoing provision shall not apply to holders of Allowed MAG Long-term Note Claims with respect to their legal, equitable and contractual rights, and personal Causes of Action against MAG, MAG's Assets and any of MAG's current or former managers, officers, employees, agents and professionals.**

56

**17.21.  Binding Effect.**

The Plan shall be binding upon New Mirant and its Affiliates, the Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

**17.22.  Severability.**

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 17.15 SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION; PROVIDED THAT THE DEBTORS MAY NOT MODIFY THE PLAN TO SEVER ANY PROVISION OF THE CALIFORNIA SETTLEMENT AGREEMENT FROM ANOTHER.  SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.  NOTHING HEREIN SHALL PERMIT THE DEBTORS TO SEVER THE PROVISIONS OF THE CALIFORNIA SETTLEMENT AGREEMENT OR ANY IMPLEMENTING AGREEMENTS RELATED THERETO.**

**17.23.  Committees' Consultation and Agreement.**

The Debtors shall not:

(a)     file any Plan Document pursuant to Section 1.5 (including, without limitation, the Confirmation Order);

(b)     agree to the form of, amend or modify the Confirmation Order, the Plan or any Plan Document;

(c)     waive any condition referenced in Section 12.3; nor

(d)     revoke or withdraw the Plan or adjourn the Confirmation Hearing pursuant to Section 17.16,

without prior consultation with each of the Committees and provided that if any such proposed action would have a material adverse impact on the rights and interests of the creditors of the Mirant Debtors, the creditors of the MAG Debtors or the holders of Equity Interests in Mirant, then such action shall not be taken without the prior consent of the Committee representing the adversely impacted creditors or equity holders (acting reasonably and in good faith).

**17.24.  Global Settlement Of Certain Recoveries.**

The Plan's treatment of the MAG Debtor Class 5 – Unsecured Claims, MAG Debtor Class 6 – MAG Long-term Note Claims, MAG Debtor Class 8 – Equity Interests, Mirant Debtor Class 3 – Unsecured Claims, and Mirant Debtor Class 5 – Equity Interests and the resolution of inter-Debtor Claims and related matters, represent elements of a global settlement and compromise that has been reached among the Debtors, the Committees and Phoenix.  This settlement provides benefit to all parties in interest in these Chapter 11 Cases by allowing confirmation of the Plan to proceed and reducing the costs and uncertainty of litigation concerning the Plan and related issues.  All of the elements of the recoveries, including, in particular, the Designated Net Litigation Distributions, constitute critical elements of the parties' settlement.  As a consequence, the parties' global settlement constitutes a resolution of disputed issues and may not be treated as an admission by the parties as to any issue, including, without limitation, the percentage recovery by any class of creditor or equity holder under the Plan.

**17.25.  No Admissions.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THIS PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, MIRANT OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, AS DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CHAPTER 11 CASES.**

**17.26.  Potential Exclusion of Mirant NY-Gen from Plan.**

Pending the Debtors' resolution of certain potential claims and liabilities associated with the Swinging Bridge, Mongaup Falls and Rio hydroelectric projects owned by Mirant NY-Gen, LLC ("Mirant NY-Gen"), on terms and conditions acceptable to the Debtors, the Debtors reserve the right to amend the Plan to (i) treat Mirant NY-Gen separately from the MAG Debtors and (ii) adjourn the Confirmation Hearing in respect of the Plan as to Mirant NY-Gen until further notice or order of the Bankruptcy Court.  If this occurs, the Confirmation Order shall (i) authorize New Mirant or its subsidiaries to operate the business of and provide debtor-in-possession financing, protected to the fullest extent permitted under sections 364(c) and (d) of the Bankruptcy Code, to Mirant NY-Gen, and (ii) provide an extension of the periods in which Mirant NY-Gen possesses the exclusive right to file a plan of reorganization and solicit acceptances thereto for an additional 180 days without prejudice to the rights of Mirant NY-Gen to seek additional extensions or the rights of parties in interest to seek to shorten or terminate such exclusive periods.  Such amendment would be without prejudice to Mirant NY-Gen to further amend, modify or revoke the Plan and/or submit any new plan of reorganization as it relates to Mirant NY-Gen.

Dated:  September 30, 2005

Respectfully submitted,

**Mirant Corporation**

By:_____/s/_____
Name: M. Michele Burns
Title:  Executive Vice President, Chief Financial
        Officer and Chief Restructuring Officer

**Mirant Americas Energy Capital, LP**

**By:    Mirant Americas Development, Inc., its general partner**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Energy Capital Assets, LLC**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wrightsville Investments, Inc.**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wrightsville Management, Inc.**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Wrightsville Power Facility, L.L.C.**

**By:   Mirant Wrightsville Management, Inc., its
member and sole manager**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Wrightsville Development Funding, L.L.C.**

**By:   Mirant Wrightsville Management, Inc., its
member and sole manager**

By:_____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant EcoElectrica Investments I, Ltd.**

**By:   Mirant Caribbean, Inc., its sole member**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Puerto Rico Power Investments, Ltd.**

**By:   Mirant Caribbean, Inc., its member**

By: _____/s/_____
Name: J. William Holden III
Title: Vice President

**By:   Mirant South America and Caribbean
Finance, Ltd., its member**

By: _____/s/_____
Name: Pedro Cherry
Title: Vice President

**Mirant Sugar Creek, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Portage County, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Zeeland, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wyandotte, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Peaker, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Gastonia, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Mid-Atlantic Services, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant New England, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Potomac River, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Michigan Investments, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Sugar Creek Ventures, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Texas Investments, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Vice President

**Mirant Las Vegas, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Dickerson Development, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wichita Falls, LP**

**By:    Mirant Wichita Falls Management, Inc., its general partner**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wichita Falls Management, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Wichita Falls Investments, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Vice President

**Shady Hills Power Company, L.L.C.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**West Georgia Generating Company, L.L.C.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Special Procurement, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Parker, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant MD Ash Management, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Fund 2001, LLC**

**By:   Mirant Capital Management, LLC, its
          manager**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Services, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant NY-Gen, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Texas Management, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Lovett, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Piney Point, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Sugar Creek Holdings, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Texas, LP**

**By:   Mirant Texas Management, Inc., its
general partner**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Kendall, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Intellectual Asset Management and
Marketing, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Potrero, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant New York, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Retail Energy Marketing, LP**

**By:    Mirant Americas Development, Inc., its
general partner**

By: _____/s/_____
Name: J. William Holden III
Title:  Sr. Vice President and Chief Financial
Officer

**Mirant Americas Gas Marketing VIII, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing IX, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing X, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing VI, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing V, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing VII, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

66

**Mirant Americas Gas Marketing III, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing XI, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing I, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Energy Marketing, LP**

**By:    Mirant Americas Development, Inc., its
general partner**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Development Capital, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**MLW Development, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Production Company**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Development, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title:  Sr. Vice President and Chief Financial
         Officer

**Mirant Americas Energy Marketing
Investments, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title:  Sr. Vice President and Chief Financial
         Officer

**Mirant Americas Gas Marketing II, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Chalk Point, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant California, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant California Investments, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Canal, LLC**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Mirant Central Texas, LP**

**By:    Mirant Texas Management, Inc., its general partner**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Mirant Danville, LLC**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Mirant Bowline, LLC**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Hudson Valley Gas Corporation**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Mirant Americas Generation, LLC**

By: _____/s/_____

Name: J. William Holden III

Title:  Sr. Vice President and Chief Financial Officer

**Mint Farm Generation, LLC**

By: _____/s/_____

Name: J. William Holden III

Title: Sr. Vice President

**Mirant Americas Gas Marketing XII, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant D.C. O&M, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Mid-Atlantic, LLC**

By: _____/s/_____
Name: J. William Holden III
Title:  Sr. Vice President and Chief Financial
          Officer

**Mirant Capital, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Vice President

**Mirant Chalk Point Development, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Capital Management, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing XV, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing XIV, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing XIII, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Procurement, Inc.**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Americas Gas Marketing IV, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Mirant Delta, LLC**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

**Newco 2005 Corporation**

By: _____/s/_____
Name: J. William Holden III
Title: Sr. Vice President

(This page intentionally left blank)

# EXHIBIT A

## GLOSSARY OF DEFINED TERMS

(This page intentionally left blank)

## EXHIBIT "A"

## <u>GLOSSARY OF DEFINED TERMS</u>

1.      "Administrative Claim" means a Claim incurred by a Debtor (or its Estate) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, <u>including</u>, without limitation, Fee Claims and DIP Claims.

2.      "Affiliate" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

3.      "Allowed," when used

(a)      with respect to any Claim, <u>except</u> for a Claim that is an Administrative Claim or a Letter of Credit Claim, means such Claim to the extent it is not a Contested Claim as of the Effective Date, or a Disallowed Claim;

(b)      with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Section 6.2(c) of this Plan;

(c)      with respect to a Letter of Credit Claim, means such Letter of Credit Claim to the extent Mirant's reimbursement obligation to the holder of the Letter of Credit Claim has become noncontingent and fixed as a result of a draw on the underlying letter of credit by the counterparty thereto; and

(d)      with respect to Equity Interests in any Debtor, means (i) the Equity Interests in any Debtor (<u>except</u> Mirant) as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date; and (ii) with respect to Mirant, the issued and outstanding shares of common stock in Mirant as reflected in stock transfer ledger as of the Effective Date.

4.      "APSA" means the Asset Purchase and Sale Agreement, dated June 7, 2000, by and between Mirant and Pepco, as amended from time to time, together with all schedules and ancillary agreements as determined by Final Order to constitute non-severable components thereto.

5.      "Assets" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

6.      "Assumption/Assignment Agreement" means, collectively, (i) that certain Assignment and Assumption Agreement, dated December 19, 2000, by and among Pepco and certain of the Debtors (other than Mirant); (ii) that certain PPA and TPA Assignment and Assumption Agreement, dated December 18, 2000, between Mirant and MAEM; and (iii) that certain Assignment and Assumption Agreement, dated December 11, 2000, by and between certain of the Debtors pursuant to which, among other things, Mirant assigned rights to purchase specific Assets to other Debtors.

7.      "Avoidance Actions" means all Causes of Action of the Estates that arise under chapter 5 of the Bankruptcy Code.

8.      "Back-to-Back Agreement" means that certain letter agreement and any and all obligations of any Debtor or Affiliate of the Debtors arising thereunder between Pepco and Southern Energy, Inc. (as predecessor in interest to Mirant), dated as of December 19, 2000 (as amended and modified from time to time,) which was executed contemporaneously with Mirant's purchase of generating assets and power purchase agreements from Pepco under the APSA, pursuant to which Mirant agreed to: (a) make Pepco whole for its financial obligations under certain unassigned power purchase agreements between Pepco and (i) Panda-Brandywine LP, and (ii) Ohio Edison Co., (b) accept from Pepco the power delivered pursuant to those unassigned power purchase agreements, and (c) be Pepco's representative "for all purposes to the fullest extent permitted under the unassigned power purchase agreements."

9.      "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

10.     "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or such other court having jurisdiction over the Chapter 11 Cases.

11.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

12.     "Bar Date Notice" means the applicable Notice of Bar Dates for Filing Proofs of Claim Against a Debtor, as approved by Order of the Bankruptcy Court.

13.     "BEWAG Contract" means the Share Purchase Agreement dated January 31, 2002 by and between Mirant Investments Germany, Inc., Mirant Holdings Germany, Inc., Vattenfall AB (publ.), Hamburgische Electricitäts-Werke Aktiengesellschaft, Mirant Holdings Beteiligungsgesellschaft mbH and Mirant.

14.     "BEWAG Counterparties" means Hamburgische Electricitats-Werke Aktiengesellschaft, Vattenfall AB, Mirant Holdings Germany GmbH, Mirant Holdings Beteiligungsgesellschaft mbH and or any successor entities thereto.

15.     "Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

16.     "CAISO" means the California Independent System Operator.

17.     "California Parties" means PG&E, Southern California Edison Company, San Diego Gas and Electric Company, the California Public Utilities Commission, the California Department of Water Resources, the California Electricity Oversight Board, and the Attorney General of the State of California.

18.     "California Party Unsecured Claims" means the Unsecured Claims to be granted to the California Parties against MAEM pursuant to the California Settlement, which shall be (a) the

Allowed Unsecured Claims of the California Parties in the aggregate amount of $175,000,000, (b) the Allowed Unsecured Claim of the California Department of Water Resources in the amount of $2,250,000, and (c) the Allowed Unsecured Claim of the Attorney General of the State of Oregon in the amount of $250,000.

19.    "California Settlement" means the global settlement between and among the California Parties and certain of the Debtors, as set forth and evidenced by the California Settlement Agreement and as approved by Final Order, entered on April 15, 2005.

20.    "California Settlement Agreement" means the agreement dated as of January 14, 2005, by and between certain of the Debtors and the California Parties."

21.    "Carved-Out Receivables" means the following accounts receivable together with any proceeds therefrom:

(1)    Enron Receivables;
(2)    City of Vernon Receivable;
(3)    Coyote Springs Receivables; and
(4)    Metromedia Receivable.

22.    "Cash" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

23.    "Causes of Action" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

24.    "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Mirant Corporation, et al.*, Chapter 11 Case No. 03-46590 (DML), Jointly Administered.

25.    "Charging Lien" means any lien or other priority in payment arising prior to the Effective Date pursuant to which the Old Indenture Trustees (including any paying agents for such Old Indenture Trustees) are each entitled, pursuant to the respective Old Indentures, against distributions to be made to holders of Mirant Note Claims and MAG Short-term Note Claims.

26.    "City of Vernon Receivable" means the amount owed to MAEM by the City of Vernon pursuant to the judgment entered by the Bankruptcy Court in the adversary no. 03-04440, as such judgment may be amended or modified on appeal or remand affirmed by the United States District Court for the Northern District of Texas by final judgment on May 17, 2005.

27.    "Claim" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right

3

to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

28.      "Claims Agent" means the entity designated by order of the Bankruptcy Court to process proofs of claim.

29.      "Committees" means, collectively, the Corp Committee, the Equity Committee and the MAG Committee.

30.      "Commodity Prepay Facility" means (a) the ISDA Master Agreement dated October 11, 2001, between MAEM and HVB Risk Management Products Inc., and (b) the ISDA Master Agreement dated October 11, 2001, between MAEM and Scarlett Resource Merchants LLC, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

31.      "Commodity Prepay Facility Claims" means all Claims arising under the Commodity Prepay Facility and any guaranty thereof issued by any Mirant Debtor, including the Commodity Prepay Guaranty.

32.      "Commodity Prepay Guaranty" means the guaranties, dated October 11, 2001, in favor of each of HVB Risk Management Products Inc. and Scarlett Resource Merchants LLC, pursuant to which Mirant guaranteed MAEM's obligations under the Commodity Prepay Facility and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

33.      "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

34.      "Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

35.      "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

36.      "Contested" (a) when used with respect to a Claim, means such Claim (i) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been filed; (ii) if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was filed on or before the Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court; (iii) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been filed with the Bankruptcy Court, in each case as to which an objection was filed on or before the Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court; or (iv) as to which an objection has been filed on or before the Effective Date; provided, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and (b) when used

4

with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

37.    "Convenience Claims" means (a) in the case of the Mirant Debtors, any Unsecured Claim, other than a Mirant Debt Claim, a Subordinated Note Claim, or a Claim of a current or former director, manager, officer or employee of a Debtor in an amount equal to or less than $25,000; provided, that the Debtors reserve the right to increase the cap amount in consultation with the Corp Committee up to an amount not in excess of $140,000 with respect to Mirant Peaker, Mirant Potomac, Mirant Zeeland, Mirant Las Vegas, Mirant Sugar Creek, LLC, Mirant Wichita Falls, LP, Mirant Wyandotte, and Shady Hills Power Company, LLC, and (b) in the case of the MAG Debtors, any Unsecured Claim, other than a MAG Short-term Debt Claim, or a Claim of a current or former director, manager, officer or employee of a Debtor, in an amount equal to or less than $25,000.

38.    "Corp Committee" means the Official Committee of Unsecured Creditors of Mirant Corporation.

39.    "Coyote Springs Receivables" means the amounts payable to Mirant Oregon under (A) its rights, claims and actions as member of CS2, LLC against Enron Corporation, National Energy Production Company, or their respective sureties, insurers or guarantors related to certain agreements for the construction of the electric generating plant located in Boardman, Oregon and (B) its rights, claims and actions as a member of CS2, LLC, with respect to rights, claims and actions against Alstom USA, Inc., Alstom T&D, Inc. or their respective sureties, insurers or guarantors related to a certain generator step-up transformer.

40.    "Debtor" means any of Mirant, and its direct and indirect subsidiaries that are debtors in the Chapter 11 Cases as identified on Schedule 2 to the Disclosure Statement.

41.    "Debtor Group" means the Mirant Debtors or the MAG Debtors, as applicable.

42.    "Debtor-in-Possession" means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

43.    "Designated Avoidance Actions" means the Southern Company Causes of Action and other Avoidance Actions that have either been commenced or are potential Avoidance Actions, as identified in Schedule 8 of the Disclosure Statement or as supplemented by the Confirmation Order.

44.    "Designated Net Litigation Distributions" means the Cash recoveries obtained in respect of the Designated Avoidance Actions net of any offsets and after the payment or reimbursement of all fees and expenses incurred in connection with such Avoidance Actions.

45.    "Deutsche Bank" means Deutsche Bank, AG, New York Branch.

46.    "Dickerson Power Station" means the coal-fired plan, which consists of three 182 MW coal-fired units and is located on approximately 779 acres of land in Montgomery County, Maryland.

47.    "DIP Agent" means General Electric Capital Corporation as agent for the DIP Lenders under the DIP Credit Agreement.

48.    "DIP Claims" means the Claims of the DIP Lenders under the DIP Credit Agreement and the DIP Order.

49.    "DIP Credit Agreement" means the credit agreement entered into on November 5, 2003 by the Debtors that are parties thereto, as borrowers; the DIP Agent; GECC Capital Markets, Inc., as lead arranger; and the DIP Lenders, pursuant to which the Debtors are permitted to make borrowings prior to the earlier of the Effective Date or November 5, 2005, as approved by the DIP Order, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

50.    "DIP Lenders" means the lenders under the DIP Credit Agreement.

51.    "DIP Order" means, collectively, the order(s) of the Bankruptcy Court approving the DIP Credit Agreement, authorizing the Debtors that are parties thereto to enter into the DIP Credit Agreement, granting certain rights, protections and liens to and for the benefit of the DIP Lenders as set forth therein, and authorizing the Debtors to make borrowings under the DIP Credit Agreement.

52.    "Disallowed" when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

53.    "Disbursing Agent" means New Mirant or any agent selected by New Mirant, acting on behalf of the Debtors in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

54.    "Disclosure Statement" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

55.    "Disclosure Statement Order" means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting vote on the Plan.

56.    "Distribution Date" means (a) with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, or (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date, (b) with respect to any Equity Interest, the Effective Date or a date that is as soon as reasonably practicable after the Effective Date and (c) the date of any subsequent distribution as provided in Section 10.15.

57.    "Effective Date" means (i) for Debtors other than the New York Debtors, a date selected by the Debtors which shall be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Section 12.2 have been satisfied or waived (to the extent waivable); and (ii) for the New York Debtors, the New York Debtors Effective Date.

58.     "Enron Receivables" means the amount owed to the Debtors and/or their Affiliates, pursuant to the Order, entered by the Bankruptcy Court and dated September 7, 2005, granting the Motion of the Debtors for the Entry of an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving (i) Settlement Agreement and Mutual Release and (ii) Related Stipulation and Order by and between Mirant Debtors and Related Non-Debtor Entities and Enron Debtors, on account of the claims allowed against Enron Corp. and its Affiliates in the Enron Corp. et al. bankruptcy proceedings.

59.     "Equipment Warehouse Facility" means (a) the Participation Agreement, dated October 22, 2001, among MADCI, as contract agent and lessee, the MC Equipment Revolver Statutory Trust, State Street Bank and Trust Company of Connecticut, National Association, as trustee, the persons named therein as Note Holders and Certificate Holders and Citibank, N.A. as agent, and (b) the Lease Agreement dated October 22, 2001, among MC Equipment Revolver Statutory Trust, as lessor, and MADCI, as lessee, all such documents having a maturity date of April 22, 2009, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

60.     "Equipment Warehouse Facility Claims" means all Claims arising under the Equipment Warehouse Facility and any guaranty thereof issued by any Mirant Debtor, including the Equipment Warehouse Guaranty.

61.     "Equipment Warehouse Guaranty" means the Guaranty in respect of the Equipment Warehouse Facility, dated October 22, 2001, among Mirant and MC Equipment Revolver Statutory Trust, and all related documents, instruments and agreements, as they have been or may be amended or supplemented from time to time.

62.     "Equity Committee" means the Official Committee of Equity Security Holders of Mirant Corporation.

63.     "Equity Interest" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

64.     "Estate" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

65.     "Exit Facility" means the credit facility pursuant to the Exit Facility Documents.

66.     "Exit Facility Agent" means the agent for the Exit Lenders under the Exit Facility.

67.     "Exit Facility Documents" means the agreements, documents and instruments to be dated on or about the Effective Date and to be entered into between New MAG Holdco, as borrower and certain of its subsidiaries as guarantors, the Exit Facility Agent and the Exit Lenders, in respect of a credit facility for an amount not less than $750,000,000, and all related documents, instruments and agreements entered into or executed in connection therewith, the proceeds of which shall be available for use by New MAG Holdco and its subsidiaries to make Plan

Distributions to the holders of certain Allowed Claims against the Debtors and to satisfy general working capital requirements of New MAG Holdco and its direct and indirect subsidiaries on and after the Effective Date. The Exit Facility Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

68.    "Exit Financing" means up to $2,350,000,000 of financing, including the Exit Facility, to be provided pursuant to the certain commitment letter, dated May 13, 2005, as amended from time to time thereafter and approved by the Bankruptcy Court on September 21, 2005.

69.    "Exit Lenders" means the lenders under the Exit Facility.

70.    "Facility Agents" means the agents under the Mirant "C" Facility, the Mirant 364-Day Facility, the Mirant 4-Year Revolver and the MAG Revolvers, as applicable.

71.    "FCC Agreement" means the Facility and Capacity Credit Agreement dated as of March 21, 1989, between Pepco and Southern Maryland Electric Cooperative, Inc.

72.    "Federal Judgment Rate" means the rate of interest calculated pursuant to the provisions of 18 U.S.C. §3612, 28 U.S.C. §1961, and 40 U.S.C. §258(e)(1), which shall be equal to the weekly average 1-year constant maturity Treasury yield as of the Petition Date, which was 1.08%.

73.    "Fee Application" means an application for allowance and payment of a Fee Claim (including Claims for "substantial contribution" pursuant to section 503(b) of the Bankruptcy Code).

74.    "Fee Claim" means a Claim of a Professional Person.

75.    "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

76.    "Implementation Order" means a Final Order, in form and substance satisfactory to the Debtors, which provides the terms and provisions set forth in Section 12.1(i).

77.    "Indenture Trustees" means the indenture trustee and any predecessor indenture trustee for each of the Mirant Notes, the MAG Long-term Notes and the MAG Short-term Notes.

78.    "Indenture Trustee Fees" means the compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys', agents' (including paying or transfer

8

agents) fees, expenses and disbursements, incurred by the respective Old Indenture Trustees and/or their respective predecessors, whether prior to or after the Petition Date, and whether prior to or after consummation of the Plan.

79.     "Insider" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

80.     "Intellectual Property" shall mean all domestic and foreign patents, patent applications, trademarks, service marks and other indicia of origin, trademark and service mark registrations and applications for registrations thereof, copyrights, copyright registrations and applications for registration thereof, Internet domain names and universal resource locators and the Internet sites corresponding thereto, trade secrets, inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), technical data, customer lists, corporate and business names, trade names, trade dress, brand names, know-how, show-how, maskworks, formulae, methods (whether or not patentable), designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collectors and other proprietary information or material of any type, whether written or unwritten (and all good will associated with, and all derivatives, improvements and refinements of, any of the foregoing).

81.     "Intercompany Claim" means a Claim held by any Debtor against any other Debtor based on any fact, action, omission, occurrence or thing that occurred or came into existence prior to the Petition Date, including, without limitation, any tax sharing agreements such as the State Tax Allocation Agreement effective as of January 1, 2001 and the Tax Allocation Agreement effective as of January 1, 2002; but shall not include the MAI/WDF Note Claim.

82.     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

83.     "IRS" means the United States Internal Revenue Service.

84.     "Joint Selection Committee" means the committee formed to identify qualified, independent candidates to serve on the Board of New Mirant comprised of: (A) Stuart E. Eizenstat; (B) Robert F. McCullough; and (C) up to four individuals who are or were representatives of members of the Corp Committee.

85.     "KERP" means the key employee retention plan that has been approved by the Bankruptcy Court by orders, dated February 13, 2004, August 2, 2004 and September 2, 2004.

86.     "Letter of Credit Claim" means a Claim for reimbursement arising with respect to a letter of credit issued at Mirant's request under either the Mirant 4-Year Revolver or the Mirant "C" Facility.

87.     "MADCI" means Mirant Americas Development Capital, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

9

88.    "MADI" means Mirant Americas Development, Inc., one of the Debtors and Debtors-in-Possession

89.    "MAEM" means Mirant Americas Energy Marketing, LP, a Delaware limited partnership, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

90.    "MAEM/MET Effective Date" means a date selected by the Debtors which shall be a Business Day that (a) occurs after (i) the Effective Date and (ii) the initiation of "fresh start reporting" (as such term is defined in Statement of Position (SOP) No. 90-7, Financial Reporting by Entities in Reorganization under the Bankruptcy Code); (b) falls on the last day of a calendar month; and (c) is to be designated by the Debtors in their sole discretion; provided, however, that such MAEM/MET Effective Date shall occur no later than 60 days after the Effective Date.

91.    "MAEMI" means Mirant Americas Energy Marketing Investments, Inc., a Georgia corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

92.    "MAG" means Mirant Americas Generation, LLC, a Delaware limited liability company, which was formerly known as Mirant Americas Generation, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

93.    "MAG Ad Hoc Committee" means the Ad Hoc Committee of Mirant Americas Generation, LLC comprised of holders of Claims against MAG represented by Hurt & Lilly LLP and Kirkland & Ellis LLP during the pendency of the Chapter 11 Cases.

94.    "MAG Committee" means the Official Committee of Unsecured Creditors of Mirant Americas Generation LLC.

95.    "MAG Debtors" means MAG and the direct and indirect subsidiaries of MAG that are Debtors, as identified on Exhibit B hereto.

96.    "MAG Indenture" means the indenture dated May 1, 2001, between MAG and Bankers Trust Company, as initial indenture trustee, as it has been amended or supplemented from time to time.

97.    "MAG Long-term Notes" means those certain senior notes issued by MAG pursuant to the MAG Indenture: (a) due 2011, in the aggregate principal amount of $850,000,000; (b) due 2021, in the aggregate principal amount of $450,000,000; and (c) due 2031, in the aggregate principal amount of $400,000,000.

98.    "MAG Long-term Note Claims" means all Claims in respect of the MAG Long-term Notes.

99.    "MAG Registration Rights Agreements" means (i) the Registration Rights Agreement dated May 1, 2001 among MAG and Lehman Brothers, Inc. and Credit Suisse First Boston Corporation and Deutsche Bank Alex. Brown Inc. and Wachovia Securities, Inc. as Initial Purchasers, and (ii) the Registration Rights Agreement Dated October 9, 2001 among MAG and Salomon Smith Barney Inc. and Banc of America Securities LLC and Blaylock & Partners, L.P. and Scotia Capital (USA) Inc. and Tokyo-Mitsubishi International plc as Initial Purchasers, collectively.