100.    "MAG Revolvers" means those certain credit facilities dated August 31, 1999, in the aggregate amounts of $250,000,000 and $50,000,000, respectively, between MAG, as borrower, Lehman Brothers, as agent, and the lenders thereunder, and all related documents, instruments and agreements, as they may have been amended or supplemented from time to time.

101.    "MAG Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the MAG Revolvers.

102.    "MAG Short-term Debt Claims" means the MAG Revolver Claims and the MAG Short-term Note Claims, in the aggregate.

103.    "MAG Short-term Notes" means those certain senior notes issued by MAG pursuant to the MAG Indenture: (a) due 2006, in the aggregate principal amount of $500,000,000; and (b) due 2008, in the aggregate principal amount of $300,000,000.

104.    "MAG Short-term Note Claims" means all Claims arising under or as a consequence of owning a MAG Short-term Note.

105.    "MAGM I-XV" means Mirant Americas Gas Marketing I, LLC, Mirant Americas Gas Marketing II, LLC, Mirant Americas Gas Marketing III, LLC, Mirant Americas Gas Marketing IV, LLC, Mirant Americas Gas Marketing V, LLC, Mirant Americas Gas Marketing VI, LLC, Mirant Americas Gas Marketing VII, LLC, Mirant Americas Gas Marketing VIII, LLC, Mirant Americas Gas Marketing IX, LLC, Mirant Americas Gas Marketing X, LLC, Mirant Americas Gas Marketing XI, LLC, Mirant Americas Gas Marketing XII, LLC, Mirant Americas Gas Marketing XIII, LLC, Mirant Americas Gas Marketing XIV, LLC, and Mirant Americas Gas Marketing XV, LLC, each a Delaware limited liability company and a Debtor and Debtor-in-possession in the Chapter 11 Cases.

106.    "MAI" means Mirant Americas, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

107.    "MAI Series A Preferred Shares" means the preferred shares (having terms and provisions as set forth on Exhibit D to the Plan) to be issued by MAI with a liquidation preference of $265,000,000 in respect of the obligation to fund certain potential capital expenditures of MIRMA.  The MAI Series A Preferred Shares shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

108.    "MAI Series B Preferred Shares" means the preferred shares (having terms and provisions as set forth on Exhibit D to the Plan) to be issued by MAI with a liquidation preference of $150,000,000 and a mandatory redemption on April 1, 2011, in respect of the obligation to provide additional liquidity to MAG in connection with the refinancing of certain MAG Long-term Notes.  The MAI Series B Preferred Shares shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

109.    "MAI/WDF Note Claim" means all Claims evidenced by or related to that certain Amended and Restated Promissory Note dated October 31, 2001 executed by WDF as "Maker" in favor of MAI as "Holder."

11

110.    "MAPCO" means Mirant Americas Production Company, a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

111.    "MAREM" means Mirant Americas Retail Energy Marketing, LP, a Delaware limited partnership, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

112.    "MD Leaseco" means the legal entity to be organized as a limited liability company under the laws of Delaware and as a direct wholly-owned subsidiary of MIRMA under the Plan.

113.    "MET" means Mirant Energy Trading LLC, a Delaware limited liability company, a subsidiary of MAEM.

114.    "Metromedia Receivable" means the amount owed to MAEM, subject to a sixty-day standstill of any execution efforts, by Metromedia Energy Marketing, L.P., pursuant to Order, entered by the Bankruptcy Court and dated September 7, 2005, granting the Debtors' Motion, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, Approving the Stipulation to Entry of Award and Judgment Between Metromedia Energy, Inc. and Mirant Americas Energy Marketing, LP.

115.    "Mint Farm" means Mint Farm Generation, LLC, a Delaware limited liability company.

116.    "Mirant" means Mirant Corporation, a Delaware corporation, which was formerly known as Southern Energy, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

117.    "Mirant 364-Day Revolver" means that certain credit facility dated July 17, 2001, in the aggregate principal amount of $1,125,000,000, by and between Mirant, as borrower, the initial lenders named therein, and Credit Suisse First Boston, as administrative agent, and having a maturity date of July 17, 2003, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

118.    "Mirant 364-Day Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant 364-Day Revolver.

119.    "Mirant 4-Year Revolver" means that certain credit facility, dated July 17, 2001, in the aggregate principal amount of $1,125,000,000, between Mirant, as borrower, the initial lenders named therein, and Credit Suisse First Boston, as administrative agent, and having a maturity date of July 17, 2005, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

120.    "Mirant 4-Year Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant 4-Year Revolver.

121.    "Mirant Ad Hoc Committee" means the Ad Hoc Committee of Mirant Corporation Note Holders comprised of the holders of Mirant Note Claims represented by Kramer Levin Naftalis & Frankel LLP and, locally, Neligan Tarpley Andrews & Foley LLP during the Chapter 11 Cases.

122.    "Mirant Bowline" means Mirant Bowline, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

123.    "Mirant "C" Facility" means that certain credit facility, dated April 1, 1999, in the aggregate principal amount of $450,000,000, by and between Southern Energy, Inc. n/k/a Mirant, as borrower, and Citibank N.A., as initial lender and agent, with a maturity date of April 1, 2004, and all related documents, instruments and agreements as they have been amended or supplemented from time to time.

124.    "Mirant "C" Facility Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant "C" Facility.

125.    "Mirant Debt Claims" means the Mirant "C" Facility Claims, the Mirant Note Claims, the Mirant 364-Day Revolver Claims, the Mirant 4-Year Revolver Claims, the Commodity Prepay Facility Claims and the Equipment Warehouse Facility Claims, in the aggregate.

126.    "Mirant Debtors" means Mirant and the direct and indirect subsidiaries of Mirant that are Debtors (other than the MAG Debtors), as identified on Exhibit C hereto.

127.    "Mirant Fiscal Agency Agreement" means the Fiscal Agency Agreement dated July 26, 1999, between Southern Energy, Inc. n/k/a Mirant, as issuer, and Bankers Trust Company, as Fiscal Agent, transfer agent, registrar and paying agent, as such agreement has been or may be amended or supplemented from time to time.

128.    "Mirant Indentures" means the Mirant Fiscal Agency Agreement and all other indentures and agreements in force and effect as of the Petition Date pursuant to which any of the Mirant Notes or Subordinated Notes have been issued.

129.    "Mirant Las Vegas" means Mirant Las Vegas, LLC, a Delaware limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

130.    "Mirant Lovett" means Mirant Lovett, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

131.    "Mirant New York" means Mirant New York, Inc., a Delaware corporation and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

132.    "Mirant Notes" means those certain: (a) 5.75% Convertible Senior Notes Due 2007, issued by Mirant in the aggregate principal amount of $370,000,000; (b) 7.4% Senior Notes Due 2004, issued by Mirant in the aggregate principal amount of $200,000,000; (c) 7.9% Senior Notes Due 2009, issued by Mirant in the aggregate principal amount of $500,000,000; and (d) 2.5% Convertible Senior Debentures Due 2021, issued by Mirant in the aggregate principal amount of $750,000,000.

133.    "Mirant Note Claims" means all Claims arising under or as a consequence of owning a Mirant Note.

134.    "Mirant NY-Gen" means Mirant NY-Gen, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

135.    "Mirant Oregon" means Mirant Oregon, LLC, a Delaware limited liability company, to be renamed Mirant Power Purchase, LLC, after the Effective Date.

136.    "Mirant Peaker" means Mirant Peaker LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

137.    "Mirant Potomac" means Mirant Potomac LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 cases.

138.    "Mirant Potrero" means Mirant Potrero LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 cases.

139.    "Mirant Sugar Creek" means Mirant Sugar Creek, LLC, an Indiana limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

140.    "Mirant Wichita" means Mirant Wichita Falls, LP, a Delaware limited partnership and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

141.    "Mirant Wyandotte" means Mirant Wyandotte, LLC, a Delaware limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

142.    "Mirant Zeeland" means Mirant Zeeland, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

143.    "MIRMA" means Mirant Mid-Atlantic LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases, formerly known as Southern Energy Mid-Atlantic LLC.

144.    "MIRMA Dickerson Leases" means the four MIRMA Leases which pertain to the Dickerson Power Station.

145.    "MIRMA Indenture Trustee" means the indenture trustee in respect of certain promissory notes issued pursuant to the MIRMA Leases.

146.    "MIRMA Lease Litigation" means the adversary proceeding previously pending before the Bankruptcy Court and styled as <u>Mirant Mid-Atlantic, L.L.C. v. Morgantown OL1 LLC, et al. (In re Mirant Corporation)</u>, Adv. No. 04-04283, pursuant to which MIRMA has sought certain relief relating to the MIRMA Leases, <u>including</u> a determination that the MIRMA Leases should be recharacterized as a financing.

147.    "MIRMA Lease Litigation Dismissal Order" means the order of the Bankruptcy Court dated April 7, 2005, entered in respect of the MIRMA Lease Litigation.

148.    "MIRMA Leased Assets" means the Assets of MIRMA that are the subject of the MIRMA Leases.

149.    "MIRMA Leases" means the eleven separate leases dated December 19, 2000, pursuant to which MIRMA leases undivided interests in the MIRMA Leased Assets from the MIRMA

Owner/Lessors, together with all related documents, instruments and agreements to which MIRMA is a party as they may have been amended or supplemented from time to time.

150.   "MIRMA Morgantown Leases" means the seven MIRMA Leases which pertain to the Morgantown Power Station.

151.   "MIRMA Owner/Lessors" means the Persons who are identified in the MIRMA Leases as the owners, or any successors in interest thereto, of the MIRMA Leased Assets.

152.   "Morgantown Power Station" means the coal-fired plant, which includes two 620 MW coal-fired units and is located on approximately 569 acres of land in Charles County, Maryland.

153.   "New MAG Debt Covenants" means new covenants to be implemented by the Confirmation Order and enforceable by the trustee under the MAG Indenture for the benefit of the holders of MAG Long-term Notes (a) that will provide that any payments from MAG to New Mirant at a time when MAG or its subsidiaries owe debt to New Mirant (or any of its non-MAG subsidiaries), shall be treated as a repayment of such debt, rather than as dividends, until all such debt is repaid, and (b) that would limit the ability of MAG and its subsidiaries to incur additional debt (other than Permitted Debt), unless the consolidated ratio of net debt to EBITDA for MAG and its subsidiaries is 6.75:1 or less based on the most recently delivered financial statements. For purposes of such covenant, all terms shall be as defined in the Exit Facility; provided that "Permitted Debt" would include (i) all debt at MAG and its subsidiaries as of the Effective Date, (ii) debt at MIRMA as permitted by the MIRMA Leases, (iii) debt arising under or permitted by the Exit Facility (excluding (A) "Subordinated Debt" as defined in the Exit Facility, and (B) intercompany loans not made in the ordinary course of business), (iv) an amount up to $200,000,000 of additional *pari passu* indebtedness at MAG, and (v) the refinancing of any of the foregoing debt; provided, that with respect to the refinancing of the MAG Long-term Notes maturing in 2011, subsidiaries of MAG may only incur up to $250,000,000 of debt in addition to any unused portion of the $250,000,000 additional debt basket provided for in the Exit Facility.

154.   "New MAEM Holdco" means the legal entity to be organized as a corporation under the laws of Delaware and as a direct wholly-owned subsidiary of New MAG Holdco under the Plan.

155.   "New MAG Holdco" means Mirant California Investments, Inc., a direct subsidiary of MAG after the transactions set forth in Section 8.2(c)(i) are completed.

156.    "New MAG Holdco 8.0% Notes" means those 8.0% senior notes due 2015, that may be issued by New MAG Holdco, at the Debtors' option in accordance with Section 5.2(e), in the aggregate principal amount of $500,000,000 pursuant to the New MAG Holdco Indenture.

157.   "New MAG Holdco 8.25% Notes" means those 8.25% senior notes due 2017, that may be issued by New MAG Holdco, at the Debtors' option in accordance with Section 5.2(e), in the aggregate principal amount of up to $850,000,000 pursuant to the New MAG Holdco Indenture.

158.   "New MAG Holdco Indenture" means that certain indenture to be dated as of the Effective Date and to be entered into between New MAG Holdco, as issuer, and the New MAG Holdco Indenture Trustee, as trustee, pursuant to which New MAG Holdco will issue each series

of the New MAG Holdco Notes.  The New MAG Holdco Indenture shall be in substantially the
form filed with the Bankruptcy Court as a Plan Document.

159.    "New MAG Holdco Indenture Trustee" means the Person or Persons appointed to act as
the indenture trustee under the New MAG Holdco Indenture.

160.    "New MAG Holdco Notes" means the New MAG Holdco 8.0% Notes and the New
MAG Holdco 8.25% Notes.  The New MAG Holdco Notes shall be in substantially the form
filed with the Bankruptcy Court as Plan Documents.

161.    "New Mirant" means the legal entity selected by the Debtors to serve as the ultimate
parent of (a) the Debtors (excluding Mirant and the Trading Debtors), and (b) the other direct
and indirect subsidiaries of Mirant that are not Debtors in the Chapter 11 Cases.

162.    "New Mirant Common Stock" means the shares of common stock to be issued or
reserved for issuance by New Mirant on or after the Effective Date pursuant to the Plan.

163.    "New Mirant Constituent Documents" means the by-laws, certificates of incorporation,
partnership agreements, or limited liability company membership agreements, as applicable, for
each of the Debtors, New Mirant and the New Mirant Entities, as amended and restated as of the
Effective Date, among other things, to (a) prohibit the issuance of non-voting equity securities by
such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, and (b) otherwise give
effect to the provisions of this Plan.  The New Mirant Constituent Documents shall be in
substantially the form filed with the Bankruptcy Court as Plan Documents.

164.    "New Mirant Employee Stock Programs" means the programs, in substantially the form
set forth in the Plan Documents, that shall be established on the Effective Date to permit
employee stock ownership of a portion of New Mirant Common Stock.  The New Mirant
Employee Stock Programs shall be in substantially the form filed with the Bankruptcy Court as
Plan Documents.

165.    "New Mirant Entities" means any legal entities created as direct or indirect subsidiaries
of New Mirant for the purpose of giving effect to the Plan.

166.    "New Mirant Series A Warrants" means the warrants, having the terms set forth on
Exhibit E of the Plan, to be issued to the holders of Allowed Consolidated Mirant Debtor Class 5
— Equity Interests, which shall provide such holders with a right to purchase, in the aggregate, a
number of shares of New Mirant Common Stock equal to ten percent (10%) of the shares of New
Mirant Common Stock issued, or reserved for issuance, under the Plan (excluding the shares
reserved for issuance pursuant to the New Mirant Employee Stock Programs) and exercisable
individually or in the aggregate at any time until the fifth anniversary of the Effective Date.  The
New Mirant Series A Warrants shall be in substantially the form filed with the Bankruptcy Court
as a Plan Document.

167.    "New Mirant Series B Warrants" means the warrants, having the terms set forth on
Exhibit E of the Plan, to be issued to the holders of Subordinated Notes, which shall provide
such holders with a right to purchase, in the aggregate, a number of shares of New Mirant
Common Stock equal to five percent (5%) of the shares of New Mirant Common Stock issued,

or reserved for issuance, under the Plan (excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs) and exercisable individually or in the aggregate at any time until the fifth anniversary of the Effective Date. The New Mirant Series B Warrants shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

168.    "New Mirant Warrants" means New Mirant Series A Warrants and New Mirant Series B Warrants, collectively.

169.    "New York Debtors" means Mirant New York, Mirant Bowline and Mirant Lovett.

170.    "New York Debtors Effective Date" means the later of (a) the Effective Date or (b) thirty (30) Business Days after all of the conditions specified in the Proposed New York Tax Settlement have been satisfied or waived (to the extent waivable).

171.    "New York Taxing Authorities" means the Town of Haverstraw, the Assessor of the Town of Haverstraw, the Board of Assessment Review of the Town of Haverstraw, the Town of Stony Point, the Assessor of the Town of Stony Point, the Board of Assessment Review of the Town of Stony Point, the Haverstraw-Stony Point Central School District and the County of Rockland.

172.    "Notice of Confirmation" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

173.    "Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 11.1 of the Plan.

174.    "Old Indentures" means the MAG Indenture and the Mirant Indentures.

175.    "Old Indenture Trustees" means the trustees for the MAG Indenture, the Mirant Indentures and the Fiscal Agent under the Mirant Fiscal Agency Agreement.

176.    "Participation Agreements" means the eleven Participation Agreements entered into by MIRMA, the respective Owner/Lessor, the respective owner participant, Wilmington Trust Company (as Owner Manager), the Loan Indenture Trustee and the Pass Through Trustee, in connection with the MIRMA Leases.

177.    "Pepco" means the Potomac Electric Power Company.

178.    "Pepco Acquisition" means the transactions that were contemplated in, and were effected pursuant to, the APSA.

179.    "Pepco Causes of Action" means the Debtors' Causes of Action against Pepco arising from or relating to the Pepco Acquisition, including but not limited to the APSA and the Back-to-Back Agreement and the parties' course of business dealings thereunder.

180.    "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

17

181.    "Petition Date" means with respect to any Debtor the date on which the Chapter 11 Case of such Debtor was commenced.

182.    "PG&E" means Pacific Gas & Electric Company.

183.    "PG&E/RMR Claims" means all three (3) of the Claims to be granted to PG&E pursuant to the California Settlement in respect of the RMR Agreements.

184.    "Phoenix" means Phoenix Partners LP, Phoenix Partners II LP, Phoenix Fund III LP and Phaeton International (BVI) Ltd., collectively.

185.    "Plan" means this chapter 11 plan, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

186.    "Plan Distribution" means the payment or distribution under the Plan of Cash, Assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

187.    "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.5 of the Plan.

188.    "Plan Secured Note" means a promissory note that may be delivered to a holder of an Allowed Secured Claim pursuant to the Plan, such note to be made payable by the Debtor(s) obligated under the Allowed Secured Claim in an amount equal to the Allowed Secured Claim and payment of which shall be secured by the Assets that secure payment of such Allowed Secured Claim (or at the Debtors' election, alternative collateral having at least an equivalent value).  Each Plan Secured Note shall accrue simple interest at the rate of 5.00% per annum and shall be payable in twenty (20) quarterly payments commencing in the first quarter after the Distribution Date with respect to the Allowed Secured Claim.  The Plan Secured Notes shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

189.    "Plan Trust" means the trust or trusts to be created pursuant to Article IX.

190.    "Plan Trust Declaration" means the declaration or declarations of trust to be entered into by the Mirant Debtors and the Plan Trustees. The Plan Trustee Declaration shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

191.    "Plan Trustees" means the three (3) Persons selected to serve as the initial trustees under the Plan Trust.

192.    "Post-Confirmation Interest" means simple interest on an Allowed Claim at the rate payable on federal judgments as of the Effective Date or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate, such interest to accrue from the Distribution Date applicable to a Claim to the date of actual payment with respect to such Claim.

193.    "Priority Claim" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims, and Tax Claims.

194.    "Pro Rata Share" means the proportion that an Allowed Claim or Equity Interest bears to the aggregate amount of all Claims or Equity Interests in a particular class, including Contested Claims or Equity Interests, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent; or (b) as determined or estimated by the Bankruptcy Court.

195.    "Professional Person" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

196.    "Proposed New York Tax Settlement" means the proposed global settlement as referenced in Section 15.3(a) of all Claims asserted by the New York Taxing Authorities and certain related matters, including the Debtors' rights to receive refunds of amounts previously paid in respect of ad valorem real property taxes, and the assessed value of the Debtors' property for purposes of calculating ad valorem real property taxes owed to the New York Taxing Authorities on a prospective basis.

197.    "Protected Persons" means the persons as defined in the "Order Restricting Pursuit of Certain Persons" (Docket No. 357) and the "Order Extending Order Restricting Pursuit of Certain Persons" (Docket No. 1006) issued by the Bankruptcy Court on August 5, 2003 and September 29, 2003, respectively.  Under such order, Protected Persons include (a) all professionals, officers, directors and managers of the Debtors, (b) the members of Committees and their professionals, (c) William Snyder in his capacity as the examiner in the Chapter 11 Cases and his professionals and (d) Dean Nancy Rapoport, in her capacity as fee examiner.

198.    "RMR Agreements" means, collectively: (a) that certain Must-Run Service Agreement dated as of June 1, 1999, between Southern Energy Potrero, L.L.C. (now known as Mirant Potrero, LLC) and the CAISO pertaining to the facility commonly known as the Potrero Power Plant, as amended from time to time; (b) that certain Must-Run Service Agreement dated as of June 1, 1999, between Southern Energy Delta, L.L.C. (now known as Mirant Delta LLC) and the CAISO pertaining to the facility commonly known as the Contra Costa Power Plant, as amended from time to time; and (c) that certain Must-Run Service Agreement dated June 1, 1999, between Southern Energy Delta, L.L.C. (now known as Mirant Delta LLC) and the CAISO pertaining to the facility commonly known as the Pittsburg Power Plant, as amended from time to time.

199.     "Schedules" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors-in-Possession from time to time in accordance with Bankruptcy Rule 1009.

200.    "Second Tier MAG Holdco" means the legal entity to be organized as a limited liability company under the laws of Delaware and as a direct wholly-owned subsidiary of New MAG Holdco.

201.    "Secured Claim" means (a) a Claim (other than the DIP Claims, but including the Allowed New York Taxing Authorities Secured Claims) secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

202.    "Series A Put Agreement" means the agreement (having the terms set forth in Exhibit D to the Plan) to be entered into by and between New Mirant and New MAG Holdco pursuant to which New MAG Holdco shall have certain put rights, with respect to the MAI Series A Preferred Shares. The Series A Put Agreement shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

203.    "Series B Put Agreement" means the agreement (having the terms set forth in Exhibit D to the Plan) to be entered into by and between New Mirant and MAG pursuant to which New Mirant shall have certain put rights, with respect to the MAI Series B Preferred Shares. The Series B Put Agreement shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

204.    "Site Lease" means that certain Site Lease Agreement, dated March 21, 1989, originally entered into by and between Pepco and SMECO.

205.    "SMECO" means Southern Maryland Electric Cooperative, Inc., a Maryland corporation.

206.    "Southern Company Causes of Action" means the Debtors' Causes of Action against Southern Company and its affiliates and insiders and any other lessor, arising from or relating to any transaction between the Debtors and Southern Company and its Affiliates and Insiders that occurred on or before April 2, 2001.

207.    "Subordinated Claim" means a Claim (other than a Subordinated Note Claim) against any Debtor subordinated by Final Order including, without limitation, the Claims of (a) the CFTC, (b) Gil Wisniak, et al., and (c) the underwriters of the initial public offering of Mirant, as each is described in the Disclosure Statement.

208.    "Subordinated Note Claim" means a Claim arising under or as a consequence of owning a Subordinated Note.

209.   "Subordinated Notes" means those certain 6.25% Junior Convertible Subordinated Debentures, Series A due in 2030, issued by Mirant in the aggregate principal amount of $356,000,000.

210.   "Tax Claim" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

211.   "Trading Debtors" means MADI, MAPCO, MAEM, MAREM and MAGM I-XV.

212.   "TPA Claim" means the claim or claims granted to Pepco under the TPA Order.

213.   "TPA Order" means the "Order Granting Debtors' Motion for Approval of (1) Settlement Agreement Under Federal Rule of Bankruptcy Procedure 9019, (2) Allowed, Prepetition General Unsecured Claims by Pepco in the Amount of $105 Million Against Each of Mirant and MAEM, and (3) Assumption of Certain Transition Power Agreements" entered by the Bankruptcy Court on November 19, 2003 (Docket No. 1876).

214.   "Transferred Trading Obligation" means an obligation of a Person to a Trading Debtor which is transferred to MET pursuant to the Plan or the Confirmation Order, including any obligations under or in connection with any trading contracts or under or in connection with any other assets or liabilities.

215.   "Unsecured Claim" means any Claim against a Debtor other than an Administrative Claim, a DIP Claim, a Priority Claim, a Tax Claim, a Secured Claim, a MAG Long-term Note Claim or a PG&E/RMR Claim.

216.   "WDF" means Wrightsville Development Funding, LLC, a Delaware limited liability company.

217.   "West Georgia" means West Georgia Generating Company, LLC.

218.   "West Georgia Amended Loan Documents" means the amendment to the West Georgia Credit Agreement, and the related documents, agreements and instruments, evidencing the treatment in accordance with the West Georgia Settlement Agreement to be provided in respect of the Allowed West Georgia Facility Claims if the holders of the West Georgia Facility Claims enter into and comply with their obligations under the West Georgia Settlement Agreement and vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code. The West Georgia Amended Loan Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

219.   "West Georgia Credit Agreement" means that certain credit agreement dated December 12, 2000 in the aggregate principal amount of $139,700,000, by and between West Georgia, as borrower, Deutsche Bank, as agent, and the financial institutions party thereto, and all related documents, instruments and agreements as they have been amended or supplemented from time to time.

220.   "West Georgia Facility Claims" means all Claims, including Secured Claims, arising under, or as a consequence of being a lender or agent, under the West Georgia Credit Agreement.

221.    "West Georgia Secured Note" means the promissory note secured by all the assets of
West Georgia that secure the West Georgia Facility Claims providing for voluntary prepayments
at any time without premium or penalty and containing limitations on asset sales and dividends
and distributions consistent with restrictions contained in investment grade debt documentation,
in form to be filed with the Bankruptcy Court as a Plan Document, made payable to Deutsche
Bank, as agent for the holders of West Georgia Facility Claims, pursuant to which the holders of
the West Georgia Facility Claims shall receive to the extent that the West Georgia Facility
Claims constitute Secured Claims in excess of $30,000,000, (i) simple interest at the rate of 7%
per annum, without compounding; (ii) principal payments of $10,000,000 per annum on June
30th of each year through the earlier of (a) the date that less than $10,000,000 of principal
remains outstanding in respect of the West Georgia Secured Note, and (b) June 2014, with the
balance, if any, payable on June 30, 2014.

222.    "West Georgia Settlement Agreement" means the agreement entered into by West
Georgia and the holders of the West Georgia Facility Claims dated September [  ], 2005,
pursuant to which the parties agreed, among other things and subject to certain conditions, to (i)
treat the West Georgia Facility Claims as Allowed Secured Claims, (ii) pay the holders of the
Allowed West Georgia Facility Claims a Cash payment of $45,000,000 on the Distribution Date,
which payment shall be applied to outstanding principal; (iii) pay interest on the balance of the
Allowed West Georgia Facility Claims at LIBOR plus 262.5 basis points through June 1, 2006,
and at LIBOR plus 312.5 basis points through final maturity, in each case with a corresponding
base rate options; (iv) extend the final maturity date under the West Georgia Credit Agreement to
September 30, 2011; (v) authorize West Georgia to make a Cash payment to MAI in the amount
of $10,000,000 after the payment of certain Administrative Claims; (vi) authorize West Georgia
to maintain a working capital reserve in the amount of $8,500,000; and (vii) authorize Deutsche
Bank, as agent for the holders of the West Georgia Facility Claims, to sweep on a quarterly basis
any cash in excess of the working capital reserve, provided that the amount of such excess is at
least $100,000.

**EXHIBIT B**

**MAG DEBTORS**

(This page intentionally left blank)

**MAG DEBTORS**

Mirant Americas Generation, LLC
Mirant Mid-Atlantic, LLC
Hudson Valley Gas Corporation
Mirant Bowline, LLC
Mirant California Investments, Inc.
Mirant California, LLC
Mirant Canal, LLC
Mirant Central Texas, LP
Mirant Chalk Point, LLC
Mirant D.C. O&M, LLC
Mirant Delta, LLC
Mirant Kendall, LLC
Mirant Lovett, LLC
Mirant MD Ash Management, LLC
Mirant New England, Inc.
Mirant New York, Inc.
Mirant NY-Gen, LLC
Mirant Parker, LLC
Mirant Piney Point, LLC
Mirant Potrero, LLC
Mirant Special Procurement, Inc.
Mirant Texas Investments, Inc.
Mirant Texas Management, Inc.
Mirant Texas, LP
MLW Development, LLC

(This page intentionally left blank)

**EXHIBIT C**

**MIRANT DEBTORS**

(This page intentionally left blank)

## MIRANT DEBTORS

Newco 2005 Corporation
Mirant Corporation
Mirant Americas Energy Marketing, LP
Mirant Americas, Inc.
Mint Farm Generation, LLC
Mirant Americas Development Capital, LLC
Mirant Americas Development, Inc.
Mirant Americas Energy Marketing Investments, Inc.
Mirant Americas Gas Marketing I, LLC
Mirant Americas Gas Marketing II, LLC
Mirant Americas Gas Marketing III, LLC
Mirant Americas Gas Marketing IV, LLC
Mirant Americas Gas Marketing V, LLC
Mirant Americas Gas Marketing VI, LLC
Mirant Americas Gas Marketing VII, LLC
Mirant Americas Gas Marketing VIII, LLC
Mirant Americas Gas Marketing IX, LLC
Mirant Americas Gas Marketing X, LLC
Mirant Americas Gas Marketing XI, LLC
Mirant Americas Gas Marketing XII, LLC
Mirant Americas Gas Marketing XIII, LLC
Mirant Americas Gas Marketing XIV, LLC
Mirant Americas Gas Marketing XV, LLC
Mirant Americas Procurement, Inc.
Mirant Americas Production Company
Mirant Americas Retail Energy Marketing, LP
Mirant Capital Management, LLC
Mirant Capital, Inc.
Mirant Chalk Point Development, LLC
Mirant Danville, LLC
Mirant Dickerson Development, LLC
Mirant Fund 2001, LLC
Mirant Gastonia, LLC
Mirant Intellectual Asset Management and Marketing, LLC
Mirant Las Vegas, LLC
Mirant Michigan Investments, Inc.
Mirant Mid-Atlantic Services, LLC
Mirant Peaker, LLC
Mirant Portage County, LLC
Mirant Potomac River, LLC
Mirant Services, LLC
Mirant Sugar Creek Holdings, Inc.
Mirant Sugar Creek Ventures, Inc.
Mirant Sugar Creek, LLC
Mirant Wichita Falls Investments, Inc.

Mirant Wichita Falls Management, Inc.
Mirant Wichita Falls, LP
Mirant Wyandotte, LLC
Mirant Zeeland, LLC
Shady Hills Power Company, L.L.C.
West Georgia Generating Company, L.L.C.
Mirant EcoElectrica Investments I, Ltd.
Puerto Rico Power Investments, Ltd.
Mirant Wrightsville Investments, Inc.
Mirant Wrightsville Management, Inc.
Wrightsville Power Facility, L.L.C.
Wrightsville Development Funding, L.L.C.
Mirant Americas Energy Capital, LP
Mirant Americas Energy Capital Assets, LLC

## EXHIBIT D

## MAI SERIES A & B PREFERRED SHARES

(This page intentionally left blank)

## EXHIBIT "D"

MIRANT AMERICAS, INC.
Series A Preferred Shares

| | |
|---|---|
| Issuer | Mirant Americas, Inc. ("MAI") |
| Liquidation Preference | $265.0 million |
| Issue | Series A preferred shares with par value of $0.001 per share (the "Series A Preferred Shares"). |
| Dividends | None |
| Mandatory Redemption | Subject to the deferral described below, Series A Preferred Shares shall be called for redemption by MAI on June 30 of each year indicated below (each such June 30, a "Scheduled Redemption Date") at a price equal to the portion of the Liquidation Preference set forth in the following table (the "Specified Redemption Amount"): |

| Year | Amount |
|---|---|
| 2007 | $5,000,000 |
| 2008 | $31,000,000 |
| 2009 | $84,000,000 |
| 2010 | $95,000,000 |
| 2011 | $50,000,000 |

The redemption of any Series A Preferred Shares on any Scheduled Redemption Date shall be deferred to the extent that MIRMA has not incurred prior to the Scheduled Redemption Date, or New MAG Holdco does not reasonably expect MIRMA to incur within 180 days of such Scheduled Redemption Date, expenditures with respect to the installation of control technology relating to environmental capital expenditures of facilities owned or leased by MIRMA (the "Required Use"). Any amounts so deferred shall be added to the amount of Series A Preferred Shares to be redeemed on the next Scheduled Redemption Date.

The outstanding balance of Series A Preferred Shares, if any, shall be redeemed by MAI on December 31, 2020 at a price equal to the par value of the outstanding Series A Preferred Shares.

Use of Proceeds............................................

New MAG Holdco shall apply the proceeds of any redemption of the Series A Preferred Shares to fund the installation of control technology relating to environmental capital expenditures at facilities owned or leased by MIRMA within 180 days of any such redemption, including the reimbursement of previously incurred costs.

Put Right to [New Mirant] ............................

Pursuant to an agreement with New Mirant (the "Series A Put Agreement"), New MAG Holdco will have the right (the "Put Right") to put the Series A Preferred Shares to New Mirant at an amount equal to the Specified Redemption Amount in the event that MAI fails to redeem the Series A Preferred Shares on a Scheduled Redemption Date.

Release of Obligations Under Put Right.......

New Mirant shall be released from its obligations under the Series A Put Agreement upon the assumption thereof by a substitute obligor; *provided* that such substitute obligor shall either (a) have a credit rating of at least BBB-/Baa3 or an equivalent rating by a nationally recognized ratings agency or (b) secure its obligations under the Series A Put Agreement with assets with a fair market value of equal or greater than 110% of an amount equal to the Liquidation Preference of the Series A Preferred Shares that have not been redeemed (as determined by an investment bank or appraiser of national reputation).

New Mirant or any substitute obligor shall be released from its obligations under the Series A Put Agreement if New Mirant or the substitute obligor, as the case may be, deposits with a trustee in a collateral account for the benefit of MIRMA cash in

U.S. dollars or government securities, or a combination thereof, in amounts equal to the Liquidation Preference (a "<u>Security Release</u>").

Series A Put Agreement Covenants.............. Under the Series A Put Agreement, New Mirant shall be restricted from (a) incurring, except in certain circumstances, indebtedness, as provided herein, and (b) paying any dividends or making distributions on, or redeem or repurchase, any New Mirant Common Stock except in certain circumstances, as provided herein.

MIRANT AMERICAS, INC.
Series B Preferred Shares

| | |
|---|---|
| Issuer............................................................ | Mirant Americas, Inc. ("MAI") |
| Liquidation Preference................................... | $150.0 million |
| Issue ............................................................ | Series B preferred shares with par value of $0.001 per share (the "Series B Preferred Shares") |
| Dividends ..................................................... | None |
| Mandatory Redemption ................................ | April 1, 2011 |
| Put Right to New Mirant................................ | Pursuant to an agreement with New Mirant (the "Series B Put Agreement"), Mirant Americas Generation, LLC will have the right (the "Put Right"), at any time after June 30, 2010, to require New Mirant to purchase the Series B Preferred Shares at an amount equal to the Liquidation Preference. |
| Release of Obligations Under Put Right....... | New Mirant shall be released from its obligations under the Series B Put Agreement upon the assumption thereof by a substitute obligor; *provided* that such substitute obligor shall either: (a) have a credit rating of at least BBB-/Baa3 or an equivalent rating by a nationally recognized ratings agency or (b) secure its obligations under the Series B Put Agreement with assets with a fair market value of equal or greater than 110% of an amount equal to the Liquidation Preference (as determined by an investment bank or appraiser of national reputation). |
| | New Mirant or any substitute obligor shall be released from its obligations under the Series B Put Agreement if New Mirant or the substitute obligor, as the case may be, deposits with a trustee in a collateral account for the benefit of New MAG Holdco cash in U.S. dollars or government securities, or a combination thereof, in amounts equal to the Liquidation Preference |

5

(a "Security Release").

Series B Put Agreement Covenants ..............    Under the Series B Put Agreement, New
Mirant shall be restricted from (a) incurring,
except in certain circumstances,
indebtedness, as provided in herein, and (b)
paying any dividends or making
distributions on, or redeem or repurchase,
any New Mirant Common Stock except in
certain circumstances, as provided herein.

## Covenants for MAI Series A & B Preferred Shares

Limitation on the Incurrence of Debt.  New Mirant shall not, and shall not permit any of its consolidated subsidiaries, other than Mirant Americas Generation, LLC and its consolidated subsidiaries (collectively referred to as "Consolidated MAG"), to incur any Debt, other than Permitted Debt; *provided, however,* that New Mirant and its consolidated subsidiaries may incur Debt if the Consolidated Debt to Consolidated Capital of New Mirant, at its most recently ended full fiscal quarter for which internal financial statements are available, immediately preceding the date on which such Debt is incurred, would have been not more than 0.6 to 1.0, determined on a pro forma basis as if the additional Debt had been incurred on the last day of such fiscal quarter.

*"Consolidated Capital"* means the sum of Consolidated Debt plus Consolidated Net Worth.

*"Consolidated Debt"* means the aggregate principal amount of Debt of New Mirant and its consolidated subsidiaries at such time outstanding excluding the Debt of Consolidated MAG.

*"Consolidated Net Worth"* means the consolidated capital stock and other equity accounts (including retained earnings and paid in capital) of a Person *provided* that for purposes of calculating the Consolidated Net Worth of New Mirant such amount shall exclude the Consolidated Net Worth of Consolidated MAG to the extent such amount does not exceed zero.

*"Debt"* means, with respect to any Person, any obligations of such Person: (a) in respect of borrowed money; (b) evidenced by bonds, notes, debentures or similar instruments, factoring (other than on a non-recourse basis) or thirty days after the drawing thereof, reimbursement agreements in respect of drawn Letters of Credit; (c) in respect of banker's acceptances; (d) in respect of the amount of the liability in respect of a capital lease of such Person that would at that time be required to be capitalized on a balance sheet of such Person; and (e) in respect of the balance deferred and unpaid of the purchase price of any property or services, except any such balance that constitutes an accrued expense or trade payable in the ordinary course of business, in each case, if and to the extent any of the preceding items would appear as a liability upon the balance sheet of the specified Person.  In addition, Debt of a Person includes, to the extent not otherwise included, a guarantee by such Person of any Debt of any other Person.

*"Permitted Debt"* means

(a)     Debt existing on the date of the Series A Put Agreement and the Series B Put Agreement;

(b)     Debt incurred in connection with a Security Release;

(c)     Project Finance Debt;

(d)     Debt incurred to finance (i) environmental capital expenditures and (ii) other capital expenditures made to comply with applicable law and regulation;

(e)    intercompany Debt incurred by New Mirant or its consolidated subsidiaries
between or among New Mirant and its consolidated subsidiaries provided, that with
respect to intercompany Debt incurred by New Mirant that such intercompany Debt
is subordinated to the obligations under the Put Agreements;

(f)    the guarantee by New Mirant or any of its consolidated subsidiaries of Debt of New
Mirant or any of its consolidated subsidiaries that was otherwise permitted to be
incurred;

(g)    Debt incurred in exchange for, or the net proceeds of which are used to extend,
refinance, renew, replace, defease or refund other Debt of New Mirant or any of its
consolidated subsidiaries that was otherwise permitted to be incurred (other than
intercompany Debt permitted under clause (e) of this definition); *provided* that the
amount of such Debt does not exceed the amount of the Debt so extended,
refinanced, renewed, replaced, defeased or refunded, plus all accrued and unpaid
interest thereon and the amount of any premium necessary to accomplish such
refinancing and any expenses incurred in connection therewith ("Permitted
Refinancing Debt");

(h)    additional Debt in an aggregate amount at any time outstanding, excluding all
Permitted Refinancing Debt incurred to refund, refinance or replace any Debt
incurred pursuant to this clause (h), not to exceed $200.0 million; and

(i)    Debt arising from the honoring by a bank or other financial institution of a check,
draft or similar instrument drawn against insufficient funds in the ordinary course of
business;

   *"Project Finance Debt"* means Debt (not exceeding the cost of the acquisition,
construction or creation of the relevant asset or project) of any subsidiary incurred or existing in
connection with the financing or refinancing of any asset or project, the repayment of which
Debt is to be made from the revenues arising out of, or other proceeds of realization from, the
acquired or created asset or project, with recourse to those revenues and proceeds and assets
forming the subject matter of such asset or project (including, without limitation, insurance,
contracts and shares or other rights of ownership in the entity(ies) which own the relevant assets
or project) and other assets ancillary thereto but without substantial recourse to any other asset or
otherwise to New Mirant or its subsidiary; provided that substantial recourse shall not be deemed
to exist by reason of normal and customary sponsor support arrangements.

Restricted Payments.  New Mirant shall not, and shall not permit any of its consolidated
subsidiaries to (a) declare or pay any dividend or make any other distribution on account of any
shares of any class of capital stock of New Mirant or any of its consolidated subsidiaries, other
than (x) dividends or distributions payable in Equity Interests of New Mirant or any of its
consolidated subsidiaries and (y) dividends or distributions payable to New Mirant or any
consolidated subsidiary thereof, (b) make any payments with respect to Affiliate Subordinated
Debt or redeem or repurchase any Affiliate Subordinated Debt or (c) purchase, redeem or
otherwise acquire for value any Equity Interests of New Mirant or any consolidated subsidiary
thereof from a Person other than New Mirant or any consolidated subsidiary thereof (all such

payments and other actions set forth in clauses (a) through (c) above being collectively referred to as "Restricted Payments"), unless, at the time and after giving effect to such Restricted Payment:

    (a)    no default under the terms of the Series A/Series B Put Agreement shall have occurred and be continuing or would occur as a consequence thereof; and

    (b)    with respect to a Restricted Payment by New Mirant or its consolidated subsidiaries, New Mirant would have had, at the end of New Mirant's most recently ended full fiscal quarter for which internal financial statements are available immediately preceding the date on which such Restricted Payment is made, and after giving pro forma effect thereto as if such Restricted Payment has been made at the end of such fiscal quarter, a Tangible Net Worth in excess of an amount equal to 200% of the aggregate outstanding liquidation preferences under the MAI Series A Preferred Shares and the MAI Series B Preferred Shares.

The preceding provisions will not prohibit:

    (a)    the payment of any dividend out of the net cash proceeds of a contribution to the common equity of New Mirant or a substantially concurrent sale of Equity Interests of New Mirant;

    (b)    the redemption, repurchase, retirement, defeasance or other acquisition of any Affiliate Subordinated Debt or of any Equity Interests of New Mirant or its consolidated subsidiaries in exchange for, or out of the net cash proceeds of a contribution to the common equity of New Mirant or a substantially concurrent sale of Equity Interests of New Mirant;

    (c)    the repurchase, redemption or other acquisition or retirement for value, in whole or in part, of the MAI Series A Preferred Shares or the Series B Preferred Shares or Restricted Payments made in connection with or related to a Security Release;

    (d)    the defeasance, redemption, repurchase or other acquisition of Affiliate Subordinated Debt with the net cash proceeds from an incurrence of Permitted Refinancing Debt;

    (e)    the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of New Mirant held by any current or former employee or director of New Mirant (or any of its consolidated subsidiaries) pursuant to the terms of any employee equity subscription agreement, stock option agreement or similar agreement entered into in the ordinary course of business;

    (f)    the declaration and payment of any dividend by any subsidiary of New Mirant to the holders of any series or class of its Equity Interests on a pro rata basis;

    (g)    the repurchase, redemption or other acquisition or retirement for value of any Equity Interests of any subsidiary of New Mirant provided for in an agreement existing on the date of the Series A Put Agreement or the Series B Put Agreement;