U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the order of the Court.**

**Signed December 9, 2005**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| MIRANT CORP., *et al.*, | § | Case No. 03-46590-DML-11 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

### MEMORANDUM OPINION

In this opinion the court addresses principally the issue of how to determine the total

enterprise value of the entities that make up Mirant Group.[1]  The court addresses that question,

---

[1]    Mirant Corp. ("Mirant") is the ultimate parent of numerous entities.  Mirant and the other 82 entities that had filed chapter 11 petitions at times pertinent to this opinion are referred to below as "Debtors" (on September 26, 2005, Newco 2005 Corporation ("Newco"), a newly formed subsidiary of Mirant filed its chapter 11 petition; reference herein to Debtors or Mirant Group do not include Newco).  The term "Mirant Group" is used herein to mean Mirant and all its wholly or partially owned direct and indirect subsidiaries.

**MEMORANDUM OPINION**                                                                          Page 1

pursuant to FED. R. CIV. P. 42(a) (applicable pursuant to FED. R. BANKR. P. 7042 and 9014),[2] for purposes of confirmation of a plan of reorganization for Debtors.[3] This matter is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334(a) and 157(b)(2)(L). This Memorandum Opinion constitutes the court's findings of fact and conclusions of law with respect to the matter discussed below. FED. R. BANKR. P. 7052 and 9014.

## I. Background

**A.     Facts**

Mirant Group is engaged in the business of producing and marketing electric power. Mirant Group conducts business not only in the United States but also in the Caribbean and the Philippines. Domestic operations are throughout the United States, but Mirant Group's principal geographic presences are in the New England, New York (outside of New York City and Long Island) and PJM[4] markets.

Mirant Group owns or leases electric generation facilities capable of producing approximately 14,000 megawatts of electric power in the United States, 2,200 megawatts in the Philippines and over 2,000 megawatts in the Caribbean. Through Mirant Americas Energy

---

[2]     As discussed below, with the agreement of principal parties in these cases, the court severed out the value issues for independent determination for confirmation purposes.

[3]     Debtors filed on January 19, 2005 their Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors. On March 25, 2005, Debtors filed their First Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors. As described below, Debtors filed a second amended plan on September 22, 2005. The court will use the term "Plan" to refer to either of these or any amended version of the Plan proposed prior to confirmation; as necessary, the court will indicate by month and day (1/19, 3/25 or 9/22) the draft of the Plan (or the accompanying Disclosure Statement) to which the court is referring. When discussing plans of reorganization generally, the court will use such term in lower case.

[4]     The PJM market includes Pennsylvania, New Jersey, Delaware, Maryland and Washington, D.C. Besides this "classic" PJM market, the PJM market has expanded to the South and West. Mirant Group assets provide electric power for southern Maryland and Washington, D.C.

Marketing, L.P. ("MAEM"), Mirant Group buys and sells fuel, electricity and other commodities. Certain emissions (sulphur dioxide and nitrous oxide, commonly referred to as "SOX" and "NOX" respectively) which are subject to regulation are dealt with (and monetized) through a market exchange.

Besides revenues generated through transactions in commodities (a relatively small amount), Mirant Group's principal business is in the merchant energy business. Thus, aside from a small income generated through the sale of electricity to consumers by Mirant's partly-owned subsidiaries in Jamaica and Grand Bahama Island, Mirant Group's revenue is derived from long-term contract sales of power to utilities (most notably in the Philippines) and from sales of power and capacity in the wholesale energy market.

Actual sales of electric power occur when power from a facility is "dispatched." Whether any power is dispatched depends on whether the power is offered at or below a price established at regular (usually hourly) intervals.[5] Each facility may bid to sell power for a price at which, for it, generation and dispatch are profitable.

Payments for capacity are made on the basis of capacity made available by the generating facility. In other words, the energy merchant, in a classic case of the aphorism "they also serve who sit and wait," is paid, even if the power it can produce is not used, in exchange for making power available should the market require it.[6] The price paid for (unused) capacity is determined

---

[5]     The various providers of power in a given market offer power through a central authority (e.g., New York Independent System Operator, Inc.) which "purchases," beginning with the lowest offered price, the power required during that period to service the needs of the market (the "Load"). All power providers, however, are paid for power dispatched during that period at the highest price at which the central authority purchases.

[6]     A market's requirements are determined by the need for power at peak Load (i.e., maximum use) times during highest use periods (typically summer months).

**MEMORANDUM OPINION**                                                                    **Page 3**

based on supply, demand and the needs of the market for availability of power.  The last of these factors is addressed by tying capacity payments to the cost of building and operating a benchmark gas turbine generating facility.[7]  Thus, in theory, if capacity falls below a certain point (required peak Load capacity plus a margin) the price paid for capacity will stimulate construction of new generation facilities.[8]

Mirant began its life as a subsidiary of The Southern Company ("TSC").[9]  Through a public offering in November of 2000 and a stock dividend to its shareholders the following April, TSC divested itself of Mirant and its subsidiaries.  Many, but not all, of Mirant Group's generation facilities were acquired and placed in operation while Mirant Group was controlled by TSC.

Following overbuilding of generation facilities and a downturn in the energy market in 2001 and 2002, Mirant Group was in a troubled financial condition.  After failing to accomplish an out-of-court workout with their creditors, Debtors sought relief under chapter 11.[10]

During their chapter 11 cases Debtors have continued to operate their business.  Two official committees of unsecured creditors have been appointed by the United States Trustee (the "U.S. Trustee") pursuant to Bankruptcy Code § 1102 (the "Code")[11] to represent the creditors of

---

[7]  The benchmark unit used in calculation of capacity prices is a single-cycle gas turbine facility – the simplest, least expensive-to-build generation facility.

[8]  The court recognizes that this is an over-simplification of the process by which energy merchants and the market interact; it is adequate for an understanding of what follows.

[9]  Mirant and its subsidiaries bore different names prior to their divestiture by TSC, but the court will uniformly refer to them by their current names in this opinion.

[10]  Mirant Corp. and 74 other of Debtors filed chapter 11 petitions in this court on July 14 and 15 of 2003.  Since then eight more Debtors have initiated chapter 11 cases.  The cases of all 83 Debtors (together with that of Newco) have been consolidated for administrative purposes.

[11]  11 U.S.C.§§ 101-1330 (2005), *amended by* 11 U.S.C. §§ 101-1532 (as enacted Apr. 20, 2005).

**MEMORANDUM OPINION**                                                                                 **Page 4**

Mirant (the "Corp. Committee") and the creditors of Mirant's second tier subsidiary, Mirant

Americas Generation LLC ("MAG" and the "MAG Committee"), and a committee has been

appointed to represent Mirant's stockholders (the "Equity Committee" and, together with the

Corp. Committee and the MAG Committee, the "Committees").  The court directed appointment

of an examiner (Code § 1104(c)) by order dated April 7, 2004, and William Snyder (the

"Examiner") was selected by the U.S. Trustee and approved by the court to perform that role.

Although the Plan as originally filed was a "waterfall" plan, meaning it was designed to

deliver value until creditors are satisfied in full, and, if value remained, provide a return to

stockholders, Debtors formulated and proposed the Plan initially based on the assumption that

unsecured creditors of Mirant (the last creditor constituency before subordinated debt held for

the benefit of, *inter alia*, Phoenix Partners LP, Phoenix Partners II LP and Phaeton International

(BVI) Ltd. (collectively "Phoenix"))[12] would not receive full satisfaction from the enterprise

value of Mirant Group. Thus, the Plan provided for Mirant's creditors, other then Phoenix, to

receive 90% of Mirant's equity post-confirmation.[13]

The 3/25 Plan originally provided (and the 9/22 Plan still provides) for creation of a trust

(the "Plan Trust") to hold certain assets not necessary to the ongoing business of Mirant Group,

including litigation.  Plan §§ 9.1-9.2.  Besides warrants[14] and any New Mirant common stock

---

[12]    The Plan proposed substantive consolidation of Mirant and other Debtors.  Under the Plan, the constituency of Mirant creditors (and the class treated as such) includes creditors of subsidiary Debtors other than MAG and its direct and indirect subsidiaries.  Debtors, however, agreed that votes would be tallied on an entity-by-entity basis.

[13]    3/25 Plan § 5.1(d) so provided.  The remaining 10% was to be distributed to certain classes of creditors of MAG.  3/25 Plan § 5.2(f).

[14]    The 3/25 Plan entitled a stockholder to a pro rata share of warrants only if such stockholder votes to accept the Plan.  Formerly Plan § 5.1(f).

**MEMORANDUM OPINION**                                                                                    **Page 5**

remaining after unsecured creditors were paid in full in accordance with the 3/25 Plan, stockholders of Mirant were to receive under the 3/25 Plan only the potential right to receive distributions from the Plan Trust, after complete satisfaction (i.e., return having a value equal to the allowed claims with interest) of Mirant creditors and full satisfaction of Phoenix (and other beneficiaries of subordinated debt). 3/25 Plan § 5.1(f).

Contending, *inter alia*, that Debtors undervalued Mirant Group in the Plan, the Equity Committee, on November 22, 2004, filed a motion and a complaint asking the court to direct Mirant to call a meeting of stockholders. It was in response to the motion and complaint of the Equity Committee that the court called a status conference (*see* Code § 105(d)) to discuss with the principal parties the wisdom of conducting a hearing to determine the total enterprise value of Mirant Group. The court considered this alternative preferable to a change in the direction of these cases through a change in management at the instance of shareholders, who might or might not ultimately be determined to have an economic entitlement to share in Mirant Group's value.

## B.    The Valuation Motion

Given that a basic dispute existed concerning value and the parties entitled to participate under a plan of reorganization, the court determined it would address the issue of Mirant Group's enterprise value (as well as other issues pertinent to confirmation[15]) before proceeding to solicitation of votes. As a result of conferences presided over by the Examiner, Debtors filed their Motion for Order Determining Valuation and for Entry of a Scheduling Order in Connection Therewith (the "Motion"). The Examiner, working with the principal parties,

---

[15]    The court, on motion of the MAG Committee, also has considered the issue of whether certain classes of MAG creditors are impaired under the Plan. *See* In re Mirant Corp., No. 03-46590-DML-11, 2005 Bankr. LEXIS 909 (Bankr. N.D. Tex. May 24, 2005).

<u>**MEMORANDUM OPINION**</u>                                                    **Page 6**

developed a scheduling order (the "Scheduling Order") for consideration of the Motion,[16] and

general notice of the Motion and the scheduled valuation hearing (the "Valuation Hearing") was

given to interested parties.[17]

Pursuant to the Scheduling Order, parties intending to participate actively in the

Valuation Hearing were required to give notice of their intent to participate by February 18,

2005. As of that date, the following entities had given notice of their intent to participate: the

Equity Committee, the Corp. Committee, the MAG Committee, Debtors, Phoenix, the Mirma

Landlords,[18] Edison Mission Energy,[19] the Ad-Hoc Committee of Bondholders of MAG, U.S.

Bank National Association as Lease Indenture Trustee and Pass Through Trustee,[20] Law

Debenture Trust Company of New York as Indenture Trustee and Property Trustee,[21] Pepco,

Kinder Morgan Power Company, and Deutsche Bank AG. Thereafter on March 15, 2005, L.

---

[16]    The court entered the Scheduling Order on February 11, 2005. The Scheduling Order was thereafter amended by orders dated February 22, 2005 and April 8, 2005.

[17]    On January 19, 2005, the Motion was served on, *inter alia*, the Committees, the Examiner, the U.S. Trustee and parties listed on the Limited Service List (*see* Order Granting Complex Chapter 11 Bankruptcy Case Treatment entered on July 16, 2003). Debtors' filed agenda for hearings on January 26, 2005, including a status conference on the Motion, was also served on the parties listed on the Limited Service List. Debtors' filed agenda reflecting the commencement of the Valuation Hearing on April 18, 2005 was also served on the parties on the Limited Service List, as well as parties on a Valuation Service List created for the Valuation Hearing.

[18]    The Mirma Landlords are certain special purpose entities created in connection with acquisition by Mirant's (and MAG's) subsidiary, Mirant Mid-Atlantic, LLC ("Mirma"), from Potomac Electric Power Company ("Pepco") of assets in the PJM market. For a description of this acquisition and the problems thereby spawned, *see* Memorandum Opinion and Order entered on January 26, 2005, denying the motion of, *inter alia*, the Mirma Landlords to dismiss the bankruptcy case of Mirma, *available at* http://www.txnb.uscourts.gov/opinions/dml/.

[19]    Edison Mission Energy withdrew its notice of intent to participate on March 3, 2005.

[20]    U.S. Bank serves as trustee for noteholders who provided financing to the Mirma Landlords.

[21]    Law Debenture Trust serves as indenture and property trustee under an indenture and trust agreement relating to the subordinated debt which runs principally to Phoenix.

---

**MEMORANDUM OPINION**                                                                                       **Page 7**

Matt Wilson, Esq., a shareholder of Mirant, filed a notice on behalf of himself and other shareholders (collectively "Wilson") of intent to participate in the Valuation Hearing.[22]

The Scheduling Order established times for submission of initial expert reports and rebuttal expert reports.  As of the deadlines set by the Scheduling Order, Debtors, the Corp. Committee, the MAG Committee, the Equity Committee and Phoenix (collectively the "Valuation Parties") submitted expert reports and, subsequently, rebuttal reports.[23]  Also in accordance with the Scheduling Order, the Valuation Parties conducted extensive discovery.

Prior to commencement of the Valuation Hearing, Wilson filed several motions.  The court summarily overruled these motions at the commencement of the Valuation Hearing.[24]

---

[22]     Because Wilson missed the deadline for noticing participation in the Valuation Hearing, the court did not permit him to present direct evidence.  However, the Valuation Hearing being part of the confirmation process, the court ruled that Wilson would be permitted to cross-examine witnesses.  *See* Almeroth v. Innovative Clinical Solutions, Ltd. (*In re* Innovative Clinical Solutions, Ltd.), 302 B.R. 136, 139 (Bankr. D. Del. 2003) (court allowed parties to examine witnesses at confirmation hearing, regardless of whether parties had filed written objections to plan in accordance with court's scheduling order); 9 COLLIER ON BANKRUPTCY ¶ 3020.02[1] n. 9 (15th ed. rev. 2001) ("[T]here appears to be no requirement that a party otherwise entitled to be heard file an objection to confirmation in order to examine witnesses and speak to evidence at the confirmation hearing.").  Shareholders, under Code § 1109, clearly are parties entitled to be heard at confirmation.

[23]     The Scheduling Order required all initial expert reports to be delivered to the Examiner by February 25, 2005, and provided that a Valuation Party, upon delivering its expert report to the Examiner or informing the Examiner in writing that it would not submit an expert report, was entitled to receive a copy of any other Valuation Party's expert report in the Examiner's possession.  A dispute arose between Phoenix and Debtors prior to the deadline for submission of initial expert reports.  Phoenix did not want its initial report to be based on public information alone and requested access to confidential information, shared by Debtors with the Committees, under the same confidentiality restrictions imposed on the Committees.  Debtors did not agree that Phoenix was entitled to the information it sought, and the court conducted a hearing on March 2, 2005 to address the issue.  The court ruled that the Equity Committee, at its discretion, could share whatever confidential information it had in its possession with Phoenix.  The court further approved an agreement reached between Phoenix and Debtors whereby Phoenix was given until March 7, 2005 to submit its initial expert report, and would not receive the expert report of any other Valuation Party until it delivered its own to the Examiner.  Phoenix's initial expert report was thereafter delivered to the Examiner on March 7, 2005.

[24]     Wilson filed (i) a motion requesting leave to fully participate in the valuation hearing, despite Wilson's failure to timely file a notice of intent to participate, (ii) a motion requesting an indefinite continuance of the Valuation Hearing and (iii) a motion requesting the court to reopen discovery in connection with the Valuation Hearing.  Grant or denial of these motions was within the sound discretion of the court.  Gulf

## C. The Valuation Hearing

The Valuation Hearing commenced on April 18, 2005 and continued for 27 days over the following 11 weeks.[25] During the Valuation Hearing the court heard testimony from Curtis Morgan ("Morgan"), Mirant's Executive Vice President and Chief Operating Officer; Kumar Krishnan ("Krishnan"), Director of Market Evaluation at Mirant; John William Holden, III ("Holden"), Mirant's Senior Vice President and Treasurer; Dr. Richard D. Tabors ("Tabors"), a principal at Charles River Associates ("CRA") and one of Debtors' experts; Timothy R. Coleman ("Coleman"), a principal of The Blackstone Group ("Blackstone"), and Debtors' other expert; Todd W. Filsinger ("Filsinger"), a principal of PA Consulting Group ("PA"), an expert retained by the Corp. Committee; David Y. Ying ("Ying"), a principal of Miller Buckfire Ying & Co. ("MBY"), also retained as an expert by the Corp. Committee; Dr. Benjamin Schlesinger ("Schlesinger"), principal of Benjamin Schlesinger and Associates, Inc. ("BSA"), retained as an expert by the Equity Committee; Kenneth J. Slater ("Slater"), principal of Slater Energy

---

Water Benefaction Co. v. Pub. Util. Comm'n of Tex., 674 F.2d 462, 468 (5th Cir. 1982) ("It is clear that discovery motions fall within the broad discretionary powers of the trial court . . . ."); Crompton-Richmond Co., Inc. v. Briggs, 560 F.2d 1195, 1202 (5th Cir. 1977) ("The grant or denial of a continuance is within the sound discretion of the Trial Judge"); *see also* Lucas v. McKeithen, 102 F.3d 171, 173 (5th Cir. 1996) (trial court denial of a motion to intervene on grounds of timeliness is reviewed for abuse of discretion); Iridium India Telecom Ltd. v. Motorola, Inc. (*In re* Iridium Operating, LLC), No. 04 Civ. 8687 (LTS)(KNF), 2005 U.S. Dist. LEXIS 4740, *2-3 (S.D.N.Y. Mar. 23, 2005) (appropriate standard of appellate review applied to bankruptcy court decision to deny a motion to intervene on grounds of timeliness is abuse of discretion). Granting the motions would not only have granted to Wilson an exception from orders complied with by the Valuation Parties. It would also have further delayed these chapter 11 cases. The court, conscious of the need to press Debtors to reorganize as quickly as possible (*see* United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd. (*In re* Timbers of Inwood Forest Assocs., Ltd.), 793 F.2d 1380, 1405 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (1988) (Congress included numerous provisions in the Code to foster rapid resolution of reorganization proceedings); Acequia, Inc. v. Clinton (*In re* Acequia, Inc.), 34 F.3d 800, 808 (9th Cir. 1994) (quick and equitable reorganization are goals of the Code)), concluded there was no good cause to grant the motions, especially given that the Equity Committee would represent (and did fully represent) shareholder interests, and there was substantial reason to deny the motions.

[25]      The court conducted the Valuation Hearing on the following days: April 18-22, 2005; May 2-6, 10-11 and 23-26, 2005; June 6-8, 13-15, 20-23 and 27, 2005.

Consultants, Inc. ("Slater Consulting"), also retained by the Equity Committee as an expert; Anders John Maxwell ("Maxwell"), a principal of Peter J. Solomon Company ("PJSC"), the Equity Committee's third expert; and Dr. Israel Shaked ("Shaked"), a principal of The Michel-Shaked Group ("MSG"), an expert retained by Phoenix.

Morgan, Krishnan and Holden gave testimony regarding the formulation and reliability of the business plan for Mirant Group (the "Business Plan"[26]) which furnished the data on which Coleman based his opinions of value. Tabors provided testimony in support of the Business Plan and Coleman's valuation and in criticism of, *inter alia*, the reports of BSA, Slater Consulting and PJSC. Filsinger gave testimony respecting development by his firm of cash flows used by Ying in his valuation of Mirant Group.[27] Coleman and Ying testified as to their valuations; Ying was also called (by the Corp. Committee) along with Morgan (called by Debtors) as rebuttal witnesses to respond to testimony by experts called by the Equity Committee and Phoenix. Schlesinger's testimony principally concerned future gas prices which, as discussed below, are a key factor in the business of Mirant Group. Slater used Schlesinger's gas price forecasts (as well as other input) to develop his own cash flows for Mirant Group.[28] From these cash flows Maxwell developed his valuation of Mirant Group. Shaked critiqued the valuation testimony of other experts—principally Coleman and Ying.

---

[26]     Debtors introduced into evidence business plans prepared in March 2004 and October 2004. Unless otherwise indicated, the court's references are to the latter.

[27]     Though Filsinger and Ying testified that the Business Plan was reasonable, the Corp. Committee determined it would rely on PA's projections rather than those contained in the Business Plan.

[28]     Mirant Group utilized two computer models (Unified Asset Model, or "UAM", for the initial two years of the Business Plan and Production Operations Simulation Scenario Enumerator, or "POSSE", for succeeding years). Slater used an edition of "PROMOD," a computer model in use in the energy industry for predicting revenues of power generators.

**MEMORANDUM OPINION**                                                        **Page 10**

Including expert reports[29] from Coleman, Tabors, Filsinger, Ying, Schlesinger, Slater, Maxwell and Shaked,[30] and the Business Plan, the parties placed in evidence a total of 454 exhibits. The court also received into evidence, by agreement of the parties, the deposition and expert report of William H. Hardie, III ("Hardie") of Houlihan Lokey Howard & Zukin ("Houlihan"), the expert retained by the MAG Committee. The parties also designated for the court's consideration portions of transcripts of depositions taken of A.W. Dahlberg ("Dahlberg"), the chairman of Mirant's board of directors; Robert A. Hayes ("Hayes"), Mirant's Vice President of Corporate Planning, Strategy and Business Development; Seth G. Parker ("Parker"), a principal of Levitan & Associates, Inc., another expert retained by the Equity Committee; and Slater.

During the Valuation Hearing, Wilson filed a motion (and, later, a renewed motion) (both the "*Till* Motion") asking that the court determine, based on *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), that the enterprise value of Mirant Group must, as a matter of law, exceed the total debt of Mirant Group. At the court's invitation, other parties (Debtors, the Corp. Committee, the MAG Committee, the Equity Committee and Michael Sammons, a shareholder) filed briefs addressing the *Till* Motion.

### D.    The Court's Ruling

---

[29]    Expert reports will be identified below by the name of the consulting firm and, if appropriate, since some experts provided a second or corrected report, the date of the report (e.g., Blackstone 2/25 Report).

[30]    Pursuant to the Scheduling Order, Phoenix had provided an expert report and rebuttal report by W. Paul Ruwe, Jr. ("Ruwe") of Muse, Stancil & Co. However, Ruwe did not testify, and his reports were never offered as evidence. Certain other exhibits (e.g., the Examiner's single exhibit – a summary of expert reports) refer to Ruwe or his reports. The court has not considered either of Ruwe's reports in reaching its conclusions.

Following completion of the Valuation Hearing, the court issued its preliminary ruling in letter form on June 30, 2005. On July 26, 2005, the court, by a second letter (together with the June 30 letter, the "Letter Ruling"), responded to inquiries transmitted by the Examiner and modified its prior ruling.[31] By the Letter Ruling the court directed that, under Morgan and Coleman's supervision and the general supervision of the Examiner, the value of Mirant Group be recalculated to effect changes required by the court and discussed below. In the Letter Ruling the court indicated it would explain and substantiate its ruling in this memorandum opinion.

E.     **Subsequent Events**

Following issuance of the Letter Ruling, the Committee, Debtors, Phoenix and certain *ad hoc* committees entered into negotiations respecting a consensual plan. On September 8, at the request of those parties, the court held an in-chambers status conference[32] at which the parties announced that they had reached agreement on a consensual plan of reorganization for Debtors that would allow for participation of Phoenix and existing shareholders.[33] The parties also requested that the court direct that the recalculation of value of Mirant Group not be completed and that the court not at that time issue this memorandum opinion.

---

[31]     The June 30 and July 26 letters may be found in the court's file at docket nos. 10393 and 10723, respectively.

[32]     The record of that conference was sealed for a brief period of time to allow Mirant to issue a press release and file a form 8-K as required by the Securities Exchange Commission.

[33]     The deal struck by the parties allocated outright 3.75% of the stock of the reorganized entity to existing equity owners and 3.5% to the Phoenix class. Under the 9/22 Plan shareholders and the Phoenix class are to receive warrants entitling them, respectively, to 10% and 5% of the equity in the reorganized company. Finally, 50% of the recoveries from the litigation assigned to the Plan Trust is to benefit existing equity owners.

One of the goals of Congress in fashioning the Bankruptcy Code was to encourage parties in a distress situation to work out a deal among themselves. *See Marandas v. Bishop (In re Sassalos)*, 160 B.R. 646, 653 (D. Or. 1993) ("compromises are favored in bankruptcy"); *see also* 10 COLLIER ON BANKRUPTCY ¶ 9019.01 (15th ed. rev. 2005). Mindful of the likely effect on the commitments of the parties to the consensual plan of completion of recalculation of value, the court agreed to the parties' request and directed that the recalculation of value be halted, at least temporarily. The court also deferred issuance of this memorandum opinion until confirmation.

The Plan, as modified to reflect the deal of the parities, has now been considered at a confirmation hearing. Because this memorandum opinion is pertinent to a number of confirmation issues (including the tests of Code § 1129(a)(7) and (11)), because it addresses the *Till* Motion, because at least one party (Wilson) has indicated an intent to appeal confirmation and the court believes an appellate court should have the benefit of the reasoning underlying the Letter Ruling, and because some objections to confirmation of the Plan concerned the failure to complete the valuation process, the court concluded it would be appropriate and beneficial to the parties to issue this memorandum opinion in connection with confirmation of the Plan.

## II.  Evidentiary Objections

Debtors and the Corp. Committee objected to consideration of the expert testimony and reports of Schlesigner, Slater and Maxwell on the basis of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In *Daubert* the Court provided a non-exclusive list of factors[34] a trial court

---

[34] The *Daubert* factors are (1) has the method been tested; (2) has it been subjected to peer review; (3) what is the rate of error; (4) are there controlling standards (as by a professional organization); (5) has the method achieved acceptance. *Daubert*, 509 U.S. at 593-94. Assuming that valuation evidence falls within the category "scientific" evidence, still factor 4 appears inapplicable and factor 3 depends on what is meant by error. Nevertheless, the Comparable Method and the DCF Method meet the remaining three tests, and the court finds that testimony or opinion by one qualified under F.R.E. 702 as knowledgeable in those methods

should apply in assessing whether expert evidence should be admitted. The gist of the complaint of Debtors and the Corp. Committee is that Schlesinger, Slater and, by extension, Maxwell did not use recognized, tested scientific method in determinations of value and the data underlying the value. The court took these *Daubert* objections under advisement.[35]

There are two issues the court must address in order to rule on these objections. First, the court must determine whether Schlesinger, Slater and Maxwell meet the test to provide expert testimony. The court concludes they do.

F.R.E. 702 states that "a witness [may be] qualified as an expert by knowledge, skill, experience, training or education." It is clear that each of Schlesinger, Slater and Maxwell meets this test. Each has experience and education necessary to understand and apply accepted methodologies for forecasting within his field.[36]

Schlesinger received his undergraduate degrees from Dartmouth College and earned a master's degree and Ph.D. from Stanford University in industrial engineering. Schlesinger has 34 years of working experience in the energy field and has served in the following positions: (i) Project Engineer for the Environmental Services Department of Bechtel Corp., (ii) Chief Environmental Engineer for the Office of Commercialization of the Energy Research and Development Administration, (iii) Vice President, Policy Evaluation and Analysis for the American Gas Association, (iv) Principal of Booz, Allen & Hamilton, Inc. and (v) President of

---

is an "expert." This rule would apply to other types of forecasting, including forecasting gas prices and power and capacity revenues.

[35] The record of the Valuation Hearing is part of the confirmation hearing, and the court was requested to consider testimony of Schlesinger, Slater and Maxwell in connection with confirmation.

[36] *Daubert* gives the trial judge considerable discretion in performing his gatekeeping role respecting expert evidence. *Daubert*, 509 U.S. at 594-95. *See also* Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150-52 (1999).

BSA.[37] Schlesinger has also lectured on the natural gas industry at Stanford University, Columbia University, the University of Pennsylvania and the University of Maryland and has spoken at more than 100 executive seminars dealing with energy matters worldwide. Schlesinger, by education and experience, is well qualified to offer expert testimony concerning gas pricing.

Slater received his undergraduate degrees from the University of Sydney, Australia and earned a master's degree in management sciences from the University of Waterloo in Ontario, Canada. Slater has worked in the electric, gas and utility industry since 1957 and has served in the following positions: (i) Professional Engineer of the Electricity Commission of New South Wales, the largest electric utility in Australia, (ii) Senior Engineer of the Production Development Section of Ontario Hydro's Operating Department, (iii) Manager of Engineering at the Ontario Energy Board, (iv) consultant to the Royal Commission on Electric Power Planning, (v) Senior Vice President and Chief Engineer of Energy Management Associates, Inc. and (vi) President of Slater Consulting. Slater was responsible for the development of PROMOD, a utility planning and reliability software program that is widely used in the energy industry, and was a major contributor to the development of later versions of PROMOD. Slater has also published a number of writings in the energy field. Slater's education and experience are sufficient to qualify him as an expert in the generation and dispatch of power and in operations in the electric power industry.

Maxwell received an undergraduate degree from the University of California and earned a master's degree from the University of Pennsylvania in business. Maxwell has extensive

---

[37]     As President of BSA, Schlesinger has testified on behalf of private clients before the Federal Energy

experience in the areas of restructuring and valuation and has served in the following positions: (i) Vice President and Manager of Leveraged Lease and Power Project Financing at General Electric Co. and GECC, (ii) Managing Director, Lease and Project Finance, at Dean Witter Reynolds, (iii) employee of Kidder Peabody, Smith Barney and Lazard Freres, (iv) Managing Director, Restructuring Advisory Practice, at Benedetto Gartland & Co., (v) Vice President and General Manager of Equity Capital Group at GE Capital, (vi) Director, High Yield Structured Products at Salomon Smith Barney and (vii) Managing Director of PJSC. By experience and education, Maxwell qualifies as an expert in valuation.

Though the court finds them qualified to testify as experts, the reports submitted by Schlesinger, Slater and Maxwell are another matter. As Maxwell's report is dependent on Slater's, and Slater's, in turn, depends on Schlesinger's, the accuracy of the latter is a necessary prerequisite to the validity of the opinions expressed in the reports of Slater and Maxwell. Maxwell himself admitted that inaccuracies in Slater's Business Plan adjustments would render his valuation incorrect. Transcript of Proceedings, testimony of Maxwell at page 3968, line 20 to line 24.[38]

In fact, Schlesinger's report contains several material errors. During cross-examination, Schlesinger admitted that his figures for delivered gas costs to a number of Debtors' facilities contained mathematical errors. TR (Schlesinger) at pp. 2862:5-2865:17. On redirect, Schlesinger stated that the inconsistencies were not in fact errors, but were due to the addition of certain taxes on delivered gas prices to Debtors' plants and that such taxes were included in his

---

Regulatory Commission, Congress, the Department of Energy and various state utility regulatory panels.

[38] The transcribed record of the Valuation Hearing will hereafter be cited as "TR (*name of witness*) at pp. ____:__-____:__".

**MEMORANDUM OPINION**                                                                                   **Page 16**

calculations, but not separately identified as line items in his report. TR (Schlesinger) at pp. 2882:20-2883:13. However, on recross, Schlesinger conceded that his report did contain errors regarding delivered gas costs for certain of Debtors' plants and that he was incorrect in attributing the discrepancies to taxes. TR (Schlesinger) at pp. 2913:12-2914:22 and 2916:18-2917:1.

Besides incorporating errors in the BSA Report, Slater's report contains several additional mistakes. Slater admitted that his projections for capacity revenues for the New York ISO market were overstated because his mathematical modeling failed to take into account that generation capacity in the New York ISO region is not derived solely from plants within the boundaries of the region, but is imported from outlying regions as well. TR (Slater) at pp. 3217:22-3222:4. Slater also admitted to making mathematical errors in calculating capacity revenues in the PJM market for the year 2005 and to excluding certain necessary market adjustments to his projections for that market. TR (Slater) at pp. 2928:17-2929:10. Finally, Slater was unable to explain how he had made proper allowance for capacity available to the classic PJM Market by reason of expansion of the PJM Market to the South and West. TR (Slater) at pp. 3175:2-3183:1 and 3479:21-3486:10.

Because the errors in the underlying reports are automatically carried over into Maxwell's report, it, too, is not reliable. For these reasons the court has decided to disregard the

expert reports of Schlesinger, Slater and Maxwell.[39]  As the court does not rely on these reports,[40] it is unnecessary to reach the *Daubert* issue.

### III.  Motives of the Experts

During the Valuation Hearing parties raised questions about the motives of the various expert witnesses.  Most significantly, Shaked and the experts retained by the Equity Committee have been attacked by Debtors and the Corp. Committee as being advocates rather than disinterested experts.

The evidence offers support for this accusation.  In addition to PJSC's monthly fee, PJSC negotiated an incentive based fee arrangement with the Equity Committee whereby, subject to court approval, PJSC may receive an additional $1 million plus 0.4% of any recovery by shareholders in excess of $400 million.  TR (Maxwell) at pp. 3964:3-3965:3.  Presentation materials submitted by PJSC to the Equity Committee identify PJSC as not simply a disinterested neutral, but as an advocate for the Equity Committee.  TR (Maxwell) at pp. 3965:9-3968:3; Debtors' Exhibit No. 173.

MSG circulates brochures nationwide advertising the firm's services of providing expert witnesses.  TR (Shaked) at p. 5228:7-25.  Shaked, in a number of articles he has published, has advertised MSG's expert witness services. TR (Shaked) at pp. 5224:7-5226:24; *see*, e.g., Allen Michel & Israel Shaked, *Solvency Analysis: A Primer on Applying Discounted Cash Flow*, 22-JAN Am. Bankr. Inst. J. 54, 55 n.1 (2004).  One of Shaked's articles, written for the American

---

[39]    The court occasionally refers below to the PJSC Report to show uniformity (or lack thereof) in methodologies of experts generally.

[40]    That their reports are not probative does not mean the testimony of Schlesinger, Slater and Maxwell has no value.  Each offered cogent criticism of the testimony and reports of Coleman, Filsinger and Ying.  The

Bankruptcy Institute, is titled "Managing your Expert for a Successful Outcome: The 10 Commandments." TR (Shaked) at p. 5241:4-21; Allen Michel & Israel Shaked, *Managing your Expert for a Successful Outcome: The 10 Commandments*, 20-MAY Am. Bankr. Inst. J. 28 (2001).

That experts may be anxious to serve the interests of the parties retaining them is neither startling nor enough reason to disregard their testimony. First, if the Equity Committee's experts and Shaked are more blatant in their willingness to adopt a bias toward their employers, it is likely that the other experts in the case were also influenced to some extent by the needs of their underwriters. Each of Hardie[41] and Ying[42] effectively admitted to taking an approach to total enterprise value consistent with the strategy of his committee. Coleman has served as an advisor to Debtors since before commencement of these chapter 11 cases.[43] It is reasonable to infer that Coleman would have some commitment to a strategy (and its factual underpinnings) that he helped devise.

---

court has considered that (and other) testimony provided by Schlesinger, Slater and Maxwell as indicated below.

[41]   Hardie was asked at his deposition if he had an opinion as to whether Mirant's balance sheet would be in good condition upon emergence from chapter 11. Hardie stated that it was difficult for him to formulate an opinion, but that he had concerns about leveraging at the MAG level. Deposition of Tuck Hardie dated April 8, 2005 at page 88, line 2 to page 89, line 18 (hereafter "Hardie Deposition at pp. ____:__-____:__). The court infers from Hardie's testimony that, in formulating his expert opinion, he kept in mind the central concern of the MAG Committee, that MAG be as little impaired as possible in its ability to satisfy debts of MAG creditors at least in full.

[42]   The court asked Ying whether he had consistently participated in Corp. Committee meetings and activities and whether he participated in the formulation of the Corp. Committee's strategy, and Ying answered yes to both questions. TR (Ying) at p. 2349:4-10. The court also asked Ying whether he agreed with Hardie's concern over leveraging at the MAG level, and Ying replied: "I can't deny my parochial interests, and obviously his as well, Your Honor." TR (Ying) at p. 2348:17-23.

[43]   The Blackstone 2/25 Report states that Blackstone was retained by Debtors in November 2002. *See also* TR (Coleman) at pp. 1641:23-1642:11.

**MEMORANDUM OPINION**                                                                 **Page 19**

This is not to say that an expert influenced by his retainer's needs acts improperly, as other courts have concluded.  *See, e.g.,* *In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004) ("[W]e recognize each side's incentives to . . . overvalue or undervalue the Debtors."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *In re Beker Indus. Corp.*, 58 B.R. 725, 739 (Bankr. S.D.N.Y. 1986) (the evidence used for valuation is "highly judgmental").  Should Mirant Group be overvalued, harm to the creditors represented by the Corp. Committee would result.  Thus, experts retained by the Corp. Committee should be cautious, even conservative, in valuing Mirant Group – certainly such experts would avoid being too optimistic about the enterprise's future.  Experts for the Equity Committee and Phoenix may be expected to take an opposite view.  This does not totally taint the testimony of either.  It simply means the court must be cautious itself, avoiding undue optimism while at the same time ensuring that assumptions and data used for valuing Mirant Group give full value to the business as rehabilitated through chapter 11.

## IV. Valuation Methodology

The Valuation Parties generally agree that there are four methods for valuing an energy merchant like Mirant Group.[44]  First, one may determine a value by multiplying Mirant Group's free cash flow by a factor based on comparable companies (the "Comparable Method").[45]  Second, one may discount Mirant Group's projected cash flows to a present value (the "DCF Method").  Third,

---

[44]    There may be other valuation methods.  For example, replacement value might be calculated based on cost less depreciation.  This and any other possible methodologies were not addressed by the expert witnesses, and the court accordingly assumes such approaches would not provide useful information and considers only the valuation methods discussed during the Valuation Hearing.

[45]    This method is similar to capitalizing earnings.  It is perceived as more accurate to use free cash flow rather than earnings, especially for debtors that may not have had historical earnings.  *See* ASWATH DAMODARAN, INVESTMENT VALUATION 501 (2d ed.).  This is consistent with precedent discussed below, which directs that the court focus on Mirant Group's future earning potential.

one might arrive at a value based upon transactions involving comparable assets (the "Transactions Method"). Finally, one may value an energy merchant based upon a calculation of a value per megawatt of capacity (the "Capacity Method").

Although the experts retained by the parties[46] each valued the Mirant Group using the DCF Method and the Comparable Method, it was generally agreed that the Transactions Method and the Capacity Method[47] were not suitable. Regarding the former, there is inadequate data (i.e., a dearth of comparable transactions[48]). The Capacity Method was regarded by most of the experts as unsatisfactory because valuation of capacity should vary depending on the type of plant, the location of the plant and other factors.[49] The court has found in numerous opinions support for valuation of a chapter 11 debtor through the use of the DCF Method and the Comparable Method. *See In re Bush Indus., Inc.*, 315 B.R. 292, 299-302 (Bankr. W.D.N.Y. 2004); *In re Exide Techs.*, 303 B.R. at 65; *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 930 (Bankr. S.D.N.Y. 1994); *In re Pullman Constr. Indus.*

---

[46] Though he did not testify and his expert report was not introduced into evidence, Ruwe also employed the DCF Method and the Comparable Method. Examiner's Exhibit No. 1.

[47] Hardie's expert report included a valuation of Mirant Group based on the Capacity Method and Maxwell utilized a generating capacity multiple as a metric in his Comparable Method.

[48] At trial, the Equity Committee sought to present recent comparable transactions through the testimony of Maxwell. Because it found that this offer of evidence surprised other parties, the court sustained an objection and did not permit its introduction. TR (Maxwell) at pp. 3900:5-3902:2. At the confirmation hearing on the 9/22 Plan, Wilson introduced, over objections, descriptions of several arguably comparable transactions. Study of the materials provided by Wilson does not alter the court's conclusions regarding the value of Mirant Group. The materials relate to (1) sales of interest in four generating facilities by American Electric Power ("AEP"); (2) the merger of Cinergy and Duke Energy; and (3) assets owned by Texas Genco, which NRG proposes to acquire. The materials are thus too sparse and unsupported to justify use of the Transactions Method. AEP was selling 50% or smaller interests, which are not comparable for valuation purposes to 100% owned assets. The Cinergy merger involves a mix of assets different from that of Mirant Group, including retail operations and pipelines, and the materials provided by Wilson do not allocate value. The Texas Genco materials simply describe that company's facilities.

[49] Both Coleman and Ying so testified. TR (Coleman) at pp. 1224:1-1225:13 and TR (Ying) at pp. 2057:5-2058:4 and 2310:18-2311:8. Houlihan used a methodology that took advantage of its specialized facility-specific database. *See* Houlihan 2/25 Report at p. 23.

*Inc.*, 107 B.R. 909 (Bankr. N.D. Ill. 1989).  The court finds these methods of valuation the most

likely to ensure that Mirant Group is valued based on the worth of its future ability to produce

income.  *See Protective Comm. v. Anderson*, 390 U.S. 414, 442 (1968) ("[T]he commercial value of

property consists in the expectation of income from it.") (*quoting Consol. Rock Prods. Co. v. Du

Bois*, 312 U.S. 510, 526 (1941)).

The Comparable Method requires identification of public companies similar to the subject

being valued.  For each comparable company, a total enterprise value ("TEV") is calculated by

multiplying the number of shares of the company's common stock by the closing price of the stock

on a given day and adding that product to the company's outstanding debt.[50]  The resulting number

is then divided by the company's annual cash flow to arrive at a "multiple".  The number most often

used as annual cash flow is the company's projected[51] EBITDA,[52] though the company's projected

EBIT[53] (or, alternatively, EBITDA plus rent, abbreviated EBITDAR) arguably could be used.  In

calculating cash flow based on EBITDA, non-recurring items (e.g., a litigation settlement) and non-

operating revenues (e.g., income from investments) and cash are also deducted (with comparable

adjustments to the TEV).  Depreciation and amortization are added back.  Using a range of multiples

---

[50]    *See* TR (Coleman) at p. 1087:15-25 and TR (Ying) at p. 2350:19-24.  *See also* MBY 2/25 Report at pp. 19-
20; PJSC 2/25 Report at p. 43; Peter V. Pantaleo & Barry W. Ridings, *Reorganization Value*, 51 Bus.
Law. 419, 421-22 (1996).

[51]    Trailing numbers can be used and Shaked advocated using them in his testimony regarding the appropriate
way to conduct a Comparable Method analysis.  TR (Shaked) at pp. 4713:16-4714:1.  But, more typically,
the experts used estimated EBITDA for 2005 and 2006 in the case at bar.  Company guidance was used if
available.  Otherwise, EBITDA was taken from Institutional Brokers' Estimate System consensus research.

[52]    EBITDA is an acronym for earnings before interest, taxes, depreciation and amortization.

[53]    EBIT is an acronym for earnings before interest and taxes.  Although Maxwell used EBIT multiples (*see*
PJSC 2/25 Report at pp. 21-24), the other experts generally rejected use of an EBIT multiple.  *See* TR
(Coleman) at pp. 1086:10-1087:11, 1216:20-1217:12 and 1219:15-1222:25 and TR (Ying) at pp. 1958:23-
1963:22.  *But see* TR (Shaked) at p. 4798:11-20.  The court will rely on use of EBITDA.

**MEMORANDUM OPINION**                                                              **Page 22**

from the comparable companies, the average (generally the median average) multiple is then applied to the valuation subject's projected EBITDA (adjusted as with the comparables) to arrive at a TEV for the subject.

The DCF Method bases valuation on the subject's projections of EBITDA for a period of years. The projected EBITDA is then discounted back to present value, using a weighted average cost of capital (the "WACC"). The WACC is determined by, first, calculating the subject's cost of debt (i.e., the interest rate the subject must pay to borrow funds reduced by the subject's effective tax rate). Next, the cost of the subject's equity (i.e., the return required for equity) is determined by using a risk-free rate (typically a long term treasury yield[54]) and adding an equity risk premium calculated by multiplying a standard equity risk premium of 7.2% by a factor (the "Beta") reflecting industry stock performance in comparison to the market generally. The resulting percentage may then be augmented by an additional risk premium, as discussed in greater detail below.

Finally, the capital structure of the subject is reviewed to determine the relative portions of debt and equity with which it is to be capitalized. The WACC is then calculated by adding (a) the product of the cost of debt multiplied by a range of percentages of debt consistent with the proposed capital structure to (b) the cost of equity multiplied by a comparable range of percentages representing equity's share of capitalization.

Having discounted the subject's cash flows to present value, a terminal value must be determined. This is done by taking the company's TEV as of the end of the cash flow projections, determined by multiplying the last year's EBITDA by a multiple (which may be similar to that

---

[54]    The Blackstone 2/25 Report, Houlihan 2/25 Report and the PJSC 2/25 Report utilized risk free rates based on 10 year, 20 year and 30 year treasury yields, respectively. Blackstone 2/25 Report at p. 39, Houlihan 2/25 Report at p. 77 and PJSC 2/25 Report at p. 34.

developed in the Comparable Method) and discounting that TEV to present value. Alternatively, terminal value my be determined by applying a growth rate to the last year's free cash flow and discounting the result to present value.[55]

The court at this juncture must comment briefly on the questionable reliability of these valuation methods. As one court has stated,

> [Deciding] going concern value is hardly elementary. It involves consideration of what Shelley in "A Defense of Poetry" called "the gigantic shadows which futurity casts upon the present." Those who would prepare future cash flow analyses and discount them to present values are not oracles. The opinion evidence they present . . . should be taken as a set of assumptions that are factored into a model and critical analysis then employed to test those assumptions. The evidence in the exercise is hardly clear, is highly judgmental and consists largely of inferences.

*In re Beker Indus. Corp*, 58 B.R. at 739. *See*, similarly *Protective Comm.*, 390 U.S. at 442 ("Since . . . application [of the criterion of earning capacity] requires a prediction as to what will occur in the future, an estimate, as distinguished from mathematical certitude, is all that can be made.") (*quoting Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941)); *Muskegon Motor Stockholders Protective Comm. v. Davis* (*In re Muskegon Motor Specialties*), 366 F.2d 522, 530 (6th Cir. 1966) ("The valuation of a business remains an art based on the use of informed, careful judgment (including that of the court), and it cannot be expected to yield mathematically precise results."); *In re Coram Healthcare Corp.*, 315 B.R. at 339 ("Simply put, when it comes to valuation issues, reasonable minds can and often do disagree. This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature.") (*quoting Peltz v. Hatten*, 279 B.R. 710, 736-37 (D. Del. 2002)).

The variables generally presented in a valuation – estimates of future cash flow, choice of

---

[55]     *See* Blackstone 2/25 Report at p. 36, Houlihan 2/25 Report at p. 21 and Peter V. Pantaleo & Barry W.

comparable companies, choice of a perpetual growth rate – are all present in the case at bar.  There are additional variables added because valuation here is not intended to establish a value for acquisition of Mirant Group,[56] but rather in the context of confirmation proceedings.  There are also a number of uncertainties peculiar to Mirant Group's industry that will affect the accuracy of any determination of value.  While a number of these are addressed below in connection with the court's ruling, it is important to acknowledge others as well.

Besides giving Mirant Group a "fresh start," Debtors' chapter 11 cases are likely to bring about other changes.  The Plan proposes a dramatically altered corporate and business structure, in which, for example, Mirant Group's debt will be concentrated at the MAG level and MAEM's functions will be reallocated and modified.  Mirant's board of directors will be changed under the Plan, and the court must consider what effect on value a change in control – and a more or less aggressive approach to the conduct of Mirant Group's business – should have.

Finally, the use of any value determined is as of an effective date for the Plan that will occur long after the generation of the data used for valuation.  Yet the data used to determine value quickly grows stale.  Changes in the comparable companies' stock prices, varying raw material prices and changes in interest rates all have multiple impacts on a value determined as of one date which will be dispositive of creditors' and interest holders' rights as of a date in the future.

Even more troubling are the peculiar problems faced by a valuation in Mirant Group's

---

Ridings, *Reorganization Value*,  51 Bus. Law. 419, 428-30 (1996).

[56]  As testified by Coleman, his calculation was not intended to reach a market value but was to determine a reorganization value.  The court agrees with Coleman that the value to be ascertained in the confirmation context is not necessarily what a willing buyer would pay for Mirant Group.

industry. It is, according to the testimony, a "cyclical" industry.[57] Yet the industry has never yet gone through a full cycle.[58] If the merchant energy industry *is* cyclical, the experts agree that it is on the upswing,[59] at least until "equilibrium" is reached. Equilibrium is the point at which capacity supply is approximately equal to market demand – or, put another way, if economic theory is correct, the point at which new capacity is attracted to the market place.[60] After reaching equilibrium, economic theory assumes that supply and demand will remain in rough balance, with no overbuilding of new facilities, indefinitely.[61]

Not only are these economic theories untested; they may be affected by many unforeseen happenings. Added capacity through new technology – e.g., windmills – or import from other regions (as discussed above for the New York and PJM markets) may invalidate many economic assumptions. Terrorist acts, changes in local economies, events around the world (from greater instability in the Philippines to new wars or revolts in the Middle East) all may so affect the future of

---

[57]    *See* TR (Coleman) at p. 1166:1-2, TR (Ying) at pp. 2329:2-6 and 5574:25-5575:9 and TR (Maxwell) at pp. 4613:23-4614:9.

[58]    *See* TR (Ying) at pp. 5574:25-5575:11 and TR (Maxwell) at p. 4610:10-17. The merchant energy business is a child of utility deregulation, the result of spin-off by utilities of their generating assets. *See, e.g.,* Mirant Corp. v. Potomac Elec. Power Co. (*In re* Mirant Corp.), 378 F.3d 511 (5th Cir. 2004).

[59]    *See* TR (Coleman) at pp. 1166:3-14, 1194:6-10 and 1639:4-8, TR (Ying) at p. 1952:8-16 and TR (Maxwell) at p. 4134:6-8.

[60]    *See* TR (Morgan) at pp. 193:8-194:3, TR (Krishnan) at pp. 534:21-535:4, TR (Ying) at pp. 2026:9-2027:2, TR (Filsinger) at pp. 2377:19-2378:6 and 2434:11-2435:3 and TR (Slater) at pp. 3207:14-3208:7. At the time of the Valuation Hearing, the New York ISO had in place and the New England ISO had proposed before the Federal Energy Regulatory Commission ("FERC") a "demand curve." In general terms, a demand curve is a formula by which the ISO compensates power generators for making capacity available to the market. When available capacity is lower than a target capacity level desired by the ISO, the demand curve functions to provide higher capacity payments to generators and thus encourages construction of new facilities to reach the desired capacity level. Conversely, when available capacity exceeds the ISO determined target capacity level, generators receive less compensation for making capacity available, which, in turn, discourages new construction and overbuilding. *See* TR (Morgan) at pp. 194:21-195:5 and 288:11-22, TR (Krishnan) at p. 415:7-16 and TR (Tabors) at pp. 598:17-600:23.

[61]    *See* TR (Ying) at pp. 2026:19-2027:2. *But see* TR (Filsinger) at pp. 2650:14-2651:14.

---

**MEMORANDUM OPINION**                                                                                    **Page 26**

Mirant Group and the merchant energy industry that "economic theory" will prove wrong.

Moreover, some of the methodology employed in valuation practice troubles the court. Stock prices of comparables for just one day are used in calculating multiples. Cash flows are not updated regularly (at least in the case at bar[62]) to reflect broken assumptions. Comparable companies are all treated as equal indicators of value and are treated as sharing an industrial typicality with Mirant Group.[63] These and other issues are dealt with to some extent below.

That the court has misgivings about the accuracy of any valuation of so complex[64] an enterprise as Mirant Group, let alone a valuation subject to inherent methodological weaknesses and assumptions unsupported by history,[65] does not mean the existing tools are not to be used to gauge value. These are the tools available to the court in its task. The necessary result, however, from dealing with evidence best described as "soft," is that the court must exercise caution in establishing a range of values for Mirant Group that will necessarily include or exclude equity participation under the Plan and effectively limit its role in the confirmation process. Thus, in the Letter Ruling, the court provided that full equity participation going forward was dependent upon the range of values

---

[62]    Debtors' Business Plan is redone annually. As discussed below, and despite innocently misleading testimony from Morgan that alteration to the Business Plan would require only a few weeks (TR (Morgan) at p. 5548:7-21), recalculation of cash flows (i.e., rerun of the Business Plan) requires more than two months. Thus, there must always be a lag between the time of generation of data used for valuation and the actual determination of value.

[63]    As discussed below, NRG is the only comparable truly close to Mirant Group. Not only do the two share more business characteristics than is true of Mirant Group and any other of the possible comparables; NRG also has a relatively clean balance sheet and recently (in 2004) emerged from chapter 11, the status the court assumes for Debtors in valuing Mirant Group. Other comparables, however, face many of the same sorts of problems (litigation from the California energy crisis, regulatory proceedings, etc.) as Debtors will be discharged of in these chapter 11 cases.

[64]    Mirant Group is quite large and currently has an extremely complex corporate structure. *See*, *generally*, Disclosure Statement.

[65]    The court directs use of some historical results below to establish an added valuation metric in part in the hope that it will validate the range of values determined using projections.

**MEMORANDUM OPINION**                                                                          **Page 27**

for Mirant Group exceeding $11 billion.

## V.  The *Till* Motion

The parties fundamentally disagree about the significance to the determination of the value of Mirant Group of the Supreme Court's decision in *Till v. SCS Credit Corp.,* 541 U.S. 465 (2004).  On the one hand, Debtors, the Corp. Committee and the MAG Committee argue that *Till* has no application to the case at bar.  They contend that *Till*, which determined the proper interest rate a consumer must pay under Code § 1325(a)(5)(B)(ii) in cramming down a creditor secured by a motor vehicle, provides no guidance for determining the going-concern value of a multi-billion dollar business.  Relying heavily on note 14 to the *Till* plurality opinion (541 U.S. at 477), they contend that *Till* recognizes that, in a chapter 11 case, it is appropriate to look to the market in determining a cram down interest rate and, hence, in valuing a business for cram down purposes.

Wilson, on the other hand, cautiously supported by the Equity Committee and Phoenix, takes the position that *Till* is dispositive of the valuation issue.  These parties argue that *Till* established a sliding scale of return payable to creditors to satisfy cram down requirements, from prime interest rate to prime plus three.  Wilson argues that a plan could be proposed that would leave all Mirant Group creditors with debt bearing interest at rates of prime to prime-plus-three, Mirant Group's cash flow being, Wilson claims, more than sufficient to service all of the debt.

Both sides are wrong.  For reasons discussed below, Debtors and the creditors' committees are mistaken in their reliance on note 14.  More importantly, they fail to appreciate the guidance available to this court in *Till* and its usefulness in deciding the valuation issue. Wilson, though, fails to give due weight to the difference between an obligation secured by an

automobile and unsecured debt or stock. He also does not accord appropriate deference to the business judgment of Mirant Group's management.

First, *Till* is clearly relevant to a determination of value, not solely in a case in which an interest rate is determined. Because *Till* instructs what return a secured creditor is entitled to for cram down purposes, *Till* effectively determines what cash flow is necessary to satisfy that creditor. Put another way, *Till* addresses, independently of the value of the underlying collateral,[66] the economic characteristics of the obligation that the secured creditor is entitled to receive in a cram down context. Under the plurality opinion in *Till*,[67] the value of the obligation, naturally dependent on the interest it bears, is *not* determined by the market.[68] What the market would pay to purchase a debtor's loan from creditors is not the proper measure of whether a given plan treatment meets the requirements for cram down. Rather, value of what is offered to satisfy a claim for cram down purposes is determined through the bankruptcy court's objective inquiry. *Till*, 541 U.S. at 476-77. Because, in turn, the value of Mirant Group will depend, in part, on the economic characteristics of the debt and equity assumed under the DCF Method, the required return on debt and equity is a necessary element in calculating enterprise value. *Till* gives direction to the court in how to determine that required return.

---

[66] As *Till* acknowledges, the value of physical collateral must be determined for cram down purposes under Assocs. Commercial Corp. v. Rash, 520 U.S. 953 (1997). *Till*, 541 U.S. at 476.

[67] Justice Thomas's concurrence would set return at a fixed, prime rate. 541 U.S. at 487 (Thomas, concurring in judgment). As his standard for cram down treatment is less onerous than that of the plurality, the court will treat the opinion of the plurality as a "safe harbour" test for cram down treatment acceptable to a majority of the Court. While this still leaves at best a slender majority holding, *Till* is the best specific indicator the court has found as to what the law requires for cram down purposes.

[68] The discussion in *Till* at note 14 mentions the active market available to chapter 11 debtors seeking lenders to extend secured credit as a suitable factor in determining a cram down rate for a secured creditor in chapter 11. *See also* Bank of Montreal v. Official Committee of Unsecured Creditors (*In re* Housepatient, Inc.), 420 F.3d 559 (6th Cir. 2005).

**MEMORANDUM OPINION**                                                          **Page 29**

Second, *Till* instructs how to derive that required return. While *Till* adopts a formula suitable to calculating the interest rate for secured claims in consumer cases, the formula approach remains valid in determining required return for cram down purposes on other obligations. Thus, the formula for determining the present value of unsecured debt[69] or equity

---

[69]  The key statutory language ("value as of the effective date of the plan") is the same for cram down treatment of unsecured creditors in chapter 11 as for secured creditors in chapter 13. *Compare* Code § 1129(b)(2)(B)(i) *with* Code § 1325(a)(5)(B)(ii). Courts have referred to *Till* in chapter 11 valuation cases. *See In re* Deep River Warehouse, Inc., No. 04-52749, 2005 Bankr. LEXIS 1793, at *27 (M.D. N.C. September 22, 2005); *In re* Prussia Assoc., 322 B.R. 572, 590 (Bankr. E.D. Pa. 2005). *But see* American Housepatient, 420 F.3d at 566-67. American Housepatient, Deep Warehouse and Prussia Assoc. all involved fixing a cram down rate for a secured claim.

securities issued under a plan will be a risk-free rate plus an adjustment for risk; the numbers plugged into the formula and the manner of their selection will vary depending on the character (secured or unsecured, debt or equity) of the underlying obligation.

Third, *Till* makes clear that the market in fact does not properly measure the value of an obligation undertaken in a plan.[70] As noted in *Till*, the advantages of bankruptcy, such as the requirement of a court determination of feasibility, the benefits of court supervision, disclosure requirements and limits on debt are not given sufficient recognition by the market. *Till*, 541 U.S. at 475, n. 12, and 480.[71]

Indeed, by its rejection of the forced loan approach (*Till*, 541 U.S. at 477), the Supreme Court has held improper in valuation an approach that relies on the market to establish what rates a debtor must provide for debt generally and, logically, what return for equity as well. That a creditor, if given cash equal to its allowed claim, would choose other investments in preference to securities offered by the debtor, does not require that the debtor raise its return to compensate for investor distaste for dealing with a former bankrupt.

It makes perfect sense that a debtor's value, credit-worthiness and attractiveness as an investment be objectively assessed as of the prospective effective date of a plan. This is

---

[70] The court addresses this important subject at greater length in section VI.B.1 of this opinion.

[71] It is not appropriate to value securities of a reorganized debtor based on what the market would pay "since the 'taint' of bankruptcy will cause the market to undervalue the securities and future earning capacity of the Debtor." *In re* Exide Techs., 303 B.R. at 66; *see also In re* Penn Cent. Transp. Co., 596 F.2d 1102, 1115 (3d Cir. 1979) (recognizing that, in some instances, "evidence of market value should be ignored because the market can be expected irrationally to undervalue the securities of a once-distressed company emerging from a lengthy reorganization"); *In re* New York, New Haven & Hartford R.R. Co., 4 B.R. 758, 792 (D. Conn. 1980) ("The stigma of bankruptcy alone is a factor that will seriously depress the market value of a company's securities."); *In re* Missouri Pac. R. Co., 39 F.Supp. 436, 446 (E.D. Mo. 1941) ("[D]ebtors have been in the process of reorganization for eight years, which fact alone would necessarily result in a serious depression in the market value of its securities.").

achieved by taking a market-accepted risk-free interest rate or rate of return and adding to that a

risk premium determined *by the court* based on the specific risks shown by the evidence,[72] in

assessing which the court may look to the market at most as an item of evidence, not as a

dispositive gauge of interest rates the debtor ought to pay or the investment return the debtor

ought to provide.

While the court finds considerable assistance in *Till* in determining *how* to value Mirant

Group, it does not share Wilson's view that *Till* dictates a finding that Mirant Group is solvent.

Wilson arrives at this conclusion by assuming all claims against Debtors could be satisfied in full

at an interest rate limited by *Till's* provisions.

Even assuming *Till's* range of rates of prime plus 1% - 3% is the applicable cram down

---

[72]      The court, in determining cost of debt or equity, may conclude in a given case that the risk is higher
because the feasibility of the plan appears more questionable.  Feasiblity, like the other requirements for
confirmation, need only be proven by a preponderance of evidence.  Fin. Sec. Assurance Inc. v. T-H New
Orleans Ltd. P'ship (*In re* T-H New Orleans Ltd. P'ship), 116 F.3d 790, 801 (5th Cir. 1997) ("The standard
of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the
evidence . . . ."); Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (*In re* Briscoe Enters., Ltd.,
II), 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate
standard of proof both under § 1129(a) and in a cramdown."); *In re* Consul Rest. Corp., 146 B.R. 979, 984
(Bankr. D. Minn. 1992) ("Considerations of feasibility are viewed in the light of a preponderance standard.
. . .  [T]he Joint Plan proponents bear the burden of proof regarding feasibility.");  7 COLLIER ON
BANKRUPTCY ¶ 1129.02[4] (15th ed. rev. 2004) ("[T]he proponent bears the burdens of both introduction
of evidence and persuasion that each subsection of section 1129(a) has been satisfied. . . .  the plan
proponent bears the burden of proof by a preponderance of the evidence.").  This means the risk of non
performance by a debtor is borne equally by debtor and creditors under a plan.  *See In re* Landing Assocs.,
Ltd., 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993) ("These are reasonable provisions that more than
adequately anticipate the risk of non-performance and afford creditors . . . adequate remedies . . . .  No plan
can offer certainty . . . .  What the plan does offer is a reasonable probability of success, and that is all the
law requires the court to find under section 1129(a)(11)."); *see also* Grogan v. Garner, 498 U.S. 279, 286
(1991) ("[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of
error between litigants . . . .").  In a marginal case, the result may be a risk premium much higher than the
1% - 3% suggested in *Till*, in which case the creditor had collateral to look to.  In the case of Mirant Group,
without addressing other matters which may affect feasibility, the court now finds by significantly more
than a mere preponderance of the evidence that the Business Plan is performable based on the testimony of
virtually every witness (*see* footnote 76 and accompanying text, below).

**MEMORANDUM OPINION**                                                                                      **Page 32**

rate for every secured claim,[73] *Till* does not specify interest rates a debtor should pay on unsecured debt. While the risk premium Debtors will pay on their exit financing is within the range of rates suggested in *Till*, and while Debtors propose a similar rate for debt obligations to be issued to creditors of MAG under the Plan, claims at the Mirant level, subject to greater risk, would have to be satisfied with obligations bearing higher interest.

Moreover, Wilson would have the court second-guess Debtors' business judgment as to the cash and debt burden Mirant Group requires to continue its business without serious risk. While the court does criticize below[74] the cash cushion maintained under the Business Plan, it does so in the context of the Plan, which will dramatically reduce Mirant Group's debt load. In general, the court accepts the Debtors' business judgment as reflected in the Business Plan and would not consider imposing on Debtors or their creditors a valuation based on premises that are seriously inconsistent with the Business Plan.

Further, the court's valuation is based on the Plan. There is, at this juncture, no other plan the court may consider. *See* Code § 1121. It is not the province of the court to compare the Plan, proposed by Debtors, to another, hypothetical plan. (*Cf.* Code §§ 1125(a)(1) and 1129(a)(7)(A)(ii)).

Finally, if Mirant Group's value exceeds its debt, that should be true under a balance sheet based on the Plan as well as under an alternative capital structure. As virtually all the debt

---

[73]     The nature of a creditor's collateral, its expected use, the duration of the obligation to the creditor, the relative likelihood of the debtor's default and other factors might support alteration of the rate required to cram down the creditor beyond the range given in *Till* even where no effective lending market exists; whether the plurality opinion in *Till* allows for such variance need not be addressed here.

[74]     The court's specific concern is with duplication between cash reserves and working capital.

Mirant Group would retain under the Plan bears interest at rates less than prime plus 3%, no claim is potentially being over-satisfied. The equity value of Mirant Group as of the effective date of the Plan should reflect Mirant Group's total ability to satisfy claims – its reorganization value – as well as would Wilson's alternative capital structure (once the latter is altered to reflect properly risk factors for debt holders as well as other costs incurred through retention of more than $6 billion of additional debt).

For the foregoing reasons, the court concludes that, while *Till* is extremely useful in designing an approach to valuation, it does not provide, as a matter of law, a specific range of interest rates required to satisfy unsecured claims pursuant to Code § 1129(b)(2)(B)(ii). The *Till* Motion is therefore DENIED.

## VI.   The Court's Ruling

The expectation for any valuation proceeding is that a value for the subject will thereby be established. In order for a court to assign a specific value or narrow range of values to the subject, however, it must either adopt an expert's opinion or be able to adjust the number generated by the expert to account for changes in assumptions considered necessary by the court.

In the case at bar, the court cannot accept unchanged any of the values for Mirant Group that have been placed in evidence. As discussed below, the data used by MBY and Blackstone, especially that used for future commodity prices, was stale by the time of the Valuation Hearing. The value arrived at by PJSC, even if the court were persuaded it was otherwise correct, was flawed by reliance on the reports of BSA and Slater Consulting. Maxwell's and Shaked's direct examinations were designed to build on the values opined to by MBY and Blackstone. Besides their, in part, adopting errors in those valuations, the additions to value proposed by Maxwell or

Shaked cannot be accepted wholesale by the court.

Moreover, recalculation of cash flows (whether under the Business Plan or as produced by one of the expert advisors), is too complex an operation for the court to undertake. Changes to commodity prices and other assumptions and data affect too many other variables (emissions cost, dispatch versus capacity, use of tax attributes, etc.) to allow estimation of overall change in value.

Nor can the court in this case simply weight the opinions of the various experts to arrive at a melded value. The values opined to in the expert reports range from $7.2 billion (Houlihan) to $13.6 billion (PJSC). In so complex a case, for the court to simply average these numbers – derived based on varying assumptions and data – would make a mockery of the valuation process and would be terribly unfair to parties whose rights are thereby disposed of. The remaining way to arrive at a number based on the record would be to patch together the best of each valuation before the court. While this might be practical for the Caribbean or Philippines operations, the number of interconnected variables otherwise prohibits such a selective melding of experts' opinions. Consequently, the court concludes it is necessary to recalculate the value of Mirant Group based on necessary changes in data and assumptions. In doing so, the court adopts as the basis for valuation the Business Plan and Blackstone's 5/2 Report.[75]

A.      **The Business Plan**

In the Letter Ruling the court directed, with certain modifications, use of the Business

---

[75]      After issuance of the June 30 letter ruling, the court learned the recalculation will consume over two months. While this is unfortunate, the court sees no alternative. Given the infirmities in valuation methodology and the unknowns respecting Mirant Group and the merchant energy industry, it would be particularly inappropriate here to add an additional layer of uncertainty to the value used for confirmation purposes by establishing that value through an estimate of the effect of changes in data and assumptions.

Plan to generate data for purposes of valuation. There was substantial evidence presented to show that the Business Plan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations.[76] The court finds and concludes that the Business Plan constitutes a fair, reasonable projection of future operations of Mirant Group. The court has rejected the alternative projections of future operations presented by the Equity Committee. Although the court does not find PA's cash flows not credible, they suffer from many of the same deficiencies discussed below for the Business Plan, and certainly PA's projections are no better supported by the evidence than are those in the Business Plan.[77]

The Business Plan, however, was prepared as a business tool.[78] Although it projects cash flows for the Mirant Group, it was intended to serve more purposes than valuation. As a result, the court required in the Letter Ruling that Debtors, using certain revised assumptions and other inputs, recalculate the valuation data provided by the Business Plan.

1.      **Pepco Amounts**

The District Court, by rulings on March 1, 7 and 16 and April 20, 2005, has held that certain obligations running from Debtors to Pepco must be honored by Debtors. By its decision of December 9, 2004, the District Court determined that Debtors would not be permitted to

---

[76]      *See* TR (Morgan) at pp. 168:15-172:10, TR (Tabors) at pp. 577:5-14 and 786:15-20, TR (Holden) at pp. 884:20-885:22, TR (Ying) at pp. 2348:17-2349:3, TR (Filsinger) at pp. 2429:25-2430:8, TR (Schlesinger) at pp. 2688:4-18 and 2772:7-18 and TR (Slater) at p. 2940:2-12.

[77]      The burden of proof in valuation is on the proponent of the Plan. *See In re* Bush Indus., Inc., 315 B.R. at 298; *In re* Genesis Health Ventures, Inc., 266 B.R. 591, 616 n. 23 (Bankr. D. Del. 2001). Because the court does not adopt either the Business Plan or the Blackstone Report without changes, the court need only find that, once assumptions are adjusted to effect the court's changes, the Business Plan, the Blackstone Report and the values they show will accord with the preponderance of the evidence.

[78]      TR (Morgan) at p. 241:3-11.

<u>**MEMORANDUM OPINION**</u>                                                                                    **Page 36**

reject the so-called Back-to-Back Agreement.[79] Although the Business Plan includes provision

for payments under the Back-to-Back Agreement (Business Plan at p. 22), Blackstone's

calculations used data from the Business Plan modified to assume eventual rejection of the Back-

to-Back Agreement.[80] Blackstone 2/25 Report at p. 20; Blackstone 5/2 Report at p. 30 n. 4.

Even if the court believed it probable that the District Court's decision respecting the

Back-to-Back Agreement would be reversed on appeal – and the court does not so believe – the

decision of the District Court is the law of the case until it is reversed. *See United States v.

Becerra*, 155 F.3d 740, 752 (5th Cir. 1998) ("Under the 'law of the case' doctrine, an issue of

law or fact decided on appeal may not be reexamined either by the [trial] court on remand or by

the appellate court on a subsequent appeal.") (*quoting Illinois Cent. Gulf R.R. v. Int'l Paper Co.*,

889 F.2d 536, 539 (5th Cir. 1989)); *Stone v. Thomas* (*In re Wright*), No. SA-03-CV-932, 2004

U.S. Dist. LEXIS 4478, *16-17 (W.D. Tex. Mar. 8, 2004) (same); *In re Tex. Health Enters., Inc.*,

255 B.R. 181, 183 (Bankr. E.D. Tex. 2000) ("Until the appeal is decided, this Court's findings of

fact and conclusions of law on these issues remains [sic] the law of the case and is [sic] binding

upon all parties.").

It would be error for the court, therefore, to accept as accurate cash flows that exclude

payments to Pepco under the Back-to-Back Agreement. Moreover, given the District Court's

other decisions respecting Debtors' obligations to Pepco, the court holds Debtors' projections

and Blackstone's determinations of value should be based on the assumption that the agreements

---

[79]     The Back-to-Back Agreement has been discussed at some length in prior decisions. *See In re* Mirant
         Corp., 378 F.3d 511; *In re* Mirant Corp., 318 B.R. 100 (N.D. Tex. 2004); Mirant Corp. v. Potomac Elec.
         Power *(In re* Mirant Corp.), 299 B.R. 152 (Bankr. N.D. Tex. 2003).

[80]     Debtors have appealed the decisions of the District Court, specifically including that court's determination
         that Debtors could not reject the Back-to-Back Agreement.

of Debtors with Pepco and the obligations owed by Debtors to Pepco will continue after confirmation of the Plan. The Letter Ruling required that obligations to Pepco be included in cash flow projections used by Blackstone in recalculating value.[81]

## 2. Tax Attributes

As was true of the Pepco obligations, the Business Plan takes into account Mirant Group's net operating losses ("NOL") in its projections. Business Plan at p. 7. The NOL was backed out of cash flows, however, for purposes of Blackstone's calculation of value. Blackstone 2/25 Report at p. 53; Blackstone 5/2 Report at p. 44.

Blackstone separately valued the NOL, adding a discounted value for it to the calculated enterprise value of Mirant Group.[82] Blackstone 2/25 Report at p. 53; Blackstone 5/2 Report at p. 44. Blackstone justified this approach because, in the DCF Method, NOL value is determined using as a discount rate the cost of equity rather than the WACC Calculated for Mirant Group.[83] If the WACC (a lower rate) is used to discount NOL, a higher value will result for the NOL. The effect of including the NOL in cash flows, which are then discounted by use of the WACC, is (according to Blackstone) to overvalue the NOL.

---

[81] The Letter Ruling also required concomitant change to Debtors' estimate of claims to be resolved under the Plan.

[82] Assets which are not included in Mirant Group's enterprise (or going concern) value, such as excess cash or property to be sold, are added to the value determined by the DCF Method or the Comparable Method as "other assets." Some of these other assets are discussed below.

[83] Ying and Hardie adopted the same approach of discounting the NOL value by the cost of equity rather than the WACC. *See* MBY 2/25 Report at p. 52; Houlihan 2/25 Report at pp. 35-37; TR (Maxwell) at p. 4258:7-10. Maxwell and Shaked, however, expressed the opinion that the cost of equity rate is inappropriate for use in discounting the NOL value and that the proper discount rate should be (in Maxwell's opinion) the WACC, or (in Shaked's opinion) a rate equal to or less than the cost of debt. *See* PJSC 2/25 Report at p. 51; TR (Maxwell) at pp. 3754:16-3755:18 and 4254:15-23 and TR (Shaked) at pp. 4925:12-4933:17 and 5192:20-5199:8. Shaked, however, reached his conclusion by equating the NOL to a government obligation – a questionable suggestion at best.

The court, however, takes a different view.  First, Maxwell's testimony was sufficient to rebut Blackstone.  Second, including tax attributes in cash flows is the best way to assess their impact on value; once the NOL is included in cash flows (which dictate return available for creditors) it is not sensible to apply variable discount rates to different elements of those cash flows.  Third, applicable case law suggests that projections of future earnings (cash flow) should include corrections for tax attributes.[84]  Fourth, Wilson has raised the question of the impact of section 199 of the Internal Revenue Code[85] on the earnings of the Mirant Group.[86]  There are also issues pertaining to other tax options including respecting the Philippines operations.[87]  The court sees no realistic way to value these other tax attributes independently of the NOL, at least under the DCF Method, and thus concludes all tax attributes must be included in cash flows.[88]

Finally, a value obtained through the DCF Method outside of bankruptcy is intended to reflect returns on both equity and debt.  In the context of chapter 11, the purpose of a valuation is to determine what returns may be produced in the future to satisfy claims and, if appropriate, equity interests.  *See Protective Comm.*, 390 U.S. at 441 ("Since participation by junior interests depends upon the claims of senior interests being fully satisfied, whether a plan of reorganization

---

[84]  In Protective Comm. v. Anderson, 390 U.S. 414 (1968), which also presented the issue of value in the context of equity participation, the Supreme Court, while in many respects critical of the valuation used in a chapter X case,  accepted without question that projections account for tax consequences prior to discounting.  390 U.S. at 443.  *See also In re* Coram Healthcare Corp., 315 B.R. at 341.

[85]  Section 199 provides for a potential tax deduction based on a company's "qualified production activities income."  Qualified production activities income is based on the company's "domestic production gross receipts," which includes gross receipts derived from the production of electricity in the United States.  26 U.S.C. § 199.

[86]  *See* TR (Shaked) at pp. 5352:20-5355:9.

[87]  TR (Morgan) at p. 5527:14-19; *see also* Business Plan at p. 29.

**MEMORANDUM OPINION**                                                              **Page 39**

excluding junior interests is fair and equitable depends upon the value of the reorganized company."); *Consol. Rock*, 312 U.S. at 525-26 (a valuation of debtor based on its future earning potential was essential to determine feasibility and fairness of plan and to protect against unwarranted participation by junior interest holders); *In re Bush Indus., Inc.*, 315 B.R. at 297-99 (where debtor's plan of reorganization provided for no return to shareholders, debtor had to demonstrate for cram down purposes its value as a reorganized entity based upon its future earning capacity).  As such, the stream of revenues that Mirant Group will produce, including provision for taxes, is properly regarded as a single source for payment.

For all of these reasons, the court concludes that the value calculated through the DCF Method will be most accurate for reorganization purposes if all tax attributes are taken into account in the cash flows used.  In the Letter Ruling the court directed that, using their best business judgment, Debtors reflect tax benefits as they are projected to be used.

**3.      Commodity Prices**

A principal variable cost in the business of Mirant Group is the price of fuel.  The facilities owned by Mirant Group are, for the most part,[89] powered by natural gas, oil[90] or coal. Prices for electric power are typically tied to the price of natural gas,[91] and the price of gas tends

---

[88]     The court accepts that the Comparable Method will take other tax attributes into account, since the treatment of Mirant Group taxes must be consistent with that of the comparable companies.  The court therefore agrees with Blackstone's separate valuation of the NOL when using the Comparable Method.

[89]     Several facilities are water powered, including Debtors' Mongaup, Swinging Bridge, Rio and Grahamsville plants in New York.

[90]     Two grades of oil are used by facilities owned by Mirant Group: #2 fuel oil and #6 fuel oil.

[91]     *See* TR (Morgan) at pp. 334:18-335:13.  The cost of electric power is such that a single-cycle gas turbine produces a profit.  *See* TR (Morgan) at p. 315:12-18, TR (Krishnan) at pp. 543:1-7 and 544:16-23, TR (Filsinger) at pp. 2516:19-2517:22 and TR (Slater) at pp. 2954:3-2955:10 and 2959:25-2960:17.

to move with the price of oil.[92]  Coal, on the other hand, though its price is sensitive to changes in the cost of other fossil fuels, is in sufficient supply that its cost does not move in lock-step with that of gas.[93]

The Business Plan was completed in October of 2004.  In preparing the Business Plan, Mirant Group predicted future gas prices for 2005 and 2006 by using forward contract prices for gas as quoted on the New York Mercantile Exchange ("NYMEX").[94]  Gas prices for later years were forecasted by Mirant Group using internal expertise while looking at forecasts of gas prices produced by PIRA Energy Group ("PIRA") and the government's Energy Information Agency ("EIA").[95]  As discussed below, prices of natural gas, however, have not proven as low as the forecast in the Business Plan.

Because of disparity between gas prices and Mirant Group's contract price for coal, and because Mirant Group's facilities in the PJM market (and, to a lesser extent, elsewhere) are largely coal fired, higher gas prices generally result in a higher profit margin for Mirant Group.

---

[92]     TR (Morgan) at p. 377:11-22, TR (Filsinger) at p. 2391:6-12 and TR (Schlesinger) at p. 2683:9-17.

[93]     TR (Filsinger) at pp. 2391:6-2392:13, TR (Schlesinger) at pp. 2681:16-2683:21 and TR (Morgan) at p. 5492:1-4.

[94]     *See* TR (Morgan) at pp. 176:8-177:17, 201:3-14, 247:7-10 and 360:4-13 and TR (Krishnan) at pp. 417:1-418:3 and 490:16-491:12.

[95]     TR (Morgan) at pp. 201:3-20, 202:1-13 and 246:8-247:13.

Indeed, the Business Plan states: "[U]nderstanding that natural gas prices will influence power prices and assuming other commodity prices are unchanged, the Company's unhedged portfolio increases in value by $50 million per year on a $0.25/mmbtu higher move in forward gas prices." Business Plan at p. 8.

While the testimony of Morgan (TR (Morgan) at pp. 5374:15-5375:23) and Krishnan (TR (Krishnan) at pp. 466:12-468:10 and 567:18-568:3) was that the incremental growth in annual revenues would actually be $25 million for each 25¢ increase in gas prices, Mirant Group's underestimation of gas prices is still potentially significant.[96]  As noted in the Business Plan, however, the increase in revenues resulting from an increase in gas prices is dependent on other prices – especially coal – remaining constant or at least rising more slowly.  TR (Morgan) at pp. 199:17-200:13 and 334:18-336:9, TR (Krishnan) at pp. 487:9-488:15, TR (Filsinger) at pp. 2591:11-2592:5 and TR (Maxwell) at pp. 4288:22-4289:15.

Morgan testified (TR (Morgan) at pp. 204:3-11, 5368:16-5370:11 and 5472:16-5473:24) that, in his judgment, changes in coal prices and other modifications to the Business Plan would largely offset the benefit to Mirant Group of prices for natural gas above those predicted in the Business Plan.[97]  But, the court has before it no specific evidence or calculations demonstrating the actual impact a revised forecast of gas prices would have on Mirant Group's cash flow.

---

[96]  Gas prices will vary potentially depending on major economies (especially of the United States, China and other Asian countries); the political stability of gas producing nations, including Middle Eastern, African and Central Asian countries, as well as Canada, Russia and the United States; availability of liquid natural gas in the United States; development of alternative fuel sources; and other factors.  Coal prices will also react to increases in the price of gas.  Thus, the business of forecasting gas prices is uncertain at best.

[97]  At the confirmation hearing, Morgan testified that Mirant Group performed only slightly better by reason of high gas prices in 2005.  The only modest improvement over the Business Plan was partly because of hedging in of profits at earlier, lower gas prices and partly due to downtime at one of Mirant Group's coal-fired facilities.

**MEMORANDUM OPINION**                                                                                     **Page 42**

Further, while several experts suggested the increase in gas prices was only temporary,[98] continued high prices strongly suggest that, as at least one service contends,[99] they represent a long term trend and higher gas prices should therefore be factored into the valuation of Mirant Group.[100]

Where, as here, new price forecasts for gas have been issued by several specialist organizations,[101] it would be clear error for the court to ignore the effect on Mirant Group's value of this change. The court might arguably adopt the measure suggested in the Business Plan as modified in testimony, to estimate the impact of higher gas prices on value. It would be inaccurate to recalculate value based solely on the change in predictions of future gas prices, though. Rather, projections of cash flow must be altered to take account of changes in the cost of all fuels used by Mirant Group (and changes in capacity payments and the value/cost of SOX and NOX). It is incumbent upon this court in valuing Mirant Group to determine whether or not its value extends to equity to reach its decision using the best, most current information available. *Protective Comm.*, 390 U.S. at 444, *et seq.*; *In re Beker Indus. Corp.*, 58 B.R. at 741 ("[A]djustments to the . . . estimate of going concern value must be made to reflect the lower costs of raw materials that are currently being incurred.").

---

[98]  Filsinger, for example, criticized PIRA for taking too aggressive a position that the trend of higher gas prices was long term. TR (Filsinger) at pp. 2419:20-2422:9.

[99]  Morgan testified that PIRA wanted to be "ahead of the curve." TR (Morgan) at pp. 5469:15-5470:8.

[100]  Gas prices rose during the 2005 Hurricane season to more than $15 per mmbtu but fell back thereafter. As of the date of the confirmation hearing (December 1, 2005), the closing price for January delivery was $13.027 per mmbtu on the NYMEX exchange. N.Y. TIMES, December 2, 2005, at C9.

[101]  Since publication of the Business Plan in October 2004, new, significantly less optimistic (higher prices being here presumed generally bad) gas forecasts were issued by EIA, Strategic Energy and Economic Research Inc. ("SEER"), Global Insight, Inc. ("Global Insight") and PIRA.

The court therefore directed in the Letter Ruling that the Business Plan be updated using an average[102] of forecasts of commodity prices by those organizations that have issued fresh (2005) forecasts for gas, oil and coal. The Letter Ruling also directed such additional modifications as necessarily flow from changes in those costs.[103]

## 4. CRA Capacity Payments

The CRA 3/16 Report, at pp. 18 *et seq*., describes certain miscalculations of capacity revenues for certain Mirant entities in the New York, New England, PJM, and other regional markets which, when corrected, raise Blackstone's valuation by approximately $107 million. The court understands Blackstone to agree that these corrections are appropriate. The court finds and concludes that (consistent with the Letter Ruling) the Business Plan should be corrected accordingly.

## B. The Blackstone Report

The court considers the Houlihan and MBY valuations credible, though subject to, *inter alia*, some of the same problems addressed below. While Maxwell's testimony was generally credible, on a par with that of Ying, Filsinger and Hardie, PJSC's report, as discussed above, is based on erroneous data produced by Schlesinger and Slater. The Blackstone report, however, particularly fortified by the work of CRA, seems to the court the most reliable of the valuations.

---

[102]  Schlesinger testified that use of averages of forecasts is not the best methodology – rather a forecast should be developed weighting forecasts with judgment. TR (Schlesinger) at pp. 2684:6-2686:11 and 2705:25-2706:23. PA, however, used an average, and MBY did not object to this technique. *See* PA 2/25 Report at pp. 5-5 and 5-7, PA 3/16 Report at p. 12, MBY 2/25 Report at pp. 2-3 and TR (Ying) at pp. 2024:5-2025:1 and 2148:17-2149:3. As the court lacks the specialized knowledge necessary to exercise judgment in the use of various predictions, it must rely on the use of an average.

[103]  In the Letter Ruling the court also required that the Business Plan be updated to reflect actual results of operations through June 30, 2005, and to assume Debtors' emergence from chapter 11 on December 31, 2005.

The court has already noted the natural bias toward conservatism of MBY, PA and Houlihan. Each of these serves as an advisor to the Corp. Committee (MBY and PA) or the MAG Committee (Houlihan).[104] Each has thus participated in and likely become, to some degree, committed to the strategy it helped formulate. At a minimum, each must be cautious not to overvalue Mirant Group to the detriment of the constituency it represents (similar criticisms, of course, may be made even more forcefully as to the experts retained by the Equity Committee and Phoenix). While it is not prepared to conclude that Blackstone does not have some commitment to the Debtors' strategy,[105] the court does find that Debtors, Debtors' management and Debtors' professionals had no improper commitment to the creditors of Mirant – those at whose level, in an insolvent situation, the value of Mirant Group would run out. Put another way, the court finds Blackstone,[106] Debtors and Debtors' management were not influenced in the valuation process by reason of any commitment to a creditor constituency to the detriment of equity owners; rather Debtors have properly attended to their fiduciary duties to all constituencies.[107]

---

[104]    TR (Ying) at pp. 2131:7-9, 2179:12-18 and 2349:4-10, TR (Filsinger) at pp. 2482:20-2483:2, PA 2/25 Report at p. 1-1 and Hardie Deposition at p. 44:9-12.

[105]    Apparently Debtors' determination that Mirant Group was insolvent was first articulated about a year ago by Debtors' then Chief Restructuring Officer, Doug Werking. Mr. Werking was subsequently replaced as Chief Restructuring Officer by Mirant's Chief Financial Officer.

[106]    CRA is a different matter. As CRA was retained as a rebuttal expert, CRA could view its task as bolstering Blackstone's findings. Dr. Tabors, however, was a very credible witness.

[107]    When questioned whether anyone from the Corp. Committee had offered to benefit Morgan in connection with his development of the Business Plan or the testimony he provided, and whether he perceived direction being given to Debtors' management to conduct the Valuation Hearing consistent with treating the Corp. Committee as the new owners of Mirant Group, Morgan responded "no." TR (Morgan) at pp. 354:12-355:8 and 5440:10-15. Coleman was asked whether the Corp. Committee, its attorneys or professionals, at any time, sought to have Coleman utilize assumptions in his valuation that would lower or mask the enterprise value of Mirant Group and Coleman responded: "I've not had any influence on me. Nobody has tried to influence me. Nobody has given me suggestions on how I ought to do my valuation.

Even were the court not more confident of the Blackstone Report than the valuations of

the other experts, the Blackstone Report commends itself as being the most compatible with the

Business Plan. Because Blackstone has a history of several years with Mirant Group, all else

being equal, its report would be preferable as a base for recalculation of value because of simpler

mechanics and the familiarity of Debtors and Blackstone with each other's methodology.

Moreover, many of the differences between the Blackstone Report and the MBY

valuation are the subject of changes directed in the Letter Ruling and described below. For

example, calculation of Mirant Group's cost of equity,[108] terminal growth rate[109] and calculation

of comparable multiples, will be based upon numbers directed by the court. As the court has

---

It's been my valuation, my firm's valuation, and in no way has somebody suggested or coordinated or anything like that with me." TR (Coleman) at p. 1248:9-19.

[108]    Blackstone utilized the Capital Asset Pricing Model ("CAPM") to calculate a cost of equity range of 16.6%-19.1% with a midpoint of 17.6% which was used to determine a WACC range then utilized as the discount rate applied to the entirety of Mirant Group's operations. TR (Coleman) at pp. 1129:14-24 and 1136:24-1137:5 and Blackstone 2/25 Report at p. 39. MBY, however, calculated a separate cost of equity, or range thereof, for each of Mirant Group's domestic, Philippine and Caribbean operations. For Mirant Group's domestic operations, MBY derived a cost of equity range by utilizing the CAPM method and the Private Equity Method which yielded ranges of 16.1%-22.2% and 18%-25%, respectively. TR (Ying) at pp. 2062:25-2063:7, 2074:15-2075:19 and 2213:21-2214:15 and MBY 2/25 Report at pp. 15-16. For Mirant Group's Philippine operations, MBY again utilized two methods (one related to the sovereign cost of debt and the other, somewhat similar to the CAPM method, premised on the typical cost of equity rate for a domestic electric utility with adjustments) and derived a cost of equity range of 11.5%-16.5% which was then utilized for the discount rate for the Philippine operations. TR (Ying) at pp. 2089:10-2090:25 and MBY 2/25 Report at pp. 30 and 33. Finally, MBY adopted 18.95% as the cost of equity for Mirant Group's Caribbean operations based on the 2004 rate case of Jamaica Public Service Company. TR (Ying) at p. 2104:7-24 and MBY 2/25 Report at p. 38.

[109]    Blackstone determined that a terminal growth rate range of 1%-3% was appropriate. Blackstone 2/25 Report at pp. 41, 43 and 45. Coleman testified that Blackstone worked with Debtors in reaching a conclusion as to the appropriate terminal growth rate, as well as looking to industry publications and other sources, and that the 2% midpoint of Blackstone's range was a number chosen by Debtors and their internal economists. TR (Coleman) at pp. 1167:25-1168:16 and 1368:9-19. Ying testified that an implied terminal growth rate range of 2.25%-3.25% was factored into MBY's terminal multiple range for its valuation of Mirant Group's domestic operations and that this range reflects an exercise in judgment on the part of MBY based on discussions with and the conclusions reached by PA. TR (Ying) at pp. 2030:21-2033:15. MBY's terminal growth rate range for Mirant Group's Caribbean operations was 2%-3% and was based on International Monetary Fund growth estimates for the relevant regions. TR (Ying) at pp. 2102:13-2104:2 and MBY 2/25 Report at p. 40.

**MEMORANDUM OPINION**                                                     **Page 46**

concluded that the Business Plan, rather than PA's cash flows, will be used in calculating EBITDA and annual cash flows, most of the differences between the two valuations are mooted.

Having decided to use as a valuation basis the Blackstone Report, the court finds it necessary to specify some changes to the calculations employed by Blackstone (as well as the changes directed for the Business Plan) in order to value Mirant Group properly for the purpose of satisfying claims.[110]

## 1.     Role of the Market

The court must, first, however address at greater length the misperception that Mirant Group's value is properly set by the market place. Blackstone determined its valuation under the DCF Method based on how the *market* would value Mirant Group for purposes of equity investment in or loans to it.[111] The market is not the proper measure for the value of Mirant Group for the purpose of satisfying claims. The Corp. Committee even suggested during argument that the market value of publicly traded debt of Mirant today [112] is an accurate reflection of the extent of value of Mirant Group. If Mirant debt trades at less than face value,

---

[110]    The court is at this time principally concerned with satisfaction of claims. Equity is entitled to a return only after satisfaction of claims against Debtors, including interest (calculated for these purposes at contract, non-default rates). Code § 1129(b)(2)(B); Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 654 (9th Cir. 1997) (chapter 11 plan which provided for equity to retain interest in debtor violated the absolute priority rule because it did not provide for payment of interest on objecting creditor's unsecured claim); Everett v. Perez (*In re Perez*), 30 F.3d 1209, 1214-15 (9th Cir. 1994) (same).

[111]    Coleman testified Blackstone's valuation was a "reorganization" value as opposed to a fair market value. TR (Coleman) at pp. 1434:23-1435:7 and 1900:1-1901:4. But the Blackstone Report, like the MBY and Houlihan Reports, uses formulae for determining *market* costs of debt and equity to arrive at a value.

[112]    Present trading values of Mirant debt were also cited as confirmation of values determined by Libertas Partners, LLC. TR (Ying) at pp. 5569:17-5570:6; Equity Committee Exhibit No. 40. As of August 31, 2005, Mirant bonds traded at anywhere between 88.50% to 101.25% of face amount – a substantial increase in market price since the Valuation Hearing. *See* www.investinginbonds.com. By the time of the December 1 confirmation hearing, Mirant debt was trading at only slightly less than par plus accrued interest.

the Corp. Committee argues, this indicates the market considers the value of Mirant Group to be inadequate to make holders of Mirant debt whole. But, even assuming that the market is a proper gauge of the value of an entity[113] in chapter 11, use of preconfirmation prices of debt cannot be an accurate measure.

The market price of Mirant debt preconfirmation must logically be based not only on the capital structure proposed in the Plan. It also would have to take into account the risk the Plan would not be confirmed. If the Plan were not confirmed, Mirant creditors might receive less value than proposed in the Plan.

Delays in the confirmation schedule, uncertainties as to postpetition, preconfirmation interest rates (on both Mirant and MAG debt) and the possibility of a change in treatment through compromise or valuation would have to be considered when buying Mirant debt preconfirmation. The MAG Committee stated its intention, should the opportunity arise, to propose a stand-alone plan for MAG.[114] Filing of such a plan could follow if the Plan were not confirmed, and its consequences could include loss to Mirant creditors of considerable value. Even if the price of Mirant debt prior to confirmation might, in other circumstances, predict

---

[113]    The Corp. Committee finds support for its position in the statement in *Till* (541 U.S. at 477, n. 14), "[W]hen picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." As discussed above, though, this statement refers to the market interest rate on loans secured by property – i.e., cram down of secured creditors. The "asset" being "valued" in *Till* was a note secured by an automobile. The market may serve as guidance in valuing an asset if there is a ready market for the asset. *Cf.* Assocs. Commercial Corp. v. Rash, 520 U.S. 953 (1997); *In re* Gray, 285 B.R. 379 (Bankr. N.D. Tex. 2002). There is, however, no ready, "efficient" market in which merchant energy companies are bought and sold. What a hypothetical buyer might be willing to pay for a share of stock in a merchant energy company is not necessarily – as the Corp. Committee would have it – a valid test of what that merchant energy company might command if sold as a going concern, with control, synergies and other attributes that might affect a buyer's judgment of fair value. The court does not believe the Supreme Court in *Till* intended to suggest that a market for an entity's debt or equity should be equated to a market establishing a value for the entity itself.

[114]    *See* Official Comm. of Unsecured Creditors of Mirant Ams. Generation, L.L.C. v. Mirant Corp. (*In re* Mirant Corp.), No. 4-04-CV-476-A, 2004 U.S. Dist. LEXIS 19796 (N.D. Tex. Sept. 30, 2004).

accurately what an investor thought the return on such debt would be worth following completion of reorganization, the actual circumstances of these chapter 11 cases posed too many risks (at least at the time of the Valuation Hearing) warranting a discount in the market in price of Mirant's traded debt for the court to look to the preconfirmation market as a credible test of value of Mirant Group or its securities postconfirmation.

The methodologies used by the experts in this case do not suffer from the problem that exists in attempting to derive from the price of a claim traded in the market the value of its anticipated satisfaction under the Plan. Rather, the DCF Method, in particular, attempts to predict the value of the subject as of a selected date of emergence from chapter 11. As data used in the DCF Method, as well as that used in the Comparable Method, involves predictions of future conditions and events, and as those predictions may prove inaccurate even before the date of emergence from bankruptcy (e.g., the price of natural gas in the instant case), valuations reached through those methods are to some extent infirm. If the valuation of a company is to be used for present decision making – i.e., if the person commissioning the valuation intends to use it for determining the amount to bid to purchase the subject – this infirmity is less. Even if agreement is reached to purchase the subject, events in the future that may affect the subject's value are often contemplated in the resulting purchase and sale agreement.[115]

In valuing Mirant Group, however, the court would have to reach a conclusion to be utilized in decisions made in the less-than-proximate future.

It is not sensible in such a situation to establish a value that largely relies on market

---

[115] Acquisition agreements typically adjust closing prices to account for at least some changes of circumstance. For example, section 3.2 of the Asset Purchase and Sale Agreement entered into between Mirant Group and Pepco (which has been before the court on multiple occasions in Debtors' cases) specifically provides for post-closing adjustments of price.

conditions existing at the time of valuation which would not necessarily obtain as of the date for which the valuation was prepared. Besides this concern with adopting today's market views and formulae based on them to calculate the worth of what creditors are to receive under the Plan, the court does not accept that what the market would demand for investment in Mirant Group is equivalent to what the Code commands creditors are entitled to. The claims against Mirant that will be dealt with in the Plan are in place.[116] No decision to invest is necessary. Mirant does not need to attract investors: they are already trapped, captive to the chapter 11 process.

Moreover, just as noted in *Till*, the court does not believe that the market – or the experts – adequately accounts for the benefits to Debtors of chapter 11. Review of the 10-K reports filed by Mirant prepetition reveals a number of serious problems outstanding.[117] Many of these problems have been resolved, at least to the point of removing uncertainties that clouded Mirant Group's future, in the course of – and often as a result of – Debtors' chapter 11 cases.[118]

---

[116]    That the claims are subject to active trading does not increase the amount of recovery to which their holders are entitled. The court is under no peculiar obligation to speculators that purchase bonds or other claims in Debtors' cases to help see to it that their expectations of profit are realized.

[117]    Challenges facing Mirant Group prepetition included, *inter alia*: (i) various rate payer lawsuits filed in California alleging that Mirant Group and others engaged in unlawful and anti-competitive acts designed to artificially inflate wholesale electricity prices in California (*see* Form 10-K filed by Mirant Corp. on March 11, 2002 ("Mirant 3/11/02 10-K") at p. 18 and Form 10-K filed by Mirant Corp. on April 30, 2003 ("Mirant 4/30/03 10-K") at pp. 25-26), (ii) civil and criminal investigations into Mirant Group's conduct in the western power markets by the (among others) FERC, United States Department of Justice, California Public Utilities Commission and the Attorney General's offices of the States of Washington, Oregon and California (*see* Mirant 3/11/02 10-K at p. 18 and Mirant 4/30/03 10-K at p. 20), (iii) potential refunds owed by Mirant Group in connection with activities in the western power markets to be determined through FERC ordered administrative hearings (*see* Mirant 3/11/02 10-K at pp. 18-19 and Mirant 4/30/03 10-K at pp. 22-24) and (iv) a purported class action lawsuit alleging violations by Mirant Group of the Employee Retirement Income Security Act (*see* Mirant 4/30/03 10-K at p. 29).

[118]    On April 15, 2005, the court entered its Order Granting Debtors' Motion for Approval of Settlement with the California Parties and Related Agreements and for Relief Under Sections 363(b) and (f) of the Bankruptcy Code to Transfer Certain Assets to Certain California Parties in Connection Therewith. In so doing, the court approved (as did another bankruptcy court and FERC previously) a settlement resolving substantially all of the myriad claims and challenges facing Debtors in connection with its activities in California. Debtors have also been faced with significant potential liabilities relating to tax assessments on

Although some of the experts minimized the significance of resolving these problems,[119] the

court does not find their testimony in this respect credible.[120]  Indeed, the mere fact that any

expert would fail to appreciate the benefit to Debtors not only of resolving expensive litigation

on which Debtors' cash flow is contingent, but of the claims process[121] and the savings through

contract rejection[122] and other special powers afforded by the Code, demonstrates that the

---

certain of Mirant Group's plants in New York.  Debtors challenged the assessments and, during the course of these bankruptcy cases, have settled (on terms favorable to Debtors) a number of tax certiorari proceedings.  *See* Form 10-K filed by Mirant Corp. on March 15, 2005 at p. F-64, available online at www.mirant.com.  The tax certiorari proceedings which have not been settled have proceeded through trial in New York during the pendency of Debtors' bankruptcy cases and settlement of remaining disputes or court decisions are imminent.

[119]  Coleman, while admitting that "wonderful things" were being done to Debtors' balance sheet through these bankruptcy proceedings, was reluctant to agree that Mirant Group's situation at emergence will be strong, stating that "I wouldn't have been part of a plan that was proposed if I didn't think that it was viable and feasible, but squeaky clean is not a word I would use at this stage." *See* TR (Coleman) at pp. 1906:16-1909:10.  Filsinger also did not take an optimistic tone when questioned about whether the market would view Mirant Group at emergence as occupying a good situation, given resolution of many of its problems through bankruptcy.  Filsinger stated that the market would view Mirant Group as a "cleaned-up company," but stated that "there's still some difficulties in the market ahead."  *See* TR (Filsinger) at pp. 2660:23-2662:21.

[120]  Ying was more optimistic about the benefits of Mirant Group's bankruptcy, stating his belief that "the bankruptcy process is pretty darned good" and one in which a company such as Mirant Group "can clean everything up." *See* TR (Ying) at p. 2340:11-2341:3.

[121]  Debtors have settled a number of material claims filed in these bankruptcy cases.  For example, Debtors have settled claims filed by (i) Burns and McDonnell of over $12.7 million for $3.75 million, (ii) Enbridge Midcoast Energy of over $25 million for $750,000, (iii) Predator Development Company of $65 million for $1.2 million, (iv) Gunderboom Inc. and Gunderboom Shareholders of $90 million for just over $200,000, (v) Enron/EME of over $1.3 billion for $19.25 million and (vi) Dick Corp./St. Paul of over $49 million for $11.5 million.  Disclosure Statement at pp. 80-81.  The court has also disallowed a number of claims against Debtors, including, for example, a number of multimillion dollar claims filed by Kinder Morgan Power Company.  As a result of Debtors' settlements and the court's orders, approximately $213 billion of the approximately $268 billion in claims filed against Debtors had been expunged from the claims register as of the date of the 3/25 Disclosure Statement.  3/25 Disclosure Statement at p. 79.

[122]  During the course of these bankruptcy proceedings, Debtors rejected a tolling agreement with Perryville Energy Partners, LLC ("Perryville").  Perryville then filed certain claims against various Debtors totaling over $1 billion.  Following discovery and sparring in court, Debtors and Perryville settled their disputes and the court entered an order on June 28, 2005 approving the settlement, which provides Perryville with claims entitling it to a recovery of just over $200 million.  This is but one example of a number of burdensome contracts and leases Debtors have been freed from through the rejection mechanisms offered by the Code.  *See* 3/25 Disclosure Statement at pp. 72-73.

**MEMORANDUM OPINION**                                                                                   **Page 51**

market does not fully accord Mirant Group the value enhancement achieved in the course of these cases. *See, similarly*, *Till*, 541 U.S. at 475 and n.12 (listing attributes of bankruptcy process tending to decrease the risk of default by a debtor); *In re Exide Techs.*, 303 B.R. at 66 ("[T]he 'taint' of bankruptcy will cause the market to undervalue the securities and future earning capacity of the Debtor."); *In re New York, New Haven & Hartford R.R. Co.*, 4 B.R. at 792 ("The stigma of bankruptcy alone is a factor that will seriously depress the market value of a company's securities.").

As to the added "risk" that would depress the value of an ex-bankrupt, while that may be an appropriate factor where a debtor's business will suffer the public relations disadvantages of bankruptcy or where the debtor is overburdened with debt incurred in satisfaction of claims, neither of these conditions exists in the case at bar. Merchant energy companies sell into a marketplace in which either they are parties to contracts or they are effectively anonymous participants in an exchange.

As to a debt-heavy balance sheet, the result in some reorganization cases, the Plan proposes conversion of substantial debt to equity.[123] Mirant's ratio of debt to capitalization is expected to be about 0.62. The company's capital structure is impressive enough that seven potential lenders initially competed to provide exit financing, and, although the Plan requires only $750 million in exit financing, Debtors have a commitment for up to $2.35 billion. *See* Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Authorize Debtors to Execute a Commitment Letter and Related Documents and to Incur Obligations Thereunder in Connection with the Acquisition of up to $2.35 Billion in Aggregate Principal Amount of Exit Financing (the

---

[123]     *See* 3/25 Disclosure Statement at p. 6; 9/22 Disclosure Statement at pp. 5-6.

**MEMORANDUM OPINION**                                                                    **Page 52**

"Exit Financing Motion").  From these facts, and notwithstanding the contrary testimony in the record discussed above, the court concludes the market's formula for valuing Mirant Group is too pessimistic about the effects of bankruptcy and not sufficiently appreciative of chapter 11's benefits.

For all these reasons, the court further concludes that it must exercise its judgment in accordance with its understanding of the record of the Valuation Hearing.  Taking account of Mirant Group's relatively clean balance sheet, of the resolution of unknowns that could have affected Mirant Group's cash flow for years to come and the difference between the return required by a hypothetical investor and the return required to satisfy a prepetition claim requires recalculation of Mirant Group's value.  Below the court discusses specific changes necessary to bring Blackstone's valuation into line with other general principles of bankruptcy valuation as well as to correct for over-reliance on the marketplace and other errors.

## 2.    Last Twelve Months ("LTM") Valuation

Although there was dispute among the experts[124] as to whether a calculation of value under the Comparable Method should be made on an LTM basis, the court believes that such a calculation, based on historical numbers, is a useful component of valuation.  Use of historical data as well as projections is sanctioned by numerous valuation decisions. *Protective Comm.*, 390 U.S. at 442 (valuation of a company "must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including . . . the past earnings record, and all circumstances which indicate whether or not that record is a

---

[124]    *See* TR (Coleman) at p. 1726:1-17, TR (Ying) at pp. 1969:15-1974:6, TR at pp. 4675:10-4680:10 and 4701:6-4706:11 and TR (Shaked) at pp. 4713:16-4714:1, 5067:18-5068:23 and 5114:17-20.

reliable criterion of future performance") (*quoting Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941)); *In re Duplan Corp.*, 9 B.R. 921, 927-28 (S.D.N.Y. 1980) ("Certainly past earnings provide a useful reference point from which to calculate present value and develop projections.  To rely on the past exclusively, however, would be misleading."); *In re Keeshin Freight Lines, Inc.*, 86 F.Supp. 439, 443 (N.D. Ill. 1949) ("It is proper to examine the past earnings history of a business in considering whether or not a future earnings estimate is reasonable."); *In re Barlum Realty Co.*, 62 F.Supp. 81, 84-85 (E.D. Mich. 1945) (citing *Consol. Rock* for proposition that valuation must take into account earning record and stating that appraiser's "approach is unwarranted in that he admittedly gave no consideration to past performances, relied entirely upon the current record, and was unduly optimistic of the future"); *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 745 (Bankr. N.D.N.Y. 1987) (judgments about cash flow projections "must take into account all facts relevant to future earning capacity including but not limited to . . . the past earnings record and all factors which tend to support or negate reliance upon the past earnings record as an appropriate index of future performance").

In the case at bar, a value calculated based on historical results will serve as a test of the accuracy of valuations based on predictions.  Accordingly, the court directed in the Letter Ruling that the Comparable Method be used to determine a value based on the last twelve months (ending March 31, 2005) of Mirant Group's operations.

**3.     Comparable Company Multiples**

In order to determine a value through the Comparable Method, comparable companies must be chosen and a multiple derived for each.  A median average of those multiples is then applied to the subject's EBITDA to derive a value.

The court adopts the comparable companies chosen by Blackstone (AES, Reliant, NRG and Dynegy). Phoenix and the Equity Committee urged use of Calpine as a comparable as well,[125] and some question was raised about use of AES. [126] The court also has some concern about the use of Dynegy, given its liquefied natural gas business (*see* TR (Coleman) at pp. 1089:24-1091:25 and 1092:18-1093:2, TR (Maxwell) at pp. 4610:7-4612:14 and Blackstone 2/25 Report at p. 27) and the substantial ownership interest in Dynegy of Chevron-Texaco (TR (Ying) at pp. 1991:3-1993:13). Reliant is also not a truly close comparable operationally because of its substantial sales in the retail market (TR (Ying) at pp. 1994:14-1995:1 and 2237:13-2238:8 and Blackstone 2/25 Report at p. 27).

The main reason why Blackstone, MBY and Houlihan declined to use Calpine as a comparable was its precarious financial condition.[127] It was the view of Blackstone and MBY that the stock price of Calpine was properly characterized as an option price rather than a true reflection of equity value. TR (Coleman) at pp. 1206:19-1209:23 and TR (Ying) at pp. 1978:10-1981:18.

As stock price is one of the principal elements in calculating total enterprise value, use of Calpine as a comparable would lead to distortion of value by according it too high an enterprise value (as the enterprise value goes up, the multiple – yielded by dividing enterprise value by EBITDA – also increases). The court has carefully considered the considerable evidence offered on the suitability of Calpine as a comparable. Based in significant part on the testimony of

---

[125]    TR at pp. 117:7-118:2 , 147:16-149:8 and 5816:2-5817:17, TR (Maxwell) at pp. 3698:9-18, 3865:15-3867:11, 4017:3-16 and 4409:11-14 and PJSC 2/25 Report at p. 46.

[126]    *See* TR (Morgan) at pp. 325:13-326:5, TR (Ying) at p. 2155:1-20 and TR at pp. 5688:7-5689:13.

Morgan, Holden and Hayes[128] the court finds that the differences in business between Calpine and Mirant Group are sufficient, when considered together with Calpine's relatively weak financial condition, to disqualify its use as a comparable.

AES, with a total enterprise value of approximately $28 billion and an approximate EBITDA of $3 billion,[129] is substantially larger than Mirant Group. Moreover, though in the merchant energy business, unlike Mirant Group, the international business of which accounts for approximately 20% of EBITDA, AES's foreign assets make up about 70% of its business.[130] The countries in which AES operates[131] are different – and, in many cases, arguably less prone to instability – than those in which Mirant Group has a presence. However, the court, based on the preponderance of the evidence, holds that AES is as valid a comparable to Mirant as is Dynegy – possibly even Reliant.[132]

Because the court does not think it appropriate to rely solely on NRG, unquestionably the

---

[127] TR (Coleman) at pp. 1206:19-1209:23, 1212:24-1214:1 and 1215:4-12, TR (Ying) at pp. 1978:10-1981:18 and Hardie Deposition at pp. 82:5-83:11.

[128] *See* TR (Morgan) at pp. 325:13-326:5 and 364:25-365:15, TR (Holden) at pp. 1020:21-1021:13 and Deposition of Hayes dated March 23, 2005 at page 211, line 19 to page 212, line 9. The court has also reviewed with interest MBY's comparison graphs in the MBY 2/25 Report at pp. 22-24.

[129] AES's TEV is $28,593,300,000.00 per the Blackstone 5/2 Report at p. 39 and is $27,481,000,000.00 per the MBY 2/25 Report at p. 46. AES's EBITDA (for the last twelve months as of December 31, 2004) is $3,501,000,000.00 per the Blackstone 5/2 Report at p. 35 and $3,211,000,000.00 (for year 2004 actual) per the MBY 2/25 Report at p. 46.

[130] *See* TR (Coleman) at p. 1124:1-19, TR (Shaked) at p. 4898:16-23, Blackstone 2/25 Report at p. 27 and MBY 2/25 Report at p. 24.

[131] AES operates in the following 27 countries: U.S., Canada, Mexico, Chile, Brazil, Spain, Qatar, Panama, Venezuela, Argentina, Cameroon, Dominican Republic, El Salvador, Czech Republic, Hungary, Nigeria, Netherlands, United Kingdom, China, Sri Lanka, Pakistan, India, Italy, Kazakhstan, Ukraine, Oman and Colombia. AES Corporation Form 10-K filed March 30, 2005 at pp. 9-13.

[132] Morgan testified Reliant was a better comparable, but its business mix is meaningfully different from Mirant Group's. *See* MBY 2/25 Report at p. 22.

company most comparable to Mirant, in formulating a value by the Comparable Method, it finds and concludes that AES (and Dynegy and Reliant) should be used as comparables as well as NRG.  In this regard the court is compelled to note that weighting of comparable companies based on their similarity to the subject being valued would seem to have some appeal.  The experts whom the court questioned about this rejected the idea,[133] and the court therefore will not adopt such an approach;[134] it may be that raising the question here will prove useful in future valuations.[135]

The court next fixes as June 27, 2005, the date for which closing prices must be used to calculate equity value as a first step toward determining total enterprise value.  June 27 was the date of conclusion of the Valuation Hearing.  The selection of June 27 is essentially arbitrary, but avoids later argument over whether the date specified was chosen because of high or low stock prices.  The court again questioned the use of a single day's closing price for comparable company stocks.  It seems to the court that it would make better sense to factor into valuation comparable companies' stock prices over a period of time, thus avoiding bringing into valuation metrics temporary instability in stock prices,[136] especially considering that the value being

---

[133]     TR (Maxwell) at pp. 4610:7-4612:10 and TR (Shaked) at pp. 5335:7-5336:7.

[134]     The court must rely on experts in deciding methodology for valuation (though it must use its own judgment in fitting the evidence with the methodology).

[135]     The notion of weighting is apparently not entirely foreign to valuation in reorganization cases.  In *In re* Bush Indus., Inc., 315 B.R. at 301-2 some of the experts adjusted their multiple to reflect differences between the debtor and its comparables, a methodology approved there by the court.

[136]     Reviewing price fluctuations available on the internet, the court noted price changes in comparable company stocks of up to approximately 15% over a two week time-frame.  Again, averaging is by no means unknown in reorganization valuations.  *See In re* Duplan Corp., 9 B.R. at 926, in which comparable company share prices were averaged for a five year period.  The court stated, respecting the role of stock prices in determining a multiple, "Since the price changes day-to-day, so does the multiple.  Thus, choosing the proper multiple in the present situation is an inexact task since there is currently no market for

determined is for a date in the future, at which time prices are likely to be different than on June 27.[137] This suggestion, however, brought, at best, a tepid response[138] except from Shaked. The court determined to use a single day's closing price, first, because the valuation experts all agreed that is a proper methodology (*see also* SHANNON P. PRATT ET AL., VALUING A BUSINESS 241 and 256 (4th ed.); *cf.* TR (Shaked) at pp. 5062:5-5064:18). Second, the evidence before the court indicates there would not be much difference if the value of Mirant Group were determined using prices over at least a short period of time. Maxwell testified as to the difference in the comparable companies' stock prices by comparing the prices for each based on (i) closing prices as of June 3, 2005, (ii) the one month average prior to June 3, 2005, and (iii) the three month average prior to June 3, 2005. The resulting figures demonstrated that the stock prices remained reasonably stable over time and that, using that particular three month average as opposed to a single day, the TEV of Mirant Group would decrease, but in a nonmaterial amount. TR (Maxwell) at pp. 3835:16-3838:17.

The court finally concludes that, in calculating the multiple for NRG, notes receivable of approximately $832 million[139] should be included in total enterprise value. Maxwell testified that he had spoken with a member of NRG's management who confirmed that payments on the

---

the new stock. To prevent the vagaries of the marketplace at any particular point in time from affecting the substantial interests involved [in the reorganization case], an historical perspective is appropriate."

[137]   Despite the insistence of the experts that there be "apples-to-apples" conformance in parallel calculations (*see, e.g.,* TR (Coleman) at pp. 1085:1-1086:9 and 1894:10-19), a requirement that mandates using the same day's closing price for each comparable company stock, no expert seemed concerned about using a date well removed from the date of utilized closing prices as the date for which Mirant Group's value would be determined.

[138]   *See* TR (Coleman) at p. 1916:7-19, TR (Ying) at pp. 2350:19-2353:14, TR (Filsinger) at pp. 2655:13-2657:25 and TR (Maxwell) at pp. 4612:15-4613:22.

[139]   The court initially in the Letter Ruling (June 30 letter) specified $832.6 million. This failed to account for regular payments, and the Letter Ruling was changed accordingly (July 26 letter).

**MEMORANDUM OPINION**                                                                                          **Page 58**

notes were included in NRG's EBITDA (TR (Maxwell) at pp. 3700:16-3701:14.). Maxwell's testimony was consistent with apparent treatment of the notes in NRG's filings and some analyst reports. TR (Maxwell) at pp. 3699:5-3710:10; Equity Committee Exhibit Nos. 40, 41, 252, 255 and 257. If the payments are included in the EBITDA, consistency requires inclusion of the notes in NRG's enterprise value.

## 4.    Cost of Equity

The WACC is the key component for calculating a value using the DCF Method. The WACC itself is dependent on the subject's after-tax cost of debt and the cost attributable to equity – outside chapter 11, a return required to attract equity investors. In the case of Mirant Group, Blackstone calculated the WACC using an after-tax cost of debt of 5%. This number is supportable using a number of standards. First, the number is consistent with (and currently higher than) the rates quoted for Mirant's post-confirmation exit loan facility and with the interest rate to be paid on debt cured or created by the Plan.[140] Second, the before-tax interest rate used by Blackstone (and other experts) is consistent with the range of rates (prime rate to prime rate plus three per cent) suggested for secured creditors in *Till* (541 U.S. at 480). While *Till* does not address rates on unsecured debt, given the relatively senior status of the exit facility

---

[140]    Pursuant to the Exit Financing Motion, the proposed interest rates on the revolving and term loans contemplated are, at Debtors' option, either (a) a fluctuating rate equal to the greater of (i) the prime rate or (ii) the federal funds rate plus 0.50%, plus, using either base rate, an additional 75-100 basis points (for the term loans) and 100-125 basis points (for the revolving loans), or (b) a periodic fixed rate based on LIBOR plus an additional 175-200 basis points (for the term loans) and 200-225 basis points (for the revolving loans). Notably these are floating rates, and the court's valuation cannot ignore the likelihood that they will go up. The fixed rates for obligations issued under the Plan are in line with Blackstone's posited cost of debt. The Plan provides for issuance of New MAG Holdco notes bearing interest rates of 8.0% and 8.25%. 3/25 Plan, Exhibit A, nos. 129-30.

**MEMORANDUM OPINION**                                                                  **Page 59**

and other debt,[141] and given Mirant's relatively low predicted post-confirmation ratio of debt to capitalization, it is appropriate for the court to use *Till* as guidance in determining cost of debt. Finally, *Till* suggests where possible using the market to determine the appropriate cost of debt in a chapter 11 case. As reflected by testimony respecting the exit facility, there is an efficient credit market for borrowing by chapter 11 debtors (*Id.* at 477 n. 14). Debtors have canvassed the market, and the exit facility reflects the market cost of borrowing; thus, the exit facility is a fair measure of the proper interest rate to use in the debt component of the WACC.

The equity part of the WACC, however, must be adjusted. As discussed above, the securities market is not the proper place to test whether claims satisfied through issuance of stock are or are not "satisfied" pursuant to Code § 1129(b)(2)(A) in determining whether existing equity may receive some return in a chapter 11 case. To use a formula based on the market assessment of risk to determine the return for the equity portion of the WACC would effect adoption by the court of the market's assumptions not only respecting Mirant Group and the merchant energy industry but also the market's overestimate of the disadvantages and underestimate of the advantages of Chapter 11. Thus, *Till* instructs that the court consider in the valuation context not only the cleansing of a debtor's balance sheet through discharge of debt but also the determination the court must make under Code § 1129(a)(11) that the debtor's chapter 11 plan is feasible (*Id.* at 479), the feasibility determination being an example of court oversight which the Supreme Court concludes operates to reduce credit risk. *See also In re Exide Techs.*,

---

[141]  Most of Mirant Group's debt following emergence will be at the level of MAG and its subsidiaries. As the Plan will transfer from Mirant and its direct subsidiaries substantial assets to subsidiaries of MAG, the effect is to pledge most of Mirant Group's value to first satisfy creditors of MAG and Mirant Group's post-confirmation institutional creditors before value reaches Mirant itself.

303 B.R. at 62 ("In determining the Debtor's value for purposes of deciding whether the Debtor's Plan is fair and equitable, it is appropriate to include the benefit of the Debtor's restructuring.").

On the other hand, as discussed in section V of this opinion, the court is not required by *Till* to limit return on claims to the prime plus zero to three per cent range used by the plurality in *Till* to determine a secured creditor's cram down rate. First, the claims here at issue (those asserted against Mirant) are unsecured and, as a result of being structurally junior to MAG and some other debt, are last in line for satisfaction. Second, it is quite clear from the language of section 1129(b)(2)(B) that it is the value of that which is offered in satisfaction of the claim – here equity interests – that must satisfy cram down requirements. As discussed in section V, even were creditors of Mirant to receive debt instruments under the Plan, unless the debt were secured, the numbers plugged into the formula used in *Till* would not be applicable.

As it is, the equity used to satisfy claims against Mirant must produce a reasonable return, sufficient, given its relative certainty compared to Mirant Group's peers, to persuade a person receiving stock under the Plan to retain that stock as an investment. In determining the rate of return required, the court is not looking to what the stock would sell for immediately upon its issuance: to rely on an estimate of that price would be to adopt the market's decision concerning feasibility of the Plan and its general aversion to distress (or apparent distress) situations.

Blackstone, in determining the equity portion of the WACC for Mirant Group, began with a risk-free investment rate of 4.3%.[142] Blackstone added to this a market risk premium

---

[142]   That this risk-free rate is different from the base rate in calculating return on debt (prime rate) is attributable to the different formulae being used. Exchanging prime for 4.3% would distort all subsequent calculations under the WACC formula.

multiplied by a factor (relevered Beta) that is calculated on the basis of the performance of comparable companies' stock versus the market generally and is then adjusted (relevered) based on potential Mirant Group capital structures. The risk premium was determined by adding a 7.2% general market premium for equity to a special risk premium of approximately 4.2%.[143]

For reasons already reviewed, the court does not believe that the resulting cost of equity used by Blackstone, 16.6% – 19.1% (Blackstone 5/2 Report p.18), accurately reflects what return must be accommodated by Mirant Group's cash flow for claims against Mirant to be fully satisfied within the meaning of Code § 1129(b)(2)(B)(i) by issuance of stock. The court finds and concludes that the low end of the range of return required for cram down through issuance of stock should approximate a good rate of return on an equity security issued by a stable, healthy company. The court heard testimony that would justify a return of even less than 10%.[144] Ying, however, testified that a rate of return on stock issued by Mirant of even 12% would not only not attract new investment, but would be so low a return as to justify sale of the subject security.[145] The court accordingly finds that the rate of return – and, hence, the cost of equity component of the WACC – necessary to meet the requirements for cram down of creditors of Mirant must

---

[143]    Blackstone 2/25 Report at p. 39 and Blackstone 5/2 Report at pp. 15-18.

[144]    In response to the court's question as to what rate of return one could reasonably expect in the present market, Maxwell stated: "That's a good question. I suppose, with long rates where they are, probably a high single digits [sic] yield would be many investors' general expectation. I mean, certainly, in the last three or four years, expectations have come down significantly, but I would say 8%, 9%." TR (Maxwell) at p. 4608:7-16.

[145]    The court posed a hypothetical to Ying whereby Ying was asked to advise the court whether to hold or sell stock in Mirant Group, assuming the court were a Mirant Group creditor given shares in the reorganized company and told that a rate of return of 12% could be expected. Ying responded: "Well, at a 12% annual rate of return, I think you should sell it . . . ." TR (Ying) at p. 5608:16-24.

equal or exceed 12%.[146]  Also based on the same testimony and Coleman's justification (TR

(Coleman) at pp. 1129:14-1138:9 and Blackstone 5/2 Report at pp. 16-17) of a 16.6% rate of

return on equity, the court finds that 16.6% is an appropriate high-end to fix for the cram down

rate for Mirant debt.[147]  Thus, in the Letter Ruling the court directed use of a range of 12% to

16.6% as cost of equity in recalculation of value under the DCF Method.

## 5.     The Philippines

The Philippines operations of Mirant Group have two peculiar, key features.  First, most

of Mirant Group's facilities in the Philippines were built to be operated by Mirant Group but

with ownership to be transferred to the government of the Philippines at dates certain.[148]  Second,

the government-owned power company, National Power Corporation ("NPC"), has contracted

with Mirant Group such that the outputs of the facilities will generate a certain cash flow until

the transfer of ownership.[149]

However, as reported in the Business Plan (Business Plan at p. 28) and confirmed in

testimony by Morgan (TR (Morgan) at pp. 5546:8-5547:9), it is likely that the agreement with

---

[146]     Because this rate is selected as itself an appropriate return, there is no need to revise it by application of a beta factor.  The court finds additional support for a 12% rate in that the sum of the risk-free rate and the risk premium is 11.5%.

[147]     The 16.6% is Blackstone's calculation of cost of equity if debt is 35% of capitalization (Blackstone Report 5/2 at p. 19).  Given the other testimony regarding returns on other investments the court finds a 16.6% return is sufficient to retain equity investors.  Other experts opined to low-end rates lower than 16% (see TR (Maxwell) at pp. 3717:9-3731:17, TR (Shaked) at pp. 4798:21-4805:10) for Mirant Group using the same formula – if making different assumptions – as Blackstone, and the court believes this testimony supports the equity range for the WACC it has directed.

[148]     Ownership of Mirant Group's Navotas II, Ilijan, Sual and Pagbilao plants (Sual and Pagbilao account for over 80% of Mirant Group's capacity in the Phillipines) was or is set to transfer to the government in July 2005, January 2022, October 2024 and August 2025, respectively.

[149]     The majority of fixed capacity charges NPC is required to pay Mirant Group are paid in U.S. dollars. Business Plan at p. 28.  There is little currency risk, therefore, in the contract.

**MEMORANDUM OPINION**                                                                                    **Page 63**

the Philippines will be renegotiated to allow Mirant Group to retain ownership to the facilities, at least with respect to the Ilijan, Sual and Pagbilao plants. Ownership of Navotas II, the court understands, was transferred to the government as planned.

The court initially (June 30 letter) proposed to account for the possibility of retained ownership through extension of 50% of the cash flows produced by the Philippines operations into perpetuity. As a result of complications in recalculation of value the court directed instead that Blackstone use the high-end value determined by it for the Philippines operations. As it is known that the arrangement with the government may change (*see* Business Plan at p. 28) the court finds that use of this high-end value will capture whatever added value may be attributable to the possibility of Mirant Group's continued ownership of the facilities.[150]

## 6.   Perpetuity Growth Rate

In calculating value under the DCF Method, Blackstone used a perpetuity growth rate of 2%. The perpetuity growth rate is applied (1) to the cash flow for the last year that is discounted to present value in order to determine (2) a terminal value, which is then discounted to present

---

[150]   The record also reflects the possibility that the Philippines operations might be sold at an attractive price. Debtors, Blackstone, the Corp. Committee and MBY received written expressions of interest from (i) Power Management Company, LLC ("PMC") and (ii) Citigroup Principal Investments and Genting Philippines (together, the "Consortium"). PMC, by letter dated December 10, 2004, indicated its desire to purchase all or a significant portion of Mirant Group's Philippine and Caribbean operations and estimated net sale proceeds to Mirant Group of $2 billion to $2.2 billion. The Consortium, by letter dated November 2, 2004, indicated its desire to purchase Mirant Group's Philippine assets and stated that the consideration for the transfer would likely include up to $1 billion in cash and the assumption of $800 million in debt. These offers were admittedly not attractive – though, no effort was made to negotiate with the prospective buyers. The court also acknowledges that the likelihood of a sale actually materializing is not adequately supported by the record – though whether because of the inadequacy of the proposals of PMC and the Consortium or Debtors' failure to pursue the matter is unclear. But use of the high-end value is supported just by the interest expressed – and the possibility of a market for the assets. The same is true of the option of a public offering: the record is much too vague to quantify any value attributable to that option, but its apparent availability (or, as suggested by the Equity Committee, even its necessity) adds attraction to the assets involved and supports use of the higher value.

value and added to the discounted cash flows to provide an enterprise value.[151] The court finds the perpetuity growth rate must be adjusted to 3% to provide a correct value.

First, other experts adopted growth rates higher than 2%.[152] Second, Debtors expended considerable effort during the Valuation Hearing showing that a 2% growth rate would not exceed inflation.[153] A company's growth rate, however, must exceed inflation for the company to survive. While it is certainly true that the price of electricity has fallen steadily for years – suggesting, according to Debtors, that the merchant energy business (or its antecedents) has grown less profitable – this is only a small part of the picture. Demand for electric energy has increased and may be expected to continue to increase, and technology is likely to continue to improve efficiency in the production of electricity. These factors, as well as industry prospects discussed below, suggest a more optimistic outlook than that espoused by Debtors.

The expectation that Mirant Group will increase in value, rather than face shrinking revenues, is supported by testimony that the merchant energy industry may be about to undergo consolidation.[154] That Mirant Group may be sought after by a corporate suitor is evidenced by

---

[151]    Alternatively, terminal value may be calculated by multiplying the cash flow for the final projected year by a terminal multiple.

[152]    PJSC proposed a growth rate range of 4.75%-5.75% (PJSC 2/25 Report at p. 18), MBY's terminal multiples implied a growth rate range of 2.25%-3.25% (TR (Ying) at p. 2031:3-24) and Houlihan assumed a growth rate of 2.5% (Houlihan 2/25 Report at pp. 8-10 and Hardie Deposition at p. 136:6-9).

[153]    Testimony elicited by Debtors in connection with this topic accounts for no less than 28 pages of the Valuation Hearing transcript. *See*, *generally*, TR (Tabors) at pp. 644-646, TR (Slater) at pp. 3332-3336, TR (Maxwell) at pp. 4145-4152 and 4586-4589 and TR (Shaked) at pp. 5152-5159.

[154]    *See* TR (Maxwell) at pp. 3905:24-3906:22 and 3926:1-3928:21. Maxwell's testimony concerning the likelihood of mergers in the merchant energy industry in the near future was supported by a Citigroup Smith Barney equity research report on energy merchants which stated that because "most merchants . . . are right-sizing their balance sheets . . . the next step in improved industry economics will be consolidation or some version of joint ventures/mergers" (Equity Committee Exhibit No. 34) and a Credit Suisse First Boston equity research report on NRG stating that NRG has the "flexibility to potentially kick off a much talked about [power] industry consolidation" (Equity Committee Exhibit No. 256).

**MEMORANDUM OPINION**                                                                                  Page 65

NRG's unsolicited approach to the Corp. Committee.[155]  Although nothing came of the

discussions between the Corp. Committee and NRG, the court understands this may have been,

in the opinion of Ying, due to some of the very problems – disputes in California and New York

– that have been resolved in these chapter 11 cases.[156]  The clean, liquid condition in which

Mirant Group will likely emerge from bankruptcy may well attract further suitors bearing offers

of merger or acquisition.

The court also notes that certain input in the valuation formulae has proven, in the short

term at least, quite conservative.  As discussed above, Mirant Group's exit facility will provide

funds at interest rates below that assumed by Blackstone for cost of debt.  While these rates float

and will likely rise (and for that reason, *inter alia*, do not justify lowering the cost of debt used

by Blackstone), they indicate potential for a greater value of Mirant Group going forward.

Likewise, the price of natural gas has gone up substantially, even since the Valuation Hearing.[157]

 As discussed above, higher gas prices add to Mirant Group's value.  While these facts do not

justify further recalculation of cash flows or the appropriate WACC, they do support a more

---

[155]     During March or April 2004, NRG approached the Corp. Committee and its advisors and expressed interest
in a potential merger with Mirant, which, in NRG's opinion, could produce $1.9 billion in synergies and a
one time benefit of $100 million.  MBY, PA and then Corp. Committee advisor Capstone Corporate
Recovery, LLC, all participated in assessing the proposition, though Filsinger testified that the advisors'
assessment amounted to a "high-level review" of the expression of interest, as opposed to a full-blown
merger analysis.  Communications between NRG, the Corp. Committee and its advisors continued through
November or December 2004.  In the course of those communications, NRG requested confidential, non-
public information about Mirant Group from the Corp. Committee which the Corp. Committee, on the
advice of its counsel, did not provide to NRG.  Although the Corp. Committee suggested to NRG that it
approach Debtors, the existence and details of the expression of interest were never communicated to
Debtors, the other Committees, the Examiner or the court because NRG demanded confidentiality.  TR
(Ying) at pp. 2177:24-2202:18 and TR (Filsinger) at pp. 2535:18-2555:22.

[156]     *See* TR (Ying) at pp. 2123:6-2125:8.

[157]     Reported closing price for natural gas for September 2, 2005 was $11.69.  FORT WORTH STAR-TELEGRAM,
September 3, 2005, at 1D.

**MEMORANDUM OPINION**                                                                    **Page 66**

optimistic view of Mirant Group's future.

The court is adjured to take into account in valuing a debtor its future prospects.

*Protective Comm.*, 390 U.S. at 444 (District Court committed error by reaching a conclusion that

debtor was insolvent where District Court "did not have before it all of the evidence and

testimony relating to the future problems and prospects of the company which were necessary to

assess its value as a going concern"); *Consol. Rock*, 312 U.S. at 526 (valuation of a debtor "must

be based on an informed judgment which embraces all facts relevant to future earning capacity");

*In re Jartran, Inc.*, 44 B.R. 331, 368 (Bankr. N.D. Ill. 1984) ("The value of a firm for corporate

reorganization purposes depends primarily upon its earning capacity.").  Even assigning low

value to Mirant's potential as an acquisition target, Debtors have failed to justify so low a growth

rate as Blackstone projects.  The court accordingly finds a 3% growth rate into perpetuity to be a

reasonable rate.  The Letter Ruling directed accordingly.

## 6.    Weightings

The experts differed as to the proper weighting to be given (1) in determining a bottom

line value, to the DCF Method compared to the Comparable Method and (2) in determining a

terminal value under the DCF Method, to use of a perpetuity growth rate versus a terminal

multiple.[158]  After considering the evidence, the court finds that there has been no showing that

---

[158]    Blackstone's valuation of Mirant Group was comprised of the following four components and weighted as
follows: (i) for New MAG, equal weighting was given to the Comparable Method and DCF Method; (ii)
for Other Corp., the DCF Method was given 60% weighting and the Comparable Method 40% weighting;
(iii) for the Caribbean, equal weighting was given to the Comparable Method and DCF Method; and (iv)
for the Philippines, the DCF Method was given 60% weighting and the Comparable Method 40%
weighting.  In the case of New MAG, Other Corp. and the Caribbean, equal weighting was given to the
terminal multiple and perpetuity growth rate components of the DCF Method (based on expiration of the
contracts for Mirant Group's major plants in the Philippines, Blackstone did not assume a terminal value in
its DCF method analysis for the Philippines).  Blackstone 2/25 Report at pp. 46 and 49 and Blackstone 5/2
Report at p. 42.  MBY, in its valuation of Mirant Group's domestic operations, gave equal weighting to the
DCF Method and Comparable Method.  TR (Ying) at p. 1954:7-12 and MBY 2/25 Report at p. 8.  For its

equal weightings will not yield a supportable value. Accordingly, equal weighting will be given to (a) a perpetuity growth rate compilation and (b) a terminal multiple calculation in recalculating value under the DCF Method. Likewise, the DCF Method and the Comparable Method will be weighted equally to arrive at Mirant Group's total value.

7.      **Additional Value**

In the Letter Ruling the court reserved the right to make minor changes to its ruling in this opinion. The court now modifies its prior ruling to provide that Additional Value be increased by $400 – 460 million (versus a single $450 million figure in the Letter Ruling).[159] Additional value items are items that are not included in enterprise value. Since those items are available to satisfy claims and equity interests, they must be added to enterprise (i.e., going concern) value. The court finds and concludes that the following additions are required: $357 million in restricted cash; $60 million in excess cash; $15 million attributable to the coal-burning facility at Lovett, New York; and $6 million through pay-down of international debt. The $60 million range of additional value is intended to allow for differences in expert calculations and various uncertainties.

The $357 million in cash was restricted in order to ensure coverage of the cost of

---

valuation of Mirant Group's Philippine and Caribbean operations, MBY relied exclusively on the DCF Method. MBY 2/25 Report at pp. 27 and 37. PJSC valued Mirant Group's domestic, Philippine and Caribbean operations, and in each case, weighted its DCF Method 60% and its Comparable Method 40%. PJSC 2/25 Report at p. 25.

[159]    The court directed elimination under the DCF Method of any added value for Debtors' NOL. The court also determined it would not attempt to value litigation Mirant Group might bring. Instead, the court has lowered the threshold for equity participation in part based on the assumption that litigation to be pursued by the Plan Trust has an indeterminate but meaningful value.

operations in the Philippines for up to six months. Morgan testified that this was a necessary precaution because the purchaser of the output of the facilities was entitled by contract to stop paying for six months (TR (Morgan) at pp. 5422:16-5423:14). However, the court does not understand this to mean Mirant Group will lose the money; rather payment will be deferred. Further, the Business Plan supposes maintenance of a high level of working capital – particularly given Mirant's apparent ability to borrow. The court is generally unwilling to second-guess Debtors' managers on what it finds to be a reasonable, if conservative, provision for working capital. There being no evidence before it, however, that working capital could not be used to fund operations in the Philippines – or that funds restricted for use in the Philippines could not be used in an emergency in domestic operations – the court finds the $357 million to be duplicative of working capital.

Various units at the Lovett facility are projected to be closed under the Business Plan in 2007 and 2008. The decision to close the facility was based on the cost of complying with the environmental requirements of the State of New York as set forth in a consent decree. Morgan testified (TR (Morgan) at pp. 231:14-233:14 and 5543:14-5544:15) that negotiations have occurred that may result in saving Lovett. Morgan estimated Lovett's value at $15 million. This amount, too, should be included in Blackstone's Additional Value.

The $6 million accounts for Blackstone's underestimation of the amount by which Debtors paid down their international debt during the first quarter of 2005 (TR (Maxwell) at pp. 4269:2-4270:6). As to the $60 million, evidence adduced during Maxwell's testimony indicated that $65 million would be made available through substitution of letters of credit for cash collateral. TR (Maxwell) at pp. 4272:19-4276:24. However, during rebuttal Morgan testified

that, in fact, savings from substitution of letters of credit for cash would be less even than assumed by Blackstone[160] (*see* TR (Morgan) at pp. 5412:20-5415:20). The court, however, concludes that restructuring of MAEM's collateralization warrants an increase in free cash (and a small equivalent decrease in working capital) of $60 million.

## C.     Other Issues

During the Valuation Hearing the Equity Committee and Phoenix pointed to a number of alleged necessary changes in Debtors' and Blackstone's calculations of value. To the extent that these have not already been dealt with, the record often is clear as to why the court has rejected these changes. For example, the Equity Committee took the position that Mirant Group's outsourcing of MAEM's functions would increase value. *See* PJSC 2/25 Report at pp. 60-62. However, cross examination of Maxwell (as well as testimony by Morgan – TR (Morgan) at pp. 211:15-216:23) clearly undercut that position. *See* TR (Maxwell) at pp. 4225:3-4227:17. But there remain several areas that warrant comment.

## 1.     Capacity Payments

As discussed above, payments to an energy merchant for making available power from a generation facility can constitute a significant share of the energy merchant's revenues. The Equity Committee and its experts contended that capacity payments were understated in the Business Plan. *See* PJSC 2/25 Report at p. 27.

In the first place, PJSC used the report of Slater Consulting in arriving at adjustments to capacity pricing. As already noted, Slater Consulting failed to account for capacity available from out-of-market or expanded market sources. Thus, the data used by PJSC is flawed, and the

---

[160]     *See* Blackstone 5/2 Report at p. 29, opining to MAEM collateral additional value of $220 – $231 million.

evidence presented in support of increased capacity payments is similarly unreliable.

Second, CRA reviewed Debtors' calculation of capacity payments.  As the court noted above, Tabors, a credible expert, testified that, with exceptions already addressed (section VI.A.4 of this opinion), Debtors' calculation of capacity payments was valid.  On the basis of the foregoing, the preponderance of the evidence supports the court's decision to use the Business Plan, including estimates of capacity payments, as the basis for cash flow projections.

## 2.    Capital Structure

The Equity Committee and Phoenix also criticized Debtors' decision to retain substantial working capital going forward.  TR (Maxwell) at pp. 3772:10-3799:20, TR (Shaked) at pp. 4945:13-4946:18, PJSC 2/25 Report at p.8 and PJSC 3/16 Report at pp. 10-11 and 32.  In this regard, those parties focused on Mirant Group's projected current ratio as compared to (a) those of comparable companies and (b) Mirant's own pre-bankruptcy current ratio.  Holden, however, testified that use of a current ratio is inappropriate in assessing working capital needs.  *See* TR (Holden) at pp. 966:23-968:9.

The amount of working capital was determined by Debtors' management in preparation of the Business Plan, and the court must start the analysis of working capital needs with the presumption that Debtors' management used its best business judgment in its decisions.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311-12 (5th Cir. 1985); *Holmes Envtl., Inc. v. Suntrust Banks, Inc.* (*In re Holmes Envtl., Inc.*), 287 B.R. 363, 389 (Bankr. E.D. Va. 2002); *In re Leroux*, No. 92-20403-WCH, 1997 Bankr. LEXIS 971, *25-26 (Bankr. D. Mass. 1997).  Since the evidence is at best equivocal, the court will defer to management and so finds the working capital Debtors propose to maintain going forward is reasonable.

3.      **Bowline 3**

PJSC took the position (PJSC 2/25 Report at pp. 6 and 52-57) that Mirant Group's

Bowline 3 facility[161] should be considered in determining Mirant Group's value. Bowline 3 is an

additional generating facility that Debtors had under construction at the time of the

commencement of their cases. The decision was made not to proceed with Bowline 3's

construction, and Debtors have begun selling equipment bought for construction of the facility.

*See* Motion of Debtors for Entry of: (I) An Order (A) Approving Bid Procedures and Bid

Protections to be Employed in Connection with Proposed Sale of Turbines; (B) Scheduling a

Sale Hearing; and (C) Approving the Form and Manner of Notice Related Thereto; and (II) An

Order (A) Approving the Terms and Conditions of a Purchase and Sale Agreement; (B)

Authorizing the Sale of Turbines Free and Clear of Liens, Claims, Encumbrances and Interests;

and (C) Granting Related Relief filed by Debtors on October 13, 2004 (docket no. 5815) and

Order Pursuant to Sections 105 and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy

Rules 2002 and 6004, Approving Sale of Assets, Free and Clear of All Liens, Claims,

Encumbrances, and Other Interests entered on December 10, 2004 (docket no. 7133).

Bowline 3, unlike Lovett, does not present the situation of an operable generation facility.

The court, for the reasons stated in the prior (working capital) portion of this opinion, will defer

to Debtors' management's business judgment. Indeed, in connection with the sales mentioned

above, the court had already made a determination that it would do so. The course chosen by

management is reasonable, and the Equity Committee has not presented evidence sufficient to

persuade the court to second-guess that choice.

### 4. Minority Interests

Shaked testified that Mirant's accounting for minority interests[162] was not consistent with that of comparable companies. *See* TR (Shaked) at p. 4947:4-23. The court has reviewed the filings of the comparable companies and does not find sufficient support for Shaked's position to direct alteration in calculation of the value of Mirant Group.

## VII. Conclusion

At best, the valuation of an enterprise like Mirant Group is an exercise in educated guesswork. At worst it is not much more than crystal ball gazing. There are too many variables, too many moving pieces in the calculation of value of Mirant Group for the court to have great confidence that the result of the process will prove accurate in the future. Moreover, the court is constrained by the need to defer to experts and, in proper circumstances, to Debtors' management. The law governing the court, from *Till* to *Protective Comm.* was developed in cases far different from that at bar.

It may be that there are better ways to determine value than through courtroom dialectic. That said, the court must work within the system created by Congress – and, in valuing a company in chapter 11, that system contemplates an adversary contest among parties before a neutral judge. The court believes all participants in the Valuation Hearing performed their duties to their constituencies, Debtors' estates, the public and the court, for which it expresses its

---

[161]   Maxwell did not testify concerning Bowline 3 and the court is unsure whether the position that the facility adds value was abandoned.

[162]   These interests are principally in Mirant Group's Caribbean business. The court is not informed of attributes of Mirant Group's minority interests versus the minority interests of others that might affect their respective value – e.g., rights of control, identity of other owners, buy-sell agreements, etc. Without better information about this and other issues, the court would in any event be cautious in assessing various accounting methods used by Mirant Group and its peers.

<u>**MEMORANDUM OPINION**</u>                                                                        **Page 73**

appreciation.

The court's ruling on the Motion is as set forth above.  The *Till* Motion is DENIED.

It is so ORDERED.

Signed this the ____ day of December 2005.

_____
DENNIS MICHAEL LYNN,
UNITED STATES BANKRUPTCY JUDGE