**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 Case |
|  | ) |  |
| MIRANT CORPORATION, et al., | ) | Case No. 03-46590 (DML) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF THE AMENDED AND RESTATED SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR MIRANT CORPORATION AND ITS AFFILIATED DEBTORS

On December 1, 2005, the Bankruptcy Court held a hearing (the "Confirmation Hearing") to consider confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors, dated as of September 30, 2005, (the "September 30th Plan," as amended by the Modifications,[1] the "Plan"), proposed by Mirant Corporation ("Mirant") and its above-captioned affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors").

1.    The following record (the "Record") was established to support confirmation of the Plan:

(a)    All documents identified on the Debtors' Exhibit and Witness List for December 1, 2005 Hearing filed on November 28, 2005 [Docket No. 12345], including, without limitation, the September 30th Plan, the Disclosure Statement[2] and all exhibits, schedules and attachments thereto

---

[1]    The "Modifications" means the modifications to the September 30th Plan as set forth in (1) The First Modifications to Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors dated November 30, 2005 [Docket No. 12402], (2) the additional modifications read into the record at the Confirmation Hearing and (3) further modifications made in connection with entry of the Confirmation Order.

[2]    Unless otherwise defined herein, capitalized terms shall have the meaning ascribed thereto in the Plan.

and filed in connection therewith, and the Plan Documents filed with the Bankruptcy Court on November 21, 2005 [Docket No. 12267], all of which were admitted into evidence without objection;

(b)    The sworn proffered testimony at the Confirmation Hearing of (i) Curt Morgan, Mirant's Executive Vice President and Chief Operating Officer, (ii) William Holden, Mirant's Senior Vice President and Treasurer, and (iii) Nicholas Leone, a Senior Managing Director of the Blackstone Group, L.P. ("Blackstone"), the Debtors' financial advisor;

(c)    The offer of proof at the Confirmation Hearing of Stephen Cohn, financial advisor to the MIRMA Owner/Lessors in connection with MIRMA's Chapter 11 Cases;

(d)    The proffered testimony at the Confirmation Hearing of Matt Covington, financial advisor to the Indenture Trustee in connection with MIRMA's Chapter 11 Cases;

(e)    The Affidavit of Bankruptcy Services LLC, sworn to by Diane Streany and filed with the Bankruptcy Court on October 14, 2005 [Docket No. 11762] and the Affidavit of Service of Financial Balloting Group LLC, sworn to by Jane Sullivan and filed with the Bankruptcy Court on October 14, 2005 [Docket No. 11763] in respect of the transmittal and service of the solicitation packages (together, the "Solicitation Affidavits"), both of which were admitted into evidence without objection;

(f)    The Certification of Jane Sullivan With Respect to the Tabulation of Votes on the Second Amended Joint Chapter 11 Plan of Reorganization, sworn to by Jane Sullivan and filed with the Bankruptcy Court on November 23, 2005 [Docket No. 12309] (the "Voting Certification"), which was admitted into evidence without objection;

(g)    The entire record of the valuation hearing held by the Bankruptcy Court commencing on April 18, 2005 and spanning 27 trial days over a two-month period that ended on June 27, 2005 (the "Valuation Hearing"), including all documentary evidence and testimony admitted into the record, briefs and papers filed, and arguments of counsel in connection therewith, all of which was incorporated into the Record at the Confirmation Hearing;

(h)    The entire record of the hearing held by the Bankruptcy Court on April 28, 2005, in connection with the Motion of The Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC Pursuant to Bankruptcy Rule 3013 Regarding Proposed Classification and Treatment of MAG Long-Term Noteholders' Claims Under the Debtors' First

Amended Plan of Reorganization [Docket No. 9480] and the Motion of the Ad Hoc Committee of Bondholders of Mirant Americas Generation, LLC for Order Determining that Certain Creditors of Mirant Americas Generation, LLC are Impaired Under the Debtors' First Amended Joint Chapter 11 Plan of Reorganization and Thus Entitled to Vote on the Plan [Docket No. 9484] (the "Impairment Hearing"), including all documentary evidence admitted into the record, briefs and papers filed, and arguments of counsel in connection therewith, all of which was incorporated into the Record at the Confirmation Hearing;

(i) The entire record of these Chapter 11 Cases and the docket maintained by the Clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases, as to all of which the Court took judicial notice at the Confirmation Hearing; and

(j) The statements and argument of counsel on the record at the Confirmation Hearing and at the pre-trial conference held by the Bankruptcy Court on November 30, 2005 (the "Pre-trial Conference"), and all papers and pleadings filed with the Bankruptcy Court in support of, in opposition to, or otherwise in connection with, confirmation of the Plan.

2.      The evidence, that was admitted into the Record in support of confirmation of the Plan and all related matters demonstrates, by a clear preponderance of the evidence that the Plan should be confirmed.

3.      The consensual resolutions of the various objections to the confirmation of the September 30th Plan, presented at the Pre-trial Conference and the Confirmation Hearing, and the Modifications satisfy all applicable requirements under the Bankruptcy Code and Bankruptcy Rules and are in the best interest of the Debtors and their Estates, and supported by the Record, and therefore should be approved. All objections to the confirmation of the Plan, which were not resolved by agreement at the Pre-trial Conference or the Confirmation Hearing should be overruled, or are otherwise disposed of, as set forth herein and in the Confirmation Order.

4.     The Record amply supports confirmation of the Plan and the Bankruptcy Court will issue an order confirming the Plan.

5.     The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014.

**A.     Jurisdiction and Venue**

6.     The Bankruptcy Court has subject matter jurisdiction to confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(A), (L) and (O).

**B.     Background**

7.     Commencing on July 14, 2003 and continuing through July 15, 2003, Mirant and 74 of its wholly owned subsidiaries in the United States filed voluntary petitions under chapter 11 of the Bankruptcy Code.  On August 18, 2003, Mirant EcoElectrica Investments I, Ltd. and Puerto Rico Power Investments, Ltd., two indirect wholly owned subsidiaries of Mirant, commenced chapter 11 cases under the Bankruptcy Code.  On October 3, 2003, four of Mirant's Affiliates, Mirant Wrightsville Investments, Inc., Mirant Wrightsville Management, Inc., Wrightsville Development Funding, L.L.C. and Wrightsville Power Facility, L.L.C., also commenced chapter 11 cases under the Bankruptcy Code.  On November 18, 2003, Mirant Americas Energy Capital, LP and Mirant Americas Energy Capital Assets, LLC, two indirect wholly owned subsidiaries of Mirant, commenced chapter 11 cases under the Bankruptcy Code.  On September 26, 2005, Newco 2005 Corporation, a newly-formed, direct wholly owned subsidiary of Mirant, commenced a chapter 11 case under the Bankruptcy Code.

8. Since the Petition Date, the Debtors have continued to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

## C. The September 30th Plan and Disclosure Statement

9. Commencing in early 2004, the Debtors' management along with their attorneys and financial advisors focused on assessing the business and its short- and long-term prospects to develop a business plan that could serve as a platform for negotiations with the Debtors' primary constituencies regarding the terms of a chapter 11 plan of reorganization.

10. In the fall of 2004, after a business plan had been developed, the Debtors initiated plan discussions with the Corp Committee and MAG Committee. While both the Corp Committee and the MAG Committee supported a plan pursuant to which substantially all unsecured debt and obligations against Mirant and its non-MAG subsidiaries would be converted into equity in the reorganized company and all unsecured claims against MAG and its subsidiaries would be paid in full mainly in cash and/or debt, the two parties initially disagreed as to how this should be achieved. The Corp Committee believed that the debt obligations of MAG should be reinstated and localized within the MAG Debtor family. The MAG Committee believed that new debt should be issued at the Mirant level where it would be supported by the net cash flow of the entire enterprise. In an attempt to resolve these issues, the Debtors came to the conclusion that it would be most beneficial to the entire enterprise to keep MAG debt at MAG, but provide significant assets and credit support to MAG in order to (a) make a plan of reorganization appropriately feasible at MAG and (b) support compromising the potential intercompany claims between Mirant and MAG. Facing a stalemate between the MAG Committee and Corp Committee and mindful of the need to move the reorganization process forward, on January 19, 2005, the Debtors filed the Joint Chapter 11 Plan of Reorganization for

Mirant Corporation and Its Affiliated Debtors together with the Disclosure Statement Relating to the Debtors' Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors. On March 25, 2005, the Debtors filed their First Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors together with the First Amended Disclosure Statement Relating to the Debtors' First Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors.

11.     By motion dated November 22, 2004, the Equity Committee requested an order from the Bankruptcy Court compelling Mirant to hold a shareholders' meeting in an effort to remove and replace the members of Mirant's Board of Directors. In an effort to resolve this motion (which was adjourned), the Debtors agreed to conduct the Valuation Hearing. After the conclusion of the Valuation Hearing, the Bankruptcy Court issued a preliminary letter ruling that directed a representative of each of the Debtors and Blackstone to make certain revisions to the Debtors' business plan and to adjust certain aspects of Blackstone's valuation methodology used in the Valuation Hearing. Assessing the Bankruptcy Court's ruling, the parties determined their interests might be better served by reaching agreement on the terms of a plan than by further pursuing litigation.

12.     Accordingly, the Debtors, the Committees and Phoenix (a holder of subordinated indebtedness of Mirant that, like the Equity Committee, was seeking a higher valuation of the Debtors' Estates) began settlement negotiations aimed at maximizing the recovery to all parties in interest and minimizing the risks and costs of litigation and in settlement and compromise of certain existing and potential disputes regarding Intercompany Claims and related matters.

13.     On September 7, 2005, the Debtors, the Committees and Phoenix executed a term sheet setting forth the proposed terms on which the Debtors would exit chapter 11 and providing

for the treatment of all Claims against, and Equity Interests in, all of the Debtors (the "Mirant Plan Term Sheet"), which was also supported by the MAG Ad Hoc Committee and the Examiner. The terms of the Mirant Plan Term Sheet are incorporated into the September 30th Plan and Disclosure Statement.

14.     The September 30th Plan is the result of extensive arm's length negotiations among the Debtors, the Committees, Phoenix, the MAG Ad Hoc Committee and the Examiner, and is supported by each of these parties. The September 30th Plan is also supported by the Mirant Ad Hoc Committee. Each of the Committees submitted letters in support of the September 30th Plan, which were transmitted along with the solicitation packages in accordance with the Disclosure Statement Order (as defined below). No evidence was submitted by any objecting party sufficient to rebut the Debtors' evidence concerning the good faith, arm's length nature of negotiations regarding the September 30th Plan.

15.     On September 27, 28 and 30, 2005, the Bankruptcy Court held a hearing to consider approval of (a) the Disclosure Statement and a summary thereof dated September 28, 2005 (the "Disclosure Statement Summary") and (b) the motion, dated April 20, 2005 (as amended by the Notice of Amendment of Proposed Solicitation Procedures dated May 3, 2005, the "Solicitation Motion"), of the Debtors for the entry of an order (i) approving the form of ballots and proposed solicitation and tabulation procedures for the Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors dated September 22, 2005, as amended; (ii) prescribing the form and manner of notice thereof; and (iii) establishing procedures for (A) voting in connection with the plan confirmation process and (B) temporary allowance of claims related thereto. On September 30, 2005, the Bankruptcy Court issued an order (the "Disclosure Statement Order") [Docket No. 11570] approving (a) the

Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, (b) the Disclosure Statement Summary and (c) the Solicitation Motion and granting the relief requested therein.

**D.    Notice**

16.    As set forth in the Record and particularly the Solicitation Affidavits, the Debtors complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws in connection with the solicitation of votes on the September 30th Plan and the provision of notice of the dates of the Pre-trial Conference, the Confirmation Hearing and the November 10, 2005 deadline for filing and serving objections to confirmation and for voting on the Plan and all other relevant deadlines related to the September 30th Plan. As such, the notice provided with respect to all matters relating to the solicitation of votes on, and the confirmation of, the September 30th Plan was due and proper and satisfied the requirements of due process with respect to all creditors, equity holders and parties in interest who were provided actual or constructive notice.

**E.    Modifications**

17.    The Modifications comply with section 1127 of the Bankruptcy Code. As provided by section 1127(a) of the Bankruptcy Code, the Debtors were authorized to propose the Modifications, and the Plan satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code. As provided by section 1127(c) of the Bankruptcy Code, the Modifications comply with section 1125 of the Bankruptcy Code. The Modifications will have no material adverse impact on the treatment of any Claims or Equity Interests, and pursuant to section 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, all acceptances of the September

30th Plan are deemed acceptances of the Plan. All Modifications are reflected in the Amended and Restated Plan attached as Exhibit 1 to the Confirmation Order.

**F.    Voting**

18.    As set forth in the Record, including, without limitation, the Solicitation Affidavits, the Modifications and the settlements announced on the Record, each Class of Mirant Debtor Claims and Equity Interests and MAG Debtor Claims and Equity Interests (other than those classes holding Claims and Equity Interests against the New York Debtors, Hudson Valley Gas Corporation ("Hudson Valley") and Mirant NY-Gen), on a Debtor-by-Debtor basis either (a) voted to accept the September 30th Plan under section 1126 of the Bankruptcy Code and for purposes of section 1129(a)(8)(A) of the Bankruptcy Code, (b) is not impaired under section 1124 of the Bankruptcy Code and for the purposes of section 1129(a)(8)(B) of the Bankruptcy Code, or (c) is impaired pursuant to section 1124 of the Bankruptcy Code and voted to reject the September 30th Plan under section 1126 of the Bankruptcy Code, but is receiving treatment that satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code. Voting on the Plan and treatment thereunder, including all votes changed pursuant to settlements announced on the Record and all treatment changes as reflected in the Modifications are as reflected on the Voting Summary Report attached hereto as Exhibit B.

**G.    Settlement of Certain Inter-Debtor Issues**

19.    As described in Articles VI and XII.A of the Disclosure Statement and Schedule 5 thereto, and in the corroborating testimony at the Confirmation Hearing of William Holden, the Debtors operated their business as a single integrated enterprise, which gave rise to numerous intercompany relationships and transactions. For example, the Debtors utilize a centralized cash management system and certain essential functions, such as providing capital, personnel, human

resources and administrative functions, and performing commercial activities (procurement of fuel, sale of energy, marketing, plant dispatch, risk management and asset optimization activities), are performed or provided by particular Debtors for the benefit of other members of the enterprise, rather than on an entity-by-entity basis. These activities, in turn, gave rise to substantial Intercompany Claims both in terms of amount and number in these Chapter 11 Cases, the proper treatment of which was subject to substantial dispute and the resolution of which was uncertain.

20.     The Debtors concluded, with the consent and approval of the Committees, that absent the global settlement of Intercompany Claims and related matters as set forth in the Plan, value, on an enterprise and Debtor-by-Debtor basis, was at risk of material degradation to the detriment of all stakeholders.

21.     Based upon the Record, the global settlement of all Intercompany Claims and related matters as set forth in the Plan, including without limitation, the releases set forth in Section 8.16 of the Plan, are fair and equitable and in the best interests of the Debtors, their Estates and all other parties in interest, including all creditors and equity holders, and satisfies the applicable requirements of the Bankruptcy Code and Bankruptcy Rules. Accordingly, such global settlement should be approved.

**H.     Transfers and Restructuring to Implement the Plan**

22.     Article VIII of the Plan provides the means for implementing the Plan. The provisions of Article VIII of the Plan and the transactions and transfers to be implemented pursuant thereto, are consistent with and permissible under section 1123(a)(5) of the Bankruptcy Code and are consistent with the interests of creditors, equity holders and public policy.

23. As a result of the transfer of assets from Mirant to New Mirant under Section 8.2(a) of the Plan, New Mirant will receive more than 50 percent of the fair market value of the gross assets held by Mirant immediately prior to the transfer and more than 70 percent of the fair market value of the operating assets held by Mirant immediately prior to the transfer. For this purpose, gross assets are all of Mirant's assets, and operating assets are all of Mirant's gross assets other than: (i) cash; (ii) accounts receivable; (iii) investment assets; and (iv) assets held for sale.

24. In addition to the transactions above, in connection with the implementation of the Plan, the Plan requires the consummation of a series of transactions (the "Fresh Structure Transactions"), including, but not limited to, the transactions set forth in Exhibit B attached hereto. Each of these transactions is necessary and appropriate in order to ensure the feasibility of the Plan, facilitate the reorganization, maximize value, and preserve tax attributes. Approval of the Fresh Structure Transactions is within the authority of the Bankruptcy Court pursuant to section 1123(a) of the Bankruptcy Code and otherwise in furtherance of the general principles of the Bankruptcy Code. The Fresh Structure Transactions represent the exercise of the sound business judgment of the Debtors, will benefit the Debtors' Estates and are proposed in good faith. Additionally, the ability to enter into and consummate the Fresh Structure Transactions is set forth in Section 8.4 of the Plan.

25. Section 12.1(i) of the Plan requires entry of the Implementation Order as a condition to confirmation of the Plan. The Implementation Order is necessary and appropriate in order to ensure the feasibility of the Plan, facilitate the reorganization, maximize value, and ensure the smooth transition of the Debtors' trading operations to MET in accordance with Section 8.3 of the Plan. Approval of the Implementation Order is within the authority of the

Bankruptcy Court pursuant to section 1123(a) of the Bankruptcy Code and otherwise in furtherance of the general principles of the Bankruptcy Code. The Implementation Order represents the exercise of the sound business judgment of the Debtors, will benefit the Debtors' Estates, is proposed in good faith, and should be entered by the Bankruptcy Court.

## I.     New Mirant Board of Directors

26.     The initial board of directors of New Mirant will consist of the following individuals: Edward R. Muller, A.D. Correll, Thomas M. Johnson, Robert E. Murray, John M. Quain, William L. Thacker, John T. Miller, Thomas W. Cason and Terry G. Dallas.

## J.     Securities Under the Plan

27.     As a part of the consideration to be paid to certain holders of Claims and Equity Interests, the following debt, equity and rights will be issued under the Plan. New Mirant will issue New Mirant Common Stock on the Effective Date to the holders of the Mirant Debtor Class 3 – Unsecured Claims and Mirant Debtor Class 5 – Equity Interests. In addition, New Mirant will contribute New Mirant Common Stock to MAI, MAI will contribute such stock to MAG and MAG will distribute such New Mirant Common Stock to holders of MAG Debtor Class 4 – PG&E/RMR Claims and MAG Debtor Class 5 – Unsecured Claims. New Mirant also will issue New Mirant Series A Warrants to holders of Mirant Debtor Class 5 – Equity Interests and New Mirant Series B Warrants to holders of Subordinated Notes. MAI will issue (a) the MAI Series A Preferred Shares to MIRMA and (b) the MAI Series B Preferred Shares to MAG. New MAG Holdco will issue, under certain circumstances, the New MAG Holdco Notes, the terms of which will be negotiated with the MAG Committee and the MAG Ad Hoc Committee. All of the securities identified in this paragraph are referred to herein as the "New Debtor Securities."

28.     The offer, sale, issuance and/or distribution of each of the New Debtor Securities is duly authorized. Moreover, the New Debtor Securities, including any New Debtor Securities issued on account of the PG&E/RMR Claims, are being offered, sold, issued or distributed (a) by the Debtors, which are not underwriters as defined in section 1145(b) of the Bankruptcy Code, (b) under the Plan and (c) in exchange for Claims against one or more of the Debtors (or Equity Interests in Mirant), or principally in exchange for such Claims (or Equity Interests) and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code and, therefore the offer, sale, issuance and/or distribution of the New Debtor Securities, including any New Debtor Securities issued on account of the PG&E/RMR Claims, by the Debtors, are exempt from the requirements of Section 5 of the Securities Act of 1933 and any state or local law requiring registration prior to the offering, issuance, distribution or sale of a security on account of the applicability of section 1145(a)(1) of the Bankruptcy Code. PG&E is not an underwriter of New Debtor Securities as a result of its obligation to sell New Debtor Securities pursuant to Sections 8.5, 8.6 and 8.9 of the California Settlement Agreement. Therefore, any resale of the New Debtor Securities by PG&E (or any broker acting on PG&E's behalf) will be exempt from the requirements of section 5 of the Securities Act of 1933 and any state or local law requiring registration prior to the offering, issuance, distribution or sale of a security on account of the applicability of section 1145(b) of the Bankruptcy Code.

29.     The New Debtor Securities are being issued under the Plan, and, therefore, the issuance of the New Debtor Securities may not be taxed under any law imposing a stamp tax or similar tax pursuant to section 1146(c) of the Bankruptcy Code.

**K.     Designated Net Litigation Distributions**

30.     As part of the overall compromise and settlement set forth in the Mirant Plan

Term Sheet, the Debtors, the Committees and Phoenix agreed that Allowed Mirant Debtor Class

3 – Unsecured Claims and Allowed Mirant Debtor Class 5 – Equity Interests would share

Designated Net Litigation Distributions in accordance with the terms of Section 10.13 of the

Plan.

31.     The sharing arrangement set forth in Section 10.13 of the Plan is an essential

component of the compromise that was reached with respect to the terms of the Plan. Absent

this arrangement, it is uncertain whether the Debtors, the Committees and Phoenix would have

been able to finalize the Mirant Plan Term Sheet that forms the basis for the Plan. In such case,

the Debtors' emergence from chapter 11 would likely have been delayed, administrative

expenses would have increased and the ultimate result would be uncertain, all to the detriment of

the Debtors' Estates and their stakeholders.

**L.     FERC Approval**

32.     The Debtors have complied with all FERC requirements necessary to

consummate the Plan and the Plan Documents. Among other things, the Debtors submitted an

application to FERC pursuant to Section 203 of the Federal Power Act concerning the internal

restructurings contemplated by the Plan (the "203 Application") and on June 17, 2005, FERC

approved the 203 Application. The California Settlement was previously approved by FERC.

The Debtors will notify FERC of the occurrence of the Effective Date within ten (10) days after

the Effective Date. There are no other governmental regulatory approvals required.

**M.     Exit Financing**

33.     In order to fund the Debtors' North American business' day-to-day operations as

well as to provide liquidity to meet working capital requirements, including potential collateral requirements resulting from changes in commodity prices, the Debtors have procured exit financing in connection with their emergence from chapter 11.

34. In late 2004, the Debtors initiated a competitive process for the acquisition of the exit financing with the goal of securing such financing on the best terms available. Over several months, the Debtors engaged in several rounds of exchanges of detailed commitment proposals with several traditional lending sources, which, in the Debtors' view, possessed the necessary capabilities and access to capital to provide exit financing of the magnitude required by the Debtors as well as an existing familiarity with the energy industry and the Debtors' business. On May 12, 2005, certain financial institutions (together the "Commitment Parties") delivered a commitment letter (as amended from time to time, the "Commitment Letter") to the Debtors. On May 13, 2005, the Debtors' Board of Directors approved the proposed financing and the Debtors executed the Commitment Letter. On September 21, 2005, the Bankruptcy Court approved the Commitment Letter and related documents. Pursuant to the Commitment Letter and subject to the conditions set forth therein, the Commitment Parties have agreed to provide certain funding for the Exit Financing.

35. The Exit Financing will consist of: (a) a $1,000,000,000 senior secured revolving credit facility (the "Revolving Credit Facility") and up to $500,000,000 senior secured tranche B term loan facility (the "Term Facility" and together with the Revolving Credit Facility, the "Senior Secured Facilities") and (b) up to $1,350,000,000 (to be reduced dollar for dollar by the amount of the Term Facility) in Cash proceeds from an issue or placement of senior notes (the "Exit Notes"). An interim facility of no less than $850,000,000 is also available to the Debtors in the event the Debtors are unable to issue all or some of the Exit Notes as of the Effective Date

(the "Bridge Facility," the Bridge Facility, if any, together with the Senior Secured Facilities and the Exit Notes, the "Exit Financing"). The documents arising in connection with the Exit Financing, including without limitation any credit agreements, purchase agreements, guaranty and collateral agreements, notes, instruments or otherwise (collectively the "Exit Financing Documents") are not Plan Documents.

36.     The Senior Secured Facilities will be senior secured obligations of New MAG Holdco. The Senior Secured Facilities will be guaranteed by the subsidiaries of New MAG Holdco (other than (a) MET, MIRMA and the subsidiaries of MIRMA, (b) Mirant New York, Inc., Mirant Lovett, LLC, Mirant Bowline, LLC, Mirant NY-Gen, and Hudson Valley until such time as such entities emerge from chapter 11, and (c) certain other permitted exceptions) (the "Subsidiary Guarantors"). The Senior Secured Facilities will be secured by first priority security interests in substantially all of the assets of New MAG Holdco, the Subsidiary Guarantors and certain other subsidiaries of New MAG Holdco (other than the assets of MIRMA and the assets of subsidiaries of MIRMA) specified in the Exit Financing Documents. The obligations under the Exit Notes and the Bridge Facility will be guaranteed on a senior unsecured basis by all of the Subsidiary Guarantors.

37.     The Revolving Credit Facility will be available for general working capital and corporate purposes of New MAG Holdco. The proceeds under the Term Facility and the Exit Notes will be used to fund Cash distributions to holders of MAG Debtor Class 4 – PG&E/RMR Claims and MAG Debtor Class 5 – Unsecured Claims under the Plan.

38.     While the aggregate fees payable will depend upon a variety of factors, the Debtors estimate that the total fees, including, but not limited to customary commitment, ticking, take-down, rollover, underwriting, arrangement and administration fees, to be incurred by the

Debtors at closing under the Exit Financing are approximately $44,500,000 to $48,500,000, subject to ratings. Such fees are reasonable under the circumstances and the Debtors have taken any and all actions and received all consents, licenses and approvals required to authorize the payment of such fees.

39.     The Exit Financing is essential for the implementation of the Plan, and represents a reasonable exercise of the Debtors' sound business judgment. As a result, the entry into the Exit Financing (including issuance of the Exit Notes) is in the best interests of all parties in interest, including all creditors, equity holders and the Estates. In addition, the Debtors have provided sufficient and adequate notice of the Exit Financing, including any material modifications to the Exit Financing or to the Commitment Letter with respect thereto, to all parties in interest, including without limitation, all creditors, equity holders, the Committees and the Examiner. The financial accommodations being extended pursuant to the Exit Financing are being extended in good faith and for legitimate business purposes. The obligations to be incurred by the Debtors, New MAG Holdco and the Subsidiary Guarantors in connection with the Exit Financing Documents are new obligations, not arising on account of an antecedent debt, and are supported by reasonably equivalent value (most notably the proceeds of the Exit Financing). The consummation of the Exit Financing and execution of the Exit Financing Documents do not conflict with the terms of the Plan or the Confirmation Order.

**N.      The Plan Trust**

40.     The creation of the Plan Trust is reasonable and appropriate and will enable the Debtors to maintain and ultimately dissolve the entities transferred to the Plan Trust. The Plan Trust will be administered by trustees approved by the Bankruptcy Court (the "Plan Trustees").

41.     The transactions to be consummated in connection with the transfer of the Equity Interests in Mirant and the Trading Debtors to the Plan Trust as set forth in the Plan are in the best interests of the Debtors, their Estates and all other parties in interest, including all creditors and equity holders, meet the requirements of the Bankruptcy Code and Bankruptcy Rules and should be approved.

**O.     Releases, Exculpations and Injunctions**

42.     The Plan provides for various releases, exculpations and injunctions pursuant to Sections 6.3, 8.4, 8.16, 9.3(c), 13.3, 14.4, 14.6, 17.2, 17.4, 17.5 and 17.20 thereof.

43.     The releases, exculpations and injunctions, as modified and limited by the Confirmation Order, provided in the Plan (a) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (b) are integral elements of the transactions incorporated into the Plan; (c) confer material benefit on, and are in the best interests of, the Debtors, their Estates and their creditors; (d) are important to the overall objectives of the Plan to finally resolve all Claims among or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization; (e) to the extent they impact the Causes of Action against non-Debtors, only do so to the extent such Causes of Action are inextricably interwoven with Causes of Action against the Debtors; and (f) are consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

44.     The Protected Persons pursuant to section 8.16 of the Plan are identified in the "Submission of Schedule of Protected Persons Pursuant to Section 8.16 of the Plan," that was filed with the Bankruptcy Court on November 28, 2005 [Docket No. 12340] and amended on November 30, 2005 [Docket No. 12399].

**P.     MAG Long-term Notes**

45.     The MAG Long-term Notes are unimpaired under the Plan and the treatment of the MAG Debtor Class 6 – MAG Long-term Note Claims satisfies all of the requirements of reinstatement pursuant to section 1124 of the Bankruptcy Code. All existing defaults under the MAG Long-term Notes are cured under the Plan (other than defaults that do not need to be cured pursuant to section 365(b)(2) of the Bankruptcy Code) and the transactions contemplated by the Plan do not cause any default under the MAG Indenture in respect of the MAG Long-term Notes (after giving effect to the New MAG Debt Covenants).

46.     In various pleadings filed with the Bankruptcy Court, the Indenture Trustee under the MAG Indenture, the MAG Committee, and the MAG Ad Hoc Committee (collectively, the "MAG Parties") have raised issues relating to whether certain transactions under the September 30th Plan may result in defaults or events of default under the MAG Indenture. In those pleadings, the MAG Parties have also raised issues relating to whether the September 30th Plan fails to cure certain defaults or events of default under the MAG Indenture with respect to the MAG Long-term Notes. In particular, the MAG Parties questioned whether the transactions in the Plan implicated Sections 801 and 802 of the MAG Indenture, thereby triggering potential defaults under Sections 109 and 111 of the supplemental indenture entered into in connection with the MAG Indenture (collectively, the "MAG Supplemental Indentures"), and whether the September 30th Plan may violate certain restrictions on asset disposition set forth in Section 110 of the MAG Supplemental Indentures. By Order dated May 24, 2005, [Docket No. 9880] the Bankruptcy Court, addressing the issues raised in the above-referenced pleadings, determined that certain aspects of the September 30th Plan do not result in impairment of the claims of the holders of the MAG Long-term Notes under section 1124 of the Bankruptcy Code. The

Bankruptcy Court expressly withheld ruling on whether certain other aspects of the Plan result in impairment of the claims of the holders of the MAG Long-term Notes under section 1124 of the Bankruptcy Code. The Bankruptcy Court now finds and concludes that any issues previously raised by the MAG Parties contesting the unimpaired status of the MAG Long-term Notes are without merit and should, to the extent not otherwise resolved, be overruled.

47.     The New MAG Debt Covenants are provided for the benefit of the holders of the MAG Long-term Notes (the "MAG Long-term Noteholders"), and the Debtors and the Indenture Trustee for the MAG Indenture (the "MAG Indenture Trustee") are authorized to enter into a supplemental indenture to effectuate the New MAG Debt Covenants without the solicitation or consent of the MAG Long-term Noteholders. The Debtors' obligations under the MAG Indenture, including their obligations to indemnify and hold harmless the MAG Indenture Trustee, will survive the confirmation and effectiveness of the Plan.

48.     In addition, the settlement and compromise set forth in Section 8.19 of the Plan is fair, equitable and in the best interests of the Debtors, their Estates and all other parties in interest, including all creditors and equity holders.

**Q.     The California Settlement**

49.     The California Settlement was approved by the Bankruptcy Court by order dated April 15, 2005 [Docket No. 9332] and became effective that same day. The California Settlement was incorporated into the Plan.

50.     The order approving the California Settlement (the "California Settlement Order") authorized the transfer of the CC8 Assets to PG&E pursuant to certain "General Principles" set forth in the California Settlement Agreement. After the entry of the California Settlement Order, Mirant Delta, LLC ("Mirant Delta"), Mirant Special Procurement, Inc. ("Special Procurement"),

and PG&E executed a definitive agreement to transfer the CC8 Assets (the "CC8 Transfer Agreement"). The CC8 Transfer Agreement was filed with the Bankruptcy Court on November 29, 2005. The CC8 Transfer Agreement is consistent with the General Principles set forth in the California Settlement Agreement; that Mirant Delta and Special Procurement were authorized to execute, deliver and perform under the CC8 Transfer Agreement pursuant to the California Settlement Order; and that such approval is ratified and confirmed in all respects.

**R.    Prepetition Employee Obligation Settlement**

51.    The Prepetition Employee Obligation Settlement provided for in Section 15.2 of the Plan is fair and equitable and in the best interests of the Debtors, their Estates and all other parties in interest, including all creditors and equity holders. Such settlement meets the applicable standards of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved.

**S.    Settlement of Subordinated Note Claims**

52.    The settlement of the rights of holders of Subordinated Note Claims provided for in Section 15.4 of the Plan is fair and equitable and in the best interests of the Debtors, their Estates and all other parties in interest, including all creditors and equity holders. Such settlement meets the applicable standards of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved.

**T.    Debtors Excluded From the Plan**

53.    In accordance with Sections 15.3(c), 17.3 and 17.26 of the Plan, the Plan excludes the New York Debtors, Hudson Valley and Mirant NY-Gen, and the Confirmation Hearing will be adjourned with respect to these Debtors and may be reset subject to further order of the Bankruptcy Court.

## U.    Executory Contracts and Unexpired Leases

54.    The Debtors have exercised reasonable business judgment in determining whether to reject, assume or assume and assign each of their executory contracts and unexpired leases under the terms of the Plan and the Confirmation Order. Each pre- or post-confirmation rejection, assumption or assumption and assignment of an executory contract or unexpired lease pursuant to Article XIV of the Plan will be legal, valid and binding upon the applicable Debtor, New Mirant and all non-Debtor parties to such executory contract or unexpired lease, as applicable, all to the same extent as if such rejection, assumption, or assumption and assignment had been effectuated pursuant to an appropriate order of the Bankruptcy Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the executory contracts and unexpired leases to be rejected, assumed or assumed and assigned is deemed to be an executory contract or an unexpired lease, as applicable.

55.    The Plan constitutes a motion to reject all of the Debtors' executory contracts and unexpired leases, except as otherwise provided in Section 14.1 of the Plan, and as set forth in the Confirmation Order. Each executory contract or unexpired lease to be rejected pursuant to the Plan is burdensome and the rejection thereof is in the best interests of the Estates.

56.    The Plan constitutes a motion to assume or assume and assign the executory contracts and unexpired leases of the Debtors that are designated to be assumed or assumed and assigned as set forth on Schedule 12 of the Disclosure Statement (as amended) or the Assumption Schedule to the Disclosure Statement, or otherwise designated for assumption or assumption and assignment pursuant to Section 14.1(a) of the Plan (the "Assumed and Assigned Contracts"). Except as otherwise provided in a separate order of the Bankruptcy Court, any non-Debtor party to an Assumed and Assigned Contract was required to object to such assumption

and assignment or to the cure amounts proposed by the Debtors in connection therewith by no later than ten (10) days prior to the Confirmation Hearing.

57. Upon the entry of the Confirmation Order, (a) all of the requirements of sections 365(b) and (f) will have been satisfied with respect to each Assumed and Assigned Contract for which no timely objection was filed; (b) all rights to object to the assumption or assumption and assignment of any such Assumed and Assigned Contract will have been waived; (c) except as the Bankruptcy Court may hereafter determine is necessary and appropriate to effect the purpose of the Bankruptcy Code and equity, all rights to object to the cure amounts with respect to any such Assumed and Assigned Contracts will have been waived; and (d) the assumption or assumption and assignment of such Assumed and Assigned Contracts will have been approved.

58. Any objections filed with respect to an Assumed and Assigned Contract will be resolved as set forth in Article XIV of the Plan.

59. If the reasonable consent of any counterparty to an executory contract of the Trading Debtors is required in connection with the transfer of such contract to MET under the Plan, (a) the refusal to grant such consent is *per se* unreasonable and (b) such consent will be and is deemed to have been given.

**V. MIRMA**

60. On or about October 4, 2005, the holders of those certain pass through trust certificates issued in respect of the MIRMA Leases (the "Certificate Holders") were served with the Notice of Solicitation of Votes and Confirmation Hearing in connection with the Plan. On November 23, 2005, the Debtors (a) filed (i) that certain Notice Regarding Treatment of MIRMA Leases In Connection with Second Amended Joint Chapter 11 Plan of Reorganization (the "MIRMA Notice") and (ii) a Term Sheet with an Exhibit One and an Exhibit Three, which

together with the subsequently filed Exhibit Two to the Term Sheet and the subsequently filed

Schedule A to Exhibit One set forth proposed alternative consensual treatment for the MIRMA

Leases more favorable to the non-Debtor parties to the MIRMA Leases than the proposed

consensual treatment of such parties contained in Section 14.6(e) of the Plan (the "Proposed

Alternative MIRMA Treatment") and (b) issued a press release containing the terms and

conditions of the MIRMA Notice and Proposed Alternative Plan Treatment.  On November 25,

2005, MIRMA filed a Form 8-K with the Securities and Exchange Commission, attaching the

press release and the MIRMA Notice, and directed the Depository Trust Company to provide the

MIRMA Notice to the Certificate Holders by overnight courier or other expedited means.  On

November 29 and 30, 2005, the Debtors filed and served, including to the Certificate Holders,

Exhibit Two and Schedule A of the Term Sheet, respectively.  No objection by a Certificate

Holder has been timely filed or received.  Such notice as set forth in this paragraph constitutes

adequate and sufficient notice to all persons of the Proposed Alternative MIRMA Treatment, as

modified hereby and as otherwise set forth herein as the "MIRMA Treatment," and no other or

further notice of the assumption of the MIRMA Leases by MIRMA in accordance with the

MIRMA Treatment and pursuant to section 365 of the Bankruptcy Code is necessary.

      61.    Each of the MIRMA Owner/Lessors consents to the MIRMA Treatment and has

withdrawn its objection to the Plan.  Neither the MIRMA Indenture Trustee nor the Pass

Through Trustee (as defined in the MIRMA Leases) opposes or otherwise objects to the MIRMA

Treatment and each has withdrawn its objection to the Plan.

      62.    Each of the MIRMA Dickerson Leases and MIRMA Morgantown Leases

constitutes a single integrated transaction.

63.     The Debtors assert, and each of the MIRMA Owner/Lessors agrees and each of the MIRMA Indenture Trustee and the Pass Through Trustee (as defined in the MIRMA Leases) does not contest and no other parties contest, and the Bankruptcy Court hereby finds and concludes that the contractual provisions referenced on Exhibit One of the MIRMA Treatment (as defined in the Confirmation Order) are unclear and ambiguous and require interpretation and clarification in connection with assumption and cure of the MIRMA Leases.  The Bankruptcy Court has jurisdiction to make such interpretations and clarifications under 28 U.S.C. §§ 157 and 1334.  *In re Stonebridge Techs , Inc.,* 2005 WL 2982311 (5th Cir. Nov. 8, 2005) (not yet published in Federal Reporter) and cases cited therein.

64.     The Debtors assert, and each of the MIRMA Owner/Lessors agrees and each of the MIRMA Indenture Trustee and the Pass Through Trustee does not contest and no other parties contest, and the Bankruptcy Court hereby finds and concludes that the interpretation of each contractual provision as set forth in Section A of Exhibit One of the MIRMA Treatment is consistent with the intent of the Operative Documents (as defined in the MIRMA Leases), represents the most reasonable interpretation of such provision in light of the circumstances and is the correct construction of such provision.

65.     Each of the Debtors, the MIRMA Owner/Lessors, and the MIRMA Indenture Trustee and the Pass Through Trustee do not contest and no other parties contest, and the Bankruptcy Court hereby finds and concludes that the MIRMA Indenture Trustee's allocation and disbursement of rents among Lessor Notes (as defined in the MIRMA Lease) during the pendency of the chapter 11 proceeding, which results in each Lessor Note diverging from its original payment schedules, was consistent with the Operative Documents and was not a violation of any provision of the Bankruptcy Code.

66.    Each of the Debtors, and the MIRMA Owner/Lessors agree and the MIRMA Indenture Trustee and the Pass Through Trustee do not contest and no other parties contest, and the Bankruptcy Court hereby finds and concludes that the methodology for the restoration of the payment schedule of the Lessor Notes as set forth in Schedule A to Exhibit One to the MIRMA Treatment is consistent with the Operative Documents, the most reasonable interpretation of the Lease Indenture (as defined in the MIRMA Leases) with respect to the issue of the restoration of such payment schedule, is fair to each holder of the Lessor Notes and the Certificate Holders and is the correct interpretation of the Operative Documents. *Mirma Owner/Lessors and [initials]*

67.    The Debtors assert and each of the MIRMA Indenture Trustee and Pass Through Trustee does not contest and the Court finds and concludes that the merger of MIRMA into Second Tier MAG Holdco, whereby MIRMA will be the surviving entity pursuant to Section 8.2(e)(iii) of the Plan, is consistent with the provisions of the Operative Documents.

68.    The findings and conclusions set forth herein, including but not limited to the payment schedules set forth in Schedule A to Exhibit One to the MIRMA Treatment, reflect this Court's construction and application of the original terms of the MIRMA Leases and of the other Operative Documents, as such terms are applied automatically without the consent or election of any party thereto, and no such construction or application constitutes an amendment or alteration of any of the terms of the MIRMA Leases or of any of the other Operative Documents.  No action taken by the Bankruptcy Court, MIRMA or any other parties to the Operative Documents in connection with or during the MIRMA chapter 11 case (including, without limitation, the assumption by MIRMA of the MIRMA Leases) results in a substantial modification of any of the MIRMA Leases or any other Operative Document.

69.     No action taken by the Bankruptcy Court, MIRMA or any other parties to the Operative Documents in connection with or during the MIRMA chapter 11 cases or the assumption by MIRMA of the MIRMA Leases, including the restoration of the original payment schedules to the Lessor Notes as set forth herein results in any modification of Periodic Lease Rent or any other amounts set forth in Schedules 1-1, 1-2 or 1-3 of the MIRMA Leases relating to Periodic Lease Rent, Allocation of Periodic Lease Rent and Proportional Rent, respectively, each as defined in the MIRMA Leases.

**W.     Sale of Mint Farm**

70.     Mint Farm has initiated the process of selling its generating plant (and related assets). On October 19, 2005, the Bankruptcy Court entered an order approving the sale of the Mint Farm facility and related assets located primarily in Longview, Washington to Mint Farm Energy Center LLC (the "Mint Farm Sale Order"), but the sale has not yet been consummated. As part of the sale, Mint Farm expects that the purchaser, Mint Farm Energy Center LLC, will request that Mint Farm assume and assign certain executory contracts (and/or unexpired leases) to it (or its designee), which are beneficial and necessary to operate the generating plant on a going forward basis.

71.     To preserve the ability of the Debtors to maximize the value of the sale of the Mint Farm generating plant, it is justified to extend the time within which the Debtors may reject, assume or assume and assign their executory contracts and unexpired leases that are associated with the Mint Farm generating plant other than the Agreement for Natural Gas Services in the State of Washington, dated February 28, 2001 between Cascade Natural Gas Corporation and Mint Farm, which is governed by the Bankruptcy Court's Order entered November 22, 2005 [Docket No. 12270].

## X.    Bankruptcy Rule 3020(e)

72.    Good cause exists for shortening the stay of the Confirmation Order set forth in Bankruptcy Rule 3020(e). In particular, the Plan represents a fair and equitable compromise by and among the major parties in interest and should be consummated as expeditiously as possible. If the stay is not shortened, the ability of the Debtors to consummate the Exit Financing may be materially delayed, adding undue risk to consummation and increased costs to the Estates.

## Y.    Plan Documents

73.    The Plan Documents, as they may be amended as contemplated and permitted by the Plan, are, in the judgment of the parties, necessary and appropriate to effectuate the Plan and the Bankruptcy Court so finds.

## Z.    Certain Tax Consequences Under the Plan

74.    The resolution of all intercompany accounts among the Debtors, as called for by the Plan, and as reflected in the "Mirant Restructuring Plan – Transaction Steps," attached as Exhibit B hereto, will occur prior to, and independent from, the remainder of the transaction steps and will be so treated under the Internal Revenue Code.

75.    The resolution of Mirant's intercompany payable to MAI will occur prior to, and independent from, Mirant's contribution of Mirant Peaker and Mirant Potomac to MAI, and therefore, Mirant's contribution of its ownership interests in (a) Mirant Peaker to MIRMA and (b) Mirant Potomac to Mirant Chalk Point pursuant to the Plan will be treated as a tax-free contribution of property to the capital of MAI.

76.    Under the Plan, as proposed and confirmed, the Debtors will be restructured pursuant to the Fresh Structure Transactions.

77. Taking into account all of the liabilities of Mirant California Investments, Inc. ("MCII") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, at the time it converts into a limited liability company, the fair market value of the properties of MCII will exceed the amount of its liabilities.

78. Taking into account all of the liabilities of Mirant Texas Investments, Inc. ("MTII") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MTII that will be transferred to New MAG Holdco upon the merger of MTII with and into New MAG Holdco will exceed the sum of the amount of the liabilities of MTII that are assumed by New MAG Holdco in connection with the exchange and the amount of money and the fair market value of any other property (other than New MAG Holdco stock) received by MTII in connection with the exchange.

79. Taking into account all of the liabilities of Mirant Texas Management, Inc. ("MTMI") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MTMI that will be transferred to Mirant Texas Management, LLC ("MTMLC") which is owned by New MAG Holdco, upon the merger of MTMI with MTMLC, will exceed the sum of the amount of the liabilities of MTMI that are assumed by MTMLC in connection with the exchange and the amount of money and the fair market value of any other property (other than New MAG Holdco stock) received by MTMI in connection with the exchange.

80. Taking into account all of the liabilities of Mirant New England, Inc. ("MNE") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MNE that will be transferred to New MAG Holdco upon the merger of MNE with and into New MAG Holdco will exceed the sum of the amount of the liabilities of

MNE that are assumed by New MAG Holdco in connection with the exchange and the amount of money and the fair market value of any other property (other than New MAG Holdco stock) received by MNE in connection with the exchange.

81. Taking into account all of the liabilities of Mirant Sugar Creek Ventures, Inc. ("MSCVI") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MSCVI that will be transferred to MAI upon the merger of MSCVI with and into MAI will exceed the sum of the amount of the liabilities of MSCVI that are assumed by MAI in connection with the exchange and the amount of money and the fair market value of any other property (other than MAI stock) received by MSCVI in connection with the exchange.

82. Taking into account all of the liabilities of Mirant Sugar Creek Holdings, Inc. ("MSCHI") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MSCHI that will be transferred to MAI upon the merger of MSCHI with and into MAI will exceed the sum of the amount of the liabilities of MSCHI that are assumed by MAI in connection with the exchange and the amount of money and the fair market value of any other property (other than MAI stock) received by MSCHI in connection with the exchange.

83. Taking into account all of the liabilities of Mirant Wichita Falls Investment, Inc. ("MWFLP") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, at the time it converts into a limited liability company, the fair market value of the properties of MWFLP will exceed the amount of its liabilities.

84. Taking into account all of the liabilities of Mirant Wichita Falls Management, Inc. ("MWFMP") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, at the

time it converts into a limited liability company, the fair market value of the properties of MWFMP will exceed the amount of its liabilities.

85. Taking into account all of the liabilities of Mirant Michigan Investments, Inc. ("MMI") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, the fair market value of the property of MMI that will be transferred to MAI upon the merger of MMI with and into MAI will exceed the sum of the amount of the liabilities of MMI that are assumed by MAI in connection with the exchange and the amount of money and the fair market value of any other property (other than MAI stock) received by MMI in connection with the exchange.

86. Taking into account all of the liabilities of Mirant Holdings Europe UK, Inc. ("MHEUK") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, at the time it converts into a limited liability company, the fair market value of the properties of MHEUK will exceed the amount of its liabilities.

87. Taking into account all of the liabilities of Mirant Investments Europe UK, Inc. ("MIEUK") other than those that are resolved, forgiven, or satisfied pursuant to the Plan, at the time it converts into a limited liability company, the fair market value of the properties of MIEUK will exceed the amount of its liabilities.

88. Pursuant to the Plan, Mirant will transfer to New Mirant more than 50 percent of the fair market value of the gross assets held by Mirant immediately prior to the transfer and more than 70 percent of the fair market value of the operating assets held by Mirant immediately prior to the transfer and, therefore, upon such transfer New Mirant will acquire "substantially all of the assets" of Mirant within the meaning of Section 354(b)(1)(A) of the Internal Revenue Code. For this purpose, gross assets are all of Mirant's assets, and operating assets are all of

Mirant's gross assets other than: (i) cash; (ii) accounts receivable; (iii) investment assets; and (iv) assets held for sale.

89. Giving effect to the cancellation of indebtedness occurring pursuant to the Plan, the fair market value of the property to be transferred by Mirant to New Mirant will exceed the sum of the amount of the liabilities of Mirant that are assumed by New Mirant in connection with the exchange and the amount of money and the fair market value of any other property (other than New Mirant Common Stock) received by Mirant in connection with the exchange.

90. The principal purpose of the Plan, as proposed and confirmed, and of each transaction step described in the "Mirant Restructuring Plan – Transaction Steps," is not the avoidance or evasion of Federal income tax within the meaning of Section 269 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and the Plan therefore complies with section 1129(d) of the Bankruptcy Code.

91. The conversion of Mirant into a limited liability company following the Effective Date is an integral and necessary part of the Plan.

92. New Mirant has been formed to serve as the corporate parent of the Debtors' business enterprise on and after the Effective Date for the business purpose of avoiding any successor liability for any unassumed obligations of Mirant and, therefore, the validity of such business purpose will be respected under the Internal Revenue Code.

93. Upon the Effective Date, no shareholder of Mirant will own more than five percent of New Mirant's outstanding stock, and there will be no "5-percent shareholder" of New Mirant within the meaning of the Treasury Regulations Section 1.382-27(g). Accordingly, the factual requirements necessary to qualify under Section 382(1)(5) of the Internal Revenue Code are met and Section 382(1)(5) of the Internal Revenue Code will apply. Unless the Debtors elect

not to have Section 382(1)(5) of the Internal Revenue Code apply, as a result of the application of Section 382(1)(5) of the Internal Revenue Code, the net operating loss limitations of Section 382(a) of the Internal Revenue Code will not apply to any ownership change resulting under the Plan.

94.     New Mirant Common Stock that is received by creditors of the MAG Debtors for unsecured claims against any of the MAG Debtors pursuant to the Plan will be issued directly from MAG to such creditors after such stock is contributed by New Mirant to MAI and from MAI to MAG.

**AA.    The Plan Complies with Section 1129 of the Bankruptcy Code**

95.     To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993), *cert. denied,* 510 U.S. 992 (1993); *In re MCorp Fin , Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992); *In re Arnold*, 80 B.R. 806, 807 (Bankr. M.D. La. 1987); *see also In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003), *aff'd,* 2004 WL 720263 (S.D. Tex. Mar. 3, 2004); *In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994); 7 *Collier On Bankruptcy* ¶ 1129.02[4], at 1129-22 (15th rev. ed. 2005).

96.     As demonstrated by the Record, the Plan complies with all relevant sections of the Bankruptcy Code, Bankruptcy Rules and applicable non-bankruptcy law relating to the confirmation of the Plan. In particular, the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code.

97.     The Debtors have satisfied section 1121 of the Bankruptcy Code in that the

Debtors have standing to file a plan.

**BB.     The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code**

98.     Pursuant to section 1129(a)(1) of the Bankruptcy Code, a plan of reorganization

must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. §

1129(a)(1). The legislative history of section 1129(a)(1) of the Bankruptcy Code indicates that a

principal objective of this provision is to assure compliance with the sections of the Bankruptcy

Code governing classification of claims and interests and the contents of a plan of

reorganization. S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see*

*also J T Thorpe*, 308 B.R. at 785; *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex.

1991). As demonstrated below and in the findings contained herein, the Plan complies fully with

the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as the other

applicable provisions of the Bankruptcy Code.

99.     Under section 1122 of the Bankruptcy Code, a plan may provide for multiple

classes of claims or interests so long as each claim or interest within a class is substantially

similar to other claims or interests in that class. Significantly, a plan proponent is afforded

significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code

provided there is a reasonable basis for the classification scheme and all claims within a

particular class are substantially similar. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint*

*Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991), *cert. denied*,

506 U.S. 821 (1992); *Aetna Cas  & Sur  Co. v. Clerk, Bankr  S.D N.Y. (In re Chateaugay Corp.)*,

89 F.3d 942, 949 (2d Cir. 1996); *In re Simmons*, 288 B.R. 737, 743 n.11 (Bankr. N.D. Tex.

2003); *In re Sentry Operating Co. of Tex., Inc* , 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001); *In re*

*Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *In re Eagle*

*Bus Mfg., Inc* , 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd,* 158 B.R. 421 (S.D. Tex. 1993).

100.     Section 1122 of the Bankruptcy Code does not require that all substantially

similar claims be placed in the same class. *In re Meadow Glen, Ltd.*, 87 B.R. 421, 424 (Bankr.

W.D. Tex. 1988). Decisions interpreting section 1122(a) generally uphold separate classification

of different groups of unsecured claims when a reasonable basis exists for the classification. *See*

*Greystone III,* 995 F.2d at 1278; *see also Sentry Operating,* 264 B.R. at 860; *7 Collier on*

*Bankruptcy* ¶ 1122.03[4][a], at 1122-11 (15th rev. ed. 2005). The Bankruptcy Code only

prohibits the identical classification of dissimilar claims and does not require the same

classification for claims sharing some attributes. *See Chateaugay,* 155 B.R. at 630; *In re 499 W.*

*Warren St Assocs., Ltd. P'ship,* 151 B.R. 307, 312 (Bankr. N.D.N.Y. 1992). Classification of

substantially similar claims in different classes is permitted for purposes of reorganization only

and for reasons independent of debtor's motivation to secure the vote of an impaired, assenting

class of claims; similar claims may not be classified differently to gerrymander affirmative votes

on the reorganization plan. *Greystone III,* 995 F.2d at 1278-79.

101.     The Plan's classifications, including the separate classification of the MAG

Debtor Class 6 - MAG Long-term Note Claims, conform to the statute and separately classify

claims based on valid business and legal reasons. The Debtors' classification has a rational basis

because it is based on the respective legal rights of each holder of a Claim against or Equity

Interest in the applicable Debtor's Estate and was not proposed to create a consenting impaired

class and, thereby, manipulate class voting.

102.     Every chapter 11 plan must comply with the requirements set forth in section

1123(a) of the Bankruptcy Code. The Plan complies fully with each such requirement: