**EXHIBIT A**

**GLOSSARY OF DEFINED TERMS**

**EXHIBIT "A"**

**GLOSSARY OF DEFINED TERMS**

1.     "Administrative Claim" means a Claim incurred by a Debtor (or its Estate) on or after the Petition Date and before the Effective Date for a cost or expense of administration in the Chapter 11 Cases entitled to priority under sections 503(b) and 507(a)(1) of the Bankruptcy Code, <u>including</u>, without limitation, Fee Claims and DIP Claims.

2.     "Affiliate" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

3.     "Allowed," when used

        (a)     with respect to any Claim, <u>except</u> for a Claim that is an Administrative Claim or a Letter of Credit Claim, means such Claim to the extent it is not a Contested Claim or a Disallowed Claim;

        (b)     with respect to an Administrative Claim, means such Administrative Claim to the extent it has become fixed in amount and priority pursuant to the procedures set forth in Section 6.2(c) of this Plan;

        (c)     with respect to a Letter of Credit Claim, means such Letter of Credit Claim to the extent Mirant's reimbursement obligation to the holder of the Letter of Credit Claim has become noncontingent and fixed as a result of a draw on the underlying letter of credit by the counterparty thereto; and

        (d)     with respect to Equity Interests in any Debtor, means (i) the Equity Interests in any Debtor (<u>except</u> Mirant) as reflected in the stock transfer ledger or similar register of such Debtor as of the Effective Date; and (ii) with respect to Mirant, the issued and outstanding shares of common stock in Mirant as reflected in stock transfer ledger as of the Effective Date.

4.     "APSA" means the Asset Purchase and Sale Agreement, dated June 7, 2000, by and between Mirant and Pepco, as amended from time to time, together with all schedules and ancillary agreements as determined by Final Order to constitute non-severable components thereto.

5.     "Assets" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

6.     "Assumption/Assignment Agreement" means, collectively, (i) that certain Assignment and Assumption Agreement, dated December 19, 2000, by and among Pepco and certain of the Debtors (other than Mirant); (ii) that certain PPA and TPA Assignment and Assumption Agreement, dated December 18, 2000, between Mirant and MAEM; and (iii) that certain Assignment and Assumption Agreement, dated December 11, 2000, by and between certain of the Debtors pursuant to which, among other things, Mirant assigned rights to purchase specific Assets to other Debtors.

7.    "Avoidance Actions" means all Causes of Action of the Estates that arise under chapter 5 of the Bankruptcy Code.

8.    "Back-to-Back Agreement" means that certain letter agreement and any and all obligations of any Debtor or Affiliate of the Debtors arising thereunder between Pepco and Southern Energy, Inc. (as predecessor in interest to Mirant), dated as of December 19, 2000 (as amended and modified from time to time,) which was executed contemporaneously with Mirant's purchase of generating assets and power purchase agreements from Pepco under the APSA, pursuant to which Mirant agreed to: (a) make Pepco whole for its financial obligations under certain unassigned power purchase agreements between Pepco and (i) Panda-Brandywine LP, and (ii) Ohio Edison Co., (b) accept from Pepco power delivered pursuant to those unassigned power purchase agreements, and (c) be Pepco's representative "for all purposes to the fullest extent permitted under the unassigned power purchase agreements."

9.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

10.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or such other court having jurisdiction over the Chapter 11 Cases.

11.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

12.    "Bar Date Notice" means the applicable Notice of Bar Dates for Filing Proofs of Claim Against a Debtor, as approved by Order of the Bankruptcy Court.

13.    "BEWAG Contract" means the Share Purchase Agreement dated January 31, 2002 by and between Mirant Investments Germany, Inc., Mirant Holdings Germany, Inc., Vattenfall AB (publ.), Hamburgische Electricitäts-Werke Aktiengesellschaft, Mirant Holdings Beteiligungsgesellschaft mbH and Mirant.

14.    "BEWAG Counterparties" means Hamburgische Electricitats-Werke Aktiengesellschaft, Vattenfall AB, Mirant Holdings Germany GmbH, Mirant Holdings Beteiligungsgesellschaft mbH and or any successor entities thereto.

15.    "Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

16.    "CAISO" means the California Independent System Operator.

17.    "California Parties" means PG&E, Southern California Edison Company, San Diego Gas and Electric Company, the California Public Utilities Commission, the California Department of Water Resources, the California Electricity Oversight Board, and the Attorney General of the State of California.

18.    "California Party Unsecured Claims" means the Unsecured Claims to be granted to the California Parties against MAEM pursuant to the California Settlement, which shall be (a) the

2

Allowed Unsecured Claims of the California Parties in the aggregate amount of $175,000,000, (b) the Allowed Unsecured Claim of the California Department of Water Resources in the amount of $2,250,000, and (c) the Allowed Unsecured Claim of the Attorney General of the State of Oregon in the amount of $250,000.

19. "California Settlement" means the global settlement between and among the California Parties and certain of the Debtors, as set forth and evidenced by the California Settlement Agreement and as approved by Final Order, entered on April 15, 2005.

20. "California Settlement Agreement" means the agreement dated as of January 14, 2005, by and between certain of the Debtors and the California Parties."

21. "Carved-Out Receivables" means the following accounts receivable together with any proceeds therefrom:

       (1)     Enron Receivables;
       (2)     City of Vernon Receivable;
       (3)     Coyote Springs Receivables; and
       (4)     Metromedia Receivable.

22. "Cash" means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

23. "Causes of Action" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

24. "Chapter 11 Cases" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Mirant Corporation, et al.*, Chapter 11 Case No. 03-46590 (DML), Jointly Administered.

25. "Charging Lien" means any lien or other priority in payment arising prior to the Effective Date pursuant to which the Old Indenture Trustees (including any paying agents for such Old Indenture Trustees) are each entitled, pursuant to the respective Old Indentures, against distributions to be made to holders of Mirant Note Claims and MAG Short-term Note Claims.

26. "City of Vernon Receivable" means the amount owed to MAEM by the City of Vernon pursuant to the judgment entered by the Bankruptcy Court in the adversary no. 03-04440, as such judgment may be amended or modified on appeal or remand affirmed by the United States District Court for the Northern District of Texas by final judgment on May 17, 2005.

27. "Claim" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right

3

to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

28.     "Claims Agent" means the entity designated by order of the Bankruptcy Court to process proofs of claim.

29.     "Committees" means, collectively, the Corp Committee, the Equity Committee and the MAG Committee.

30.     "Commodity Prepay Facility" means (a) the ISDA Master Agreement dated October 11, 2001, between MAEM and HVB Risk Management Products Inc., and (b) the ISDA Master Agreement dated October 11, 2001, between MAEM and Scarlett Resource Merchants LLC, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

31.     "Commodity Prepay Facility Claims" means all Claims arising under the Commodity Prepay Facility and any guaranty thereof issued by any Mirant Debtor, including the Commodity Prepay Guaranty.

32.     "Commodity Prepay Guaranty" means the guaranties, dated October 11, 2001, in favor of each of HVB Risk Management Products Inc. and Scarlett Resource Merchants LLC, pursuant to which Mirant guaranteed MAEM's obligations under the Commodity Prepay Facility and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

33.     "Confirmation Date" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

34.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan.

35.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

36.     "Contested" (a) when used with respect to a Claim, means such Claim (i) to the extent it is listed in the Schedules as disputed, contingent, or unliquidated, in whole or in part, and as to which no proof of claim has been filed; (ii) if it is listed in the Schedules as undisputed, liquidated, and not contingent and as to which a proof of claim has been filed with the Bankruptcy Court, to the extent (A) the proof of claim amount exceeds the amount indicated in the Schedules, or (B) the proof of claim priority differs from the priority set forth in the Schedules, in each case as to which an objection was filed on or before the Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court; (iii) if it is not listed in the Schedules or was listed in the Schedules as disputed, contingent or unliquidated, in whole or in part, but as to which a proof of claim has been filed with the Bankruptcy Court, in each case as to which an objection was filed on or before the Objection Deadline, unless and to the extent allowed in amount and/or priority by a Final Order of the Bankruptcy Court; or (iv) as to which an objection has been filed on or before the Effective Date; provided, that a Claim that is fixed in amount and priority pursuant to the Plan or by Final Order on or before the Effective Date shall not be a Contested Claim; and (b) when used

4

with respect to an Equity Interest, means such Equity Interest to the extent it is not reflected on the applicable Debtor's stock transfer register as of the Effective Date.

37.     "Convenience Claims" means (a) in the case of the Mirant Debtors, any Unsecured Claim, other than a Mirant Debt Claim, a Subordinated Note Claim, or a Claim of a current or former director, manager, officer or employee of a Debtor in an amount equal to or less than $25,000; provided, that the Debtors reserve the right to increase the cap amount in consultation with the Corp Committee up to an amount not in excess of $140,000 with respect to Mirant Peaker, Mirant Potomac, Mirant Zeeland, Mirant Las Vegas, Mirant Sugar Creek, LLC, Mirant Wichita Falls, LP, Mirant Wyandotte, and Shady Hills Power Company, LLC, and (b) in the case of the MAG Debtors, any Unsecured Claim, other than a MAG Short-term Debt Claim, or a Claim of a current or former director, manager, officer or employee of a Debtor, in an amount equal to or less than $25,000.

38.     "Corp Committee" means the Official Committee of Unsecured Creditors of Mirant Corporation.

39.     "Coyote Springs Receivables" means the amounts payable to Mirant Oregon under (A) its rights, claims and actions as member of CS2, LLC against Enron Corporation, National Energy Production Company, or their respective sureties, insurers or guarantors related to certain agreements for the construction of the electric generating plant located in Boardman, Oregon and (B) its rights, claims and actions as a member of CS2, LLC, with respect to rights, claims and actions against Alstom USA, Inc., Alstom T&D, Inc. or their respective sureties, insurers or guarantors related to a certain generator step-up transformer.

40.     "Debtor" means any of Mirant, and its direct and indirect subsidiaries that are debtors in the Chapter 11 Cases as identified on Schedule 2 to the Disclosure Statement.

41.     "Debtor Group" means the Mirant Debtors or the MAG Debtors, as applicable.

42.     "Debtor-in-Possession" means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

43.     "Designated Avoidance Actions" means the Southern Company Causes of Action and other Avoidance Actions that have either been commenced or are potential Avoidance Actions, as identified in Schedule 8 of the Disclosure Statement or as supplemented by the Confirmation Order.

44.     "Designated Net Litigation Distributions" means the Cash recoveries obtained in respect of the Designated Avoidance Actions net of any offsets and after the payment or reimbursement of all fees and expenses incurred in connection with such Avoidance Actions.

45.     "Deutsche Bank" means Deutsche Bank, AG, New York Branch.

46.     "Dickerson Power Station" means the coal-fired plan, which consists of three 182 MW coal-fired units and is located on approximately 779 acres of land in Montgomery County, Maryland.

MIAMI 623421 v4 (2K)

47.    "DIP Agent" means General Electric Capital Corporation as agent for the DIP Lenders under the DIP Credit Agreement.

48.    "DIP Claims" means the Claims of the DIP Lenders under the DIP Credit Agreement and the DIP Order.

49.    "DIP Credit Agreement" means the credit agreement entered into on November 5, 2003 by the Debtors that are parties thereto, as borrowers; the DIP Agent; GECC Capital Markets, Inc., as lead arranger; and the DIP Lenders, pursuant to which the Debtors are permitted to make borrowings prior to the earlier of the Effective Date or November 5, 2005, as approved by the DIP Order, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

50.    "DIP Lenders" means the lenders under the DIP Credit Agreement.

51.    "DIP Order" means, collectively, the order(s) of the Bankruptcy Court approving the DIP Credit Agreement, authorizing the Debtors that are parties thereto to enter into the DIP Credit Agreement, granting certain rights, protections and liens to and for the benefit of the DIP Lenders as set forth therein, and authorizing the Debtors to make borrowings under the DIP Credit Agreement.

52.    "Disallowed" when used with respect to a Claim, means a Claim, or such portion of a Claim, that has been disallowed by a Final Order.

53.    "Disbursing Agent" means New Mirant or any agent selected by New Mirant, acting on behalf of the Debtors in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

54.    "Disclosure Statement" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

55.    "Disclosure Statement Order" means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting vote on the Plan.

56.    "Distribution Date" means (a) with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, or (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date, (b) with respect to any Equity Interest, the Effective Date or a date that is as soon as reasonably practicable after the Effective Date and (c) the date of any subsequent distribution as provided in Section 10.15.

57.    "Effective Date" means (i) for Debtors other than the New York Debtors, a date selected by the Debtors which shall be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Section 12.2 have been satisfied or waived (to the extent waivable); and (ii) for the New York Debtors, the New York Debtors Effective Date.

6

58.     "Enron Receivables" means the amount owed to the Debtors and/or their Affiliates, pursuant to the Order, entered by the Bankruptcy Court and dated September 7, 2005, granting the Motion of the Debtors for the Entry of an Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure Approving (i) Settlement Agreement and Mutual Release and (ii) Related Stipulation and Order by and between Mirant Debtors and Related Non-Debtor Entities and Enron Debtors, on account of the claims allowed against Enron Corp. and its Affiliates in the Enron Corp. et al. bankruptcy proceedings.

59.     "Equipment Warehouse Facility" means (a) the Participation Agreement, dated October 22, 2001, among MADCI, as contract agent and lessee, the MC Equipment Revolver Statutory Trust, State Street Bank and Trust Company of Connecticut, National Association, as trustee, the persons named therein as Note Holders and Certificate Holders and Citibank, N.A. as agent, and (b) the Lease Agreement dated October 22, 2001, among MC Equipment Revolver Statutory Trust, as lessor, and MADCI, as lessee, all such documents having a maturity date of April 22, 2009, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

60.     "Equipment Warehouse Facility Claims" means all Claims arising under the Equipment Warehouse Facility and any guaranty thereof issued by any Mirant Debtor, including the Equipment Warehouse Guaranty.

61.     "Equipment Warehouse Guaranty" means the Guaranty in respect of the Equipment Warehouse Facility, dated October 22, 2001, among Mirant and MC Equipment Revolver Statutory Trust, and all related documents, instruments and agreements, as they have been or may be amended or supplemented from time to time.

62.     "Equity Committee" means the Official Committee of Equity Security Holders of Mirant Corporation.

63.     "Equity Interest" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, membership interests and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

64.     "Estate" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

65.     "Exit Facility" means the credit facility pursuant to the Exit Facility Documents.

66.     "Exit Facility Agent" means the agent for the Exit Lenders under the Exit Facility.

67.     "Exit Facility Documents" means the agreements, documents and instruments to be dated on or about the Effective Date and to be entered into between New MAG Holdco, as borrower and certain of its subsidiaries as guarantors, the Exit Facility Agent and the Exit Lenders, in respect of a credit facility for an amount not less than $750,000,000, and all related documents, instruments and agreements entered into or executed in connection therewith, the proceeds of which shall be available for use by New MAG Holdco and its subsidiaries to make Plan

7

Distributions to the holders of certain Allowed Claims against the Debtors and to satisfy general working capital requirements of New MAG Holdco and its direct and indirect subsidiaries on and after the Effective Date. The Exit Facility Documents shall be in substantially the form filed with the Bankruptcy Court by the Effective Date.

68. "Exit Financing" means up to $2,350,000,000 of financing, including the Exit Facility, to be provided pursuant to the certain commitment letter, dated May 13, 2005, as amended from time to time thereafter and approved by the Bankruptcy Court on September 21, 2005.

69. "Exit Lenders" means the lenders under the Exit Facility.

70. "Facility Agents" means the agents under the Mirant "C" Facility, the Mirant 364-Day Facility, the Mirant 4-Year Revolver and the MAG Revolvers, as applicable.

71. "FCC Agreement" means the Facility and Capacity Credit Agreement dated as of March 21, 1989, between Pepco and Southern Maryland Electric Cooperative, Inc.

72. "Federal Judgment Rate" means the rate of interest calculated pursuant to the provisions of 18 U.S.C. §3612, 28 U.S.C. §1961, and 40 U.S.C. §258(e)(1), which shall be equal to the weekly average 1-year constant maturity Treasury yield as of the Petition Date, which was 1.08%.

73. "Fee Application" means an application for allowance and payment of a Fee Claim (including Claims for "substantial contribution" pursuant to section 503(b) of the Bankruptcy Code).

74. "Fee Claim" means a Claim of a Professional Person.

75. "Final Order" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

76. "Implementation Order" means a Final Order, in form and substance satisfactory to the Debtors, which provides the terms and provisions set forth in Section 12.1(i).

77. "Indenture Trustees" means the indenture trustee and any predecessor indenture trustee for each of the Mirant Notes, the MAG Long-term Notes and the MAG Short-term Notes.

78. "Indenture Trustee Fees" means the compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys', agents' (including paying or transfer

8

agents) fees, expenses and disbursements, incurred by the respective Old Indenture Trustees and/or their respective predecessors, whether prior to or after the Petition Date, and whether prior to or after consummation of the Plan.

79.     "Insider" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

80.     "Intellectual Property" shall mean all domestic and foreign patents, patent applications, trademarks, service marks and other indicia of origin, trademark and service mark registrations and applications for registrations thereof, copyrights, copyright registrations and applications for registration thereof, Internet domain names and universal resource locators and the Internet sites corresponding thereto, trade secrets, inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), technical data, customer lists, corporate and business names, trade names, trade dress, brand names, know-how, show-how, maskworks, formulae, methods (whether or not patentable), designs, processes, procedures, technology, source codes, object codes, computer software programs, databases, data collectors and other proprietary information or material of any type, whether written or unwritten (and all good will associated with, and all derivatives, improvements and refinements of, any of the foregoing).

81.     "Intercompany Claim" means a Claim held by any Debtor against any other Debtor based on any fact, action, omission, occurrence or thing that occurred or came into existence prior to the Petition Date, including, without limitation, any tax sharing agreements such as the State Tax Allocation Agreement effective as of January 1, 2001 and the Tax Allocation Agreement effective as of January 1, 2002.

82.     "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

83.     "IRS" means the United States Internal Revenue Service.

84.     "Joint Selection Committee" means the committee formed to identify qualified, independent candidates to serve on the Board of New Mirant comprised of: (A) Stuart E. Eizenstat; (B) Robert F. McCullough; and (C) up to four individuals who are or were representatives of members of the Corp Committee.

85.     "KERP" means the key employee retention plan that has been approved by the Bankruptcy Court by orders, dated February 13, 2004, August 2, 2004 and September 2, 2004.

86.     "Letter of Credit Claim" means a Claim for reimbursement arising with respect to a letter of credit issued at Mirant's request under either the Mirant 4-Year Revolver or the Mirant "C" Facility.

87.     "MADCI" means Mirant Americas Development Capital, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

88. "MADI" means Mirant Americas Development, Inc., one of the Debtors and Debtors-in-Possession

89. "MAEM" means Mirant Americas Energy Marketing, LP, a Delaware limited partnership, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

90. "MAEM/MET Effective Date" means a date selected by the Debtors which shall be a Business Day that (a) occurs after (i) the Effective Date and (ii) the initiation of "fresh start reporting" (as such term is defined in Statement of Position (SOP) No. 90-7, Financial Reporting by Entities in Reorganization under the Bankruptcy Code); (b) falls on the last day of a calendar month; and (c) is to be designated by the Debtors in their sole discretion; provided, however, that such MAEM/MET Effective Date shall occur no later than 60 days after the Effective Date.

91. "MAEMI" means Mirant Americas Energy Marketing Investments, Inc., a Georgia corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

92. "MAG" means Mirant Americas Generation, LLC, a Delaware limited liability company, which was formerly known as Mirant Americas Generation, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

93. "MAG Ad Hoc Committee" means the Ad Hoc Committee of Mirant Americas Generation, LLC comprised of holders of Claims against MAG represented by Hurt & Lilly LLP and Kirkland & Ellis LLP during the pendency of the Chapter 11 Cases.

94. "MAG Committee" means the Official Committee of Unsecured Creditors of Mirant Americas Generation LLC.

95. "MAG Debtors" means MAG and the direct and indirect subsidiaries of MAG that are Debtors, as identified on Exhibit B hereto.

96. "MAG Indenture" means the indenture dated May 1, 2001, between MAG and Bankers Trust Company, as initial indenture trustee, as it has been amended or supplemented from time to time.

97. "MAG Long-term Notes" means those certain senior notes issued by MAG pursuant to the MAG Indenture: (a) due 2011, in the aggregate principal amount of $850,000,000; (b) due 2021, in the aggregate principal amount of $450,000,000; and (c) due 2031, in the aggregate principal amount of $400,000,000.

98. "MAG Long-term Note Claims" means all Claims in respect of the MAG Long-term Notes.

99. "MAG Registration Rights Agreements" means (i) the Registration Rights Agreement dated May 1, 2001 among MAG and Lehman Brothers, Inc. and Credit Suisse First Boston Corporation and Deutsche Bank Alex. Brown Inc. and Wachovia Securities, Inc. as Initial Purchasers, and (ii) the Registration Rights Agreement Dated October 9, 2001 among MAG and Salomon Smith Barney Inc. and Banc of America Securities LLC and Blaylock & Partners, L.P. and Scotia Capital (USA) Inc. and Tokyo-Mitsubishi International plc as Initial Purchasers, collectively.

MIAMI 623421 v4 (2K)

100. "MAG Revolvers" means those certain credit facilities dated August 31, 1999, in the aggregate amounts of $250,000,000 and $50,000,000, respectively, between MAG, as borrower, Lehman Brothers, as agent, and the lenders thereunder, and all related documents, instruments and agreements, as they may have been amended or supplemented from time to time.

101. "MAG Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the MAG Revolvers.

102. "MAG Short-term Debt Claims" means the MAG Revolver Claims and the MAG Short-term Note Claims, in the aggregate.

103. "MAG Short-term Notes" means those certain senior notes issued by MAG pursuant to the MAG Indenture: (a) due 2006, in the aggregate principal amount of $500,000,000; and (b) due 2008, in the aggregate principal amount of $300,000,000.

104. "MAG Short-term Note Claims" means all Claims arising under or as a consequence of owning a MAG Short-term Note.

105. "MAGM I-XV" means Mirant Americas Gas Marketing I, LLC, Mirant Americas Gas Marketing II, LLC, Mirant Americas Gas Marketing III, LLC, Mirant Americas Gas Marketing IV, LLC, Mirant Americas Gas Marketing V, LLC, Mirant Americas Gas Marketing VI, LLC, Mirant Americas Gas Marketing VII, LLC, Mirant Americas Gas Marketing VIII, LLC, Mirant Americas Gas Marketing IX, LLC, Mirant Americas Gas Marketing X, LLC, Mirant Americas Gas Marketing XI, LLC, Mirant Americas Gas Marketing XII, LLC, Mirant Americas Gas Marketing XIII, LLC, Mirant Americas Gas Marketing XIV, LLC, and Mirant Americas Gas Marketing XV, LLC, each a Delaware limited liability company and a Debtor and Debtor-in-possession in the Chapter 11 Cases.

106. "MAI" means Mirant Americas, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

107. "MAI Series A Preferred Shares" means the preferred shares (having terms and provisions as set forth on Exhibit D to the Plan) to be issued by MAI with a liquidation preference of $265,000,000 in respect of the obligation to fund certain potential capital expenditures of MIRMA. The MAI Series A Preferred Shares shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

108. "MAI Series B Preferred Shares" means the preferred shares (having terms and provisions as set forth on Exhibit D to the Plan) to be issued by MAI with a liquidation preference of $150,000,000 and a mandatory redemption on April 1, 2011, in respect of the obligation to provide additional liquidity to MAG in connection with the refinancing of certain MAG Long-term Notes. The MAI Series B Preferred Shares shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

109. "MAI/WDF Note Claim" means all Claims evidenced by or related to that certain Amended and Restated Promissory Note dated October 31, 2001 executed by WDF as "Maker" in favor of MAI as "Holder."

11

110.   "MAPCO" means Mirant Americas Production Company, a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

111.   "MAREM" means Mirant Americas Retail Energy Marketing, LP, a Delaware limited partnership, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

112.   "MD Leaseco" means the legal entity to be organized as a limited liability company under the laws of Delaware and as a direct wholly-owned subsidiary of MIRMA under the Plan.

113.   "MET" means Mirant Energy Trading LLC, a Delaware limited liability company, a subsidiary of MAEM.

114.   "Metromedia Receivable" means the amount owed to MAEM, subject to a sixty-day standstill of any execution efforts, by Metromedia Energy Marketing, L.P., pursuant to Order, entered by the Bankruptcy Court and dated September 7, 2005, granting the Debtors' Motion, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, Approving the Stipulation to Entry of Award and Judgment Between Metromedia Energy, Inc. and Mirant Americas Energy Marketing, LP.

115.   "Mint Farm" means Mint Farm Generation, LLC, a Delaware limited liability company.

116.   "Mirant" means Mirant Corporation, a Delaware corporation, which was formerly known as Southern Energy, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

117.   "Mirant 364-Day Revolver" means that certain credit facility dated July 17, 2001, in the aggregate principal amount of $1,125,000,000, by and between Mirant, as borrower, the initial lenders named therein, and Credit Suisse First Boston, as administrative agent, and having a maturity date of July 17, 2003, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

118.   "Mirant 364-Day Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant 364-Day Revolver.

119.   "Mirant 4-Year Revolver" means that certain credit facility, dated July 17, 2001, in the aggregate principal amount of $1,125,000,000, between Mirant, as borrower, the initial lenders named therein, and Credit Suisse First Boston, as administrative agent, and having a maturity date of July 17, 2005, and all related documents, instruments and agreements, as they have been amended or supplemented from time to time.

120.   "Mirant 4-Year Revolver Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant 4-Year Revolver.

121.   "Mirant Ad Hoc Committee" means the Ad Hoc Committee of Mirant Corporation Note Holders comprised of the holders of Mirant Note Claims represented by Kramer Levin Naftalis & Frankel LLP and, locally, Neligan Tarpley Andrews & Foley LLP during the Chapter 11 Cases.

MIAMI 623421 v4 (2K)

122.    "Mirant Bowline" means Mirant Bowline, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

123.    "Mirant "C" Facility" means that certain credit facility, dated April 1, 1999, in the aggregate principal amount of $450,000,000, by and between Southern Energy, Inc. n/k/a Mirant, as borrower, and Citibank N.A., as initial lender and agent, with a maturity date of April 1, 2004, and all related documents, instruments and agreements as they have been amended or supplemented from time to time.

124.    "Mirant "C" Facility Claims" means all Claims arising under, or as a consequence of being a lender under, the Mirant "C" Facility.

125.    "Mirant Debt Claims" means the Mirant "C" Facility Claims, the Mirant Note Claims, the Mirant 364-Day Revolver Claims, the Mirant 4-Year Revolver Claims, the Commodity Prepay Facility Claims and the Equipment Warehouse Facility Claims, in the aggregate.

126.    "Mirant Debtors" means Mirant and the direct and indirect subsidiaries of Mirant that are Debtors (other than the MAG Debtors), as identified on Exhibit C hereto.

127.    "Mirant Fiscal Agency Agreement" means the Fiscal Agency Agreement dated July 26, 1999, between Southern Energy, Inc. n/k/a Mirant, as issuer, and Bankers Trust Company, as Fiscal Agent, transfer agent, registrar and paying agent, as such agreement has been or may be amended or supplemented from time to time.

128.    "Mirant Indentures" means the Mirant Fiscal Agency Agreement and all other indentures and agreements in force and effect as of the Petition Date pursuant to which any of the Mirant Notes or Subordinated Notes have been issued.

129.    "Mirant Las Vegas" means Mirant Las Vegas, LLC, a Delaware limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

130.    "Mirant Lovett" means Mirant Lovett, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

131.    "Mirant New York" means Mirant New York, Inc., a Delaware corporation and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

132.    "Mirant Notes" means those certain: (a) 5.75% Convertible Senior Notes Due 2007, issued by Mirant in the aggregate principal amount of $370,000,000; (b) 7.4% Senior Notes Due 2004, issued by Mirant in the aggregate principal amount of $200,000,000; (c) 7.9% Senior Notes Due 2009, issued by Mirant in the aggregate principal amount of $500,000,000; and (d) 2.5% Convertible Senior Debentures Due 2021, issued by Mirant in the aggregate principal amount of $750,000,000.

133.    "Mirant Note Claims" means all Claims arising under or as a consequence of owning a Mirant Note.

134.    "Mirant NY-Gen" means Mirant NY-Gen, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

13

135. "Mirant Oregon" means Mirant Oregon, LLC, a Delaware limited liability company, to be renamed Mirant Power Purchase, LLC, after the Effective Date.

136. "Mirant Peaker" means Mirant Peaker LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

137. "Mirant Potomac" means Mirant Potomac River LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 cases.

138. "Mirant Potrero" means Mirant Potrero LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 cases.

139. "Mirant Sugar Creek" means Mirant Sugar Creek, LLC, an Indiana limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

140. "Mirant Wichita" means Mirant Wichita Falls, LP, a Delaware limited partnership and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

141. "Mirant Wyandotte" means Mirant Wyandotte, LLC, a Delaware limited liability company and one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

142. "Mirant Zeeland" means Mirant Zeeland, LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

143. "MIRMA" means Mirant Mid-Atlantic LLC, a Delaware limited liability company, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases, formerly known as Southern Energy Mid-Atlantic LLC.

144. "MIRMA Dickerson Leases" means the four MIRMA Leases which pertain to the Dickerson Power Station.

145. "MIRMA Indenture Trustee" means the indenture trustee in respect of certain promissory notes issued pursuant to the MIRMA Leases.

146. "MIRMA Lease Litigation" means the adversary proceeding previously pending before the Bankruptcy Court and styled as Mirant Mid-Atlantic, L.L.C. v. Morgantown OL1 LLC, et al. (In re Mirant Corporation), Adv. No. 04-04283, pursuant to which MIRMA has sought certain relief relating to the MIRMA Leases, including a determination that the MIRMA Leases should be recharacterized as a financing.

147. "MIRMA Lease Litigation Dismissal Order" means the order of the Bankruptcy Court dated April 7, 2005, entered in respect of the MIRMA Lease Litigation.

148. "MIRMA Leased Assets" means the Assets of MIRMA that are the subject of the MIRMA Leases.

149. "MIRMA Leases" means the eleven separate leases dated December 19, 2000, pursuant to which MIRMA leases undivided interests in the MIRMA Leased Assets from the MIRMA

14

Owner/Lessors, together with all related documents, instruments and agreements to which MIRMA is a party as they may have been amended or supplemented from time to time.

150. "MIRMA Morgantown Leases" means the seven MIRMA Leases which pertain to the Morgantown Power Station.

151. "MIRMA Owner/Lessors" means the Persons who are identified in the MIRMA Leases as the owners, or any successors in interest thereto, of the MIRMA Leased Assets.

152. "Morgantown Power Station" means the coal-fired plant, which includes two 620 MW coal-fired units and is located on approximately 569 acres of land in Charles County, Maryland.

153. "New MAG Debt Covenants" means new covenants to be implemented by the Confirmation Order and enforceable by the trustee under the MAG Indenture for the benefit of the holders of MAG Long-term Notes (a) that will provide that any payments from MAG to New Mirant at a time when MAG or its subsidiaries owe debt to New Mirant (or any of its non-MAG subsidiaries), shall be treated as a repayment of such debt, rather than as dividends, until all such debt is repaid, and (b) that would limit the ability of MAG and its subsidiaries to incur additional debt (other than Permitted Debt), unless the consolidated ratio of net debt to EBITDA for MAG and its subsidiaries is 6.75:1 or less based on the most recently delivered financial statements. For purposes of such covenant, all terms shall be as defined in the Exit Facility; provided that "Permitted Debt" would include (i) all debt at MAG and its subsidiaries as of the Effective Date, (ii) debt at MIRMA as permitted by the MIRMA Leases, (iii) debt arising under or permitted by the Exit Facility (excluding (A) "Subordinated Debt" as defined in the Exit Facility, and (B) intercompany loans not made in the ordinary course of business), (iv) an amount up to $200,000,000 of additional *pari passu* indebtedness at MAG, and (v) the refinancing of any of the foregoing debt; provided, that with respect to the refinancing of the MAG Long-term Notes maturing in 2011, subsidiaries of MAG may only incur up to $250,000,000 of debt in addition to any unused portion of the $250,000,000 additional debt basket provided for in the Exit Facility.

154. "New MAEM Holdco" means the legal entity to be organized as a corporation under the laws of Delaware and as a direct wholly-owned subsidiary of New MAG Holdco under the Plan.

155. "New MAG Holdco" means Mirant California Investments, Inc., a direct subsidiary of MAG after the transactions set forth in Section 8.2(c)(i) are completed.

156. "New MAG Holdco 8.0% Notes" means those 8.0% senior notes due 2015, that may be issued by New MAG Holdco, at the Debtors' option in accordance with Section 5.2(e), in the aggregate principal amount of $500,000,000 pursuant to the New MAG Holdco Indenture.

157. "New MAG Holdco 8.25% Notes" means those 8.25% senior notes due 2017, that may be issued by New MAG Holdco, at the Debtors' option in accordance with Section 5.2(e), in the aggregate principal amount of up to $850,000,000 pursuant to the New MAG Holdco Indenture.

158. "New MAG Holdco Indenture" means that certain indenture to be dated as of the Effective Date and to be entered into between New MAG Holdco, as issuer, and the New MAG Holdco Indenture Trustee, as trustee, pursuant to which New MAG Holdco will issue each series

of the New MAG Holdco Notes. The New MAG Holdco Indenture shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

159. "New MAG Holdco Indenture Trustee" means the Person or Persons appointed to act as the indenture trustee under the New MAG Holdco Indenture.

160. "New MAG Holdco Notes" means the New MAG Holdco 8.0% Notes and the New MAG Holdco 8.25% Notes. The New MAG Holdco Notes shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

161. "New Mirant" means the legal entity selected by the Debtors to serve as the ultimate parent of (a) the Debtors (excluding Mirant and the Trading Debtors), and (b) the other direct and indirect subsidiaries of Mirant that are not Debtors in the Chapter 11 Cases.

162. "New Mirant Common Stock" means the shares of common stock to be issued or reserved for issuance by New Mirant on or after the Effective Date pursuant to the Plan.

163. "New Mirant Constituent Documents" means the by-laws, certificates of incorporation, partnership agreements, or limited liability company membership agreements, as applicable, for each of the Debtors, New Mirant and the New Mirant Entities, as amended and restated as of the Effective Date, among other things, to (a) prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, and (b) otherwise give effect to the provisions of this Plan. The New Mirant Constituent Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

164. "New Mirant Employee Stock Programs" means the programs, in substantially the form set forth in the Plan Documents, that shall be established on the Effective Date to permit employee stock ownership of a portion of New Mirant Common Stock. The New Mirant Employee Stock Programs shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

165. "New Mirant Entities" means any legal entities created as direct or indirect subsidiaries of New Mirant for the purpose of giving effect to the Plan.

166. "New Mirant Series A Warrants" means the warrants, having the terms set forth on Exhibit E of the Plan, to be issued to the holders of Allowed Consolidated Mirant Debtor Class 5 — Equity Interests, which shall provide such holders with a right to purchase, in the aggregate, a number of shares of New Mirant Common Stock equal to ten percent (10%) of the shares of New Mirant Common Stock issued, or reserved for issuance, under the Plan (excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs) and exercisable individually or in the aggregate at any time until the fifth anniversary of the Effective Date. The New Mirant Series A Warrants shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

167. "New Mirant Series B Warrants" means the warrants, having the terms set forth on Exhibit E of the Plan, to be issued to the holders of Subordinated Notes, which shall provide such holders with a right to purchase, in the aggregate, a number of shares of New Mirant Common Stock equal to five percent (5%) of the shares of New Mirant Common Stock issued,

16

or reserved for issuance, under the Plan (excluding the shares reserved for issuance pursuant to the New Mirant Employee Stock Programs) and exercisable individually or in the aggregate at any time until the fifth anniversary of the Effective Date. The New Mirant Series B Warrants shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

168. "New Mirant Warrants" means New Mirant Series A Warrants and New Mirant Series B Warrants, collectively.

169. "New York Debtors" means Mirant New York, Mirant Bowline and Mirant Lovett.

170. "New York Debtors Effective Date" means the later of (a) the Effective Date or (b) thirty (30) Business Days after all of the conditions specified in the Proposed New York Tax Settlement have been satisfied or waived (to the extent waivable).

171. "New York Taxing Authorities" means the Town of Haverstraw, the Assessor of the Town of Haverstraw, the Board of Assessment Review of the Town of Haverstraw, the Town of Stony Point, the Assessor of the Town of Stony Point, the Board of Assessment Review of the Town of Stony Point, the Haverstraw-Stony Point Central School District and the County of Rockland.

172. "Notice of Confirmation" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

173. "Objection Deadline" means the deadline for filing objections to Claims as set forth in Section 11.1 of the Plan.

174. "Old Indentures" means the MAG Indenture and the Mirant Indentures.

175. "Old Indenture Trustees" means the trustees for the MAG Indenture, the Mirant Indentures and the Fiscal Agent under the Mirant Fiscal Agency Agreement.

176. "Participation Agreements" means the eleven Participation Agreements entered into by MIRMA, the respective Owner/Lessor, the respective owner participant, Wilmington Trust Company (as Owner Manager), the Loan Indenture Trustee and the Pass Through Trustee, in connection with the MIRMA Leases.

177. "Pepco" means the Potomac Electric Power Company.

178. "Pepco Acquisition" means the transactions that were contemplated in, and were effected pursuant to, the APSA.

179. "Pepco Causes of Action" means the Debtors' Causes of Action against Pepco arising from or relating to the Pepco Acquisition, including but not limited to the APSA and the Back-to-Back Agreement and the parties' course of business dealings thereunder.

180. "Person" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

17

181. "Petition Date" means with respect to any Debtor the date on which the Chapter 11 Case of such Debtor was commenced.

182. "PG&E" means Pacific Gas & Electric Company.

183. "PG&E/RMR Claims" means all three (3) of the Claims to be granted to PG&E pursuant to the California Settlement in respect of the RMR Agreements.

184. "Phoenix" means Phoenix Partners LP, Phoenix Partners II LP, Phoenix Fund III LP and Phaeton International (BVI) Ltd., collectively.

185. "Plan" means this chapter 11 plan, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

186. "Plan Distribution" means the payment or distribution under the Plan of Cash, Assets, securities or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

187. "Plan Documents" means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Section 1.5 of the Plan.

188. "Plan Secured Note" means a promissory note that may be delivered to a holder of an Allowed Secured Claim pursuant to the Plan, such note to be made payable by the Debtor(s) obligated under the Allowed Secured Claim in an amount equal to the Allowed Secured Claim and payment of which shall be secured by the Assets that secure payment of such Allowed Secured Claim (or at the Debtors' election, alternative collateral having at least an equivalent value). Each Plan Secured Note shall accrue simple interest at the rate of 5.00% per annum and shall be payable in twenty (20) quarterly payments commencing in the first quarter after the Distribution Date with respect to the Allowed Secured Claim. The Plan Secured Notes shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

189. "Plan Trust" means the trust or trusts to be created pursuant to Article IX.

190. "Plan Trust Declaration" means the declaration or declarations of trust to be entered into by the Mirant Debtors and the Plan Trustees. The Plan Trustee Declaration shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

191. "Plan Trustees" means the three (3) Persons selected to serve as the initial trustees under the Plan Trust.

192. "Post-Confirmation Interest" means simple interest on an Allowed Claim at the rate payable on federal judgments as of the Effective Date or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate, such interest to accrue from the Distribution Date applicable to a Claim to the date of actual payment with respect to such Claim.

193. "Priority Claim" means any Claim to the extent such Claim is entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than Secured Claims, Administrative Claims, and Tax Claims.

194. "Pro Rata Share" means the proportion that an Allowed Claim or Equity Interest bears to the aggregate amount of all Claims or Equity Interests in a particular class, including Contested Claims or Equity Interests, but excluding Disallowed Claims, (a) as calculated by the Disbursing Agent; or (b) as determined or estimated by the Bankruptcy Court.

195. "Professional Person" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

196. "Proposed New York Tax Settlement" means the proposed global settlement as referenced in Section 15.3(a) of all Claims asserted by the New York Taxing Authorities and certain related matters, including the Debtors' rights to receive refunds of amounts previously paid in respect of ad valorem real property taxes, and the assessed value of the Debtors' property for purposes of calculating ad valorem real property taxes owed to the New York Taxing Authorities on a prospective basis.

197. "Protected Persons" means the persons as defined in the "Order Restricting Pursuit of Certain Persons" (Docket No. 357) and the "Order Extending Order Restricting Pursuit of Certain Persons" (Docket No. 1006) issued by the Bankruptcy Court on August 5, 2003 and September 29, 2003, respectively. Under such order, Protected Persons include (a) all professionals, officers, directors and managers of the Debtors, (b) the members of Committees and their professionals, (c) William Snyder in his capacity as the examiner in the Chapter 11 Cases and his professionals and (d) Dean Nancy Rapoport, in her capacity as fee examiner.

198. "RMR Agreements" means, collectively: (a) that certain Must-Run Service Agreement dated as of June 1, 1999, between Southern Energy Potrero, L.L.C. (now known as Mirant Potrero, LLC) and the CAISO pertaining to the facility commonly known as the Potrero Power Plant, as amended from time to time; (b) that certain Must-Run Service Agreement dated as of June 1, 1999, between Southern Energy Delta, L.L.C. (now known as Mirant Delta LLC) and the CAISO pertaining to the facility commonly known as the Contra Costa Power Plant, as amended from time to time; and (c) that certain Must-Run Service Agreement dated June 1, 1999, between Southern Energy Delta, L.L.C. (now known as Mirant Delta LLC) and the CAISO pertaining to the facility commonly known as the Pittsburg Power Plant, as amended from time to time.

199. "Schedules" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors-in-Possession from time to time in accordance with Bankruptcy Rule 1009.

200. "Second Tier MAG Holdco" means the legal entity to be organized as a limited liability company under the laws of Delaware and as a direct wholly-owned subsidiary of New MAG Holdco.

201. "Secured Claim" means (a) a Claim (other than the DIP Claims, but including the Allowed New York Taxing Authorities Secured Claims) secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of recoupment or setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to recoupment or setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as an Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

202. "Series A Put Agreement" means the agreement (having the terms set forth in Exhibit D to the Plan) to be entered into by and between New Mirant and New MAG Holdco pursuant to which New MAG Holdco shall have certain put rights, with respect to the MAI Series A Preferred Shares. The Series A Put Agreement shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

203. "Series B Put Agreement" means the agreement (having the terms set forth in Exhibit D to the Plan) to be entered into by and between New Mirant and MAG pursuant to which New Mirant shall have certain put rights, with respect to the MAI Series B Preferred Shares. The Series B Put Agreement shall be in substantially the form filed with the Bankruptcy Court as a Plan Document.

204. "Site Lease" means that certain Site Lease Agreement, dated March 21, 1989, originally entered into by and between Pepco and SMECO.

205. "SMECO" means Southern Maryland Electric Cooperative, Inc., a Maryland corporation.

206. "Southern Company Causes of Action" means the Debtors' Causes of Action against Southern Company and its affiliates and insiders and any other lessor, arising from or relating to any transaction between the Debtors and Southern Company and its Affiliates and Insiders that occurred on or before April 2, 2001.

207. "Subordinated Claim" means a Claim (other than a Subordinated Note Claim) against any Debtor subordinated by Final Order including, without limitation, the Claims of (a) the CFTC, (b) Gil Wisniak, et al., and (c) the underwriters of the initial public offering of Mirant, as each is described in the Disclosure Statement.

208. "Subordinated Note Claim" means a Claim arising under or as a consequence of owning a Subordinated Note.

209. "Subordinated Notes" means those certain 6.25% Junior Convertible Subordinated Debentures, Series A due in 2030, issued by Mirant in the aggregate principal amount of $356,000,000.

210. "Tax Claim" means a Claim against any of the Debtors that is of a kind specified in section 507(a)(8) of the Bankruptcy Code.

211. "Trading Debtors" means MADI, MAPCO, MAEM, MAREM and MAGM I-XV.

212. "TPA Claim" means the claim or claims granted to Pepco under the TPA Order.

213. "TPA Order" means the "Order Granting Debtors' Motion for Approval of (1) Settlement Agreement Under Federal Rule of Bankruptcy Procedure 9019, (2) Allowed, Prepetition General Unsecured Claims by Pepco in the Amount of $105 Million Against Each of Mirant and MAEM, and (3) Assumption of Certain Transition Power Agreements" entered by the Bankruptcy Court on November 19, 2003 (Docket No. 1876).

214. "Transferred Trading Obligation" means an obligation of a Person to a Trading Debtor which is transferred to MET pursuant to the Plan or the Confirmation Order, including any obligations under or in connection with any trading contracts or under or in connection with any other assets or liabilities.

215. "Unsecured Claim" means any Claim against a Debtor other than an Administrative Claim, a DIP Claim, a Priority Claim, a Tax Claim, a Secured Claim, a MAG Long-term Note Claim or a PG&E/RMR Claim.

216. "WDF" means Wrightsville Development Funding, LLC, a Delaware limited liability company.

217. "West Georgia" means West Georgia Generating Company, LLC.

218. "West Georgia Amended Loan Documents" means the amendment to the West Georgia Credit Agreement, and the related documents, agreements and instruments, evidencing the treatment in accordance with the West Georgia Settlement Agreement to be provided in respect of the Allowed West Georgia Facility Claims if the holders of the West Georgia Facility Claims enter into and comply with their obligations under the West Georgia Settlement Agreement and vote in favor of the Plan pursuant to section 1126 of the Bankruptcy Code. The West Georgia Amended Loan Documents shall be in substantially the form filed with the Bankruptcy Court as Plan Documents.

219. "West Georgia Credit Agreement" means that certain credit agreement dated December 12, 2000 in the aggregate principal amount of $139,700,000, by and between West Georgia, as borrower, Deutsche Bank, as agent, and the financial institutions party thereto, and all related documents, instruments and agreements as they have been amended or supplemented from time to time.

220. "West Georgia Facility Claims" means all Claims, including Secured Claims, arising under, or as a consequence of being a lender or agent, under the West Georgia Credit Agreement.

221. "West Georgia Secured Note" means the promissory note secured by all the assets of West Georgia that secure the West Georgia Facility Claims providing for voluntary prepayments at any time without premium or penalty and containing limitations on asset sales and dividends and distributions consistent with restrictions contained in investment grade debt documentation, in form to be filed with the Bankruptcy Court as a Plan Document, made payable to Deutsche Bank, as agent for the holders of West Georgia Facility Claims, pursuant to which the holders of the West Georgia Facility Claims shall receive to the extent that the West Georgia Facility Claims constitute Secured Claims in excess of $30,000,000, (i) simple interest at the rate of 7% per annum, without compounding; (ii) principal payments of $10,000,000 per annum on June 30th of each year through the earlier of (a) the date that less than $10,000,000 of principal remains outstanding in respect of the West Georgia Secured Note, and (b) June 2014, with the balance, if any, payable on June 30, 2014.

222. "West Georgia Settlement Agreement" means the agreement entered into by West Georgia and the holders of the West Georgia Facility Claims dated October 25, 2005, pursuant to which the parties agreed, among other things and subject to certain conditions, to (i) treat the West Georgia Facility Claims as Allowed Secured Claims, (ii) pay the holders of the Allowed West Georgia Facility Claims a Cash payment of $45,000,000 on the Distribution Date, which payment shall be applied to outstanding principal; (iii) pay interest on the balance of the Allowed West Georgia Facility Claims at LIBOR plus 262.5 basis points through June 1, 2006, and at LIBOR plus 312.5 basis points through final maturity, in each case with a corresponding base rate options; (iv) extend the final maturity date under the West Georgia Credit Agreement to September 30, 2011; (v) authorize West Georgia to make a Cash payment to MAI in the amount of $10,000,000 after the payment of certain Administrative Claims; (vi) authorize West Georgia to maintain a working capital reserve in the amount of $8,500,000; and (vii) authorize Deutsche Bank, as agent for the holders of the West Georgia Facility Claims, to sweep on a quarterly basis any cash in excess of the working capital reserve, provided that the amount of such excess is at least $100,000.

.

MIAMI 623421 v4 (2K)