U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

Signed February 13, 2006                                                    _____
                                                                            **United States Bankruptcy Judge**

---

IN THE UNITED STATES OF BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| MIRANT CORPORATION, et al., | § § | Case No. 03-46590 |
| | § | Jointly Administered |
| Debtors. | § | Chapter 11 |

### Memorandum Opinion

Before the court is the Motion of TransCanada Gas Services, Inc. ("TGS") and Gas Transmission Northwest Corporation ("GTN" and, with TGS, "Movants") to Enforce Settlement Agreements Read into the Record in Open Court (the "Motion"), which is opposed by Debtors. The Motion was considered at a hearing on February 1, 2006, during which Movants and Debtors made oral argument and offered as evidence various transcripts and written exhibits.

The Motion is subject to this court's core jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(B) and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

## I.  Background

Debtors are merchant power producers and sellers.  GTN owns and operates a natural gas pipeline in the northwestern United States.  In order to provide natural gas to fuel facilities owned by Debtors, Mirant Americas Energy Marketing, LLP ("MAEM"),[1] one of the Debtors,[2] entered into certain long-term firm transportation contracts whereby GTN promised to make available, and MAEM promised to pay for, capacity on GTN's Pacific Northwest pipeline.[3]

TGS was engaged in the purchase and sale of energy products and was a party to a firm transportation agreement with Portland Natural Gas Transmission System ("PNGTS") entered into in 1997 for firm capacity on PNGTS's pipeline.  In 1998 TGS released to Androscoggin Energy, LLC ("Androscoggin") a portion of its firm capacity on the PNGTS pipeline.  TGS remained liable to PNGTS under the original firm capacity agreement (the "PNGTS Contract"), however.

In 2001 certain Canadian affiliates of Debtors acquired certain assets of TGS, including the PNGTS Contract and the agreement between TGS and Androscoggin.  These agreements were thereafter transferred to MAEM.  As part of this transaction MAEM indeminified TGS as to its obligations to PNGTS arising from the capacity being used by Androscoggin.  Also, Mirant Corp. ("Mirant"), parent of MAEM, guaranteed MAEM and its Canadian affiliates' obligations

---

[1]  The contracts at issue were sometimes entered into by predecessors of MAEM; Movants also have experienced name changes.  The court here will refer to the parties only by the names used during the pendency of Debtors' chapter 11 cases.

[2]  For a discussion of firm transportation capacity, *see In re Mirant Corp.*, 332 B.R. 139 (Bankr. N.D. Tex. 2005).

[3]  The GTN firm transportation contracts are form contracts and are therefore all the same with respect to the provisions relevant to this matter.  One of these contracts, dated June 28, 2002 (the "GTN Contract"), was presented to the court as an example and will be used by the court for reference herein.

to TGS.[4]  Mirant also guaranteed MAEM's obligations to GTN by virtue of an agreement dated August 31, 2001, and amended on November 1, 2001.[5]

On July 14 and 15, 2003, 75 of Debtors, including Mirant and MAEM, filed Chapter 11 petitions in this court.  On November 26, 2004, Androscoggin also filed for relief under chapter 11 in another court.  On May 26, 2004, this court authorized rejection of MAEM's contracts with TGS.  On April 21, 2004, the court authorized rejection of MAEM's contract with GTN, as of which time GTN held cash collateral for the benefit of MAEM of $3,107,790.

On January 25, 2005, this court approved a settlement that established the amount of the claim of GTN.  Debtors' settlement with TGS[6] concerning the amount of TGS's claim did not jell until late 2005 and was first described to the court during a pre-confirmation status conference held on November 30, 2005.  The settlement with GTN provided that GTN have a claim of $25,000,000, against which it might offset its cash collateral.[7]  The TGS settlement

---

[4]  TGS's claim arises out of the PNGTS Contract, not the indemnity or guaranty agreement.  Section 2.1 of the guaranty agreement states that "[Mirant] covenants and guarantees that it will discharge the Guaranteed Obligations strictly in accordance with the terms of the documents."  Section 2 of the indemnity agreement states that MAEM "shall indemnify and hold harmless [TGS]…against all Losses suffered or incurred by or brought against [TGS] resulting from or arising out of the performance or non-performance of the obligations contained in Section 7.2(c) of the Purchase and Sale Agreement…"  Included among the obligations "contained in Section 7.2(c) of the Purchase and Sale Agreement" is the PNGTS Contract.  Thus, Mirant's liability to TGS under the guaranty cannot be determined without reference to the indemnity agreement between MAEM and TGS, and MAEM's liability to TGS cannot be determined without reference to the PNGTS Contract, which is the basis for calculating TGS's original liability to PNGTS for TGS's non-performance.

[5]  Just as TGS's claim arises out of the PNGTS Contract, GTN's claim arises out of the GTN Contract.  *See* footnote 4, *supra*.

[6]  Though other claims are asserted by TGS in these cases, they are not here at issue.

[7]  Section 1 of the settlement agreement provides:

> 1. <u>Allowed Claims.</u>  In full and final satisfaction of all pre-petition claims GTN holds against MAEM and Mirant, arising under or in connection with the Rejected Contracts, GTN shall have a final present value allowed claim against MAEM in the amount equal to $25,000,000 (the "Allowed Claim") . . . .  GTN shall also have a final present value, allowed claim against Mirant on the Guarantee in the amount of $25,000,000 (the "Guarantee Claim") subject to

provided for (1) a claim of $37,000,000; (2) assignment to TGS of Debtors' rights against Androscoggin; and (3) reduction (to $29,750,000) of TGS's claim by reason of such assignment.[8]

At the time of the GTN settlement agreement, Debtors and GTN did not foresee that creditors of Debtors would be satisfied in full under Debtors' plan of reorganization. Their principal concern appears to have been dealing with claims arising from the same transaction against more than one of Debtors. In the end, however, the plan of reorganization confirmed by the court provided for 100% recovery by creditors, including interest, and, in addition, a substantial return to equity owners of Mirant. Indeed, by the time Debtors' plan became effective, the stock provided under it in satisfaction of unsecured claims against Mirant and MAEM had a value substantially higher than the face amount of the claims.

This change of circumstance was known to all parties by the time of confirmation. Movants had filed objections to confirmation, and those were resolved by agreements announced on the record. The statements of counsel relevant to the GTN and TGS claims are attached hereto as Appendix A. The agreements reflected in Appendix A are the subject of the Motion.

## II.  Issues

---

   reduction by the amount of any consideration paid or distributed to GTN from MAEM on the Allowed Claim; provided, further, GTN will retain the Guarantee Claim for any amount that remains unsatisfied.

[8]   Section 2 of the settlement agreement provides:

   2.   <u>Allowed Claims.</u>  In full and final satisfaction of all pre-petition claims GTN holds against MAEM and Mirant, arising under or in connection with the Rejected Contracts, GTN shall have a final present value allowed claim against MAEM in the amount equal to $25,000,000 (the "Allowed Claim") . . . . GTN shall also have a final present value, allowed claim against Mirant on the Guarantee in the amount of $25,000,000 (the "Guarantee Claim") subject to reduction by the amount of any consideration paid or distributed to GTN from MAEM on the Allowed Claim; provided, further, GTN will retain the Guarantee Claim for any amount that remains unsatisfied.

The dispute now confronting the court is whether interest should or should not be compounded on the GTN and TGS claims for the period from commencement of Debtors' chapter 11 cases until the effective date of Debtors' plan and on what principal amount the interest should be calculated (the face amount of the claim or the face amount less, as the case may be, the Androscoggin reduction of the TGS claim[9] or the cash collateral held by GTN) during what period (in other words, as of what point in time should these claim reductions be effective).

Under the terms of Debtors' plan,[10] if the interest rate applied to the claims is established by contract, it is to be compounded on the payment dates. If the claim is not based on documents providing a "contract rate," then a simple interest rate of 4% without compounding is to be used for the petition date to effective date period.

The court must thus determine (1) whether the GTN and TGS claims are subject to interest calculated at a contract rate; and (2) when the GTN and TGS claims should be reduced by either, as the case may be, the Androscoggin amount or the cash collateral for purposes of calculating interest.

### III. Discussion

---

[9] At the hearing on February 1, the court understood that TGS agreed that the reduction in its claim (from $35,000,000 to $29,750,000) should relate back for purposes of calculating interest to the date of Debtors' chapter 11 petitions.

[10] The applicable plan provision, Section 10.14(a), reads as follows:

> (a) <u>Mirant Debtors; Unsecured Claims</u>. For purposes of calculating Plan Distributions, the accrual of interest from the Petition Date through the Effective Date on Allowed Mirant Debtor Class 3 – Unsecured Claims (<u>including</u> Allowed Claims in respect of Subordinated Notes) that have a contractual interest rate shall be at the applicable non-default contractual rate with compounding to occur on the date of scheduled payments. With respect to holders of Allowed Unsecured Claims against the Mirant Debtors that do not have a contractual rate of interest, interest from the Petition Date through the Effective Date shall be herein accrued at 4% without compounding.

Resolution of the issues before the court turns on the meaning of (1) sections 502(b) and 506(a)(1) (formerly section 506(a)) of the Bankruptcy Code (the "Code")[11]; (2) section 10.14(a) of Debtors' plan; and (3) the agreements underlying the claims of GTN and TGS.[12] In construing provisions of the Code the court will apply the plain meaning rule: if the statute is clear and unambiguous, absent an absurd result, it must be applied as written. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (quoting *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6 (2000) (in turn quoting *United States* v. *Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241 (1989) (in turn quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)))).

Similarly, construction of the underlying contracts is subject to the plain meaning rule. The GTN contracts are governed by California law (*See, e.g.*, GTN Contract, § 7.1), which requires use of the plain meaning rule in contract construction. *See, e.g., Palmer v. Truck Ins. Exch*. (1999) 21 Cal. 4th 1109, 1115 (citing *Bank of the West* v. *Superior Court* (1992) 2 Cal. 4th 1254, 1264). The PNGTS Contract is governed by the law of Maine, which applies a similar rule.

---

[11]  11 U.S.C. §§ 101, *et seq*. The Code was extensively amended in 2005. Most of the amendments are not effective in Debtors' cases. *See* 1-SP COLLIER ON BANKRUPTCY (15th ed. rev'd). Those that are effective are not relevant to this contested matter.

[12]  Debtors have argued that the settlement agreements constituted novations and that those agreements, rather than any contracts underlying Movants' claims, should determine whether or not those claims bear a contractual rate of interest. The bases of the claims, however, are the underlying contracts. Settlement of the amount of the claims and other issues respecting their allowance and payment does not effect a novation that would alter the rights of the claimants to pre-effective date interest. *See In re Miller*, 54 B.R. 710 (Bankr. D. N.D. 1985) (presumption is that a settlement does not effect a novation); *see also* 58 Am. Jur. 2d Novation § 12 (in order to effect a novation, the intent of the parties must be clear and definite).

*See, e.g., Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 814 A.2d 989, 993 (Me. 2003); *Portland Valve Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me. 1983).

Finally, a plan of reorganization is to be construed like a contract. *See In re U.S. Brass Corp.*, 301 F.3d 296, 307 (5th Cir. 2002); *In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1982); *U.S. v. Ramirez*, 291 B.R. 386, 392 (N.D. Tex. 2002). Debtors' plan provides that its construction is governed by New York law (Debtors' plan, § 17.9). As is true of the law of Maine and California, New York law requires that a court apply the plain meaning rule in divining the meaning of a contract. *See, e.g., R/S Assocs. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32, *rearg denied* 98 N.Y.2d 693 [2002]; *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 [1990].

Turning first to the contracts from which Movants' claims arise, it is clear that they provide for interest. Each contract incorporates the shipper's (GTN or PNGTS) tariff (the "GTN Tariff" and the "PNGTS Tariff," respectively). *See* GTN Contract § 6.3; PNGTS Contract Art. VII, ¶ 20. Each tariff provides for monthly invoicing and payment pursuant to the contract. *See* GTN Tariff §§ 7.1, 8.1; PNGTS Tariff §§ 15.1, 15.2. Each tariff provides that unpaid sums will bear interest calculated at the FERC (Federal Energy Regulatory Commission) rate. *See* GTN Tariff § 8.2; PNGTS Tariff § 15.4(a). The FERC rate is provided in 18 C.F.R. § 154.501, which also provides interest shall be compounded quarterly.

Debtors argue that the FERC rate is only applicable to an amount that is due but is not paid and, thus, is not a "non default contractual rate," as required by section 10.14 of Debtor's plan. However, in each of GTN and, PNGTS's tariffs, interest accrues for nonpayment whether or not the failure to pay is due to a dispute or a default. Moreover, interest accrues prior to the ability of the shipper to act in response to any default (by suspending service; *see* GTN Tariff §§

8.2, 8.3; PNGTS Tariff § 15.4). Thus, the interest called for by the contracts underlying Movants' claims is not just a default rate but rather a rate to be applied to any amounts not paid on the applicable payment date.

Moving next to Debtors' plan, it is clear that Movants are both entitled to interest on their claims at the FERC rate (4.7% according to Appendix A as well as the first numbered paragraph of the TGS Settlement Agreement). The only open issue is the frequency of compounding. 18 C.F.R. 154.501 provides for quarterly compounding. Debtors' plan provides for compounding on payment dates (§ 10.14(a)). Under the tariffs subsumed by the contracts which form the basis for Movants' claims, payments are due monthly. Thus, on its face the plan would require monthly compounding, even though Movants' contracts would only allow for quarterly compounding.

The court concludes that compounding should occur quarterly. Because payment dates under the tariffs are more frequent than the intervals provided in 18 C.F.R. 154.501, the effect of compounding on payment dates would be to afford better treatment to Movants than they would receive in a liquidation or outside of bankruptcy. This is so because more frequent compounding by reason of Debtors' plan than that provided by the contracts' incorporation of 18 C.F.R. 154.501's quarterly compounding would result in a higher claim than Movants could assert absent the plan. As a general rule, a creditor's claim ought not to be higher in a bankruptcy case than it would be in the absence of bankruptcy. *See Butner v. United States,* 440 U.S. 48, 55 (1979) (citing *Lewis v. Manufacturers Nat'l Bank*, 364 U.S. 603, 608-609 (1961) (creditors should not receive a windfall "merely by reason of the happenstance of bankruptcy")).

To allow Movants a higher claim in chapter 11 than that on which they could recover absent bankruptcy would disadvantage other creditors whose claims would be the same in or

outside of bankruptcy. This is particularly true where, as here, under Debtors' plan Movants will share pro rata with other unsecured creditors in a pool of common stock (Debtors' plan, § 5.1(c)). Nor could Debtors agree to better treatment for Movants than for other creditors. Although Debtors' plan does not limit, in Movants' class, consensual treatment to equal or lesser treatment than that given other unsecured creditors, as it does for secured creditors (*see* sections 5.1(b)(2) and 5.2(b)(2)), to permit preferable treatment of Movants (*i.e.*, treatment providing a greater distribution on the claim than that to which the creditor is legally entitled) would frustrate significant goals of Congress in enacting the Code and would run counter to provisions of the Code. It is a goal of the Code that similar creditors receive like treatment. *See Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1069 (5th Cir. 1986) (the purpose of the automatic stay is to promote the bankruptcy goal of equal treatment of creditors); *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 382 (6th Cir. 2001) (same); *Nelson v. Dalkon Shield Claimants Trust (In re A.H. Robins Company, Inc.),* No. 98-1080, 1998 U.S. App. LEXIS 21387, at *16 (4th Cir. Aug. 31, 1998) (the central goal of bankruptcy law is the equality of treatment among creditors). To permit one creditor to accrue more interest than that to which his or her claim is legally entitled vis-à-vis other creditors would frustrate that goal. It would also be inconsistent with, *inter alia*, Code § 502(b)(2).

Finally, the provision regarding frequency of compounding provided in Debtor's plan, the court infers, was designed to address the bond and bank debt that accounted for the vast majority of claims in Debtors' cases.[13] As payment dates were probably the occasion for compounding for bond and bank debt, section 10.14(a) would have been drafted to conform.

---

[13] *See* section XII.D.3.a. of the Second Amended Disclosure Statement Relating to the Debtors' Second

That Debtors ought not to be able to give a creditor better treatment than other members of its class also supports the court's conclusion that the 4.7% FERC interest rate is a non-default contract rate. To conclude otherwise would require treating Movants better than other creditors not having the benefit of a contract rate. Because section 10.14(a) of Debtors' plan provides a 4% rate for creditors having no contract provision for interest, if the 4.7% is not contractual, the effect of TGS's settlement agreement and Movants' agreements reflected in Appendix A would be to prefer them to other, similarly classified and situated creditors. The court doubts Debtors so intended and, in any case, would certainly not have approved on so slender a record any settlement that brought about such a result.

Having determined that Movants are entitled to post-petition, pre-effective date interest on their claims at 4.7% compounded quarterly, the court must now turn to the question of the date on which should be applied for interest calculation purposes the $7,250,000 (Androscoggin) reduction to TGS's claim and the $3,107,790 (cash collateral) reduction to GTN's claim. The issue respecting the TGS claim is resolved to the satisfaction of both parties by TGS's agreement, referred to above, that the reduction should be effective on the petition date. This is also in accord with the court's conclusion that the unsecured claim of GTN must be calculated as of the petition date.

Section 506(a) of the Code[14] provides that a claim is to be divided into secured and unsecured portions. Section 502(b)[15] specifies that a claim is to be determined as of the petition

---

Amended Joint Chapter 11 Plan of Reorganization (showing that bond and bank debt accounted for almost 90% of the unsecured debt at the Mirant Corp. level).

[14] Section 506(a) (as in effect for these chapter 11 cases; now section 506(a)(1)) reads:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to

date. By the plain meaning of the statute, therefore, the value of any collateral held by a creditor is to be deducted from the creditor's claim as of the petition date. *See Chase Manhattan Bank USA NA v. Stembridge (In re Stembridge)*, 394 F.3d 383, 388-89 (5th Cir. 2004); *In re Process Prop. Corp.*, 327 B.R. 603, 609 (Bankr. N.D. Tex. 2005). Thus, GTN's $25,000,000 claim, as of the petition date, was made up of a secured claim of $3,107,790 and an unsecured claim of $21,892.210. It is only on the latter amount that GTN is entitled to interest as provided in section 10.14(a) of Debtors' plan.[16]

### IV. Conclusion

For the reasons given above, TGS is entitled to distribution on a Mirant Class 3 claim of $29,750,000, bearing interest at 4.7%, compounded quarterly from July 15, 2003 to the effective date. GTN is entitled to a Mirant Class 3 claim of $21,892,210, bearing interest at 4.7%, compounded quarterly from July 15, 2003, to the effective date. To such extent the Motion is granted and is otherwise denied. Movants shall prepare and submit a final judgment in accordance with the foregoing.

---

setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

[15] Section 502(b) (excluding subsections) reads:

(b) …[I]f [an] objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount….

[16] GTN might have either (a) invested its cash collateral or (b) sought permission from the court to apply it to its claim. Having done neither, it cannot complain if it derived no benefit in the form of interest from the petition date to the date of the first settlement with Debtors. To hold otherwise would be contrary to the teaching of *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363 (5th Cir. 1987), *aff'd* 484 U.S. 365 (1988).