

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the order of the Court.**

Signed May 18, 2006            United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MIRANT CORPORATION, et al., | § | CASE NO. 03-46590-DML-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |

### MEMORANDUM OPINION

Before the court is the objection (the "Objection") filed by Debtors to the claims asserted by Joseph T. Pokalsky (the "Claim" and "Pokalsky"). The court previously rendered partial summary judgment in favor of Debtors by memorandum opinion dated July 12, 2005 (the "July 12 Ruling").[1] Remaining issues were addressed by the parties at an evidentiary hearing held on February 28 and March 13, 2006. At the hearing, the court received testimony from Wincent (Vince) Kaminsky, Pokalsky and Vance Booker ("Booker"), a vice president of Debtors. The parties also offered into evidence a number of exhibits, identified as necessary below, and submitted designated portions of depositions. Following the hearing, Debtors and Pokalsky each submitted post-trial briefs, and, on May 3, 2006, the court heard oral argument from the parties.

---

[1] The memorandum opinion is available at www.txnb.uscourts.gov/opinions/dml/03-46590_20050712.pdf.

Memorandum Opinion – Page 1
G:\ORD-Server\activePDF\Sign\InputFolder\dlynn\49664_312280.doc

This matter is subject to the court's core jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(B). This memorandum opinion embodies the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

## I. Background

Pokalsky was recruited and employed by Debtors[2] in 1996 to establish a trading business that would deal principally in energy derivatives. As a result of their negotiations, Debtors entered into an employment agreement (the "Agreement"; Debtors' Exhibit 2[3]) on May 3, 1996. The Agreement provided that Pokalsky would serve as "Vice President, Energy Trading and Marketing." Agreement ¶¶ 1 and 3.

As part of his employment package, Pokalsky insisted, *inter alia*, that he receive an equity interest in the business he was to develop. To that end, Debtors established the Southern Energy Marketing Executive Incentive Pay Plan (the "Plan"; Debtors' Exhibit 3). The Plan provided for the grant to certain employees of phantom equity[4] and milestone equity[5] (Plan articles V and VI). The Agreement[6] granted "irrevocably . . . to [Pokalsky] a Phantom Equity Grant in the PE Percentage amount of 0.4%" and granted "irrevocably . . . to [Pokalsky] a Milestone Equity Grant in the ME Percentage amount of 0.35%." Agreement ¶ 5(d) and (e).

---

[2] At the time of his employment, Debtors were part of the Southern Company family. Subsequently, Debtors were spun off by the Southern Company and assumed the names they bore during these chapter 11 cases.

[3] The Agreement and the Plan (as defined below) were also offered as exhibits by Pokalsky.

[4] Phantom equity is an interest calculated based on an entity's fair market value which compensates an employee for increases in that value. Under the Plan, phantom equity was calculated by multiplying the grant amount of phantom equity times the increase in fair market value above a base year (the year of the grant). Fair market value was calculated under the Plan as a multiple of EBIT (earnings before interest and taxes). Plan Article I. Phantom equity substitutes for actual equity ownership.

[5] Milestone equity is a type of phantom equity calculated to reflect specific achievements.

[6] The Agreement incorporates the Plan. Agreement, p.1.

On February 13, 1998, Pokalsky was scheduled for his annual review. Instead, at the meeting with Booker and Debtors' then-CEO, Marce Fuller, Pokalsky was told he was being removed from his position. At that time and thereafter Pokalsky had some discussions, largely with Booker, about another potential job with Debtors.

However, on February 13, following the meeting, Pokalsky was given a few minutes to clear out his desk and then was escorted from Debtors' offices. He was subsequently not allowed to enter Debtors' offices (except for one later meeting), and other of Debtors' employees were cautioned to have no contact with Pokalsky.

Following February 13, Pokalsky was paid his salary through April 15, 1998. By letter dated April 20, 1998, Debtors advised that they "accept[ed] your resignation." Debtors' Exhibit 10. As severance, Debtors paid Pokalsky a lump sum of $545,000. *Id*. On April 14, 2000, Pokalsky commenced suit against Debtors for, *inter alia*, breach of the Agreement.[7] Pokalsky's suit had not been concluded at the commencement of Debtors' chapter 11 cases, and the suit is the basis of the Claim.[8]

## II. Discussion

The first issue the court must address is whether Pokalsky's termination is governed by paragraph 8(c) (termination without cause) or paragraph 9 (resignation) of the Agreement.[9] Though the question of whether Pokalsky resigned or was terminated without cause is subject

---

[7] Pokalsky's suit alleged causes of action based on defamation, intentional infliction of emotional distress, and conversion as well as breach of the Agreement. Pokalsky's claims, other than breach of the Agreement, were disposed of in the July 12 Ruling.

[8] Pokalsky did not contest the correctness of Debtors' calculation of the lump-sum payment due to him, which represented the total amounts Pokalsky was to be paid as salary and an annual "Guaranteed Payment" over the three year life of the Agreement. His cause for breach of the Agreement is limited to his claim that Debtors should have compensated him for his phantom equity and milestone equity.

[9] In fact, the result (i.e., the amount due Pokalsky for phantom equity and milestone equity) would be the same, given the court's reading of the Agreement and the Plan, whether paragraph 8(c) or 9 governs.

to debate, the court finds he was terminated without cause. The humiliating nature of his exit from Debtors' offices and the evidence concerning the job opportunity supposedly offered him support a finding that Pokalsky did not leave Debtors' employment by choice. Had Debtors truly wished Pokalsky to continue in their employ, it is hardly credible that they would have parted company with him on February 23 in such a fashion. The evidence, moreover, reflects that the position Pokalsky was supposedly offered did not exist at the time, and there is no evidence an actual offer of the position was in fact made.

Having determined the threshold issue of the nature of Pokalsky's termination, the court need only construe the terms of the Agreement and the Plan to decide Pokalsky's entitlement to compensation for his phantom equity and milestone equity. Both documents are to be construed under Georgia law. Agreement ¶ 10(e); Plan §8.8. Georgia law requires the court, in divining the meaning of contracts like the Plan and Agreement, to give effect to the intent of the parties. *See Carlos v. Lane*, 275 Ga. 674, 675 (571 S.E.2d 736) (2002) (citing *McAbee Constr. Co. v. Ga. Kraft Co.*, 178 Ga. App. 496, 498 (343 S.E.2d 513) (1986)) (cardinal rule of contract construction is to ascertain the intention of the parties). In doing this, the best guide to that intent is the plain meaning of the document under review. *See Park 'N Go v. United States Fid. & Guar. Co.,* 266 Ga. 787, 791 (471 S.E.2d 500) (1996); *OTI Shelf v. Schair & Assoc.*, 238 Ga. App. 12, 13-14 (517 S.E.2d 542) (1999). The court must consider the whole of the Agreement and the Plan, construction of contracts being a holistic endeavor under Georgia law. *See Carlos v. Lane,* 275 Ga. at 675; *First Data POS, Inc. v. Willis*, 273 Ga. 792, 794 (546 S.E.2d 781) (2001); *Wiggins v. Southern Bell Tel.*, 245 Ga. 526, 529 (266 S.E.2d 148) (1980); *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 674 (34 S.E.2d 839) (1945). Finally, the court must avoid a construction that fails to give meaning or effect to some words or provisions of

the document. *See Dohn v. Dohn*, 276 Ga. 826, 828 (584 S.E.2d 250) (2003); *Harvey v. J.H. Harvey Co.*, 256 Ga. App. 333, 342 (568 S.E.2d 553) (2002); *Deep Six v. Abernathy*, 246 Ga. App. 71, 74 (2) (538 S.E.2d 886) (2000).

Although Pokalsky's rights to compensation will be determined by paragraph 8(c) of the Agreement, that to which Pokalsky's rights pertain is the Plan. The court thus begins with the allocation and value to the holder of phantom equity and milestone equity under the Plan.

The purpose of the Plan is clear from its preamble: "This [Plan] is intended to provide the potential for levels of compensation which will enhance the ability of [the company] to attract, retain and motivate high performance [sic] employees . . . ." The Plan provides for three types of incentives: bonuses (Article IV), phantom equity (Article V) and milestone equity (Article VI). The Claim does not implicate bonuses, and the court is thus concerned with just phantom and milestone equity.

In order for an employee during his or her employment to realize on either phantom equity or milestone equity, three conditions must have been met. First, the award of phantom or milestone equity must have been granted. Second, the company must have achieved a positive fair market value[10] (for phantom equity) or a milestone increase in fair market value (for milestone equity). If these two conditions were met, then the employee would have an "accrued" award. The accrued amount of the award would be equal to the percentage grant of phantom equity (for Pokalsky, 0.4%) or the percentage grant of milestone equity (for Pokalsky, 0.35%) multiplied by (in the case of Phantom equity) the increase in the company's value over

---

[10] Fair market value was to be calculated annually by multiplying EBIT times ten. (Plan § 1.16). Although phantom equity is to be calculated based upon increases in fair market value, for Pokalsky's purposes, the company's fair market value to begin with was zero. Thus any positive fair market value of the company would result in an accrual of value for his phantom equity grant.

a base year or (in the case of milestone equity) incremental increases of $250 million in the company's fair market value over $500 million up to $2 billion. Plan §§ 1.2, 5.1, 6.1 and 6.2.

For an active employee to actually receive payment for phantom equity or milestone equity, the third requirement is that the award must have vested. Plan §§ 5.2 and 6.2. The vesting schedules (over a four year period for phantom equity and a three year period for milestone equity) are structured such that, when fully vested, an employee's compensation for an award would be equal to his or her grant percentage multiplied by the fair market value of the company or incremental (milestone) increase as of the time of full vesting. In other words, had the company's fair market value in year one been $50 million, in year two $200 million, in year three $1 billion and in year four $750 million, Pokalsky's phantom equity grant would have entitled him to $3 million in payments (0.4% x $750 million). He would have accrued $200,000 in the first year and could have been paid $50,000 (the vested one fourth of the accrued grant); in the second year, his accrued award would have been $800,000, and he could have received $400,000 (the vested two fourths of the accrued grant), less any amount paid in the first year; in the third year, the accrued award would be $4 million, of which $3 million could be paid (the vested three fourths of the accrued grant), less prior payments; and in the fourth year the accrued amount would be $3 million. Thus, the accrual for an employee, and, by extension, entitlement to compensation would fluctuate with the fair market value of the company.[11] *See* Plan § 5.2.1.[12]

---

[11] Because the company's assets were commodity contracts and because the company marked these contracts to market each year, the EBIT, and, hence, the fair market value of the company would be subject to considerable potential fluctuation.

[12] There were to be two phases of phantom equity vesting and payment. Plan §§ 5.2.1 and 5.2.2. The court need not address the second phase, and the preceding discussion is limited to the first phase.

The Plan contains a provision describing the rights of a participant who is terminated (other than for cause). Section 7.5, however, provides only for voluntary termination by a participant and, in any case, would be superseded by the terms of the Agreement. Rather, Agreement ¶ 8(c) controls in the event of Pokalsky's termination without cause. That provision states:

> c. <u>Termination Before Three Years</u>. Employer may terminate this Agreement at any time, provided, however, that if such termination occurs prior to the third anniversary date of this Agreement for any reason other than Termination for Cause, Employer shall pay to Employee, in lump sum within a reasonable period of time following such termination, any unpaid Salary and Guaranteed Payment as if the Employee had been employed for the full three year term of this Agreement. In addition, Employer shall pay Employee, in lump sum, any accrued but unpaid awards under the PE Grant or ME Grant through the date of such termination.

The final sentence of paragraph 8(c) deals with compensation for phantom equity and milestone equity grants. Notably, unlike paragraph 9 (dealing with voluntary termination by Pokalsky) which provides (like the provision for voluntary termination of Plan § 7.5) for payment of *vested* amounts, paragraph 8(c) provides for payment to Pokalsky of all "*accrued* but unpaid awards" (emphasis supplied) of phantom or milestone equity.[13] Thus, rather than being limited to payment of 0.1% of the company's increased fair market value (the *vested* amount of the phantom equity award at the time of his termination), Pokalsky, upon termination pursuant to paragraph 8(c), would be entitled to 0.4% of the company's fair market value (to the extent of any increase above zero, the fair market value in the base year) and the full accrued amount of any milestone equity.

---

[13] The terms "vested" and "accrued" are not defined in either the Plan or the Agreement. However, the terms are consistently used in a very specific manner throughout the Plan, which, in fact, incorporates the term "accrued" into some definitions (e.g., §§ 1.2 and 1.3), and the court therefore concludes that the terms must have the same meaning in the Agreement.

Unfortunately for Pokalsky, in order for milestone equity to accrue at all, a milestone had to be achieved. That would require the company to have a fair market value of at least $750 million ($500 million plus a $250 million milestone; Plan § 6.1); this, in turn, would require EBIT of at least $75 million. In 1997, the year in which Pokalsky's award would have to have accrued, the company's EBIT was zero and the company's fair market value was therefore also zero—thus, no milestone equity was accrued at the time of Pokalsky's termination.

Likewise, Pokalsky's accrued phantom equity at the time of his termination would be determined by "multiplying [1997's fair market value] of the Company over the base amount by [his] PE [phantom equity] Percentage."[14] Plan § 1.2. As this requires multiplying Pokalsky's grant (0.4%) by zero, the "accrued . . . awards under the PE Grant" (Agreement ¶ 8(c)) equal zero as well. Consequently, paragraph 8(c) requires no payment to Pokalsky by reason of phantom or milestone equity.

The court is satisfied that this is the proper plain reading of the Agreement and the Plan. However, even if the court considered other readings reasonable and so considered the documents ambiguous, this is clearly the best reading of the documents.

Pokalsky argues that the failure to include language modifying the term "lump sum" in paragraph 8(c) like that in Agreement ¶¶ 8(b) and 9 ("in satisfaction of any and all amounts owing to Employee or Employee's beneficiaries") indicates that paragraph 8(c) contemplates payments over time following termination. But this argument is weak at best. First, the missing language modifies, in paragraphs 8(b) and (9), the payment to be made for salary and the Guaranteed Payment (*see* Agreement ¶ 5(b)), whereas the critical part of paragraph 8(c)

---

[14] The base amount would be zero. Plan § 1.4. As 1997's EBIT for the company also was zero, the result of subtracting the base amount from the 1997 fair market value (zero minus zero) is also zero.

deals only with phantom and milestone equity. Second, paragraph 8(c), unlike the other two provisions, provides for payment of amounts due for salary and the Guaranteed Payment for the full term of the Agreement. As the company must fully perform the Agreement, there is no need to specify that the payments contemplated under paragraph 8(c) will fully satisfy the company's obligations. This reading is also consistent with the payment pursuant to paragraph 8(c) of 100% of any accrued phantom or milestone equity award without regard to vesting. Paragraph 8(c), as the court reads it, is meant to cash out the terminated employee.

Third, had the parties intended to provide for a stream of payments, paragraph 8(c) would have been drafted like paragraph 5(g), dealing with the possibility that Pokalsky's non-compete agreement with his prior employer might prevent him from working.[15]

Pokalsky's argument that he was entitled to have his award vest as contemplated by Plan § 5.2.1 is unavailing. Aside from the fact that there is no mention of future vesting for Pokalsky's benefit in the Agreement, the effect of Pokalsky's reading would be payment at termination of full accrued phantom equity and thereafter vesting of the same awards. The result would be payment for the same award twice (first as accrued and then when vesting).[16] That the value of the accrued phantom equity at Pokalsky's termination was zero is his bad luck.[17]

---

[15] Agreement ¶ 5(g) states:

> g. <u>Injunction</u>. The above-referenced compensation shall be paid to Employee for the three year term of this Agreement even if a court enjoins the Employee from performing services for Employer.

[16] Section 5.2 clearly was intended to avoid this very result: prior payment of awards was to be credited against amounts vesting (though it appears under Plan §§ 5.2.1.4 and 5.2.2.1 an employee might be eligible for vesting of more than 100% of an award).

[17] Pokalsky argues that the Agreement should be construed against Debtors as its primary drafters. This is a rule of construction applied by Georgia courts. S*ee, e.g.,* Boardman Petroleum v. Federated Mut. Ins. Co., 269 Ga. 326, 328 (498 S.E.2d 492) (1998). However the rule only would apply to resolve an ambiguity. *See, e.g.*, Hurst v. Grange Mut. Cas. Co., 266 Ga. 712, 716 (470 S.E.2d 659) (1996).

Finally, the court's reading of the documents effects the stated purpose of the Plan. As the court reads the Plan and the Agreement, Pokalsky would be entitled under paragraph 8(c) to receive full benefit of his efforts in the company's employ. His phantom equity payment would reflect the EBIT produced during his tenure. If milestones were achieved, his milestone equity award would accrue value. If the Agreement is read as Pokalsky would have it, he would benefit from (or, if held to the vesting schedules, possibly be harmed by) the work of others performed after his departure. The former reading is certainly more consistent with the goal of attracting, retaining and motivating high-performance employees.

### III. Conclusion

For the foregoing reasons, the Objection must be sustained. The Claim is disallowed. Debtors shall submit a final judgment consistent with the July 12 Ruling and this memorandum opinion.

# # # END OF ORDER # # #

---

Moreover, the evidence at trial demonstrated that the Agreement was fully dickered. Finally, even if Debtors' counsel bore the laboring oar in drafting the Agreement, Pokalsky testified that he introduced Marce Fuller to the concept of phantom equity. Given his active participation in drafting the Agreement, the court is comfortable inferring that paragraph 8(c) and applicable provisions of the Plan, as read by the court, reflect Pokalsky's intent.