U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



_____

**Signed August 9, 2006**                     **United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MIRANT CORPORATION, et al., | § | CASE NO. 03-46590-DML-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |

### MEMORANDUM OPINION

Before the court is the Motion for an Order Approving Settlement Agreement with

Potomac Electric Power Company ("Pepco") Pursuant to Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Pepco Motion") filed by Mirant,[1] the Motion for an Order

Approving (I) The Settlement Agreement with Southern Maryland Electric Cooperative, Inc.

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and (II) The Assumption of

Certain Agreements Pursuant to Section 365 of the Bankruptcy Code (the "Smeco Motion" and,

with the Pepco Motion, the "Motions"), also filed by Mirant, and the Objection of Certain

Holders of Class 3 Claims to Debtors' Motions for Orders Approving Settlement Agreements

with Potomac Electric Power Company and Southern Maryland Electric Cooperative, Inc. (the

---

[1] The court refers to "Mirant" in this memorandum opinion to mean the reorganized debtors in these chapter 11 cases. When it uses "Debtors," the court means the pre-confirmation debtors in these cases. "Mirant Corp." refers to the reorganized parent debtor. "Debtor Mirant Corp." refers to the parent Debtor.

"Objection") filed by certain holders of Class 3 Claims[2] (the "Objectors"). The court considered

the Motions and the Objection at a hearing on July 5, 2006, at which it heard testimony from

Hugh Davenport ("Davenport"), Mirant Corp.'s Deputy General Counsel and Senior Vice

President, Gary Kubik ("Kubik"), Mirant Corp.'s Finance Director, J. Phil Williamson

("Williamson"), Mirant Corp.'s Associate Tax Director, and Peter Schaulb ("Schaulb"), a

manager of Pepco. The court also received into evidence a number of exhibits, referred to as

necessary below. Mirant, Pepco, Smeco and Objectors also presented argument.

In addition to the record made on July 5, the court will consider prior proceedings in

these chapter 11 cases. Because the Motions and Objection constitute contested matters, the

record of the entire case is available to the court. *See Nantucket Investors II v. Cal. Fed. Bank*

*(In re Indian Palms Assocs. Ltd.)*, 61 F.3d 197, 203 (3d Cir. 1995); *cf. In re Alexander*, 284 B.R.

626, 629 (Bankr. N.D. Ohio 2002) (court taking into account record from entire bankruptcy case

in deciding contested matter). Because the disputes to be disposed of by the Motions have had a

continuing and pervasive effect on these cases, it would be unrealistic for the court not to do so.

The Motions and Objection are subject to this court's core jurisdiction pursuant to 28

U.S.C. §§ 1334(a) and 157(b)(1)[3] and (2) (A) and (O).[4] This memorandum opinion constitutes

the court's findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

---

[2]     "Class 3 Claims" refers to Class 3 Claims in Debtor Mirant Corp.'s chapter 11 case as defined in the Plan. Debtors' Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and its Affiliated Debtors, dated September 30, 2005, was voted on by holders of Class 3 Claims and thereafter confirmed in an "Amended and Restated" form, dated December 9, 2005. References in this memorandum opinion to the "Plan" mean the Amended and Restated version unless otherwise stated.

[3]     Certain of the matters addressed in the Pepco Motion were the subject of orders of the District Court withdrawing their reference to this court. The District Court, however, specifically referred to this court decision on the Pepco Motion. *See* District Court's Order of May 31, 2006 and Corrected Order of June 6, 2006, in Mirant Corporation, et al. v. Potomac Electric Power Company, et al. No. 4:03-CV-944-A, in the United States District Court for the Northern District of Texas.

## I.      Background

Debtors commenced these cases on July 14 and 15, 2003.[5]  Virtually from that date[6] disputes between Debtors and Pepco have been a major focus of these chapter 11 cases.[7]

The genesis of the disputes among Debtors, Pepco and other interested parties is in the acquisition by Debtor Mirant Corp. from Pepco of several electric power generating facilities in the area around Washington, D.C.[8]  That acquisition, pursuant to an Asset Purchase and Sale Agreement (the "APSA"), included a number of contracts that figure in the Motions.  The principal contention between the parties, however, arose from the so-called Back-to-Back Agreement (the "BTB"), by which Debtors agreed, as part of the consideration due to Pepco under the APSA, to purchase from Pepco, at its cost, power purchased by Pepco pursuant to

---

[4]      Because the Plan has been confirmed, there is no property of the estate.  *See* section 1141(b) of the Bankruptcy Code (11 U.S.C. § 101, *et seq*., hereinafter referred to as the "Code").  Hence, though the court's jurisdiction to approve compromises is typically connected to its jurisdiction to approve use, sale or lease of property of the estate (*see* Reynaldo A. Valencia, *The Sanctity of Settlements and the Significance of Court Approval: Discerning Clarity from Bankruptcy Rule 9019*, 78 OR. L. REV. 425, 477-78 (1999)), the court's authority to decide the Motions cannot be so traced to the court's core jurisdiction to hear matters involving the use, sale, or lease of property under 28 U.S.C. § 157(b)(2)(M).

[5]      75 of Debtors filed for chapter 11 relief at that time. An additional 8 of Debtors filed chapter 11 petitions in the succeeding months, and on September 25, 2005, Newco 2005 Corporation ("Newco"), formed to facilitate implementation of the Plan, filed a chapter 11 petition. Following confirmation of the Plan, Newco became Mirant Corp.

[6]      Indeed, Pepco filed its first pleading in the case, an objection to Debtors' Motion for an Order Authorizing and Approving a Procedure for the Rejection of Certain Executory Contracts, on July 16, 2003.

[7]      Debtors' disputes with Pepco have been the subject of opinions reported as follows:  318 B.R. 100 (N.D. Tex. 2004); 303 B.R. 304 (N.D. Tex. 2003), *aff'd in part, rev'd in part*, 378 F.3d 511 (5th Cir. 2004); 299 B.R. 152 (Bankr. N.D. Tex. 2003); 251 F.Supp. 2d 144 (D. D.C. 2003) (this opinion was entered before the commencement of Mirant's bankruptcy case).  In addition, Pepco has been the sole subject of or an active participant in numerous hearings before this court, the District Court and the Court of Appeals that have led to many unpublished opinions and rulings.

[8]      The acquisition from Pepco was engineered by Debtors' former parent, The Southern Company ("Southern").  Southern sold (through a public offering) approximately 20% of Debtor Mirant Corp.'s common stock in September of 2000; the balance of Debtor Mirant Corp.'s stock was distributed to Southern's shareholders the following April. The acquisition from Pepco occurred in December 2000.

certain contracts with third parties. The BTB, the term of which lasts until 2021, has been

projected to produce net losses over its life having a present value in the range of $300 million to

$600 million.[9] Thus, on August 28, 2003, Debtors filed their motion seeking to reject the BTB.

After three years of litigation, the effort at rejection remains unsuccessful.[10]

In addition to the BTB, Pepco has asserted claims in these chapter 11 cases for various

alleged breaches by Debtors of other agreements subsumed by the APSA. Pepco has filed 14

proofs of claim seeking damages ranging in amount from $37,769 to approximately $31,100,000.

All of these claims, as well as certain costs of administration Pepco alleges it is due, are covered

by the Motions.[11]

The Smeco Motion proposes resolutions of disputes between Debtor, on the one hand,

and Pepco and Smeco, on the other, respecting a certain Facility and Capacity Credit Agreement

(the "FCC"). The FCC pertains to possession and operation of a two-turbine peak-load facility

on the premises at one of Mirant's operating locations known as the Chalk Point facility. The

FCC has been the subject of this court's memorandum opinions dated June 28, 2004, and

November 22, 2005.[12] As per the Smeco Motion, those disputes would be resolved by Mirant's

assumption of the FCC.

---

[9] The court here synthesizes estimates of the cost of the BTB. The cost of performance of the BTB—the amount of the damage claim resulting from its rejection—is discussed further below.

[10] The Court of Appeals very likely ended any chance the BTB could be rejected in an opinion dated July 19, 2006. *See* Mirant Corp. v. Pepco (*In re* Mirant Corp.), Nos. 05-10038 and 05-10419, 2006 U.S. App. LEXIS 18129, at *27 (5th Cir. July 19, 2006).

[11] Pepco also held a Class 3 Claim of $105 million that is not the subject of the Motions and that the court understands has been satisfied by distributions under the Plan.

[12] Mirant Peaker, LLC v. So. Md. Elec. Power Co. (*In re* Mirant Corp.), No. 04-4073 (Bankr. N.D. Tex. June 28, 2004), *available at* http://www.txnb.uscourts.gov/opinions/dml/03-46590_Adv04-4073_20040629.pdf; Mirant Peaker, LLC v. So. Md. Elec. Power Co. (*In re* Mirant Corp.), No. 04-4073, 2005 Bankr. LEXIS 2309 (Bankr. N.D. Tex. Nov. 22, 2005).

Notwithstanding that the disputes with Pepco were unresolved, Debtors were able to propose and confirm the Plan.[13]  For purposes of dealing with the Motions and Objection, the court need here be concerned only with the treatment of creditors of Debtor Mirant Corp.[14]  As creditors holding Debtor Mirant Corp. Class 3 Claims, Objectors were to receive treatment as specified by Plan § 5.1(c).  This treatment included (1) pro rata distribution of approximately 90% of Mirant Corp.'s common stock; (2) entitlement to a pro rata share of recoveries from certain litigation (the most significant litigation being against Southern); and (3) importantly from Objectors' perspective, entitlement to a pro rata distribution of Mirant Corp. common stock reserved but not used to satisfy contested Class 3 Claims (a total of 21.5 million shares were reserved for contested claims).

As this court has previously noted, the public debt underlying Class 3 Claims was trading at almost 100% of principal and interest on the eve of confirmation of the Plan.  *See In re Mirant Corp.*, 334 B.R. 800, 832 n.112 (Bankr. N.D. Tex. 2005); *see also In re Mirant Corp.*, No. 03-46590, 2006 Bankr. LEXIS 221, at *10 (Bankr. N.D. Tex. Feb. 13, 2006).  Although the court was advised at the beginning of the July 5 hearing that the initial distribution of stock to holders of Class 3 Claims provided value equal to only approximately 95% of those claims, the evidence before the court in the course of these cases (e.g., as indicated above and during hearings on fee applications) strongly supports a finding that Class 3 Claims have been satisfied in full.[15]

---

[13]    The Plan left open Debtors' flexibility to deal with Pepco.  *See, e.g.,* Plan § 14.5.  The court will further discuss this flexibility below.

[14]    However, Pepco has argued that it can assert certain of its claims against *inter alia*, Debtor Mirant Peaker, LLC ("Debtor Peaker").  Holders of claims asserted against Debtor Peaker are assured satisfaction in full under the Plan.  *See* Plan § 5.1(g).

[15]    The court here uses the phrase "satisfied in full" to mean that each holder of a Class 3 Claim received "property of a value, as of the effective date of the [P]lan, equal to the allowed amount of such claim . . . ."  Code §

Certainly based on current stock prices (and stock prices for almost any day since the effective date of the Plan) and as testified to by Davenport, the shares of common stock issued by Mirant Corp. have a value in excess of the total of claims in satisfaction of which those shares were distributed.

Prior to confirmation of the Plan, Pepco, Smeco and Debtors (with the encouragement of the court and the concurrence of the Corp. Committee (as defined below)) began discussions as to how they might settle their disputes. At their request, the Examiner[16] served as a mediator to bring the parties together. The Examiner, through counsel, advised the court during the July 5, 2006, hearing that the settlements proposed in the Motions (collectively, the "Settlement"; when used with a paragraph citation "Settlement" means the agreement that is the subject of the Pepco Motion) were the subject of arms-length, good-faith negotiations.

---

1129(b)(2)(B)(i). That the court assesses the value of the stock issued by Mirant Corp. for purposes of that section should have no bearing on whether creditors are deemed fully satisfied for other purposes, including in litigation with Southern. The court understands the concern expressed at the commencement of the July 5, 2006, hearing that Southern (despite its anxiety to avoid the jurisdiction of this court) may find helpful and seek to use findings made in this court to block litigation against it in Georgia. Even assuming theories of issue preclusion may be so invoked by Southern, the courts in Georgia will no doubt recognize the distinction between "value" for purposes of a plan and "value" in determining any liability Southern may have by reason of misconduct respecting Debtors. *Cf.* Code § 506(a) ("value shall be determined in light of the purpose of the valuation"). It is especially important in any determination of value to remember that most creditors in Debtors' cases were not paid in cash but rather received stock. Moreover, Debtors' arguable solvency at case commencement or on the Plan's effective date could only affect fraudulent transfer causes of action if it affects any claims against Southern. Even if such solvency were to prove relevant to fraudulent transfer claims, it will not hinder recoveries from Southern by any who were, in fact, harmed by Southern's conduct respecting Debtors, though it might alter the theory of recovery. Finally, any determination of value at this time certainly does not address the losses suffered by claimants and stockholders who traded out of their positions prior to the effective date of the Plan.

[16]     Pursuant to an order dated April 7, 2004, William Snyder was selected by the United States Trustee and approved by the court to serve as Examiner in Debtors' chapter 11 cases. His duties included mediations such as among Debtors, Pepco and Smeco.

Pursuant to the Settlement, in full satisfaction of all its claims, Pepco is to receive $520,000,000.[17] The $520,000,000 is to be paid from the proceeds of two distributions of up to a total of 18,000,000 shares of common stock of Mirant Corp., which Pepco will sell in block trades, and a cash payment of at least $70,000,000 from Mirant to Pepco. Debtors (and Mirant) will assume the FCC, thus resolving the dispute with Smeco. On the other hand, the BTB will be deemed rejected effective May 31, 2006,[18] and Mirant will be relieved of certain other obligations asserted against various Debtors (now Mirant entities) by Pepco.

Since confirmation of the Plan, the holders of Class 3 Claims have asserted their control over Mirant Corp. By virtue of their ownership of roughly 90% of Mirant Corp. stock, through the committee (the "Corp. Committee") representing, essentially, the holders of Class 3 Claims, those claimants selected Mirant Corp.'s current president and CEO, Edward Muller.[19] *See* Plan §§ 8.10 and 8.11. Mr. Muller has brought in as management for Mirant Corp. many new employees who have his confidence. As Davenport testified, it was this management team,

---

[17] The settlement allows Mirant to elect instead under certain circumstances to pay Pepco $70,000,000 and assume the BTB.

[18] Although Pepco and the Federal Energy Regulatory Commission ("FERC") previously insisted to the court that rejection could occur only with FERC's prior approval because of the "public interest" in the BTB (a position both FERC and Pepco seem to have urged vigorously as well in the District Court and the Court of Appeals), Pepco now informs the court FERC approval is unnecessary because rejection is occurring by agreement of the parties. While the court is puzzled how a rejection by agreement obviates the need for regulatory blessing (the court being doubtful that accord between the managements of Pepco and Mirant provides particularly effective protection of the "public interest" Pepco and FERC insisted was at stake in the case of the BTB), the court notes it has ruled FERC is a party-in-interest in these cases (a ruling subsequently cited with approval by the Court of Appeals; *In re* Mirant, 378 F.3d at 525-26), and FERC thus had notice of the Motions. Despite repeated invitations in the past from the court, FERC has not participated in this court in these cases—except, of course, in the jurisdictional turf war over the BTB. Given the notice to FERC, the court concludes that, whether because it has abdicated its responsibility or determined the Settlement is in the public interest, FERC has consciously decided not to object to the Pepco Motion.

[19] The court was advised during argument on July 5 that since the effective date there has been a meeting of Mirant Corp. shareholders, which ratified Mr. Muller's election. But even if present management of Mirant is not the choice of the shareholders (including, as discussed below, Objectors), it certainly is more the choice of holders of Class 3 Claims than it is of any other constituency.

selected directly or indirectly by the representatives of holders of Class 3 Claims, that agreed to the Settlement and directed its submission to this court.

## II.  Issues

1. Mirant has raised a question concerning Objectors' standing to contest the Motions, so the court must first address whether the Objection should even be considered.

2. Objectors argue that the Settlement is inconsistent with, and so not permissible under, the Plan, and the court, once past the question of Objectors' standing, must address that argument before turning to the merits of the Settlement.

3. If the Settlement is permissible under the Plan and if Objectors have standing to oppose the Motions, the court must consider Objectors' other arguments and determine whether the Settlement satisfies the standards for its approval.

## III.  Discussion

A.      Objectors' Standing

Mirant argues that at least some of the Objectors acquired their Class 3 Claims after the effective date of the Plan and after distribution of Mirant Corp. stock on account of those claims and should not be heard.  Mirant alternatively argues that Objectors are no longer "creditors" in these cases, since Objectors' claims have been discharged (Code § 1141(d)); in order to be a "creditor" one must have a "claim" (Code § 101(10)); in order to have a "claim" one must have a "right to payment" (Code § 101(5)(A)); because the Plan discharged all Debtors' debts, and because a "debt" is liability on a claim (Code § 101(12)), Mirant has no liability to Objectors, Objectors have no rights to payment and, hence, no claims; and Objectors, therefore, are not

creditors. According to Mirant, since Objectors are no longer creditors, they no longer have a right to appear and be heard on the Motions (Code § 1109(b)).

Taking the second contention first, even if Objectors are not "creditors," they are parties in interest entitled to be heard under Code § 1109. It would be absurd to provide in a plan for retention by the court of jurisdiction, for example, to "hear and determine all controversies . . . and disputes that may relate to, impact upon, or arise in connection with the Plan . . ." (Plan § 16(vii)) and yet disenfranchise those whom that retained jurisdiction is intended to protect. Thus, where, as in the case at bar, a controversy has arisen over the meaning of the Plan and the committee that represented holders of Class 3 Claims no longer exists, it is essential that standing exist for representative entities willing to challenge an act as to which, in accordance with the terms of the Plan, court approval has been requested.

It is true that, while the Corp. Committee is out of business, Mirant is controlled by those selected by representatives of holders of Class 3 Claims. This figures in the court's analysis of the merits of the Settlement below. But whether a creditor whose claim has been discharged and who has received distributions (other than full cash payment) the value of which distributions may be affected by proposed actions brought before the court for its consideration is otherwise represented or not should not affect that creditor's right to appear and be heard.

As to Mirant's contention that some of the Objectors acquired their claims after the initial distribution of Mirant Corp. stock and so are entitled only to any supplemental distribution of stock from the reserve for disputed claims,[20] this does not alter the fact that such a purchaser of a

---

[20]    Mirant argues that holders of Class 3 Claims who sold their claims after the effective date of the Plan could not transfer their interest in litigation proceeds to be distributed pursuant to Plan § 10.13. If this is so, and if beneficial interests in litigation have "issued," transfer of a Class 3 Claim would carry, at most, the right to supplemental distributions under Plan § 10.15. Mirant argues that Objectors bought their Class 3 Claims as a

claim obtains all the rights of its seller.  *See United States v. Cherry Street Partners, L. P. (In re Alliance Health of Fort Worth, Inc.)*, 240 B.R. 699, 704 (N.D. Tex. 1999) (citing *Defense Servs., Inc. v. United States (In re Defense Servs., Inc.)*,104 B.R. 481, 485 (Bankr. S.D. Fla. 1989)); *In re Lake Hopatcong Water Corp.*, 15 B.R. 411, 416 (Bankr. D. N.J. 1981).  That those rights are very limited—here the expectation of a supplemental distribution of stock—does not mean such a claim holder does not have the standing that comes with ownership of the claim.

On the other hand, the purchaser also takes the claim *cum onere*.  If there have been distributions on the claim, its acquirer holds the claim as if it had received the distributions.  *Cf. In re Alliance Health of Fort Worth, Inc.*, 240 B.R. at 704 (an assignee of a claim should never receive more on account of the claim than the assignor would have received had the claim not been assigned); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 224 (S.D. N.Y. 2005) ("The purchase of the claims in a bankruptcy proceeding should not grant a transferee any greater rights than the transferor had."); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180, 199 (Bankr. S.D. N.Y. 2006) ("While the transferees [of claims] have the same rights and benefits as other similarly situated creditors in the bankruptcy proceeding, the transferees must also assume the obligations, risks and liabilities attached to the claims.").  In the case at bar, that means the court must consider the holder of a Class 3 Claim to be in the same position whether or not the holder held the claim and received distributions on the Plan's effective date.  In other words, the court, in considering the

---

speculative investment on the assumption that the BTB would not be rejected.  If the BTB were not rejected, the distribution under Plan § 10.15 would be substantial.  If, however, as is true under the Settlement, the BTB is rejected and Pepco's claim is satisfied by a distribution of Mirant stock, one who purchased the right to receive distributions under Plan § 10.15 would necessarily look to a much reduced return on his investment.  While the court agrees that the disappointment of any such Objector may constitute a questionable motive for the Objection, even if that is the reason behind the Objection, it does not amount to a basis for denying standing.

arguments of Objectors, must presume that each Objector has received (and retains) common stock of Mirant Corp. having a value at least equal to the amount of the Objector's Class 3 Claim.

Alternatively, even if Mirant is correct and an Objector that acquired its claim after the effective date does not have standing to oppose the Motions, at least some of the Objectors have held their Class 3 Claims since prior to any distributions under the Plan.[21] There can be no question that these latter Objectors are parties in interest (creditors) entitled to oppose the Motions.

That Objectors have standing to oppose the Motions, however, does not give them the right to interpose objections wholly lacking in merit. As discussed below, the Objection does not state any valid reason for the court not to approve the Settlement. Many of Objectors' arguments are fragile to the point of being frivolous, and not one is well supported by the facts and the law.

B.     Permissiveness of Settlement Under the Plan

Objectors argue that the Settlement represents an impermissible post-substantial consummation modification of the Plan (*see* Code § 1127). They cite to Plan § 14.5(c) to demonstrate that Pepco's claims, addressed in the Settlement, are only "entitled to the treatment specified in the Plan the same as though such Claim[s] became Allowed as of the Effective Date." Because the treatment of Pepco's claims under the Settlement differs from that specified by Plan § 5.1(c), Objectors reason, the effect of approving the Settlement would be a modification of the Plan—which is not permitted by section 1127 of the Code.

---

[21]     Counsel for Objectors advised the court that, *inter alia*, Edison Mission Energy ("EME") joined the Objection. EME has been an active creditor through a significant part of these chapter 11 cases. *See, e.g., In re Mirant*, 334 B.R. at 808; Debtors' Second Amended Disclosure Statement Relating to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization (the "Disclosure Statement"), pp. 96, 99-100.

Objectors rely heavily on *U.S. Brass Corporation v. Travelers Insurance Group, Inc.* (*In re U.S. Brass Corporation*), 301 F. 3d 296 (5th Cir. 2002). In *U.S. Brass*, the Court of Appeals held that a proposed settlement actually modified the debtor's confirmed plan and so could not be approved. *U.S. Brass*, however, is readily distinguishable from the case at bar.[22] First, the "settlement" there did not resolve the claims at issue; rather it changed the method of their liquidation. *U.S. Brass*, 301 F.3d at 302. Second, the method for liquidating the claims at issue had been dickered prior to confirmation between the appellants and appellees, and the method of liquidation was a prerequisite to appellees withdrawing their opposition to debtor's plan. *Id*. at 301. Third, the method of liquidation proposed in the settlement (arbitration) as opposed to that provided in the plan (litigation) was adopted in the *U.S. Brass* plan for claims other than those at issue through an alternative dispute resolution mechanism, thus indicating a clear intent not to

---

[22]     The other cases cited by Objectors to show the Settlement modifies the Plan not only are not binding precedent for this court, but are also easily distinguished. Objectors cite to *In re* Joint Eastern & Southern Dist. Asbestos Litigation, 982 F.2d 721 (2d Cir. 1992), to support their proposition that the Settlement cannot be approved because it is an impermissible post-consummation modification of the Plan. Joint Eastern & Southern concerned the Johns-Manville Corporation, which was the world's largest asbestos producer. 982 F.2d at 725. The proposed settlement in Manville involved changes to the trust formed to satisfy asbestos victims. The changes would have divided victims into two categories, limited previously existing rights to jury trial and capped potential recoveries to certain claimants. *Id*. at 747. No provision of the plan or trust documents allowed such amendments. *Id*. at 746. In the case at bar, as discussed below, the Plan specifically allows for settlement among Mirant, Pepco and Smeco. No term of the Plan will be changed. The "change" to treatment of Objectors results only from using the stock reserved for contested claims to satisfy one of the claims for which the stock was reserved. Objectors will still retain the right to left-over reserved stock and are still fully satisfied; their rights to a jury trial (if they have or need any) are not affected.

Objectors also cite to *In re* Ionosphere Clubs, Inc., 208 B.R. 812 (Bankr. S.D. N.Y. 1997) in which the bankruptcy court refused to approve a proposed settlement that amended the related reorganization plan because the plan did not provide the authority for any plan amendments. 208 B.R. 812, 816. The settling parties argued that the amending authority was contained in a pre-petition contract, but that contract was altered by the reorganization plan and an approved post-consummation settlement. *Id*. The bankruptcy court stated, "Permitting appellees to modify a provision that explicitly was incorporated into a reorganization plan as occurred here would permit circumvention of the bankruptcy process." In the case at bar, all provisions of the Plan will remain the same. The Settlement requires no change to any provision of the Plan.

Finally, Objectors cite to two unpublished opinions as additional support; in both opinions, the proposed settlements materially altered the terms of the plans and violated express provisions of the plans. *See In re* Northwestern Corp., 2005 Bankr. LEXIS 367, March 10, 2005 (Bankr. D. Del.); *In re* Continental Airlines, 1994 U.S. Dist. LEXIS 20531, June 8, 1994 (D. Del.).

---

use arbitration to liquidate the claims that were the subject of the settlement. *Id*. In the case at bar, the Settlement will, in fact, dispose of Pepco's claims. Further, Objectors did not negotiate any term of the Plan at issue—it cannot be said here that approval of the Settlement would fly in the face of a bargain struck with Objectors to obtain confirmation of the Plan. Finally, as discussed below, it was clearly not the intent of the drafters of the Plan to limit settlement of Pepco's claims to exactly the same treatment as provided for Class 3 Claims.

In regard to the last of these distinctions, Objectors misread the Plan. Of necessity they rely on Plan § 14.5(c) for the proposition that any claim of Pepco must receive treatment identical to other claims in the same class. Section 14.5(c) reads:

> (c) <u>Condition Subsequent</u>. Upon a determination by Final Order (i) authorizing the assumption or rejection of any agreement with Pepco or its subsidiaries; (ii) recharacterizing the obligations arising under any such agreement; or (iii) avoiding the obligations under such agreements, then (A) such agreement shall be rejected, recharacterized, and/or avoided, as the case may be, (B) the interim performance obligations set forth in Section 14.5(a) (and any guarantee thereof) shall terminate and be of no further force or effect, (C) New Mirant (for itself or as agent) may pursue any claims it may have against Pepco or third parties for rescission damages, (D) any Claim of Pepco resulting therefrom shall, upon becoming Allowed, be entitled to the treatment specified in the Plan the same as though such Claim became Allowed as of the Effective Date. If the Debtors are unable to obtain a Final Order authorizing the rejection, recharacterization or avoidance of any agreement with Pepco or its subsidiaries, to the extent such agreement constitutes an executory contract pursuant to section 365 of the Bankruptcy Code, such agreement shall be assumed by the Debtor that is a party thereto (and in the case of the Back-to-Back Agreement, the APSA and the Assumption/Assignment Agreement, assigned to Mirant Oregon and unconditionally guaranteed by New Mirant) and in connection therewith all required cure obligations under section 365 of the Bankruptcy Code shall then be performed pursuant to Section 14.2.

Plan § 14.5(c) appears to have been drafted for the situation where Debtors' disputes with Pepco

were litigated to final judgment.  The provisions of subsection (D) (upon which Objectors rely)

would only be triggered by an order authorizing rejection.  Section 14.5(c)(C), also triggered by

such an order, provides for suit by Mirant against Pepco, even while subsection D is invoked by

the same facts and would lead to liquidation and allowance of Pepco's claims.  Yet the very idea

of "settlement" contemplates an end to litigation.  By providing for allowance of a claim

following rejection and yet in contemplating further litigation against Pepco, section 14.5(c) does

not appear a logical framework for governing potential settlements among the parties.

Plan § 14.5(b), however, *is* suited to dealing with potential settlements.  Section 14.5(b)

reads:[23]

> (b)    <u>Reservation of Rights</u>.  The Debtors shall have the right, at any time prior
> to the commencement of the Confirmation Hearing, to commence an
> action or proceeding to obtain a Final Order (i) authorizing the Debtors to
> assume or reject any or all of the agreements with Pepco or any of its
> subsidiaries, (ii) determining that the Debtors' obligations under any of
> such agreements constitute prepetition debt obligations, (iii) determining
> that any postpetition amounts paid (in excess of the value of any actual
> benefits received) by the Debtors, Mirant Oregon, and/or New Mirant to
> Pepco (<u>including</u> payments made after the Effective Date) are recoverable
> by the Debtors pursuant to sections 105, 503, and 549 of the Bankruptcy
> Code; (iv) recharacterizing obligations under the agreement arising on or
> before the Petition Date; (v) avoiding any or all of the obligations under
> the agreements under the Pepco Causes of Action; or (vi) otherwise
> resolving the disputes between the Debtors and Pepco.  Nothing herein
> shall (A) preclude the Debtors and Pepco from seeking approval of a
> negotiated settlement of any such disputes, actions or matters at any time
> after the Effective Date, or (B) limit the rights, remedies, claims or
> defenses of Pepco with respect to the matters set forth herein or in
> connection with any pending litigation.

---

[23]       Plan §§ 14.5(b) and 14.5(c) (and most other sections of the Plan referred to in this memorandum opinion)
were the same in the version of the Plan on which holders of Class 3 Claims voted and in the Amended and Restated
version that was confirmed by the court.

Case 03-46590-rfn11 Doc 14448 Filed 08/09/06 Entered 08/09/06 13:18:08 Page 15 of 30

While most of section 14.5(b) deals with pre-effective date settlements, the first portion of the final sentence of the section (subsection (A)) controls the case at bar. Because "herein," as used in that sentence, refers not just to Plan § 14.5(b), but rather "to the Plan as a whole" (Plan § 1.4), section 14.5(b) trumps potential application of section 14.5(c) and allows "Debtors and Pepco [to seek] approval of a negotiated settlement" of their disputes "at any time after the Effective Date." It is noteworthy that the only requirement the proposed settlement must meet under section 14.5(b) is that it be "negotiated." Had the drafters intended that any claims of Pepco would have to be treated as provided in, e.g., Plan § 5.1(c), section 14.5(b) could and would have so provided. The very absence in section 14.5(b) of any language like that of section 14.5(c)(D), providing that Pepco claims would receive treatment as provided in the Plan, indicates the Plan drafters intended the apparently unrestricted flexibility in settling the disputes with Pepco that is implied by section 14.5(b)(A).[24]

It is logical that the Plan be read to allow flexibility in settling with Pepco. The complexity of the relations between Pepco and Debtors would encourage flexibility in any provision anticipating settlement of outstanding disputes between them. To have created in the Plan rigid limitations on the form of settlement would surely have frustrated any negotiations between the parties to resolve their differences by agreement. Settlement of disputes such as those addressed in the Motions should be encouraged. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 607 F. Supp. 1312, 1320 (S.D. N.Y. 1985); 10 COLLIER ON BANKRUPTCY ¶ 9019.01 (15th ed. rev. 2006). Reading Plan § 14.5(b) as limited by section 14.5(c) would run counter to the

---

[24]     Plan § 14.8 provides similar flexibility for settling disputes pertaining to the FCC.

law's general favor for settlement. Certainly there is no reason for this court to adopt such a strained reading of the settlement authority provided in section 14.5(b). The court therefore concludes that the Settlement may be approved without contradiction to the Plan.

C.     Merits of the Settlement

As a preliminary matter, there is the question of what tests the court should apply in determining whether to approve the Settlement. The parties have focused on the tests regularly used by courts in considering settlements proposed pre-effective date pursuant to FED. R. BANKR. P. 9019.[25] The court, subject to the following discussion, will adopt those standards; they are the toughest of the potential tests the court could adopt. By doing this, however, the court does not mean to suggest that those standards must be adopted as a matter of law for evaluating a post-effective date settlement in a chapter 11 case in which creditors are fully satisfied. Rather, because the court holds the Settlement may be approved under the same standards that would be applicable to a pre-effective date settlement, the court sees no need to test the Settlement against lesser standards that might have been invoked as proper for adjudication of the Motions.[26]

1.     "Fair and Equitable" and "In the Best Interests of the Estate"

Case law suggests two general standards against which a proposed settlement is to be assessed: (1) whether the settlement is "fair and equitable," and (2) whether the settlement is "in the best interests of the estate." *See Protective Comm. for Indep. Stockholders of TMT Trailer*

---

[25]     Rule 9019 is purely procedural. Contrary to Objectors' arguments, the Plan does not require that a settlement be tested by any specific standard. Rule 9019(a) only requires notice and hearing respecting a settlement. Finally, the Plan only addresses Rule 9019 in negative terms: those compromises of claims not requiring submission to the court in accordance with Rule 9019. Plan § 11.3.

[26]     For example, the court might have tested the Settlement by the same standard a court in Delaware (Mirant Corp.'s state of incorporation) would apply in a stockholder suit to prevent such a corporate action.

*Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980).

a. Fair and Equitable

As to whether the settlement is "fair and equitable," that term is properly a term of art associated with plan confirmation. *See* Code § 1129(b)(1); former Bankruptcy Act §§ 174 and 221(2). Use of this test in the settlement approval context traces back to the Supreme Court's decision in *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*. 390 U.S. 414, 424 (1968). In *Protective Committee*, the Supreme Court invoked the term "fair and equitable" when considering a settlement reached by a chapter X trustee with secured creditors. The court did so in determining whether the settlement, included in a plan of reorganization, violated the confirmation requirement that a chapter X plan be "fair and equitable." *Id*. The Court held that the reorganization court could not approve the proposed compromise unless, as required of chapter X plans generally, it was "fair and equitable." *Id.* at 441. In reaching its decision, the Court referred to the definition of "fair and equitable," stating "[t]his standard incorporates the absolute priority doctrine." *Id*. According to the absolute priority rule, senior interests are entitled to full satisfaction before any return may be provided for junior interests. *Id*.; *see also SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594 (1965).

Because "fair and equitable" translates to the absolute priority rule, in order for a settlement to meet that test it must be consistent with the requirement that dissenting classes of creditors[27] must be fully satisfied before any junior creditor receives anything on account of its

---

[27]     Under the Bankruptcy Act, any chapter X plan had to meet the fair and equitable test as to all classes of creditors (other than those accepting by 100%). Under the Code, only dissenting classes are assured fair and equitable treatment. In the context of a *pre-plan* settlement, it would be appropriate to assume that holders of claims

claim.  Where the dissenting class and the settling creditor hold claims that are on a parity, and

where the dissenting class will not receive full satisfaction of its claims, providing a return to the

settling creditor greater than what will be received by the dissenting class may violate the

requirement that the settlement be fair and equitable.  *See generally In re Boston & Maine Corp.*,

468 F. Supp. 996 (D. Mass. 1979).  In the case at bar, however, because Class 3 Claims have

been fully satisfied under the Plan, the Settlement cannot, as a matter of law, violate the absolute

priority rule, and, hence, the fair and equitable standard.[28]   The court therefore holds that the

Settlement is "fair and equitable," giving that term its statutory meaning.

    b. Best Interests of the Estate

    Even though the Supreme Court held that the "fair and equitable" standard means the

absolute priority rule, subsequent cases considering Rule 9019(a) motions sometimes appear to

conflate the "best interests of creditors" standard and the "fair and equitable" standard.  *See In re*

*Nutraquest, Inc.*, 434 F.3d 639 (3d Cir. 2006); *In re Servisense.com, Inc.*, 382 F.3d 68, 72 (1st

Cir. 2004); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.* (*In re Cajun*

*Elec. Power Coop.*), 119 F.3d 349, 355-56 (5th Cir. 1997); *In re Jackson Brewing Co.*, 624 F.2d

at 602; *Am. Employers' Ins. Co. v. Kin Res. Co.*, 556 F.2d 471, 475 (10th Cir. 1977); *In re John*

*August Engman*, 331 B.R. 277, 287 n.24 (Bankr. W.D. Mich. 2005).  Because the test to assess a

---

that cannot expect to be fully satisfied would dissent.  *See, e.g., In re* AWECO, Inc., 725 F.2d 293, 296 (5th Cir. 1984).

[28]    Indeed, in a post-effective date context, if a class voted to accept a plan (as did Class 3 in this case), then the claims of that class need not be satisfied in full, even as a prerequisite to settlement with a parity creditor on a more favorable basis, so long as the settlement is permissible under the plan.  In the case at bar, Class 3 accepted the Plan, including Plan § 14.5(b).  Thus, by its acceptance, the class consented to Mirant's authority to reach a "negotiated" settlement with Pepco (and by Plan § 14.8(b) with Smeco).  As section 14.5(b) leaves Mirant essentially unfettered discretion, Objectors, their class having accepted the Plan, very likely could not complain on the basis of the "fair and equitable" standard even if Class 3 Claims were not satisfied in full while Pepco received full payment.

proposed settlement is not found in the Code, courts have developed a number of checklists to give these phrases meaning and "to ensure that the settlement is fair, equitable, and in the best interest of the estate and creditors." *Conn. Gen. Life Ins. Co. v. Foster Mortgage Corp.* (*In re Foster Mortgage Corp.*), 68 F.3d 914, 917 (5th Cir. 1995). As demonstrated by the content of these checklists, they appear directed to benefits and burdens a settlement imposes on an estate. To the extent "fair and equitable" has a meaning independent of effects for a bankruptcy estate, as discussed in the preceding section, that meaning must be the historical and statutory one given to the phrase. Because the court holds the Settlement qualifies as "fair and equitable" in that sense, the remaining question is whether it meets the checklist requirements for approval: i.e., whether it results in provision of benefits or relief from burdens such that it is in the best interests of Mirant and its stakeholders.[29]

As guidance to bankruptcy courts, the Court of Appeals for the Fifth Circuit has articulated a four-prong test to be applied to determine if a settlement is beneficial: (1) the probability of success of litigation; (2) the complexity and likely duration of the litigation; any attendant expense, inconvenience, or delay; and possible problems collecting a judgment; (3) the interest of creditors with proper deference to their reasonable views; and (4) the extent to which the settlement is truly the product of arms-length negotiations. *See In re Cajun Elec. Power Coop.*, 119 F.3d at 355-56; *see, similarly, In re Southern Medical Arts Cos., Inc.*, 343 B.R. at 256; *In re Nutraquest, Inc.*, 434 F.3d at 644; 10 COLLIER ON BANKRUPTCY ¶ 9019.02 (15th ed. rev. 2006).

---

[29]     Although the test for settlements is typically phrased in terms of best interests of creditors and the estate, following confirmation of the Plan on December 9, 2005, the estate vested in Mirant. *See* Code § 1141(b). The court consequently must assess best interests in terms of Mirant and those who have an interest in Mirant.

As the discussion below details, the Settlement should be approved because each of the four prongs established by *Cajun Electric* weighs in its favor.

First, the court finds that the probability of Debtors' success in the litigation with Pepco is small based on the history of their conflict and the rulings of the District Court and the Court of Appeals for the Fifth Circuit.[30]  Second, the court further finds that the litigation is extremely complex.  Many of the questions are of first impression (e.g., the standard for rejection of the BTB is unsettled, as is the applicability of Code § 502(b)(6) to the FCC) and could require numerous costly appeals before concrete resolution.  Davenport estimated the cost to Mirant of the litigation to be between $7 million and $10 million.  Assuming Pepco's litigation costs (which Pepco has argued Mirant should bear) are comparable to Mirant's, the total cost to the parties of the litigation to date is between $14 million and $20 million.  If the disputes between the parties are not resolved, further substantial costs will be incurred.  Thus, the first two prongs of the *Cajun Electric* standard weigh in favor of approval of the Settlement because it provides for resolution of each of the previously disputed and litigated issues without the need for further litigation or cost.

The third prong of the *Cajun Electric* standard requires the court to consider the *reasonable* views of creditors.  To begin with, of course, the Settlement was negotiated under the supervision of management chosen by representatives of class 3 creditors.  It seems unlikely that Mirant's management would not have carefully considered the best interests of the constituency

---

[30]      *See, e.g.,* Pepco Motion ¶ 11 (detailing three years of litigation in the bankruptcy court, the District Court, and the Court of Appeals for the Fifth Circuit); Mirant Corp. v. Pepco (*In re* Mirant Corp.), Nos. 05-10038 and 05-10419, 2006 U.S. App. LEXIS 18129, at *27 (5th Cir. July 19, 2006) (holding both that the BTB is not severable from the APSA and that Mirant must continue to perform under the APSA unless and until it is rejected and cautioning Mirant that any further appeals involving an attempt to reject the BTB "may well invite the most severe sanctions available to [the Fifth Circuit]").

responsible for its selection. However, even if this prong of the *Cajun Electric* standard is rephrased as requiring the reasonable views of *Objectors*, the Settlement still should be approved.

Objectors argue that the Settlement should not be approved because 1) the Settlement is impermissible under the Plan;[31] 2) the Settlement results in an excessively high payment to Pepco; 3) the Settlement requires assumption or rejection of contracts but Mirant has not met the standard for assumption or rejection; and 4) the Settlement serves the best interests of Mirant's management rather than the best interests of the holders of Class 3 Claims in that the latter would receive greater benefit from distribution of the stock reserved for contested claims than from the conversion of Mirant's potential liability under the BTB into stock.

Objectors' argument that Pepco's treatment is too rich turns on two factors: the amount of Pepco's claim and the treatment of that claim under the Settlement. During the July 5 hearing, the court, with the assistance of Schaulb, calculated that, even based on less than the maximum potential annual damages, the claim to which Pepco would be entitled by reason of rejection of the BTB would total approximately $450 million,[32] considering interest from commencement of the case to the date of rejection (May 31, 2006).[33] Quantification of the BTB claim in this

---

[31]      This argument is addressed in section III.B., supra.

[32]      Mirant, in its presentation, considered prepetition amounts due under the BTB independently of the claim for rejection damages. However, if the BTB were assumed, the unpaid prepetition amounts would have to be paid as part of the "cure" required by Code § 365(b)(1). Thus, the prepetition arrearages are properly considered as part of the claim arising from rejection of the BTB. *Cf.* Code § 502(g)(1). Further, the entirety of the claim relating to rejection of the BTB is entitled to interest from the date of Debtors' chapter 11 filings, unlike other of the claims asserted by Pepco.

[33]      Mirant indicated in argument that it did not concede Pepco would be entitled to interest on its claim from the Plan's effective date to the date of rejection. This issue need not be decided, but it is unlikely Pepco would agree with Mirant's view if the issue were reached outside the context of the Settlement.

amount[34] is based on discounting projected losses over the remaining life of the BTB to present value at a rate of approximately 8%.[35]

Objectors argue, however, that rejection of the BTB and allowance of a claim from such rejection has adverse tax consequences for Mirant. Considering the tax consequences, they insist, the claim from rejection of the BTB is too high for its satisfaction as proposed in the Settlement to be in Mirant's (and Class 3 Claim holders') interests. But the evidence is quite to the contrary. Williamson testified that, in fact, rejection of the BTB and satisfaction of Pepco's claim as provided in the Settlement instead provides for tax benefits to Mirant. Thus, because $450 million is well within the range of potential claims from rejection of the BTB, the court finds the Settlement reasonable to the extent it depends on a claim of that amount.[36]

Pepco asserts its additional claims far exceed $70 million. Pepco may be entitled to professional fees for which it has made no claim.[37] While the court lacks a sufficient record to

---

[34] Objectors suggested that holders of Class 3 Claims could not have anticipated depletion of the reserve for contested claims to resolve a claim by Pepco of this magnitude. Yet, the Plan (§ 14.5(b)) clearly contemplated settlement with Pepco; the Disclosure Statement left no doubt Debtors hoped to reject the BTB (Disclosure Statement, pp. 120 ff.); and the Disclosure Statement made it clear that the magnitude of a claim resulting from rejection of the BTB would be potentially in the range of $500 million (Disclosure Statement, pp. 120; Debtors also used $500 million as the estimated amount of a BTB rejection claim during hearings on Debtors' valuation.)

[35] In *In re* Mirant, 332 B.R. 139 (Bankr. N.D. Tex. 2005), the court applied an 8% discount rate to determine present value of damages arising from rejection of a contract. The 8% rate may be high for the BTB: under the court's reasoning in the cited opinion, the applicable discount rate should conform to the interest paid by Debtor Mirant Corp. on debt incurred at the time of entry into the rejected contract. *See In re* Mirant, 332 B.R. at 158. As detailed in the Disclosure Statement (at p. 44), Debtor Mirant Corp. incurred debt (albeit debt with a conversion feature), even after its spin-off by Southern, when its financial condition would have been weaker, at rates less than 8%. Use of a lower discount rate would increase Pepco's claim for rejection of the BTB.

[36] For a settlement to meet the best interests test, the amount being paid or received by the estate (or, here, Mirant) need only be within the extremes of the range. *See* Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972); Cosoff v. Rodman (*In re* W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983). Here the court finds that the BTB claim alone could exceed $500 million if determined through a full evidentiary hearing. *Cf.* Disclosure Statement, p. 120.

[37] The court expresses no opinion as to Pepco's entitlement to professional fees.

estimate what Pepco's additional claims in fact might total, given the potential magnitude of the BTB claim, the uncertainties that could arise from further litigation over rejection of the BTB or the APSA[38] and the facial appeal of the additional claims asserted by Pepco, the court finds $520 million to be a reasonable amount at which to quantify Pepco's total claims.

Objectors' argument that the effect of the Settlement will be better treatment for Pepco than for other holders of Class 3 Claims is also incorrect. While such favorable treatment would not seem to be improper given the terms of the Plan, its acceptance by Class 3, and the full satisfaction of Class 3 Claims, even assuming *arguendo* that it were improper, it is not true that Pepco's treatment is better. Accepting that quantification of Pepco's claims at $520 million is reasonable, if Pepco were to receive treatment as provided in Plan § 5.1(c), it would have distributed to it 22,297,600 shares of Mirant Corp. common stock[39] and would be entitled to a share in litigation proceeds pursuant to Plan §§ 5.1(c) and 10.13. Under the Settlement, however, Pepco will receive no distributions pursuant to Plan § 10.13. Moreover, as of this writing (July 19, 2006), Mirant Corp. stock is trading at $26.64 per share; thus far fewer shares (less than 20,000,000) are necessary to satisfy Pepco's $450 million claim under the Settlement than would have been distributed under the Plan.[40]

---

[38]     Debtors have moved in the District Court to reject the APSA. It has been their position that rejection of the APSA would not impair Mirant's ability to operate the assets acquired from Pepco pursuant to the APSA. However, the Court of Appeals has shed doubt on that view. *See Mirant Corp. v. Pepco (In re Mirant Corp.)*, Nos. 05-10038 and 05-10419, 2006 U.S. App. LEXIS 18129 (5th Cir. July 19, 2006). As discussed below in the context of the FCC, the court has serious concern about how Mirant's other relationships with its counterparties would be affected by rejection of one of a family of agreements. Pepco's agreement to rejection of the BTB removes that dangerous uncertainty.

[39]     Based on the price of $ 23.32 per share used for calculating initial distribution.

[40]     The court is aware that the stock price will vary and that Pepco's sales of the stock through block trades may be at a discounted price. Because the Settlement assures Pepco of recovery of $450 million from the stock, Pepco is not subject to the same risks of fluctuating stock prices as are holders of Class 3 Claims. However, the court finds that the approximately $3 per share advantage to Mirant in today's stock price versus that at the effective

If Pepco's claims were dealt with under Plan § 14.5(c) (as suggested by Objectors) damages from rejection of the BTB might arguably have been subject to calculations based on energy prices as of July 14, 2003, the date of the commencement of Debtors' cases. Because of, *inter alia*, changes in the commodities market, quantification as of that date could result in a much larger claim from rejection of the BTB. For all these reasons, the court concludes the Settlement does not treat Pepco better than holders of Class 3 Claims.

Objectors also argue that the Settlement does not meet the best interests test because it puts Mirant's management's interests ahead of those of the holders of Class 3 Claims. The gist of this argument is that management is benefited by the Settlement since conversion of Mirant's obligations to Pepco into stock strengthens Mirant; if the Settlement were not approved, Objectors reason, holders of Class 3 Claims would be better off since they would receive a substantial additional distribution of stock reserved for contested claims. This argument is also without merit. As previously noted, the effect of Plan distributions was complete satisfaction of all Class 3 Claims. Now, for Mirant to operate successfully and to fulfill its fiduciary duties to its shareholders (including Objectors), Mirant and its management must make business decisions that are in the best interests of the company. Mirant and management, in accordance with their fiduciary duties, are entering into the Settlement for the benefit of the enterprise as a whole. This, in turn benefits the shareholders,[41] who are largely the holders of Class 3 Claims. Indeed, considering Objectors' position from the perspective of a typical holder of a Class 3 Claim, that

---

date together with the absence of any right of Pepco to receive litigation distributions more than offsets any risk avoided by Pepco. Indeed, the result of the Settlement is to satisfy Pepco's $520 million claim with $520 million, whereas given today's stock price and the potential for litigation distributions, if Mirant were to satisfy Pepco under the exact terms of the Plan, Pepco would receive value well in excess of $520 million.

[41]     Kubik testified that ratings organizations favored the Settlement. It would appear that rejection of the BTB positively affects the price of Mirant Corp. stock.

holder's interests as a shareholder far outweigh any participation to which it might be entitled pursuant to Plan § 10.15.

Objectors next argue that the Settlement does not meet the test for assumption or rejection of executory contracts. *Objection* at 15. The usual test for the assumption or rejection of an executory contract is whether assumption or rejection meets the "business judgment test." *NLRB v. Bildisco & Bildisco* (*In re Bildisco*), 682 F.2d 72, 79 (3d Cir. 1982), *aff'd at* 465 U.S. 513 (1984).[42] When the assumption or rejection of an executory contract or lease is one of the terms of a settlement or compromise, however, the proper test to be applied to the entire transaction is that for approval of a proposed settlement. *See In re Pinnacle Brands, Inc.*, 259 B.R. 46, 54 (Bankr. D. Del. 2001).

In *Pinnacle Brands*, a debtor and a licensor entered into a settlement that allowed the debtor to reject a licensing agreement. *Id.* at 53. A creditor objected to the settlement based on the argument that rejection of the licensing agreement was not in the best interest of the estate and that assumption would not only benefit the estate, but also minimize that creditor's exposure. *Id.* at 54. The court, however, held that because the settlement agreement as a whole was within the allowable range of reasonableness, the court was not required to pick apart the settlement issue by issue. *Id.* ("The responsibility of the bankruptcy judge is . . . to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.") (citing

---

[42] The District Court established a different standard to be applied in deciding whether to permit rejection of the BTB. *See In re* Mirant, 318 B.R. 100, 107-108 (N.D. Tex. 2004). This standard, however, is intended to safeguard the public interest. *Cf. In re* Bildisco, 465 U.S. at 523-24. Because the issue before the court is not whether the public interest should prevent rejection but rather whether rejection will be good for Mirant and its stakeholders (including holders of Class 3 Claims), the "business judgment" standard is the appropriate one to apply if a rejection standard is to be used at all.

*Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).  The court, therefore, approved the settlement, including the rejection, under Rule 9019.  *Id*.

The same result is appropriate in the case at bar:  rejection of the BTB (and assumption of the FCC) is part of the Settlement.  If the Settlement meets the tests for approval, disposition of the contracts is simply one element of what should be approved.  But even if the court were required to assess rejection of the BTB (or assumption of the FCC, as discussed below) independently, it would approve Mirant's proposed disposition.  The business judgment standard is more easily met than the four-prong test of *Cajun Electric*.  The court is expected to defer to management's views in applying the business judgment test.  *See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.* (*In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1046 (4th Cir. 1985); *Polin v. Conductron Corp.*, 552 F.2d 797, 809 (8th Cir. 1977).  Only if a proposed transaction—here disposition of a contract—does not serve business purposes may the court substitute its judgment for that of management.  *In re Richmond Metal Finishers, Inc.*, 756 F.2d at 1047 ("[C]ourts should defer to—should not interfere with—decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of their 'business discretion.'"); *Computer Sales Int'l, Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.),* 293 B.R. 124, 126 (D. Del. 2003) ("As [the business judgment test is] applied in the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction.") (citing *In re Martin*, 91 F.3d 389, 396 (3d Cir. 1996) (in turn citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991))).

Here, it is clearly reasonable that management, as part of Debtors' reorganization, should want to convert the substantial, uncertain future liabilities associated with the BTB into a claim satisfied largely through the issuance of Mirant Corp. stock. Furthermore, as both Davenport and Kubik testified, the Settlement was carefully considered by Mirant's top management. The decision to negotiate and enter into the Settlement clearly was not taken lightly; the court does not question (and Objectors have presented no contrary evidence) that approval of the Settlement (including rejection of the BTB and assumption of the FCC) was in accord with management's best judgment.

In sum, then, the court finds no merit in the arguments advanced by Objectors. As their opposition to the Settlement lacks a valid basis, the court concludes that, even if *Cajun Electric* requires it to defer to Objectors' reasonable views (as opposed to the views of creditors generally), the positions advanced by Objectors do not in fact support disapproval of the Settlement.

The fourth and final prong of the best interests test enunciated by *Cajun Electric* is to determine if the Settlement is the product of true arms-length bargaining or if it is the product of fraud or collusion. All the evidence before the court, the court's extensive experience with the parties and the assurance to such effect of the Examiner support the court's finding that the Settlement is a product of arms-length bargaining.

Because this court finds that in light of all of the circumstances and relevant facts the Settlement is in the best interest of the estate and is fair and equitable, the court will approve the Settlement and will therefore grant the Pepco Motion.

2.      Assumption of the FCC

The court has already noted that approval of assumption of the FCC as part of the Settlement is governed by the same standard as approval of the Settlement as a whole. Objectors, however, argue that Mirant would be better served by rejection of the FCC than its assumption: they argue that the cost of performance of the FCC[43] is greater than the damage claim to which Smeco would be entitled if the FCC is rejected.

Objectors' argument is without merit. First, assumption of the FCC is an integral part of the Settlement. *See* Settlement ¶ 2(a)(vii). If the FCC is not assumed, the Settlement cannot go forward. Second, it may ultimately be determined that Code § 502(b)(6) does not limit Smeco's damages for rejection of the FCC.[44] Finally, the FCC is but one of several agreements among Smeco, Pepco and Debtors. Debtors, for example, supply all of Smeco's power needs. *See Mirant Peaker, LLC v. So. Md. Elec. Power Co. (In re Mirant Corp.)*, No. 04-4073 (Bankr. N.D. Tex. June 28, 2004), *available at* http://www.txnb.uscourts.gov/opinions/dml/03-46590_Adv04-4073_20040629.pdf. It is by no means clear that rejection of the FCC would leave unaffected the benefits Mirant receives through other agreements with Smeco.[45]

For all these reasons, the court concludes that assumption of the FCC is appropriate and the Smeco Motion should be granted.

---

[43]     It is not clear to the court whether the "cost" calculated by Objectors takes into account benefits Mirant will receive under the FCC (profits from power produced by the peak-load facility that is the subject of the FCC). For purposes of deciding the Smeco Motion, the court will assume the cost of performance is greater than the damage claim if the latter is limited by Code § 502(b)(6). The court has previously held that the FCC is a lease of real property. If this holding survived, Debtors would argue that Smeco's rejection claim is capped under Code § 502(b)(6).

[44]     Not only is it possible that this court's holding that the FCC is a lease of realty would not survive on appeal; it is also possible Smeco would argue successfully that section 502(b)(6) should not be applicable to the case of a solvent debtor.

[45]     For example, without the peak-load units subject to the FCC, Mirant might not be able to keep its power commitments to Smeco.

## IV. Conclusion

As is apparent from the foregoing, the Motions should be granted, the Settlement approved and the Objection overruled. But one additional matter remains that requires the attention of the court. The Settlement is unfortunately structured so that it may unduly encourage the Objectors to appeal this court's decision. The Settlement requires that the order approving it be final prior to the Settlement's implementation. *See* Settlement ¶ 5(a).

Thus, Objectors can appeal the court's decision without fear of the Settlement being implemented. They have no need to enjoin effectiveness of this court's order and so no need to post a bond. Absent the necessity of a final order, if no bond were posted, the Settlement could be implemented when this court's order becomes effective. If the Settlement were so implemented, any appeal would be mooted. *See In re Scruggs*, 392 F.3d 124, 128 (5th Cir. 2004); *Hower v. Molding Sys. Eng'g Corp*., 445 F.3d 935, 938 (7th Cir. 2006).

As noted above, the price of Mirant Corp. stock fluctuates. Indeed, the Settlement allows Mirant to assume the BTB rather than reject it and incur the corresponding claim if the price of Mirant Corp. stock falls below $16.00 per share. *See* Settlement ¶ 5(c). Thus, delay in implementing the Settlement could have deleterious effects, and the delay caused by an appeal could be used as leverage by Objectors to cause Mirant or Pepco to make some sort of "deal" to buy off Objectors, though such a "deal" might violate 18 U.S.C. § 152(6) and would almost likely not be authorized by this court.

Of course, Objectors, by appealing, could risk sanctions[46] or even liability for damages resulting from delays in implementation. *See* 28 U.S.C. 1912; Fed. R. App. P. 38; *Ozee v.*

---

[46] The court notes the caution directed to Mirant by the Court of Appeals. *See* Mirant Corp. v. Pepco, 2006 U.S. App. LEXIS 18129, at *27. While the court lacks a sufficient record to find Objectors have acted in bad faith

*American Council on Gift Annuities*, 110 F.3d 1082, 1097 (5th Cir. 1997).  Nevertheless, the court concludes that approval of the Settlement should not leave open to Objectors obstructive tactics they might otherwise be tempted to use.  The court cannot change the terms of the Settlement.  The court can, however, not only warn Objectors against any effort to wrest advantage for themselves from their ability to prevent effectiveness of the Settlement (*cf. Young v. Higbee Co.*, 324 U.S. 204 (1945)) but can also relieve the parties to the Settlement of any need to seek further relief should they decide to implement the Settlement even while an appeal is pending.  Thus, the court will GRANT the Motions, OVERRULE the Objection and APPROVE the Settlement and will further authorize the parties to waive at will and in their sole discretion the necessity to implementation of a final order approving the Settlement.[47]

It is so ORDERED.

### ###  End of Memorandum Opinion  ###

---

in asserting the Objection, notwithstanding its seriously flawed legal basis (e.g., an almost obtuse misreading of Plan § 14.5), having now had a full review by this court of their arguments, the court would be deeply troubled by further action by Objectors to delay resolution of disputes that have already gone on far too long.

[47]    The court does not intend by this portion of its ruling to limit and does not limit the ability of the parties to agree to waive other preconditions to implementation of the Settlement.