# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 Case |
|  | ) |  |
| MIRANT CORPORATION, <u>et al.</u>, | ) | Case No. 03-46590 (DML) 11 |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |

## <u>DISCLOSURE STATEMENT REGARDING</u>
## <u>CHAPTER 11 PLAN OF REORGANIZATION</u>
## <u>PROPOSED BY MIRANT NY-GEN, LLC</u>

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main Street, Suite 1290
Fort Worth, Texas 76102
(817) 877-8855
(817) 877-4151 FAX

Attorneys for the Debtor

Dated: February 22, 2007.

# TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................1

II.     INFORMATION REGARDING THE DISCLOSURE STATEMENT ......................1

        A.      Preliminary Statement..........................................................................1

        B.      Purpose of the Disclosure Statement....................................................3

III.    EXPLANATION OF CHAPTER 11 ........................................................................3

        A.      Overview of Chapter 11........................................................................3

        B.      Chapter 11 Plan....................................................................................4

        C.      Confirmation of a Plan of Reorganization............................................4

        D.      Claims and Administrative Expenses....................................................5

                1.      Filing of Proofs of Claim ..........................................................5

                2.      Bar Date by Which Rejection Damages Claims Must be Filed ..........5

                3.      Bar Dates By Which Proofs of Claim and Administrative
                        Expenses Must Be Filed.............................................................6

IV.     SUMMARY OF CLASSIFICATIONS AND TREATMENT OF CLAIMS
        AND EQUITY INTERESTS..................................................................................6

V.      BACKGROUND OF THE MIRANT REORGANIZATION CASES.....................12

        A.      The Mirant Reorganization Cases.......................................................12

                1.      Filing of the Mirant Reorganization Cases...............................12

                2.      Continuation of the Debtors' Businesses after the Petition Date ........12

                3.      Joint Administration.................................................................12

                4.      Cash Management ....................................................................12

                5.      Intercompany Relationships Involving Mirant Services................12

                6.      Notice......................................................................................13

| | | | |
|---|---|---|---|
| | 7. | Complex Chapter 11 Bankruptcy Case Treatment | 13 |
| | 8. | Representation of the Mirant Debtors | 13 |
| | 9. | Protected Persons Order | 13 |
| | 10. | Schedules and Statements of Financial Affairs | 14 |
| | 11. | Mirant Debtors' Confirmation Order and Emergence from Chapter 11 | 14 |
| B. | | The Excluded Debtors | 14 |
| | 1. | Excluded Debtors Continue to Operate as Debtors-in-Possession after Confirmation of the Mirant Plan | 14 |
| | 2. | Withdrawal of W&C and H&B as Counsel to the Excluded Debtors | 14 |
| | 3. | Employment of F&P as Counsel for the Excluded Debtors | 15 |
| | 4. | Exclusivity Periods for the Excluded Debtors | 15 |
| | 5. | Administrative Services Agreement; Trading Agreement | 15 |
| | 6. | Mirant Bowline, Mirant New York, and Hudson Valley | 16 |
| | 7. | Mirant Lovett | 16 |
| C. | | Mirant NY-Gen | 16 |
| | 1. | Specific Financing Transactions for the Debtor | 16 |
| | 2. | The Sale of Mirant New York's Membership Interest in the Debtor | 16 |
| VI. | | GENERAL INFORMATION REGARDING THE DEBTOR | 18 |
| A. | | The Business of the Debtor | 18 |
| | 1. | Hydroelectric Power Stations | 18 |
| | 2. | Gas Turbine Power Stations | 21 |
| | 3. | Grahamsville Station | 21 |
| B. | | Employees | 21 |

| VII. | SELECTED FINANCIAL INFORMATION | 21 |
| | A. Financial Information | 21 |
| | 1. The Debtor's Monthly Operating Reports | 21 |
| | 2. Historical Financial Summaries | 22 |
| | B. Assets as of the Petition Date | 22 |
| | 1. Unexpired Leases and Executory Contracts | 22 |
| | 2. Property and Equipment | 22 |
| | 3. Insurance Policies and Proceeds | 22 |
| | C. Voidable Transfers | 22 |
| VIII. | ANALYSIS OF CLAIMS AGAINST THE DEBTOR | 23 |
| | A. General | 23 |
| | B. Intercompany Claims | 24 |
| | C. Tax Liabilities | 25 |
| IX. | LITIGATION, SETTLEMENTS, AND CONSENT ORDERS | 25 |
| | A. Pending Actions: Post-Petition | 25 |
| | 1. Litigation | 25 |
| | 2. Selected Regulatory Actions, Consent Orders with Governmental Agencies, and Settlements | 27 |
| | 3. Assertion of Administrative Expenses | 28 |
| | B. Transfer of Third Party Claims to Mirant Americas | 29 |
| X. | THE CHAPTER 11 PLAN AND MEANS OF IMPLEMENTATION OF THE PLAN | 29 |
| | A. General Description of the Plan | 29 |
| | 1. Sale of Mirant New York's Membership Interest | 29 |

|   |   |   |   |
|---|---|---|---|
|   | 2. | Certain Intercompany Transactions | 29 |
|   | 3. | Estimation of Claims | 30 |
|   | 4. | The Disbursing Agent | 31 |
|   | 5. | Corporate Actions | 32 |
| B. | | Provisions Governing Distributions | 33 |
|   | 1. | Plan Distributions | 33 |
|   | 2. | Timing of Plan Distributions | 33 |
|   | 3. | Address for Delivery of Plan Distributions/Unclaimed Distributions | 33 |
|   | 4. | De Minimis Distributions | 34 |
|   | 5. | Time Bar to Cash Payments | 34 |
|   | 6. | Manner of Payment Under the Plan | 34 |
|   | 7. | Fractional Plan Distributions | 34 |
|   | 8. | Surrender and Cancellation of Certificates, Instruments, Notes, or Other Agreements | 34 |
|   | 9. | No Interest Unless Otherwise Provided | 35 |
|   | 10. | Prepayment | 35 |
| C. | | Procedures for Resolving and Treating Contested Claims | 35 |
|   | 1. | Objection Deadline | 35 |
|   | 2. | Prosecution of Contested Claims | 35 |
|   | 3. | Claims Settlement | 35 |
|   | 4. | Entitlement to Plan Distributions Upon Allowance | 35 |
|   | 5. | Estimation of Contested Claims | 35 |
| D. | | Conditions Precedent to Confirmation of the Plan and to the Occurrence of the Effective Date | 36 |

| | 1. | Conditions Precedent to Confirmation | 36 |
|---|---|---|---|
| | 2. | Conditions Precedent to the Occurrence of the Effective Date | 36 |
| | 3. | Waiver of Conditions | 37 |
| | 4. | Effect of Non-Occurrence of the Effective Date | 37 |
| E. | | Executory Contracts and Unexpired Leases | 37 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 37 |
| | 2. | Rejection of Executory Contracts and Unexpired Leases | 37 |
| | 3. | Cure | 38 |
| | 4. | Rejection Damages Claims | 38 |
| | 5. | Application of Section 365 of the Bankruptcy Code | 39 |
| F. | | Means of Implementation of the Plan | 39 |
| | 1. | Vesting of Assets | 39 |
| | 2. | Charter and Bylaws | 39 |
| | 3. | Sources of Cash for Plan Distributions | 39 |
| | 4. | Releases by the Debtor | 39 |
| | 5. | Appointment of the Disbursing Agent | 40 |
| G. | | Other Material Provisions of the Plan | 40 |
| | 1. | Payment of Statutory Fees | 40 |
| | 2. | Satisfaction of Claims | 40 |
| | 3. | Third Party Agreements; Subordination | 40 |
| | 4. | Exculpation | 40 |
| | 5. | Discharge of the Debtor | 41 |
| | 6. | Discharge of Liabilities | 41 |

| | 7. | Injunctions | 41 |
| | 8. | Notice of Confirmation | 42 |
| | 9. | Notices | 42 |
| | 10. | Headings | 43 |
| | 11. | Governing Law | 43 |
| | 12. | Exemption from Transfer Taxes | 43 |
| | 13. | Retiree Benefits | 43 |
| | 14. | Attorneys' Fees | 43 |
| | 15. | Modification of the Plan | 43 |
| | 16. | Setoff Rights | 44 |
| | 17. | Compliance with Tax Requirements | 44 |
| | 18. | Rates | 44 |
| | 19. | Binding Effect | 44 |
| | 20. | Severability | 44 |
| | 21. | No Admissions | 44 |
| | 22. | Bankruptcy Restrictions | 45 |
| | 23. | Plan Controls | 45 |
| XI. | | RISK FACTORS | 45 |
| | A. | Risk Factors | 45 |
| | B. | Bankruptcy Risks | 45 |
| | 1. | Insufficient Acceptances | 45 |
| | 2. | Confirmation Risks | 46 |

|  | 3. | Sale of the Membership Interest in the Debtor Held by Mirant New York | 46 |
|  | 4. | Conditions Precedent | 46 |
| XII. | ALTERNATIVES TO CONFIRMATION OF THE PROPOSED PLAN | | 46 |
| XIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | 47 |
|  | A. | Tax Consequences to the Debtor | 47 |
|  | B. | Tax Consequences to Creditors | 48 |
| XIV. | VOTING PROCEDURES AND REQUIREMENTS | | 48 |
|  | A. | Ballot | 48 |
|  | B. | Voting Deadlines | 48 |
|  | C. | Parties in Interest Entitled to Vote | 49 |
|  | D. | Definition of Impairment | 49 |
|  | E. | Classes Impaired Under the Plan | 50 |
|  | F. | Vote Required for Class Acceptance | 50 |
| XV. | CONFIRMATION OF THE PLAN | | 50 |
|  | A. | Confirmation Hearing | 50 |
|  | B. | Deadline for Objections | 50 |
|  | C. | Requirements for Confirmation of the Plan | 51 |
|  | D. | Cramdown | 51 |
|  |  | 1. Secured Claims | 51 |
|  |  | 2. Unsecured Claims | 52 |
|  |  | 3. Equity Interests | 52 |
| XVI. | CONCLUSION | | 52 |

## EXHIBITS AND SCHEDULES

**EXHIBIT A** – CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY MIRANT NY-GEN, LLC

**EXHIBIT B** – MONTHLY OPERATING REPORT – MIRANT NY-GEN, LLC – PERIOD ENDING NOVEMBER 30, 2006

**EXHIBIT C** – MONTHLY OPERATING REPORT – MIRANT NEW YORK, INC. – PERIOD ENDING NOVEMBER 30, 2006

**EXHIBIT D** – MIRANT NY-GEN, LLC – FINANCIAL INFORMATION THROUGH SEPTEMBER 30, 2006

**SCHEDULE 7.9** - LIST OF PROTECTED PERSONS

**SCHEDULE 11.1(a)** - ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**SCHEDULE 11.1(b)** - REJECTED EXCECUTORY CONTRACTS AND UNEXPIRED LEASES

# I. INTRODUCTION

The debtor and debtor-in-possession, Mirant NY-Gen, LLC ("Mirant NY-Gen" or the "Debtor"), Case No. 03-46642-DML, hereby submits this Disclosure Statement (the "Disclosure Statement"), dated February 22, 2007, pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code") with respect to the Chapter 11 Plan of Reorganization Proposed by Mirant NY-Gen, LLC dated February 15, 2007 (the "Plan"). This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan. A copy of the Plan is attached as *Exhibit A* to this Disclosure Statement.

# II. INFORMATION REGARDING THE DISCLOSURE STATEMENT

## A. Preliminary Statement

This Disclosure Statement and the accompanying Ballot are being furnished by the Debtor to the holders of Claims against the Debtor pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of ballots for the acceptance of the Plan under chapter 11 of the Bankruptcy Code filed by the Debtor. All of the capitalized terms used in this Disclosure Statement, and not defined herein, shall have their respective meanings set forth in the Plan (Article I of the Plan entitled "Definitions") or, if not defined in the Plan, as defined in section 101 of the Bankruptcy Code.

The purpose of this Disclosure Statement is to enable those persons who have Claims against the Debtor entitled to vote under the Plan to make an informed decision with respect to the Plan before exercising their rights to vote to accept or reject the Plan. On _____, 2007, after notice and hearing, the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), pursuant to Section 1125 of the Bankruptcy Code, entered an Order (the "Disclosure Statement Order") approving this Disclosure Statement as containing information of a kind, and in sufficient detail, adequate to enable a hypothetical, reasonable investor, typical of the solicited holders of Claims against the Debtor, to make an informed judgment with respect to the acceptance or rejection of the Plan. The Order also fixes deadlines for voting on and objecting to the Plan. The Court's approval of this Disclosure Statement does not constitute either a guarantee of the accuracy or completeness of the information contained herein or an endorsement of any of the information contained in this Disclosure Statement or the Plan.

Holders of Claims should read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. In the event of any inconsistency between a provision of the Plan and this Disclosure Statement, the Plan shall control.

***Significance of Court Approval.*** Approval of the Disclosure Statement does not constitute a determination by the Bankruptcy Court as to the fairness or the merits of the Plan.

***Statements as of February 15, 2007 Unless Otherwise Indicated.*** The statements contained in the Disclosure Statement are made as of February 15, 2007, unless another date is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in

connection with the Plan shall, under any circumstances, create an implication that there has been any change in the information set forth herein since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

***Source of Information.*** Most of the information contained herein is furnished by the Debtor, or taken from the Debtor's records.

***Read the Disclosure Statement and Plan.*** Creditors and parties in interest should carefully read the Disclosure Statement and the Plan in their entirety prior to voting on the Plan.

***Plan Summaries Cannot Change the Plan.*** For the convenience of creditors and parties in interest, this Disclosure Statement summarizes the terms of the Plan but the Plan itself qualifies all summaries. Therefore, this Disclosure Statement is qualified in its entirety by the terms of the Plan. If any inconsistencies exist between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

***This Disclosure Statement is Only for Use in Relation to the Plan of Reorganization.*** The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtor on holders of Claims against or the Equity Interest in the Debtor. Certain of the information contained in the Disclosure Statement is, by its nature, forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong or which may be materially different from actual results.

***Consult Your Advisors.*** Each claimant should consult the claimant's individual attorney, accountant, and/or financial advisor as to the effect of the Plan on such claimant.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed ballot and returning the same to the address set forth on the ballot so that it will be received by the Debtor no later than 4:00 p.m. (Prevailing Central Time) on _____, 2007. **TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON _____, 2007.** For detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures, *see "Voting Procedures and Requirements"* and *"Confirmation of the Plan"* below.

Pursuant to Section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing"), on _____, 2007, at ____ __.m. (Prevailing Central Time) in the Bankruptcy Court and has directed that objections, if any, to confirmation of the Plan be filed with the Bankruptcy Court by 4:00 p.m. (Prevailing Central Time) on _____, 2007, and thereafter served on the Debtor and other designees in the manner described below in *"Confirmation of the Plan – Deadline for*

*Objections".*

THE DEBTOR BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND, CONSEQUENTLY, THE DEBTOR URGES ALL HOLDERS OF IMPAIRED CLAIMS TO VOTE TO ACCEPT THE PLAN.

## B.      Purpose of the Disclosure Statement

The purpose of this Disclosure Statement is to provide sufficient information about the Debtor to enable the holders of Impaired Claims against the Debtor to make an informed decision with respect to acceptance or rejection of the Plan. This Disclosure Statement should be read in its entirety prior to voting on the Plan. This Disclosure Statement describes various transactions contemplated under the Plan. No solicitation of any vote for or against the Plan may be made except as is consistent with this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtor or its business other than the information contained in this Disclosure Statement. Each creditor or other party in interest is urged to carefully consider the Plan and this Disclosure Statement in their entirety and to consult legal counsel or other advisors, if necessary, to understand the Plan and its effects, including possible tax consequences, before voting to accept or reject the Plan.

## III. EXPLANATION OF CHAPTER 11

## A.      Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, stockholders, and other parties in interest. The Debtor commenced its chapter 11 case (the "Chapter 11 Case") by filing for voluntary protection under chapter 11 of the Bankruptcy Code on July 14, 2003, under Case No. 03-46642-DML. On July 14, 2003, and various dates thereafter, the Mirant Debtors, as identified on *Exhibit B* and *Exhibit C* to the Mirant Plan, filed the Mirant Reorganization Cases. The Chapter 11 Case and the Mirant Reorganization Cases were consolidated for administrative purposes and jointly administered under Case No. 03-46590-DML by order of the Bankruptcy Court.

The commencement of a chapter 11 case creates an estate comprising all of the legal and equitable interests of the debtor as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor in a chapter 11 proceeding may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as

otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Filing Period"). However, Section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Filing Period upon a showing of "cause." Following the filing of a plan, a debtor must solicit acceptances of the plan within a certain time period (the "Solicitation Period"). The Solicitation Period may also be extended or reduced by the bankruptcy court upon a showing of "cause."

In the Mirant Reorganization Cases, the Bankruptcy Court extended the Filing Period and the Solicitation Period. Following confirmation of the Mirant Plan, the Debtor's Filing Period and Solicitation Period were ultimately extended to February 15, 2007, and April 14, 2007, respectively.

## B.     Chapter 11 Plan

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the obligations owed by the debtor to such parties are compromised and exchanged for the obligations specified in the plan. For a description of key components of the Plan, see "*The Chapter 11 Plan and Means of Implementation of the Plan.*"

After a plan of reorganization has been filed, the holders of impaired claims against and equity interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, Section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and the Equity Interest in the Debtor to satisfy the requirements of Section 1125 of the Bankruptcy Code in connection with the Debtor's solicitation of votes on the Plan.**

## C.     Confirmation of a Plan of Reorganization

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. See "*Confirmation of the Plan.*" **The Debtor believes that the Plan satisfies all of the applicable requirements of Section 1129(a) of the Bankruptcy Code.**

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan. See "*Voting Procedures and Requirements*."

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. See "*Voting Procedures and Requirements*." Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or equity interests in an impaired class. **Except for Class 1 (Priority Claims, other than Tax Claims) and Class 6 (Membership Interest), which are unimpaired, all classes of Claims are Impaired under the Plan and entitled to vote on the Plan.**

The bankruptcy court also may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. See "*Confirmation of the Plan*." **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims, and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

## D.      Claims and Administrative Expenses

### 1.      Filing of Proofs of Claim

To participate in any payments or other distributions under the Plan, a creditor must have an allowed claim against the Debtor. The first step in obtaining an allowed claim is filing a Proof of Claim.

A Proof of Claim is deemed filed for any claim that appears in the Schedules that were filed in the Chapter 11 Case, except a claim that is scheduled as disputed, contingent, unliquidated, or in an unknown amount. In other words, if a creditor agrees with the amount of the claim as scheduled by the Debtor, and that claim is not listed in the Schedules as being disputed, contingent, unliquidated, or in an unknown amount, it is not necessary that the creditor file a separate Proof of Claim.

Claims that are unscheduled, or which are scheduled as disputed, contingent, unliquidated, or in an amount that varies from the amount claimed by the creditor, shall be recognized and potentially allowed only if a Proof of Claim has been timely filed.

### 2.      Bar Date by Which Rejection Damages Claims Must be Filed

As more fully explained herein, any party to an executory contract or lease that is rejected

by the Debtor under the Plan must file its Rejection Damages Claim for any damages resulting from such rejection within thirty (30) days after service of the Notice of Confirmation.. **Failure to timely file a Proof of Claim relating to any such Rejection Damages Claim may bar the Claimant from receiving payment.**

### 3. Bar Dates By Which Proofs of Claim and Administrative Expenses Must Be Filed

On August 21, 2003, the Bankruptcy Court issued an order that established: (a) December 16, 2003 at 5:00 p.m. (EST) as the last day for non-governmental units to file a timely proof of claim in the Mirant Reorganization Cases, and (b) January 12, 2004 at 5:00 p.m. (EST) as the last day for governmental units to file a timely proof of claim in the Mirant Reorganization Cases. **Failure to timely file a Proof of Claim relating to any such Claim may bar the Claimant from receiving payment.**

All Administrative Expenses against the Debtor must be filed within thirty (30) days after service of the Notice of Confirmation and served on the Debtor, its counsel, and the Office of the United States Trustee. **Failure to timely file an Administrative Expense relating to any such Administrative Expense may bar the holder from receiving payment.**

## IV. SUMMARY OF CLASSIFICATIONS AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of the Claims and the Equity Interest. Creditors are encouraged to carefully review the terms of the complete Plan and to consult the legal counsel of their choice.

The following is a summary of the distributions under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to the Disclosure Statement as *Exhibit A*. In addition, for a more detailed description of the terms and provisions of the Plan, see *"The Chapter 11 Plan and Means of Implementation of the Plan."*

The claim amounts set forth below are based upon information contained in the Debtor's Schedules and Proofs of Claim and reflect what the Debtor believes to be reasonable estimates of the likely resolution of outstanding disputed Claims. The following charts summarize the distribution for unclassified Claims and each Class under the Plan:

### UNCLASSIFIED CLAIMS

| Unclassified Claims | Treatment of Unclassified Claims |
| --- | --- |
| Administrative Expenses (Excluding DIP Secured Claims and Fee Claims.) | On the Distribution Date or the Subsequent Distribution Date, subject to Section 7.3 of the Plan, each holder of an Allowed Administrative Expense, other than a Fee |

| Unclassified Claims | Treatment of Unclassified Claims |
|---|---|
| Estimated Claims: $0 | Claim or DIP Secured Claim, shall receive from the Plan Carve-Out (i) the amount of such holder's Allowed Administrative Expense, or (ii) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense. |
| Unpaid Fee Claims<br><br>Estimated Claims: $100,000 (or less) | Unpaid Fee Claims will be paid in full from the Sale Proceeds when Allowed by Final Order of the Bankruptcy Court. Unpaid Fee Claims as of the Effective Date are estimated to be less than $100,000. |
| Tax Claims<br><br>Estimated Claims: $0 | At the election of the Debtor, subject to Section 7.3 of the Plan, each holder of an Allowed Tax Claim shall receive from the Plan Carve-Out:<br><br>(a)    the amount of such holder's Allowed Claim in one Cash payment on the Distribution Date or Subsequent Distribution Date, as applicable;<br><br>(b)    the amount of such holder's Allowed Claim, in equal annual Cash payments on each anniversary of the Distribution Date or Subsequent Distribution Date, as applicable, with interest thereon at the non-default statutory rate applicable to the tax in question, without penalties, until the last anniversary of the Distribution Date or Subsequent Distribution Date that precedes the sixth (6th) anniversary of the date of assessment of such Allowed Claim; or<br><br>(c)    such other treatment as may be agreed to in writing by the Debtor and the holder of such Allowed Tax Claim; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Tax Claim. The Confirmation Order shall enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer, or director of the Debtor that otherwise would be liable to such holder for payment of a Tax Claim as long as the Debtor is in compliance with Section 4.4 of the Plan. |
| DIP Secured Claim<br><br>Estimated Claims: $16,500,000 | (a)    Assignment of Certain Assets.<br><br>(i)    On the Effective Date, all of the |

| Unclassified Claims | Treatment of Unclassified Claims |
| --- | --- |
| | Debtor's right, title and interest in and to the Assigned Assets shall be assigned to and vested in Mirant Americas (or an Affiliate of Mirant Americas to be designated by Mirant Americas) free and clear of all Claims, Liens and interests. Upon such assignment, Mirant Americas (or an Affiliate of Mirant Americas to be designated by Mirant Americas) shall be entitled (in its sole discretion) to liquidate the Assigned Assets without further order of the Bankruptcy Court and to retain any proceeds generated therefrom for its own account.<br><br>(ii)    Without limiting the generality of the foregoing, upon the occurrence of the Effective Date, Mirant Americas (or an Affiliate of Mirant Americas to be designated by Mirant Americas) shall have full standing and be fully empowered pursuant to Section 1123(b)(3)(B) to pursue all Avoidance Actions and other Causes of Action, including, without limitation, the ORU Litigation, without further order of the Bankruptcy Court.  **No Person may rely on the absence of a specific reference in the Plan  or the Disclosure Statement to any Cause of Action against them as any indication that Mirant Americas (or an Affiliate of Mirant Americas to be designated by Mirant Americas) will not pursue any and all available Causes of Action against them.  Mirant Americas expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan.** Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, Mirant Americas expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.<br><br>(b)    The Sale Proceeds. On the Effective Date, the Sale Proceeds, net of the Breakup Fee, if any, shall be deposited in the Sale Proceeds Account as set forth in Section 7.2(a) of the Plan and the Lien of Mirant Americas granted under the DIP Facility upon substantially all of the Debtor's Assets shall attach to |

| Unclassified Claims | Treatment of Unclassified Claims |
|---|---|
| | the net Sale Proceeds. The Debtor has agreed (i) that such Lien shall be valid, perfected, non-avoidable, and fully enforceable and (ii) that all amounts due and owing under the DIP Facility are not subject to any setoffs, counterclaims or defenses of any kind or nature whatsoever. In exchange for the foregoing, and in consideration for the treatment received by Mirant Americas in Section 4.3(a) and Section 7.9 of the Plan, Mirant Americas shall release its Lien upon the Estate Assets and shall agree that its Lien upon the Sale Proceeds shall be subject to a carve-out (the "Plan Carve-Out") in the aggregate amount of (x) the Unsecured Creditor Amount and (y) the Other Amount. The Plan Carve-Out shall replace the carve-out set forth in the DIP Facility in its entirety. The Unsecured Creditor Amount shall be used solely for the purpose of paying holders of General Unsecured Claims under the Plan and the Other Amount shall be used solely for the purpose of paying holders of Administrative Expenses (other than the DIP Secured Claim and Fee Claims), Tax Claims, Priority Claims, Secured Tax Claims, and Other Secured Claims under the Plan; provided, that any portion of the Unsecured Creditor Amount not needed to pay General Unsecured Claims and any portion of any segregated category of the Other Amount not required to pay the respective category of Administrative Expenses (other than the DIP Secured Claim and Fee Claims), Tax Claims, Priority Claims (except Tax Claims), Secured Tax Claims, and Other Secured Claims shall revert to Mirant Americas. In addition to the Plan Carve-Out, the Sale Proceeds will be used to pay all unpaid Allowed Fee Claims. The balance of the Sale Proceeds, after allocation for the Plan Carve-Out and payment of Allowed Fee Claims, will be disbursed to Mirant Americas. Except to the extent of the Plan Carve-Out and Allowed Fee Claims (a) no Administrative Expenses (other than the DIP Secured Claim and Fee Claims) of the Chapter 11 Case or any future proceeding or case which may result therefrom, including liquidation in bankruptcy or any other proceedings under the Bankruptcy Code, shall be charged pursuant to Section 506(c) of the Bankruptcy Code or otherwise against the Debtor, the Reorganized Debtor, Mirant Americas (or any of its Affiliates, including without limitation, Mirant New York) or the Sale Proceeds or Assigned Assets in each case without the prior written consent of Mirant Americas and (b) neither the Debtor, the Reorganized Debtor, Mirant |

| Unclassified Claims | Treatment of Unclassified Claims |
|---|---|
| | Americas (or any of its Affiliates, including without limitation, Mirant New York) nor the Sale Proceeds or Assigned Assets shall be liable for the payment of any other Claims of any kind against the Debtor. |

## CLASSIFIED CLAIMS AND INTERESTS

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests |
|---|---|
| Class 1 – Priority Claims (except Tax Claims)<br><br>Estimated Claims: $0 | Unimpaired.<br><br>Each holder of an Allowed Priority Claim (except Tax Claims) against the Debtor shall be unimpaired under the Plan, and, pursuant to Section 1124 of the Bankruptcy Code, all of the legal, equitable, and contractual rights to which such Claim entitles such holder in respect of such Claim shall be fully reinstated and retained, and, subject to Section 7.3 of the Plan, such Allowed Priority Claim (including any amounts to which such holder is entitled pursuant to Section 1124(2) of the Bankruptcy Code) shall be paid in full from the Plan Carve-Out in accordance with such reinstated rights on the Distribution Date. |
| Class 2 – Secured Tax Claims<br><br>Estimated Claims: $0 | Impaired.<br><br>Subject to Section 7.3 of the Plan, the holder of an Allowed Class 2 – Secured Tax Claim shall receive from the Plan Carve-Out on the Distribution Date or Subsequent Distribution Date, (a) the amount of such holder's Allowed Class 2 – Secured Tax Claim plus, to the extent such holder is entitled to interest pursuant to Section 506(b) of the Bankruptcy Code, post-petition interest in an amount to be determined by the parties or by a Final Order of the Bankruptcy Court in one Cash payment, or (b) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Class 2 – Secured Tax Claim. |
| Class 3 – Other Secured Claims | Impaired. |

| Classes of Claims and Interests | Treatment of Classes of Claims and Interests |
|---|---|
| Estimated Claims: $0 | Subject to Section 7.3 of the Plan, the holder of an Allowed Class 3 – Other Secured Claim shall receive from the Plan Carve-Out on the Distribution Date or Subsequent Distribution Date (a) the amount of such holder's Allowed Class 3 – Other Secured Claim plus, to the extent such holder is entitled to interest pursuant to Section 506(b) of the Bankruptcy Code, post-petition interest in an amount to be determined by the parties or by a Final Order of the Bankruptcy Court in one Cash payment, or (b) such other treatment as may be agreed upon in writing by the Debtor and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Class 3 – Other Secured Claim. |
| Class 4 – General Unsecured Claims<br><br>Estimated Claims: $147,883 | Impaired.<br><br>Subject to Section 7.3 of the Plan, each holder of an Allowed Class 4 - General Unsecured Claim shall be paid from the Plan Carve-Out on the Distribution Date or the Subsequent Distribution Date an amount in Cash equal to the principal amount of such Allowed Class 4 – General Unsecured Claim. |
| Class 5 – Affiliates Unsecured Claims<br><br>Estimated Claims: $4,792,740 | Impaired.<br><br>Each holder of an Allowed Class 5 – Affiliates Unsecured Claim shall receive the releases set forth in Section 7.9 of the Plan in full and complete satisfaction of its Allowed Class 5 – Affiliates Unsecured Claim. |
| Class 6 – Membership Interest | Unimpaired.<br><br>The sole holder of the Membership Interest shall retain its interest in the Membership Interest. |

The above is only a summary of the treatment of holders of Allowed Claims and the Equity Interest under the Plan. As such, it is subject to, and qualified by, the provisions of the Plan itself. **The above summary is only for the convenience of Creditors. Creditors should carefully and completely review all provisions of the Plan, and should not rely upon the above summary.**

# V. BACKGROUND OF THE MIRANT REORGANIZATION CASES

## A.  The Mirant Reorganization Cases

### 1.  Filing of the Mirant Reorganization Cases

On July 14, 2003 and thereafter (the "Petition Date"), the Mirant Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Mirant Reorganization Cases were jointly administered under a single case heading and number, *In re Mirant Corporation et al.*, Case No. 03-46590, before the Honorable D. Michael Lynn.

### 2.  Continuation of the Debtors' Businesses after the Petition Date

After the Petition Date, the Mirant Debtors operated their businesses and managed their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. During the period immediately following the Petition Date, the Mirant Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Mirant Debtors to be essential to the smooth and efficient transition into chapter 11 administration and the stabilization of their operations.

### 3.  Joint Administration

To expedite the administration of the Mirant Reorganization Cases and reduce administrative expenses without prejudicing any creditor's substantive rights, the Mirant Debtors sought the joint administration of the Mirant Reorganization Cases. The Bankruptcy Court issued an initial order directing the joint administration of certain of the Mirant Debtors' cases for procedural purposes and subsequently issued an order approving the joint administration of additional Mirant entities with those of the original Mirant Debtors.

### 4.  Cash Management

Prior to the Petition Date, the Mirant Debtors primarily utilized a consolidated cash management system for receipts and disbursements (the "Cash Management System"). The Mirant Debtors also maintained excess funds in various money market accounts. The Bankruptcy Court issued an order granting the Mirant Debtors the authority (a) to continue the use of their existing (i) Cash Management System, (ii) certain bank accounts, and (iii) business forms and stationery; and (b) to continue to invest excess funds consistent with prior practice and certain investment guidelines.

### 5.  Intercompany Relationships Involving Mirant Services

Mirant Services, LLC ("Mirant Services") provides various administrative and other services to the other Mirant Debtors pursuant to a series of administrative services agreements. These services include finance, treasury, accounting, legal, procurement, and human resources services. Nearly all of the Mirant Debtors' domestic personnel are employees of Mirant Services. Mirant Americas Development, Inc. ("MADI") also provides some administrative

services to certain Mirant Debtors under similar agreements. Mirant Services pays the state taxes of the Mirant Debtors, for which it is reimbursed. Additionally, the Mirant Debtors entered into various administrative services agreements to provide for the reimbursement of Mirant Services through the allocation of costs to the other Mirant Debtors.

### 6. Notice

The Mirant Debtors identified thousands of entities and persons to which notice was to be given. The Mirant Debtors prepared a single master initial service list (the "Limited Service List") that included (a) the United States Trustee; (b) the Mirant Debtors and their counsel; (c) counsel for various lenders, including prepetition and postpetition; (d) counsel for the indenture trustees; (e) parties whose interests were affected by a pleading; (f) counsel to the committees appointed in the Mirant Reorganization Cases; and (g) those persons who formally appeared and requested notice in the Mirant Reorganization Cases pursuant to Bankruptcy Rule 2002.

### 7. Complex Chapter 11 Bankruptcy Case Treatment

The Bankruptcy Court determined that the Mirant Reorganization Cases were "complex chapter 11 cases" and established certain guidelines regarding (a) notices of and hearings on motions and other matters; and (b) settlements. The Mirant Debtors filed a Notice of Designation as a Complex Chapter 11 Case.

### 8. Representation of the Mirant Debtors

In late 2000, the Mirant Debtors retained White & Case LLP ("W&C") to provide legal services with respect to a variety of issues. Prior to the Petition Date, W&C provided restructuring and bankruptcy advice, performed due diligence, and prepared the requisite petitions, pleadings, and other documents submitted in connection with the commencement of the Mirant Reorganization Cases. After the Petition Date, in anticipation of the volume of matters that were likely to come before the Bankruptcy Court in the Mirant Reorganization Cases, and to maximize the efficiency with which all such matters were to be handled, the Mirant Debtors retained the firm of Haynes & Boone, LLP ("H&B") to serve as Texas bankruptcy co-counsel in connection with the prosecution of the Mirant Reorganization Cases. In addition, the Mirant Debtors retained the firm of Forshey & Prostok LLP ("Forshey & Prostok" and, collectively with W&C and H&B, the "Mirant Debtors' Counsel"), to serve as special conflicts counsel to represent the Mirant Debtors in connection with any such matters. As discussed below, following the Effective Date of the Mirant Plan, Forshey & Prostok was retained as debtors' counsel to represent the Excluded Debtors.

### 9. Protected Persons Order

On August 5, 2003, the Bankruptcy Court entered the *Order Restricting Pursuit of Certain Persons*, which was subsequently amended on September 29, 2003 by the *Order Extending Order Restricting Pursuit of Certain Persons* (collectively, the "Protected Persons Order"). The Protected Persons Order stayed and enjoined all entities from commencing any claim or action against the following parties: (a) members of the Committees and the entities

they represent; (b) officers, directors, and managers who were employed or terminated by the Mirant Debtors during the Mirant Reorganization Cases, and (c) the Professional Persons who were not otherwise afforded indemnity for such professionals' work in connection with the Mirant Reorganization Cases.

### 10. Schedules and Statements of Financial Affairs

Each of the Mirant Debtors were required to prepare and file with the Bankruptcy Court a schedule of assets and liabilities, a schedule of executory contracts and unexpired leases, and a statement of financial affairs to reflect certain financial information existing as of the Petition Date.

### 11. Mirant Debtors' Confirmation Order and Emergence from Chapter 11

In an order dated December 9, 2005 (the "Mirant Confirmation Order"), the Bankruptcy Court confirmed the *Debtors' Amended and Restated Second Amended Joint Chapter 11 Plan of Reorganization for Mirant Corporation and Its Affiliated Debtors* (the "Mirant Plan"), with respect to all of the Mirant Debtors except the Debtor and the other Excluded Debtors. Pursuant to the Mirant Confirmation Order, the Excluded Debtors were excluded from the Mirant Confirmation Hearing until further order or notice of the Bankruptcy Court. On January 3, 2006, the Mirant Debtors, except the Excluded Debtors, emerged from Chapter 11.[1] As a result of restructuring of the New Mirant Entities pursuant to the Mirant Plan, the Excluded Debtors became indirect subsidiaries of the newly-formed Mirant Corporation.

## B. The Excluded Debtors

### 1. Excluded Debtors Continue to Operate as Debtors-in-Possession after Confirmation of the Mirant Plan

The Excluded Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 2. Withdrawal of W&C and H&B as Counsel to the Excluded Debtors

The New Mirant Entities emerged from Chapter 11 on January 3, 2006, and the Excluded Debtors deemed it appropriate to retain separate counsel. On January 18, 2006, the Bankruptcy Court entered an order granting the *Joint Motion of White & Case LLP and Haynes and Boone, LLP for Permission to Withdraw from Representation of the [Excluded] Debtors* (the "Motion to Withdraw"). Separate counsel became necessary, in part, because the New Mirant Entities are no longer operating as debtors-in-possession under Section 1107 of the Bankruptcy Code. In

---

[1] The Mirant Debtors, except the Excluded Debtors, are referred to hereinafter as the "New Mirant Entities." References herein to "Mirant" or "Mirant Corporation" for events occurring prior to January 3, 2006, shall be meant to apply to the Mirant Corporation entity that was a Mirant Debtor ("Old Mirant"). References herein to "Mirant" or "Mirant Corporation" for events occurring on or after January 3, 2006, shall be meant to apply to the Mirant Corporation entity formed pursuant to and following confirmation of the Mirant Plan ("New Mirant").

addition, the New Mirant Entities' assets are no longer property of the respective Mirant Debtors' estates; the Excluded Debtors' assets, however, remain subject to oversight by the Bankruptcy Court and the United States Trustee. In their Motion to Withdraw, W&C and H&B stated that the two firms will continue to represent the New Mirant Entities, including, but not limited to, representing the New Mirant Entities in the chapter 11 cases of the Excluded Debtors.

### 3. Employment of F&P as Counsel for the Excluded Debtors

On January 19, 2006, the Bankruptcy Court approved the employment of Forshey & Prostok as counsel under Section 327(a) of the Bankruptcy Code to the Excluded Debtors in connection with various matters, including the Excluded Debtors' continued prosecution of the Chapter 11 proceedings, *nunc pro tunc* to January 3, 2006.

### 4. Exclusivity Periods for the Excluded Debtors

On June 19, 2006, the Bankruptcy Court entered an *Order Granting Excluded Debtors' Motion for Order Preserving the Period During Which to Solicit Acceptances of a Plan of Reorganization and Setting the Filing Period* (the "Excluded Debtors' Extension Order"). The Excluded Debtors' Extension Order included a Filing Date of August 7, 2006, and a Solicitation Date of October 6, 2006. On August 2, 2006, the Bankruptcy Court entered an Order extending the Excluded Debtors' Filing Date to December 5, 2006, and the Solicitation Date to February 3, 2007. On December 14, 2006, after extending the Filing Period from December 5, 2006, to December 18, 2006 by docket entry, the Bankruptcy Court further extended the Filing Period and the Solicitation Period for the Excluded Debtors to February 15, 2007, and April 14, 2007, respectively.

### 5. Administrative Services Agreement; Trading Agreement

On December 16, 2005, the Excluded Debtors' filed their *Motion Pursuant to 11 U.S.C. 363 for Approval for Debtors to Enter into (I) Administrative Services Agreements with Mirant Services, LLC; and (II) Trading Agreements with Mirant Americas Energy Marketing, LP and Mirant Energy Trading, LLC* (the "Service and Trading Motion"). Prior to and during the Mirant Reorganization Cases, Mirant Services, LLC ("Mirant Services") provided administrative services to various Mirant Debtors, including the Excluded Debtors (the "Service Functions"). Because the Excluded Debtors did not and do not have the corporate infrastructure to provide the Service Functions, the Excluded Debtors determined that an intercompany agreement between Mirant Services and the Excluded Debtors was necessary.

Additionally, certain of the Excluded Debtors' commercial activities were conducted through Mirant Americas Energy Marketing, LP ("MAEM"), including fuel procurement, power dispatch, logistics, asset hedging and risk management, and optimization trading (the "Trading Services"). MAEM entered into transactions for the benefit of the other Mirant Debtors pursuant to which MAEM procured the appropriate fuel, formulated the daily dispatch decisions and sold the electricity generated in the wholesale market for the generation facilities. Notwithstanding the confirmation of the Mirant Plan, the Excluded Debtors continued to require the Trading Functions that MAEM historically provided to them. The Excluded Debtors did not and do not

have the corporate infrastructure to provide the Trading Functions and an intercompany agreement (the "Trading Agreement") with MAEM and Mirant Energy Trading, LLC ("MET"), relating to the foregoing was necessary.

On January 4, 2006, the Bankruptcy Court entered an order approving the Excluded Debtors' Service and Trading Motion. Thereafter, on January 31, 2006, pursuant to the Mirant Plan, all of MAEM's obligations to the Debtor under the Trading Agreement were assumed by MET, as the transferee of MAEM.

### 6. Mirant Bowline, Mirant New York, and Hudson Valley

On January 26, 2007, Mirant Bowline, Mirant New York, and Hudson Valley (the "Emerging New York Entities") filed their Notice of Recommencement of Confirmation in Connection with the Chapter 11 Cases of Mirant Bowline, LLC, Mirant New York, Inc., and Hudson Valley Gas Corporation.

On January 26, 2007, the Emerging New York Entities and Mirant Corporation, as co-proponents, filed the Supplemental Joint Chapter 11 Plan of Reorganization of the Emerging New York Entities, and on February 16, 2007, filed the Amended Supplemental Joint Chapter 11 Plan of Reorganization of the Emerging New York Entities (as amended, the "Supplemental Plan"). The Supplemental Plan, if confirmed, will reorganize the Emerging New York Entities.

### 7. Mirant Lovett

On January 24, 2007, Mirant Lovett filed its *Motion to Extend the Exclusivity Period during which to (i) File a Plan of Reorganization and (ii) Solicit Acceptances Related Thereto* (the "Lovett Exclusivity Motion"). In its Exclusivity Motion, Mirant Lovett sought to extend its period during which to file its plan of reorganization to May 16, 2007, and the period during which it had exclusive authority to solicit acceptances of such a plan to July 16, 2007. On February 15, 2007, the Court entered an order approving the Lovett Exclusivity Motion.

## C. Mirant NY-Gen

### 1. Specific Financing Transactions for the Debtor

On March 2, 2006, the Court entered an order authorizing the Debtor to enter into a Debtor-in-Possession Credit Agreement with Mirant Americas, as lender, and the Debtor, as borrower (the "DIP Facility"). The DIP Facility initially provided for secured revolving loans to the Debtor not to exceed $4.5 million. On July 24, 2006, the Bankruptcy Court authorized the amount of the commitment of the DIP Facility to be increased by $5 million. The DIP Facility, as amended by the First Amendment to the DIP Facility, provides for a secured term loan or term loans not to exceed $9.5 million. On February 12, 2007, the Bankruptcy Court entered an order authorizing the Debtor to enter into a Second Amendment to the DIP Facility to increase the amount of the commitment to $16.5 million.

### 2. The Sale of Mirant New York's Membership Interest in the Debtor

As described more fully below, on January 31, 2007, Mirant New York, the holder of 100% of the Equity Interest in the Debtor, entered into a Purchase and Sale Agreement with the Purchaser. Under the Sale Motion, Mirant New York proposes to sell its Membership Interest in the Debtor to the Purchaser or a Prevailing Bidder.

(a) <u>The Proposed Purchaser</u>. Mirant New York, the sole member of the Debtor, entered into a competitive bidding process with certain parties interested in purchasing the Membership Interest. Alliance Energy Renewables, LLC submitted the initial highest and best offer to purchase Mirant New York's Membership Interest. The Membership Interest Purchase and Sale Agreement dated January 31, 2007, by and between Mirant New York, as Seller, and Alliance Energy, as proposed Purchaser, provides, among other things, that (i) the Membership Interest will be sold for $3,000,000, subject to certain adjustments and subject to higher and better bids, (ii) the sale of the Membership Interest will be free and clear of all liens, claims, encumbrances, and interests, and that (iii) the liabilities of the Debtor shall be discharged pursuant to the Debtor's Plan to the fullest extent permitted by the Bankruptcy Code.

(b) <u>The Sale Procedures Order</u>. In its Sale Procedures Motion, Mirant New York asked the Bankruptcy Court to, among other things, (a) approve the Sale Procedures in connection with the proposed Membership Interest Sale, (b) approve the payment of a Breakup Fee in accordance with the terms of the Purchase and Sale Agreement to Alliance Energy, in the event that Alliance Energy is not the Prevailing Bidder; and (c) schedule a hearing to consider approval of the Membership Interest Sale and an Auction through which the Seller will determine the highest and otherwise best offer for the sale of the Membership Interest. On February 7, 2007, the Bankruptcy Court signed the Sale Procedures Order. Under the terms of the Sale Procedures Order, Mirant New York will conduct an Auction on March 5, 2007, at the United States Bankruptcy Court for the Northern District of Texas, 501 West 10th Street, Fort Worth, Texas 76102. The entry of the Sale Procedures Order is one of the conditions precedent to closing of the sale of the Membership Interest under the Purchase and Sale Agreement.

(c) <u>The Sale Order</u>. On February 1, 2007, the Excluded Debtors filed their Sale Motion seeking entry of an order pursuant to Sections 105(a), 363, and 1146(c) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9006, 9007, 9008, 9013, 9014, and 9036, (a) authorizing and approving the sale by Mirant New York of the Membership Interest in the Debtor to Alliance Energy, or alternatively to a prevailing overbidder, free and clear of all liens, claims, encumbrances, and interests pursuant to the terms of the Purchase and Sale Agreement; (b) authorizing and approving the Purchase and Sale Agreement (including all related instruments, documents, exhibits, schedules, lists, and agreements thereto) between Mirant New York and Alliance Energy, which provides for the (i) sale, conveyance, assignment, transfer, and delivery of the Membership Interest in the Debtor to the Purchaser free and clear of all liens, claims, encumbrances, and interests, and (ii) performance of related transactions as set forth in the Purchase and Sale Agreement; and (c) authorizing the Excluded Debtors to enter into, terminate or modify certain contracts and leases in connection with the performance and Sale Closing Date of

the Purchase and Sale Agreement. A hearing on the Sale Motion is set for March 8, 2007, at the United States Bankruptcy Court for the Northern District of Texas, 501 West 10th Street, Fort Worth, Texas 76102. The Court's entry of a Sale Order is one of the conditions precedent to the closing of the sale of the Membership Interest under the Purchase and Sale Agreement.

(d) <u>The Sale Closing</u>. Simultaneously with the occurrence of the Effective Date, Mirant New York shall close the sale of the Membership Interest to the Purchaser pursuant to the terms and conditions of the Purchase and Sale Agreement and the Sale Order.

(e) <u>The Sale Proceeds</u>. The Sale Proceeds from the sale of the Membership Interest will be transferred to the Disbursing Agent, net of the Breakup Fee, if any, and will be deposited in the Sale Proceeds Account. The funds in the Sale Proceeds Account will be subject to liens in favor of Mirant Americas, as holder of the DIP Secured Claim, and will be used, in part, to pay creditors under the Plan. Any portion of the Sale Proceeds not used to pay Allowed Claims under the Plan will revert to Mirant Americas.

## VI. GENERAL INFORMATION REGARDING THE DEBTOR

### A.  The Business of the Debtor

The Debtor is a limited liability company organized under the laws of the State of Delaware. It was organized on November 10, 1998 as Southern Energy NY-Gen, L.L.C. and, on January 19, 2001, changed its name to Mirant NY-Gen, LLC. As previously stated, Mirant New York is the sole member and owner of the Debtor. The Debtor purchased its facilities from Orange and Rockland Utilities Inc. ("ORU") on June 30, 1999 as part of the purchase of a larger portfolio of power stations.

**1.  Hydroelectric Power Stations.** As of the Petition Date, the Debtor owned and operated three hydroelectric power stations located in southeastern New York (the "Stations"): the Swinging Bridge facility (the "Swinging Bridge Station"), the Mongaup Falls facility (the "Mongaup Station"), and the Rio facility (the "Rio Station"). The Debtor operates the Stations subject to licenses issued by the Federal Energy Regulatory Commission ("FERC"). The FERC licensing process for the Stations was completed by ORU prior to their sale to the Debtor and the licenses will expire on April 14, 2022.

(a)  Swinging Bridge Station

The Swinging Bridge Station, located in Forestburgh, New York, consists of three major reservoirs (the "Toronto Reservoir," the "Cliff Lake Reservoir," and the "Swinging Bridge Reservoir"), three associated dams (the "Toronto Dam," the "Cliff Lake Dam," and the "Swinging Bridge Dam"), and two powerhouses with a total nominal generating capacity of 12 megawatts ("MW").

The Toronto Dam is of the earthfill type, 1,630 feet long with a maximum height of 103 feet, a crest width of 25 feet and impervious core. The rest of the dam is at Elevation 1225 feet (U.S.G.S. datum). Constructed above the junction of the Black Lake Creek and Hemp Meadow Brook, the dam creates the Toronto Reservoir.

The Cliff Lake Dam consists of an earth embankment, 270 feet long, on the right side (looking downstream) of a concrete overflow spillway, 100 feet long and a concrete gravity non-overflow wall on the left abutment with the non-overflow wall. Water releases from the Cliff Lake Reservoir to the Swinging Bridge Reservoir are made through an unlined horseshoe-shaped tunnel.

The Swinging Bridge Dam is of the earthfill type, about 975 feet long and 135 feet in height, and has a separate concrete side channel spillway located approximately 750 feet upstream of the dam. Swinging Bridge Unit No. 1 is supplied from the Swinging Bridge Reservoir by a concrete encased riveted steel penstock, 692 feet long and 10 feet in diameter, running approximately under the center of the dam. Swinging Bridge Unit No. 2 is supplied from the Swinging Bridge Reservoir through a concrete lined tunnel running approximately 784 feet around the west end of the dam, connected to a steel penstock approximately 188 feet long.

Swinging Bridge Sinkhole. On May 5, 2005, the Debtor discovered a sinkhole at the Swinging Bridge Dam. In response, the Debtor filled this sinkhole, inspected the dam's penstock and slopes for damage, drew down the lake level, and cleaned the diversion tunnel. The Debtor's analysis indicates that the most probable cause of the sinkhole was erosion of soil comprising the dam from water flow through a hole in the penstock. The dam is currently stabilized, and the Debtor is performing additional remediation repairs. The Debtor currently expects to incur additional costs to repair the dam that could be material and to recover insurance proceeds for a portion of these repair costs. By letter dated June 14, 2006, FERC authorized the Debtor to proceed with its remediation plan for the sinkhole. FERC has also concurred with the results of the Debtor's flood study for its Swinging Bridge, Rio and Mongaup generation facilities, which study concluded that no additional remediation is required. The Bankruptcy Court authorized the Debtor to proceed with implementation of the remediation plan by Order entered on June 29, 2006. The Bankruptcy Court approved the DIP Credit Facility, as amended, from Mirant Americas under which Mirant Americas, subject to certain conditions, may lend up to $16.5 million to the Debtor to provide funding for the repairs on the Swinging Bridge dam.

The Final Remediation Plan. Since the sinkhole event, monitoring, evaluating, and inspecting the Swinging Bridge Dam site have been conducted by the Debtor, its engineering consultant, and the FERC engineering staff. Pursuant to FERC regulations, the Debtor convened a Board of Consultants (the "BOC") which included geotechnical engineering and grouting experts. The role of the BOC is

to review analyses and remediation plans proposed by the Debtor prior to filing plans with FERC for construction approval. Each aspect or workscope was presented to the BOC for review and concurrence prior to being filed with FERC. As of September 30, 2006, the Debtor had incurred approximately $17 million in remediation tasks, and, as of that date, expected the total cost to implement the Final Remediation Plan to be approximately $23 million.

Under the terms of Swinging Bridge Station's FERC license, public recreation areas are located at the Station. There are two boat launches at Toronto Reservoir, a fishing access area below Toronto Dam, a car-top boat launch and picnic area at the north end of Swinging Bridge Reservoir and a large developed boat launch area on the eastern shore. A large portion of the Swinging Bridge facility falls within the boundaries of New York State Department of Environmental Conservation's ("NYDEC") Bald Eagle Habitat Area, including all of Cliff Lake, approximately half of Swinging Bridge Reservoir, the powerhouses, and the access roads to the facilities.

     (b)    Mongaup Station.

The Mongaup Station is located in Forestburgh, New York and consists of the Mongaup Reservoir with associated dam, a powerhouse with four turbine generators providing a total generating capacity of 4 MW, and a substation with both transmission and distribution functions. In addition, the Mongaup Station includes the Black Brook Diversion, which includes a small dam on Black Brook. The Black Brook Diversion has been out of service since 1986.

A fully-equipped maintenance facility is located adjacent to the Mongaup Station powerhouse. The facility includes a single story masonry building with offices, crew facilities, shop, and a three-bay truck garage. In addition, there are two houses, one used for storage and one reserved for hydro-crew occupancy, and a pole barn. There are two above-ground fuel tanks for diesel and gasoline storage.

Under the terms of the Mongaup Station's FERC license, public access at the facility consists of a parking facility on Plank Road and hiking/fishing access trails on the Mongaup River and Black Brook. The entire facility falls within the boundaries of NYDEC's Bald Eagle Habitat Area.

     (c)    Rio Station

The Rio Station is located in the Towns of Deerpark, Forestburgh, and Lumberland, New York, and consists of the Rio Reservoir with an associated dam, a powerhouse with two turbine generators with a total capacity of 10 MW, and a substation with transmission and distribution functions.

Under the terms of the Rio Station's FERC license, public access at the facility consists of two fishing accesses on the Mongaup River between the dam and the powerhouse. There is a whitewater access area adjacent to the powerhouse. NYDEC

also has a boat launch with fishing access located on the reservoir near the dam. The entire facility falls within the boundaries of NYDEC's Bald Eagle Habitat Area.

**2.     Gas Turbine Power Stations.** In addition, as of the Petition Date, the Debtor owned and/or operated two gas turbine power stations located in southeastern New York: the Hillburn Station and the Shoemaker Station.

(a)     Hillburn Station

The Hillburn gas turbine peaking unit is located on approximately thirteen (13) acres of land in Hillburn, New York and was purchased from ORU in 1999. The site consists of a 40-MW turbine that is fueled by either natural gas or kerosene from the 210,000 gallon above-ground storage tank and associated ancillary equipment. The Hillburn Station has received a petroleum bulk storage license and Title V permit from the NYDEC.

(b)     Shoemaker Station

The Shoemaker Station is equipped with a natural gas compressor to raise the gas supply pressure to the required level. The Shoemaker gas turbine peaking unit is located on approximately four (4) acres in Middletown, New York on real property which is subject to a license granted to the Debtor by ORU. The Shoemaker Station consists of a 40-MW turbine that is fueled by either natural gas or kerosene from the 210,000 gallon above-ground storage tank and ancillary equipment. The Shoemaker Station has received a petroleum bulk storage license and Title V permit from NYDEC.

**3.     Grahamsville Station.**

As of the Petition Date, the Debtor also operated the Grahamsville hydroelectric station (the "Grahamsville Station") under sublease from ORU (under lease from the City of New York, acting by and through the New York City Department of Environmental Protection (the "City of New York")). The sublease expired on October 31, 2006, after which the Grahamsville Station reverted from the Debtor to ORU and from ORU to the City of New York.

**B.     Employees**

The employees at the Stations are employed by Mirant Services and are represented by the International Brotherhood of Electrical Workers, AFL-CIO, Local Union No. 503 (the "Union"). The collective bargaining agreement between Mirant Services and the Union is effective from June 1, 2003 to May 31, 2008.

## VII.  SELECTED FINANCIAL INFORMATION

**A.     Financial Information**

**1.     The Debtor's Monthly Operating Reports**

The monthly operating report ("MOR") for the month ended November, 2006, filed by the Debtor with the Clerk of the Bankruptcy Court on January 12, 2007 (the "November 2006 MOR"), is attached as *Exhibit B*. The November 2006 MOR includes the Debtor's balance sheet as of November 30, 2006. Also attached as *Exhibit C* is a copy of the MOR for the month ended November 30, 2006 filed by the Debtor's parent, Mirant New York.

### 2.     Historical Financial Summaries

The Debtor's financial summaries (unaudited) for the nine months ended September 30, 2006, and the years ended December 31, 2005, and December 31, 2004, are attached as *Exhibit D*.

## B.     Assets as of the Petition Date

### 1.     Unexpired Leases and Executory Contracts

As of the Petition Date, the Debtor was party to certain unexpired leases, licenses, easements, permits, executory contracts, and other agreements which became property of the estate.

### 2.     Property and Equipment

According to the Debtor's Schedules, as of the Petition Date, the Debtor's equipment, fixtures, and machinery were valued at approximately $16 million (Schedule B27).

### 3.     Insurance Policies and Proceeds

Mirant maintains a program of insurance coverage on behalf of all of its Affiliates, including the Debtor (the "Mirant Insurance Coverage"). The Insurance Coverage includes the following: (a) All Risk Property, Machinery Breakdown, and Business Interruption; (b) Commercial General Liability; (c) Auto Liability; (d) Workers' Compensation; and (e) Employers' Liability.

According to the terms of the Purchase and Sale Agreement, all Mirant Insurance Coverage with respect to the Debtor will be cancelled at the date of closing of the Purchase and Sale Agreement (the "Sale Closing Date").

On the Effective Date, pursuant to Section 7.2(b) of the Plan, the Debtor will assign to Mirant Americas (or an Affiliate of Mirant Americas to be designated by Mirant Americas) the Debtor's pending insurance claims for losses with respect to the Swinging Bridge Station and the Hillburn Station (which may include, but shall not be limited to, property, business interruption, and environmental losses).

## C.     Voidable Transfers