# EXHIBIT "A"

# MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT

Dated

**January 31, 2007**

between

**Alliance Energy Renewables, LLC**

and

**Mirant New York, Inc.**

# TABLE OF CONTENTS

ARTICLE I ................................................................................................................2
    1.A    Defined Terms. ......................................................................................2
    1.B.    Interpretation. .....................................................................................10

ARTICLE II SALE AND PURCHASE OF THE MEMBERSHIP INTEREST...........................11
    2.01    Membership Interest to be Sold. ...........................................................11
    2.02    Purchase Price and Payment. ................................................................11
    2.03    Adjustments to the Purchase Price. .......................................................11
    2.04    Allocation of Purchase Price. ...............................................................14

ARTICLE III THE CLOSING..............................................................................................15
    3.01    Time and Place; Effective Time of Transfer...........................................15
    3.02    Deliveries by Seller. ...........................................................................15
    3.03    Deliveries by Purchaser. ......................................................................16

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER................................16
    4.01    Power to Sell the Membership Interest. .................................................16
    4.02    Corporate Organization.........................................................................16
    4.03    Due Authorization and Execution; Valid and Binding Agreement; No
            Violation. ...........................................................................................17
    4.04    Capitalization. ....................................................................................17
    4.05    Licenses and Permits; Consents and Approvals of Governmental Authority........18
    4.06    Financial Statements. ...........................................................................18
    4.07    No Undisclosed Liabilities. ..................................................................18
    4.08    Absence of Certain Changes. ...............................................................18
    4.09    Real Property Leases, Easements and Licenses. .....................................19
    4.10    Litigation. ..........................................................................................19
    4.11    Subsidiaries. .......................................................................................19
    4.12    Taxes. ................................................................................................19
    4.13    NYISO. ..............................................................................................19
    4.14    Bank Accounts. ...................................................................................19
    4.15    Compliance with Law. .........................................................................20
    4.16    Material Contracts; Contracts with Affiliates. ........................................20
    4.17    Consents. ............................................................................................20
    4.18    Title to Assets. ....................................................................................20
    4.19    No Other Representations or Warranties; Disclaimer. .............................21

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................22
    5.01    Corporate Organization. .......................................................................22
    5.02    Authorization. .....................................................................................22
    5.03    No Violation. ......................................................................................22
    5.04    Consents and Approvals of Governmental Authorities. ...........................22
    5.05    Litigation. ..........................................................................................23
    5.06    Brokers. .............................................................................................23

5.07 "AS IS" SALE. ...........................................................................................23
5.08 Due Diligence Inspections and Reviews. .............................................23

ARTICLE VI CONDUCT OF BUSINESS PENDING THE CLOSING ......................23
6.01 Regular Course of Business. ...............................................................23
6.02 Amendments. .......................................................................................23
6.03 Capital Changes. ..................................................................................24
6.04 Environmental Remediation; Requirements of Governmental Authorities. ........24

ARTICLE VII COVENANTS OF THE PARTIES.............................................................24
7.01 Reasonable Access. .............................................................................24
7.02 Confidentiality. ....................................................................................24
7.03 Hart-Scott-Rodino Act. .......................................................................25
7.04 Access to Records;................................................................................25
7.05 Regulatory and Other Authorizations and Consents. ..........................25
7.06 Employee Matters. ...............................................................................26
7.07 No Public Announcement. ...................................................................26
7.08 Certain Amounts Owed To Seller and Its Affiliates. ..........................26
7.09 Provisions Relating to Treatment of Assets and Liabilities of the Company
     Under the Plan. ...................................................................................26
7.10 Break-Up Fee. .....................................................................................27
7.11 Further Assurances. .............................................................................27
7.12 Supplements to Schedules....................................................................27
7.13 Tax Matters...........................................................................................27
7.14 Required Consents.................................................................................28
7.15 Bankruptcy Court Orders and Related Matters. ..................................29
7.16 Purchaser Contact with Vendors and Employees. ...............................32
7.17 Taxes, Prorations and Closing Costs. ..................................................32
7.18 Acknowledgement by Purchaser. ........................................................33
7.19 No Recourse. ........................................................................................33
7.20 Advice of Changes. ..............................................................................33
7.21 Casualty Loss........................................................................................33
7.22 Post Closing — Information and Records. ...........................................35
7.23 Insurance. .............................................................................................35
7.24 Use of Certain Names. .........................................................................35
7.25 Settlement Agreement. .........................................................................36
7.26 Registration of Company with NYISO. ...............................................36
7.27 Gas Transportation and Balancing Services Agreement. . ...................36
7.28 Air Title V Permits (Hillburn and Shoemaker Facilities). .................37
7.29 Assignment of Certain Purchase Orders. .............................................37

ARTICLE VIII MUTUAL CONDITIONS .......................................................................37
8.01 HSR Act. ..............................................................................................37
8.02 Regulatory and Other Authorizations and Consents. ..........................37
8.03 Orders....................................................................................................37

ARTICLE IX CONDITIONS TO PURCHASER'S OBLIGATIONS..............................38

9.01 Representations and Warranties True. .................................................38
9.02 Performance. ....................................................................................38
9.03 Certificates; Evidence of Compliance. ..............................................38
9.04 Board Resolutions. ...........................................................................38
9.05 Bankruptcy Court Orders. .................................................................38

ARTICLE X CONDITIONS TO SELLER'S OBLIGATIONS......................................38
10.01 Representations and Warranties True. ..............................................38
10.02 Performance. ....................................................................................39
10.03 Certificates. ......................................................................................39
10.04 Board Resolutions. ...........................................................................39
10.05 Pending Insurance Claims. ...............................................................39
10.06 Bankruptcy Court Orders. .................................................................39
10.07 Termination of Gas Transportation Agreement. ................................39
10.08 Modification of Title V Permits. .......................................................39

ARTICLE XI SURVIVAL AND INDEMNIFICATION..............................................39
11.01 Survival. ...........................................................................................39
11.02 Indemnification. ...............................................................................40
11.03 Limitations on Indemnification..........................................................42
11.04 Purchaser's Release of Seller. ..........................................................42
11.05 Mitigation and Limitation on Claims. Notwithstanding anything to the
contrary contained in this Agreement:................................................43

ARTICLE XII TERMINATION AND REMEDIES....................................................43
12.01 Rights To Terminate. ........................................................................43
12.02 Specific Performance. ......................................................................44
12.03 Purchaser's Remedies. .....................................................................45
12.04 Seller's Remedies. ............................................................................45
12.05 Effect of Termination. ......................................................................45

ARTICLE XIII MISCELLANEOUS PROVISIONS..................................................46
13.01 Commissions and Finders' Fees. ......................................................46
13.02 Amendment and Modification. .........................................................46
13.03 Waiver of Compliance. . ...................................................................46
13.04 Expenses. .........................................................................................46
13.05 Notices. ............................................................................................46
13.06 Assignment. .....................................................................................47
13.07 Governing Law. ................................................................................47
13.08 Jurisdiction of Bankruptcy Court. .....................................................48
13.09 Effect of Closing Over Known Unsatisfied Conditions or Breached
Representations, Warranties or Covenants. ........................................48
13.10 Dispute Resolution............................................................................48
13.11 Delays or Omissions. ........................................................................49
13.12 Conflicts. ..........................................................................................50
13.13 Counterparts. ....................................................................................50
13.14 Effectiveness; Binding Effect. ..........................................................50

| | | |
|---|---|---|
| 13.15 | Headings. | 50 |
| 13.16 | Entire Agreement. | 50 |
| 13.17 | No Recourse Against Others. | 50 |
| 13.18 | Third Parties. | 50 |
| 13.19 | Mutual Agreement. | 51 |
| 13.20 | Severability. . | 51 |

## SCHEDULES

| | |
|---|---|
| 1.1 | Seller's Representatives |
| 1.2 | Purchaser's Representatives |
| 1.41 | Escrow Agreement |
| 1.45 | Hydroelectric and Gas Turbine Generating Stations |
| 2.03(c) | Pre-Approved Capital Expenditures |
| 3.02 | Form of Assignment for Membership Interest Transfer |
| 3.02(d-1) | Assignment of Insurance Claims |
| 3.02(d-2) | Assignment of Claims Against Third Parties |
| 3.03(a) | Wire Transfer |
| 4.03 | Agreements Requiring Consent, Notification, Etc. (Seller) |
| 4.05 | Consents and Approvals of Governmental Authorities (Seller) |
| 4.07 | Certain Liabilities |
| 4.08 | Certain Changes |
| 4.09 | Real Property Leases, Easements and Licenses |
| 4.10 | Litigation |
| 4.12 | Taxes |
| 4.14 | Bank Accounts |
| 4.15 | Compliance with Law |
| 4.16 | Material Contracts |
| 4.17 | Consents |
| 4.18 | Title to Assets |
| 5.04 | Consents and Approvals of Governmental Authorities (Purchaser) |
| 5.05 | Litigation (Purchaser) |
| 7.15(b) | Sale Procedures Order |
| 7.15(c) | Sale Order |
| 7.25 | Cross-Indemnity Agreement |

This **MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT** (this "Agreement") is made, as of the 31st day of January, 2007, by and between Mirant New York, Inc., a corporation organized under the laws of the State of Delaware ("**Seller**"), and Alliance Energy Renewables, LLC, a limited liability company organized under the laws of the State of New York ("**Purchaser**").

## BACKGROUND

A.      Seller owns a 100% membership interest (the "**Membership Interest**") in Mirant NY-Gen, LLC, a limited liability company organized under the laws of the State of Delaware (the "**Company**" or "**Mirant NY-Gen**") constituting all of the outstanding membership interests of the Company. This Agreement sets forth the terms and conditions upon which Purchaser will purchase the Membership Interest from Seller.

B.      Subject to the entry of the Bankruptcy Court Orders (as hereinafter defined) and on the terms and conditions set forth herein, Seller desires to sell to Purchaser the Membership Interest and Purchaser desires to purchase the Membership Interest from Seller.

C.      Seller has offered the Membership Interest pursuant to a competitive bidding process during which Purchaser viewed information concerning the Membership Interest and completed its Due Diligence Inspections and Reviews (as defined herein). The Parties recognize that the Assets (as defined herein) in these transactions are being sold on an "as is" basis and free and clear of all liens, claims, encumbrances and interests in accordance with the terms and conditions herein and that the liabilities of the Company now existing and hereafter arising through the Plan Effective Date (as defined herein) shall be satisfied and discharged pursuant to the Plan (as defined herein), at or prior to the Closing Date.

D.      On July 14, 2003, Seller and certain of its Affiliates, including Mirant NY-Gen, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, et seq.) (the "**Bankruptcy Code**"), commencing cases in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "**Bankruptcy Court**"), and continue to operate their respective businesses as debtors and debtors-in-possession.

E.      The Parties recognize that it is in the best interest of Seller and its Affiliates to pursue the transactions contemplated herein.

F.      Seller and Purchaser are entering into this Agreement to evidence their respective duties, obligations and responsibilities.

**NOW, THEREFORE,** in consideration of the respective representations, warranties, covenants and agreements contained in this Agreement, each of Seller and Purchaser agrees as follows:

ARTICLE I

CERTAIN DEFINITIONS

**1.A    Defined Terms**.  As used in this Agreement each of the following terms shall have the following meaning:

**1.01    "Action"** has the meaning set forth in <u>Section 11.02(a)</u>.

**1.02    "Affiliate"** of a Person means any other Person that (a) directly or indirectly controls the specified Person; (b) is controlled by or is under direct or indirect common control with the specified Person; or (c) is an officer, director, employee, representative or agent or subsidiary of the Person. For the purposes of this definition, **"control,"** when used with respect to any specified Person, means the power to direct the management or policies of the specified Person, directly or indirectly, whether through the ownership of voting securities, partnership or limited liability company interests, by contract or otherwise.

**1.03    "Agreement"** means this Membership Interest Purchase and Sale Agreement, together with the Schedules and Exhibits hereto.

**1.04    "Air Permits"** has the meaning set forth in <u>Section 7.28</u>.

**1.05    "Assets"** means all of the Company's tangible and intangible assets underlying the presentation of such assets on the Company's Interim Balance Sheet, as added to or removed during the period from such date to the Closing Date including, but not limited to, and the Company's generating plant to the extent not reflected on said Interim Balance Sheet as a result of being fully written off or any other similarly situated properties of the Company.

**1.06    "Assignments"** means, collectively, each of the assignments in the form annexed hereto as <u>Schedule 3.02</u>, <u>Schedule 3.02(d)(1)</u> and <u>Schedule 3.02(d)(2)</u> to be entered into pursuant to <u>Section 2.01</u> and <u>Section 2.03(f)</u>.

**1.07    "Assumed Contracts"** means the executory leases, contracts and other agreements assumed by the Company under the Plan, which agreements shall include, but not be limited to, any interconnection agreements to which the Company is a party prior to the Plan Effective Date, all such agreements to be included in a Schedule to be mutually agreed between the Parties and approved by the Bankruptcy Court.

**1.08    "Auction"** has the meaning set forth in <u>Section 7.15(g)</u>.

**1.09    "Bankruptcy Case"** means the voluntary petitions filed by Seller and Affiliates of Seller, under Chapter 11 of Title 11 of the United States Code, as amended and the resulting proceeding in the Bankruptcy Court.

**1.10    "Bankruptcy Code"** means the United States Bankruptcy Code, as the same may be amended from time to time, in each case as of the relevant date or dates.

**1.11** "**Bankruptcy Court**" has the meaning set forth in paragraph D of the Recitals hereto.

**1.12** "**Bankruptcy Court Orders**" has the meaning set forth in Section 7.15(a).

**1.13** "**Break-Up Fee**" has the meaning set forth in Section 7.15(b).

**1.14** "**Business Day**" means a day other than Saturday, Sunday or a day on which banks are legally required or permitted to be closed for business in the State of New York.

**1.15** "**Capital Expenditure**" means any additions or changes to or replacements of property, plant and equipment and any other expenditures or repairs (including capitalized maintenance costs) that would be capitalized on Seller's balance sheet in accordance with Seller's capitalization policy.

**1.16** "**Closing**" has the meaning set forth in Section 2.01.

**1.17** "**Closing Date**" has the meaning set forth in Section 3.01.

**1.18** "**Code**" has the meaning set forth in Section 2.04.

**1.19** "**Commercially Reasonable Efforts**" means those efforts (i) which are reasonably foreseeable by the Parties at the time of executing this Agreement, (ii) which a Party would reasonably expect the other Party to take under the circumstances in order to satisfy its obligations hereunder, and (iii) which a Party would undertake for its own benefit under similar circumstances in order to achieve the results contemplated by this Agreement; provided, however, that any efforts set forth in clauses (i)-(iii) will not require or include any expense or conduct not ordinarily incurred or engaged in by Persons seeking to implement transactions of the type contemplated by this Agreement.

**1.20** "**Company**" has the meaning set forth in the Background section (A) of this Agreement.

**1.21** "**ConEd**" has the meaning set forth in Section 7.27.

**1.22** "**Confidential Information**" has the meaning assigned to such term in the Confidentiality Agreement.

**1.23** "**Confidentiality Agreement**" means that certain Confidentiality Agreement dated September 29, 2006 between Seller and Purchaser.

**1.24** "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan and approving the transactions contemplated therein.

**1.25** "**Consent Order**" means the Consent Order dated July 22, 2005, between the Company and the New York Department of Environmental Conservation relating to certain

environmental remediation at the Hillburn Facility, as such Consent Order may be revised, amended or supplemented from time to time.

**1.26** "**CPR**" means the Center For Public Resources, Inc.

**1.27** "**Cross Indemnity Agreement**" has the meaning set forth in <u>Section 7.24</u>.

**1.28** "**Damages**" has the meaning set forth in <u>Section 11.02(a)</u>.

**1.29** "**DEC**" means the New York State Department of Environmental Conservation.

**1.30** "**Disclosure Statement**" has the meaning set forth in <u>Section 7.15(a)</u>.

**1.31** "**Disclosure Statement Order**" has the meaning set forth in <u>Section 7.15(a)</u>.

**1.32** "**Dispute**" has the meaning set forth in <u>Section 13.07</u>.

**1.33** "**Disputed Claims**" has the meaning set forth in <u>Section 7.09</u>.

**1.34** "**Down Payment**" has the meaning set forth in <u>Section 2.02</u>.

**1.35** "**Due Diligence Inspections and Reviews**" means any due diligence, inspection or review related to the Membership Interest and Assets and described in or conducted pursuant to the terms and conditions of the Confidentiality Agreement.

**1.36** "**Effective Date**" means the date on which this Agreement is executed by the Parties.

**1.37** "**Encumbrances**" means any mortgages, pledges, liens, security interests, conditional and installment sale agreements, activity and use limitations, conservation easements, deed restrictions, easements, encumbrances and charges of any kind.

**1.38** "**Environmental Laws**" means any Governmental Rule relating to air emissions, storage and use of hazardous or toxic substances, generation, treatment, storage, and disposal of hazardous wastes, waste water discharges and similar environmental matters, including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 <u>et seq</u>.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 <u>et seq</u>.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 <u>et seq</u>.), the Federal Water Pollution Control Act (33 U.S. C. § 1251 <u>et seq</u>.), the Clean Air Act (42 U.S.C. § 7401 <u>et seq</u>.), the Toxic Substances Control Act (15 U.S.C. § 2601 <u>et seq</u>.), the Oil Pollution Act (33 U.S.C. § 2701 <u>et seq</u>.) and the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 <u>et seq</u>.).

**1.39** "**Escrow Agent**" means Hiscock & Barclay, LLP.

**1.40** "**Escrow Agreement**" means the escrow agreement among Seller, Purchaser and Escrow Agent dated as of the date hereof substantially in the form of Schedule 1.41 hereto.

**1.41** "**Event of Loss**" has the meaning set forth in <u>Section 7.21(a)</u>.

**1.42** "**Final Order(s)**" means an order of the Bankruptcy Court (i) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or other proceedings for review, rehearing or reargument; (ii) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; and (iii) respecting which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; provided, however, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.43** "**Financial Statements**" has the meaning set forth in <u>Section 4.06</u>.

**1.44** "**GAAP**" shall mean generally accepted accounting principles for financial reporting in the United States.

**1.45** "**Gas Transportation Agreement**" has the meaning set forth in <u>Section 7.27</u>.

**1.46** "**Governmental Approval**" means any authorization, consent, approval, waiver, exception, variance, order, franchise, permit, license or exemption issued by, and any registration or filing with, any Governmental Authority.

**1.47** "**Governmental Authority**" means any federal, state, local or other governmental, regulatory or administrative agency, governmental commission, department, board, subdivision, court, tribunal, or other governmental arbitrator, arbitral body or other authority having jurisdiction over the matter or Person in question.

**1.48** "**Governmental Rule**" means, with respect to any Person, any applicable law (including, but not limited to, common law), statute, treaty, rule, regulation, ordinance, order, code, judgment, decree, directive, injunction, writ or similar binding action or decision duly implementing any of the foregoing by any Governmental Authority, but does not include Governmental Approvals.

**1.49** "**Grahamsville Generating Facility**" means the approximately 18 MW hydroelectric electric generating station located on Route 55A, Grahamsville, New York, and formerly owned by Orange and Rockland Utilities Inc. and previously leased to Company, which lease expired on October 31, 2006.

**1.50** "**Hazardous Substances**" means any chemical, material or substance that is listed or regulated under applicable Environmental Laws as a "hazardous" or "toxic" substance or waste, or as a "contaminant," or is otherwise listed or regulated under applicable Environmental Laws because it poses a hazard to human health or the environment.

**1.51** **"Hillburn Air Permit"** has the meaning set forth in <u>Section 7.28</u>.

**1.52** **"Hillburn Facility"** has the meaning set forth in item 1 on Schedule 1.45.

**1.53** **"HSR Act"** has the meaning set forth in <u>Section 7.03</u>.

**1.54** **"Hydroelectric and Gas Turbine Generating Stations"** means those stations listed on <u>Schedule 1.45</u>.

**1.55** **"Indemnifying Party"** has the meaning set forth in <u>Section 11.02(a)</u>.

**1.56** **"Indemnitee"** has the meaning set forth in <u>Section 11.02(a)</u>.

**1.57** **INTENTIONALLY OMITTED**

**1.58** **"Intercompany Claims"** means all claims and causes of action existing as of the Closing Date that the Company has or could have asserted against Seller or any Affiliate of Seller, including without limitation: (i) all "claims", as defined in Section 101(5) of the Bankruptcy Code against Seller or any Affiliate of Seller, and all causes of action against Seller or any Affiliate of Seller arising under sections 542, 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code or any comparable state law affecting creditors rights generally, and which constitute property of the Company's chapter 11 estate and (ii) any claims arising with respect to any accounts receivable due to the Company from Seller or any Affiliate of Seller that have been assigned to Seller or its designee as further described in Sections 2.03(a)(i) and 2.03(f) of this Agreement.

**1.59** **"Interim Balance Sheet"** has the meaning set forth in <u>Section 4.06 (ii)</u>.

**1.60** **"Knowledge"** or similar phrases in this Agreement means: (i) in the case of Seller, the actual, current knowledge of Seller's representatives or the Company's representatives listed in <u>Schedule 1.1</u> at the date of this Agreement (or, with respect to any certificate delivered pursuant to <u>Section 9.03</u>, the date of delivery of such certificate), provided that, with respect to any third party claims against the Company, actual, current knowledge of the representatives listed on <u>Schedule 1.1</u> shall be deemed to include actual, current knowledge of any actual claims or any contingent or potential claims against the Company; and (ii) in the case of Purchaser, the actual, current knowledge of Purchaser's representatives listed in <u>Schedule 1.2</u> at the date of this Agreement (or, with respect to the certificate delivered pursuant to <u>Section 10.03</u>, the date of delivery of such certificate).

**1.61** **"Major Loss"** has the meaning set forth in <u>Section 7.21(a)</u>.

**1.62** **"Material Adverse Effect"** means a material adverse effect upon (a) the business, operations, assets, liabilities, condition (financial or otherwise) or results of operations of the Company, or (b) the ability of Seller to consummate the transactions contemplated by this Agreement.

**1.63** **"Material Contract"** has the meaning set forth in <u>Section 4.16</u>.

**1.64** "**Membership Interest**" has the meaning set forth in the Background section at the beginning of this Agreement.

**1.65** "**MET**" has the meaning set forth in Section 4.16.

**1.66** "**Minor Loss**" means an Event of Loss that is not a Major Loss.

**1.67** "**Mirant Energy Marketing**" has the meaning set forth in Section 4.16.

**1.68** "**Mirant Marketing Agreement**" has the meaning set forth in Section 4.16.

**1.69** "**Mirant NY-Gen**" has the meaning set forth in the Recitals hereto.

**1.70** "**Mirant Services**" has the meaning set forth in Section 4.16.

**1.71** "**Necessary Capital Expenditure**" means any Capital Expenditure other than a Pre-Approved Capital Expenditure or a Remediation Expenditure that, in the exercise of Prudent Utility Practices, is reasonably necessary for the continued operation or maintenance of the Hydroelectric and Gas Turbine Generating Stations or that is required by applicable law. Necessary Capital Expenditure does not include any Capital Expenditure undertaken primarily to expand or re-power the Hydroelectric and Gas Turbine Generating Stations.

**1.72** "**NO$_x$ Bubble**" has the meaning set forth in Section 7.28.

**1.73** "**NYISO**" has the meaning set forth in Section 7.26.

**1.74** "**O&R Settlement Agreement**" has the meaning set forth in Section 7.25.

**1.75** "**Party**" means either Seller or Purchaser, as the context requires and "**Parties**" means, collectively, "Seller and Purchaser".

**1.76** "**Person**" means an individual, partnership, joint venture, corporation, limited liability company, trust, association or unincorporated organization, or any Governmental Authority.

**1.77** "**Plan**" means the Chapter 11 plan for Mirant NY-Gen providing, inter alia, for (a) the discharge to the fullest extent permitted by the Bankruptcy Code of (i) all claims against Mirant NY-Gen existing on the Plan Effective Date with the exception of the Southern Company Claims, and (ii) all liens, claims, encumbrances and interests in any of the Assets existing on the Plan Effective Date, (b) the assumption of the Assumed Contracts, and (c) the retention by Seller of the Membership Interest, as the same may be amended, supplemented, or otherwise modified from time to time, together with the exhibits and schedules thereto, as the same may be in effect at the time such Chapter 11 plan is confirmed by the Bankruptcy Court.

**1.78** "**Plan Effective Date**" means the effective date of the Plan as defined in the Plan, which shall in no event be sooner than the Closing Date.

**1.79** "**Pre-Approved Capital Expenditures**" has the meaning set forth in Section 2.03(c).

**1.80** "**Prevailing Bidder**" has the meaning set forth in Section 7.15(g).

**1.81** "**Prudent Utility Practices**" means any of the practices, methods and acts engaged in or approved by a significant portion of the competitive electric generation industry for facilities similar to the Hydroelectric and Gas Turbine Generating Stations during the relevant time period or any of the practices, methods or acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety, law, regulation, environmental protection and expedition. Prudent Utility Practices are not intended to be limited to the optimum practices, methods or acts to the exclusion of all others, but rather, to be acceptable practices, methods or acts generally accepted in the industry.

**1.82** "**Purchase Price**" means the consideration to be paid for the Membership Interest as set forth in Section 2.02.

**1.83** "**Purchaser**" has the meaning set forth in the introductory paragraph of this Agreement.

**1.84** "**Purchaser Indemnified Parties**" has the meaning set forth in Section 11.02(e).

**1.85** "**Purchaser Required Consents**" has the meaning set forth in Section 7.14(a).

**1.86** "**Records**" has the meaning set forth in Section 7.04.

**1.87** "**Regulatory Approvals**" means any regulatory approvals required from the Federal Energy Regulatory Commission and the New York Public Service Commission.

**1.88** "**Related Agreements**" means the Confidentiality Agreement, the Assignments, and the Cross Indemnity Agreement (to the extent applicable).

**1.89** "**Remediation Expenditures**" means expenditures made and to be made by the Company for remediation work conducted pursuant to (i) the Consent Order and (ii) the Swinging Bridge Remediation Plan.

**1.90** "**Review Firm**" has the meaning set forth in Section 2.03(a).

**1.91** "**Sale Motion**" has the meaning set forth in Section 7.15(a).

**1.92** "**Sale Order**" has the meaning set forth in Section 7.15(c).

**1.93** "**Sale Procedures Order**" has the meaning set forth in Section 7.15(b).

**1.94** "**Schedules**" means the schedules to this Agreement.

**1.95** "**Section**" means a numbered section of this Agreement included within the Article that begins with the same number as that section.

**1.96** "**Seller**" has the meaning set forth in the introductory paragraph of this Agreement.

**1.97** "**Seller Marks**" has the meaning set forth in <u>Section 7.24</u>.

**1.98** "**Seller Required Consents**" has the meaning set forth in <u>Section 7.14(b)</u>.

**1.99** "**Seller Taxes**" has the meaning set forth in <u>Section 7.15(c)</u>.

**1.100** "**Seller's Estimate**" has the meaning set forth in <u>Section 7. 21(a)</u>.

**1.101** "**Shoemaker Air Permit**" has the meaning set forth in <u>Section 7.28</u>.

**1.102** "**Southern Company Claims**" has the meaning set forth in <u>Section 11.02(e)</u>.

**1.103** "**Station**" has the meaning set forth in <u>Section 7.21(a)</u>.

**1.104** "**Swinging Bridge Facility**" has the meaning set forth in item 5 on Schedule 1.45.

**1.105** "**Swinging Bridge Basic Remediation**" means the remediation work under the Swinging Bridge Remediation Plan other than the Unit 1 Fill-In.

**1.106** "**Swinging Bridge Remediation Plan**" means the remediation plan for the Swinging Bridge Facility approved by the Federal Energy Regulatory Commission in its letter dated June 14, 2006, as such remediation plan may be revised, amended or supplemented from time to time. For purposes of this Agreement, the remediation work under the Swinging Bridge Remediation Plan shall consist of the Swinging Bridge Basic Remediation and the Unit 1 Fill-In.

**1.107** "**Tax**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Internal Revenue Code of 1986, as amended), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property (including assessments, fees or other charges based on the use or ownership of real property), personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated tax, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, including without limitation, any item for which a Person's liability arises as a transferee or successor-in-interest.

**1.108** "**Third Party Claim**" means a claim by a Person other than Seller or a Person related to Seller as described in Section 11.03 or Purchaser or related to Purchaser as described in Section 11.02.

**1.109** "**Third Party Sale**" has the meaning set forth in Section 7.15(g).

**1.110** "**Unit 1 Fill-In**" means that part of the Swinging Bridge Remediation Plan consisting of the volumetric "fill-in" of the penstock and tunnel of Unit 1 at the Swinging Bridge Facility.

**1.111** "**Unit 1 Fill-In Contract**" has the meaning set forth in Section 2.03(d)(ii).

**1.B.** **Interpretation**. In this Agreement, unless a clear contrary intention appears:

    (i)    the singular number includes the plural number and vice versa;

    (ii)    reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity;

    (iii)    reference to any gender includes each other gender;

    (iv)    reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof;

    (v)    reference to any Article, Section, Schedule or Exhibit means such Article, Section, Schedule or Exhibit to this Agreement, and references in any Article, Section, Schedule, Exhibit or definition to any clause means such clause of such Article, Section, Schedule, Exhibit or definition;

    (vi)    "hereunder," "hereof," "hereto" and words of similar import are references to this Agreement as a whole and not to any particular Section or other provision hereof or thereof;

    (vii)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

    (viii)    relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including";

    (ix)    the word "will" shall be construed to have the same meaning and effect as the word "shall"; and

(x)     reference to any law (including statutes and ordinances) means such law as amended, modified codified or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder.

## ARTICLE II

## SALE AND PURCHASE OF THE MEMBERSHIP INTEREST

**2.01  Membership Interest to be Sold**.  Subject to the terms and conditions of this Agreement, at the Closing provided for in Section 3.01 hereof (the "**Closing**"), Seller shall sell, transfer and deliver the Membership Interest to Purchaser, and Purchaser shall purchase the Membership Interest from Seller, pursuant to Section 363 of the Bankruptcy Code and the Sale Order.

**2.02  Purchase Price and Payment.**  Subject to the terms and conditions of this Agreement, as consideration for the Membership Interest, Purchaser will pay to Seller in cash an aggregate of Three Million U.S. Dollars ($3,000,000) (the "**Purchase Price**").  Purchaser shall pay ten percent (10%) of such amount as a down payment (the "**Down Payment**") to Escrow Agent within ten (10) Business Days of the Effective Date in accordance with the terms and provisions of the Escrow Agreement.  The balance of the Purchase Price shall be payable by Purchaser at the Closing.  Both payments shall be made by wire transfer in U.S. Dollars in immediately available funds to such account(s) as Seller will designate.

**2.03  Adjustments to the Purchase Price**.  The Purchase Price is subject to adjustment in accordance with the following:

(a)     Working Capital.

(i)     Within ninety (90) days after the Closing, Seller shall calculate the amount of net working capital at the Company as of the Closing Date and provide written notice of such amount to Purchaser.  To the extent that the amount of the net working capital is greater than zero, Purchaser shall pay Seller an adjustment within fifteen (15) days of receiving the notice from Seller; and to the extent that the amount of the net working capital is less than zero, Seller shall pay Purchaser an adjustment within fifteen (15) days of issuing such notice.  For purposes hereof, "net working capital" shall mean cash and cash equivalents, accounts receivable (excluding accounts receivable due from its Affiliates that have been assigned to Seller or its designee pursuant to Section 2.03(f)), prepayments (including prepaid real estate Taxes covering the period after the Closing Date) and fuel inventory (at the higher of cost or market) less trade accounts payable and accruals (excluding trade accounts and accruals due to its Affiliates).  Accounts receivable shall also exclude: Tax refunds that are subject to the terms of Section 2.03(b) below; and amounts related to insurance and other claims that are subject to the terms of Section 2.03(e) below.  Trade accounts payable and accruals shall also exclude: the remediation work at the Swinging Bridge Facility that is subject to the terms of Section 2.03(d) below; amounts recorded for remediation and monitoring work at the Hillburn Facility; and asset retirement

obligations for all of the Company's generating facilities. The market value of fuel inventory shall be determined by reference to the price listed in Platts US Marketscan, Atlantic Coast, Low Sulfur Jet, Barge Quote, published on the Closing Date, plus all applicable Taxes. If no price is published on the Closing Date, then the price shall be the average of (i) the price for the first day for which a price (as determined using the preceding methodology) is published that precedes the Closing Date and (ii) the price for the first day for which a price (as determined using the preceding methodology) is published that next follows the Closing Date. If Platts US Marketscan, or the relevant location or fuel type ceases to be published, the Parties shall agree on the appropriate index to be used.

       (ii)     In the event of a dispute with respect to Seller's calculation of the amount of net working capital and any adjustment to be paid by Purchaser or Seller pursuant hereto, Purchaser and Seller shall attempt to reconcile their differences. If Purchaser and Seller are unable to do so within sixty (60) days of receipt by Purchaser of Seller's written notice of the amount of its calculation, Purchaser and Seller shall submit the disputed items for resolution to Deloitte & Touche, LLP (Atlanta Office) (the "**Review Firm**") which, within ninety (90) days from such submission, shall determine and report to the Parties upon such disputed items, and such report shall be final, binding and conclusive on the Parties hereto. In acting pursuant to this <u>Section 2.03(a)</u>, the Review Firm shall have the rights, privileges and immunities of an arbitrator, and its fees shall be paid one half by Purchaser and one half by Seller.

       (b)     <u>Tax Refunds</u>. All refunds of Taxes relating to the Company with respect to Tax periods ending on or before the Closing Date will be for the account of Seller. To the extent the Company receives any such refund after the Closing Date, Purchaser shall pay the amount of such refund to Seller within five (5) Business Days of receipt.

       (c)     <u>Pre-Approved Capital Expenditures and Necessary Capital Expenditures</u>. From the Effective Date through the Plan Effective Date, the Company may (without Purchaser's consent) make: (i) the Capital Expenditures described on <u>Schedule 2.03(c)</u> (the "**Pre-Approved Capital Expenditures**"); and (ii) Necessary Capital Expenditures. Subject to the provisions of <u>Section 7.21(a)</u>, Purchaser will pay to Seller at Closing, as an addition to the Purchase Price, the amount of capital contributed by Seller to the Company during such period and expended by the Company on account of all Pre-Approved Capital Expenditures and Necessary Capital Expenditures made between the Effective Date and the Closing and not theretofore paid by Purchaser.

       (d)     <u>Remediation Expenditures</u>. From the Effective Date through the Closing, the Company may (without Purchaser's consent) make the Remediation Expenditures; subject to the following:

       (i)     Purchaser shall not be liable to reimburse Seller for the Remediation Expenditures;

       (ii)     the Unit 1 Fill-In shall be done in accordance with a fixed price, lump sum contract for same to be entered into by the Company prior to Closing

(the "**Unit 1 Fill-In Contract**"), the requirements of the Federal Energy Regulatory Commission, and other applicable legal requirements. A copy of the proposed Unit I Fill-In Contract shall be provided to Purchaser for Purchaser's comments within a reasonable time before it is to be finalized and it shall be attached to and, subject to any required approval of the Bankruptcy Court, become a part of this Agreement in accordance with Section 7.12(a) and Schedule 2.03(d)(ii). The Purchase Price shall be reduced by an amount equal to the difference between the amount stated in the Unit 1 Fill-In Contract for completion of the work described therein and the unpaid portion of that amount on the Closing Date. If the Company does not enter into the Unit 1 Fill-In Contract on or before the Closing, the Purchase Price shall be reduced by the estimated amount agreed to by Purchaser and Seller at or before the Closing as the cost for completion of the Unit 1 Fill-In. In the event the Parties cannot agree on the estimated amount as aforementioned, then the amount proposed by Seller shall prevail for purposes of the Closing; provided, however, that Purchaser shall be entitled to invoke the dispute resolution provisions contained in Section 13.10 hereof with respect to such estimated amount; and, provided further, that the Purchase Price shall be reduced by only such portion of the reduction determined pursuant to this Section 2.03(d)(ii) which, when aggregated with the Purchase Price reduction determined pursuant to Sections 2.03(d)(iii) and 2.03(e) and Seller's liability under Section 11.03(b)(iii) hereof, does not exceed the Purchase Price.

(iii) Seller shall make a good faith effort to cause Company to complete the Swinging Bridge Basic Remediation on or before the Closing Date. If the Swinging Bridge Basic Remediation is not expected to be completed by the Closing Date, the Purchase Price shall be reduced in accordance with Section 2.03(e) below; and

(iv) **INTENTIONALLY OMITTED**

(v) **INTENTIONALLY OMITTED**

(vi) upon Closing and the adjustment of the Purchase Price in accordance with Sections 2.03(d) and 2.03(e), if any, the Company shall be responsible for completing the remediation in accordance with the applicable Consent Order, Swinging Bridge Remediation Plan, and applicable law and, following Closing and, except as provided in Section 2.03(e) below, Seller shall have no liability or obligation to Purchaser or Company for the costs of such completion.

(e) <u>Remediation Shortfall</u>. If the Company is not reasonably expected to complete the Swinging Bridge Basic Remediation on or before the Closing Date, then Seller shall notify Purchaser, within fifteen (15) days prior to the Closing, of Seller's option to:

(i) reduce the Purchase Price for Seller's good faith written estimate of amounts required to be expended to complete the applicable remediation, or

(ii)     cause the Company to contract with a third party reasonably acceptable to Purchaser to complete the applicable remediation, in which case the Purchase Price shall be reduced by the amount payable to such third party under such contract;

provided, however, that in the case of either option specified in (i) or (ii) aforementioned, Seller's liability shall be limited to an amount which, when aggregated with Seller's liability under Section 2.03(d) hereof and Section 11.03(b)(iii) hereof, does not exceed the Purchase Price.

(f)     Insurance Proceeds and Affirmative Claims Against Third Parties. Prior to the Closing Date, the Company will (i) assign to Seller (or such Affiliate of Seller as Seller may direct pursuant to the Plan) all of the Company's pending insurance claims filed with respect to and related to its Remediation Expenditures at both the Swinging Bridge Facility and the Hillburn Facility, which may include, but shall not be limited to, claims in respect of property, business interruption, and environmental losses. To the extent an insurance carrier pays amounts related to such claims to the Company after Closing, the Company shall hold such amounts in trust for Seller (or Seller's Affiliate, as the case may be) and Purchaser shall cause the Company to pay Seller or its Affiliate such amounts within five (5) Business Days of receipt, (ii) assign to Seller (or such Affiliate of Seller as Seller may direct pursuant to the Plan) the Company's affirmative claims against any third parties (including, but not limited to, claims originally filed in the Bankruptcy Case against Orange and Rockland Utilities Inc. and Consolidated Edison, Inc. and/or any of their respective Affiliates) for actions or inactions arising prior to the Closing Date, and (iii) assign to Seller (or such Affiliate of Seller as Seller may direct pursuant to the Plan) all Intercompany Claims. If requested by Seller, Purchaser shall cause re-organized Mirant NY-Gen to cooperate with Seller (or Seller's designated Affiliate) in the prosecution of such insurance and affirmative claims, including making personnel, records, and access to the Assets reasonably available as needed by Seller; provided, however, that the costs of prosecuting any such claims shall be borne by, and be for the account of, Seller. It is expressly understood that nothing herein shall affect any claims that the Company may or could have asserted against any Affiliate that is party to the O&R Settlement Agreement for setoff, contribution, reimbursement or indemnity under the O&R Settlement Agreement, or any claim or cause of action that Purchaser or the Company may assert against Seller or any other Affiliate of Seller arising under or related to this Agreement or any agreement entered into pursuant to or in connection with this Agreement.

**2.04  Allocation of Purchase Price.** Company is a disregarded entity under Section 7701 of the Internal Revenue Code, of 1986 as amended (the "**Code**"). This purchase constitutes an asset acquisition under Code Section 1060. The Purchaser and the Seller shall allocate the Purchase Price to the Assets of the Company within ninety (90) days after the Closing Date in a manner consistent with Section 1060 of the Code and the Treasury Regulations thereunder. Purchaser shall provide the initial draft of the allocation. Each of the Purchaser and the Seller agrees to file Internal Revenue Service Form 8594, and all federal, state, local and foreign Tax returns, in accordance with such allocation. Each of the Purchaser and the Seller shall report the transaction contemplated by this Agreement for federal income Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Section 2.04; provided, however, that if the Parties should fail to agree upon the allocation as herein described, then the matter shall be submitted to a nationally recognized valuation firm whose decision regarding the allocation will

be binding upon the Parties. Each of the Purchaser and the Seller agrees to provide the other promptly with any other information required to complete Form 8594. Each of the Purchaser and the Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding the agreed upon allocation of the Purchase Price.

## ARTICLE III

## THE CLOSING

**3.01   Time and Place; Effective Time of Transfer.**

(a)     Except as provided by the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, or any order by the Bankruptcy Court in the Bankruptcy Case, the Closing of the transactions contemplated by this Agreement will take place at the offices of Hiscock & Barclay, LLP, 50 Beaver Street, Albany, New York  12207-2830 at 10:00 A.M. local time, on the Closing Date (as hereinafter defined).  Subject to Section 11.01 hereof, the Closing shall occur as soon as practicable after the conditions set forth in Articles VII, VIII, IX and X have been satisfied or waived, on a date specified in a written notice from Seller to Purchaser, given at least five days prior to such date (the "**Closing Date**"), provided, however, that such date shall not be sooner than the Plan Effective Date.

(b)     For all purposes, the transfer of the Membership Interest by Seller to Purchaser pursuant to this Agreement shall be effective at 11:59 P.M. on the date of Closing.

**3.02   Deliveries by Seller.**  At the Closing, Seller shall deliver the following to Purchaser:

(a)     Assignment in the form of Schedule 3.02 hereto duly executed by Seller transferring the Membership Interest to Purchaser;

(b)     a good standing certificate for the Company from the Secretary of State of the State of Delaware and from the Secretary of State of each jurisdiction in which the Company is authorized to do business as a foreign limited liability company bearing a date within fifteen (15) days of the Closing Date;

(c)     resignations of the Company's managers and officers, effective on the Closing Date;

(d)     a copy of the assignments referred to in Section 2.03(f) in the forms attached as Schedules 3.02(d-1) and 3.02(d-2) hereto;

(e)     the various certificates, documents and instruments referred to in Article IX hereof;

(f)     the Cross Indemnity Agreement  referred to in Section 7.25 hereof (to the extent applicable) in the form attached as Schedule 7.25 hereto; and

(g)     such other items as Purchaser deems reasonably necessary to effectuate the transactions described in this Agreement; provided, however, that if any required action with respect

to the Gas Transportation Agreement as specified in Section 7.27 hereunder has not been completed, then the Company, Seller, Purchaser and the parties thereto shall enter into an arrangement to continue the Gas Transportation Agreement with respect to the Company under the same provisions as existed prior to the Closing until such time as the replacement agreement specified in Section 7.27 hereunder has been implemented, and provided, further that, if Seller should be required to pay a consideration to effectuate the obligations as provided in this clause (g), then Purchaser shall bear any costs other than nominal costs associated with the same.

(h)     all documents delivered by Seller at Closing shall be effective as of 11:59 P.M. on the Closing Date.

**3.03    Deliveries by Purchaser**.  At the Closing, Purchaser shall deliver the following to Seller:

(a)     the amount of the Purchase Price to be paid at the Closing in accordance with Section 2.02, by wire transfer to the account(s) indicated on Schedule 3.03(a):

(b)     a good standing certificate for Purchaser from the Secretary of State of the State of New York, bearing a date within fifteen (15) days of the Closing Date; and

(c)     the various certificates, documents and instruments referred to in Article X hereof; and

(d)     such other items as Seller deems reasonably necessary to effectuate the transactions described in this Agreement; provided, however, that if Purchaser is required to pay a consideration to obtain or otherwise provide any such other item, then Seller shall bear any costs other than nominal costs associated with the same.

(e)     all documents delivered by Purchaser at Closing shall be effective as of 11:59 P.M. on the Closing Date.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

**4.01    Power to Sell the Membership Interest**.  Subject to prior approval by the Bankruptcy Court, Seller has the power to sell, assign, transfer and deliver to Purchaser good title to the Membership Interest, free and clear of all security interests, liens, pledges, assessments, options and encumbrances, and with no restriction on the voting rights and other incidents of record ownership pertaining thereto.

**4.02    Corporate Organization**.

(a)     Seller is a corporation validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and corporate authority to enter into this Agreement and to perform its obligations hereunder.

(b)     The Company is a limited liability company validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and corporate authority to carry on its business as it is now being conducted and to own the properties and assets it now owns; and is duly qualified or licensed to do business as a foreign limited liability company in good standing in all jurisdictions in which the ownership of property or the conduct of its business requires such qualification, except where the failure to so qualify would not have a Material Adverse Effect.

### 4.03  Due Authorization and Execution; Valid and Binding Agreement; No Violation.

(a)     Subject to prior approval by the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary corporate action required by law or by Seller's and the Company's organizational documents.  This Agreement has been duly executed and delivered by Seller and, assuming due authorization, including prior approval of the Bankruptcy Court, and execution and delivery by Purchaser, constitutes a valid and binding agreement of Seller, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting generally the enforcement of creditors' rights and rules of law governing specific performance, injunctive relief or other equitable remedies.

(b)     Except as set forth on Schedule 4.05 and, assuming receipt of all consents and approvals required from (i) Governmental Authorities as disclosed in Schedule 4.03 and (ii) third parties other than Governmental Authorities as disclosed in Schedule 4.17, neither the execution and delivery of this Agreement by Seller nor the consummation of the transactions contemplated hereby will violate any provision of the organizational documents of Seller or the Company or, to the Knowledge of Seller, violate, or be in conflict with, or constitute a default under, or cause the amendment, modification or acceleration of, or give any party the right to amend, modify or refuse to perform, or modify the time within which duties are to be performed or rights or benefits are to be received under, or cause the acceleration of the maturity of any debt or obligation pursuant to, or result in the creation or imposition of any security interest, lien or other encumbrance upon any property or asset of Seller or the Company under any lease, agreement, understanding, restriction or commitment or any judgment, decree, or order of any court or Governmental Authority to which Seller or the Company is a party or by which Seller or the Company is bound, or to which the property of Seller or the Company is subject, except for violations, conflicts or defaults which would not have a Material Adverse Effect.

### 4.04  Capitalization.  As of the date of this Agreement, the number of issued and outstanding membership interests of the Company consists of the Membership Interest.  The Membership Interest is validly issued, fully paid and non-assessable; and the Membership Interest is owned of record by Seller.  As of the date of this Agreement, there are no outstanding (a) securities convertible into, exchangeable for or evidencing the right to purchase any capital of the Company; (b) options, warrants, calls or other rights to purchase or subscribe to the Company's

membership interests or securities convertible into, exchangeable for or evidencing the right to purchase any membership interests of the Company; or (c) contracts, commitments, agreements, understandings or arrangements of any kind relating to the issuance of any membership interests of the Company, any such convertible or exchangeable securities or any such other securities evidencing the right to purchase any such options, warrants or rights.

### 4.05 Licenses and Permits; Consents and Approvals of Governmental Authority.

(a)     To the Knowledge of Seller, Section A of <u>Schedule 4.05</u> is a list of all licenses and permits issued by a Governmental Authority to the Company relating to the operation of the Company's business ("<u>Existing Licenses and Permits</u>"). Seller has no Knowledge that any license or permit from a Governmental Authority is required for such operation other than: (i) the Existing Licenses and Permits, and (ii) licenses and permits not presently held by the Company, if any, but with respect to which such failure does not have a Material Adverse Effect.

(b)     To the Knowledge of Seller, the consent or approval of a Governmental Authority is required in connection with the execution, delivery and performance of this Agreement by Seller or the consummation by Seller of the transactions contemplated hereby with respect to: (i) those Existing Licenses and Permits listed in Section B of <u>Schedule 4.05</u> including, but not limited to, an order by the Federal Energy Regulatory Commission ("FERC") under Section 203 of the Federal Power Act (16 USC §824b, as amended) authorizing Purchaser's acquisition of the Membership Interests, (ii) those Consent Orders and agreements with Governmental Authority listed in Section C of <u>Schedule 4.05</u>, and (iii) the Bankruptcy Case. Seller disclaims any representation or warranty regarding the requirement for the approval or consent of a Governmental Authority in connection with the execution, delivery and performance of this Agreement by Seller or the consummation by Seller of the transactions contemplated hereby except to the extent set forth in this subparagraph (b) and as set forth on <u>Schedule 4.05</u>.

4.06 **Financial Statements**. Seller has heretofore delivered to Purchaser the following (collectively, the "**Financial Statements**"): (a) unaudited balance sheets of the Company as at December 31, 2004 and December 31, 2005 and unaudited statements of operations, cash flow and members' equity for each of the fiscal years then ended; and (ii) an unaudited balance sheet of the Company as at September 30, 2006 (the "**Interim Balance Sheet**") and unaudited statements of operations, cash flow and stockholders' equity for the nine (9) month period then ended. Such financial statements of the Company are all in accordance with GAAP.

4.07 **No Undisclosed Liabilities**. Except as disclosed in the Financial Statements, Schedule 4.07, or otherwise in this Agreement and the Schedules hereto, and except for liabilities and obligations incurred since the date of the Interim Balance Sheet in the ordinary course of business, to the Knowledge of Seller, the Company has no liabilities of the type required to be reflected in financial statements in accordance with GAAP which would have a Material Adverse Effect which are not reflected or reserved against in the Interim Balance Sheet.

4.08 **Absence of Certain Changes**. To the Knowledge of Seller, except as disclosed on Schedule 4.08 or as may be required by the Bankruptcy Court, since the date of the Interim Balance Sheet, (a) there has not been any Material Adverse Effect, provided that, Seller makes no representations with respect to (i) business or economic conditions which are generally applicable

to companies in the Company's industry, (ii) changes in general business or economic conditions; (iii) any change resulting from the announcement or pendency of any of the transactions contemplated by this Agreement; or (iv) any change resulting from compliance by the Seller with the terms of, or the taking of any action required by, this Agreement, and (b) the Company has not suffered any material damage or destruction to any of its Assets, which damage or destruction is not covered by insurance.

**4.09  Real Property Leases, Easements and Licenses**.  Schedule 4.09 lists all: (a) leases pursuant to which the Company leases real property from or to other parties, and (b) easements and licenses pursuant to which the Company receives the right to use real property or grants the right to others to use real property, but does not list leases, easements or licenses the absence of which would not have a Material Adverse Effect . Copies of such leases and easements have been made available for review by Purchaser. Except as set forth on Schedule 4.09, to the Knowledge of Seller, there are no existing defaults by the Company thereunder and no event of default has occurred which (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default thereunder by the Company, except such defaults, events of default or other events that would not have a Material Adverse Effect.

**4.10  Litigation**.  Except as disclosed on Schedule 4.10, there is no action, suit, arbitration or proceeding pending or, to the Knowledge of Seller, threatened against the Company which, if adversely determined against the Company, would have a Material Adverse Effect.

**4.11  Subsidiaries**.  The Company does not have any subsidiaries or own or have the contractual right to vote or to acquire equity interests or any option, right, warrant or other right or instrument convertible into or exchangeable or exercisable for any such equity interest of any entity, corporate or otherwise.

**4.12  Taxes**.  The Company has filed all federal, state and local Tax returns required to be filed by it, all such Tax returns are correct and complete in all material respects and, except as disclosed on Schedule 4.12, the Company has duly paid all Taxes shown to be due on such Tax returns and there are no claims or Encumbrances against the Company or any of its Assets due to any unpaid Taxes. The provisions for Taxes reflected in the Interim Balance Sheet are reasonable. There are no pending actions or proceedings for the assessment or collection of Taxes from the Company and, except as disclosed on Schedule 4.12, there is currently no active or ongoing Tax audit.

**4.13  NYISO**.  The Assets participate in the energy and capacity markets and certain ancillary services markets of the NYISO through Seller's Affiliate, Mirant Energy Trading, LLC. The Assets currently are not eligible to participate in certain ancillary service markets of the NYISO, including voltage support, regulation, and black start services.

**4.14  Bank Accounts**.  Schedule 4.14 sets forth the names of all banks, trust companies, savings and loan associations, brokerage houses and other financial institutions at which the Company maintains accounts of any nature, and the names of all individuals authorized to draw thereon or make withdrawals therefrom.

**4.15** **Compliance with Law**. Except as set forth on Schedule 4.15 or otherwise in this Agreement and the Schedules hereto, to the Knowledge of Seller, the Company is in compliance in all material respects with all laws, ordinances, regulations, and orders applicable to them, the failure with which to comply would have a Material Adverse Effect. Except as set forth on Schedule 4.15, to the Knowledge of Seller, all licenses, franchises, permits and other Governmental Approvals held by the Company are valid and sufficient to permit the operations thereof except where the failure to hold such licenses, franchises, permits and other Governmental Approvals would not have a Material Adverse Effect.

**4.16** **Material Contracts; Contracts with Affiliates**. Schedule 4.16 lists each material, written contract or agreement of the Company that cannot be terminated on notice of thirty (30) days or less (each of which is herein referred to as a "**Material Contract**") other than real property leases, easements and licenses referred to in Section 4.09, but does not list contracts or agreements the absence of which would not have a Material Adverse Affect. Except as set forth on Schedules 4.09 and 4.16 and except with respect to defaults based upon the filing of the Bankruptcy Case, to the Knowledge of Seller, with respect to the Material Contracts, there is no existing default or event of default by the Company or any event which, with or without due notice or lapse of time or both, would constitute a default or event of default by the Company, except such defaults, events of default and other events which, either individually or collectively, would not have a Material Adverse Effect. Except as set forth on Schedules 4.09, 4.16 and 4.17, each of the Material Contracts is capable of being assumed by the Company. Effective no later than the Closing Date, all contracts and agreements between or among the Company and any Affiliate of the Company and/or Seller shall terminate, including without limitation: (i) that certain Power Sale, Fuel Supply and Services Agreement dated January 3, 2006, by and among the Company, Mirant Energy Trading, LLC ("**MET**"), as the transferee from Mirant Americas Energy Marketing, LP ("**Mirant Energy Marketing**") and others (the "**Mirant Marketing Agreement**") providing for, among other things, the sale by the Company to MET of all or a portion of the capacity, electricity, ancillary services and/or other related products generated by, or available from, the Company's generating facilities, and (ii) that certain Administrative Services Agreement dated January 3, 2006, by and between the Company and Mirant Services, LLC ("**Mirant Services**") providing for the procurement by the Company from Mirant Services of certain administrative, accounting and other similar services.

**4.17** **Consents**. Except for approval by the Bankruptcy Court and as otherwise listed on Schedule 4.17, to the Knowledge of Seller, no consent of any third party (other then consents of Governmental Authorities listed on Schedule 4.03) is necessary to the consummation of the transactions contemplated hereby, except consents whose failure to obtain would not have a Material Adverse Effect.

**4.18** **Title to Assets**. Except as set forth on Schedule 4.18, the Company has good and valid title to the Assets reflected in the Interim Balance Sheet, except Assets disposed of in the ordinary course of business or related to the transfer of the Grahamsville Generating Facility pursuant to the termination of the sublease for that facility, since the date of the Interim Balance Sheet. To Seller's Knowledge, none of such Assets are subject to any encumbrance except (a) liens reflected on the Interim Balance Sheet; (b) liens of landlords and liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and vendors' liens incurred in the ordinary course of business consistent with past practice; (c) purchase money liens arising or created in the

ordinary course of business consistent with past practices; (d) minor imperfections of title, if any, none of which would, either individually or collectively, have a Material Adverse Effect; (e) liens for Taxes not yet due; and (f) leases, easements and licenses set forth on <u>Schedule 4.09</u> or such other easements, leases and licenses that would not, either individually or collectively, have a Material Adverse Effect.

### 4.19 <u>No Other Representations or Warranties; Disclaimer</u>.

(a)     Except for the representations and warranties contained in this Article IV, none of the Seller, the Company, nor any other Person acting on behalf thereof (including any of their respective Affiliates, officers, directors, employees, agents or representatives) makes any representation or warranty, express, implied, statutory or arising by operation of law, and Seller hereby disclaims any such representations or warranties other than those contained in this Article IV, whether by Seller, the Company, or any of their respective Affiliates, officers, directors, employees, agents or representatives or any other Person, notwithstanding the delivery or disclosure to Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives or any other Person of any documentation or other information by Seller, the Company, or any of their respective Affiliates, officers, directors, employees, agents or representatives or any other Person. In connection with Purchaser's investigation of the Company, Purchaser has received from Seller and the Company certain financial information. Purchaser agrees and acknowledges that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all financial information so furnished to it, and that Purchaser shall have no claim against Seller or any other Person with respect thereto, except as otherwise provided in this Agreement. Accordingly, except as expressly provided in this Article IV, Seller makes no representation or warranty with respect to such financial information.

(b)     EXCEPT AS EXPRESSLY PROVIDED IN THIS ARTICLE IV, PURCHASER IS ACQUIRING THE MEMBERSHIP INTEREST AND THE COMPANY "AS IS", "WHERE IS" AND "WITH ALL FAULTS", AND SELLER EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS OR WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR ARISING BY OPERATION OF LAW. SPECIFICALLY, WITH RESPECT TO COMPANY'S ASSETS, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSETS OR AS TO THE PROSPECTS (FINANCIAL AND OTHERWISE) OR RISKS INCIDENTAL TO THE ASSETS. SELLER SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, USAGE, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE ASSETS OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, OR AS TO COMPLIANCE WITH ENVIRONMENTAL LAWS, OR AS TO THE CONDITION OF, OR COMPANY'S RIGHTS IN, OR ITS TITLE TO, THE ASSETS, OR ANY PART THEREOF, OR WHETHER COMPANY POSSESSES SUFFICIENT REAL PROPERTY AND PERSONAL PROPERTY INTERESTS TO OWN OR OPERATE THE ASSETS OR TO CONVEY THE ASSETS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT. SELLER FURTHER SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY REGARDING THE ABSENCE OF HAZARDOUS

SUBSTANCES OR LIABILITY OR POTENTIAL LIABILITY ARISING UNDER ENVIRONMENTAL LAWS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF ANY KIND REGARDING THE CONDITION OF THE ASSETS OR THE SUITABILITY OF THE HYDROELECTRIC AND GAS TURBINE GENERATING STATIONS FOR OPERATION AS POWER PLANTS AND NO SCHEDULE OR EXHIBIT TO THIS AGREEMENT, NOR ANY OTHER MATERIAL OR INFORMATION PROVIDED BY OR COMMUNICATIONS MADE BY SELLER, WILL CAUSE OR CREATE ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSETS.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller as follows:

**5.01 Corporate Organization.** Purchaser is a limited liability company validly existing and in good standing under the laws of its jurisdiction of formation and has full corporate power and corporate authority to carry on its business as it is now being conducted and to own the properties and assets it now owns and to enter into this Agreement and to perform its obligations hereunder.

**5.02 Authorization.** Purchaser has taken all corporate action required by law or its organizational documents to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and this Agreement, assuming due authorization, execution and delivery by Seller, constitutes a valid and binding agreement of Purchaser enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting generally the enforcement of creditors' rights and rules of law governing specific performance, injunctive relief or other equitable remedies.

**5.03 No Violation.** Neither the execution and delivery of this Agreement by Purchaser nor the consummation of the transactions contemplated hereby will violate any provision of the organizational documents of Purchaser, or violate, or be in conflict with, or constitute a default under, or cause the amendment, modification or acceleration of, or give any Party the right to amend, modify or refuse to perform, or modify the time within which duties are to be performed or rights or benefits are to be received hereunder, or cause the acceleration of the maturity of any debt or obligation pursuant to, or result in the creation or imposition of any security interest, lien or other encumbrance upon any property or asset of Purchaser under, any lease, agreement, understanding, restriction or commitment or any judgment, decree, or order of any court or governmental or regulatory authority or agency to which Purchaser is a party or by which Purchaser is bound or to which the property of Purchaser is subject.

**5.04 Consents and Approvals of Governmental Authoritiess.** Except for the Bankruptcy Court and as provided on <u>Schedule 5.04</u>, no consent, approval or authorization of, or declaration, filing or registration with, any Governmental Authority is required in connection with

the execution, delivery and performance by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby.

**5.05 Litigation.** There is no pending or, to Purchaser's Knowledge, threatened action, investigation or request for information by any Governmental Authority or third person which could result, or has resulted, in (a) the institution of legal proceedings to prohibit or restrain the performance of this Agreement or the consummation of the transactions contemplated hereby or thereby, or (b) a claim for damages as a result of this Agreement or the consummation of the transactions contemplated hereby or thereby. Except as set forth on <u>Schedule 5.05</u>, Purchaser has no Knowledge of any pending or threatened litigation, claim, investigation or proceeding, private or governmental, which directly and specifically relates to the Membership Interest.

**5.06 Brokers.** All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on by Purchaser without the intervention of any other Person and in such a manner as not to give rise to any valid claim against Seller (by reason of Purchaser's actions) for a brokerage commission, finder's fee or other like payment to any Person.

**5.07 "AS IS" SALE. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER UNDERSTANDS AND AGREES THAT THE MEMBERSHIP INTEREST AND THE COMPANY'S ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR CONDITION ON THE CLOSING DATE AND THAT PURCHASER IS RELYING ON ITS OWN EXAMINATION OF THE COMPANY AND ITS ASSETS.**

**5.08 Due Diligence Inspections and Reviews.** Subject to any intentional misrepresentation, gross negligence or willful misconduct with respect to any information provided by Seller or its representatives, Purchaser acknowledges and agrees that it has, prior to its execution of this Agreement, fully completed to its satisfaction all of its due diligence inspections and reviews. Subject to the provisions of <u>Section 12.02</u> hereof, Purchaser will bear all of its own costs, expenses and charges incurred in connection with its Due Diligence Inspections and Reviews.

ARTICLE VI

CONDUCT OF BUSINESS PENDING THE CLOSING

Pending the Closing, and except as otherwise consented to or approved by Purchaser in writing, Seller agrees to cause the Company to do the following:

**6.01 Regular Course of Business.** Except as otherwise provided in Sections 6.04, 7.27 and 7.28 below, the Company shall carry on its business diligently and substantially in the same manner as heretofore conducted, and the Company shall not institute any new methods of purchase, sale, lease, management, accounting or operation or engage in any transaction or activity, enter into any agreement or make any commitment, except in the ordinary course of business consistent with past practices or as required by the Bankruptcy Court.

**6.02 Amendments.** No change or amendment shall be made in the organizational documents of the Company.