**6.03   Capital Changes**.  The Company will not issue or sell any membership interests or other securities, acquire directly or indirectly, by redemption or otherwise, any such membership interests, reclassify or split-up any such membership interests, declare or pay any distributions thereon or make any other distribution with respect thereto, or grant or enter into any options, warrants, calls or commitments of any kind with respect thereto.

**6.04   Environmental Remediation; Requirements of Governmental Authorities**.  The Company shall operate in compliance with orders from and other requirements of Governmental Authorities, including the Consent Order dated July 22, 2005, with the New York Department of Environmental Conservation relating to certain environmental remediation at the Hillburn Facility and the remediation plan for the Swinging Bridge Facility approved by the Federal Energy Regulatory Commission in its letter dated June 14, 2006 (as such Consent Order and remediation plan may be revised, amended or supplemented from time to time).

ARTICLE VII

COVENANTS OF THE PARTIES

Seller hereby covenants and agrees with Purchaser, and Purchaser hereby covenants and agrees with Seller that:

**7.01   Reasonable Access**.  Seller shall cause the Company to afford Purchaser and authorized representatives of Purchaser reasonable access to the books and records of the Company and to the employees working for the Company (all at reasonable times during regular business hours, upon prior notice to the Plant Manager of the Company listed on Schedule 1.1 hereto and in a manner so as not to interfere with the normal business operations of the Company) in order that Purchaser may have an opportunity to make such investigations as it shall desire into the Company and its business.

**7.02   Confidentiality**.

(a)     **General.**  Any Confidential Information furnished by Seller to Purchaser on and after the Effective Date shall be subject to the Confidentiality Agreement.  In the event of any conflict between this Agreement and the Confidentiality Agreement, the provisions of the Confidentiality Agreement shall prevail.

(b)     **Regulatory Authorities and Court of Competent Jurisdiction.**  Either Party may disclose Confidential Information to any Governmental Authority or court of competent jurisdiction where such disclosure is necessary to comply with Section 7.13 hereof.  To the extent permitted by applicable Governmental Rules, the disclosing Party shall seek confidential treatment for the Confidential Information provided to any Governmental Authority and the disclosing Party shall notify the other Party as far in advance as is practicable of its intention to release Confidential Information to any Governmental Authority to enable the other Party to seek injunctive relief.

(c)     **Disclaimer Regarding Tax Treatment.**  Notwithstanding anything in this Agreement or in any other written or oral understanding or agreement to which the Parties hereto may be bound, each Party may (i) consult any Tax advisor regarding the Tax treatment and Tax structure of the transactions contemplated by this Agreement, and (ii) at any time disclose to any

Person, insofar as required to comply with Treasury Regulations Section 1.6011-4(b)(3), the Tax treatment and Tax structure of such transactions and all materials of any kind (including opinions or other Tax analyses) that are provided relating to such Tax treatment or Tax structure. The preceding sentence is intended to satisfy the requirements for the transactions contemplated herein to avoid classification as a "confidential transaction" for purposes of Treasury Regulations Section 1.6011-4(b)(3) and shall be interpreted consistent with such intent. This authorization is not intended to permit disclosure of any information that is unrelated to the Tax treatment or Tax structure of any transactions contemplated hereby, including (i) the identities of participants or potential participants in any such transactions, (ii) the existence or status of any negotiations, and (iii) any pricing or financial information, except in each case to the extent such information is related to the Tax treatment or Tax structure of any such transactions. In addition, each Party acknowledges that it has no proprietary or exclusive rights to the federal Tax structure of such transactions or any federal Tax matter or federal Tax idea related to such transactions.

(d)    **Survival**.  The obligations of the Parties in this Section 7.02 will survive the termination of this Agreement, the discharge of all other obligations owed by the Parties to each other, any transfer of title to the Membership Interest, and the Closing of the transactions contemplated in this Agreement.

**7.03    Hart-Scott-Rodino Act.**  If required, each Party shall promptly file any Notification and Report Form and related material that it may be required to file with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act") and shall, subject to Section 7.06, use its best efforts to obtain an early termination of the applicable waiting period and make any further filings or information submissions pursuant thereto that may be reasonably necessary, proper or advisable.

**7.04    Access to Records;.**

(a)    Prior to and following the Closing, Seller shall provide Purchaser, its counsel, accountants and other representatives with access to the books and records of the Company for periods ending on or before the Closing Date (collectively, the "**Records**"), upon reasonable notice during normal business hours. Seller shall not dispose of any Records for a period of seven (7) years after the Closing Date. Thereafter, Seller shall not dispose of any Records until it has given reasonable notice to Purchaser of its intention to do so and given Purchaser a reasonable opportunity to take possession of the Records to be disposed of.

(b)    Following the Closing, Purchaser shall provide Seller, its counsel, accountants and other representatives with access to the books and records of the Company for periods ending on or before the Closing Date (collectively, the "**Records**"), upon reasonable notice during normal business hours. Purchaser shall not dispose of any Records for a period of seven (7) years after the Closing Date. Thereafter, Purchaser shall not dispose of any Records until it has given reasonable notice to Seller of its intention to do so and given Seller a reasonable opportunity to take possession of the Records to be disposed of.

**7.05    Regulatory and Other Authorizations and Consents**.  Each Party will use its best efforts to obtain the authorizations, consents and approvals of federal, state or local regulatory

bodies or other Persons as the same may be necessary for that Party to comply with its obligations under this Agreement and to consummate the transactions contemplated hereby and will cooperate fully with the other Party in promptly seeking to obtain the authorizations, consents and approvals that are or may become necessary for such Party; provided, however, that neither Purchaser, on the one hand, nor Seller or the Company, on the other hand, shall be obligated to: (a) undertake any additional financial obligation, dispose of any property or surrender any material right; (b) otherwise consent to any arrangement or undertake any obligation that would, in its sole and reasonable judgment, materially adversely affect its business or properties; or (c) consent to the extension of the Closing Date of this Agreement beyond that provided in <u>Section 12.01(a)(vi)</u> of this Agreement. Without limiting the preceding portion of this Section 7.05, Purchaser shall be responsible for obtaining the approval of the New York State Public Service Commission and the Federal Energy Regulatory Commission for the transaction contemplated by this Agreement and agrees to file applications for such approvals within fifteen (15) days of the date of this Agreement. Seller agrees to join in such applications, and shall cause the Company to do the same, provided however, that Purchaser shall be solely responsible for pursuing and obtaining such approvals and for the cost thereof. The Parties hereto will not take any action that will or could have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents or approvals.

**7.06   Employee Matters**. Nothing in this Agreement shall confer upon any employee of Seller or of Seller's affiliates, subsidiaries and/or third party administrators ("Seller's Employees") the right to employment with Purchaser after the date of Closing. Further, Purchaser shall have no rights, liabilities or obligations with respect to Seller's Employees or independent contractors for any period prior to Closing, nor will Purchaser have any rights, liabilities or obligations with respect to any agreements related to Seller's Employees or independent contractors prior to Closing.

**7.07   No Public Announcement**. Neither Party shall issue any press release or make any other public announcement concerning this Agreement or the transactions contemplated hereby without the prior approval of the other Party, which approval shall not be unreasonably withheld. This Section 7.07 shall not apply to filings with the Bankruptcy Court in connection with the transactions contemplated by this Agreement.

**7.08   Certain Amounts Owed To Seller and Its Affiliates**. Subject to any requirements of the Bankruptcy Court or the Plan, at or prior to Closing, Seller shall cause the Company to fully repay or otherwise provide for the deemed resolution of any indebtedness owed by the Company to Seller or any other Affiliate of Seller, including but not limited to, indebtedness owed under the Debtor-In-Possession Credit Agreement dated as of February 28, 2006, between Mirant Americas, Inc. and the Company.

**7.09   Provisions Relating to Treatment of Assets and Liabilities of the Company Under the Plan.** The Plan shall provide for the discharge to the fullest extent permitted by the Bankruptcy Code of all claims (as defined in Section 101(5) of the Bankruptcy Code) against the Company existing on the Plan Effective Date, including, but not limited to, all pre- and post-petition secured, priority and unsecured claims of every kind and nature. The Plan shall provide that on the Plan Effective Date, all of the Assets of the Company shall be free and clear of all liens, claims, encumbrances, and interests existing on the Plan Effective Date, as if such Assets had been sold pursuant to Section 363 of the Bankruptcy Code. All payments and distributions provided for under

the Plan in respect to all allowed claims against the Company and all costs and expenses incurred in connection with the discharge of all liens, claims, encumbrances and interests in the Assets existing on the Plan Effective Date shall be paid or otherwise resolved in accordance with the Plan. To the extent that there are any disputed claims against the Company on the Plan Effective Date (the "**Disputed Claims**"), neither the reorganized Company nor Purchaser shall have any obligation under the Plan or for the Disputed Claims.

**7.10 Break-Up Fee**. In connection with the approval of the Sale Procedures Order, the Break-Up Fee shall be payable at the times provided in the Agreement.

**7.11 Further Assurances**. Each Party shall execute and deliver such instruments and take such other actions as the other Party may reasonably require in order to carry out the intent of this Agreement.

**7.12 Supplements to Schedules**.

(a) From time to time prior to the Closing, each Party shall promptly supplement or amend its Schedules hereto with respect to any matter hereafter arising which, if existing or occurring as at the Effective Date, would have been set forth or described in such Schedules.

(b) For purposes of determining the satisfaction of the conditions set forth in Sections 9.01 and 10.01, respectively, and the accuracy of the representations and warranties of each Party contained in this Agreement, the Schedules shall be deemed to include the information contained therein on the Closing Date, as such Schedules may be supplemented or amended in accordance with Section 7.12(a) above.

**7.13 Tax Matters**.

(a) The Parties agree that after the Closing Date, Seller shall have the right to review drafts of and approve (which approval shall not be unreasonably withheld) all Tax returns of the Company relating to taxable periods ending (i) on or before the Closing Date and (ii) after the Closing Date, which encompass periods prior to the Closing Date. Copies of each draft Tax return shall be delivered to Seller at least twenty (20) days prior to the proposed filing date thereof. If Seller does not give Purchaser notice of any objection to such draft within five (5) days of receipt of the draft, Seller shall be deemed to have approved such draft. Purchaser shall, and shall cause the Company to, cooperate with Seller in the review of all such Tax returns and in connection therewith provide Seller and its accountants, attorneys and other representatives reasonable access to any and all books, records and data with respect to the Company relevant to such Tax returns, including, without limitation, financial statements, management accounts and work papers of the Company's accounting department and the Company's independent accountants.

(b) In the event of a dispute with respect to any such Tax return, Purchaser and Seller shall attempt to reconcile their differences. If Purchaser and Seller are unable to do so within ten (10) days, Purchaser and Seller shall submit the disputed items for resolution to the Review Firm, which, within fifteen (15) days from such submission, shall determine and report to the Parties upon such disputed items, and such report shall be final, binding and conclusive on the Parties hereto and such Tax return shall be filed on a basis which reflects such report. In acting pursuant to

this Section 7.13(b), the Review Firm shall have the rights, privileges and immunities of an arbitrator, and its fees shall be paid one-half by Purchaser and one-half by Seller.

(c)     The provisions of clauses (a) and (b) of this Section 7.13 or any approval of any Tax return by Seller notwithstanding, Seller shall have no liability pursuant to Article XI or otherwise arising from or relating to any Tax election or amended return filed by Purchaser or the Company or any change in the Company's Tax accounting principles or policies after the Closing Date which recharacterizes, restates or otherwise affects any item for any taxable period ending on or prior to the Closing Date.

(d)     Each Party will promptly notify the other in writing upon receipt by such Party of notice of any pending or threatened Tax audit or proceeding relating to Taxes of the Company for any (i) Tax period ending on or before the Closing Date or (ii) Tax period ending after the Closing Date but which includes the Closing Date. Seller will have the sole right to represent the interests of the Company in any audit or Tax proceeding related to Taxes for Tax periods ending on or prior to the Closing Date and to employ counsel of its choice at its expense, and Purchaser and Seller agree to cooperate in the defense of any claim in such audit or proceeding. Seller will have the right to participate at its expense in representing the interests of the Company in any audit or proceeding related to Taxes for any Tax period ending after the Closing Date, if and to the extent that such period includes any Tax period before the Closing Date, and to employ counsel of its choice at its expense. Seller and Purchaser agree to cooperate in the defense of any claim in such audit or proceeding.

### 7.14  Required Consents.

(a)     Except as provided in Sections 4.05, 7.05 and 7.15, Purchaser is responsible for obtaining the following (collectively, the **"Purchaser Required Consents"**): all authorizations, consents, licenses, permits and approvals of Governmental Authorities and third Persons required by applicable law or required by any such third Persons in connection with the consummation of the transactions contemplated by this Agreement (including the approvals of the New York State Public Service Commission and the Federal Energy Regulatory Commission as provided in Section 7.05 and those consents listed on Schedule 5.04) and any related agreements and with Purchaser's operation of the Hydroelectric and Gas Turbine Generating Stations.

(b)     Seller is responsible for obtaining all authorizations, consents, licenses, permits and approvals referenced in Section 4.05 hereof to the extent Seller is required by law or under this Agreement to obtain same (collectively, the **"Seller Required Consents"**).

(c)     In connection with obtaining any Purchaser Required Consents or Seller Required Consents from third Persons, each Party will:

(i)     promptly commence and use Commercially Reasonable Efforts to obtain all Purchaser Required Consents or Seller Required Consents, as the case may be;

(ii)     provide the other Party with the opportunity to comment on drafts of all submissions to such third Persons sufficiently in advance of the submission thereof insofar as practicable;

(iii) consider any comments received from the other Party in good faith;

(iv) invite the other Party or its representative to attend all meetings with such third Persons;

(v) provide copies of all correspondence from such third Persons promptly after receipt thereof; and

(vi) promptly following any request from the other Party, provide a detailed report as to the status of each Purchaser Required Consent or Seller Required Consent (as the case may be) and its efforts to obtain the same.

(d) After the Closing, Purchaser will notify promptly all relevant Governmental Authorities and all other third Persons of the change in ownership of the Membership Interest resulting from the transactions contemplated herein to the extent required by applicable law or the specific underlying agreements.

**7.15 Bankruptcy Court Orders and Related Matters**. The Parties acknowledge and agree as follows:

(a) promptly after the execution of this Agreement, (i) Seller shall, in accordance with all applicable requirements of, and procedures under, the Bankruptcy Code, file with the Bankruptcy Court a motion (the "**Sale Motion**") seeking approval of the (A) Sale Procedures Order (as defined below), and (B) Sale Order (as defined below) and (ii) the Company shall, in accordance with all applicable requirements of and procedures under, the Bankruptcy Code, file with the Bankruptcy Court a motion or motions seeking, among other things, an order (the "**Disclosure Statement Order**"), approving the disclosure statement (the "**Disclosure Statement**") with respect to the Plan (which shall be developed through meaningful and timely consultation between the parties, but with final submission to the Bankruptcy Court in the sole discretion of Seller), establishing procedures for solicitation of acceptances to the Plan and setting a hearing on confirmation of the Plan and seeking entry of the Confirmation Order (the Sale Procedures Order, the Sale Order, the Disclosure Statement Order and the Confirmation Order, herein collectively referred to as the "**Bankruptcy Court Orders**"). Seller and the Company, as applicable, will use Commercially Reasonable Efforts to (1) cause such Sale Procedures Order, Sale Order, Disclosure Statement Order and Confirmation Order to be issued, entered and become Final Orders in, as applicable, Seller's and the Company's Bankruptcy Cases, and (2) timely serve copies of the notices setting forth the hearing date on the Sale Procedures Order, the Sale Order, Disclosure Statement Order and the Confirmation Order upon any and all parties in interest entitled or required to receive notice under all applicable laws, rules and regulations and orders of the Bankruptcy Court prior to the hearing on such motions (all such motions and actions relating to the Sales Procedures Order, the Sale Order, the Disclosure Statement Order and the Confirmation Order will be in form and substance reasonably acceptable to Purchaser and Seller and their respective counsel). Seller further agrees that it shall not take any action in the Bankruptcy Case which would be contrary to or inconsistent with this Agreement or any of the terms hereof, and any plan of reorganization of Seller or order confirming such plan shall in no way adversely affect the rights of Purchaser under this Agreement.

(b)     Seller shall use its Commercially Reasonable Efforts so that the Bankruptcy Court enters a "**Sale Procedures Order**", substantially in the form attached hereto as Schedule 7.15(b) (and which, as entered by the Bankruptcy Court, is in a form reasonably acceptable to Purchaser, Seller, and their respective counsel) that, among other things: (i) names Purchaser as the "stalking horse" with respect to the Membership Interest, (ii) if there is an overbid as provided herein, requires the payment of Two Hundred Fifty Thousand Dollars ($250,000) as a break up fee (the **"Break-Up Fee"**) under the circumstances and in accordance with the terms of this Agreement, (iii) requires an initial overbid at least Five Hundred Thousand Dollars ($500,000) in cash greater than the Purchase Price, (iv) requires all overbids be accompanied by a down payment equal to ten percent (10%) of the purchase price offered by the overbidder, (v) requires that each bidder provide (A) written evidence satisfactory to Seller demonstrating that such bidder (1) has the financial ability to consummate the purchase of the Membership Interest and its obligations to perform under the definitive purchase and sale agreement described in 7.15(b)(vi) herein no later than ten (10) days following the hearing on the Sale Order; (2) is not affiliated with Purchaser or Seller (and such Person is not a creditor of Seller or Seller's Affiliate) and (B) evidence to Seller and the Bankruptcy Court that it is a <u>bona fide</u> purchaser and is willing and able to cover its own legal counsel fees and other costs associated with the sale of the Membership Interest, (vi) requires the delivery to Seller of an executed copy of a definitive purchase and sale agreement having the same terms and conditions as those set forth in this Agreement (except for the purchase price, the terms of (i) through (ix) of this Subsection (b), and the reasonable extension of the dates set forth in Sub-Sections 12.01(a) (iii), (iv), and (vii) necessary or appropriate in light of such overbid) for a price that exceeds the purchase price by at least $500,000, no later than five (5) days prior to the hearing on the Sale Order, (vii) requires subsequent bidding increments of at least Two Hundred and Fifty Thousand Dollars ($250,000.00), (viii) requires that any qualified bid, other than Purchaser's bid pursuant to this Agreement, be delivered to Seller and Purchaser on or before the deadline established by the Bankruptcy Court, and (ix) if Purchaser submits the successful overbid, permits Purchaser to credit the amount of the Break-Up Fee against such overbid.

(c)     Seller shall use its Commercially Reasonable Efforts so that the Bankruptcy Court approves the Sale Order, substantially in the form attached hereto as Schedule 7.15(c) (and which, as entered by the Bankruptcy Court, is in a form reasonably acceptable to Purchaser and Seller and their respective counsel), which shall contain provisions, among other things, (i) approving the sale of the Membership Interest to Purchaser on the terms and conditions set forth in this Agreement, (ii) stating that any objections timely filed with respect to the sale of the Membership Interest, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iii) finding that Purchaser is a good faith purchaser of the Membership Interest under Section 363(m) of the Bankruptcy Code and that the sale is not subject to avoidance under Section 363(n) of the Bankruptcy Code, (iv) providing that the sale of the Membership Interest to Purchaser shall be free and clear of any and all liens, claims, encumbrances and interests of any kind or nature whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code, (v) providing that the Bankruptcy Court shall retain jurisdiction for the purpose of enforcing the provisions of the Sale Order including, without limitation, compelling delivery of the Membership Interest to Purchaser and providing that any liens, claims, encumbrances and interests shall attach solely to the Purchase Price, (vi) providing that any liens, claims encumbrances and interests of any kind or nature whatsoever asserted under laws, rules, regulations or governmental or court orders imposing a stamp Tax, transfer Tax or similar Tax arising from the transfer of the

Membership Interest to Purchaser or any sales Tax and any other Taxes of Seller relating to a pre-Closing period (collectively, **"Seller Taxes"**) shall be filed against Seller's estate and shall not be asserted against Purchaser, (vii) providing, if Purchaser consents, that the Parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Order and the Confirmation Order pursuant to Rule 6004(g) of the Federal Rules of Bankruptcy Procedure, (viii) authorizing and directing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, and (ix) determining that Purchaser is not a successor to Seller or otherwise liable for any of the Liabilities of Seller and permanently enjoining all persons and entities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or lien or Encumbrance against Purchaser or the Membership Interest to Purchaser (the **"Sale Order"** ).

(d)     The Disclosure Statement Order and the Confirmation Order shall be in form and substance reasonably acceptable to Purchaser, Seller and their respective counsel. Seller and the Company shall use Commercially Reasonable Efforts to obtain entry of the Confirmation Order no later than seventy-five (75) days after execution of this Agreement by the Parties hereto. The Confirmation Order shall, among other things, approve the assumption of all Assumed Contracts and declare that all Assumed Contracts are valid and binding and in full force and effect, confirm the Plan pursuant to Section 1129 of the Bankruptcy Code, approve all documents and actions necessary to implementation of the Plan under Section 1123(a) of the Bankruptcy Code and provide that the transfer of the Membership Interest to Purchaser is exempt from Tax pursuant to Section 1146 (c) of the Bankruptcy Code.

(e)     In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from either the Sale Procedures Order, the Sale Order, the Disclosure Statement Order or the Confirmation Order, Seller will immediately notify Purchaser of such appeal or stay request and will provide to Purchaser within two (2) Business Days a copy of the related notice of appeal or order of stay or application for reconsideration. Seller will also provide Purchaser with written notice and copies of any other or further notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration of, any of such orders and any related briefs.

(f)     Seller will notify, as is required by the Bankruptcy Code and as may reasonably be requested by Purchaser, all parties entitled to notice of all motions, notices and orders required to consummate the transactions contemplated by this Agreement, including, without limitation, the Sale Procedures Order, the Sale Order, the Disclosure Statement Order and/or the Confirmation Order, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court.

(g)     Purchaser acknowledges that the sale of the Membership Interest as contemplated by this Agreement is subject to Bankruptcy Court approval and to higher and better counteroffers and that the Membership Interest will be sold to the highest and best bidder at an auction to be conducted by Seller in connection with the hearing on the approval of the Sale Order (the **"Auction"**). In the event that the highest and best offer, as determined by Seller is submitted at the Auction by a purchaser other than Purchaser that (i) is not affiliated with Purchaser or Seller (and such Person is not a creditor of Seller or Seller's Affiliate), (ii) submits to Seller a valid,

irrevocable offer to purchase the Membership Interest on the same terms as this Agreement (except for the purchase price, the terms of (i) through (ix) of Subsection 7.15 (b), and the reasonable extension of the dates set forth in Sub-Sections 12.01(a) (iii), (iv), and (vii) necessary or appropriate in light of such overbid) for a purchase price that exceeds the Purchase Price by at least Five Hundred Thousand Dollars ($500,000), no later than five (5) days prior to the hearing on the Sale Order, (iii) executes all necessary and appropriate documents, in form and substance acceptable to Seller, to memorialize the sale (the **"Third Party Sale"**) and has the financial ability to consummate the purchase of the Membership Interest and its obligations to perform under the definitive purchase and sale agreement described in 7.15(b)(vi) herein no later than ten (10) days following the hearing on the Sale Order, (iv) satisfies Seller and the Bankruptcy Court that it is a <u>bona fide</u> purchaser, and (v) is willing and able to cover its own legal counsel fees and costs associated with the Third Party Sale, Seller shall, upon approval of the Bankruptcy Court of a Sale Order naming such other purchaser as Purchaser and the related Confirmation Order, be entitled to close such Third Party Sale pursuant to such other offer; <u>provided, however</u>, that nothing contained herein shall prevent Purchaser from contesting that such other offer is the highest and best offer. Upon entry of the Sale Order authorizing a sale of the Membership Interest to a purchaser other than Purchaser (the **"Prevailing Bidder"**), Seller shall direct the Escrow Agent to return to Purchaser the Down Payment (with all accrued interest thereon) and Seller shall pay to Purchaser the Break-Up Fee from the first cash proceeds of the Third Party Sale or any other sale of the Membership Interest within five (5) days after the closing of the Third Party Sale or any other disposition of the Membership Interest. In the event that Purchaser agrees to be a back-up bidder, Seller shall direct the Escrow Agent to return the Down Payment (with all accrued interest thereon) to Purchaser upon the earlier of closing of the sale to the Prevailing Bidder or a termination of this Agreement by Purchaser according to its terms. Upon the closing of the Third Party Sale, payment of the Break-Up Fee to Purchaser from the first cash proceeds of the Third Party Sale shall be made within five (5) days after the closing of the Third Party Sale.

**7.16** **Purchaser Contact with Vendors and Employees**. Purchaser agrees that, prior to the Closing Date, it will not contact any vendors, suppliers, employees or other contracting parties of Seller or Seller's Affiliates with respect to any aspect of the Company's business or the transactions contemplated hereby without the prior written consent of Seller.

**7.17** **Taxes, Prorations and Closing Costs**.

(a) **Taxes**.

(i) Purchaser will pay all Taxes, including sales, use, transfer and documentary transfer Taxes, arising in connection with the sale and transfer of the Membership Interest. Seller and Purchaser will each pay its own income Taxes. State and local real and personal property Taxes relating to the Company for the Tax year of the Closing will be prorated between Purchaser and Seller on the following basis: Seller is to be responsible for all such Taxes for the period up to the Closing; and Purchaser is to be responsible for all such Taxes for the period on and after the Closing. All Taxes assessed on an annual basis will be prorated on the assumption that an equal amount of Taxes applies to each day of the year, regardless of how any installment payments are billed or made, except that Purchaser will bear all supplemental or other state and local real and personal

property Taxes which arise out of a change in ownership of the Membership Interest.

(ii)     After the Closing, Purchaser will notify Seller in writing, within fifteen (15) days after its receipt of any correspondence, notice or other communication from a taxing authority or any representative thereof, of any pending or threatened tax audit, or any pending or threatened judicial or administrative proceeding that involves Taxes relating to the Membership Interest for the period prior to the Closing, and will furnish Seller with copies of all correspondence received from any taxing authority in connection with any audit or information request with respect to any such Taxes relating to the Membership Interest for the period prior to the Closing.

(b)     **Purchaser's Closing Costs.**  Purchaser will pay: (i) all costs of (1) any title policy and all endorsements thereto that Purchaser elects to obtain, (2) all filings required under the HSR Act, (3) Purchaser's Due Diligence Inspections and Reviews, and (4) any Person (if any) that is entitled to a brokerage commission, finder's fee or other like payment by reason of Purchaser's actions, and (ii) one-half (1/2) of any document recordation costs, including any applicable deed transfer Tax.

**7.18  Acknowledgement by Purchaser.**  Prior to its execution of this Agreement, Purchaser has conducted to its satisfaction an independent investigation and verification of the Company, including without limitation its Due Diligence Inspections and Reviews. In making its decision to execute this Agreement, and to purchase the Membership Interest, Purchaser has relied and will rely upon the results of its own independent investigation and verification. **THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE IV OF THIS AGREEMENT CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF SELLER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY.**  There are no representations, warranties, covenants, understandings or agreements among the Parties regarding the Membership Interest or its transfer other than those set forth in this Agreement.  Except for the representations and warranties expressly set forth in Article IV, Purchaser disclaims reliance on any representations, warranties or guarantees, either express or implied by Seller, its officers, directors, counsel, representatives or agents.

**7.19  No Recourse.**  To the extent the transfer, conveyance, assignment and delivery of the Membership Interest to Purchaser as provided in this Agreement is accomplished by deeds, assignments, sublicenses, subleases, subcontracts or other instruments of transfer and conveyance, whether executed at the Closing or thereafter, these instruments are made without representation or warranty by, or recourse against, Seller, except as expressly provided in this Agreement.

**7.20  Advice of Changes**.  Prior to Closing, each Party will promptly advise the other in writing with respect to any matter arising after execution of this Agreement of which that Party obtains knowledge and which, if existing or occurring at the date of this Agreement, would have been required to be set forth in any of the Schedules.

**7.21  Casualty Loss.**

(a)     If, at any time following the Effective Date but prior to Closing, any of the Hydroelectric or Gas Turbine Generating Stations suffers (each of such Stations referred to herein as a "**Station**") a total or partial casualty loss (an "**Event of Loss**") that is reasonably estimated to cost in excess of One Million Dollars ($1,000,000) to repair or replace the damaged Station (a "**Major Loss**"), Seller will promptly inform Purchaser of the Major Loss.  As soon as practicable following the Major Loss, Seller will provide to Purchaser its good faith, detailed written estimate ("**Seller's Estimate**") setting forth the amount required to repair or replace the damaged Station and the estimated time period for completion of such repair or replacement. Concurrently with the delivery of a Seller's Estimate relating to a Major Loss, Seller will notify Purchaser whether it will repair or replace the Station.  The completion of the repair or replacement of the Station relating to a Minor Loss and, if Seller elects to repair or replace the Station relating to a Major Loss, the completion of the work relating to a Major Loss, will be a condition to the Closing and the outside date for the Closing set forth in <u>Section 12.01(a)(vii)</u> will be extended by the estimated time period for completion of such repair or replacement plus thirty (30) days (provided that the overall number of estimated days for completion of such repair or replacement shall not exceed ninety (90) days, failing which Purchaser shall have the option to terminate this Agreement), and the costs thereof (less any insurance proceeds received by Seller in connection with such loss) will be deemed a Necessary Capital Expenditure, unless such costs shall exceed Fifty Thousand Dollars ($50,000), in which event any amount in excess of Fifty Thousand Dollars ($50,000) shall be for the account of Seller. If Seller elects not to repair or replace the Station relating to a Major Loss, the provisions of <u>Section 7.21(b)</u> will apply.

(b)     **Purchaser's Election**.

(i)     Within the thirty (30) day period immediately following receipt of a Seller's Estimate relating to a Major Loss and Seller's election not to repair or replace the damaged Station, Purchaser will elect, by written notice to Seller, to either:

(1)     terminate this Agreement pursuant to <u>Section 12.01(a)(v)</u>; or

(2)     require a reduction in the Purchase Price by an amount equal to Seller's Estimate, in which case Seller will have no obligation to repair the Station as a result of such Event of Loss.

(ii)     If Purchaser should fail to make the election set forth in this <u>Section 7.21(b)</u> within the thirty (30) day period immediately following receipt of Seller's notice of a Major Loss, Purchaser will be deemed to have made the election contained in <u>Section 7.21(b)(i)(2)</u>.  To the extent the thirty (30) day period described in this <u>Section 7.21(b)</u> extends past the outside date for the Closing set forth in Section <u>12.01(a)(vii)</u>, the outside date for the Closing shall be extended by such time.

**7.22  Post Closing — Information and Records.**

(a)  Purchaser agrees that, from and after the Closing Date, it will, promptly following the request of Seller, provide such information and administrative support as will be reasonably requested by Seller to enable Seller to comply with its obligations with respect to the issuance of Form 1099 and other Tax reports, reports and notices relating to income Tax returns, preparation of financial statements and completion of Seller's audit for the three fiscal years ended December 31st following the Closing Date and other similar matters.

(b)  **Employees.**  Purchaser will make available to Seller on a reasonable basis and as requested from time to time by Seller after Closing, those employees of Purchaser with Knowledge of or relevant to the matters described in this Section 7.22 for the purpose of consultation, investigation and/or testimony in connection therewith.

**7.23  Insurance.**  Seller shall maintain or cause to be maintained in full force and effect all policies of insurance applicable to the Hydroelectric and Gas Turbine Generating Stations as of the Effective Date.  All such insurance policies shall terminate as of the Closing.

**7.24  Use of Certain Names.**  Within thirty (30) days following the Closing, Purchaser shall cause the Company to cease using the name "Mirant," and any word or expression similar thereto or constituting an abbreviation or extension thereof (the "**Seller Marks**"), including eliminating the Seller Marks from any Assets and disposing of any unused stationery and literature of the Company bearing the Seller Marks.  Thereafter, neither Purchaser nor any of its Affiliates shall use the Seller Marks.  Purchaser acknowledges that neither it nor its Affiliates has any rights whatsoever to use the Seller Marks after said thirty (30) day period.  Without limiting the foregoing:

(i)  Within five (5) Business Days after the Closing Date, Purchaser shall cause the Company to change its name to a name that does not contain any of the Seller Marks.

(ii)  Within sixty (60) days after the Closing Date, Purchaser shall provide evidence to Seller, in a format that is reasonably acceptable to Seller, that Purchaser has made all governmental filings required pursuant to clause (i) above and has provided notice to all applicable Governmental Authorities and all counterparties to the Material Contracts regarding the change of the Company's and a new address for the purpose of notice to the Company.

(iii)  Notwithstanding Purchaser's right to use the Seller Marks for the time periods set forth in this Section 7.24, Purchaser acknowledges and agrees as follows:  (i) neither Purchaser nor any of its Affiliates (including the Company after the Closing Date) shall be deemed an agent, representative or joint venture partner of Seller; (ii) Seller shall retain sole and exclusive ownership of the Seller Marks, and all goodwill and rights related thereto; (iii) Purchaser and its Affiliates (including the Company after the Closing Date) shall not engage in any conduct or take part in any activity that would be reasonably likely to (A) impair the validity or enforceability of the Seller Marks, (B) dilute the distinctiveness of the

Seller Marks, (C) disparage the Seller Marks or (D) be considered unfair competition or an infringement or other violation of the rights of Seller or its Affiliates in the Seller Marks; (iv) Purchaser and its Affiliates (including the Company after the Closing Date) shall not co-brand any of their goods or services (or communications describing such goods or services) using any of the Seller Marks; and (v) notwithstanding anything to the contrary contained in Article XI, and irrespective of such Article XI, Purchaser shall indemnify, defend and hold harmless Seller from, against, and in respect of, any and all Damages incurred or suffered by Seller arising out of or relating to any use of any of the Seller Marks by Purchaser or any of its Affiliates (including the Company after the Closing Date).

**7.25  Settlement Agreement**.  The Company is a party to a certain Settlement Agreement dated as of August 31, 2001, by and among Orange and Rockland Utilities Inc. ("O&R"), Mirant Bowline, LLC ("Bowline"), Mirant Lovett, LLC ("Lovett"), Hudson Valley Gas Corporation ("Hudson Valley") and the Company (the **"O&R Settlement Agreement"**).  On or before the Closing Date, unless O&R has released Company from liability under the O&R Settlement Agreement, each of the Company, Bowline, and Lovett shall enter into a cross indemnity agreement (the **"Cross Indemnity Agreement"**) substantially in the form attached as Schedule 7.25 hereto, and the same shall have been finally approved by the Bankruptcy Court with respect to each proceeding applicable to each of the parties thereto.

**7.26  Registration of Company with NYISO**.  Purchaser is responsible for registering prior to Closing the Company or Purchaser as representative of the Company as a market participant with the New York Independent System Operators (**"NYISO"**).  Seller will cooperate with Purchaser and the Company in effecting such registration.

**7.27  Gas Transportation and Balancing Services Agreement**.  The Company is a party to a certain Gas Transportation and Balancing Services Agreement dated December 9, 2002 by and among O&R, Bowline, Lovett, Company, Consolidated Edison Company of New York, Inc. ("ConEd"), and MET, as transferee of Mirant Energy Marketing, (the **"Gas Transportation Agreement"**).  On or before the Closing Date, Seller shall cause the Company to enter into a written agreement with the other parties to the Gas Transportation Agreement terminating Company as a party thereto effective upon Closing.  Seller shall cooperate with Purchaser so that, on or before the Closing Date, Purchaser may enter into a written agreement effective upon Closing replacing the operational supply arrangements available to Company under the Gas Transportation Agreement so as to allow for the full and complete operation of the Company and its Assets post-Closing consistent with its operations prior to Closing.  Seller and Purchaser agree that such replacement agreement will provide for, *inter alia*, at least the same level of gas supply, capacity and transportation rights for Company under such replacement agreement as existed under the Gas Transportation Agreement prior to Closing, although the price and other terms therein may be different.  Such replacement agreement shall be executed by the Company and any other parties thereto within seven (7) days prior to the Closing Date. Prior to Closing, all new written agreements referred to in this Section 7.27 shall have been timely filed with the New York State Public Service Commission and shall be finally approved by the Bankruptcy Court with respect to each proceeding therein applicable to the parties to such written agreements.

**7.28** <u>Air Title V Permits (Hillburn and Shoemaker Facilities)</u>. Company is the holder of an Air Title V Permit issued by the New York State Department of Environmental Conservation ("**DEC**") for the Hillburn Facility (Permit #3-3926-00059/00003) and the Shoemaker Facility (Permit #3-3309-00040/00004) (respectively, the "**Hillburn Air Permit**" and the "**Shoemaker Air Permit**", collectively the "**Air Permits**" and individually each an "**Air Permit**"). After the Effective Date, Company shall apply for a modification of each Permit to remove the Hillburn and Shoemaker Facilities from the calculation of the system wide average of Nitrogen Oxide emissions used to determine compliance with the $NO_x$ RACT Limit (as defined in and required by each Permit) (such calculation being referred to herein as the "**$NO_x$ Bubble**"). Prior to filing any such application, Seller shall provide Purchaser with a copy thereof and accept comments from Purchaser for a reasonable time thereafter. Other than such comments to Seller, Purchaser shall take no action opposing Company's applications for such modification. If Purchaser requests Seller to cause any such application to include a modification to a Permit which Purchaser determines is reasonably necessary to allow the Company to operate in compliance with the Nitrogen Oxide emission limits in the Permits after the amendment removing the relevant Facility from the $NO_x$ Bubble, Seller agrees to include such requested modification, provided that the implementation thereof shall not cause the Company to incur costs prior to the Closing. Seller and Purchaser shall cooperate in good faith to obtain modified Permits consistent with this Section 7.28 that shall be effective on the Closing Date.

**7.29** <u>Assignment of Certain Purchase Orders</u>. Prior to the Closing Date, Seller shall cause Company to assign to Seller or Seller's designee the following purchase orders: (a) Purchase Order No. NY-6867 between Company and Mead and Hunt, Inc. (item #9 on Schedule 4.16), and (b) Purchase Order No. NY-8296 between Company and Burns and Roe Enterprises, Inc. (item #13 on Schedule 4.16). Seller or Seller's designee shall assume and perform all of Company's obligations under said Purchase Orders for services performed by the other party thereto after the Effective Date.

## ARTICLE VIII

## MUTUAL CONDITIONS

The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless waived in writing by each Party.

**8.01** <u>HSR Act</u>. All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated.

**8.02** <u>Regulatory and Other Authorizations and Consents</u>. All authorizations, consents and approvals of Governmental Authorities, third parties and the Bankruptcy Court, shall have been obtained (other than Seller Required Consents and Purchaser Required Consents).

**8.03** <u>Orders</u>. Other than the approval of the Bankruptcy Court, neither Party hereto shall be subject to any order or injunction of a court of competent jurisdiction which prohibits the consummation of the transactions contemplated by this Agreement.

## ARTICLE IX

## CONDITIONS TO PURCHASER'S OBLIGATIONS

Each and every obligation of Purchaser under this Agreement to be performed on or before the Closing Date shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless waived in writing by Purchaser:

**9.01** **Representations and Warranties True**. The representations and warranties of Seller contained in Article IV hereof shall be in all material respects true and accurate as of the date when made and at and as of the Closing Date as though such representations and warranties were made at and as of such date (unless expressly made at and as of an earlier date, in which case such representations and warranties shall be true in such respects only at and as of such earlier date), except for changes permitted or contemplated by the terms of this Agreement.

**9.02** **Performance**. Seller shall have performed and complied with all agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

**9.03** **Certificates; Evidence of Compliance**. Seller shall have furnished Purchaser with such certificates of Seller and/or such other evidence as Purchaser may reasonably request to demonstrate compliance with the conditions set forth in this Article IX including, with respect to the indebtedness owed under the Debtor-In-Possession Credit Agreement dated as of February 28, 2006, between Mirant Americas, Inc. and the Company, notes marked "cancelled" and/or otherwise acknowledged by the holder(s) thereof to be discharged, proof of satisfaction of any mortgages filed against Company's real property, and discharge of any liens on record against any Assets.

**9.04** **Board Resolutions.** A certified copy of such resolutions of the Board of Directors of Seller as may be required to authorize the transactions contemplated by this Agreement and the Related Agreements and authorizing specified officers of Seller to execute and deliver this Agreement, the Related Agreements and any other documents or instruments which they deem necessary and appropriate in connection with this Agreement.

**9.05** **Bankruptcy Court Orders**. The Bankruptcy Court Orders shall (a) have been entered by the Bankruptcy Court, with such changes as are reasonably acceptable to Seller and Purchaser and their respective counsel, and (b) become Final Orders.

## ARTICLE X

## CONDITIONS TO SELLER'S OBLIGATIONS

Each and every obligation of Seller under this Agreement to be performed on or before the Closing Date shall be subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless waived in writing by Seller:

**10.01** **Representations and Warranties True**. The representations and warranties of Purchaser contained in Article V hereof shall be in all material respects true and accurate as of the

date when made and at and as of the Closing Date as though such representations and warranties were made at and as of such date (unless expressly made at and as of an earlier date, in which case such representations and warranties shall be true in such respects only at and as of such earlier date), except for changes permitted or contemplated by the terms of this Agreement.

**10.02 Performance.** Purchaser shall have performed and complied with all agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

**10.03 Certificates.** Purchaser shall have furnished Seller with such certificates of its officers to evidence compliance with the conditions set forth in this Article X as may reasonably be requested by Seller.

**10.04 Board Resolutions.** A certified copy of such resolutions of Purchaser's sole member as may be required to authorize the transactions contemplated by this Agreement and the Related Agreements and authorizing specified officers or representatives of Purchaser, as the case may be, to execute and deliver this Agreement, the Related Agreements and any other documents or instruments which they deem necessary and appropriate in connection with this Agreement.

**10.05 Pending Insurance Claims.** Written acknowledgment from each relevant insurance carrier or its broker or other designee that the Company's pending claims for losses at the Swinging Bridge Facility and the Hillburn Facility shall be paid to Seller or such third party or third parties as the Seller or Company shall designate to each such carrier prior to Closing.

**10.06 Bankruptcy Court Orders.** The Bankruptcy Court Orders shall (i) have been entered by the Bankruptcy Court, with such changes as are reasonably acceptable to Seller and Purchaser and their respective counsel, and (ii) become Final Orders.

**10.07 Termination of Gas Transportation Agreement.** Company shall have entered into a written agreement effective upon Closing terminating the Gas Transportation Agreement as to Company, such written agreement shall have been timely filed with the New York State Public Service Commission, and all Bankruptcy Court approvals with respect to such agreement shall have become final and not subject to appeal, all in accordance with Section 7.27.

**10.08 Modification of Title V Permits.** The Air Permits have been modified in accordance with Section 7.28, effective upon Closing.

ARTICLE XI

SURVIVAL AND INDEMNIFICATION

**11.01 Survival.**

(a) All representations and warranties made by any Party in this Agreement shall survive the Closing hereunder for a period of ninety (90) days following the Closing. Anything in this Agreement to the contrary notwithstanding, no claim based upon misrepresentation or breach of representation or warranty shall be made, no action or litigation with respect thereto commenced, and no remedy shall be available unless written notice specifying with particularity the

misrepresentation or breach claimed shall have been delivered on or prior to the expiration of such period.

(b)    All covenants and agreements made by any Party in this Agreement shall survive the Closing hereunder until all obligations set forth therein shall have been satisfied.

**11.02 <u>Indemnification</u>.**

(a)    Each Party (each, a **"Indemnifying Party"**), as a material inducement to the other party to enter into this Agreement, shall defend, indemnify, and hold harmless the other Party, such other Party's successors and assigns, and all of such other Party's officers, directors, lenders, shareholders, beneficial owners, trustees, partners, members, affiliates, agents and employees (each, an **"Indemnitee"**, collectively, the **"Indemnitees"**) from and against any and all damages, claims, losses, judgments, awards, penalties, fines and forfeitures (each, an **"Action"**), together with reasonable attorneys' fees and related litigation or arbitration costs and expenses of such Indemnitees, of whatever kind or nature, without limitations being asserted against any of the Indemnitees (collectively, **"Damages"**), which in any way arise or result from a breach of any representation, warranty, covenant or agreement of the Indemnifying Party under this Agreement.

(b)    No indemnity pursuant to this Agreement shall be paid by the Indemnifying Party:

(i)    on account of the Indemnitee's conduct that is established in a final, non-appealable judgment by a court of competent jurisdiction as having been knowingly fraudulent, deliberately dishonest, reckless, grossly negligent or constituting willful misconduct;

(ii)    on account of the Indemnitee's conduct that is established in a final, non-appealable judgment by a court of competent jurisdiction as having constituted a breach of the Indemnitee's duty of loyalty to the Indemnifying Party or as having resulted in any personal profit or advantage to the Indemnitee to which the Indemnitee was not legally entitled;

(iii)    for which payment is actually made to the Indemnitee under a valid and collectible insurance policy or under another valid and enforceable indemnity clause or agreement, except in respect of any deficit in payment actually received under any such policy of insurance, indemnity clause or agreement; or

(iv)    if indemnification is unlawful or has been determined by any regulatory or administrative body having jurisdiction over the Indemnifying Party to be against public policy.

(c)    As a condition precedent to the Indemnitee's rights of indemnification under this Agreement, the Indemnitee shall give the Indemnifying Party written notice as soon as reasonably practicable after becoming aware of any claim made against the Indemnitee for which indemnification will or could be sought under this Agreement. In addition, the Indemnitee shall give the Indemnifying Party such information and cooperation as the Indemnifying Party may

reasonably request to enable the Indemnifying Party to perform its obligations hereunder. Failure by the Indemnitee to give such notice shall not deprive the Indemnitee of a right to indemnification hereunder, provided that the Indemnifying Party has actual knowledge of the claim and/or is not adversely affected in its ability to defend the claim as a result of any such failure.

(d)     With respect to the commencement of any Action of which the Indemnitee notifies the Indemnifying Party pursuant to clause (c) above:

(i)     the Indemnifying Party will be entitled to participate therein at its own expense;

(ii)     except as otherwise provided below, the Indemnifying Party may, at its option and jointly with any other indemnifying party similarly notified and electing to assume such defense, assume the defense thereof, with counsel reasonably satisfactory to the Indemnitee. After written notice from the Indemnifying Party to the Indemnitee of its election to assume the defense thereof, the Indemnifying Party will not be liable to the Indemnitee under this Agreement for any legal or other expenses subsequently incurred by the Indemnitee in connection with the defense thereof except for reasonable costs of investigation or as otherwise provided in this clause (d). The Indemnitee shall have the right to employ separate counsel in such Action, provided that the fees and expenses of such counsel incurred after written notice from the Indemnifying Party of its assumption of the defense thereof shall be at the expense of the Indemnitee unless: (1) the employment of such counsel has been authorized by the Indemnifying Party, (2) the Indemnitee shall have reasonably concluded, and so notified the Indemnifying Party, that there is an actual conflict of interest between the Indemnifying Party and the Indemnitee in the conduct of the defense of such Action, in which event the Indemnifying Party shall not be entitled to assume the defense of such Action, or (3) the Indemnifying Party shall not in fact have employed counsel to assume the defense of such Action.

(iii)     the Indemnifying Party shall not be liable to indemnify the Indemnitee under this Agreement for any amounts paid in settlement of any Action effected by the Indemnitee without the Indemnifying Party's prior written consent, which consent shall not be unreasonably withheld;

(iv)     the Indemnifying Party shall be permitted to settle any Action, provided that it shall not settle any Action in any manner that would impose any penalty or limitation on the Indemnitee without the Indemnitee's prior written consent, which consent shall not be unreasonably withheld.

(e)     Seller shall indemnify, defend and hold harmless Purchaser, Purchaser's successors and assigns, and all of Purchaser's officers, directors, lenders, shareholders, beneficial owners, trustees, partners, members, affiliates, agents and employees (collectively, the "**Purchaser Indemnified Parties**") from and against all damages, claims, losses, judgments, awards, penalties, fines and forfeitures, together with reasonable attorneys' fees and related litigation or arbitration costs and expenses of such Purchaser Indemnified Parties, of whatever kind or nature, without

limitation, asserted against, incurred or suffered by any Purchaser Indemnified Party arising out of or resulting from the Southern Company Claims. For purposes hereof, **"Southern Company Claims"** means any liability of Company associated with the following proofs of claim filed by The Southern Company in the Bankruptcy Case: proofs of claim numbered 6398, 6442, 8159, and 8313. Seller's obligations under this Section 11.02(e) shall not be subject to the limitations contained in Sections 11.03(b)(i), 11.03(b)(ii), 11.03(c) or any other provision of this Agreement.

(f)　　Each Indemnifying Party shall have the right to audit, inspect and copy the books and records of the Indemnitees with respect to a claim for indemnification under this Section 11.02. The Indemnitees shall cooperate in providing such Indemnifying Party with reasonable access to its books and records during normal business hours for this purpose. If the results of audit or inspection show an overpayment to any Indemnitee upon any such claim, then such Indemnifying Party shall repay the amount of such overpayment within fifteen (15) days of the completion of such audit or inspection.

### 11.03 <u>Limitations on Indemnification</u>.

(a)　　The remedies provided in this Article XI shall be exclusive and shall preclude assertion by either Party of any other rights or the seeking of any and all other remedies against the other for claims based on this Agreement.

(b)　　Any claims for indemnity under this Agreement shall be subject to the following limitations and adjustments: (i) the provisions of <u>Section 11.02</u> shall be effective only when the aggregate amount of all Damages for which a Party may be liable under this Article XI exceeds two percent (2%) of the Purchase Price, in which case such Party shall be liable for only such amounts as exceed two percent (2%) of Purchase Price; (ii) the amount of any claim by either Party for indemnification shall be subject to adjustment to reflect (A) any actual direct or indirect income Tax benefit (taking into account the amount of any indemnification actually received) resulting therefrom to the Indemnitee, (B) any insurance coverage with respect thereto and (C) any amounts recoverable from third parties based on claims the Indemnitee has against such third parties which would reduce the damages that could otherwise be sustained; (iii) subject to the provisions of Section 11.03(c) hereof, in no event shall a Party be liable, in the aggregate, for indemnification hereunder in an amount greater than twenty percent (20%) of Purchase Price; and (iv) neither Party hereto shall be liable to the other Party for special, incidental, consequential or punitive damages.

(c)　　Seller's liability under Section 11.03(b) shall be limited to an amount which, when aggregated with the Purchase Price reductions under Section 2.03(d) and (e) hereof, does not exceed the Purchase Price.

### 11.04 <u>Purchaser's Release of Seller</u>.　**EXCEPT FOR THE RIGHTS OF PURCHASER SET FORTH IN THIS ARTICLE XI, COMMENCING ON THE CLOSING DATE, PURCHASER SHALL RELEASE, HOLD HARMLESS AND FOREVER DISCHARGE SELLER FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES (INCLUDING FINES AND CIVIL PENALTIES), OR CAUSES OF ACTION AT LAW OR IN EQUITY (INCLUDING ANY ACTIONS ARISING UNDER ENVIRONMENTAL LAWS), DESTRUCTION, LOSS OR DAMAGE OF ANY KIND OR CHARACTER, WHETHER KNOWN OR UNKNOWN, VISIBLE OR INVISIBLE, TO THE PERSON OR**

PROPERTY OF PURCHASER RESULTING FROM OR ARISING OUT OF THE PRESENCE OR RELEASE OF ANY HAZARDOUS SUBSTANCE AT, ON, UNDER, IN, ABOUT OR FROM COMPANY'S REAL PROPERTY. PURCHASER HEREBY ACKNOWLEDGES, AGREES, REPRESENTS, AND WARRANTS THAT FACTUAL MATTERS NOW UNKNOWN TO IT MAY HAVE GIVEN OR MAY HEREAFTER GIVE RISE TO CLAIMS THAT ARE PRESENTLY UNKNOWN, UNANTICIPATED AND UNSUSPECTED BY EITHER PARTY, AND PURCHASER FURTHER ACKNOWLEDGES, AGREES, REPRESENTS, AND WARRANTS THAT THIS RELEASE HAS BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF SUCH UNDERSTANDING AND PURCHASER NEVERTHELESS HEREBY INTENDS TO RELEASE THE SELLER FROM THE CLAIMS, DEMANDS, AND LIABILITIES DESCRIBED IN THE FIRST SENTENCE OF THIS SECTION 11.04.

**11.05 Mitigation and Limitation on Claims**. Notwithstanding anything to the contrary contained in this Agreement:

(a)     The Indemnitee will take all reasonable steps to mitigate all losses, damages and the like relating to an Action, including availing itself of any defenses, limitations, rights of contribution, claims against third Persons and other rights at law or equity, and will provide such evidence and documentation of the nature and extent of the Action as may be reasonably requested by the Indemnifying Party. The Indemnitee's reasonable steps include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any loss or expense for which indemnification would otherwise be due under this Article XI, and the Indemnifying Party will reimburse the Indemnitee for the Indemnitee's reasonable expenditures in undertaking the mitigation.

(b)     The amount of any indemnity in relation to any Action is limited to the amount of actual damages sustained by the Indemnitee by reason of such breach or nonperformance, net of the dollar amount of any insurance proceeds or proceeds from third parties receivable by the Indemnitee or any of its Affiliates with respect to such Action.

ARTICLE XII

TERMINATION AND REMEDIES

**12.01 Rights To Terminate**. This Agreement may, by written notice given on or prior to the Closing Date, in the manner provided in Section 13.05, be terminated at any time prior to the Closing Date:

(a)     **Seller/Purchaser Termination**:

(i)     by Seller, if there has been a material misrepresentation or a material default or material breach by Purchaser with respect to any of Purchaser's representations and warranties in this Agreement or in any Related Agreement or the due and timely performance of any of Purchaser's covenants and agreements contained in this Agreement or in any Related Agreement, and such misrepresentation, default or breach is not cured by the earlier of the Closing

Date or the date thirty (30) days after receipt by Purchaser of written notice specifying particularly such misrepresentation, default or breach;

(ii)   by Purchaser, if there has been a material misrepresentation or a material default or breach by Seller with respect to Seller's representations and warranties in this Agreement or in any Related Agreement or the due and timely performance prior to the Closing of any of Seller's covenants and agreements contained in this Agreement or in any Related Agreement, and such misrepresentation, default or breach is not cured by the earlier of the Closing Date or the date thirty (30) days after receipt by Seller of written notice specifying particularly such misrepresentation, default or breach;

(iii)   by Seller, on thirty (30) days prior written notice to Purchaser, if Seller shall not have received all Purchaser Required Consents by September 1, 2007;

(iv)   by Purchaser, on thirty (30) days prior written notice to Seller if Purchaser shall not have received all Seller Required Consents by September 1, 2007;

(v)   by Purchaser in accordance with Section 7.21(b);

(vi)   by mutual agreement of Seller and Purchaser;

(vii)   by Seller or Purchaser if (A) all of the orders referenced in clause (viii) below shall have become Final Orders and (B) the Closing has not occurred on or before the earlier of September 1, 2007, or the date which is thirty (30) days after the date upon which the last of all required Regulatory Approvals has been received, unless such time has been extended pursuant to Section 7.21(b);

(viii)   by Seller or Purchaser if any of the Sale Procedures Order, Sale Order, Disclosure Statement Order and Confirmation Order has not been entered or become final in a sequence such that each of the same shall be a Final Order at or prior to the Closing Date by September 1, 2007; or

(ix)   by Seller or Purchaser if at the time the written notice of termination is given, there is in effect a preliminary or permanent injunction enjoining consummation of the transactions contemplated hereby.

(b)   **Bankruptcy Court Termination.**   This Agreement shall automatically terminate at any time prior to the Closing upon entry by the Bankruptcy Court of the Sale Order that (i) approves and consummates a Third Party Sale; and (ii) becomes a Final Order. This Agreement also shall automatically terminate at any time prior to the Closing if the Bankruptcy Court should not approve the transactions contemplated by this Agreement.

**12.02 Specific Performance.** Any Party desiring to proceed with the Closing despite any failure or refusal of the other Party hereto to so proceed shall have the right to pursue the remedy of specific performance or to seek an injunction without the requirement of posting any bond.

**12.03 Purchaser's Remedies**. If this Agreement is terminated by Purchaser pursuant to Section 12.01(a)(ii) because of Seller's uncured default hereunder then, subject to the next sentence, Purchaser shall be entitled to recover the Down Payment and, subject to Bankruptcy Court approval, damages equal to Purchaser's actual, reasonable out-of-pocket costs and expenses incurred in connection with the transactions contemplated by this Agreement and the costs of Purchaser's claim against Seller, including but not limited to, reasonable legal expenses, plus costs and expenses associated with Purchaser's Due Diligence Inspection and Reviews, provided that Purchaser's total recovery in excess of the Down Payment shall not exceed One Hundred Thousand Dollars ($100,000.00). Prior to Purchaser's exercise of its remedy pursuant to the previous sentence, Purchaser may seek specific performance of Seller's obligations which (if awarded) will be Purchaser's sole remedy for such default hereunder. Purchaser will have no other remedies, whether at law or in equity, for any such default by Seller hereunder (provided Purchaser will still be entitled to the benefit of any obligations, covenants and indemnities hereunder and under the Confidentiality Agreement and any other Related Agreements which expressly survive the termination of this Agreement with respect to any other defaults thereunder by Seller). Purchaser may only avail itself of the remedies in this Section 12.03 if, at the time of Seller's default, Seller would not be permitted (whether at such time or as of the expiration of any applicable cure period) to terminate this Agreement pursuant to Section 12.01(a)(i).

**12.04 Seller's Remedies**. If the purchase of the Membership Interest is not consummated in accordance with this Agreement by the date set forth in Section 12.01(a)(vii) because of Purchaser's default hereunder, or if Seller terminates this Agreement in accordance with Section 12.01(a)(i), then Seller will have the right to pursue the remedy of specific performance under Section 12.02 herein which, if awarded, will be Seller's sole remedy for such default. If Seller does not seek the remedy of specific performance for such default, then Seller will, as its sole remedy, have the right to retain the Down Payment as liquidated damages, and no other remedy, whether at law or in equity, for the failure to close by Purchaser hereunder; provided, however, that Seller will still be entitled to receive any costs and expenses due to Seller pursuant to this Agreement and the benefit of any obligations, covenants and indemnities hereunder and under the Confidentiality Agreement by Purchaser which expressly survive the termination of this Agreement with respect to any other defaults thereunder by Purchaser. Seller may only avail itself of the remedy in this Section 12.04 if, at the time of Purchaser's default, Seller is not in material default hereunder. **THE PARTIES EXPRESSLY AGREE AND ACKNOWLEDGE THAT SELLER'S ACTUAL DAMAGES WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO ASCERTAIN AND THAT THE DOWN PAYMENT REPRESENTS THE PARTIES' REASONABLE ESTIMATE OF SUCH DAMAGES. SUCH LIQUIDATED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR PENALTY.**

**12.05 Effect of Termination.** Except as set forth in Section 12.03 above, any termination of this Agreement by any Party shall have the effect of causing this Agreement to thereupon become void and of no further force or effect whatsoever, and thereupon no Party will have any rights, duties, liabilities or obligations of any kind or nature whatsoever against any other Party hereto based upon either this Agreement or the transactions contemplated hereby, except in each case the obligations of each Party for its own expenses incurred in connection with the transactions contemplated by this Agreement as provided in Section 13.04 and the obligations of each party with respect to confidentiality set forth in Section 7.02 hereof and the Confidentiality Agreement.

ARTICLE XIII

MISCELLANEOUS PROVISIONS

**13.01 <u>Commissions and Finders' Fees</u>.** Each of the Parties represents that the negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Seller directly with Purchaser in such manner as not to give rise to any claims against any of the Parties hereto for a brokerage commission, finders' fee or other like payment. Insofar as any such claims are made which are alleged to be based on an agreement or arrangements made by, or on behalf of, a Party, such Party agrees to indemnify and hold the other Party harmless from and against all liability, loss, cost, charge or expense, including but not limited to, reasonable counsel fees, arising therefrom.

**13.02 <u>Amendment and Modification</u>.** This Agreement may only be amended, modified and supplemented by written agreement executed by Purchaser and Seller and, if the Bankruptcy Court has already approved this Agreement, with the approval of the Bankruptcy Court.

**13.03 <u>Waiver of Compliance</u>.** Any failure by Seller, on the one hand, or Purchaser, on the other hand, to comply with any obligation, covenant, agreement or condition herein may be expressly waived in writing by Purchaser or Seller, respectively, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**13.04 <u>Expenses</u>.** Each of the Parties hereto will pay its own expenses incurred by it or on its behalf in connection with this Agreement or any transactions contemplated by this Agreement, whether or not such transactions shall be consummated. In addition, Purchaser shall bear the expense of any transfer Tax or sales Tax applicable to the transactions contemplated hereby.

**13.05 <u>Notices</u>.** All notices, requests, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, by recognized overnight courier service or facsimile transmission:

        (a)     If to Seller, to:

                Mirant New York, Inc.
                c/o Mirant Corporation
                1155 Perimeter Center West
                Atlanta, GA 30338-5416
                Attention: Jeffrey Perry, President
                Fax: (678) 579-3824
                Email: jeffrey.perry@mirant.com

                With a copy to:

                Mirant New York, Inc.
                c/o Mirant Corporation
                1155 Perimeter Center West
                Atlanta, GA 30338-5416

Attention: Sonnet Edmonds, Vice President
and Assistant General Counsel
Fax: (678) 579-5890
Email: mailto:Sonnet.Edmonds@mirant.com

And

Hiscock & Barclay, LLP
One Park Place
300 South State Street
Syracuse, NY 13202
Attention: George S. Deptula, Esq.
Fax: (315) 425-8545
Email: gdeptula@hiscockbarclay.com

or to such other Person or address as Seller shall furnish to Purchaser in writing.

      (b)     If to Purchaser, to:

Alliance Energy Renewables, LLC
6941 Kassonta Drive
Jamesville, NY 13078
Attn: Samuel G. Nappi, President
Fax: 315-682-7089
Email: snappi@allianceenergy.us

With a copy to:

Troutman Sanders LLP
405 Lexington Avenue
New York, NY 10174
Attention: Howard L. Margulis, Esq.
Fax: 212-704-8330
Email: mailto:howard.margulis@troutmansanders.com

or to such other Person or address as Purchaser shall furnish to Seller in writing.

**13.06 <u>Assignment</u>**.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party hereto without the prior written consent of the other Party; provided, however, that Purchaser may assign this Agreement and its rights, interests and obligations hereunder to any of Purchaser's Affiliates.  Any such assignment shall not release Purchaser from its obligations hereunder.

**13.07 <u>Governing Law</u>**.  The validity, interpretation and effect of this Agreement are governed by and will be construed in accordance with the laws of the State of New York applicable to contracts made and performed in such state and without regard to conflicts of laws

rules, provided that, while the Bankruptcy Case is pending, as to any claim or dispute involving Seller or its Affiliates, or arising out of or relating to this Agreement or any Related Agreement (a "**Dispute**"), this Agreement shall be governed by and construed and enforced in accordance with the Bankruptcy Code and, to the extent not inconsistent with the Bankruptcy Code, the laws of the State of New York applicable to contracts made and performed in such state and without regard to conflicts of laws rules.

**13.08 Jurisdiction of Bankruptcy Court.** The Parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction over this Agreement and that, while the Bankruptcy Case is pending, any Dispute shall be properly brought only before the Bankruptcy Court. Notwithstanding the provisions of this Section 13.08, if and to the extent (i) the Bankruptcy Court refuses to accept jurisdiction over any Dispute, or (ii) the Bankruptcy Case is dismissed or closed and does not retain jurisdiction over a Dispute, the Parties consent to binding arbitration in accordance with the provisions of Section 13.09.

**13.09 Effect of Closing Over Known Unsatisfied Conditions or Breached Representations, Warranties or Covenants.** If Seller or Purchaser elects to proceed with the Closing knowing of any failure to be satisfied of any condition in its favor or knowing of the breach of any representation, warranty or covenant by the other Party, the condition that is known to be unsatisfied or the representation, warranty or covenant which is known to be breached at the Closing Date will be deemed waived by such Party, and such Party will be deemed to fully release and forever discharge the other Party on account of any and all claims, demands or charges, known or unknown, with respect to the same.

**13.10 Dispute Resolution.**

(a)     Except as otherwise provided in this Agreement, in the event of any Dispute, the Party wishing to declare a Dispute shall deliver to the other party a written notice identifying the disputed issue.

(b)     Either Party may give the other Party written notice of any Dispute not resolved in the normal course of business. Executives of both Parties shall meet at a mutually acceptable time and place within ten (10) Business Days after delivery of such notice and thereafter as often as they reasonably deem necessary, to exchange relevant information and to attempt to resolve the Dispute. In such meetings and exchanges, a party shall have the right to designate as confidential any information that such Party offers. No confidential information exchanged in such meetings for the purpose of resolving a Dispute may be used by a Party in litigation against the other Party; provided that, if the same information is obtained by the Party seeking to use it through other lawful means, such as discovery under Section 13.10(c)(iv) below, this provision shall not bar the use of such information that is so obtained. If the matter has not been resolved in the aforementioned manner within thirty (30) days of the disputing Party's notice having been delivered, or if the Parties fail to meet within ten (10) Business Days as required above, either Party may initiate binding arbitration in New York, New York, as hereafter provided in clause (c) below.

(c)     The Parties agree that all disputes, controversies or claims that may arise out of the transactions contemplated by this Agreement, or the breach, termination or invalidity thereof,

including any requests for emergency or equitable relief and/or specific performance, shall be submitted to, and determined by, binding arbitration in accordance with the following procedures:

(i)     Either Party may submit a dispute, controversy or claim to arbitration by giving the other Party written notice to such effect, which notice shall describe, in reasonable detail, the facts and legal grounds forming the basis for the filing Party's request for relief. The arbitration shall be held before one (1) neutral arbitrator in New York, New York and a decision as to any matters submitted thereto shall be made by such arbitrator.

(ii)    Within thirty (30) days after the other Party's receipt of such demand, the Parties shall make a good faith effort to select such arbitrator. In the event of a failure to make such selection, and if the Parties cannot resolve their disagreements as to the same within thirty (30) days, such arbitrator shall be selected by the American Arbitration Association ("AAA"). In any event, the arbitrator shall have a background in, and knowledge of, transactions in the energy industry and shall otherwise be an appropriate person based on the nature of the dispute. If a person with experience in such matters is not available, the arbitrator shall be chosen from the retired federal judges pool maintained by AAA.

(iii)   The arbitration shall be governed by the Commercial Arbitration Rules of the AAA.

(iv)    All discovery shall be guided by the Federal Rules of Civil Procedure. All issues concerning discovery upon which the parties cannot agree shall be submitted to the arbitrator for determination.

(v)     In rendering an award, the arbitrator shall determine the rights and obligations of the parties according to the substantive and procedural laws of the State of New York.

(vi)    The decision of, and award rendered by, the arbitrator, shall be determined no more than sixty (60) days after the submission of the case to the arbitrator and shall be final and binding on the parties and shall not be subject to appeal. Judgment on the award may be entered in and enforced by any court of competent jurisdiction.

(vii)   Each Party shall bear its own costs and expenses (including filing fees) with respect to the arbitration, including one-half of the fees and expenses of the arbitrator.

**13.11 Delays or Omissions**. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any Party, upon any breach or default of the other Party to this Agreement, shall impair any such right, power or remedy of such Party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Except as

provided in Section 13.09, any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.

**13.12 Conflicts.** In the event of any conflicts or inconsistencies between the terms of this Agreement and the terms of any of the Related Agreements, the terms of this Agreement will govern and prevail.

**13.13 Counterparts**. This Agreement may be executed simultaneously in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement or other documents or agreements to be delivered pursuant to this Agreement, including executed signature pages, by electronic transmission will constitute effective execution and delivery of this Agreement or any such agreement or document for all purposes. Signatures transmitted electronically will constitute original signatures for all purposes.

**13.14 Effectiveness; Binding Effect**. This Agreement shall become effective as to each Party hereto when and only when this Agreement shall have been executed by such Party; provided, however, that this Agreement shall be null and void ab initio as to each Party hereto in the event that both Parties hereto shall not have executed this Agreement within five (5) days of the date upon which any Party hereto shall have executed this Agreement.

**13.15 Headings**. The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof.

**13.16 Entire Agreement**. This Agreement, including the Schedules and Exhibits hereto, sets forth the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, express or implied, by any officer, employee or representative of any party hereto, except the Confidentiality Agreement and any other Related Agreements, which remain in full force and effect.

**13.17 No Recourse Against Others**. This Agreement is solely and exclusively between Purchaser and Seller and any obligations of Seller created herein shall be the obligations solely of Seller. The directors, officers, employees, representatives and Affiliates of Seller or the Company shall have no liability for any obligations of Seller under this Agreement or for any Damages based on, in respect of or by reason of this Agreement or Seller's obligations hereunder or any breach thereof. Purchaser, for itself and its affiliates (including, post-Closing, the Company), hereby waives, remises and releases each director, officer, employee, representative and affiliate of Seller and the Company from all such obligations and Damages.

**13.18 Third Parties**. Except as specifically set forth or referred to herein, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the Parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement.

**13.19 <u>Mutual Agreement</u>**. This Agreement embodies the arm's length negotiation and mutual agreement between the Parties hereto and shall not be construed against any Party as having been drafted by it.

**13.20 <u>Severability</u>**. If in any jurisdiction, any provision of this Agreement or its application to any Party or circumstance is restricted, prohibited or unenforceable, such provision shall, as to such jurisdiction, be ineffective only to the extent of such restriction, prohibition or unenforceability without invalidating the remaining provisions hereof and without affecting the validity or enforceability of such provision in any other jurisdiction or its application to the other Party or any other circumstances. In addition, if any one or more of the provisions contained in this Agreement shall for any reason in any jurisdiction be held to be excessively broad as to time, duration, geographical scope, activity or subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law of such jurisdiction as it shall then appear.

[The remainder of this page is intentionally left blank]

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, each by its duly authorized officer, all as of the day and year first above written.

ALLIANCE ENERGY RENEWABLES, LLC

By:    Samuel G. Nappi, Chairman     1/31/07
and President of Alliance
Energy, Inc., the Sole and
Managing Member of
Alliance Energy Renewables,
LLC

MIRANT NEW YORK, INC.

By:    Jeffrey R. Perry, President

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement, each by its duly authorized officer, all as of the day and year first above written.

ALLIANCE ENERGY RENEWABLES, LLC

By:    Samuel J. Nappi, Chairman and President of Alliance Energy, Inc., the Sole and Managing Member of Alliance Energy Renewables, LLC

MIRANT NEW YORK, INC.

By:    Jeffrey R. Perry, President