U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
Signed May 15, 2008　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MIRANT CORPORATION, et al., | § | CASE NO. 03-46590-DML-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |

### MEMORANDUM OPINION

Before the court are (1) the Motion of Mirant New York, LLC for Protective Order Requiring Return of Inadvertently Disclosed Privileged Documents and for Sanctions (the "Privilege Motion") filed by Mirant New York, LLC ("Mirant NY"); and (2) the Motion of AER NY-Gen, LLC (Reorganized Mirant NY-Gen, LLC) and Alliance Energy Renewables, LLC for Entry of an Order Enforcing the Rights of AER NY-Gen, LLC Under the Order Confirming Amended Chapter 11 Plan of Reorganization Proposed by Mirant NY-Gen, LLC (the "Enforcement Motion" and, together with the Privilege

Motion, the "Motions") filed by AER-NY Gen[1] and Alliance Energy Renewables, LLC (collectively "Alliance").

By the Privilege Motion, Mirant NY seeks to enforce the protection of the attorney-client privilege, which it claims is applicable to a series of emails (the "Subject Emails").[2] By the Enforcement Motion Alliance asks the court to enforce certain obligations Alliance claims Mirant NY owes Alliance under the Amended Chapter 11 Plan of Reorganization Proposed by Mirant NY-Gen, LLC (the "Plan") confirmed on April 25, 2007 in the chapter 11 case of Mirant NY Gen, LLC ("NY Gen").[3]

Because of the interrelationship of the Motions, the court considered them together at hearings held on April 2, 3, and 14, 2008 (the "Hearings"). During the Hearings the court heard testimony from Jeffrey Prostok ("Prostok"), a partner in the Fort Worth, Texas law firm of Forshey & Prostok, LLP ("Forshey"); Hollace Cohen ("Cohen"), a partner in the New York offices of Troutman Sanders, LLP ("Troutman"); Douglas Nash ("Nash"), a partner in the Syracuse office of the New York law firm of Hiscock & Barclay, LLP ("Hiscock"); G. Kimball Williams ("Williams"), a shareholder in the Albany office of the New York law firm of McNamee, Lochner, Titus & Williams, P.C. ("McNamee"); Howard Margulis ("Margulis"), a partner in the New York offices of

---

[1] AER-NY Gen, as described below, is the present name of NY Gen (as defined below).

[2] As discussed below, the Subject Emails are representative of a larger trove of documents, the protection of which by attorney-client privilege (though not necessarily work-product privilege) is dependent upon the same reasoning as is protection of the Subject Emails. By the Objection of AER NY-Gen, LLC to Motion of Mirant New York, LLC for Protective Order Requiring Return of Inadvertently Disclosed Privileged Documents and for Sanctions (the "Objection") (at p. 17), Alliance asks the court to rule with respect to NY Gen's right to these additional documents.

[3] As discussed below, NY Gen was sold to Alliance.

Troutman;[4] William Smith ("Smith") an in-house attorney of Mirant (as defined below); and, offered by Mirant NY as an expert, F. Richard Bernasek, a partner in the Fort Worth, Texas firm of Kelly Hart & Hallman LLP.[5] The court also received into evidence without objection exhibits[6] indentified as necessary below.[7]

Although the court is not satisfied that the Privilege Motion, at least, is subject to the court's core jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2), both parties have asserted that the court exercises its core jurisdiction respecting the Motions. The court consequently concludes that, at a minimum, both parties have consented to entry of orders and judgments by the bankruptcy court and so the court has jurisdiction to resolve the Motions pursuant to 28 U.S.C. §§ 1334(b) and 157(c)(2). This memorandum opinion, therefore, embodies the court's rulings, findings of fact and conclusions of law. FED. R. BANKR. P. 9014 and 7052.

## I. Background

### A. General

---

[4] In addition to their live testimony, Alliance offered affidavits executed by Cohen and Margulis as a proffer of their additional testimony. The court also makes reference below to an affidavit of Nash filed in support of the Privilege Motion.

[5] Alliance objected to the use of Mr. Bernasek's expert testimony, and the court has not relied on it in its decision.

[6] There being no objection from Alliance, the court also granted Mirant NY's request that the court take judicial notice of certain items. *See* Request for Judicial Notice in Support of Opposition of Mirant New York, LLC to Motion of AER NY-Gen, LLC (Reorganized Mirant NY-Gen, LLC) and Alliance Energy Renewables, LLC for Entry of an Order Enforcing the Rights of AER NY-Gen, LLC Under the Order Confirming Amended Chapter 11 Plan of Reorganization Proposed by Mirant NY-Gen, LLC.

[7] During the Hearings the court did not receive the Subject Emails into evidence pending its determination of whether they were protected by the attorney-client privilege. The court now admits the Subject Emails into the record.

NY Gen is one of several subsidiaries of Mirant NY (collectively with its subsidiaries, the "NY Debtors"), which, in turn, is a downstream subsidiary of Mirant Corp. ("Mirant"). Mirant and 82 of its direct and indirect subsidiaries,[8] including Mirant NY and NY Gen, were the subjects of chapter 11 cases in this court. Mirant and its debtor subsidiaries, other than the NY Debtors, confirmed a joint plan of reorganization on December 9, 2005 (the "Mirant Plan"). The Mirant Plan became effective on January 3, 2006. The NY Debtors were not included in the Mirant Plan because of pending disputes over ad valorem taxation of the assets of the NY Debtors. In March of 2007, a plan was confirmed for all the NY Debtors other than NY Gen. As discussed at greater length below, the Plan was finally confirmed on April 27, 2007.

The principal business of Mirant and its subsidiaries is the generation and sale in the wholesale market of electric power. Mirant and its subsidiaries conduct their business throughout the United States and in several foreign countries. The NY Debtors own a number of facilities that generate power sold in upstate New York markets (principally in Rockland County).[9]

Unlike most of Mirant's electrical generation facilities which are gas, oil or coal fueled power plants, NY Gen owns and operates four hydroelectric facilities on the Mongaup River System. One of these, the Toronto Reservoir Dam Site (the "Reservoir"), is central to the disputes between Mirant NY and Alliance which underlie the Motions.

**B.  Sale of NY Gen**

---

[8] An 84th case was commenced for a shell corporation that was used in the restructuring of Mirant and its subsidiaries under the Mirant Plan (as defined below). The effects of the restructuring are not relevant to the matters before the court, and the court will refer to Mirant and its subsidiaries without necessarily accounting for the effects of the restructuring.

[9] The business of Mirant and its subsidiaries is described at greater length in numerous published opinions. *See, in particular, In re Mirant Corp.*, 334 B.R. 800 (Bankr. N. D. Tex. 2005).

Management of Mirant determined that the appropriate disposition of NY Gen's chapter 11 case was through a sale of Mirant NY's membership interest in NY Gen.[10] Following a search for potential purchasers, Mirant NY and Alliance entered into a purchase and sale agreement executed on January 31, 2007 (including all subsequent versions of the agreement, the "PSA"). Mirant NY was represented in the transaction with Alliance by Hiscock, principally an attorney named George Deptula ("Deptula"),[11] while Margulis, assisted by Cohen and other Troutman lawyers, represented Alliance. Pursuant to the PSA, Alliance agreed to purchase the membership interest in NY Gen for $3,000,000. PSA, ¶ 2.02. However, it was contemplated that Alliance would serve as a stalking-horse bidder and that the membership interest would be sold at auction. PSA, ¶ 7.15(g). That auction was held on March 5, 2007, and Alliance was ultimately the successful bidder based on a purchase price of $5,100,000. On March 13, 2007, the court entered an order authorizing and approving the sale of NY Gen to Alliance.

The sale was in furtherance of the Plan. Alliance was represented in connection with the Plan by Troutman, principally Cohen. Forshey represented the NY Debtors in their chapter 11 cases, and acted, through the services of Prostok, as NY Gen's lead counsel in connection with the Plan. On May 7, 2007, following confirmation of the Plan, the sale of NY Gen to Alliance closed.

C. **The Barrett Litigation**

---

[10] NY Gen is a limited liability company organized under Delaware law. Under Delaware Law, a limited liability company such as NY Gen is owned through membership interests. *See* 6 DEL. C. § 18-301 (2008); *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 391-92 (Dist. Del. 2000). Mirant NY held a 100% membership interest in NY Gen.

[11] As discussed later in this memorandum opinion, Nash's involvement in the PSA and Plan was limited to providing information about the Barrett Litigation (as defined below). Transcript of Hearings (hereafter "TR") p. 127, ll. 1-10.

In March of 2006 Robert and June Barrett commenced suit (the "Barrett Litigation") against, *inter alia*, NY Gen, Woodstone Lakes Development, LLC, Woodstone Toronto Development, LLC, and Woodstone Crestwood Development, LLC (the latter three hereafter referred to collectively "Woodstone") in the Supreme Court of the State of New York for Sullivan County (the "NY Court"). The plaintiffs' claims, which were, at least in part, monetary, related to public access to the Reservoir.[12] NY Gen held an easement over property owned by Woodstone (the "Easement")[13] which afforded NY Gen access to the Reservoir. In the Barrett Litigation, in which Nash represented NY Gen, NY Gen crossclaimed against Woodstone, asserting that the Easement could be used by the public to gain access to the Reservoir. Woodstone countered that the Easement was private and could not be used by the general public.

It was critical to NY Gen that the Easement provide public access because, on March 1, 2006, before commencement of the Barrett Litigation, NY Gen had been notified by the Federal Energy Regulatory Commission ("FERC") that, without public access to the part of the Reservoir reached by the Easement, NY Gen would be out of compliance with the FERC license which permitted NY Gen to operate the hydroelectric

---

[12] The plaintiffs sought money damages based, at least in part, on the contention that Woodstone and NY Gen had falsely imprisoned them. Apparently the "false imprisonment" occurred because the plaintiffs were denied use of the Easement (as hereafter defined).

[13] The Easement provides:
(Private Roads)
RESERVING to the party of the first part [NY Gen] the right to enter upon and utilize the following existing private roads for any purpose, including without limitation the right to unrestricted travel along said roads with any vehicle, equipment or machinery of the party of the first part: . . .

    5. A private road between Moscow Road and Toronto Reservoir Dam Site; . . . .

facility at the Reservoir.[14] *See* PSA, Schedule 4.15. In October of 2006, in the odd context of a motion by third parties to intervene in the Barrett Litigation, the NY Court received briefs and evidence and heard argument respecting the dispute between NY Gen and Woodstone over the extent of the Easement.

All of the foregoing was disclosed prior to execution of the PSA in a January 4, 2007, conference call among Nash, Deptula, multiple in-house counsel for Mirant (including Smith), Margulis and other representatives of Alliance. *See, e.g.*, TR p. 45, l. 25 – p. 46, l. 10; p. 130, l. 4 – p. 133, l. 8. The testimony during the Hearings also suggests that Alliance understood that, despite the odd context of the intervention motion, the NY Court might soon issue a ruling that would affect NY Gen's rights (and public access) under the Easement, though Nash did not anticipate that the NY court would actually adjudicate at that time the NY Gen – Woodstone dispute.[15]

However, on February 26, 2007, the NY Court issued a decision[16] which appeared to determine that the Easement could not be used to afford the public access to the Reservoir. *See* February 26, 2007, Decision and Order, pp. 6-7. Because the decision of the NY Court responded to the motion to intervene, NY Gen was uncertain whether the NY Court's statements were dicta or constituted findings of fact and conclusions of law and so should be appealed. Thus, on March 23, 2007, Nash sent a letter to the NY Court

---

[14] Mirant had argued to FERC that alternative access on the other side of the Reservoir was adequate for the public. FERC, however, rejected this argument.

[15] Nash did not expect the NY Court to rule on the merits of the Easement dispute; rather, he expected Woodstone to seek summary judgment on the question following disposition of the intervention motion. However, because issues pertaining to the Easement were raised in connection with the intervention motion, he concluded NY Gen should make its position clear. *See* TR, p. 131, l. 16 – p. 132, l. 21; p. 139, l. 23 – p. 140, l. 12.

[16] The decision was received by Hiscock on March 9, a Friday, but did not come to Nash's attention until March 12, 2007.

requesting clarification of the effect of the decision. On April 19, 2007, the NY Court responded by letter that "as it relate[d] to . . . the nature of the easement in question," the decision on the motion to intervene represented the "Court's conclusions of law and/or findings of fact."

Although there is dispute about whether Prostok during the morning of April 20, 2007, prior to NY Gen's confirmation hearing, mentioned to Cohen the February 26 ruling of the NY Court,[17] otherwise no effort was made by Mirant or any of its attorneys to inform Alliance or any of its attorneys of the ruling, Nash's March 23 letter, or the NY Court's April 19 response.[18] Moreover, until shortly before the May 7th closing under the PSA, none of the ruling, Nash's letter and the NY Court's response were entered into the internet data "room," which had been established in connection with the sale of the membership interest.

**D. The Subject Emails**

Following closing of the sale to Alliance, Alliance learned of the February 26 decision. Nash had filed a notice of appeal of the February 26 ruling, and the parties next turned to pursuit of that appeal. Although it initially appeared that Nash and Hiscock might continue to represent NY Gen in the Barrett Litigation, Hiscock could not negotiate

---

[17] *Compare* testimony of Prostok, TR p. 65, l. 25 – p. 69, l. 1, *with* testimony of Cohen, TR p. 104, ll. 5-7.

[18] There was dispute among the witnesses over whether Troutman expressed much concern about the Barrett Litigation or the Easement issue. While Cohen obviously was sufficiently concerned to reserve Alliance's rights as to Mirant NY's obligation to defend the Barrett Litigation and cover "claims" pertaining to the Easement (which concern supports Prostok's testimony that he told her of the February 26 ruling), the weight of the evidence suggests that Troutman generally and Margulis in particular did not ask to be kept up to date on the Barrett Litigation during the January 4 call or thereafter. *Compare* testimony of Nash, TR p. 238, ll. 11-17, *with* Smith, p. 335, l. 19 – p. 337, l. 13, *with* Margulis testimony, TR p. 272, ll. 22-24. Indeed, the Closing Checklists submitted by Mirant as rebuttal exhibits support Smith's testimony that Troutman and Alliance did not even bring up the Barrett Litigation during the regular conference calls held by the parties after January 4 and up to the time of closing.

a waiver from Mirant to permit it to continue the representation. Thus NY Gen retained McNamee and, specifically, Williams to substitute for Hiscock and Nash.

During a conference call on June 13, 2007, with Williams, Cohen and others, Nash undertook to transmit the file concerning the Barrett Litigation to Williams. Before doing so, Nash caused the file to be purged of items he considered attorney work product of the sort to which, under New York law, his client would not be entitled.[19] He then caused copies of the sanitized file to be sent to Williams and Cohen.

Included in the files sent to Williams and Cohen were copies of the Subject Emails. When Mirant NY learned that Williams and Cohen had received copies of the Subject Emails, it demanded their return, insisting that they were privileged communications between Mirant NY and its attorneys at Hiscock that had been inadvertently included in the files.[20]

Alliance, however, maintaining that the Subject Emails were not privileged vis-à-vis Alliance,[21] refused to return them. Moreover, Alliance believes that the Subject Emails provide evidence that Mirant intentionally failed to disclose to it the February 26 ruling in the Barrett Litigation as well as the March 23 and April 19 letters. Noting the

---

[19] Nash also testified that he attempted to remove privileged documents from the file. *See* TR p. 147, ll. 2-10. Given the court's conclusion that the file maintained by Nash was maintained for NY Gen, Nash should not have considered anything in it to be subject to a privilege other than that assertable by NY Gen.

[20] Alliance suggests that the Subject Emails were not inadvertently transmitted to Williams and Cohen. While Nash testified (*see* Declaration of Douglas J. Nash ¶ 11, Ex. A of the Privilege Motion) that the Subject Emails were appended to a pleading and thus were not discovered before the files were sent, Cohen testified (*see* Affidavit of Hollace T. Cohen ¶ 11, Ex. F of the Objection) that the Subject Emails were separate from other documents. Williams did not recall the manner in which the Subject Emails were included in the file (*see* TR p. 260, ll. 3-7). Given the court's conclusion that the Subject Emails were properly provided to McNamee and Troutman, it is immaterial whether their disclosure was accidental or intentional on Nash's part.

[21] As discussed below, Alliance does not dispute that the Subject Emails are privileged. Rather, Alliance argues that the privilege may not be asserted vis-à-vis NY Gen and, therefore, Alliance, the owner of NY Gen.

significance of the February 26 ruling to NY Gen's FERC license to operate the facility at the Reservoir, Alliance suggests that the failure of Mirant NY to call to Alliance's attention the February 26 ruling amounted to a failure to disclose a material adverse change in circumstances as required by the PSA.

As a result, on January 18, 2008, Alliance filed the Enforcement Motion. In the Enforcement Motion, Alliance argues that Mirant NY was required by the PSA and the Plan to ensure that upon transfer of the membership interest in NY Gen, the assets owned by NY Gen were "free and clear of all liens, claims, encumbrances and interests . . . ." PSA, ¶ 7.09. Alliance construes this provision (and parallel language in section 9.6 of the Plan) to mean that Mirant NY is responsible to pay costs incurred in pursuing the Barrett Litigation and, if necessary, to spend such money as may be required, through purchase or condemnation, to acquire rights from Woodstone such that the Easement would comply with the requirements of FERC.

On January 30, 2008, Mirant NY responded with the Privilege Motion. In the Privilege Motion, Mirant NY asserts that the Subject Emails are privileged communications between Mirant NY and its counsel which must be returned. Mirant NY further argues that Troutman should have recognized that the Subject Emails were privileged and should be sanctioned for not returning them upon their discovery – or at least upon Mirant NY's demand.[22] During the Hearings, the court advised the parties that, even if it concluded that the Subject Emails were privileged, it was prepared to find that Troutman had cause to believe they were not privileged vis-à-vis Alliance and so

---

[22] Although Williams also received copies of the Subject Emails, he turned those over to Troutman.

could be retained. By reason of that determination, the court ruled it would deny Mirant NY's request for sanctions.

## II. Issues

1. May Mirant NY assert attorney-client privilege so as to require the return of the Subject Emails by Troutman, or does NY Gen have a right to the Subject Emails and any other like materials not turned over to Troutman by Nash?

2. Does the PSA require that Mirant pay the costs of the Barrett Litigation, including whatever amounts may be required to obtain public access to the Reservoir via the Easement or otherwise?[23]

## III. Discussion

### A. The Privilege Motion

Alliance and Troutman argue that the Subject Emails are properly held by them because the communications were made, whether to NY Gen or Mirant NY, in the course of Hiscock's joint representation of both entities. Perhaps savoring a delicious irony in doing so, Alliance and Troutman point to this court's decision in *In re Mirant Corp.*, 326 B.R. 646 (Bankr. N.D. Tex. 2005) ("*Mirant/Troutman*"), in which the court held that Troutman was required to share with Mirant documents pertaining to Troutman's joint

---

[23] During the Hearings, the court raised the additional question of whether, if, through the Plan and court approval of sale of the membership interest in NY Gen, a fraud was perpetrated on Alliance, the court might, based on its inherent and equitable powers, provide relief to Alliance even if not contemplated by the PSA. The court, however, concluded during the Hearings that it was not deceived by counsel for NY Gen (Prostok) and thus was not misused as a tool in a fraudulent scheme. The court concluded that Prostok (1) did not fully understand the significance of the February 26 ruling respecting the Easement, (2) was focused on claims arising from the Barrett Litigation that would be discharged under the Plan (essentially the damage claims of the plaintiffs in the Barrett Litigation), and (3) understood the Plan and PSA to contemplate the sale of NY Gen without requiring cure of any defects in that entity's assets.

representation of Mirant and its former parent during the transactions leading to Mirant's spin-off.

The case at bar, however, is different from that presented to the court in *Mirant/Troutman*. In that case Troutman represented both Mirant and its parent in connection with a public offering of some of the parent's stock in Mirant and the dividending of the parent's remaining ownership interest in Mirant to the parent's shareholders. In other words, Troutman represented two related parties vis-à-vis each other in the same transactions. In the case at bar, Hiscock represented Mirant NY in connection with the PSA. Though NY Gen was the subject of the PSA and the resulting sale, it was not a party to the PSA. PSA, p.1 (naming the parties, Mirant NY as Seller and Alliance as Purchaser). Hiscock also represented NY Gen in the Barrett Litigation, but Mirant NY was not itself a party to that suit. Thus, whatever the potential for the Barrett Litigation to affect the sale of the membership interest in NY Gen, Hiscock did not jointly represent Mirant NY and NY Gen in connection with either the PSA or the Barrett Litigation. That the two entities were related and the Barrett Litigation was a subject of concern in negotiating the PSA – and in performing it – does not make the representation a joint one that fits the model of *Mirant /Troutman* and the cases cited therein.

Moreover, the reason the rule respecting the attorney-client privilege is relaxed in joint representation cases is to protect against one client in the representation being disadvantaged for the benefit of another client. *See* MODEL RULES OF PROF'L CONDUCT R. 1.7, cmt. 30 (2008); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(1) (2008); *U.S. ex. rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, No. Civ.-99-3298,

2004 WL 2009413, *4 (N.D. Ill. May 17, 2003). Put another way, if two clients are jointly represented, the privilege may not be used by one to shield communications between it and common counsel in aid of a scheme intended to harm the other.

The case at bar presents no such policy argument. If any party was disadvantaged through concealment of the February 26 ruling, it was Alliance, which, of course, was not Hiscock's client. No harm occurred to NY Gen by reason of any concealment; nor is there a scintilla of evidence before the court that Mirant NY set out to take advantage of or harm or cause Hiscock to harm NY Gen. NY Gen cannot claim that it (as opposed to Alliance) needs access to communications between Hiscock and Mirant NY in order to assert a claim that it (NY Gen) has against Mirant NY. *Cf. Teleglobe Commc'ns Corp. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.)*, 493 F.3d 345, 379 (3d Cir. 2007); *Interfaith Hous. Del., Inc. v. Town of Georgetown*, 841 F. Supp. 1393, 1402 (D. Del. 1994).

On the other hand, during the Hearings the court asked the parties to address in post-hearing briefs whether Hiscock was able to keep from the new management of NY Gen (i.e., management nominated and controlled by Alliance) communications between prior management of NY Gen and its counsel. Based on the submissions by the parties, it is clear there is no disagreement that current management of NY Gen is entitled to receive from Hiscock anything Hiscock would have been required to turnover to NY Gen or substitute counsel for NY Gen in the Barrett Litigation if that substitution had occurred in the absence of a change in ownership and management. *See United States v. Int'l Bd. of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997); *United States v. Richard Roe, Inc. (In re Richard Roe, Inc.)*, 168 F.3d 69, 72 (2d Cir. 1999) (applying the well-recognized rule that

privilege arising out of corporate representation runs to the corporation and not former employees of the corporation).

The evidence is such that the court finds that the Subject Emails were written or received by Nash in his capacity as counsel for NY Gen in the Barrett Litigation.[24] First, his representation in the Barrett Litigation was Nash's only involvement with any Mirant entity.[25] Second, Nash repeatedly testified that he made no distinction between NY Gen and the other Mirant entities.[26] Third, the in-house lawyers to whom he reported concerning the Barrett Litigation, in their capacity as managers of NY Gen, included the same persons involved as authors or recipients of the Subject Emails.[27] Finally, it is clear from the record that the Subject Emails were included in the file that Nash maintained in his representation of NY Gen – and, thus, were held by him as attorney for NY Gen.

On these facts, the court holds that whatever privilege attached to the Subject Emails and other documents in the file maintained by Nash in connection with the Barrett Litigation belonged to and could be asserted or waived by NY Gen. Accordingly, the

---

[24] In its post-Hearings brief, Mirant NY concedes the first of the Subject Emails may not be privileged as to NY Gen, but argues that that was the only one of the emails to which Nash was party. However, it appears Deptula sent all the Subject Emails to Samantha Zappia, Nash's associate working on the Barrett Litigation; Sonnet Edmonds, the in-house lawyer at Mirant who was Nash's contact for the Barrett Litigation, was a party to each of the Subject Emails; and the emails were in Nash's Barrett Litigation file. It defies common sense to suggest that privilege can be claimed after the fact on the basis that Mirant's in-house attorney, Ms. Edmonds, was wearing her NY Gen hat at the time of the first email and then switched roles for the balance of the Subject Emails.

[25] TR p. 167, l. 20 – p. 168, l. 3. To the extent Nash was involved in the Plan and the sale of the membership interest in NY Gen, as noted above, it was only to provide information about the Barrett Litigation. It would be patently ridiculous to conclude that his communications with Mirant NY respecting his representation of NY Gen in the Barrett Litigation could be privileged, as between Mirant NY and its counsel, and so not subject to disclosure to NY Gen.

[26] *See, e.g.,* TR p. 148, ll. 8-17; p. 153, l. 24 – p. 154, l. 2; p. 173, ll. 14-21; p. 176, l. 20 – p. 177, l. 11.

[27] TR p. 129, ll. 3-23; p. 154, ll. 3-10; p. 174, ll. 10-13.

privilege respecting the Subject Emails (and other materials maintained in Nash's file) is assertable or waivable by NY Gen's present – Alliance nominated – management, and retention by Troutman of the Subject Emails is not improper.[28]

For these reasons, the Privilege Motion must be DENIED and the request for production in the Objection must be GRANTED.

**B.     The Enforcement Motion**

Before turning to the issue posed by the Enforcement Motion, it is important to understand what is *not* before the court. First, the court has not been asked to determine whether Alliance has a viable cause of action against Mirant NY based on fraud, fraudulent inducement or some similar theory. Whether the failure to inform Alliance of the February 26 ruling of the NY Court or the March 27 and April 19 letters was a material, actionable omission on the part of Mirant NY or whether, as Mirant NY maintains, Troutman simply failed to perform adequate due diligence and so learn information that was publicly available, is not relevant to construction of the Plan or a determination of Mirant NY's obligations under the PSA in connection with the scope of the Easement.[29] Likewise, the court is not called upon to adjudicate vis-à-vis Woodstone the rights of NY Gen under the Easement.[30]

---

[28]   The court here holds that the privilege as to all material in Nash's file belongs to NY Gen. The court's ruling does not affect Hiscock's ability to keep from NY Gen work-product which, under New York law, it could keep from its client.

[29]   Indeed, at the April 25, 2007 hearing on confirmation of the Plan, Cohen and Prostok specifically reserved the rights of each party to address the responsibilities of Mirant NY and NY Gen's residual estate for problems with the Easement (as opposed to damage claims arising from the Barrett Litigation) at a later date.

[30]   While, under 28 U.S.C. § 1334(e)(1), this court might have been an appropriate (perhaps the only appropriate) forum to adjudicate the nature and extent of the Easement, it is doubtful that the jurisdiction permitting such an adjudication survived confirmation. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388 (5th Cir. 2001); *In re Neptune World Wide Moving, Inc. v. Schneider*

Rather, Alliance argues that Mirant NY agreed in the PSA to ensure that NY Gen's assets were as free and clear of liens, claims, encumbrances and interests as they would have been had Alliance acquired the assets through a sale under 11 U.S.C. § 363. *See* PSA, ¶ 7.09; Plan, § 9.6. Alliance reasons that Mirant NY's obligation under these provisions ran to ensuring that the Easement satisfied the license-related requirements of FERC.

This, however, misperceives the power given a bankruptcy court by 11 U.S.C. § 363. The bankruptcy court's authority under section 363 is limited to cleansing what a debtor owns from the claims, encumbrances and charges of third parties that are (or can be) quantified as claims under 11 U.S.C. § 101(5) or 102(2). Neither section 363 nor any other provision of the Bankruptcy Code gives the bankruptcy court the power to enhance or improve whatever ownership interest was held by the debtor prepetition that became property of the estate. *See In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985) (stating section 541 does not enlarge the debtor's interests beyond those held at the commencement of the case). Likewise, the court cannot convert rights of one who is not a creditor, here Woodstone, into a claim. *See In re M. Fabrikant & Sons, Inc.*, No. 06-12737, 2008 Bankr. LEXIS 986, *21 (Bankr. S.D.N.Y. Apr. 9, 2008) (citing 11 U.S.C. § 101(10)).

Because the PSA, ¶ 7.09, refers to 11 U.S.C. § 363, the terms "lien," "claim," "encumbrance" and "interest" have the same meaning when used in that provision of the PSA as when they are used in the Bankruptcy Code.. "Lien" and "Claim" are specifically

---

*Moving & Storage Co. (In re Neptune World Wide Moving, Inc.)*, 111 B.R. 457 (Bankr. S.D.N.Y. 1990); *In re Aylesbury Inn, Inc.*, 121 B.R. 675 (Bankr. N.D.N.Y. 1990).

defined in the Bankruptcy Code,[31] and in construing these terms, the court must apply the plain meaning rule. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989).

Clearly, whatever Woodstone's assertions regarding its rights respecting the Easement, they do not amount to a "charge against or interest in property *to secure payment of a debt or performance of an obligation*." 11 U.S.C. § 101(37) (emphasis added). Because Woodstone's claims against NY Gen in the Barrett Litigation do not secure a debt or an obligation to perform, Woodstone cannot be asserting a lien.

Although Congress intended the term "claim" to be broadly construed, *see Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1340 (10th Cir. 1996); *United States v. Moriarty*, 8 F.3d 329, 334 (6th Cir. 1993), it was in order to reach contingent or unliquidated claims that would not have been provable under prior law. *See Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 708 (9th Cir. 1986) (citing *Tignor v. Parkinson*, 729 F.2d 977 (4th Cir. 1984)). Regardless of the breadth of the term's definition, in order for something to be a claim, it must involve the assertion of a "right to payment" or a "right to an equitable remedy for breach of performance." Woodstone's claims against NY Gen in the Barrett Litigation assert no right to payment

---

[31] Lien is defined in 11 U.S.C. § 101(37), which states: "The term lien means charge against or interest in property to secure payment of a debt or performance of an obligation."

Claim is defined in 11 U.S.C. § 101(5), which states:

The term "claim" means—
(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(2) extends the definition of "claim" to rights against a debtors property.

and do not seek any performance from NY Gen. Thus, Woodstone is not asserting a "claim" against NY Gen in the Barrett Litigation.

The term "encumbrance" is not defined in the Bankruptcy Code. Black's Law Dictionary, however, defines an encumbrance as "[a] claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest." BLACK'S LAW DICTIONARY 568 (8th ed. 2004). In the Barrett Litigation, Woodstone, in fact, is asserting *its* ownership interest as against a claim by NY Gen that would limit that ownership interest. Further, Woodstone's claims do not attach to NY Gen's property; rather the issue posed in the Barrett Litigation is the extent to which NY Gen's rights – claims – encumber Woodstone's property. Clearly, Woodstone is not asserting an "encumbrance" against NY Gen's property.

The term "interest" is also not defined in the Bankruptcy Code, but it is used in 11 U.S.C. § 363 to mean a third party's interest in property that is to be sold, used or leased. *See, e.g.*, § 363(e), (f) and (h); *UMWA 1992 Benefit Pension Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 580 (4th Cir. 1996) (defining the term "interest" in section 363(f)). As noted above, Woodstone claims no interest in the Easement.[32] Rather, the Easement is a burden on Woodstone's fee, and Woodstone seeks in the Barrett Litigation to determine only the extent of that burden. It is counter-intuitive to suggest that authority to sell property free of interests includes the ability to sell an interest in real property free of the underlying fee holder's ownership rights.

---

[32] It is NY Gen that, by the Easement, claims an interest in Woodstone's property: Black's Law Dictionary defines an easement as "[a]n interest in land owned by another person . . . ." BLACK'S LAW DICTIONARY 548 (8th ed. 2004).

Memorandum Opinion – Page 18

In the case at bar, the Easement, prior to the February 26 ruling by the NY Court, had the same scope and nature it has now, since the February 26 ruling. The Easement means no more and no less today than it did when it passed into NY Gen's estate pursuant to 11 U.S.C. § 541(a). Only that which came into the estate might be sold from the estate.

That the NY Court construed the Easement to be less than NY Gen (and Alliance) hoped or thought it might be changes nothing. The February 26 ruling did not create a claim or right. The rights of Woodstone were already in existence as attributes of its fee ownership in the Property, and those rights limited the Easement from its inception. Woodstone's rights and the limitations on the Easement were not "liens, claims, encumbrances [or] interests." The rights of Woodstone, the limitations on the scope of the Easement, were part of the Easement from the time of its granting.

Indeed, the PSA provides in paragraph 5.07 that the sale of the membership interest is on an "as is, where is" basis. That provision states:

> **5.07 "AS IS" SALE. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER UNDERSTANDS AND AGREES THAT THE MEMBERSHIP INTEREST AND THE COMPANY'S ASSETS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR CONDITION ON THE CLOSING DATE AND THAT PURCHASER IS RELYING ON ITS OWN EXAMINATION OF THE COMPANY AND ITS ASSETS.**

(emphasis as in original). This provision evidences that it was not the intent of the parties to require Mirant NY to convey to Alliance assets it did not have – or assets of a different description or legal character than those that were property of NY Gen's estate.

Because the result of the February 26 ruling of the NY Court was not to change the Easement but rather to define it, because Woodstone, standing in the shoes of the

original grantor of the Easement, is not asserting any sort of claim or charge against an asset of NY Gen, because Alliance acquired NY Gen "warts and all," the PSA and Plan do not by their terms require Mirant NY to cure the problem the February 26 ruling has created for NY Gen.

Thus, the Enforcement Motion must be DENIED.

### IV. Conclusion

For the reasons stated above, the court holds that the Motions must be, and they hereby are, DENIED; the production request in the Objection is GRANTED.

It is so ORDERED.

### # # # END OF MEMORANDUM OPINION # # #